```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )     Case No. 3:22-CR-00094-DJH
 4                                  )
              Plaintiff,            )
 5                                  )
     v.                             )
 6                                  )
     SUZANNE CRAFT,                 )
 7                                  )     March 8, 2023
              Defendant.            )     Louisville, Kentucky
 8

 9                            *  *  *  *  *

10      TRANSCRIPT OF TESTIMONY OF JEREMY FLETCHER AT JURY TRIAL
                   BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                            *  *  *  *  *

13   APPEARANCES:

14   For United States:      Christopher C. Tieke
                             Stephanie M. Zimdahl
15                           U.S. Attorney's Office
                             717 West Broadway
16                           Louisville, KY 40202

17   For Defendant:          Angela M. Rea
                             Western Kentucky Federal
18                               Community Defender, Inc.
                             629 S. 4th Avenue, Suite 200
19                           Louisville, KY 40202

20   [Defendant present.]

21

22                      Dena Legg, RDR, CRR, CCR-KY
                           Official Court Reporter
23                        232 U.S. Courthouse
                          Louisville, KY 40202
24                           (502) 625-3778

25   Proceedings recorded by certified stenographer, transcript
     produced by computer.
```

Fletcher - Direct

```
1         (Begin proceedings in open court at 3:51 p.m.  Jury in.)

2         (JEREMY FLETCHER, called by the Government, sworn.)

3                         DIRECT EXAMINATION

4    BY MR. TIEKE:

5    Q.   Good afternoon, sir.

6    A.   Good afternoon.

7    Q.   Please state your name for the jury.

8    A.   My name is Jeremy Fletcher.

9    Q.   And, Mr. Fletcher, where are you employed?

10   A.   I work for the DNA Casework Unit of the FBI laboratory

11   located in Quantico, Virginia.

12   Q.   And what is your title?

13   A.   I'm a forensic DNA examiner.

14   Q.   And you mentioned this, but what's the particular unit

15   you're assigned to?

16   A.   The DNA Casework Unit.

17   Q.   And how long have you been employed in DNA work?

18   A.   I've been working for the FBI for 18 years, all within the

19   DNA Casework Unit.

20   Q.   What are your official duties as a forensic examiner in the

21   DNA Casework Unit?

22   A.   As a forensic examiner, my job starts when the evidence is

23   received into our unit.  I evaluate the case and determine what

24   items of evidence need to be tested and what tests need to be

25   performed on those items.
```

Fletcher - Direct

1     I then direct a team of biologists to perform those

2  examinations and provide me with the results.  I interpret those

3  results, make comparisons, and write up my conclusions in a

4  report of examination.  I then testify to that report, if

5  needed.

6  Q.  Sir, what is your -- what's your educational background?

7  A.  I attended the University of Central Florida in Orlando,

8  Florida, where I obtained two bachelor's of science degrees as

9  well as a master's of science.  My bachelor's of science are in

10  molecular and microbiology with a second in forensic science.

11  My master's of science is in industrial chemistry with my thesis

12  work being in forensic DNA testing.

13  Q.  What training and experience do you have in the area of DNA

14  analysis?

15  A.  Before being qualified as a forensic examiner at the FBI, I

16  completed a year and a half long training program that required

17  me to pass multiple moot court and oral board examinations and

18  ultimately culminated in me completing a competency test, and

19  this tested all the knowledge, skills, and abilities required of

20  a forensic DNA examiner.

21  Q.  Are you a member of any professional organizations?

22  A.  No, I'm not.

23  Q.  Okay.  Have you ever lectured on DNA analysis methods?

24  A.  Yes, I've had the privilege to lecture at local universities

25  in the Virginia area as well as to FBI agents and other FBI

Fletcher - Direct

1    laboratory personnel in evidence handling techniques and DNA

2    testing procedures.

3    Q.  Have you testified as an expert witness before today in

4    federal or state court?

5    A.  Yes, I've testified 31 times previously in forensic DNA

6    testing.

7    Q.  Now I'd like to talk about DNA.  What is DNA?

8    A.  DNA stands for deoxyribonucleic acid, and it's the genetic

9    information that makes us who we are.  It makes us human.  It

10   gives us two arms, two legs, makes sure we don't grow a tail.

11   It also makes us unique.  It makes us tall or short, brown hair

12   or blue eyes.  All of that information is encoded in our DNA.

