```
1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF KENTUCKY
2                   LOUISVILLE DIVISION

3
    UNITED STATES OF AMERICA,    )    Case No. 3:22-CR-00094-DJH
4                                )
            Plaintiff,           )
5                                )
    v.                           )
6                                )
    SUZANNE CRAFT,               )
7                                )    March 8, 2023
            Defendant.           )    Louisville, Kentucky
8

9                         * * * * *

10    TRANSCRIPT OF TESTIMONY OF ICEL KUZNETSOVA AT JURY TRIAL
                 BEFORE HONORABLE DAVID J. HALE
11                UNITED STATES DISTRICT JUDGE

12                        * * * * *

13   APPEARANCES:

14   For United States:     Christopher C. Tieke
                            Stephanie M. Zimdahl
15                          U.S. Attorney's Office
                            717 West Broadway
16                          Louisville, KY 40202

17   For Defendant:         Angela M. Rea
                            Western Kentucky Federal
18                             Community Defender, Inc.
                            629 S. 4th Avenue, Suite 200
19                          Louisville, KY 40202

20   [Defendant present.]

21

22                    Dena Legg, RDR, CRR, CCR-KY
                       Official Court Reporter
23                     232 U.S. Courthouse
                       Louisville, KY 40202
24                        (502) 625-3778

25   Proceedings recorded by certified stenographer, transcript
     produced by computer.
```

Kuznetsova - Direct

1          (Begin proceedings in open court at 2:29 p.m.  Jury in.)

2          (ICEL KUZNETSOVA, called by the Government, sworn.)

3                        DIRECT EXAMINATION

4     BY MR. TIEKE:

5     Q.   Good afternoon, ma'am.

6     A.   Good afternoon.

7     Q.   Could you please state your name for the jury.

8     A.   My name is Icel Kuznetsova.  My first name is spelled

9     I-C-E-L.  My last name is spelled K-U-Z-N-E-T-S-O-V-A.

10    Q.   Thank you.  And where are you employed?

11    A.   I work for the Federal Bureau of Investigation at the

12    Laboratory Division.

13    Q.   And you're a forensic examiner?

14    A.   Yes.  My official title is forensic examiner/physical

15    scientist.

16    Q.   Okay.  And are you assigned to any particular unit?

17    A.   I'm assigned to the Latent Print Operations Unit.

18    Q.   And is that, like, fingerprint analysis, things like that?

19    A.   Yes.  I look at evidence for the detection and comparisons

20    for latent prints as well as known prints.

21    Q.   And how long have you been employed in that area?

22    A.   I've been with the Latent Print Operations Unit since

23    December of 2012, but prior to that I did do known print or

24    tenprint comparisons with the Criminal Justice Information

25    Services Division, which is also part of the FBI, and I did that

Kuznetsova - Direct

1    for approximately a year before that.

2    Q.  And just typically, what are your official duties as an

3    examiner?

4    A.  I regularly receive inventory and examine items of evidence

5    for the potential detection of latent prints.  I will process

6    these items to try and develop latent prints.

7        If latent prints are developed, I will then analyze,

8    compare, and evaluate these prints, comparing them potentially

9    to other latent prints, known prints, or launch them in our

10   automated database system.  I write reports based on my

11   conclusions and will testify, if called to do so.

12   Q.  And does -- that area, is that what you spend the majority

13   of your time doing?

14   A.  Yes.

15   Q.  What is your educational background?

16   A.  I have a bachelor's of science in biochemistry from Shepherd

17   University located in Shepherdstown, West Virginia.  I also have

18   a master's of science, forensic science, in forensic biology,

19   from Stevenson University located in Stevenson and Owings Mills,

20   Maryland.

21   Q.  And what training and experience do you have in the area of

22   friction ridge skin?

23   A.  When I was first employed with the FBI, I was part of that

24   CJIS Division, the Criminal Justice Information Services

25   Division.  With this division, I completed an approximate five-

1    month training program in order to evaluate, analyze, compare,

2    as well as filing and retrieval of known tenprint cards as well

3    as palm print recordings.  These known tenprint cards are

4    something most people are familiar with when they go through

5    things like background checks or employment opportunities or

6    military service where they're recording the friction ridge skin

7    from the end joints of the finger.

8        I did that work for a little over a year, and then I joined

9    the Latent Print Operations Unit, which is at the Laboratory

10   Division for the FBI.  With the Latent Print Operations Unit, I

11   completed an approximate 18-month training program which

12   composed of lectures and tests as well as presentations, moot

13   courts, oral boards, as well as comparison skills tests and,

14   finally, a comprehensive test at the end to encompass the

15   entirety of training.  Also during that training, I did two

16   six-month internship type mentorship opportunities with

17   qualified examiners where I conducted casework under their

18   guidance.

19   Q.  As part of that training, did you learn how to examine items

20   of evidence?

21   A.  Yes.  Some of the lectures that I attended, as well as

22   practicals that I had to perform, constituted things such as the

23   actual processing of items of evidence and the sequence in which

24   we do that.

25   Q.  Are you a member of any professional organizations?

Kuznetsova - Direct

1    A.   No, I am not.

2    Q.   Are you certified by any independent organization?

3    A.   No.  I am qualified as a forensic examiner with the FBI.

4    Q.   Is the FBI lab that you work at, is it accredited?

5    A.   Yes, it is.

6    Q.   Have you testified as an expert witness before today in

7    federal or state court?

8    A.   Yes, I have.

9    Q.   Approximately how many times?

10   A.   I think I've testified five times before.

11   Q.   Okay.  Now I'd like to talk about the fingerprint analysis

12   process.  Can you just please tell the jury, what is friction

13   ridge skin?

14   A.   Friction ridge skin is a type of specialized skin found on

15   the entire palm or surface of the hand as well as the entire

16   sole of the foot.  It's composed of raised portions, which are

17   those friction ridges, and the spaces or valleys in between,

18   which are known as furrows.

19   Q.   Could you just explain to them -- you mentioned this in your

20   background, but what is a known fingerprint?

