```
                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
                           LOUISVILLE DIVISION


UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00094-DJH
                               )
        Plaintiff,             )
                               )
v.                             )
                               )
SUZANNE CRAFT,                 )
                               )    March 8, 2023
        Defendant.             )    Louisville, Kentucky


                              * * * * *

     TRANSCRIPT OF TESTIMONY OF HECTOR MALDONADO AT JURY TRIAL
                 BEFORE HONORABLE DAVID J. HALE
                   UNITED STATES DISTRICT JUDGE

                              * * * * *

APPEARANCES:

For United States:       Christopher C. Tieke
                         Stephanie M. Zimdahl
                         U.S. Attorney's Office
                         717 West Broadway
                         Louisville, KY 40202

For Defendant:           Angela M. Rea
                         Western Kentucky Federal
                            Community Defender, Inc.
                         629 S. 4th Avenue, Suite 200
                         Louisville, KY 40202

[Defendant present.]



                     Dena Legg, RDR, CRR, CCR-KY
                        Official Court Reporter
                         232 U.S. Courthouse
                         Louisville, KY 40202
                            (502) 625-3778

Proceedings recorded by certified stenographer, transcript
produced by computer.
```

1         (Begin proceedings in open court at 4:18 p.m.  Jury in.)
2         (HECTOR MALDONADO, called by the Government, sworn.)
3                         DIRECT EXAMINATION
4    BY MS. ZIMDAHL:
5    Q.  Good afternoon.
6    A.  Good afternoon.
7    Q.  Would you please state your name.
8    A.  My name is Hector Maldonado, and Maldonado is spelled
9    M-A-L-D-O-N-A-D-O.
10   Q.  And, sir, where are you employed?
11   A.  I am employed by the Federal Bureau of Investigation,
12   Laboratory Division, located in Quantico, Virginia.
13   Q.  What is your occupation there?
14   A.  I am a document analyst/forensic examiner with the Federal
15   Bureau of Investigation.
16   Q.  And, Forensic Examiner Maldonado, how long have you worked
17   for the FBI?
18   A.  I've worked with the FBI for approximately 29 years.
19   Q.  Can you tell us a little bit please about the nature of the
20   work in that position?
21   A.  Yes, of course.  As a document analyst/forensic examiner, I
22   conduct examinations on handwriting, hand printing, typewriting,
23   photocopiers, inks, paper, and other related documentary
24   evidence; that is, I conduct examinations of evidence that is
25   submitted as questioned material with evidence that is submitted

1  as known material in order to determine the origin or
2  authenticity of the questioned material.
3  Q.  And is that sometimes referred to as questioned documents?
4  A.  That is correct.
5  Q.  Generally, what is a questioned document?
6  A.  A questioned document, generally it is a question that has
7  an unknown origin.  And there's a matter in place to determine
8  further, probably with comparisons with other documents, if that
9  questioned document or writing is authentic or not.
10 Q.  Sir, could you tell us briefly, what is your educational
11 background?
12 A.  Of course.  I received a Bachelor's in sciences from the
13 University of Puerto Rico and a Master in criminal justice from
14 the Inter American University of Puerto Rico.
15 Q.  Could you also tell the members of the jury a little bit
16 more about the training that you've received in the examination
17 of questioned documents.
18 A.  As a document analyst in questioned documents, I received a
19 two-year training from the Institute of Forensic Sciences in
20 Puerto Rico.  And upon being assigned to the Federal Bureau of
21 Investigation, I received an additional year of training.  That
22 training consisted of extensive classroom instructions, the
23 lectures by senior examiners, the reading of books, articles,
24 and other literature in the field of questioned documents, and
25 the examination of cases under the direct supervision of senior

