```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,     )     Case No. 3:22-CR-00094-DJH
 4                                 )
             Plaintiff,            )
 5                                 )
     v.                            )
 6                                 )
     SUZANNE CRAFT,                )
 7                                 )     March 9, 2023
             Defendant.           )     Louisville, Kentucky
 8

 9                              * * * * *

10        TRANSCRIPT OF TESTIMONY OF RICHARD WATTS AT JURY TRIAL
                    BEFORE HONORABLE DAVID J. HALE
11                   UNITED STATES DISTRICT JUDGE

12                              * * * * *

13   APPEARANCES:

14   For United States:      Christopher C. Tieke
                             Stephanie M. Zimdahl
15                           U.S. Attorney's Office
                             717 West Broadway
16                           Louisville, KY 40202

17   For Defendant:          Angela M. Rea
                             Western Kentucky Federal
18                              Community Defender, Inc.
                             629 S. 4th Avenue, Suite 200
19                           Louisville, KY 40202

20   [Defendant present.]

21

22                      Dena Legg, RDR, CRR, CCR-KY
                           Official Court Reporter
23                         232 U.S. Courthouse
                          Louisville, KY 40202
24                            (502) 625-3778

25   Proceedings recorded by certified stenographer, transcript
     produced by computer.
```

Watts - Direct

```
1        (Begin testimony in open court at 10:24 a.m.  Jury in.)

2        (RICHARD WATTS, called by the Government, sworn.)

3                      DIRECT EXAMINATION

4    BY MR. TIEKE:

5    Q.  Good morning, sir.

6    A.  Good morning.

7    Q.  There's a bar microphone right in front of you.  So if you'd

8    just keep up -- if you keep your voice up, that should be able

9    to pick you up.  Okay?

10   A.  Okay.

11   Q.  Thank you.  Would you please state your name for the jury.

12   A.  Richard Watts.

13   Q.  And what was your -- what's your relationship to Suzanne

14   Craft?

15   A.  We lived together for about ten years and had a daughter.

16   Q.  So you were romantically involved with Suzanne Craft?

17   A.  Correct, yes.

18   Q.  And when were you-all together?

19   A.  About 2007 to 2017.

20   Q.  And you said you share a child with Ms. Craft?

21   A.  Yes.

22   Q.  What's that child's name?

23   A.  Sarah Watts.

24   Q.  And how old is she now?

25   A.  She's 14.
```

Watts - Direct

```
1    Q.   And in 2020, how old was she?

2    A.   She was 10.

3    Q.   You mentioned you lived with Ms. Craft at 507 Edgeforest

4    Place in Louisville?

5    A.   Yes.

6    Q.   When did you move in with her?

7    A.   It was back in 2007.

8    Q.   2007.  And how long did you live there?

9    A.   Ten years.

10   Q.   And so when did you move out?

11   A.   2017.

12   Q.   Was it kind of in the spring/summer 2017?

13   A.   Spring.

14   Q.   Okay.  And where do you live now, sir?  You don't have to

15   give your full address, just a street.

16   A.   Lyndon.

17   Q.   Lyndon?

18   A.   In Bridgeview.

19   Q.   Okay.  Do you know Connie and Michella Pineda, the neighbors

20   who lived at 510 Edgeforest Place?

21   A.   No.

22   Q.   Did you ever meet them?

23   A.   No.

24   Q.   Did they move in after you had already moved out of Craft's

25   house?
```

Watts - Direct

1    A.   Correct, yes.

2    Q.   And you moved out in 2017; right?

3    A.   Yes.

4    Q.   Let's talk about November 2020, when you received a text

5    from Ms. Craft.  Let's start with -- did you have a set of

6    bullets when you lived with Craft at 507 Edgeforest?

7    A.   Yes.

8    Q.   How many bullets did you have?

9    A.   Three.

10   Q.   Three.

11   A.   Correct.

12   Q.   And are all three the same kind of type of bullet?

13   A.   Yes.

14   Q.   Okay.  Can you just describe the bullets for the jury.

15   A.   About 3, 4 inches long, tip pointed.

16   Q.   And were all three similar?

17   A.   Yes.

18   Q.   Okay.  Where'd you get those?

19   A.   Military, rifle range.

20   Q.   So you were -- you took them from the rifle range?

21   A.   Yes.

22   Q.   Okay.  And was that just kind of as a souvenir when you were

23   shooting or something like that?

24   A.   Yeah, picked one up once every time I was there.

25   Q.   Okay.  When you lived with Craft at 507 Edgeforest, where

1    did you keep those three bullets?

2    A.   In a box in the basement.

3    Q.   Kind of -- was it with your other military stuff?

4    A.   With my other military stuff, correct.

5    Q.   Okay.  In a box?

6    A.   Yeah.

7    Q.   And were all three of those bullets -- were they stored

8    together?

9    A.   Yes.

10   Q.   When you lived with Craft at 507 Edgeforest, did you have a

11   flood in the basement?

12   A.   Yes.

13   Q.   Okay.  Did you have to move that -- the bullets at that

14   point?

15   A.   Yes, I moved them up into the garage.

16   Q.   Okay.  All three of them together again?

17   A.   Yes.

18   Q.   Okay.  Did you ever show your daughter, Sarah, those

19   bullets?

20   A.   No.

21   Q.   And so when you moved out in 2017, did you move the box

22   where you'd kept your bullets in?

23   A.   It was a different box; but, yes, I took them with me.

24   Q.   So when it flooded, you put them in a different box?

25   A.   Correct, yes.

6

1  Q.  And then put that box in the garage?

2  A.  Yeah, I took that box with me, yes.

3  Q.  Okay.  So when you moved, you just moved the box?

4  A.  Yes.

5  Q.  Okay.  All right.  Sorry.  That clears it up.  And when you

6  moved the box when you moved out in 2017, did you look inside

7  the box with the bullets before you moved out?

