```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF KENTUCKY
 2                          LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00094-DJH
 4                                  )
             Plaintiff,             )
 5                                  )
     v.                             )
 6                                  )
     SUZANNE CRAFT,                 )
 7                                  )    March 9, 2023
             Defendant.             )    Louisville, Kentucky
 8

 9                            *  *  *  *  *

10                             VOLUME 1
         TRANSCRIPT OF TESTIMONY OF SUZANNE CRAFT AT JURY TRIAL
11                 BEFORE HONORABLE DAVID J. HALE
                      UNITED STATES DISTRICT JUDGE
12
                              *  *  *  *  *
13
     APPEARANCES:
14
     For United States:        Christopher C. Tieke
15                             Stephanie M. Zimdahl
                               U.S. Attorney's Office
16                             717 West Broadway
                               Louisville, KY 40202
17
     For Defendant:            Angela M. Rea
18                             Western Kentucky Federal
                                 Community Defender, Inc.
19                             629 S. 4th Avenue, Suite 200
                               Louisville, KY 40202
20
     [Defendant present.]
21
                         Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                            232 U.S. Courthouse
23                        Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

```
 1          (Begin testimony in open court at 3:32 p.m.  Jury in.)

 2          (SUZANNE CRAFT, called by the defense, sworn.)

 3                          DIRECT EXAMINATION

 4     BY MS. REA:

 5     Q.   Go ahead and have a seat.  Good afternoon.

 6     A.   Good afternoon.

 7     Q.   Please introduce yourself to the jury.

 8     A.   My name is Suzanne Craft.

 9     Q.   Make sure you keep your voice up.  That's a microphone in

10     front of you, and I want to make sure we can hear you.

11          Suzanne, how old are you?

12     A.   I'm 55.

13     Q.   Okay.  And do you have a house in Edgeforest Place?

14     A.   I do.

15     Q.   Where is it?

16     A.   It's 507 Edgeforest Place.

17     Q.   How long have you lived there?

18     A.   Fifteen years.

19     Q.   Did you buy that house?

20     A.   Yes.

21     Q.   Do you have a mortgage on it?

22     A.   Yes.

23     Q.   Do you have equity in that house?

24     A.   Yes.

25     Q.   How much?
```

Craft - Direct

```
 1   A.  Approximately 75 percent.

 2   Q.  Okay.  Who lives there with you?

 3   A.  My daughter, Sarah.

 4   Q.  What's her birthday?

 5   A.  12-11-07.

 6   Q.  12-11?

 7   A.  '07.

 8   Q.  So she turned 15 in December.

 9   A.  Yes, ma'am.

10   Q.  Okay.  And did anyone else used to live there with you?

11   A.  Yes, her father.

12   Q.  Okay.  And her -- is her father Richard?

13   A.  Richard Watts.

14   Q.  Okay.  Did you-all move into the house at the same time?

15   A.  Yes, we did.

16   Q.  When was that?

17   A.  It was in October/November of 2007.

18   Q.  Okay.  And approximately when did he move out?

19   A.  In May of 2017.

20   Q.  When 2017?

21   A.  May.

22   Q.  May.  Okay.  Does your daughter primarily live with you or

23   with him?

