```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00094-DJH
 4                                  )
              Plaintiff,            )
 5                                  )
     v.                             )
 6                                  )
     SUZANNE CRAFT,                 )
 7                                  )    March 10, 2023
              Defendant.           )    Louisville, Kentucky
 8

 9                            *  *  *  *  *

10                            VOLUME 2
          TRANSCRIPT OF TESTIMONY OF SUZANNE CRAFT AT JURY TRIAL
11                 BEFORE HONORABLE DAVID J. HALE
                    UNITED STATES DISTRICT JUDGE
12
                              *  *  *  *  *
13
     APPEARANCES:
14
     For United States:        Christopher C. Tieke
15                             Stephanie M. Zimdahl
                               U.S. Attorney's Office
16                             717 West Broadway
                               Louisville, KY 40202
17
     For Defendant:            Angela M. Rea
18                             Western Kentucky Federal
                                 Community Defender, Inc.
19                             629 S. 4th Avenue, Suite 200
                               Louisville, KY 40202
20
     [Defendant present.]
21
                         Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                           232 U.S. Courthouse
23                        Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

```
 1            (Begin testimony in open court at 9:52 a.m.  Jury in.)

 2            (SUZANNE CRAFT, called by the defense, previously sworn.)

 3                           CROSS-EXAMINATION

 4   BY MR. TIEKE:

 5   Q.  Ms. Craft, you told Ms. Rea yesterday that you went to your

 6   friend Tammy's house on the early morning hours of October 18th,

 7   2020; right?

 8   A.  Yes, I did.

 9   Q.  You drove from your home to Tammy's house?

10   A.  Yes, I did.

11   Q.  Pardon me?

12   A.  Yes, I did.

13   Q.  You also told the jury that you did not go over and leave a

14   letter by the Pinedas' fountain before you left for Tammy's

15   house; right?

16   A.  Yes, I did.

17   Q.  Did you go over and leave anything by the Pinedas' fountain

18   before you left to go to Tammy's house?

19   A.  No, I did not.

20   Q.  I'd like you to watch videos from October 18th, 2020, that

21   have been admitted as United States Exhibit 23B and 23D.  We can

22   start with 23B, please.  These are the early morning hours of

23   October 18th, 2020, ma'am.

24            (Government playing video.)