13   Q.  Where is DNA found in the human body?

14   A.  DNA is found in virtually every cell of the body, and what's

15   great forensically is it's all the same.  So the DNA in your

16   blood is the same as the DNA in your saliva, the same as the DNA

17   in your skin cells.  So forensically I can take DNA left behind

18   at a crime scene on a blood stain and compare it to DNA that's

19   collected by swabbing someone's inside cheek and determining

20   could those two DNA profiles have been left by the same person.

21   Q.  So is DNA unique to an individual?

22   A.  Yes.  Because half of your DNA comes from your mother and

23   half comes from your father.  With the exception of identical

24   twins, no two people have the same DNA.

25   Q.  What type of differences do you look at in DNA?

Fletcher - Direct

1    A.   Forensically I'm interested in what are called short tandem

2    repeats or STRs, and these are just small sections of your DNA

3    that repeat one after another for no known reason.  Some people

4    have 10 repeats, some people have 12 repeats, some people have

5    15 repeats.  And it's the number of repeats a person has at 21

6    different locations in your DNA that I use to develop a forensic

7    DNA profile.

8    Q.   You mentioned earlier that DNA is in all of the cells.  Can

9    you just please explain what is commonly known as touch DNA?

10   A.   Sure.  Touch DNA is the analysis of DNA that may be left

11   behind by touching or handling an item.  So if I were to touch

12   this bench, for instance, I might, like, leave my skin cells

13   behind through that touching.  So touch DNA is just the analysis

14   of DNA that someone may have left behind just by touching or

15   handling an item.

16   Q.   And what is, like, body fluid DNA?

17   A.   Another good source of DNA is bodily fluids.  So blood,

18   semen, saliva, they're very rich in DNA and contain a lot of

19   DNA.  So forensically I can obtain DNA profiles either from a

20   body fluid or from someone touching an item and collecting any

21   skin cells that may have been left behind.

22   Q.   What's the process that you use for DNA analysis?

23   A.   DNA testing is done in five steps.  The first is collection.

24   This is where we collect the cells that contain the DNA.  That

25   can be either by cutting a blood stain off of a shirt or

6

1   swabbing of an area that someone may have touched or handled.

2   And swabbing is just taking a sterile Q-tip that we add water to

3   and just rub it across the surface of that item.

4       The second step is extraction.  We take that DNA.  We add

5   chemicals, use an instrument, and it breaks open the cells and

6   leaves us with nothing but the DNA.

7       The third step is quantitation.  It's just determining how

8   much DNA we recovered.

9       And the fourth step is amplification.  We use special

10  chemicals, a special instrument that makes millions and millions

11  of copies of those short tandem repeats I talked about earlier.

12      The last step is separation.  We use a special instrument

13  that separates those short tandem repeats so I as the forensic

14  examiner can determine, are there 12 repeats?  Are there 13

15  repeats?  Are there 14 repeats?

16      Those five steps for DNA processing are done on every sample

17  that we handle and we test for DNA.

18  Q.  Is this process the same both for the touch DNA and the body

19  fluid DNA that you talked about earlier?

20  A.  Yes.  No matter what the DNA sample is, it goes through the

21  same five steps every single time.

22  Q.  And what is the process for determining whether or not an

23  item has comparable DNA on it?

24  A.  So we do those five steps of the DNA process, and on the

25  back end, I as the examiner interpret that profile.  If there

Fletcher - Direct

1    are any short tandem repeats detected, then we can compare that

2    DNA profile to a DNA profile from a reference sample.  And a

3    reference sample is a swabbing of the inside cheek taken

4    directly from an individual.

5    Q.  And when you compare the DNA profiles, what are the possible

6    outcomes?

7    A.  So when I do a DNA comparison, there are two possible

8    outcomes.  The first is the DNA on the evidence and the DNA from

9    the reference sample are different.  So the person who provided

10   the DNA from the reference sample -- that swabbing of the inside

11   cheek -- and whoever provided the DNA in the evidence could not

12   be the same person.  That's an exclusion.  So that's the first

13   outcome.

14       The other option is an inclusion.  That's where the DNA on

15   the evidence and the DNA in the reference sample are the same or

16   similar.  So whoever provided the reference sample could have

17   contributed to the DNA on the evidence.  Whenever I have an

18   inclusion, I will also have to provide statistics that provide

19   weight to that inclusion.