21   A.   A known fingerprint typically refers to the friction ridge

22   skin arrangement from the end joint of the finger.  That

23   tenprint card or that known recording is typically where we see

24   these friction ridge arrangements.

25       A known print on that tenprint card is taken in a controlled

1    manner, typically in one of two methods:  either the ink method

2    or a digital method.  In the ink method, a thin layer of black

3    printer's ink is laid out, and the finger is rolled nail bed to

4    nail bed in that black printer's ink and then, again, nail bed

5    to nail bed on that contrasting background or that tenprint

6    card.  The digital method is done in much the same way, but it's

7    performed on a digital, flatbed scanner.

8    Q.  And so could you just contrast that for the jury for -- with

9    a latent fingerprint.  What is a latent print?

10   A.  A latent fingerprint is a chance or unintentional recording

11   of the friction ridge skin, fingerprint being the end joint of

12   the finger.

13       Throughout the day our hands can be become coated with

14   substances such as oil, grease, sweat, food substances, makeup,

15   or lotion.  As we come into contact with various items, such as

16   water bottles or other surfaces, we could transfer those

17   substances from our fingerprints to the actual item that we're

18   coming in contact with.  This could leave behind an impression

19   of that friction ridge.  Latent prints are typically fragmentary

20   in nature and require some sort of forensic aid in order to

21   become visualized, such as a chemical or a powder.

22   Q.  What are the basic factors in the use of fingerprints as

23   kind of a means of identification?

24   A.  There are two basic factors that allow fingerprints to be

25   used as a means of identification, and these are uniqueness and

1    persistency.

2        Uniqueness means that from person to person and finger to

3    finger, those friction ridge arrangements on the friction ridge

4    skin are unique and different.  Even identical twins have

5    different friction ridge skin arrangements.

6        Persistency goes with -- the friction ridge skin is in its

7    final arrangement during gestation prior to birth and will

8    remain in that final arrangement until after death, when

9    decomposition occurs, barring any sort of permanent scarring or

10   disease that may take place.

11   Q.  And so when you -- what's the process that you use for

12   fingerprint comparison?

13   A.  In terms of fingerprint comparison, we use a series of steps

14   known as the ACE series of steps.  This is an acronym that

15   stands for analysis, comparison, and evaluation.

16   Q.  Could you just explain each of those processes.  What's

17   analysis?

18   A.  Analysis is the information gathering phase.  This is where

19   I'm going to be looking at the latent print or known print in

20   question.  I'll be looking at the overall quality and quantity

21   of information that I can see.  I'll also be looking at other

22   factors that could influence the quality and quantity of what

23   I'm looking at.

24       I'll be looking at -- if environmental conditions may have

25   played a role in that overall clarity of that print.  I'll be

Kuznetsova - Direct

1    looking at the development method that I used to try and develop

2    this print.  So did I use a chemical or a powder or forensic

3    light source?  I'll also be looking at any obvious signs of

4    distortion.  So were there movements, slippage, twisting or

5    turning that may have occurred during contact with this

6    particular item?

7        I'm also going to be looking at three different levels of

8    detail, and they're known as level one, level two, and level

9    three.  Level one detail is the overall ridge flow of that

10   specific print.  There are three basic pattern types that may

11   occur on the end joint of the finger, and they can also occur

12   throughout the palm and sole of the foot as well.

13       The arched-type pattern is where ridges will enter upon one

14   side, make a rise or a wave in the center, and then exit upon

15   the opposite side from which they entered.  The loop-type

16   pattern is where ridges enter upon one side, recurve, and exit

17   the same side from which they entered, and then a whorl-type

18   pattern where ridges will form a concentric circle resembling a

19   target.

20       This overall ridge flow is also going to be taken into

21   consideration for orientation.  When I compare prints, I will

22   orient them as to how they would appear on that tenprint card or

23   palm print recording card.  So tip up is the fashion that I'll

24   be looking to orient those prints.

25       I'll also be looking for focal points.  There are two

Kuznetsova - Direct

1    different main focal points that I'll look for, the first being

2    a delta, which is where ridges are flowing in three separate

3    directions resembling a triangle.  A loop-type pattern will have

4    one delta, and a whorl-type pattern will have at least two.

5        I'm also going to perform -- trying to find something known

6    as the core, which is the approximate center of that pattern

7    type.  So when looking at the whorl-type pattern where those

8    ridges are forming circles, I'll be looking for the center of

9    those circles.

10        I can then perform what's known as a ridge count, which is

11   the count of how many ridges there are between the core or

12   approximate center of that print, and one of the deltas, which

13   is where those ridges are flowing in those three separate

14   directions.  This can offer some information about orientation

15   as well as size of the overall pattern.

16        In addition to that, I'm also going to be looking at what

17   sort of anatomical source this print came from.  So is it from,

18   in fact, the end joint of a finger, the lower joint of the

19   fingers, somewhere else in the palm, or somewhere on the foot?

20   That's level one information.

21        Level two information is what most people might be familiar

22   with when talking about fingerprints and analysis and

23   comparison.  This is those individual ridge events, ridge

24   characteristics, points, minutiae, details that you might see.

25   These are three different types of ridge events or ridge

Kuznetsova - Direct

1    characteristics that I'll be looking for:  an ending ridge where

2    ridge flows and abruptly stops in space, a dividing ridge where

3    a ridge flows and then splits into two resembling a fork in a

4    road, or a dot where ridges are as wide as is it long resembling

5    a period at the end of a sentence.

6        During analysis, I'm going to be marking up these different

7    characteristics to determine the overall quantity of what they

8    are, what types there are, their general location within the

9    print, and their direction.

10       Each of these different characteristics offers more than one

11   single piece of information because I'm not just counting

12   points.  I'm looking at their type, direction, location, and

13   spatial relationship to the surrounding points within that

14   print.

15       Level three information is much more minute.  This is where

16   I'm looking at the individual ridge itself and the angles at

17   which it presents itself.  I'll be looking at the actual shape

18   of that ridge.  A ridge isn't a singular format thickness

19   throughout.  Some parts are thinner.  Some parts are thicker.