1 document examiners.
2 Q. Are you a member of any professional organizations relating
3 to the examination of questioned documents?
4 A. Yes, I am.
5 Q. Tell us a little bit about that.
6 A. I am a member of the Questioned Documents Section of the
7 American Academy of Forensic Sciences, and I am an affiliate of
8 the Organization of Scientific Area Committees, also known as
9 OSAC.
10 Q. Do you presently devote the majority of your time to
11 studying and examining these questioned documents in your field?
12 A. That is correct.
13 Q. Now, today we're gonna focus on a subset of your field which
14 is referred to as obliteration evidence.  So I want to talk
15 about that as a general matter before we get to the specifics of
16 this case, if that's all right.  Could you please define for the
17 members of the jury what an obliteration is or an obliterated
18 writing.
19 A. An obliteration is something that cannot be seen with the
20 naked eye.  It can be done by destroying it, or it can be done
21 by covering it so it cannot be seen.  Some of the documentary
22 observations are correction fluid over ink, tape, correction
23 tape over ink, or erasers.  Also, ink over ink.
24 Q. And, again, before we return -- turn to all of the specific
25 documents in this case, could you just explain for us briefly

1  how you go about examining a document that has obliterated
2  writing on it?
3  A.  I begin my examination utilizing a method that is called
4  initial assessment methodology, and that methodology consists of
5  three stages.  The first stage is -- the first stage should
6  be -- is analysis of the document.  And at that stage, I look at
7  the document visually, also known as microscopically, taking
8  notations of the size, the design of the document; and then I
9  move on to utilize certain instruments in my unit that will help
10 me or assist me to see things that I cannot see with the naked
11 eye.
12     The other stage in this method is evaluation.  After I
13 analyze a document, I evaluate what I see, and then I issue a
14 report of examination.  After I complete my examination and the
15 report is issued, then it moves to a verification stage.  That
16 means that an independent review of my case and my examinations
17 is conducted by an independent document analyst in the FBI
18 laboratory.
19 Q.  And you mentioned instruments that you use.  Are there
20 scientific procedures and instruments that you use to attempt to
21 reveal things that underlie the obliteration that you're looking
22 at?
23 A.  Yes, that is correct.  In this instance, I observed the
24 documents, and I put the document in an instrument that is
25 called a video spectral comparator.  This instrument is

1  calibrated weekly assuring that it's in proper condition to
2  conduct those examinations.
3  Q. And just so we all understand this properly, is this a
4  digital process?
5  A. That is correct. It is a computer that has a program, like
6  any computer that you know that you probably would have at your
7  house or your offices, and then has another device that
8  documents can be located and looked at utilizing lights,
9  cameras, and specialized filters.
10 Q. And does that then capture an image of what the computer and
11 those specialized instruments are able to see that the naked eye
12 cannot?
13 A. That is correct. That instrument allows me to, again, see
14 what I cannot see with my naked eye. And once I see that
15 information revealed through the use of those lights, cameras,
16 and filters, I take most likely an image, and then I move on to
17 another stage, if I need to.
18 Q. All right. Forensic Examiner, I'd like to turn your
19 attention to the case at hand here today and ask if you were
20 requested to conduct a review of documents in this particular
21 case?
22 A. Yes.
23 Q. And when you reviewed those documents, did you find an
24 obliterated writing?
25 A. Yes, I did.

1  Q.  Did you examine that writing to see if you could determine
2  what was underneath that obliteration?
3  A.  Yes, I did.
4  Q.  When were you asked to first conduct that review?
5  A.  I was first asked to conduct that review -- I began my
6  examinations on April 26, 2021.
7  Q.  And I'd like to now show you a page from what we're calling
8  here today Government Exhibit 5B and ask if we could bring up
9  page 3, please.  And Forensic Examiner Maldonado, is this the
10 item that you examined at your lab for an obliterated writing?
11 A.  Yes, it is.
12 Q.  Just to be clear and to orient everyone, this item or this
13 document that's here before you on this screen, did this item
14 come from just inside another item, if we could go back one
15 page, from inside an envelope that was addressed to the name
16 Michelle Pineda?  So going back one page, is this the outer
17 envelope from which that obliterated writing came?
18 A.  That is correct.
19 Q.  Okay.  If we could go back to page 3 now.  We have before
20 you here the obliterated writing that you examined.  Could you
21 please point out on the screen -- and you can circle on your
22 screen there in front of you for the jury -- the obliterations
23 on this document?
24 A.  Yes, I can.
25     (Witness indicating.)