8  A.  No.

9  Q.  And so did you move, you know, a couple times after you

10  moved out?

11  A.  Yes.

12  Q.  And as you moved those couple of times, did you -- what'd

13  you do with that box?

14  A.  It just came with me.

15  Q.  Did you just pick it up and move it?

16  A.  Yes.

17  Q.  Did you look in it each time?

18  A.  No.

19  Q.  Did you just have it as your box of military stuff and move

20  it place to place?

21  A.  Correct.

22  Q.  And at some point, did you become aware that some of the

23  bullets in that box were missing?

24  A.  Yes.

25  Q.  How did you find out about that?

1    A.   A text message.

2    Q.   From who?

3    A.   From Suzanne Craft.

4    Q.   Okay.  I'm gonna show you what is Government's Exhibit 29.

5           MR. TIEKE:  If we could scroll through that, please.

6        All right.  If we'd go to the first page.

7    Q.   Is that your telephone number, 954-557-7346?

8    A.   Correct, yes.

9    Q.   And are these texts on November 12th, 2020, are -- do you

10   recognize these as texts between you and Craft?

11   A.   Yes.

12   Q.   Do these printouts accurately contain content of those text

13   messages between you and Craft?

14   A.   Yes.

15          MR. TIEKE:  Your Honor, at this time, I would move to

16   admit United States Exhibit 29 and publish.

17          MS. REA:  No objection.

18          THE COURT:  It will be admitted.

19       (Government Exhibit 29 admitted in evidence.)

20          MR. TIEKE:  Thank you.

21   BY MR. TIEKE:

22   Q.   Okay.  So the -- is the gray box there -- sorry.  Are those

23   your texts?

24   A.   In gray, yes.

25   Q.   Okay.  And then the blue box, are those texts from Craft to

Watts - Direct

1    you?

2    A.  Yes.

3    Q.  Did she send you a text on November 12th, 2020, there?  And

4    I'll just read it.  It says "They say I put bullets in their

5    mailbox."  Do you remember getting that text?

6    A.  Yes.

7    Q.  And then can you read your response?

8    A.  "Sure can I do it tomorrow?"

9    Q.  And is that kind of in reference to the previous text from

10   Ms. Craft about installing a camera or something?

11   A.  Yes.

12   Q.  Okay.  Now, if we can continue to go through, and I'll read

13   her texts.

14       "Ok thank you."  Then it looks like some sort of picture.

15           MR. TIEKE:  And if we could stop there.  Sorry.  If we

16   could go back up, please.  Keep going, please.

17   Q.  It says "they" right there.  When you got that text on

18   November 12th, did you understand what that was referring to?

19   A.  Yeah, the Pinedas.

20   Q.  The Pinedas?

21   A.  The Pinedas, yes.

22           MR. TIEKE:  Okay.  We can scroll down, please.

23   Q.  And then, on November 12th, 2020, do you recall getting that

24   image?

25   A.  Yes.

Watts - Direct

1   Q.   And that photograph was sent to you by Ms. Craft?

2   A.   Correct.

3   Q.   And what was in that photograph?

4   A.   Two of my bullets.

5   Q.   Okay.  And then does there appear to be some cutout?

6   A.   Yes.

7   Q.   Okay.  And so was Craft the one who told you that the

8   Pinedas had received bullets?

9   A.   Yes.

10  Q.   Okay.  And did you immediately recognize those as your

11  bullets?

12  A.   Yes.

13  Q.   How did you -- how'd you recognize those as your bullets in

14  that text message?

15  A.   They had the watermark on them.

16  Q.   Pardon me?

17  A.   There's a watermark on them.

18  Q.   A watermark.  Okay.  And so where's that watermark come

19  from?

20  A.   From sitting in the water when the basement flooded.

21  Q.   When the basement flooded at 507?

22  A.   Yes.

23          MR. TIEKE:  Your Honor, may I approach the witness?

24          THE COURT:  Yes.

25  BY MR. TIEKE:

Watts - Direct

1    Q.  Can you just go ahead and pick up those and take a look at

2    them, please.  Can you show those to the -- just show those to

3    the jury.

4    A.  Okay.

5        (Witness indicating.)

6    Q.  Sir, are those your bullets?

7    A.  Yes.

8    Q.  I should have said I was gonna hand you those bullets.

9    Those are from United States Exhibit 10, and those are -- are

10   those your bullets?

11   A.  Yes.

12   Q.  And if you could take a look at them.  How do you know that?

13   A.  I can see the watermark on them.

14           MR. TIEKE:  Okay.  May I approach, Your Honor?

15           THE COURT:  Yes.

16           MR. TIEKE:  Thank you.

17   BY MR. TIEKE:

18   Q.  I'd like to show you what's been marked Exhibit 10A, page 7.

19   Here's a photograph of those two bullets that we -- is that a

20   photograph of the two bullets we just looked at?

21   A.  Yes.

22   Q.  Are those -- those were the same two bullets that you just

23   had up there with you?

24   A.  Yes.

25   Q.  And can you point out the watermarks that you recognized on

Watts - Direct

```
 1    those.  You can touch the screen and circle it, if you want.
 2        (Witness indicating.)
 3    Q.  Okay.  Like the rusty part?
 4    A.  Rusty part.
 5    Q.  Okay.  And when you got that image, you recognized those
 6    watermarks?
 7    A.  Correct.
 8    Q.  And at some point around the time that you received that
 9    November 12th text from Craft, did you have a telephone call
10    with Craft?
11    A.  Yes.
12    Q.  Okay.  What did you tell her on that call?
13    A.  That those looked like my bullets.
14    Q.  You said those look like your bullets?
15    A.  Yeah.  I was curious how they got there.
16    Q.  Okay.  And so after you received that November 12th text
17    from Craft and you recognized that your bullets wound up in a
18    threat to the Pinedas, did you go check your military box?
19    A.  The next day.
20    Q.  Okay.  And when you looked in your box of military items,
21    before you did that, had you bothered to look in that box for
22    those bullets in the three years or so since you had moved out
23    of Craft's house?
24    A.  I hadn't seen them since the flood.  I hadn't seen them
25    since the flood.
```

Watts - Direct

1   Q.  Okay.  Yeah, if you'll just kind of remember that little

2   microphone.  It's kind of far away.  You don't have to lean

3   over.  Just keep your voice up, and it'll pick it up.