24   A.  My daughter lives with her father now.

25   Q.  Okay.  In 2019-2020, did she primarily live with him or with
```

1    you?

2    A.   She primarily lived with me.

3    Q.   Okay.  What was the arrangement with respect to time that

4    she would spend with him?

5    A.   She would be with her father every other weekend, but she

6    primarily lived with me.

7    Q.   Okay.  And is Richard Jewish?

8    A.   Yes.

9    Q.   So is Sarah half Jewish --

10   A.   Yes.

11   Q.   -- on the dad's side?

12          THE COURT:  Let me interrupt and ask counsel to

13   approach, please.

14      (Bench conference on the record.)

15          THE COURT:  I'm concerned about questions of religion.

16   I'm concerned that they violate the Federal Rules of Evidence,

17   which specifically address using a religious question to bolster

18   the credibility of a witness.

19      I want to take a five-minute break and have you-all look at

20   that.  It might suggest an instruction to that effect.  There is

21   some Sixth Circuit case law on point.  Of course, there are

22   exceptions which may be applicable when bias is the primary

23   focus of the trial, but I am concerned that we're veering into

24   this area.  So I want us to flesh this out before we go further.

25          MS. REA:  And I will say the reason for the question

1   is there's an allegation of painting swastikas.  So that is --

2   I'm not in any way saying religious --

3          THE COURT:  I understand.  I understand, but the rule

4   is there.  So I want us to take a few minutes to flesh it out.

5   So I'm going to apologize to the jury and tell them that we need

6   to talk about an issue, and we'll get them back as soon as

7   possible.

8      (End of bench conference.)

9          THE COURT:  Members of the jury, we're going to have

10  to do a few minutes of work.  Rather than have you sit and wait,

11  we're gonna let you take yet another break while we do some of

12  of that, and we'll have you back as soon as possible.  Thank

13  you.

14     (Jury out 3:36 p.m.)

15     (Bench conference on the record.)

16         THE COURT:  Let me find my notes and call you right

17  back up here.

18         MS. REA:  And I'll get my binder.

19     (End of bench conference.)

20         THE COURT:  If you could come back to the bench,

21  please.

22     (Bench conference on the record.)

23         THE COURT:  All right.  So it is Rule 610, which

24  you-all may now have found, not an oft cited rule in my

25  experience but one that does appear to have some application

1    here.

2        Let me give you a case that I would also like you to look

3    at.  It is *U.S. v. Acosta*, 924 F.3d 288.  It's a 2019 Sixth

4    Circuit case which says American courts universally condemn the

5    injection of religion into legal proceedings.  By the same

6    token, credibility arguments based on religious affiliations or

7    practices are not favored.

8        So the prohibition against vouching or bolstering would

9    apply, it seems to me, based on this case -- this line of cases

10   even if it's not the witness that -- even if it's not the actual

11   witness being asked the question about their religious

12   affiliation.  In other words, the earlier question about

13   Mr. Watts' religious affiliation, if done to bolster the

14   credibility of Sarah or Ms. Craft, it is probably improper under

15   this instruction.  So I am a bit concerned about that.

16       I understand why you're going where you're going.  I do, but

17   we have Rule 610, and we have these cases.  So I want to give

18   you-all a few minutes to look at them --

19            MS. REA:  Okay.

20            THE COURT:  -- and then we can follow-up.

21            MS. REA:  Thank you.

22       (End of bench conference.)

23       (Recess at 3:40 p.m. until 4:16 p.m.  Jury out.)

24            THE COURT:  We're back on the record.  The jury is not

25   in the courtroom.  Let me see counsel at the bench, please.

1      (Bench conference on the record.)

2           THE COURT:  Is your co-counsel joining us or --

3           MS. REA:  She has abandoned him.

4           THE COURT:  Have you-all looked at *U.S. v. Acosta*?

5           MS. REA:  Yes, Your Honor.

6           MR. TIEKE:  Yes, Your Honor.

7           THE COURT:  I am concerned.  I should have made this

8    type of interruption when the issue was first raised with

9    Mr. Watts during his testimony.  I am not sure how to put the

10   toothpaste back in the tube, though, at this point.  I do think

11   it is necessary to instruct this jury that they are not

12   permitted to consider the religious affiliation of any person in

13   assessing the credibility of any witness.

14       In other words, they have heard testimony that the

15   defendant's daughter may be Jewish.  They have heard testimony

16   that Mr. Watts -- I mean, he didn't say "I am Jewish" in his

17   testimony.  He did -- it seems clear, though, he did answer a

18   question of parentage that -- it seems clear that his ethnicity

19   may be extrapolated from the questions asked and the answers

20   given.  So Rule 610 prohibits the jury from assessing anybody's

21   credibility on the basis of that.  So I think at minimum we need

22   that cautionary instruction.

23       Now, I understand why you asked the question that you asked,

24   but it raises, again, in light of what Judge Bush, who wrote

25   this very well-reasoned, very well-written opinion in *U.S. v.*

1    *Acosta* -- I mean, he cautions very strongly that religion should

2    not have a place in our jurisprudence.

3        So the question becomes what do we do with what is out

4    there?  Is the defense permitted to go further and make an

5    argument regarding motive, which is in a different category than

6    credibility of a witness; right?

7        And so that's what I need -- all of that is by way of

8    background to narrow the issue, and let me hear from you-all.

9    I'll start with you first, Ms. Rea, as to what you propose that

10   we do in order to comply with Rule 610 and deal with where we

11   are in the trial.

12          MS. REA:  And I think the Court is correct in that I

13   was getting at motive, not vouching for credibility with respect

14   to religion.

15       The other thing I will say is I did not plan to do more than

16   what I have done as far as questioning, as far as any argument.

17   You know, my goal was that -- you know, the motive, she had

18   basically done something to attack her daughter -- without

19   vouching for anyone's credibility.

20       You know, at this point, I think -- if the Court is

21   concerned over confusion about it, you know, are we using it for

22   a proper purpose, I guess that raises the possibility of an

23   instruction.  I don't -- my position on it is there's not enough

24   out there that we need to take that curative step because it

25   might just draw more attention to something that I am not making

Craft - Direct

1   a real issue of.

2          THE COURT:  Well, it isn't just your question.  This

3   is -- we're just in day four.  So fresh in the jury's mind, upon

4   hearing your question -- or in the jury's minds, it seems

5   reasonable to me, upon hearing your question to Ms. Craft about

6   her daughter's religious affiliation, would have been that just

7   yesterday similar questions were asked of Mr. Watts.  So it is

8   more than just the one question that you just asked.