25   Q.  Ms. Craft, this woman on the video here, this is not you
```

1    going over to the Pinedas' house at 1:41 a.m. and throwing

2    something into their yard?

3    A.   No.  That person's too slender to be me.

4    Q.   So that person is not you coming over to the Pinedas' yard,

5    throwing something in the fountain and then walking back in your

6    garage?

7    A.   No, that is not me.

8              MR. TIEKE:  23D, please.

9        (Government playing video.)

10             MR. TIEKE:  That's good.  Thank you.

11   Q.   But this person leaving your garage a couple minutes later

12   in your car is you?

13   A.   Yes.

14   Q.   So on October 18th, before you left for Tammy's house,

15   someone walked over to the Pinedas' garage -- or Pinedas'

16   fountain, threw something in it and went back to your garage,

17   that was someone else?

18   A.   I don't think you can actually see the person going back --

19   you see them walking towards my garage.

20             MR. TIEKE:  Let's play the video again, please, 23B,

21   and we can fast-forward to the end, please, if you want.

22       (Government playing video.)

23             MR. TIEKE:  That's good.

24   Q.   So this is another person, and that person didn't go in your

25   garage?

1    A.   That person -- you can't see the garage.  It's blocked by --

2    there's a bush right in front of there, and the light is so

3    bright, you can't -- the person is obscured by the light because

4    the person's basically the same color as the light.  You can't

5    see a person go inside my garage, no, sir.

6         MR. TIEKE:  Okay.  Let's watch 23C, please.

7         (Government playing video.)

8    Q.   Ma'am, if we could -- I just want you to keep an eye on --

9    that's your -- this is your garage?

10   A.   Uh-huh.

11   Q.   Okay.

12        THE WITNESS:  Can we turn the volume up a tiny bit?

13        MR. TIEKE:  Sure, we can turn -- Ms. Legg?

14        Just keep an eye on the screen there, ma'am, in the corner.

15        (Video continuing to play.)

16   Q.   This is in between those two videos we watched before.  Did

17   you see someone up there in your garage?

18   A.   Yes, that was me.

19   Q.   That was you?

20   A.   Uh-huh.

21   Q.   The time stamp on this video is approximately 1:45, 1:46,

22   two, three, four minutes after this other person walked over to

23   the Pinedas' fountain.

24   A.   Uh-huh.

25   Q.   So someone walked over to the Pinedas' fountain and walked

1  over to your house and went in your garage?

2  A.  You can see the light on in this one, that the garage door

3  is open.

4  Q.  That's right.  And the person on the first video walked up

5  into your garage.

6  A.  No.

7        MR. TIEKE:  Play 23B, and we can fast-forward to the

8  end, please.

9  Q.  You said your garage was open, ma'am?  Your garage was open?

10       (Government playing video.)

11  A.  In this one?  No, the garage is not open.  You can't see the

12  light.  You would see a light here if it was open.

13       MR. TIEKE:  That's good.

14  Q.  So, ma'am, where does this mysterious person go?

15  A.  How long is this video?

16  Q.  Ma'am, the video's approximately four, five minutes long,

17  1:41 to 1:47.

18  A.  This video is?

19  Q.  Ma'am, where is this -- this mysterious person, did you call

20  the police that night from someone in your yard?

21  A.  For someone in my yard?

22  Q.  In your garage, ma'am.

23  A.  The person is -- didn't go in my garage.

24  Q.  That person didn't go in your garage?

25  A.  No.

1   Q.  Ma'am, you never told anyone about someone near your house?

2   Where did that person go?

3   A.  I believe they waited there and then exited left like the

4   other videos show.

5   Q.  Other video?

6   A.  The ones that were given to the police.

7   Q.  So, ma'am, when you came out to get in your car, you didn't

8   -- did you see anyone?

9   A.  No.

10  Q.  All right.

11  A.  They'd already left.

12  Q.  In the time frame between walking over to the fountain and

13  when you apparently opened your garage and then got in your car

14  and drove away, the person left?

15  A.  The person came over from my driveway and then came over to

16  the fountain, deposited the items, walked back up my driveway,

17  waited -- if we could see the rest of the video -- and then

18  exited left.

19  Q.  Exited left to where, your backyard?

20  A.  Behind Betty's house.

21        MR. TIEKE:  We can play 23B, please, and we can zoom

22  to the end when the person --

23      (Government playing video.)

24  Q.  Ma'am, that person turned right and went in your garage.

25  A.  The video's been cropped.

1    Q.   It's been cropped?

2    A.   How long is this video?

3    Q.   We'll move on.  I want to talk about something else, ma'am.

4    You told Ms. Rea yesterday that you had all these photos of the

5    Pinedas in your phone because you were researching them

6    because -- I think I took it down -- you wanted to show that

7    they were not African-Americans.

8    A.   Yes.

9    Q.   Okay.  But, in fact, ma'am, you started researching the

10   Pineda family long before the driveway paintings occurred,

11   didn't you?

12   A.   When are you talking about?

13   Q.   You started researching the Pineda family long before the

14   driveway paintings occurred, didn't you?

15   A.   I don't recall.

16   Q.   Did you, in fact, research Michella Pineda's father in May

17   of 2020 before the driveway paintings?

18   A.   Yes, because I met him when we first moved in, and he's the

19   owner of the house.

20   Q.   Did you start researching Michella Pineda's father on your

21   phone in May of 2020?

22   A.   In May of 2020?