20   Q.  Are there many, many factors that can affect the quantity or

21   the presence of DNA detected on an item of evidence both in

22   terms of touch DNA and fluid DNA?

23   A.  Sure.  To determine whether or not I can recover DNA, a lot

24   of factors go into it.  The first is how much DNA is actually

25   deposited on the item.  So if a body fluid is provided, those

Fletcher - Direct

1    are rich in DNA.  They have lots of DNA.

2        Or did someone touch an item?  Touching an item, generally

3    speaking, provides less DNA, but how much was that touched or

4    handled?  If I just touch an item, that could provide a little

5    bit of DNA, but if I really manipulated it or really touched it

6    or really handled it, that could leave behind more DNA.  The

7    first step is how much DNA was left behind.

8        The second factor, or things that go into it, is what

9    happens between me spitting, bleeding, touching this item and

10   when it's collected by the police or the crime lab?  Did someone

11   come behind and clean the surface up?  Was it left out in the

12   sun or the heat or the rain?  All of those would wash away or

13   remove the DNA.

14       So there's a lot of factors that go into determining whether

15   or not I as the forensic examiner can recover any DNA left on an

16   item or substance.

17   Q.  So can the amount of times an individual handles an item

18   impact whether or not that item has comparable DNA?

19   A.  Sure.  Like I said before, the more you manipulate, the more

20   you touch, the more you handle gives you more opportunities to

21   leave your skin cells behind on that item.

22       Just touching an item once, yeah, it could provide some DNA,

23   some skin cells; but if you really touch it, really handle it,

24   really move it, then there's a chance of leaving more DNA

25   behind, which makes it easier for me to detect when we do our

Fletcher - Direct

1    testing.

2    Q.  Similarly, can the amount of body fluid that might be on an

3    item affect that -- the presence of DNA as well, comparable DNA,

4    I should say?

5    A.  Yes.  Body fluids are rich in DNA.  So we only need, really,

6    like a drop of blood or semen or saliva because there are so

7    many cells present.  But just like touching, the more DNA you

8    start with, the more likely it is that I'm going to be able to

9    detect it on the back end.  So the more blood, more semen, more

10   saliva on an item, the easier it'll be for us in the laboratory

11   to detect and develop a DNA profile from that sample.

12   Q.  And when we're looking at that touch DNA, can the amount of

13   skin surface, for example, whether you handled something with

14   your palm or fingerprints, can that impact whether or not

15   there's comparable touch DNA on an item?

16   A.  Yes.  Generally speaking, the more you handle it, the more

17   you touch it -- touching it with a fingerprint or fingertip

18   versus the whole hand, there's just more surface and more

19   availability for me to leave my DNA behind on that item.

20   Generally speaking, the more I handle it, the more I manipulate

21   it, whether it's with my finger, the whole hand, the more

22   contact, the more likely that you'll leave behind DNA, generally

23   speaking.

24   Q.  And along that vein, similarly, generally speaking, can the

25   friction involved with an item impact whether or not there's

Fletcher - Direct

1   comparable DNA on it?

2   A.   Yes.  So like I said, the difference between me touching

3   versus me rubbing the surface -- rubbing and manipulating

4   generally will leave behind more DNA.

5       What about the surface that I'm touching?  This is a smooth

6   bench.  You know, I'm still likely to leave behind DNA, but what

7   if this were a brick?  Imagine me rubbing my hand across that.

8   I'm gonna leave behind a lot more DNA because there's all these

9   nicks -- nooks and crannies and things in the brick.  In fact,

10  if I did that to a brick, it's likely my fingers are going to

11  start bleeding because I'm going to leave behind so much of my

12  skin cells.

13      The surface, the contact, all of those play into how much

14  DNA is left behind, and it's generally common sense.  The more

15  you touch, the more you handle, the more friction, the better

16  the surface is to have those nooks and crannies to kind of hold

17  the skin cells and collect the DNA, the more DNA will be left

18  behind on that item.

19  Q.   Does the fact that there might be something in between an

20  individual's hand and the surface, such as a rubber glove or

21  something like that, would that affect whether or not there's

22  any comparable DNA on an item?