20   Sometimes it has more boldness or rounded edges than others.  So

21   I'm going to be looking at those different ridge shapes.

22       The angles I'm also going to be looking at are how those

23   dividing ridges are splitting.  Sometimes they're much closer

24   together.  Sometimes they're much wider.  So I'm going to be

25   taking those angles into consideration as well.

Kuznetsova - Direct

1     I'll also be looking for pore locations.  Pores are openings

2     on the ridge that -- where sweat can be released.  Some pores

3     are more towards one side than the other.  Sometimes they're

4     quite close together.  Sometimes they're farther apart.

5     Sometimes they're open, and sometimes they might be closed.

6         So all of the level three information, because it's so

7     minute, really goes to show how much clarity can be seen within

8     that latent print.  This information isn't always reliably

9     transferred because it's quite dependent on how an item is

10    handled, the grip strength or deposition pressure.  Was the item

11    handled quite tightly or loosely?  That can play into and affect

12    how I see level three information.

13        At the end of analysis, I'll be making an assessment to

14    determine is this print suitable to move on to comparison,

15    meaning does it have a sufficient amount of quality and quantity

16    of information such as I could actually compare it to other

17    prints?

18    Q.  And so if you were to proceed to the next step there, which

19    would be the comparison, can you explain what comparison is?

20    A.  Comparison is that second step in the ACE process.  In

21    comparison, I'm going to be taking this latent print and

22    comparing it side by side to another latent print, to a known

23    print, or using it in our NGI or our Next Generation

24    Identification database system.

25        I'm going to be looking at all of those characteristics I

Kuznetsova - Direct

1    marked during my analysis, the type, the direction, the

2    location, and the spatial relationship.  I'm going to be using a

3    wholistic approach and examining those ridges in sequence to see

4    if there's agreement or disagreement, similarities or

5    differences in that friction ridge arrangement.

6    Q.  All right.  And then after that, the third sequence in your

7    ACE analysis would be the "E" or the evaluation.  Can you

8    explain what that is?

9    A.  The evaluation phase is where I'm going to be coming to some

10   sort of decision based on the information that I found in

11   analysis and then the information that I observed during

12   comparison.

13       I can come to one of three decisions:  identification,

14   exclusion, or inconclusive.  Identification is where there's a

15   sufficient amount of information in agreement that it's my

16   opinion that these two prints came from the same source.  And

17   then I would not expect to see that same level of agreement in

18   two prints that came from different sources.

19       Exclusion is my opinion that there's a sufficient amount of

20   disagreement such that I believe these two prints came from

21   different sources.

22       Inconclusive is where I can't come to one of those other

23   decisions because I either lack the amount of overall

24   information, or I may not have the corresponding area.  An

25   example of this may be if a latent print were from the extreme

Kuznetsova - Direct

1    tip of a finger, that it may not be reliably recorded on a

2    standard tenprint card; so I can't do a full comparison at that

3    point.

4    Q.   And so after that process, are there -- and you make the

5    evaluation, are there any quality assurance measures taken as it

6    relates to fingerprint comparisons?

7    A.   Within my unit, we have various types of quality assurance

8    measures that can occur.  There's verification, blind

9    verification, and then some sort of review process for the case.

10        In verification, that's where a second examiner will perform

11   their own analysis, comparison, and evaluation to determine if

12   they come to the same decision that I did.  This will be

13   performed on every single identification that is present within

14   a case.

15        For blind verification -- the only difference between

16   standard and blind is that the blind verifier, performing their

17   own analysis, comparison, and evaluation, does not receive any

18   of my markups.  In traditional verification, they can see my

19   markups as well as my decision.  Blind verification they do not.

20        Blind verification will be performed on any single

21   conclusion within a case.  For example, if a case has ten prints

22   and nine are identified to one individual and one is excluded to

23   that individual, the nine identifications would be verified, and

24   the one exclusion would be blind verified.  This would be the

25   same in reverse.  If nine exclusions occurred in one case with

1   one identification, that one identification would be blind

2   verified.  It's just an additional quality assurance measure

3   taken on those single conclusion decisions.

4       The reviews that can take place for a case are technical and

5   administrative to see if I performed the requested work and in

6   the correct order, and those reviews are performed on every case

7   in our unit.

8   Q.  So when you initially receive an item in, how do you

9   determine what kind of processing techniques you're gonna use on

10  that item?

11  A.  First, I will do an inventory or an evaluation of the items

12  that I'm receiving.  I'm going to be looking at the actual

13  material that the items are consisting of to make a

14  determination on what sort of processing techniques I'm going to

15  be using.

16      We divide items into three general types of categories:

17  porous, nonporous, and semiporous.  Porous, meaning that that

18  substrate or the residue that was on our friction ridges, is

19  absorbed into the item.  Think of things like paper, cardboard,

20  or money.

21      For nonporous items, these would be things where that

22  residue is merely sitting on the surface of the item, such as a

23  glass jar, a plastic water bottle, a plastic bag.

24      Semiporous is some sort of combination of those two.  A

25  magazine paper, which is a paper type item but has a glossy

Kuznetsova - Direct

1    sheen to it, would be a semiporous type item.  An envelope with

2    that plastic window would a semiporous type item.

3        In semiporous items, I will use processing techniques that

4    are present in both the porous and nonporous processing

5    sequence.

6    Q.  Is it possible to handle an item and not leave any latent

7    prints on that item?

8    A.  It's possible because there are so many different factors

9    that come into play when an individual's handling an item, yes.

10   Q.  Let's talk about the work -- what you were asked to do in

11   this case.  Were you asked to perform fingerprint analysis of

12   the mailings and items at issue in this case?

13   A.  Yes, I was.

14   Q.  And what were you asked to do?

15   A.  For this particular case, I was -- part of the request was

16   to evaluate the items, perform processing on them, and if any

17   latent prints were detected, to perform analysis and comparison

18   of those latent prints.

19   Q.  So did you essentially receive some items, and were you

20   asked to use the ACE process that you talked about before on

21   those items?

22   A.  Yes.  So I processed the -- each individual item as

23   appropriate based on the material that it consisted of; and if

24   latent prints were developed, I would analyze and then compare

25   if those latent prints were suitable for comparison.