1  Q. And I see there you've now circled the return address block
2  and the address block of this envelope. Looking at this
3  document now as you sit here and before you conducted your
4  examination in the lab, could you see what was beneath this
5  obliteration with your naked eye?
6  A. I could not see what was underneath the obliteration with my
7  naked eye.
8  Q. Could you now please tell the members of the jury about the
9  process and examination that you conducted for this particular
10 obliteration on this document in order to try to attempt to
11 reveal and understand what was beneath this obliteration.
12 A. Yes. When I looked at Government Exhibit 5B, I noticed that
13 there were some areas that contained some information underneath
14 the ink obliteration. I put the document in the video spectral
15 comparator instrument, and using some lights, filters, and the
16 camera, I was able to reveal, using the instrument, the
17 information that was underneath that obliteration.
18     When I saw the information, I decided that I needed to take
19 it to the special photographic studio to get a better image and
20 resolution of what was underneath the obliteration. I took the
21 document to the Forensic Imaging Unit studio and they, using
22 cameras, lights, and filters, were able to take a picture or
23 photograph of this document with the revealed information.
24 Q. So you were then able to capture an image of what was
25 underneath?

1   A.  That is correct.
2   Q.  I'm gonna ask if we could please show the witness only what
3   has been marked for identification as Government's Exhibit 5C.
4   Sir, do you recognize this document?
5   A.  Yes, I do.
6   Q.  What is this?
7   A.  That document is Government's Exhibit 5B after it was
8   processed using special photographic techniques.
9   Q.  Is this a true and accurate depiction of the image taken
10  after the scientific process that we just discussed?
11  A.  Yes, it is.
12          MS. ZIMDAHL:  And, Your Honor, I would move to admit
13  Government Exhibit 2C -- I'm sorry -- 5C.
14          MS. REA:  No objection.
15          THE COURT:  It will be admitted.
16     (Government Exhibit 5C admitted in evidence.)
17          MS. ZIMDAHL:  May I now publish?
18          THE COURT:  Yes.
19  BY MS. ZIMDAHL:
20  Q.  And, sir, can you please describe what we have here on the
21  screen for us.
22  A.  Yes, of course.  The image on the screen contains the
23  information that was -- that is underneath the obliteration.  As
24  you can see, the printing area, the return area, and the address
25  area contain information, and it looks darker printing and

1  darker ink.  When I saw that, I determined that I needed to
2  report this finding and I did afterwards.
3  Q.  And does the return address say "Girl Scouts of
4  Kentuckiana"?
5  A.  Yes, it does.
6  Q.  And the address block, does it say "Sara Watts, 507
7  Edgeforest Place, Louisville, Kentucky," with a zip code?
8  A.  That is correct.
9  Q.  Now, just as you described earlier with the general process,
10 was the verification process that you follow in all your cases
11 followed to verify the results that we have here on the screen
12 before us today?
13 A.  That is correct.
14 Q.  And, finally, did you prepare a report for the work that you
15 did in this case, including finding the text that was under this
16 obliterated writing?
17 A.  I issued a report of examination indicating that
18 Government's Exhibit B -- 5B was -- obliteration was revealed
19 using special lighting, photographic lighting, and I added that
20 information in my results.
21 Q.  And, sir, when was that report prepared?
22 A.  That report I prepared on August 9th, 2021.
23          MS. ZIMDAHL:  Your Honor, I have no further questions.
24          THE COURT:  Ms. Rea.
25          MS. REA:  Thank you, Your Honor.  I have no questions.

1           THE COURT:  May the witness be excused?
2           MS. ZIMDAHL:  Yes, Your Honor.
3           THE COURT:  Thank you.  You may step down.
4           THE WITNESS:  Thank you.  Thank you, Your Honor.
5      (Testimony concluded at 4:35 p.m.)
6                    C E R T I F I C A T E
7      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
8 THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

          s/Dena Legg                          May 16, 2023
11   Certified Court Reporter No. 20042A157      Date
     Official Court Reporter

```
 1                              INDEX

 2    GOVERNMENT WITNESS:

 3    HECTOR MALDONADO
           Direct Examination By Ms. Zimdahl          2
 4

 5
                              EXHIBITS
 6
      GOVERNMENT:
 7    5C - photo                                      9

 8
      DEFENDANT:
 9    No exhibits

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```