4   A.  Yes, sir.

5   Q.  Let me ask you that again.  In that time since you had moved

6   out of Craft's house, had you bothered to look in that box?

7   A.  No.

8   Q.  And after you got this November 12th text and then you went

9   and looked in that box, what did you find in that box after

10  checking it once you'd received that text?

11  A.  I was missing two.

12  Q.  Two were missing?

13  A.  Two were missing.

14  Q.  And so you had -- did you have one remaining bullet in that

15  box?

16  A.  Yes.

17  Q.  And at some point later, did you provide that remaining

18  bullet to the FBI?

19  A.  Yes.

20       MR. TIEKE:  Your Honor, may I approach the witness?

21       THE COURT:  Yes.

22  BY MR. TIEKE:

23  Q.  Sir, I've just handed you what's been admitted as United

24  States Exhibit 13, if you'd just hold that up for the jury and

25  then take a look at it.  Is that the remaining bullet that you

1    found in your military box with your other military items?

2    A.   Yes.

3    Q.   And is that the one that you provided to the FBI?

4    A.   Yes.

5    Q.   And when you lived with Craft, you distinctly remember

6    having three of those bullets?

7    A.   Yes.

8              MR. TIEKE:  May I approach, Your Honor?

9              THE COURT:  Yes.

10   BY MR. TIEKE:

11   Q.   I'm placing United States Exhibit 13 and United States -- a

12   portion of United States Exhibit 10 on the Elmo.  And this

13   bullet that you provided to the FBI, is it similar to the

14   bullets that were found in the mailing?

15   A.   Yes.

16   Q.   Sir, are these three bullets your bullets?

17   A.   Yes.

18   Q.   Are the bullets -- the two bullets that were sent to the

19   Pinedas, were those your bullets?

20   A.   Yes.

21   Q.   And you're 100 percent sure of that?

22   A.   100 percent sure.

23   Q.   And did you send the Pinedas these bullets?

24   A.   No.

25   Q.   At the time you received that text in November, how did you

Watts - Direct

1    suspect your bullets got to the Pinedas?

2    A.  I wasn't sure, but I accused the farmer, yes.

3    Q.  Sir, when you got those bullets in -- when you got the text

4    in November, you said you accused a farmer.  Who did you suspect

5    of sending the bullets in November 2000?

6    A.  I suspected the farmer or Suzanne, yes.

7    Q.  Do you remember testifying in the grand jury before?

8    A.  Yes.

9    Q.  On May 8th -- excuse me -- on May 18th, 2022?

10   A.  Yes.

11   Q.  If I showed you your grand jury testimony, would that help

12   you refresh your recollection?

13          MR. TIEKE:  May I approach the witness, Your Honor?

14          THE COURT:  Yes.

15   BY MR. TIEKE:

16   Q.  I'll ask you to take a look at that and read it to yourself,

17   please, and if you could focus on lines 1 through 9.  Does that

18   help you refresh your recollection?

19   A.  I did.

20   Q.  Okay.  I'm gonna walk back up and grab that.  Okay?

21          MR. TIEKE:  May I approach, Your Honor?

22          THE COURT:  Yes.

23   BY MR. TIEKE:

24   Q.  And so, sir, did that help you refresh your recollection?

25   A.  Yes.

Watts - Direct

1   Q.  Okay.  And so at the time that you received the text in

2   November of 2020, who did you suspect of sending the bullets?

3   A.  At the time, Suzanne.

4   Q.  Suzanne Craft?

5   A.  Suzanne Craft.

6   Q.  The defendant?

7   A.  Yes.

8   Q.  All right.  So let's kind of go to a different -- stay in

9   that same November and December 2020, okay, and let's talk about

10  what you did after you received that text message November 2020.

11  Did you at some point confront Craft about why the bullets --

12  your bullets were in a mailing to the Pinedas?

13  A.  Yes.

14  Q.  Okay.  And when did that occur?

15  A.  It was around the end of 2020.

16  Q.  November/December 2020?

17  A.  November/December, yes.

18  Q.  Did you take -- that remaining bullet that we looked at, did

19  you take that with you?

20  A.  Yes.

21  Q.  Did you meet with Ms. Craft in person or --

22  A.  Yes, in person.

23  Q.  In person.  Where'd you meet at?

24  A.  At her house.

25  Q.  507 Edgeforest?

Watts - Direct

1   A.   Edgeforest Place, yes.

2   Q.   Okay.   When you were at that meeting, what did you say to

3   her?

4   A.   I asked her if she -- I asked her where the bullets came

5   from.

6   Q.   Did you tell her that you thought they were her -- your

7   bullets?

8   A.   Yeah, I told her that they were my bullets, yes.

9   Q.   Did you tell her that you suspected that she had sent them?

10  A.   Not at that time, no.

11  Q.   Okay.   Did you hand her that remaining bullet for her to

12  look at?

13  A.   Yes.

14  Q.   And at some point later on, did she ask you about that

15  incident when you handed her the bullet?

16  A.   Yes.

17  Q.   Okay.   And tell us about that.

18  A.   She was concerned I might sent it, set her up.   She was

19  afraid I was going to set her up for that bullet.

20  Q.   Okay.   And to be clear, had you -- at that time had you met

21  with the FBI yet?