9          MS. REA:  You're correct.  I did ask it also of

10  Mr. Watts for the same purpose, for discussion, which is --

11         THE COURT:  In fairness, Mr. Tieke asked a follow-up

12  question or two.

13         MR. TIEKE:  Yes.  I mean, I redirected, I think, for

14  the -- attacking the same issue, which would have been, you

15  know, that Ms. Craft didn't do this because of that, which I do

16  think touches on this issue.  I'm not sure that we need the

17  curative instruction, but if we would, perhaps we could -- if

18  Ms. Rea doesn't intend to, you know, stand up there in closings

19  and pound that --

20         MS. REA:  I don't.

21         MR. TIEKE:  -- sword, then maybe we could do it in the

22  jury instructions themselves.

23         THE COURT:  One that just says something along these

24  lines:  You have heard questions about the religious affiliation

25  of one witness and the defendant's daughter.  You may not

1  consider this testimony in assessing the credibility of any

2  witness.

3          MR. TIEKE:  And, I mean, that way we don't isolate

4  that --

5          THE COURT:  I think that's essentially what the rule

6  says.

7          MS. REA:  Yeah.

8          MR. TIEKE:  -- we don't isolate the issue.  We put it

9  amongst the other jury instructions.  So we draw less attention

10  to it.  And, of course, I mean, that's based on the

11  understanding that that's not gonna be the brunt of any

12  arguments in the -- in closing.

13          THE COURT:  If it's going to be --

14          MS. REA:  It is not.

15          THE COURT:  Well --

16          MR. TIEKE:  I trust Angela -- Ms. Rea.  I wouldn't --

17          THE COURT:  Well, you're all professionals.  I have no

18  qualms or concerns there.  There is some extra circuit case law,

19  a little older, which would suggest that there may be -- in

20  limited circumstances, it may be appropriate for evidence of a

21  religious affiliation to be considered with respect to the issue

22  of motive.

23      I am hesitant, frankly, because even that seems -- even that

24  type of usage seems to be inconsistent with the very strongly

25  worded, straightforward admonition found in *Acosta*, but it is

1  understandable in the motive or lack of motive context, as

2  opposed to the credibility.

3      We have crossed that line in this trial.  Nobody has said

4  this person is more or less credible because of their religious

5  affiliation.  I'm not concerned about that, but I also don't

6  want a jury going back and saying, "Well, do you remember

7  so-and-so saying he was Jewish?  Did he say he was Jewish?  Did

8  he say he was not Jewish?"  That has no place -- that has no

9  place in our trial practice.  And again, Judge Bush's opinion in

10  *Acosta* makes very clear -- and I agree wholeheartedly with it --

11  there is no place for that type of evidence.

12      So I feel strongly that we need an instruction of some type

13  consistent with Rule 610.  Your suggestion that rather than give

14  it as a curative instruction contemporaneous to this testimony

15  and instead include it in the instructions at the end of the

16  case, that may be a way to make sure that the jury hears it,

17  understands it before they begin their deliberation, and it

18  may -- it may provide the appropriate fix to the problem.

19      If you have decided, upon reflection, that there is little

20  value to you in arguing the motive issue, then I think we can

21  end our discussion here.

22          MS. REA:  I think that we can end our discussion here,

23  Your Honor.

24          THE COURT:  All right.  So I will then ask my law

25  clerk to begin preparing a very brief instruction along the

1    lines of what I -- as you can see on my -- I never worry about

2    anybody from that side trying to read my handwriting on this

3    side because it's difficult enough to read it on this side, but

4    what I read to you is consistent with the rule and I think

5    probably will form the basis of a reasonable instruction.

6        Are counsel in agreement with Mr. Tieke's suggestion that it

7    be done as part of the instructions at the end of the case, as

8    opposed to now?

9            MS. REA:  Yes, sir, that sounds good.

10           MR. TIEKE:  Yes, Your Honor.

11           THE COURT:  You're sticking by your suggestion?

12           MR. TIEKE:  I'll stick by my suggestion, Your Honor.

13           THE COURT:  All right.  Then that's what we'll do.

14       You're gonna move on from this issue now?

15           MS. REA:  I am.  I'm done, yeah.

16           THE COURT:  All right.  It is 4:25.  I told someone in

17   chambers when I was reading *Acosta* and a couple of other cases

18   that every trial has its hurdles.  So I'm -- we've had few up

19   until now, but that's okay.  That's to be expected.

20       All right.  I appreciate your quick work on that.  We will

21   have you put your client back on the stand, and then we'll bring

22   the jury back in and pick right up.

23           MS. REA:  Okay.

24           THE COURT:  We might not get done by 5:00.  So do you

25   anticipate a witness after?

Craft - Direct

1              MS. REA:  No.

2              THE COURT:  So you will close with her testimony?

3              MS. REA:  Yes.

4              THE COURT:  Do you think it's possible that we would

5     be done in 15, 20 minutes?

6              MS. REA:  Maybe 30.  It could be 15 to 20.  I don't

7     want to underestimate, but --

8              THE COURT:  All right.  Well, in any case, we'll

9     finish with her testimony first thing in the morning and then

10    finalize instructions.  I think we'll still be in good shape

11    timewise.  Thank you.

12             MR. TIEKE:  Thank you, Judge.

13             MS. ZIMDAHL:  Thank you, Your Honor.

14        (End of bench conference.)

15        (Jury in 4:29 p.m.)

16             THE COURT:  Thank you, members of the jury.  We are

17    now ready to proceed.

18        Ms. Rea.

19             MS. REA:  Thank you, Your Honor.

20    BY MS. REA:

21    Q.  Ms. Craft, I'm gonna zoom out a little bit.  Did you place

22    threatening items in or around the fountain in the Pineda's

23    yard?

24    A.  No.

25    Q.  Did you put threatening items, the letters that we've seen,

1    in the mail to be sent to them?

2    A.   No.

3    Q.   Did you paint these slurs that we've seen photos of on their

4    driveway?

5    A.   No.

6    Q.   Did you meet the Pinedas pretty shortly after they moved in?

7    A.   Yes, I did.

8    Q.   Okay.  And what -- for the first couple months they lived

9    there, how would you describe your interactions with them?

10   A.   It was very cordial.

11   Q.   Okay.  Did you communicate with either Michella or Connie?

12   A.   I communicated with Michelle because that's -- she gave me

13   her phone number.

14   Q.   Okay.  And after that, did you communicate with her either

15   text message or in person?

16   A.   Both; both in person and text message.

17   Q.   And we have seen some of those text messages in evidence;

18   right?

19   A.   Uh-huh.

20   Q.   Okay.  Did you believe that the Pineda family had some sort

21   of surveillance cameras at their property at that time?

22   A.   It wasn't a question.  I didn't have an opinion either way.

23   I didn't know either way.

24   Q.   Okay.  Did there come a point where you asked Michelle to

25   look for video footage of something that may or may not have

Craft - Direct