23   Q.   Before the driveway paintings.

24   A.   I believe that he was the owner of the house, and that's why

25   I did.

1    Q.  You researched the owner of the house?

2    A.  Yes.

3    Q.  Ma'am, I'm gonna show you Exhibit 43.

4         MR. TIEKE:  United States Exhibit 43 for the witness,

5    please.

6    A.  Uh-huh.

7    Q.  Are those text messages between you and Betty Probst on May

8    23rd, 2020?

9    A.  Yes.

10        MR. TIEKE:  I'd move to admit United State Exhibit 43,

11   please.

12        MS. REA:  No objection.

13        THE COURT:  It will be admitted.

14     (Government Exhibit 43 admitted in evidence.)

15        MR. TIEKE:  Thank you.

16   BY MR. TIEKE:

17   Q.  This text shows that you got a background check on Michella

18   Pineda's father, Virgilio Pineda, didn't you?

19   A.  Yes, I did.

20   Q.  And that's on May 23rd, 2020.  Prior to the driveway

21   paintings, you sent a background check to your friend Betty

22   Probst, didn't you?  Didn't you?

23   A.  Yes, I did.

24   Q.  And on May 28th, 2020, did you ask your friend Jackie to run

25   another background check on Michella Pineda's father?

Craft - Cross

1    A.  Yes.

2    Q.  And you also told Jackie that you thought Michella Pineda's

3    father had died and that the Pinedas were stealing his social

4    security checks, didn't you?

5    A.  I wasn't sure.

6    Q.  Did you tell Jackie that?

7    A.  I wasn't sure.

8    Q.  Did you tell Jackie that?

9    A.  I said I -- I asked her to look into it.

10   Q.  Ma'am, if I show you a text communications with Jackie,

11   would that help you remember what you said?

12   A.  Of course.

13        MR. TIEKE:  May I approach the witness, Your Honor?

14        THE COURT:  Yes.

15   A.  Uh-huh, yes, I asked her to.

16   Q.  Does that help you remember?

17   A.  Yes, I did ask her to.

18   Q.  Does that help you remember your text messages with Jackie?

19   A.  I'm trying to find the one about the social security check.

20   Is this -- is it on here?

21   Q.  Ma'am, I've marked it with the --

22   A.  Oh.

23   Q.  Does that help you remember?

24   A.  Yes.

25        MR. TIEKE:  Your Honor, may I approach?

1        THE COURT:  Yes.

2    BY MR. TIEKE:

3    Q.  When you're finished, I'll take that from you, ma'am.

4    A.  Here you go.

5    Q.  Thank you.  Did you tell Jackie that you thought Michella's

6    father had died and that the Pinedas were stealing his social

7    security check?

8    A.  I wasn't sure.

9    Q.  "Just a thought.  I think the old man dad died, and they are

10   taking his S security checks."

11   A.  I think it says "I think," doesn't it?

12   Q.  "Just a thought.  I think."

13   A.  Just a thought?

14   Q.  "I think."

15   A.  I think I mean -- it means I think, but it doesn't mean

16   I'm -- that's why I asked her to look into it because I wasn't

17   sure.

18   Q.  And this is before the driveway paintings that you testified

19   yesterday kind of initiated your search of the family.

20   A.  The --

21   Q.  You testified yesterday that you started searching the

22   family after they accused you of painting their driveways.

23   Well, this is before that.  So which one is it?  Did you

24   research them before or after?

25   A.  I researched the father before.

Craft - Cross

1   Q.   Oh, and then you just started researching the family after?

2   A.   Well, the photographs came after my attorney asked for them.

3   Q.   Photographs of what?

4   A.   Of the family.

5   Q.   Oh, let's talk about those.  You testified that you saw

6   videos the Pinedas posted of the second driveway painting on

7   Facebook; right?

8   A.   Yes, yes.

9   Q.   That was posted on June 19th, 2020; right?

10  A.   Yes.

11  Q.   And that's how you thought you knew they were accusing you;

12  right?

13  A.   That's how I knew for sure.

14  Q.   That's what you told us yesterday was that you -- that you

15  saw the Facebook post June 19th, 2020, and then you started

16  researching them.

17  A.   I thought it happened the first driveway painting, but I

18  didn't know for sure until the second one.

19  Q.   Okay.  And then the second one -- and that's why you started

20  researching them?

21  A.   I had started talking to an attorney.

22  Q.   After June 19, 2020, when you became aware of the second

23  driveway painting and they started accusing you, that's when you

24  started researching them; right?

25  A.   That's when I started talking to an attorney, and he asked

Craft - Cross

1    for photos of the people that are accusing me.

2    Q.  And that was after June 19th because the painting didn't

3    take place till the 16th.

4    A.  So -- yeah, but the father was a separate -- the owner of

5    the house was a separate issue.

6    Q.  Ma'am, in fact, you were actually researching more about the

7    Pinedas prior to learning about the painting on June -- on the

8    post regarding the painting on June 19th, weren't you?

9    A.  Was it after March 22nd?

10   Q.  Ma'am, you were actually researching more about the Pinedas

11   prior to June 19th, when you saw the post, weren't you?

12   A.  Was it after the May 23rd vandalism?  I don't recall exactly

13   when.

14   Q.  You don't recall?  Let me show you Exhibit 44.  Are those

15   text messages between you and Betty Probst on June 15th, 2020?

16   We can scroll through.

17       Ma'am, are those text messages between you and Betty Probst

18   on June 15th, 2020?

19   A.  Yes.  I was --

20   Q.  Okay.

21   A.  -- because the --

22   Q.  Just a second.  Let me get them up there so the jury can see

23   them.  Okay?

24   A.  All right.

25            MR. TIEKE:  Your Honor, at this time, I'd move to

Craft - Cross