23  A.   Sure, that would have a big impact.  So if I'm touching an

24  item -- my DNA that's left behind is from my skin cells being

25  deposited onto this workbench.  Well, if I'm wearing gloves,

Fletcher - Direct

1    well, there's no contact between the bench and my skin any

2    longer.  So that provides a deterrent for me leaving behind my

3    DNA.  So wearing gloves would inhibit or make it harder for me

4    to detect my DNA on those items or on those surfaces because

5    it's less likely that I would leave that DNA behind because of

6    the gloves.

7    Q.  Also, does the fact -- with respect to body fluid DNA, does

8    the fact that a person may or may not have licked an item, such

9    as an envelope or a seal on an envelope, does that impact

10   whether or not there's comparable DNA present?

11   A.  It does.  So when we analyze envelopes in the laboratory, we

12   look for envelopes that are moisture activated.  It means you

13   have to provide moisture, whether through licking or wetting it

14   with a sponge, some way that moisture activates the glue.

15       If a person were to lick the envelope, then they're adding

16   their saliva, their skin cells to the envelope.  If they were to

17   use a wet sponge and activate the glue, well, it's less likely

18   they'll leave behind their DNA.  So licking and leaving saliva

19   behind on an envelope would be a better source of DNA for me as

20   a forensic examiner than using a sponge or something like that

21   to activate that envelope.

22   Q.  Let's turn now kind of to the surfaces DNA are left on.  You

23   explained this a little bit earlier, but does the object being

24   handled impact whether or not there's DNA on an item?

25   A.  Yeah.  It's what I talked about before, whether it's smooth

Fletcher - Direct

1    or rough or textured.  Textured items are better for leaving

2    behind DNA because those nooks and crannies and those crevices

3    on the textures are good places for skin cells to be left behind

4    and get caught in.  So those things are better surfaces for me

5    to recover DNA from.  So the surface does play into whether or

6    not I'm able to recover DNA or recover more DNA off an item.

7    Q.  Can you explain what persistence is?

8    A.  Persistence is just how long the DNA lasts after it's left

9    behind.  So like I was describing before, I touch this bench,

10   how long will my DNA be left on this bench?  And persistence has

11   a lot of factors that we talked about, whether or not it rains

12   on this bench or whether or not there's sun hitting this bench

13   or someone cleans this bench.  It's just how long can the DNA

14   last?

15       If DNA is left in a cold, dark, dry place, it can last for a

16   long time, tens and tens of years, but if it's cleaned or wiped

17   or left out in the sun or moisture, all of those things can

18   break down the DNA or remove the DNA.  So it makes it harder for

19   me to detect it down the road.

20   Q.  So is it possible to handle or to come into contact with an

21   item and not leave any comparable DNA on that item?

22   A.  Yes, it is.  Like we talked about, the factors -- how much

23   it's handled, what the surface is that you're handling, whether

24   or not you're wearing gloves, all of those things are factors

25   that lead to determining whether DNA will be left behind and

Fletcher - Direct

1   whether I can recover it when I'm doing my testing.

2   Q.   Thank you, Mr. Fletcher.

3        Let's shift to what you did in this case.  Were you asked to

4   perform DNA analysis of the mailings and items at issue in this

5   case?

6   A.   Yes, I was.

7   Q.   And how many items did you analyze in order to determine

8   whether or not there was comparable DNA on that item?

9   A.   In total in the DNA Casework Unit, we received and looked at

10  22 items of evidence, 22 envelopes or portions of envelopes, one

11  portion of a glove, and one reference sample for Ms. Craft.

12  Q.   And what were the -- what were the majority of these items

13  that you tested?

14  A.   So the majority of the items were envelopes or a portion of

15  envelopes.  Those were 20 of the 22 items we looked at in the

16  DNA Casework Unit.

17  Q.   And from all of the items, how did you go about collecting

18  any detectable DNA from the items that were submitted to you in

19  this case?

20  A.   So the first thing that we do is do a visual examination,

21  look to see is there a good place for us to test?  So of those

22  20 envelopes, three of those we didn't do any testing on.  I

23  determined that there was nothing really there to test.

24       So for envelopes, we're looking for the flap where someone

25  may have licked to leave their saliva behind.  Two of the

1    envelopes or portions of envelope had no flap.  So there was no

2    real place to look for the DNA.