Kuznetsova - Direct

1    Q.  And when you went through that process, were there any

2    latent fingerprints detectable on those items that were suitable

3    for comparison?

4    A.  Yes, there were.

5    Q.  And were you then asked to compare those detectable latent

6    prints that you found to fingerprints for Connie Pineda,

7    Michella Pineda, and the defendant, Suzanne Craft?

8    A.  For this specific request that I received, my initial report

9    addresses two individuals that I obtained through the NGI

10   database, the Next Generation database -- Identification system.

11   Excuse me.  For those types of prints, because I didn't -- I was

12   not provided with a known card for comparison, I did do some

13   comparisons within that database.

14       The second request came in.  I was provided with known

15   records.  These known cards bore the name Connie Lynn Pineda.

16   Q.  And so were the other two that you used the NGI fingerprints

17   for, were those for Michella Pineda and the defendant, Suzanne

18   Craft?

19   A.  The cards that I used in that first request bore the name

20   Michella Fe Pineda and Suzanne Rebecca Craft.

21   Q.  And so were those three folks the three known fingerprints

22   that you used in the comparison process?

23   A.  Yes, they were.

24   Q.  So when you did that process, did any of your comparisons

25   result in identification?

Kuznetsova - Direct

1    A.   Yes, I did have identifications in this case.

2    Q.   Okay.  So let's talk about those identifications.

3              MR. TIEKE:  Your Honor, may I approach the witness?

4              THE COURT:  Yes.

5              THE WITNESS:  Thank you.

6    BY MR. TIEKE:

7    Q.   I'm showing you what is marked as United States Exhibit 34,

8    which is a demonstrative item summarizing the particular items

9    you found a fingerprint or multiple fingerprints on.  I'm gonna

10   ask you, is this a fair and accurate depiction of the items you

11   reviewed and found one or more fingerprints on?

12   A.   Yes, it is.

13   Q.   And will this demonstrative help you explain your testimony

14   to the jury in this case?

15   A.   Yes, it can.

16             MR. TIEKE:  Your Honor, I'd like to move to publish

17   United States Exhibit 34 as a demonstrative exhibit.

18             MS. REA:  May we approach, Your Honor?

19             THE COURT:  Yes.

20       (Bench conference on the record.)

21             MS. REA:  The demonstrative being used to show what

22   the items are, I don't have an objection to, but the item with

23   Ms. Craft's prints where those were identified is on the reverse

24   side of the -- of what you have as the -- in the photograph.

25       So I think we just need to make clear that we're just --

Kuznetsova - Direct

1   this is just showing what the objects are, not where the

2   fingerprints were.  With that, I have no objection.  So it's

3   really a point of clarification.

4           MR. TIEKE:  Yeah, that was the purpose, just to make

5   sure she knew which ones were which, rather than have her, yeah,

6   handle her lab reports up here.

7           MS. REA:  That's fine.  Then I have no objection.

8           MR. TIEKE:  I will just ask her, if it's okay --

9           THE REPORTER:  I can't hear you.

10          MR. TIEKE:  Yes, Your Honor.  Sorry.

11          MS. REA:  That's because I walked away.

12          MR. TIEKE:  I will ask her --

13          MS. REA:  Yes, clarify that it is the item.

14          MR. TIEKE:  Yes, ma'am.

15          THE COURT:  So there's no objection?

16          MR. TIEKE:  Yes.

17          MS. REA:  Thank you.

18          MR. TIEKE:  Thank you, Judge.

19      (End of bench conference.)

20  BY MR. TIEKE:

21  Q.  Ma'am, before we show that to the jury, I'd just like to

22  make clear that that demonstrative, that shows the particular

23  item that you found the fingerprints on, but it does not show

24  where those fingerprints are; is that correct?

25  A.  Correct.  There are no latent prints on these images.

Kuznetsova - Direct

1  Q.  That -- in other words, that image is of a particular item

2  on which you found a fingerprint somewhere.  It may not be the

3  side of that item that is on the demonstrative.

4  A.  Correct.

5          MR. TIEKE:  Okay.  May I publish that to the jury,

6  Your Honor?

7          MS. REA:  No objection.

8          THE COURT:  Yes.

9  BY MR. TIEKE:

10  Q.  And so to get at what I was going at, just to make sure

11  we're clear, these items -- if we could blow Item Number 1 up,

12  that's an item that you found a fingerprint on, but just

13  generally speaking, that fingerprint might have been on the back

14  of that item or the side.  This just shows the particular item

15  that a fingerprint is on; right?

16  A.  Correct.

17  Q.  Okay.  Thank you.  We can take that one down.

18      And if we can scroll through to the second page, please.  Is

19  that document on the screen the same document that I handed you?

20  A.  Yes, it is.

21  Q.  Okay.  And does that document depict particular items you

22  examined and found one or more fingerprints?

23  A.  Yes, it is.

24  Q.  Okay.  And so just to explain how we're gonna use this with

25  the jury, is the first column the particular item on which you

Kuznetsova - Direct

1    found a latent fingerprint or fingerprints?

2    A.  Yes, it is.

3    Q.  And is the second column the identification that you made

4    after you went through your analysis, comparison, and evaluation

5    process?

6    A.  Yes.  The second column would be the card bearing the

7    name -- of the name in that column would be to which

8    identification it was made.