22  A.   No.

23  Q.   Any law enforcement yet?

24  A.   No.

25  Q.   And so she said you were setting her up?

Watts - Direct

```
1    A.  With that bullet, yes.
2    Q.  Okay.  And to be clear, I mean, were you trying to set her
3    up or anything?
4    A.  No.
5    Q.  Were you working with the FBI?
6    A.  No.
7    Q.  Okay.  And at that point, had you even talked to any law
8    enforcement about these bullets yet?
9    A.  No.
10   Q.  And in the course of that November/December conversation
11   with Craft at her house, did you tell her that those were --
12   again, you told her those were your bullets that were --
13   A.  Yes.
14   Q.  Okay.  Let's fast-forward a little bit in May or June of
15   2022.  Okay?  You already mentioned this, but did you -- you
16   testify in the grand jury on May 18th, 2022?
17   A.  Yes.
18   Q.  And at some point after you did that, did you tell Ms. Craft
19   that you had indeed testified?
20   A.  Yes.
21   Q.  When was that conversation?
22   A.  It was before my second testimony and after I had talked
23   with the FBI.
24   Q.  June?
25   A.  Yes.
```

Watts - Direct

1  Q.  Summer?

2  A.  Summer.

3  Q.  Okay.  And was it by telephone?

4  A.  Yes.

5  Q.  Okay.  And what did you -- what did you tell her?

6  A.  I just told her I spoke with the FBI.

7  Q.  Did you tell her what you told investigators?

8  A.  No.

9  Q.  So you didn't tell -- not specifically, but generally did

10 you give her an idea of what you talked to the investigators

11 about?

12 A.  About my bullets.

13 Q.  About your bullets?

14 A.  Yeah.

15 Q.  What did you tell her about your -- what did you tell her

16 about what you told the FBI about your bullets, if that question

17 makes sense.

18 A.  I just told her that they were my bullets.

19 Q.  And did you tell her that you told the FBI they were your

20 bullets?

21 A.  Yes.

22 Q.  Okay.  That was a poor question, but I appreciate you

23 working with me on it.  When you told her that you told the FBI

24 they were your bullets, what was her response to that?

25 A.  She was surprised.

Watts - Direct

1    Q.   Yeah.  Did she say anything else to you about that?

2    A.   I don't remember.

3    Q.   Do you recall testifying, again, in the grand jury on

4    October 19th, 2022?

5    A.   Yes.

6    Q.   You remember testifying in the grand jury?

7    A.   Yes, I remember testifying, yes.

8    Q.   Okay.  If I showed you a transcript of that testimony, would

9    that help you remember?

10   A.   Yes.

11        MR. TIEKE:  Okay.  Your Honor, may I approach the

12   witness?

13        THE COURT:  Yes.

14   BY MR. TIEKE:

15   Q.   Sir, I've just handed you your grand jury transcript from

16   10-19-2022.  I'd ask you to look at page 21 and specifically

17   lines 8 through 16 and if you want to continue down just to 23.

18   I misspoke about the page number.  My apologies.  Does that help

19   you remember parts of that telephone call?

20   A.   Yes.

21        MR. TIEKE:  Your Honor, may I approach the witness?

22        THE COURT:  Yes.

23   BY MR. TIEKE:

24   Q.   So after -- let me ask you the question again.  After you

25   told Ms. Craft that you had told the FBI that those were your

Watts - Direct

1    bullets, what was her response?

2    A.   She didn't understand why I was talking to them.

3    Q.   If you could speak up, please.

4    A.   She didn't understand why I was talking to them.

5    Q.   Did she accuse you of changing your story?

6    A.   Yes, she accused me of changing my story.

7    Q.   Okay.  And what story did she say you changed?

8    A.   That I'd been saying that they weren't my bullets.

9    Q.   From your recollection and every -- what was your reaction

10   to that?

11   A.   I got upset.

12   Q.   You were upset?

13   A.   Yeah.

14   Q.   And why were you upset?

15   A.   Because I've been saying those were my bullets the whole

16   time.

17   Q.   If you could speak up.

18   A.   I've been saying they've been my bullets the whole time.

19   They were mine.

20   Q.   Were you saying to her that those were your bullets the

21   whole time?

22   A.   Yes.

23   Q.   And did you tell the FBI that those were your bullets?

24   A.   Yes.

25   Q.   Okay.  And your reaction was what?

Watts - Direct

1    A.  I was upset.

2    Q.  Because?

3    A.  She sounded like she was lying.  She was trying to set me

4    up.

5            MR. TIEKE:  Your Honor, may we approach?

6            THE COURT:  Yes.

7        (Bench conference on the record.)

8            MR. TIEKE:  Your Honor, I just wanted to approach.

9    I'm gonna ask you to read the Stipulation of Fact.  I guess it's

10   Number 2 now, the one about the letter.  I don't believe there's

11   any dispute about that.

12           MS. REA:  There's not.

13           THE COURT:  Is this it, the target letter?

14           MR. TIEKE:  Thank you, Judge.  Yes, Your Honor.

15           MS. REA:  Yes, sir.

16           THE COURT:  So you want me to read this now?

17           MR. TIEKE:  Yes, Your Honor.

18           THE COURT:  Without objection?

19           MS. REA:  Correct.

20           THE COURT:  So I'm gonna mark this for the record as

21   Stipulation Number 2.

22           MR. TIEKE:  Thank you, Judge.

23           THE COURT:  And after I read it, do you have more

24   questions --

25           MR. TIEKE:  Yes.

1          THE COURT:  -- on direct?

2          MR. TIEKE:  This just lays those -- the framework for

3     those, yes, Your Honor.

4          THE COURT:  Very well.

5          MR. TIEKE:  Thank you.

6       (End of bench conference.)

7          THE COURT:  Members of the jury, I am now going to

8     read you another stipulation.  Remember earlier, when I read the

9     first stipulation, I mentioned that stipulations are simply

10    agreements reached between the parties as to an otherwise

11    disputed fact.