```
1    happened on your property?
2    A.  Yes.
3    Q.  Okay.  And what was her response?
4    A.  She said that she would check her camera and see if she saw
5    anything -- or she said it didn't go that far.
6    Q.  Okay.  So after that exchange, did you believe that she had
7    cameras?
8    A.  Yes.
9    Q.  Okay.  Moving on through the summer, late summer, and fall
10   of 2019, did you hear reported from anyone that Sarah had used a
11   racial slur involving the -- any of the Pineda children?
12   A.  In summer of 2019?
13   Q.  In the either late summer or fall of 2019 --
14   A.  No.
15   Q.  -- did anybody report anything about that to you?
16   A.  No.
17   Q.  Okay.  We have heard testimony about an event that happened
18   in March of 2020, specifically March 22 of 2020.  What happened
19   that day?
20   A.  Well, we were home because it was COVID.  COVID had just
21   shut everything down, and the schools were closed.  The parks
22   were closed.  We weren't -- we were supposed to stay at home.
23   And Sarah's an only child.  So she had been out before playing
24   with the kids -- or in the street.  And I said, "Well, why don't
25   you go over and see if the Pinedas wanna play."
```

Craft - Direct

1    Q.   And did she stay over there very long?

2    A.   No.

3    Q.   Did she come back home thereafter?

4    A.   Yes.

5    Q.   Okay.  Had she not been able to play with the Pineda

6    children?

7    A.   No, she did not.  She came back.

8    Q.   Okay.  What did you do as a result of that?

9    A.   I was confused why she was sent away.

10   Q.   Okay.

11   A.   Because I don't believe the kids were in school.  Nobody was

12   in school.  So I -- she was upset.  So I went over and rang the

13   doorbell.

14   Q.   Okay.  Did you bang on the door?

15   A.   No.

16   Q.   Did you make the statement we have heard about?  "What the

17   'F' did that" --

18   A.   No, I did not.

19   Q.   -- "say to you?"  And when you rang the doorbell, what

20   happened?

21   A.   Nobody came to the door.

22   Q.   What did you do?

23   A.   I went home.

24   Q.   Okay.  Did you stay at home?  Did you do something else?

25   A.   Well, I asked her if she wanted to ride bikes.

1    Q.  Okay.  And did you-all go ride bikes?

2    A.  Well, I went -- I got my bike out.  Sarah -- Sarah didn't

3    want to ride bikes.  So I was like, "Well, I'm gonna go ride my

4    bike."

5    Q.  Okay.  What happened while you were riding your bike?

6    A.  I was riding around the circle and up the street and back.

7    It was a cul-de-sac.  It's a very small street.  And then Connie

8    came out and was yelling at me.

9    Q.  And did you yell back?

10   A.  No.  I stopped my bike in the street, and I was -- I said,

11   "What are you talking about?"

12   Q.  How did that interaction end?

13   A.  Connie said to me, "We don't want you over here anymore.  Go

14   away."  She said Sarah was a little bitch.  Sorry.  And I kind

15   of just stood there because I didn't know what to say.

16   Q.  Did you -- how long did you stay there?

17   A.  Maybe for about -- a few moments because I was trying to

18   process what she was saying to me.  So maybe a couple minutes.

19   Q.  Okay.

20   A.  And then --

21   Q.  Go ahead.  Sorry.

22   A.  And then I turned around and went back inside.

23   Q.  Went back inside your own home?

24   A.  Yes.

25   Q.  Okay.  And then let's move forward to the sort of next event

Craft - Direct