```
 1   admit United States Exhibit 44.
 2             MS. REA:  No objection.
 3             MR. TIEKE:  All right.
 4             THE COURT:  It will admitted.
 5        (Government Exhibit 44 admitted in evidence.)
 6   BY MR. TIEKE:
 7   Q.  Apologies for interrupting you, ma'am.  I just want to make
 8   sure the jury can see them first before you start talking.
 9   Okay?
10   A.  Sorry.
11   Q.  My question to you was:  You were actually researching more
12   about the Pinedas prior to seeing the paintings on June 19th,
13   2020.
14   A.  Because of the first painting.
15   Q.  Let's look at this text string that you sent to Ms. Probst
16   on June 15th, 2020.  We can scroll through.
17        So, ma'am, this is June 15th.  This is before the June 16th
18   driveway painting.
19   A.  Uh-huh.
20   Q.  You sent --
21             MR. TIEKE:  If we could go back to the top, please.
22   Q.  You sent a picture to Ms. Probst of the Pineda family?
23   A.  Yes, I did.
24   Q.  Next page.  You sent a screenshot of Michella's father,
25   Virgilio Pineda's Facebook page too, didn't you?
```

Craft - Cross

1    A.   Yes, I did.

2    Q.   Another page.  Now, next, please.  Now a page -- if we could

3    go to the next page, please.  Now a page from Michella's

4    Facebook page where she sends a happy Father's Day message to

5    her dad.

6    A.   Uh-huh.

7    Q.   Next page.  And now another second background check that you

8    had run on Michella's father from instantcheckmate.com?

9    A.   Uh-huh.

10   Q.   Okay.  And then --

11        MR. TIEKE:  Next page, please.  Thank you.

12   Q.   And then a text to Betty Probst with Connie Pineda's maiden

13   name -- Connie Stephens.

14   A.   Uh-huh.

15   Q.   Ma'am, this is June 15th.  This is before the June 16th

16   driveway painting.

17   A.   Yes, but I --

18   Q.   This is before the Facebook post on June 19th.

19   A.   True, but it was after the first painting.

20   Q.   I want to talk about some other stories that you told a lot

21   of people leading up to this.  You've told a lot of stories to a

22   lot of people about the events in this case, haven't you?

23   A.   Series.

24   Q.   You first said and you reported to metro police that the

25   mail was stolen from your mailbox; correct?

1    A.   That was after -- that was reported November 30th.   That's a

2    separate event.

3    Q.   A separate event?

4    A.   Yes.

5    Q.   A separate event from what?

6    A.   From the mailings that the Pinedas received.

7    Q.   Ma'am, in that report, didn't you report that you were

8    missing a Fifth Third Bank statement --

9    A.   Uh-huh.

10   Q.   -- a Visa credit card statement?

11   A.   Uh-huh.

12   Q.   Is that a yes?  I'm sorry.  She can only write yes or no

13   so --

14   A.   Yes, sir.

15   Q.   Yes.  Thank you.  And a Girl Scouts letter?

16   A.   Yes, sir.

17   Q.   The Pinedas received in the mailings a Fifth Third Bank

18   statement.

19   A.   Uh-huh.

20   Q.   Yes or no?

21   A.   Yes, sir.

22   Q.   And a Girl Scouts letter --

23   A.   Yes, sir, they did.

24   Q.   -- in the mailings.  And those are different than the ones

25   that you claim were stolen from your mailbox?

1   A.  Yes.  Those are before -- the mailings were November 4th,

2   5th, and 6th, I believe, and I didn't report my mail stolen

3   until November 30th.  That was a different event altogether, not

4   the same thing.

5   Q.  That's what you said first; right?

6   A.  I wasn't sure.

7   Q.  You said it was stolen from your mailbox first, didn't you?

8   A.  That mail was stolen from my mailbox, the one that was

9   delivered on November 21st, and that's what the report said,

10  November 21st, days after -- two weeks after the Pinedas'

11  mailings for the 4th, the 5th, and 6th, I believe.  It's a

12  separate event.

13  Q.  Separate event?