3        One, where the flap was, there was writing or letters glued

4    across the flap.  So I didn't do any testing.  I didn't want to

5    obliterate or damage the message to look underneath the flap.

6    So three of the envelopes we didn't even do any DNA testing on.

7        The other 17 envelopes, we all tested for DNA.  And the way

8    we tested that is by swabbing -- so we took a sterile Q-tip,

9    added water, and swabbed where someone would have licked the

10   envelope and where the envelope -- that licked envelope would

11   have touched the other side.  So those two surfaces, the flap

12   itself where the glue is and then where that pressed on the

13   envelope, we would swab that to collect any skin cells or saliva

14   cells that may have been left behind when activating the glue on

15   those envelopes.

16   Q.  And so of those items you tested, where did you find

17   detectable DNA?

18   A.  So the 17 envelopes that we tested, 16 of them resulted in

19   no DNA suitable for comparisons.  So we did not recover any DNA

20   or those short tandem repeats I talked about.  So 16 of them,

21   there was nothing to compare to.  One of them resulted in a DNA

22   profile that was suitable for comparison.

23   Q.  Did you find detectable DNA on any of the other items that

24   you tested or that you looked at, I should say?

25   A.  The other two items that we looked at were the portion of a

Fletcher - Direct

1    glove.  So what we did was we took another sterile swab and

2    swabbed portions of the glove that may have come in contact with

3    the skin.  So we tested that.  That resulted in comparable DNA

4    being obtained.  And then the reference sample for Ms. Craft,

5    that resulted in a DNA profile that was suitable for comparison.

6    Q.  So by my count, were there approximately 18 items that

7    had -- 18 of all of the items that you tested, envelopes,

8    gloves, how many had detectable DNA on them?

9    A.  So of the 18 items that we processed for DNA, only three of

10   them obtained -- were DNA profiles obtained.  One was the

11   reference sample for Ms. Craft and then two questioned items,

12   one envelope and one portion of the glove.  So those were the

13   places where we were able to recover comparable DNA.

14   Q.  And just to -- I just want to clear something up.  The

15   reference sample, that's -- is that the sample that you're

16   testing against what you find on these items?

17   A.  Yes.  So I have two evidence samples:  the DNA sample that

18   was recovered off one of the envelopes and the DNA profile that

19   we recovered off the glove.  Those are the two evidence samples

20   or questioned items.  And then I had the reference sample for

21   Ms. Craft.  So those are the three DNA profiles that we obtained

22   in this case.

23   Q.  So from all of the items that you tested to see whether

24   there were detectable DNA, did you only find comparable DNA on

25   two items?

Fletcher - Direct

1    A.   Yes.   The only two questioned items that we got DNA from

2    were one of the envelopes that we tested and the portion of

3    gloves that was in one of the envelopes.

4    Q.   So of all of those things that you tested to see -- all of

5    the things you received and tested to see whether it was

6    comparable DNA, to compare against the sample for the defendant,

7    did you only have two items to test against?

8    A.   Yes.   I had two items to test against.   The other 16

9    envelopes or portions of envelopes resulted in no DNA that was

10   suitable for comparison.   I basically got none of those short

11   tandem repeats that I could compare to.

12   Q.   And so when you did compare those two samples of all of the

13   stuff that you received, the glove and then one envelope, to the

14   sample from Ms. Craft, what were the results?

15   A.   So for the envelope, we obtained DNA from a single female

16   individual.   And when comparing that DNA profile to Ms. Craft,

17   she was excluded as a possible contributor.   So she could not

18   have been the contributor to the DNA profile off of that one

19   envelope that gave us results.

20       For the portion of the glove, we got female DNA from a

21   mixture of three individuals.   And when comparing to Ms. Craft,

22   she was excluded as a possible contributor to the DNA off of the

23   portion of glove.

24   Q.   And as we talked about earlier, does exclusion mean that a

25   person never handled an item or came into contact with that

Fletcher - Cross

1  item?

2  A.  No.  It just means that the DNA that we recovered and I was

3  able to detect, they're excluded as being a contributor to that

4  DNA.  So it doesn't mean they never handled or touched or

5  manipulated an item.  It just means the DNA that was left

6  behind, they're excluded from being a contributor to that DNA.

7  Q.  For example, if a person sealed an envelope with water

8  instead of licking it, as you discussed earlier, would there be

9  any DNA?