9    Q.  Okay.  So you hold on to that, and we'll take that down.

10   And let's go through these particular items and talk about the

11   identifying -- the identifications that you made.  I'd like to

12   show you what has previously been admitted as United States

13   Exhibit 10A, page 1.  Have you seen this item before?

14   A.  Yes, I have.

15   Q.  Does it appear to be an outer envelope that is addressed to

16   Michella Pineda at 510 Edgeforest?

17   A.  Yes, it does.

18   Q.  And did you examine this for latent prints?

19   A.  Yes, I did.

20   Q.  And did you use the ACE process that you discussed earlier?

21   A.  Yes, I did.

22   Q.  And did you develop any latent prints on this item?

23   A.  Yes, I developed three latent prints.

24   Q.  And were you able to make an identification on that?

25   A.  Yes, I did.

Kuznetsova - Direct

```
1    Q.   What was that identification?

2    A.   I made an -- I made one identification on this item to a

3    card bearing the name Michella Fe Pineda.

4    Q.   Okay.  I'm showing you what has previously been admitted as

5    United States Exhibit 4A, page 1.  Have you seen this item

6    before?

7    A.   Yes, I have.

8    Q.   So does this item appear to be an outer envelope that is

9    addressed to Michelle Pineda at 510 Edgeforest?

10   A.   Yes, it does.

11   Q.   Did you examine this for latent prints?

12   A.   Yes, I did.

13   Q.   Did you perform processing on this item?

14   A.   Yes, I did.

15   Q.   Did you develop any latent prints?

16   A.   Yes, I developed, I believe, seven latent prints on this

17   item.

18   Q.   And were you able to make an identification?

19   A.   Yes, I did.

20   Q.   What was that identification?

21   A.   All of the latent prints developed on this item were

22   identified to the card bearing the name Michella Fe Pineda.

23   Q.   I'd like to show you Exhibit 7A, page 6.  Have you seen this

24   item before?

25   A.   Yes, I have.
```

Kuznetsova - Direct

1    Q.  So this item is an inner envelope that was found inside of

2    an envelope that was addressed to Michella Pineda at 510

3    Edgeforest?

4    A.  Yes, I believe so.

5    Q.  Did you examine this envelope for latent prints?

6    A.  Yes, I did.

7    Q.  Did you apply processing to this item?

8    A.  Yes, I did.

9    Q.  And did you develop any latent prints?

10   A.  Yes, I did.

11   Q.  Were you able to make an identification?

12   A.  Yes, I was.

13   Q.  And what was that?

14   A.  I identified one latent print on this item to the card

15   bearing the name Michella Fe Pineda.

16   Q.  I'd like to pull up Exhibit 5A, page 1, please.  Have you

17   seen this item before?

18   A.  Yes, I have.

19   Q.  So does this appear to be an outer envelope that is

20   addressed to Michella Pineda at 510 Edgeforest?

21   A.  Yes, it does.

22   Q.  Did you examine this for latent prints?

23   A.  Yes, I did.

24   Q.  Did you perform processing on this item?

25   A.  Yes, I did.

Kuznetsova - Direct

1   Q.   Did you develop any latent prints?

2   A.   Yes.

3   Q.   Okay.  Were you able to make an identification?

4   A.   Yes.

5   Q.   What was that?

6   A.   The latent prints developed on this item were identified to

7   the card bearing the name Michella Fe Pineda.

8   Q.   And, finally, I'm gonna show you what's previously been

9   admitted as United States Exhibit 8A, page 1.  Have you seen

10  this item before?

11  A.   Yes, I have.

12  Q.   So does this appear to be an outer envelope that is

13  addressed to Michella Pineda at 510 Edgeforest?

14  A.   Yes, it does.

15  Q.   Did you examine this for latent prints?

16  A.   Yes, I did.

17  Q.   Did you perform processing on this item?

18  A.   Yes, I did.

19  Q.   Did you develop any latent prints?

20  A.   Yes.

21  Q.   Were you able to make an identification?

22  A.   Yes.

23  Q.   And what was that identification?

24  A.   I made an identification of one latent print on this item to

25  a card bearing the name Connie Lynn Pineda.

Kuznetsova - Direct

1    Q.   Okay.   Now I'd like to talk about where you found the

2    defendant -- Ms. Craft's fingerprints.   Did you obtain the

3    fingerprints for Craft that you used for comparison purposes

4    from that NGI system?

5    A.   In my initial report, yes, from the NGI system.

6    Q.   And did you use the best available NGI fingerprints for

7    Craft for comparison purposes?

8    A.   Yes, I did.

9    Q.   Okay.   I'm showing you what has previously been marked as

10   United States Exhibit 8A, page 5.   Have you seen this item

11   before?

12   A.   Yes, I have.

13   Q.   So does this appear to be -- in your inventory, does this

14   appear to be an inner portion of an envelope that contains the

15   cutout text "You will die bitch" that was found inside an

16   envelope addressed to Michella Pineda at 510 Edgeforest?

17   A.   According to the paperwork I received, yes, this was an

18   inner envelope.

19   Q.   Okay.   Did you examine this for latent prints?

20   A.   Yes, I did.

21   Q.   Did you perform processing on this item?

22   A.   Yes, I did.

23   Q.   Did you develop any latent prints?

24   A.   Yes.

25   Q.   Were you able to make an identification?

Kuznetsova - Direct

1    A.   Yes.

2    Q.   And let's talk about how you did that.  First of all, before

3    I go there, what was that identification?

4    A.   I developed two latent prints on this particular item, and

5    both were identified to a card bearing the name Suzanne Rebecca

6    Craft.

7    Q.   And where were those prints located?

8    A.   When looking at this particular item, on the reverse side of

9    the image from which you see.

10   Q.   I'm gonna show you on the screen what has been marked as

11   United States Exhibit 32.  It's for the witness only, please.

12   You recognize that item?

13   A.   Yes, I do.

14   Q.   What is that?

15   A.   These are photographs that indicate markings that I've used

16   during my analysis and comparison.  It will have markings of any

17   of the points or minutiae that I determined to be present during

18   my analysis.  It will have a claiming mark when I determined

19   that a print was suitable for comparison as well as some other

20   information on the item as a result of those comparisons that

21   occurred.

22        MR. TIEKE:  Your Honor, I move to admit United States

23   Exhibit 32.

24        MS. REA:  No objection.

25        THE COURT:  It will be admitted.

Kuznetsova - Direct

1      (Government Exhibit 32 admitted in evidence.)

2           MR. TIEKE:  Carisa, if we could maybe blow this part

3      up here.  Thank you.

4      BY MR. TIEKE:

5      Q.  Can you just explain to the jury here what they're looking

6      at in this first image.