12       The defendant, Suzanne Craft, through her counsel, Angela

13    Rea, and the United States, by counsel, Ms. Zimdahl and

14    Mr. Tieke, stipulate and agree to the following set of facts:

15       On July 28, 2022, at approximately 12:48 p.m., counsel for

16    the United States sent counsel for Suzanne Craft a letter

17    indicating that Suzanne Craft was the target of a federal

18    investigation into potential federal criminal violations

19    involving the mailing of threatening communications and the

20    interference of the right to fair housing.  That same day, and

21    no later than 8:00 p.m., the contents of the letter were

22    communicated to Ms. Craft.  The parties do not dispute these

23    facts.  You may accept them as I have read them to you as true.

24          MR. TIEKE:  Thank you, Your Honor.

25    BY MR. TIEKE:

Watts - Direct

1   Q.  Sir, on that same day, July 28, 2022, at 9:30 p.m., did you

2   get a voicemail from your daughter, Sarah?

3   A.  Yes.

4   Q.  Was she calling you from Craft's cell phone?

5   A.  Yes.

6   Q.  I'm gonna show you what has previously been marked as United

7   States Exhibit 30 for the witness only, please.

8      Sir, you recognize this?

9   A.  Yes.

10   Q.  Is it a screenshot showing a voicemail on July 28th, 2022,

11   at approximately 9:30 p.m.?

12   A.  Yes.

13        MR. TIEKE:  Your Honor, at this time I'd move to admit

14   United States Exhibit 30.

15        MS. REA:  May we approach?

16        THE COURT:  Yes.

17    (Bench conference on the record.)

18        MS. REA:  If you said it, I missed it.  So apologies,

19   but I think we're not quite there with foundation.  I think you

20   need to ask him if he's reviewed it and it's --

21        THE COURT:  I didn't hear that last part.

22        MS. REA:  I'm sorry.  Are you trying to admit right

23   now the message or the screenshot?

24        MR. TIEKE:  Screenshot.

25        MS. REA:  Okay.  Then no objection.

```
 1              THE COURT:  All right.

 2              MS. REA:  Thank you.

 3              THE COURT:  You beat me.  I was gonna ask if you were

 4    moving for admission of --

 5              MR. TIEKE:  Just the screenshot.

 6              THE COURT:  There is a voicemail?

 7              MR. TIEKE:  Yes.

 8              THE COURT:  All right.  You're gonna get to that next?

 9              MR. TIEKE:  I'm not gonna play the voicemail.

10              THE COURT:  Okay.  You just want the screenshot?

11              MR. TIEKE:  I just want the screenshot in for now,

12    yes, Your Honor.

13              THE COURT:  I think he's met that.

14              MS. REA:  I agree.

15              THE COURT:  So it'll be admitted.

16              MS. REA:  Yes, without objection.

17              THE COURT:  Why don't you just return to the podium

18    and ask again for admission of Exhibit 30.  She'll say "no

19    objection."  I'll admit it.

20              MR. TIEKE:  Yes, Your Honor.  Thank you.

21         (End of bench conference.)

22              MR. TIEKE:  Your Honor, may we approach, briefly?

23         (Bench conference on the record.)

24              MR. TIEKE:  I'm apparently suffering from lack of

25    sleep at this point.  So I am going to play the voicemail next.
```

1          MS. REA:  Then I think you need to have him lay the

2    foundation that he is -- I will object unless there's a

3    foundation that is laid.

4          MR. TIEKE:  Yes.  Thank you.

5          THE COURT:  Did you want to admit the screenshot

6    first?

7          MR. TIEKE:  Yes, Your Honor, and then I'll proceed to

8    the voicemail.

9          THE COURT:  The voice clip is a separate exhibit;

10   correct?

11         MR. TIEKE:  Yes, Your Honor.

12         THE COURT:  All right.  So let's just do this, and

13   then you can ask your foundational questions on 31.

14         MR. TIEKE:  Yes, Your Honor.

15         THE COURT:  Is it 31?  I just assumed so.

16         MS. REA:  I don't know.

17         MR. TIEKE:  Yes, Your Honor, and my apologies.

18         THE COURT:  That's okay.

19      (End of bench conference.)

20         MR. TIEKE:  Sir, let me pull back up Exhibit 30 there.

21   This is the screenshot we were looking at.

22      I'd like to move to admit United States Exhibit 30.

23         MS. REA:  No objection.

24         THE COURT:  It will be admitted.

25      (Government Exhibit 30 admitted in evidence.)

Watts - Direct

1    BY MR. TIEKE:

2    Q.  And so is this a screenshot from your phone?

3    A.  Yes.

4    Q.  Of a voicemail from a phone that is listed in there as

5    Suzanne?

6    A.  Yes.

7    Q.  Is that the contact for the defendant, Craft?

8    A.  Yes.

9    Q.  Was it odd to you that Sarah was calling you from -- on July

10   28th, 2022, from Craft's cell phone?  Did Sarah have her own

11   cell phone at this time?

12   A.  Yes, she did.

13   Q.  And does she -- at this time, did she typically call you

14   from her own cell phone?

15   A.  Yes.

16   Q.  And so did you listen to that July 28th, 2022, voicemail

17   from Sarah?

18   A.  Yes.

19          MR. TIEKE:  I'd like to bring up for the witness only,

20   please, Exhibit 31.

21   Q.  And so, sir, did you save that voicemail of July 28th, 2022?

22   A.  Yes.

23   Q.  And did you provide a copy of it to the FBI?

24   A.  Yes.

25   Q.  And did you listen to a copy of the July 28th, 2020,

Watts - Direct

1   voicemail from Sarah in preparation for your testimony today?