```
 1    in the history of this case, which is June the 7th.  June the
 2    7th, you recall that as a day when there were paintings on your
 3    driveway and the Pineda driveway?
 4    A.  Yes.
 5    Q.  Okay.  Did something wake you up that morning?
 6    A.  Yes.
 7    Q.  What was that?
 8    A.  Well, actually, I got up to go to the bathroom, and I heard
 9    the water on outside.
10    Q.  Okay.  And had you -- when you say "water," what do you
11    mean?
12    A.  My -- the water outside that was hooked up to a hose.
13    Q.  Okay.  Is it a sprinkler, or is it just a hose that was
14    running?  Is it a spigot?  What is it?
15    A.  It's a hose with a small sprinkler at the end that was
16    placed in the yard to water one spot.
17    Q.  Okay.  And is -- where is that sprinkler located in
18    connection with where you would have been sleeping?
19    A.  Oh, I sleep in the back of the house.  The sprinkler was
20    located -- my daughter's room is in the front of the house.  So
21    it was right underneath her window.
22    Q.  Okay.  And you heard -- how'd you hear it?  Were you walking
23    to the bathroom?
24    A.  Oh, well, you can hear it.  It's like a high-pitched noise.
25    Q.  Okay.
```

1    A.   I could hear it -- like, yeah, when I woke up, I could hear

2    it outside.

3    Q.   What did you do as a result of that?

4    A.   I went out and turned it off.

5    Q.   And had you left it on?

6    A.   No.

7    Q.   Okay.  About what time was that?

8    A.   It was about 3:30 in the morning.

9    Q.   Okay.  And why were you watering that particular patch of

10   grass?

11   A.   Because it had been damaged previously, and I had planted

12   and had help planting grass seed and several bags of dirt that

13   we got from Home Depot.

14   Q.   Okay.  What did you do after you turned off your sprinklers?

15   A.   I went back to bed.

16   Q.   Okay.  And when you woke up in the morning, at what point

17   did you realize there was something painted on your driveway?

18   A.   When I went out to go to work.

19   Q.   And what did you see?

20   A.   I saw orange paint on my driveway.

21   Q.   Okay.  Did you also notice there was orange paint on the

22   Pineda driveway?

23   A.   Not at first 'cause I was trying to read what it said.

24   Q.   Okay.

25   A.   And then I -- then I looked over and saw theirs.  It was

1   painted too.

2   Q.  Could you tell what theirs said?

3   A.  No.

4   Q.  Did you call police?

5   A.  Yes.

6   Q.  Okay.  And did you find a paint can on your property?

7   A.  Yes, I did.

8   Q.  Where was it?

9   A.  It was off to the side in the bushes, further back from the

10  painting on the left side between my driveway and Betty's

11  driveway.  There's a bunch of tall, like, fir trees, and it was

12  beneath, I believe, the second one.

13  Q.  Okay.  So if we've -- we've seen photos of your driveway.

14  You're saying it was to the left if we are facing the driveway?

15  A.  Yes, between Betty's house and my house.

16  Q.  Okay.  And did you point that out to police?

17  A.  I did.

18  Q.  Okay.  Did you -- that morning when you saw this, did you

19  see other neighbors outside?

20  A.  Later I did.

21  Q.  Later on when --

22  A.  Yes.

23  Q.  Were there other people gathered outside later on in the

24  morning?

25  A.  Yes, later.

Craft - Direct

1    Q.   Okay.  Were there other people gathered at the Pineda house?

2    A.   Yes.

3    Q.   And were the Pinedas out?

4    A.   Yes.

5    Q.   Okay.  Did you go over there?

6    A.   No.

7    Q.   Why not?

8    A.   Because Connie had told me in March that I couldn't come --

9    not to come over there anymore.  She said, "Don't come over here

10   anymore.  You're not welcome."

11   Q.   Did you later check any -- well, first of all, do you have

12   any kind of camera system?

13   A.   At the time, yes.

14   Q.   What did you have?

15   A.   I had a Ring doorbell camera.

16   Q.   Did you take a look at that?

17   A.   Not until later.

18   Q.   Okay.  When you did take a look at it, did you -- did your

19   camera record anything early that morning?

20   A.   Yes, but not at 3:30.

21   Q.   Okay.  What time was it?

22   A.   It was right around 2:00.

23         MS. REA:  Okay.  And if I could show my screen to just

24   the witness, please.

25         (Counsel conferring off the record.)

1    Q.  Ms. Craft, can you see that image on your screen?

2    A.  Yes, I can.

3    Q.  Is that a still or the start of what your camera recorded at

4    6-7-2020 at 1:59?

5    A.  Yes.

6    Q.  Okay.  Have you seen this video before?

7    A.  Yes, I have.

8    Q.  And is this video a representation of what your camera

9    captured on that morning?

10   A.  Yes, it is.

11         MS. REA:  Okay.  Your Honor, it's my motion -- or I'm

12   asking to admit what will be Defense Exhibit 1, the video from

13   Ms. Craft's Ring doorbell from 6-7-2020.

14         MR. TIEKE:  No objection.

15         THE COURT:  It will be admitted.

16     (Defendant Exhibit 1 admitted in evidence.)

17         MS. REA:  And may I publish?

18         THE COURT:  Yes.

19         MS. REA:  Thank you.  So I'd like it share this with

20   the jury.

21     (Defense playing video.)

22         MS. REA:  Thank you.  We can take that down now.