14  A.  Yes, sir.

15  Q.  Now, later on, you said the threats to the Pineda family

16  were on mail that was stolen from your trash, didn't you?

17  A.  I figured it out after looking at it.

18  Q.  And, in fact, we -- I mean, we even heard your voice, didn't

19  we, on the jail calls?

20  A.  That was after viewing the discovery that my attorney,

21  Ms. Rea, showed me.

22  Q.  And so at that point, you surmised that it was stolen from

23  your trash?

24  A.  Not at that point.  It was before that, but then I saw all

25  of it 'cause I had only seen what was on the internet that they

1    posted on Facebook before that.  I didn't know about all the

2    rest of it until she showed me.

3    Q.  Ma'am, you also told your mom that you thought that -- with

4    respect to the driveway paintings, that you were being set up by

5    an imposter from the neighborhood, didn't you?

6    A.  I wasn't sure.

7    Q.  And at one point you told your mom that that person setting

8    you up, that imposter, that was not the Pinedas?

9    A.  I wasn't sure.

10   Q.  You weren't sure?

11   A.  No.

12   Q.  At another point, though, you told Richard that the Pinedas

13   were editing the videos to disguise the identity of the person,

14   didn't you?

15   A.  I wasn't sure.

16   Q.  You weren't sure whether you said that or whether you

17   thought that?

18   A.  I probably said it, but I was not sure because I didn't know

19   for sure because you can't see a face in the videos.  It's all

20   blurred, and I just didn't know if there was -- I'm not a tech

21   savvy person.  I didn't even have a computer for a long time.  I

22   didn't know about Adobe and if you can adjust the setting on the

23   visual effects or any of that.  I don't know if it's possible to

24   do that.

25       And everything I read about the videos and everything I've

1    seen, no one can make out a face.  I don't know who that was.  I

2    don't even know if it's a male or a female.  All I know is that

3    person is more slender than I am, and it's not me.

4    Q.  You told Richard Watts that people -- the Pinedas were

5    editing the videos to disguise the identity of a person.

6    A.  I wasn't for sure.

7    Q.  Did you tell him that you thought they were doing that?

8    A.  I had a suspicion.

9    Q.  Did you tell him the Pineda videos are blurry to the point

10   of indicating an editing of the resolution in order to

11   purposefully disguise the true identity of the individual in the

12   videos?  Did you tell him that?

13   A.  That is what my friend Jerry told me, and I agreed with him.

14   And I pretty much repeated pretty close to what he said 'cause

15   he is a computer savvy person or a technology savvy person.

16   It's in -- it's probably stored in my texts on my phone that the

17   FBI has.

18          MR. TIEKE:  Ma'am, I can show you those.

19      May I approach, Your Honor?

20          THE COURT:  Yes.

21   BY MR. TIEKE:

22   Q.  If you take a look at those texts, will it help you

23   remember?

24   A.  Sure.

25   Q.  Okay.

Craft - Cross

1    A.   Where is it?  Where is the one that you --

2    Q.   Ma'am, does that help you remember your text with --

3    A.   I'm looking for the one about the resolution and the -- is

4    that in here?

5            MR. TIEKE:  May I approach, Your Honor?

6            THE COURT:  Yes.

7    A.   I didn't know there was a flip side.  I didn't know.

8         Okay.  Here it is.

9    Q.   Does that help you remember?

10   A.   Hold on.  So this is January 6.  That is what my -- 'cause I

11   sent it to --

12   Q.   Ma'am, does that help you remember?  Then I'll come take it

13   from you, and then we can talk about it.  Okay?

14   A.   Oh, okay.  Yes.

15           MR. TIEKE:  May I approach, Your Honor?

16           THE COURT:  Yes.