10  A.  It'd be a lot less likely to recover any DNA because there

11  would be no transfer of the saliva onto the envelope.  It would

12  be a lot less likely to recover anything.

13  Q.  Or with respect to the touch DNA we discussed earlier, if a

14  person wore gloves while handling an item, would there be any

15  DNA to compare against?

16  A.  That would make it a lot less likely that we'd recover any

17  DNA from an individual wearing gloves when they handled or

18  manipulated an item.

19        MR. TIEKE:  Thank you, Your Honor.  No further

20  questions for this witness.

21        THE COURT:  Ms. Rea.

22        MS. REA:  Thank you.

23                  CROSS-EXAMINATION

24  BY MS. REA:

25  Q.  Good afternoon.

Fletcher - Cross

1    A.   Good afternoon.

2    Q.   I just have a few questions just to make sure I'm clear on

3    things.  Of the 22 items you received, you've talked about DNA

4    profiles from three of those; right?

5    A.   Yes.

6    Q.   And one of those was what you called a reference sample.

7    A.   That is correct.  That was a buccal sample submitted from

8    Ms. Craft.

9    Q.   And so that's a known reference; right?

10   A.   Yes.  We know the source of that as being a swabbing of the

11   inside of her cheek.

12   Q.   Okay.  The other items that you've talked about, one was the

13   swabbing from the wrist area of the gloves; right?

14   A.   That is correct.

15   Q.   And Ms. Craft was excluded as a contributor to that DNA

16   mixture?

17   A.   Yes, she was.

18   Q.   And that DNA mixture did include female DNA?

19   A.   Yes.  We identified female DNA, and it was interpreted as

20   being from a mixture of three individuals, and Ms. Craft was

21   excluded as a possible contributor to that DNA mixture.

22   Q.   And the only other item that generated a profile was a flap

23   and, I think, corresponding area of an envelope.  So the place

24   where the flap and the envelope would come together; right?

25   A.   That is correct.

1   Q.  That was a -- in that instance, it's a single DNA profile;

2   right?

3   A.  Yes.

4   Q.  All --

5   A.  We got female DNA from a single individual.

6   Q.  Also female?

7   A.  Yes.

8   Q.  And Ms. Craft is excluded?

9   A.  That is correct.

10  Q.  And just so the jury knows what item we're talking about --

11  and if you need to take a look at your report, I can get it to

12  you -- that was the item that had -- among other words, it had

13  "We hate your kind" on it.

14  A.  Yes, that is correct.

15  Q.  Okay.  And when you received the items for testing, you only

16  received one reference sample; correct?

17  A.  Yes.  The only reference sample that was sent in to compare

18  for this case was that for Ms. Craft.

19        MS. REA:  Okay.  I don't have any other questions.

20  Thank you.

21        THE COURT:  Any redirect?

22        MR. TIEKE:  Just one question, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MR. TIEKE:

25  Q.  You talked about exclusion.  And, again, does exclusion mean

Fletcher - Redirect

1  that a person never handled an item or came into contact with

2  it?

3  A.   No.   It just means the DNA recovered off the item, that

4  person is excluded as possibly contributing that DNA.   It

5  doesn't mean they didn't handle or touch an item.   It just means

6  the DNA that was recovered, they're excluded as being a

7  contributor to that DNA.

8          MR. TIEKE:   Thank you, sir.

9          MS. REA:   Nothing, Your Honor.

10          THE COURT:   May the witness be excused?

11          MR. TIEKE:   Yes, Your Honor.   Thank you.

12          THE COURT:   Thank you.   You may step down.

13          THE WITNESS:   Thank you, sir.

14      (Testimony concluded at 4:18 p.m.)

15                C E R T I F I C A T E

16      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

17  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19

20  _____s/Dena Legg_____          May 16, 2023
    Certified Court Reporter No. 20042A157      Date
    Official Court Reporter

21

22

23

24

25

```
 1                            INDEX

 2   GOVERNMENT WITNESS:

 3   JEREMY FLETCHER
          Direct Examination By Mr. Tieke              2
 4        Cross-Examination By Ms. Rea                 17
          Redirect Examination By Mr. Tieke            19
 5

 6                           EXHIBITS

 7   GOVERNMENT:
 8   No exhibits

 9
     DEFENDANT:
10   No exhibits

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```