7      A.  This image indicates -- it's my photograph.  You can tell by

8      the initials on the bottom right-hand corner.  "IMK," those are

9      my initials.

10         The green horseshoe markings on it indicate that there are

11     two latent prints that I determined to be suitable for

12     comparison.  On the left side, there is an additional black

13     horseshoe around that particular latent print, meaning that I

14     searched that specific latent print in the NGI system.

15         The two prints in question are numbered P1 and P2 to just

16     indicate which number specifically -- which print I would be

17     looking at.  The markings beside that were -- will have a last

18     name and a zero with a line through it as well as a number.

19     That's an identification symbol, the number being the finger

20     number that it was identified to.  The last name is the card

21     that I used during that comparison.  The last name present on

22     that card will be the last name that I wrote down for this

23     identification.

24         On the right-hand side, there is an asterisk where it says

25     "See NGI screenshot," meaning that that latent print on the left

1    that was searched in NGI was an identification as a result of

2    that search in the NGI system.

3    Q.  You might have referenced this earlier, but we -- let's just

4    stop at this point, and can you just explain what NGI is since

5    we've used that a few times.

6    A.  NGI or the Next Generation Identification system is a tool

7    that examiners can use in conducting those analysis, comparison,

8    and evaluation decisions.  NGI is a repository where it consists

9    of tenprint cards, palm print cards, and other recordings of

10   individuals.

11       Individuals within the NGI system could be there for a

12   variety of reasons, military records -- so an individual who has

13   joined any of the military branches and has had known

14   fingerprint recordings taken will be in the NGI system.  Federal

15   workers/state workers could also be within the NGI system.

16       My prints are in the NGI system.  Certain background checks

17   that may occur, depending on what job a person might be applying

18   for, such as school bus drivers, teachers, doctors, that sort of

19   thing, their prints could be retained in NGI.  Additionally, if

20   an individual has been arrested or convicted of crimes, those

21   prints could also be contained within the NGI system.

22   Q.  So does this image reflect that you were able to detect two

23   latent fingerprints on this particular item from two different

24   fingers?

25   A.  So this image shows that there were two latent prints that I

Kuznetsova - Direct

1    determined to be suitable for comparison, and based on my

2    identifications, they did come from two different fingers.

3    Q.  And when you analyzed these two fingerprints, were you able

4    to identify them to be known fingerprint -- to be the known

5    fingerprint card bearing the name Suzanne Craft?

6    A.  These two prints were identified to the number 8, or the

7    left middle finger, and the number 9, or the left ring finger,

8    to the card bearing the name Suzanne Rebecca Craft.

9    Q.  You talked about the verification process that goes on when

10   you make an identification.  Was the verification process you

11   discussed earlier done for this identification?

12   A.  Yes.  So because there were two identifications to the same

13   source in this particular instance, a standard verification

14   would be performed.

15           MR. TIEKE:  If we could take that down and put up the

16   second part, please.  Thank you.

17   Q.  And is -- evidence of that verification process, is that

18   what's shown here with the second image?

19   A.  Yes.  This second image is the work of the verifier for this

20   case.  The blue markings indicate those horseshoes, so agreement

21   that both of those prints were suitable for comparison.  And

22   then the identification symbols, as well as the number for each

23   of the fingers above those horseshoes, indicate which number

24   finger the verifier agreed with the identification for.

25       The lower right-hand corner indicates that -- with the V

Kuznetsova - Direct

1    that these prints were verified and on that specific date.  The

2    name indicates who that verifier was.  And if you look at the

3    top center, that's the name of the card that they were

4    identified to.

5    Q.  And so, essentially, did another person analyze these two

6    fingerprints and come to the same identification that you did?

7    A.  Yes.  This verifier was in agreement for both analysis,

8    comparison, and evaluation for those two prints.

9    Q.  And the verifier identified those fingerprints -- did the

10   verifier identify those fingerprints to the known fingerprint

11   card bearing the name Suzanne Craft?

12   A.  Yes.

13   Q.  I'd like to show you what's been marked as United States

14   Exhibit 33.  Do you recognize that item?

15   A.  Yes, I do.

16   Q.  What is that?

17   A.  This is the screenshot showing my comparison that I

18   performed within the NGI system.  My latent print that I

19   determined to be suitable for comparison is on the left side,

20   and on the right side, it's the known fingerprint from a card

21   that was presented to me for that comparison.

22            MR. TIEKE:  Your Honor, at this time I'd move to admit

23   United States Exhibit 33.

24            MS. REA:  No objection.

25            THE COURT:  It will be admitted.

Kuznetsova - Direct

1      (Government Exhibit 33 admitted in evidence.)

2    BY MR. TIEKE:

3    Q.  So just to explain, since the jury couldn't see it before,

4    what you said, on that left side, is that the latent fingerprint

5    that you found on the item that we were just talking about where

6    the fingerprints for Suzanne Craft were found?

7    A.  On the previous image, where I had those two prints that had

8    the green horseshoes on them, the one with the additional black

9    horseshoe, that specific imprint is this latent print from this

10   image.

11   Q.  On the left side?

12   A.  Correct.

13   Q.  Okay.  And then what is on the right side there?

14   A.  The right side of this image is a known fingerprint from a

15   card in the NGI system that was presented to me for comparison.

16      When I do NGI comparisons, I take the latent image, and I

17   will encode or mark up the different characteristics that I see.

18   I'll be putting markings on those ending ridges and those

19   dividing ridges.  NGI will take the encoding that I've marked up

20   and read it in a sort of map-type encoding.  It will then try

21   and find candidates with similar encodings to that, present them

22   to me for comparison, and then I make a determination on

23   identification, exclusion, or inconclusive.

24   Q.  And is this -- is this screenshot -- does this essentially

25   reflect your work in doing that comparison process?

1    A.   Correct.  In this specific screenshot, those pink dots

2    between the latent print and the known print are those different

3    points or minutiae that I found to be in common.

4    Q.   And is that the NGI fingerprint image for Suzanne Craft?

5    A.   This specific known print on the right side came from a card

6    bearing the name Suzanne Rebecca Craft.