2   A.   Yes.

3   Q.   You recognized what you listened to on that day, the

4   voicemail you provided to the FBI, as a true and accurate copy

5   of the July 28th, 2022, voicemail from Sarah?

6   A.   Yes.

7           MR. TIEKE:  Okay.  Your Honor, I move to admit United

8   States Exhibit 31.

9           MS. REA:  No objection.

10          THE COURT:  It will be admitted.

11      (Government Exhibit 31 admitted in evidence.)

12          MR. TIEKE:  If we can publish that and play it,

13   please.

14      (Government playing audio.)

15   BY MR. TIEKE:

16   Q.   Sir, why did you provide that voicemail to the FBI?

17   A.   It was just strange that my daughter was calling me about

18   this.

19   Q.   You mentioned earlier -- you ever shown her the bullets?

20   A.   No.

21   Q.   In that voicemail, does she -- what does she tell you

22   about -- or in that voicemail, does Sarah talk about -- just

23   explain.  What do you hear in that voicemail?

24   A.   Her trying to tell me that she's seen the bullets and that

25   she got them from a drawer at the farmhouse.

1    Q.   Does she tell you who is asking her to make that call?

2    A.   Her mother.

3    Q.   Ms. Craft?

4    A.   Ms. Craft.

5    Q.   And you said that you heard mention of a drawer and bullets

6    in one of those places you moved out of after 507 Edgeforest.

7    Did that make sense, from your recollection of the events, about

8    the bullets that we looked at earlier?

9    A.   No.

10   Q.   And, in fact, was the last place that you ever saw the three

11   bullets together at Craft's house, at 507 Edgeforest Place?

12   A.   Yes.

13   Q.   What's your reaction to this voicemail?

14   A.   It was weird.  I got upset a little bit.

15   Q.   Why'd you get upset?

16   A.   It just seems like she was forced to make a phone call.

17           MR. TIEKE:  Okay.  May I have a moment, Your Honor?

18           THE COURT:  Yes.

19           MR. TIEKE:  Can we approach?

20           THE COURT:  Yes.

21      (Bench conference on the record.)

22           MR. TIEKE:  Your Honor, Ms. Moss is yelling at me that

23   I did not admit Exhibit 30.  I believe I did --

24           MS. REA:  You did.

25           MR. TIEKE:  -- that screenshot.

```
1            MS. REA:  You did because I'm not objecting.
2            MR. TIEKE:  You're not objecting.
3            THE COURT:  It was admitted.
4            MR. TIEKE:  Thank you.  I'll tell Ms. Moss.
5            THE COURT:  While we're here, any ballpark on your
6    cross?
7            MS. REA:  It could be, like, a half hour.  So I don't
8    think it'll be super long.
9            THE COURT:  No, that's --
10           MS. REA:  Of course, last time I said that, I think it
11   was more like 50 minutes, but --
12           THE COURT:  Yeah, that's true.
13           MS. REA:  -- that's my best guess.
14           THE COURT:  I haven't yet employed a stopwatch.  So I
15   will not begin now.  I'm just thinking that what we would
16   probably end up doing is taking lunch early.  And then you'll
17   have your final witness; correct?
18           MR. TIEKE:  Yes, Your Honor.
19           THE COURT:  All right.
20           MS. REA:  Okay.
21           MR. TIEKE:  Thank you, Judge.
22       (End of bench conference.)
23           MR. TIEKE:  Thank you, sir.  I don't have any
24   additional questions.  Ms. Rea might have a few questions for
25   you.  Okay?
```

1          THE COURT:  Ms. Rea.

2          MS. REA:  Thank you.

3                    CROSS-EXAMINATION

4    BY MS. REA:

5    Q.  Hi, Mr. Watts.  Let's start by just walking through some

6    background.  As you spoke about with Mr. Tieke, when -- you

7    moved to Louisville with Suzanne around about 2007; is that

8    right?

9    A.  Yes.

10   Q.  And the residence that you moved into at that time was the

11   house at 507 Edgeforest?

12   A.  Yes.

13   Q.  And you lived there with her up until 2017?

14   A.  Correct.

15   Q.  And your daughter, Sarah, was born not too long after you

16   moved in; right?

17   A.  Correct.

18   Q.  Is her birthday December 2007?

19   A.  Yes.

20   Q.  Okay.  I don't remember the day, and I won't try to guess.

21   The flood that you have talked about, that flood took place

22   shortly after you moved in; correct?

23   A.  Yes.

24   Q.  So would that be late 2007, early 2008?

25   A.  I think it was early 2008.

Watts - Cross

1    Q.  Early 2008.  Okay.  To back up even further than that, you

2    were in the service; right?

3    A.  Yes.

4    Q.  You were a marine?

5    A.  Yes.

6    Q.  When did you leave the service?

7    A.  2003.

8    Q.  2003.  Okay.  So when we're talking about firing at the

9    range, is that when you were in the service?

10   A.  Yes.

11   Q.  So that would be sometime 2003 or prior?

12   A.  Correct.

13   Q.  What kind of gun were you shooting?

14   A.  M16.

15   Q.  Okay.  And what kind of rounds?

16   A.  5.56.

17   Q.  5.56s.  Okay.  And you would -- if you did well at the

18   range, it's fair to say, kind of as a trophy, I guess, is the

19   right word, take a round with you?

20   A.  Yes.

21   Q.  Okay.  And that happened three times that you took a round

22   with you?

23   A.  Yes.

24   Q.  Those rounds were kept in a box with other keepsakes from

25   the military?

Watts - Cross

1   A.   Yes.

2   Q.   Okay.  When you took a look -- the flood caused you to take

3   a look at those items?

4   A.   To empty out the items.

5   Q.   'Cause stuff had water in it; right?

6   A.   Yes.

7   Q.   So when you emptied out the items, did you sit them

8   somewhere and let them dry?