23   BY MS. REA:

24   Q.  Ms. Craft, first, just -- like, the scene, set the scene for

25   us.  What does that show?

Craft - Direct

1    A.  It shows my front porch looking towards this cul-de-sac.

2    Q.  And what is to the right?

3    A.  To the right is my -- are my -- the faucet for my

4    sprinklers.

5    Q.  And what did we see there?

6    A.  A person with a flashlight coming up.  And with the

7    flashlight, you can see it moving around and then the person

8    running away.

9    Q.  And thereafter some -- an hour and a half or so thereafter,

10   you heard your sprinklers running?

11   A.  Yes, at 3:30 in the morning.

12   Q.  Okay.  Was that you turning on the sprinklers?

13   A.  No, it was not.

14   Q.  Is that person bigger or smaller than you?

15   A.  Smaller.

16   Q.  How tall are you?

17   A.  I'm 5'6.

18   Q.  At the time how much did you weigh?

19   A.  I weighed 170 pounds.

20   Q.  Okay.  And we've seen a photo of you from -- that's been

21   admitted into evidence from August 2020.  Is that how you looked

22   then?

23   A.  Yes, it is.

24   Q.  Okay.  After the 6-7 event, did you ask Matt Lanham to share

25   footage with you?

1   A.   Yes, I did.

2   Q.   And did he do that?

3   A.   Yes, he did.

4   Q.   The next event I want to move forward to is the 6-16 event.

5   How did you become aware that that had happened, that that --

6   that something else had been painted on the Pineda driveway?

7   A.   How did I become aware that their driveway was painted?

8   Q.   Yes.

9   A.   Because I saw it.  I saw it.

10  Q.   You saw the painting on the driveway?

11  A.   Yes, I did.

12  Q.   Okay.  At that point, did you have any reason to check your

13  cameras to see if they'd captured anything?

14  A.   Yes.

15  Q.   And had they?

16  A.   Yes, I -- I saw the person, the 2:00 video.

17  Q.   Okay.  Are you talking about 6-16 or 6-7?

18  A.   Oh, 6-16.  I'm sorry.

19  Q.   That's okay.  I moved on.  I wanted to make sure I wasn't

20  confusing you.  The next event -- so the next time there was

21  paint on the Pineda driveway was 6-16-2020, and there was --

22  right?

23  A.   Yes.

24  Q.   After that did you check your camera system and see if your

25  cameras had recorded anything?

Craft - Direct

1    A.   Yes, I did.

2    Q.   And did you find anything?

3    A.   No, I did not.

4    Q.   Okay.  Same question for 6-27.  Did you check?

5    A.   Yes, I did.

6    Q.   And did you find anything?

7    A.   No, I did not.

8    Q.   Tell me how your Ring camera system works.

9    A.   The Ring camera -- during the day, it records a lot.  Like,

10   it -- the daylight it captures.  It's light and motion

11   activated, but it only sees so far.  Like, perhaps if a car

12   would come around with its lights on at night, it would activate

13   it and record that car coming around.  And it would stay on for

14   approximately a minute and a half, I believe, and then turn off.

15   Q.   Okay.  The goal of having that camera -- what was your --

16   what were you trying to capture by having that camera?

17   A.   I was trying to capture the -- if anybody had done -- would

18   do any kind of vandalism to my yard or if somebody would come up

19   and steal a package or the typical reasons why a person would

20   get -- have a Ring camera.

21   Q.   Okay.  Did you see any Facebook postings after the June 16th

22   driveway painting from the Pinedas?

23   A.   Yes, I did.

24   Q.   Did you, at that point, know that they were accusing you?

25   A.   The Facebook posting that the Pinedas put on?

1    Q.  Uh-huh.

2    A.  I believe it said something about me coming over there and

3    painting their driveway.

4    Q.  Okay.  And those postings, what was -- this is a bad way of

5    asking the question.  What did they include?

6    A.  They said that --

7    Q.  Not the words necessarily.  Were there photographs?

8    A.  Yes, there were photographs.

9    Q.  Were there also images of the video?

10   A.  Yes, there were screenshots of the video.

11   Q.  Okay.  Could you tell from looking at those screenshots what

12   area their cameras were able to capture?

13   A.  Yes, I could.

14   Q.  Okay.  I want to talk to you now about the fall of 2020.

15   Did you always stay at your house?

16   A.  No, I did not.

17   Q.  Where did you stay?

18   A.  At my friend Tammy's house.

19   Q.  Okay.  About when did you start doing that?

20   A.  It was the beginning of October of 2020.

21   Q.  Okay.  When would you go over there?

22   A.  I would wait till about -- it would depend.  I would change

23   the times I would go over there.  So definitely after midnight,

24   sometimes 1:00, sometimes 2:00.

25   Q.  Did you do that every night?

Craft - Direct

| | |
|---|---|
| 1 | A.  Not every night. |
| 2 | Q.  Did you let her know that you were headed over there? |
| 3 | A.  Not every time.  It was understood that I had an open door, |
| 4 | which she kept unlocked for me downstairs.  Whenever I would |
| 5 | want to come over there, it was open. |
| 6 | Q.  Okay.  And why were you doing that? |
| 7 | A.  So they couldn't make any more videos. |
| 8 | Q.  Okay.  Would you sometimes let her know via text that you |
| 9 | were on the way? |