17           MR. TIEKE:  Thank you.

18   BY MR. TIEKE:

19   Q.   Now, let me ask you the question, and then you can go ahead

20   and share.  Did you tell Richard Watts that you thought that the

21   Pinedas were editing the video to disguise the identity of the

22   person on the videos?

23   A.   I did say that, but I wasn't sure.

24   Q.   Okay.

25   A.   I don't --

Craft - Cross

1    Q.  Did you also tell your friend Tammy, the one you go over and

2    visit, that the Pinedas were working with other neighbors to

3    frame you so that they could sell your house and split the

4    profit?

5    A.  I wasn't sure if that was the -- going on or if that was the

6    goal.  I was theorizing.

7    Q.  Did you tell Tammy that though?

8    A.  Yes.

9    Q.  Okay.  So the Pinedas were working with someone else in the

10   neighborhood to frame you, and then three of those -- the

11   Pinedas, plus this third person, were gonna sell your house and

12   split the profits?

13   A.  The three -- oh, the -- the two and then a neighbor?

14   Q.  Whoever.  I don't know.

15   A.  I wasn't sure.  I was theorizing.  I really didn't know for

16   sure.

17   Q.  Did you call them evil greedy bitches?

18   A.  I probably did say that.

19   Q.  In fact, later on, did you even text Task Force Officer

20   Downs and tell her that there was some sort of conspiracy in the

21   neighborhood?  One of your neighbors had motive.  "She needs

22   money.  So do the Pinedas.  They don't own the house.  Their

23   daddy does, and they need money."  Was that your theory?

24   A.  That was one of them.

25   Q.  And you told that to Task Force Officer Downs?

1    A.  I did.  I wasn't sure if that was -- I'm still -- I still
2    don't know.
3    Q.  So one of your theories is that all of your neighbors were
4    coordinating and conspiring against you?
5    A.  Not all of my neighbors, no.
6    Q.  A couple?  Three?  Four?
7    A.  Well, the Pinedas, I kind of think, is one person.
8    Q.  I mean, who doctored Mr. Lanham's videos?
9    A.  His are not doctored.
10   Q.  Those are true, and the Pinedas aren't true?
11   A.  I had questions about them --
12   Q.  Okay.
13   A.  -- because you can't see a face.
14   Q.  So there's a coordinated effort to frame you, and yet as you
15   sit here today, you didn't do a single thing to the Pinedas; is
16   that what you're claiming?
17   A.  What was the first part?
18   Q.  Is one of your theories that there was a conspiracy amongst
19   at least the Pinedas and another neighbor to frame you and sell
20   your house?  That's what you just told us a second ago; right?
21   A.  I wasn't sure.
22   Q.  Okay.  But you didn't do a single thing to the Pinedas; is
23   that what you're saying to this jury today?
24   A.  I did not do anything to the Pinedas.
25            MR. TIEKE:  No further questions, Your Honor.

Craft - Cross

1          THE COURT:  Redirect?

2          MS. REA:  Nothing else, Your Honor.

3          THE COURT:  May the witness be excused or permitted to

4    step down?

5          MS. REA:  Yes, Your Honor.

6          THE DEFENDANT:  Thank you.

7       (Testimony concluded at 10:29 a.m.)

8                    C E R T I F I C A T E

9      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

10   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

11

12

         _____s/Dena Legg_____        _June 23, 2023_
13   Certified Court Reporter No. 20042A157    Date
     Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2     DEFENSE WITNESS:

3     SUZANNE CRAFT
          Cross-Examination By Mr. Tieke                    2
4

5                             EXHIBITS

6     GOVERNMENT:
7     43 - text message                                     8
      44 - text messages                                   13
8

9     DEFENDANT:
      No exhibits
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25