7    Q.   And then we're looking -- you explained those points are

8    your analysis determining that there -- or that allowed you to

9    make the identification that you did in this case?

10   A.   The points in pink are from my comparison.

11   Q.   Okay.  We can take that down.  Thank you.

12        And so after you went through this process, were you later

13   asked to verify that the fingerprints for Craft that you had

14   pulled from NGI that you would use for comparison purposes

15   actually belonged to Ms. Craft?

16   A.   For the third report that I wrote for this particular case,

17   I was requested to compare a specific arrest date of a card to

18   the known cards I used in this first report that I had used from

19   the NGI system.

20   Q.   And so how did you go about comparing the fingerprints that

21   you received on August 19, 2020, when Craft was arrested, to the

22   fingerprints that you used to do your analysis?

23   A.   The initial known cards that I used during those comparisons

24   of the latent prints I got as a result of making the singular

25   identification in the NGI system and then performing manual

Kuznetsova - Direct

1   comparisons from those cards.

2       The second -- sorry.  Excuse me.  The third request for this

3   case involved having a specific arrest date pulled from the NGI

4   system of a specific identity and comparing those two different

5   known cards to determine if they came from the same source.

6   Q.  Did you confirm that the set of fingerprints that you used

7   for the comparison were the same as the fingerprints from

8   Craft's August 19th, 2022, arrest in this case?

9   A.  The two sets of known records that I used for comparison, I

10  did reach the identification result for those known print

11  recordings.

12  Q.  I'd like to come back to the chart that we began with.  And

13  so if we could pull up United States Exhibit 34 and scroll

14  through, please.

15      Looking at these items, is it fair to say that all of the

16  fingerprints that were able to be identified to fingerprint

17  cards bearing the name Connie Pineda and Michella Pineda, with

18  the exception of one, were found on the outer envelopes of the

19  letters that you analyzed?

20  A.  Yes, all of these items that were identified to cards

21  bearing the name Michella Fe Pineda or Connie Lynn Pineda were

22  identified on outer most envelopes except for one specific item.

23  Q.  And if we scroll to page 2, please.  One.  I'm sorry.  Was

24  that exception that item right there?

25  A.  Yes.  The item indicated was an inner envelope item.

Kuznetsova - Direct

1    Q.   And the other ones were all outer; is that correct?

2    A.   Of the ones that we're discussing right now, yes.

3    Q.   Yes.  In your experience, would that be consistent -- well,

4    have you analyzed letters before?

5    A.   Yes, I have.

6    Q.   And in your experience, would that be consistent with a

7    person who's receiving and handling a letter that was mailed to

8    them and taking it out of their mailbox?

9    A.   It's not uncommon to develop latent prints on outer most

10   envelopes that have gone through the mailing system.

11   Q.   And why is that?

12   A.   Because multiple people are handling the outer most

13   envelopes as it goes through that mailing system.

14   Q.   And is it -- if we could go to the next page or the prior

15   page, whichever one we're on here, and if we could blow this up.

16   And is it fair to say that the fingerprints identified to Craft

17   were found on the reverse side of this item that was inside one

18   of the envelopes that you analyzed?

19            THE COURT:  Mr. Tieke, just for the record, you're

20   talking about Exhibit 34, page 2; is that correct?

21            MR. TIEKE:  Yes, Your Honor, 34, page 2.

22            THE WITNESS:  Could you repeat your question.  I'm

23   sorry.

24            MR. TIEKE:  Yes, ma'am.

25   BY MR. TIEKE:

1    Q.  Is it fair to say that the fingerprints that you identified

2    to Craft were found on the reverse side of an item that was

3    inside one of the envelopes, this item right here?

4    A.  Yes.  The two fingerprints I identified on this particular

5    item were on the reverse side of what you're seeing, and they

6    were identified to a known card bearing the name Suzanne Rebecca

7    Craft.

8              MR. TIEKE:  Thank you, Your Honor.  No further

9    questions.

10             THE COURT:  Ms. Rea.

11             MS. REA:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MS. REA:

14   Q.  Hi, Ms. Kuznetsova.  I knew I was gonna mess it up.  My name

15   is Angela Rea.  I have not very many questions for you.

16             MS. REA:  May I -- do you have the stuff?

17             MR. TIEKE:  The actual --

18      (Counsel conferring off the record.)

19   BY MS. REA:

20   Q.  Just to -- while I'm putting my glove on, there was one item

21   on which you identified Ms. Craft's fingerprints; correct?

22   A.  Yes, only one item I received and analyzed and compared had

23   prints identified to the known card bearing the name Suzanne

24   Rebecca Craft.

25   Q.  And as you've testified, all of the -- for the items that

1    were identified with prints of either Connie or Michella

2    Pineda -- Michella, excuse me, Pineda, four of those items were

3    outer envelopes; correct?

4    A.   There was one inner envelope, and the rest were outer

5    envelopes for those identifications.

6    Q.   Okay.  And when you did the identification of the

7    fingerprints, it is also identification of specific fingers;

8    right?

9    A.   An identification will be made to a specific finger or a

10   palm print or a footprint, and those will be indicated either by

11   a number or some sort of letter designation to indicate left

12   palm or right palm or something like that.

13   Q.   And I'm gonna direct you to the document camera.  This can

14   be shared with the jury.  This is what has already been admitted

15   as U.S. Exhibit 32.  In this case, on this item, the

16   fingerprints that were examined were 8 and 9; correct?

17   A.   The identifications were to the number 8, or the left

18   middle, and the number 9 or the left ring fingers.

19   Q.   Okay.  And that -- you have anticipated my question.  So

20   left middle finger/left ring finger is what is found on this

21   item?

22   A.   Correct.

23   Q.   Okay.  I want to look at the actual item.

24        THE COURT:  Could I ask you to pause for just one

25   minute and see counsel at the bench just briefly.

1        (Bench conference on the record.)