9   A.   Yes.

10  Q.   Then what'd you do with them?

11  A.   I believe I put them all back into another box.

12  Q.   And where did they go after that?

13  A.   Back into the basement.

14  Q.   Okay.  Did they remain in that box in the basement until you

15  moved out?

16  A.   Yes.

17  Q.   And when you moved out, did you remove them from that box?

18  A.   No.

19  Q.   Did you take a look at them?

20  A.   No.

21  Q.   Did you show them -- prior to the time you moved out, did

22  you show them to Suzanne?

23  A.   No.

24  Q.   So when we're talking about laying eyes on those 5.56

25  rounds, is it -- up until you went looking in the box recently,

Watts - Cross

```
 1   had you laid eyes on those rounds since 2007?

 2   A.   No.

 3   Q.   Okay.  When we're talking about watermark -- in the photos

 4   that you were shown by the U.S., when you say "watermark," what

 5   you're talking about is a spot or spots of rust; correct?

 6   A.   Yes.

 7   Q.   From where metal came into contact with water?

 8   A.   Correct.

 9   Q.   Okay.  Are 5.56 rounds an uncommon round to shoot?

10   A.   In the military, no.

11   Q.   Okay.  So if you shoot with an M16 when you're in the

12   military, do you shoot an M16 a fair amount?

13   A.   Yes.

14   Q.   Okay.  When you moved out of the Edgeforest Place residence

15   in 2017, where did you move to after that?

16   A.   I'm sorry.  I can't recall the apartment.  Champion Farms,

17   that's what it is.

18   Q.   You moved to an apartment?

19   A.   An apartment, yes.

20   Q.   And about how long did you stay there?

21   A.   A year.

22   Q.   Okay.  Where did -- and then did you move to another

23   apartment after that?

24   A.   Yes.

25   Q.   Okay.  And after that -- so we go house, apartment,
```

Watts - Cross

| | |
|---|---|
| 1 | apartment.  Is the next move to the farm? |
| 2 | A.   Correct. |
| 3 | Q.   Okay.  Around about when did you move to the farm? |
| 4 | A.   2019, I think. |
| 5 | Q.   Okay.  In, I guess -- this is the way that I know to do |
| 6 | things.  About how old was Sarah when you moved to the farm? |
| 7 | A.   9 or 10. |
| 8 | Q.   Okay.  What's the farmer's name? |
| 9 | A.   Rick Park. |
| 10 | Q.   Okay.  Just -- you made reference to "the farmer," and I |
| 11 | don't want it to be confusing.  The situation as far as your |
| 12 | setup while you were living at the farm, did you have your own |
| 13 | building?  Did you share a house with him?  Describe for us what |
| 14 | that was like. |
| 15 | A.   There was a separate room, essentially, that had a kitchen, |
| 16 | bathroom, and a bedroom attached to the house.  So it was |
| 17 | essentially one house.  I just had a section of it. |
| 18 | Q.   Okay.  And that was the section that you occupied |
| 19 | independently, and the farmer lived in the other part? |
| 20 | A.   He didn't -- he didn't really live there.  He had a house. |
| 21 | Q.   Okay.  But you didn't occupy that other part? |
| 22 | A.   I could go in there.  I just never occupied it. |
| 23 | Q.   Okay.  When Mr. Tieke was asking you questions, you said -- |
| 24 | made a reference to suspecting the farmer.  What's that about? |
| 25 | A.   I had -- accidentally had killed his dog. |

Watts - Cross

1   Q.   Okay.

2   A.   I thought maybe he may be wanting me off the farm and set me

3   up for that.

4   Q.   Okay.  Were you trying to just make sense of this stuff?

5   A.   Yes.  I was just shooting in the dark.

6   Q.   Okay.  When you lived at the farm -- and you don't live

7   there now.  Now you live in an apartment in Lyndon.  When did

8   you move?

9   A.   2021, around March.

10  Q.   Okay.  While you were living at the farm, did Suzanne visit?

11  A.   No.

12  Q.   Did Suzanne ever take Sarah when she stayed with you?

13  A.   No.  She never came out to the farm.

14  Q.   Okay.  And Sarah stayed with you every other weekend?

15  A.   Correct.

16  Q.   Is that right?  Okay.  As far as you know, did Sarah know

17  the address of the farm?

18  A.   Not to my knowledge.

19  Q.   Okay.  Did Suzanne ask you for the address of the farm after

20  all this stuff had happened?

21  A.   After all this stuff had happened, yes.

22  Q.   The rounds, when they were at the farm, were they in a box?

23  A.   I assumed.

24  Q.   Okay.  When you went looking for them after you received the

25  text, where was that box?

Watts - Cross

1    A.  It was in my closet.

2    Q.  Was it on a high shelf in your closet?

3    A.  Yes.

4    Q.  Okay.  Do you think you would have known if Sarah would have

5    gotten that item from your closet?

6    A.  No.

7    Q.  Okay.  One moment.  The space that you had at the farm, did

8    you have cameras?

9    A.  I had one camera.

10   Q.  Okay.  And did that camera system have alerts --

11   A.  Yes.

12   Q.  -- if there was -- is it if there was motion?

13   A.  Correct.

14   Q.  Okay.  Was there a time when you came home and stuff was

15   kind of in disarray?

16   A.  There was one time, yes.

17   Q.  Okay.  If I described it incorrectly, please correct me.

18   Were items knocked over?  What was it you observed?

19   A.  I had a keepsake box that was knocked over on my window

20   sill.

21   Q.  Okay.  And did your cameras catch anything?

22   A.  No.

23   Q.  Okay.  And Sarah didn't know where you kept those rounds at

24   the farm?

25   A.  Not that I'm aware of.

Watts - Cross

1   Q.   You'd never shown them to her?

2   A.   No.

3   Q.   Okay.  The message that the U.S. discussed with you that you

4   received from Ms. Craft on November 12 of 2020, that message

5   simply said "They say I put bullets in their mailbox"; correct?