| 10 | A.  Yes, I did. |
| 11 | Q.  Okay.  So we've seen the videos from October 18. |
| 12 | A.  Yes. |
| 13 | Q.  And did you go over to Tammy's that night? |
| 14 | A.  October 18th? |
| 15 | Q.  Uh-huh. |
| 16 | A.  No. |
| 17 | Q.  Did you leave in your car at some point? |
| 18 | A.  Oh, yes, I did. |
| 19 | Q.  Okay.  Where were you -- |
| 20 | A.  Sorry.  I was confusing the dates. |
| 21 | Q.  Okay.  Where were you going when you left in your car on the |
| 22 | 18th? |
| 23 | A.  Tammy's house. |
| 24 | Q.  Okay.  Before you went to Tammy's house, did you walk over |
| 25 | to the Pineda's house and leave anything for them? |

1   A.   No, I did not.

2   Q.   Okay.  Did you also observe Facebook postings about the

3   mailings?

4   A.   Yes, I did.

5   Q.   Okay.  And in those postings were there photographs?

6   A.   Yes, there were.

7   Q.   Okay.  What do you remember seeing in those photographs?

8   A.   It looked like a bunch of letters and bullets.

9   Q.   Okay.  Did you -- did seeing the visuals of the letters mean

10  anything to you?

11  A.   Yes.

12  Q.   What did it mean?

13  A.   Well, the one with the bullets was sitting on top of a Fifth

14  Third Bank envelope.  So I immediately thought, "That's my

15  bank."

16  Q.   Okay.  Was there any other piece of mail that you thought

17  looked familiar to you?

18  A.   Not initially.  I texted that photo to several people.  My

19  attorney was one of them.  Richard was another one.  My

20  attorney's private investigator, Pattie.

21  Q.   What did you realize -- did you ever recognize that piece of

22  mail?

23  A.   After looking at it more, I did.

24  Q.   And what was it?

25  A.   It was a Girl Scout envelope.

Craft - Direct

1    Q.   Could you see the Girl Scout emblem kind of partially?

2    A.   Yes, I could.

3    Q.   Did you also recognize the end of the zip code?

4    A.   Yes, I did.

5    Q.   Okay.  At the time that you saw those items, what did you

6    think?

7    A.   I thought, "Uh-oh.  Someone's stealing my mail."

8    Q.   Okay.  Later on did you change your mind about that?

9    A.   Yes.

10   Q.   Okay.  And what did you think later on?

11   A.   Well, I mean, it's mail.  And then I figured out, well,

12   Sarah's -- from the last zip code, that's -- I looked it up, and

13   that's my street.  Sarah's the only Girl Scout on my street.  So

14   I looked at the mail again, and it looked like discarded trash

15   mail.

16   Q.   Why's that?

17   A.   'Cause it was wrinkled up, and it just looked like trash

18   mail, something that I had discarded.

19   Q.   And what did you conclude after that?

20   A.   That it was.

21   Q.   That it was what?

22   A.   That it was trash mail, but -- yes.

23   Q.   Okay.  After you came to that conclusion, did you do

24   anything differently?

25   A.   Yes, I stopped putting out my trash can --

Craft - Direct

1    Q.  Okay.

2    A.  -- overnight on the curb.

3    Q.  What would you do instead?

4    A.  I would either leave it inside, or I would just have it -- I

5    wouldn't put it out on the curb overnight.  I would put it out

6    in the morning.

7    Q.  Okay.  We have heard evidence that you did report about

8    theft of mail.

9    A.  Yes.

10   Q.  When did you do that?

11   A.  That was November 30th of 2020.

12   Q.  Okay.  Was that -- and when were the items -- when did you

13   think the items had been delivered and then went missing?

14   A.  The report that I made was November 21st.

15   Q.  Okay.  And had you looked at your Ring camera?

16   A.  Yes.  Initially I went back -- was able to go back all the

17   way before the Pinedas' post to see if someone had stolen mail

18   out of my mailbox overnight.

19   Q.  Okay.  And when you looked back to 11-21 and saw mail had

20   been delivered and you didn't have it, what did you think?

21   A.  Well -- the 21st?

22   Q.  Yes, ma'am.

23   A.  Okay.  11-21.  Because I thought -- I went back and --

24   because I thought, "Well, they can't get my trash anymore.  So

25   they're gonna start stealing my other mail," because that's how

1    -- "somebody's doing something to me."

2        So I started watching -- looking at when the mailman would

3    drop stuff off and when I would get the mail, or if I -- if I

4    could get the mail 'cause sometimes I had to leave the mail in

5    the mailbox overnight.

6    Q.  Okay.  I want to ask you a few questions about the calls

7    that we heard, the recorded calls between you and your mom.  We

8    heard you talk about the three pieces of a pasta box.  At that

9    point when you made that call, had you and I reviewed the

10   evidence in your case?

11   A.  Yes.

12   Q.  Had you seen the photograph or photographs?

13   A.  Yes, I did.

14   Q.  Had you seen the three different pieces of pasta box?

15   A.  Yes, I did.

16   Q.  Okay.  And what did you conclude based on looking at those

17   photographs?

18   A.  That that's from my trash.

19   Q.  Okay.  We also heard in one of those calls you say something

20   to your mother about "don't talk to Richard."  What did you mean

21   by that?

22   A.  Because I was told not to talk to anybody about anything,

23   and I told my mom not to talk about it either.

24   Q.  Okay.

25   A.  My attorney told me.