2               THE COURT:  Is Exhibit 34 admitted?

3               MR. TIEKE:  The demonstrative?

4               THE COURT:  Yes.

5               MR. TIEKE:  No, sir.

6               THE COURT:  And so it's not going --

7               MS. REA:  Oh, right, right.

8               MR. TIEKE:  No, sir, just a demonstrative.

9               THE COURT:  I just --

10              MR. TIEKE:  Thank you.

11              THE COURT:  Well, the jury -- if I am, the jury may be

12      a bit confused as to matching up the demonstrative, 34, which I

13      think you're about to do, with the actual previously admitted

14      exhibit.  In other words, match up what is depicted in the

15      demonstrative with what was previously admitted.  I just -- I

16      was a bit confused as --

17              MS. REA:  I was going to go straight to the item, but

18      I can still go back to the demonstrative.

19              THE COURT:  If you're gonna do that, that's fine.  I

20      was just taking -- I was trying to --

21              MR. TIEKE:  Maybe I didn't make it clear enough for

22      them, but those are the ones that I marched through, each one

23      with her, but maybe it wasn't done effectively.

24              THE COURT:  If one of you can do that on cross or

25      redirect, just -- I was just trying to keep track so -- I didn't

Kuznetsova - Cross

1    think you intended to introduce 34, but you were having her

2    testify about 34, and I -- it wasn't clear to me from my notes

3    what is depicted in 34 as which earlier exhibit number.  You see

4    what I'm asking you?

5              MR. TIEKE:  Yes, sir.

6              THE COURT:  Okay.

7         (End of bench conference.)

8    BY MS. REA:

9    Q.  So from your -- looking at your report -- and I will say

10   over time some of these letters have fallen off.  So the thing

11   as you examined it may not look as it looks in this envelope,

12   but based on your report, what I'm showing you is Item 17, as it

13   was previously assigned a number.  When we are talking about

14   things that were examined in the latent prints that were found

15   for Ms. Craft, that was Item 17; correct?

16   A.  Correct, this is Item 17.

17   Q.  Okay.  And the side of Item 17 -- I'll try to make it look

18   as good as possible or be as visible as possible.  The side of

19   Item 17 that at one point had the letters on it is this side

20   with that sort of security printing; correct?

21   A.  The side that you're showing on screen had the letters

22   attached to it.

23   Q.  Right.  And that would be, if that were a whole envelope,

24   the inside of that envelope; right?

25   A.  Yes.

Kuznetsova - Redirect

1    Q.   Okay.  And the place where you located Ms. Craft's latent

2    prints was actually on this side; right?

3    A.   Yes.

4    Q.   And that would have been the outside of that envelope?

5    A.   Yes, the outside.

6         MS. REA:  Okay.  I don't have any other questions for

7    you.  Thank you.  It'll take me a minute to reassemble the item.

8       Actually, just to clarify --

9       (Counsel conferring off the record.)

10        MS. REA:  That's all I have for you.  Thank you.

11        THE COURT:  Redirect, Mr. Tieke?

12                      REDIRECT EXAMINATION

13   BY MR. TIEKE:

14   Q.   If we could pull up Exhibit 34, please.  The items here on

15   the left, those -- do those correspond to particular exhibits in

16   this case?

17   A.   Yes, they do.

18   Q.   And so this demonstrative shows the first photograph of that

19   mailing.  Does that depict the mailing that has been introduced

20   as United States Exhibit 10?

21   A.   I believe so.

22   Q.   And if we can bring up Exhibit 10, just the page.  And if we

23   could bring up next to it 4A, please.  We'll just -- can we keep

24   Exhibit 34 on one side and -- yes, please.

25       Does the second item there on your demonstrative exhibit,

Kuznetsova - Redirect

1    does that depict the mailing that is depicted there in United

2    States Exhibit 4A?

3    A.   The second image down from Government's Exhibit 34 is

4    Government's Exhibit 4A.

5    Q.   Thank you.  And then Exhibit 7 on the right side, please.

6    And is the third item down there on your demonstrative, is that

7    an envelope that was inside of Government's Exhibit 7, which is

8    depicted in the photographs that are Exhibit 7A?

9    A.   Yes, I believe so.

10   Q.   If we could go to page 2 of the demonstrative and pull up

11   Exhibit 5A, page 1.  The top item there on the demonstrative,

12   does that correspond with the item there on the right, which is

13   Exhibit 5A, which depicts Government's Exhibit 5?

14   A.   Yes, it is.

15   Q.   Could we do 8, please.  Does the second item there down on

16   the demonstrative, page 2, does that correspond with the image

17   that is exhibit -- Government's Exhibit 8A, which depicts the

18   mailing, which is Government's Exhibit 8?

19   A.   Yes.

20   Q.   And then same Exhibit 8, if we could go to the page.  And

21   does the final item on your demonstrative, the item where you

22   identified fingerprints belonging to Suzanne Craft, does that

23   correspond with the image there, which is a page from

24   Government's Exhibit 8A, which depicts the mailing that is

25   Government's Exhibit 8?

Kuznetsova - Redirect

1   A.   The identifications made to the card bearing the name

2   Suzanne Rebecca Craft on the image depicted on the left is the

3   same as the image depicted on the right.

4            MR. TIEKE:  Okay.  Thank you, Your Honor.  No further

5   questions.

6            THE COURT:  Anything further?

7            MS. REA:  No, sir.

8            THE COURT:  May the witness be excused?

9            MR. TIEKE:  Yes, Your Honor.  Thank you.

10           THE COURT:  Thank you.  You may step down.

11           THE WITNESS:  Thank you.

12       (Testimony concluded at 3:30 p.m.)

13                    C E R T I F I C A T E

14       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

15   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

16

17

          s/Dena Legg                    May 16, 2023
18   Certified Court Reporter No. 20042A157    Date
     Official Court Reporter
19

20

21

22

23

24

25

1                              INDEX

2     GOVERNMENT WITNESS:

3     ICEL KUZNETSOVA
          Direct Examination By Mr. Tieke              2
4         Cross-Examination By Ms. Rea                 34
          Redirect Examination By Mr. Tieke            38
5

6
                              EXHIBITS
7
      GOVERNMENT:
8     32 - photo                                       26
      33 - NGI screenshot                              30
9

10    DEFENDANT:
      No exhibits
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25