6   A.   Correct.

7   Q.   She did not say anything about what kind of bullets; right?

8   A.   Correct.

9   Q.   Did not opine on where they came from; correct?

10  A.   Correct.

11  Q.   On whose they were?

12  A.   Correct.

13  Q.   And thereafter, on the 13th, she sends you a photo.

14  A.   Correct.

15  Q.   And the photo is the first time there's a visual of the

16  rounds?

17  A.   Correct.

18  Q.   You introduced the idea that they looked like yours; right?

19  A.   Correct.

20  Q.   And that was in a phone call.  It wasn't in the text

21  messages?

22  A.   Correct.

23  Q.   Okay.  But it was after she had sent you a photo showing you

24  what they looked like; right?

25  A.   Correct.

1   Q.   Okay.  I'm gonna back up to a different subject for a

2   moment.  Is Sarah part Jewish?

3   A.   Yes.

4   Q.   Okay.  Is there a menorah in the home?

5   A.   Yes.

6   Q.   And is there recognition of the Hanukkah holiday?

7   A.   A little bit.

8   Q.   Okay.  The rounds that you were shown today and that you

9   held in your hand in the evidence bag, prior to that had you

10  ever seen them in person?

11  A.   No.

12  Q.   You had only seen a photograph?

13  A.   Just a photograph.

14  Q.   Okay.  Did you put in or attempt to put in security cameras

15  at Suzanne's house?

16  A.   Yes.

17  Q.   How many times did you do that?

18  A.   I think it was three times.

19  Q.   Okay.  As best you can, when was -- it's hard.  As best you

20  can, about when was the first time that you attempted that?

21  A.   I don't remember.  I can't remember the date the first time.

22  Q.   Okay.  In the timeline of things that we're talking about,

23  if that -- does that help at all? -- had discussion about these

24  issues already arisen?

25  A.   I'm sorry.  I can't recall.

Watts - Cross

1    Q.   Okay.  The first time that you tried to install a camera,

2    where did you try to install it?

3    A.   I believe that was the Ring doorbell camera.

4    Q.   Okay.  And thereafter did you -- so we have a Ring doorbell

5    camera.  Thereafter did you try to install a camera on her back

6    fence that would show the driveway?

7    A.   Yes.

8    Q.   And was that successful?

9    A.   No because it was having issues.

10   Q.   Okay.  Do you know why?

11   A.   I think it was reception.

12   Q.   Okay.  And then was there another camera that you tried to

13   install after that?

14   A.   Three of them -- well, there was three others attached to

15   that system.

16   Q.   Three others.  Okay.  So it was one system --

17   A.   It was one system.

18   Q.   -- at that time.  And it was not functioning because of

19   reception issues?

20   A.   Just one of them was having issues.

21   Q.   One of them was having reception issues.  Okay.  Where were

22   the other cameras?

23   A.   One on the porch, one facing the front yard.

24   Q.   Okay.

25   A.   And then there was one in the living room.

Watts - Redirect

1    Q.  One in the living room?

2    A.  In the living room, yes.

3    Q.  Okay.  Do you know if those were put in around about

4    February of 2021?

5    A.  It sounds close to about it, yes.

6         MS. REA:  Okay.  Let me take a quick look.  That might

7    be all, but give me one second.

8      No further questions.  Thank you, Your Honor.

9         THE COURT:  Redirect?

10        MR. TIEKE:  Just a few, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MR. TIEKE:

13   Q.  Mr. Watts, Ms. Rea asked you about Sarah's faith.  Is

14   Ms. Craft Jewish?

15   A.  No.

16   Q.  So does -- Sarah's Jewish heritage, does that come from your

17   side of the family, Mr. Watts?

18   A.  Correct.

19   Q.  You were also asked about a farmer, that you lived on his

20   property.  Did you say that -- you know, when you were talking

21   about him and you thought it might be a -- setting you up, you

22   thought it was a shot in the dark?

23   A.  Correct.

24   Q.  Were you scrambling at that point, when you thought that,

25   for ways to -- that this might not be Ms. Craft?

1    A.   At the time, yes.

2    Q.   I mean, is she your former girlfriend?

3    A.   Yes.

4    Q.   The mother of your child?

5    A.   Yes.

6    Q.   Was she the woman that your daughter was spending the most

7    of her time with?

8    A.   Yes.

9    Q.   And so you didn't want it to be her, did you?

10   A.   I'm sorry.  Repeat the question.

11   Q.   You didn't want it to be her, did you?

12   A.   Yes, I didn't want it to be her.

13   Q.   You did not want it be her?

14   A.   I'm sorry.  No, I did not want it to be her.

15   Q.   Sir, are the bullets that we looked at today, all three of

16   them, were those your three bullets?

17   A.   Yes.

18   Q.   And do you recognize, as you sit here today, the two bullets

19   that are in the mailing that was sent to the Pinedas as your

20   bullets?

21   A.   Yes.

22        MR. TIEKE:  No further questions, Your Honor.

23        MS. REA:  Nothing else, Your Honor.

24        THE COURT:  May the witness be excused?

25        MR. TIEKE:  Yes, Your Honor.  Thank you.

1        (Testimony concluded at 11:23 a.m.)

2                    C E R T I F I C A T E

3        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

4   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6
          s/Dena Legg                    June 23, 2023
7   Certified Court Reporter No. 20042A157      Date
    Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2     GOVERNMENT WITNESS:

 3     RICHARD WATTS
            Direct Examination By Mr. Tieke              2
 4          Cross-Examination By Ms. Rea                30
            Redirect Examination By Mr. Tieke           40
 5

 6                             EXHIBITS

 7
       GOVERNMENT:
 8     29 - text messages                               7
       30 - call log screenshot                        25
 9     31 - voicemail                                  27

10
       DEFENDANT:
11     No Exhibits

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```