```
 1   Q.  Okay.  There was a civil suit that was filed against you;
 2   right?
 3   A.  Yes.
 4   Q.  Was it only you?
 5   A.  No, it was not.
 6   Q.  Who else was it?
 7   A.  The homeowners association from Lake Forest.
 8   Q.  And when was that filed?
 9   A.  I believe it was July 7th or 8th of 2020.
10   Q.  Okay.  And in that -- did you get a copy of the complaint?
11   A.  Yes, I did.
12   Q.  Okay.  Did you know from that complaint whether the -- one
13   of the accusations was threatening to run over a child?
14   A.  Yes, I did.
15   Q.  Okay.  Did you know about that accusation before any text
16   exchange with Betty?
17   A.  Yes, I did.
18   Q.  Okay.  Did you also see Facebook posts about -- well, you
19   already said you did -- the mailings and the bullets?
20   A.  Yes.
21   Q.  What did you do with those photographs?  Did you send them
22   to anybody?
23   A.  I texted them to several people.
24   Q.  Okay.  Did you text them to Richard?
25   A.  Yes, I did.
```

Craft - Direct

1    Q.   Okay.  Why'd you text them to Richard?

2    A.   Because he was aware of the paintings.  He was aware of what

3    had been going on with regards to the accusations that I had

4    done it, and he's Sarah's father.  And I told him about the

5    civil lawsuit.  I just wanted him to be aware that there --

6    something else had been posted.

7    Q.   Did you recognize those rounds when you saw the photograph?

8    A.   No, I did not.

9    Q.   Had you seen rounds or bullets when Richard lived with you?

10   A.   No, I did not.

11   Q.   Did you know if he kept any in the house?

12   A.   No, I did not.

13   Q.   Did you -- when he moved out, did you see as part of the

14   moving out process him -- bullets going with him?

15   A.   No, I did not.

16   Q.   Okay.  Did you ever see them in your home after he moved

17   out?

18   A.   No, I did not.

19   Q.   Did you visit his residence at the farm?

20   A.   No, I did not.

21   Q.   Did you see -- there were a couple of moves in between.  Did

22   you see bullets at any point in any of the other places he

23   lived?

24   A.   I wasn't allowed to go inside his other residences.  I

25   stayed outside.

Craft - Direct

1    Q.   When you -- is that when you would pick up your daughter?

2    A.   Yes.

3    Q.   Okay.  Did you ask Sarah to pick up bullets and -- at

4    Richard's residence and bring them to you?

5    A.   I did not.

6    Q.   Okay.  Did you know they existed?

7    A.   No, I did not.

8    Q.   Did you know where he lived?

9    A.   The first --

10   Q.   The farm.

11   A.   No, I did not.

12   Q.   Did you ever ask for his address?

13   A.   Yes, I did.

14   Q.   When did you do that?

15   A.   After I sent him -- texted him the picture of the Facebook

16   post from the Pinedas.

17   Q.   Okay.  We saw how you were dressed in that 8-20-2020 photo.

18   Is that usually how you dressed?

19   A.   I dress like that every day.

20   Q.   And what is "like that"?

21   A.   All black.  I wore a lot of black, a black V-neck T-shirt

22   over a camisole, black camisole, and then black leggings that

23   were loose at the ankle, and a black -- it's actually a Nike

24   golf cap, and I put my air up in a bun.

25   Q.   And you went about your business day-to-day often dressed

Craft - Direct

1   like that?

2   A.  Every day.

3   Q.  Okay.  People who saw you regularly, would they have known

4   how you were dressed --

5   A.  Yes.

6   Q.  -- often?  Okay.  I asked you about height and weight.  I

7   didn't ask you how -- what size shoe do you wear?

8   A.  I wear -- it's between a 9 and a half or 10.  It's now a 10.

9   So some shoes I can wear -- still wear a 9 and a half.

10  Q.  Okay.

11  A.  But I would say 10, a women's 10.

12  Q.  Okay.  We've seen also photos or captures from your cell

13  phone that involve photos of the Pineda family.

14  A.  Yes.

15  Q.  Let's talk about the yearbook.  Where did that photo come

16  from?

17  A.  That came from Sarah's -- my daughter's yearbook.

18  Q.  Where did she go to school?

19  A.  At Crosby Middle School.

20  Q.  The other captures that we saw, where do those come from?

21  A.  The Pinedas' Facebook posts or their Facebook page.  It was

22  public.

23  Q.  Okay.  Why did you take and save those pictures?

24  A.  To show -- I was being accused of using the N-word.  And I

25  believe the N-word refers to African-Americans, and I was

1    confused because the Pinedas are not African-American.

2    Q.  Overall, when you were being accused of these things, how

3    did you feel?

4    A.  Terrible.

5    Q.  Okay.  Did you find it confusing?

6    A.  Yes.

7    Q.  Okay.  And in your own mind, did you try to make sense of

8    it?

9    A.  Yes, I did.

10           MS. REA:  Okay.  Just one moment, Ms. Craft.  Let me

11   think.  Okay?

12   Q.  Oh, I know.  We've also heard a voicemail that was left by

13   Sarah for Richard.  Did you ask Sarah to call him?

14   A.  Yes, I did.

15   Q.  Okay.  Did you tell her with specificity what to say?

16   A.  No, I did not.

17   Q.  Okay.  Why'd you ask her to make the call?

18   A.  Because when she came home -- when Richard brought her home,

19   I asked her if she ever saw bullets at the farm.

20   Q.  Why did you ask her that?

21   A.  Because I had -- I wanted to -- the last time Richard had

22   spoken of the bullets -- or we had spoken of the bullets, I

23   assumed they were still missing.

24   Q.  Okay.  And did she tell you about what she had seen at the

25   farm?

Craft - Direct

1    A.   Yes, she did.

2    Q.   Okay.  And what did you tell her to do with that

3    information?

4    A.   I asked her if she ever saw bullets at the farm, and she

5    said, "Yeah, they're in the drawer."

6    Q.   And what did you ask her to do when you knew what she had

7    seen?

8    A.   I said, "Well, you need to tell your dad that."

9    Q.   Okay.

10   A.   "It's important."

11          MS. REA:  Okay.  Ms. Craft, I don't have any other

12   questions for you.  Thank you.

13      (Testimony concluded at 5:06 p.m.)

14                   C E R T I F I C A T E

15      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

16   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

17

18        _____s/Dena Legg_____        June 23, 2023

19   Certified Court Reporter No. 20042A157     Date
     Official Court Reporter

20

21

22

23

24

25

1                                    INDEX

2      DEFENSE WITNESS:

3      SUZANNE CRAFT
            Direct Examination By Ms. Rea                        2
4

5
                                   EXHIBITS
6
       GOVERNMENT:
7      No exhibits

8
       DEFENDANT:
9      1 - video                                                 22

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25