UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL NO. 3:22-CR-00094<br>***Electronically Filed*** |
| SUZANNE CRAFT | DEFENDANT |

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by counsel, files its memorandum in support of sentencing in this action currently scheduled for July 6, 2023. The United States anticipates that some of the victims in this case will request to address the Court through a written statement or will request that counsel for the United States read such statement into the record. The United States recommends that defendant Suzanne Craft ("Craft") be sentenced to 120 months imprisonment. Such a sentence would be sufficient, but no greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

**I.  BACKGROUND FACTS**

Over the course of several years, Craft terrorized her neighbors, the Pinedas, because of their race. In particular, Craft terrorized the Pineda's bi-racial children using racial slurs and death threats.

The terror began in the Spring of 2019 when the Pinedas moved into the neighborhood and Craft's daughter used a racial slur toward one of the Pineda children. (Presentence Investigation Report, (DN 68, Page ID #463).

Then again, in March 2020, two of the Pineda children were out in the cul-de-sac riding bikes when Craft's daughter again directed racial slurs at them. (*Id*.). One of the Pineda children confronted Craft's daughter. (*Id*.). A short time later, Craft came to the Pineda's front door and

banged on it, yelling down to her daughter at the end of the driveway, "what the f*** did that n-word say to you." (*Id.*). Terrified, M.P., who was pregnant at the time, and one of the Pineda children, who were both near the front door, got down on the floor and crawled to the back of the house to avoid being seen through a window near the front door. (*Id.*). Later that same day, two of the Pineda children were outside and one of the children was riding a bike in the cul-de-sac. (*Id.*). Craft, returning to the cul-de-sac in her car, approached the Pineda child, rolled down her window, and threatened to run over the child saying "Ride on my side of the road and I'll run your ass over." (*Id.*).

In June and July 2020, the Pinedas were subject to three separate instances of having hateful racial slurs painted on their driveway. (*Id.* at Page ID #464).

In the fall of 2020, the Pinedas found two letters in their yard. One of the letters, done in cutout letters, stated "You had enough n-word bitch." The second, stated "Die stupid bitch move out." (*Id.*).

Between October and December 2020, Craft sent the Pinedas multiple pieces of mail matter containing racial slurs and threats of violence. In particular, certain of the mailings and communications stated the following:

- "Die Die Stupid N-word Die."
- "YOU will DiE B***h!"
- "tWO DEaD n-LeTS"
- "n-word LeAVE We hatE Your kind Last Chance"
- "MOVE OUT OR BULLETS!"

(*Id.* at Page ID #465). Many of the mailings and communications contained the return address of "N-LET DESTROYER".

Of particular note, another envelope the Pineda family received during this time period contained two rounds of ammunition. It was a white envelope with six stamps, addressed to M.P. The contents of the envelope included another white envelope which contained an envelope from Fifth Third Bank and two live ammunition rounds wrapped in a purple latex glove and cardboard from a Barilla pasta box with the threat "GET OUT." (*Id*. at Page ID #465).

At trial, R.W., Craft's former romantic partner and father of her daughter, S.W., testified that in June 2022, he informed Craft that he had previously met with the FBI and told them that the two bullets the Pinedas received in a letter were in fact his bullets. Craft became upset and attempted to influence R.W. to recant on his statement to the FBI. (*Id*. at Page ID #466).

In addition, the evidence at trial was that on July 28, 2022, at approximately 12:48 p.m., counsel for the United States sent counsel for Craft a letter indicating that Craft was the target of a federal investigation into potential federal criminal violations involving the mailing of threatening communications and the interference of the right to fair housing. That same day, and no later than 8 p.m., the contents of the letter were communicated to Craft. At approximately 9:30 p.m. on that same day, R.W. received a voicemail from S.W. calling from Craft's cell phone. *See* United States Exhibit #'s 30 and 31. In that voicemail, S.W. discussed the bullets, their whereabouts, and seemed to attempt to influence R.W.'s recollection relating to the bullets sent to the Pinedas. Watts said that he believed Craft directed S.W. to make this call. And in fact, Craft testified at trial that she instructed S.W. to make this call. (*Id*. at Page ID #467).

Putting her threats into action, on July 16, 2021, M.P. and victim child K.P. were driving on the highway and encountered Craft driving in her vehicle. Cell phone video taken by the victims shows that Craft engaged in erratic driving to maneuver behind the Pinedas in an effort to tail and chase them on the highway. Craft's actions forced the Pinedas to speed up to a dangerous rate of speed to try and escape Craft who continued to closely follow behind. (*Id*.).

After a week-long jury trial, Craft was convicted of five counts of mailing threatening communications in violation of 18 U.S.C. § 876(c) (Verdict, DN 51). In addition, the jury found that Craft sent each of the particular threatening communications because of the actual or perceived race or color of the victims. (*Id*.).

## II. GUIDELINES CALCULATION

The United States agrees with the U.S. Probation Office's ("USPO") calculations contained within its Presentence Investigation Report. Craft's total offense level is 29; (PSR at Page ID #469). The United States further agrees with the U.S. Probation Office's calculation that Craft's Criminal History Category is I. (*Id*. at Page ID #473). This produces a guideline sentencing range of 87 to 108 months' imprisonment. (*Id*. at Page ID #478).

### A. The 6-level enhancement under U.S.S.G. §2A6.1(b)(1) was appropriately applied.

Under U.S.S.G. §2A6.1(b)(1), a 6-level enhancement applies where "the offense involved any conduct evidencing an intent to carry out such threat." In analyzing whether a defendant's conduct indicates intent to carry out his threats, the Sixth Circuit counsels that courts should consider whether the "defendant engage[d] in some overt conduct in addition to making the threats before a §2A6.1(b)(1) enhancement can be sustained." *United States v. Nickerson*, 782 F. App'x 377, 380 (6th Cir. 2019). Additionally, "[c]onsideration of the tone of the threats, viewed in conjunction with the defendant's other overt conduct, is proper in determining whether the defendant intended to carry out his threats […] but the district court may not rely on the threats alone to apply a §2A6.1(b)(1) six-level enhancement." *United States v. Newell*, 309 F.3d 396, 403 (6th Cir. 2002). *But see United States v. Thomas*, 155 F.3d 833, 838–39 (7th Cir.1998) (finding that the five threatening letters that were sent to the victim by the defendant provided probative evidence of the defendant's intent to harm the victim); *United States v. Bohanon*, 290 F.3d 869 (7th Cir. 2002) (Defendant's letters threatening to kill the victim and giving specific details that

4

formed basis of his conviction of mailing threatening communications supported inference that he intended to carry out his threats as required for application of 6-level upward adjustment under guideline governing threatening communications).

Application of the 6-level enhancement under U.S.S.G. §2A6.1(b)(1) is appropriate in instances where the threatening communications have been accompanied by physical objects evincing an intent to carry out the threat. For example, in *United States v. Ellis*, No. 21-10091, 2022 WL 1112959, at (11th Cir. Apr. 14, 2022), *cert. denied*, 214 L. Ed. 2d 148, 143 S. Ct. 332 (2022) the defendant, using a return address with a different name than his, mailed a package containing a dead rat to his ex-wife, A.E. The package also contained a blackened rose, a Bible verse, and a letter calling A.E. a racial slur and saying she should be gang raped and forced to eat human feces. The 11th Circuit affirmed the district court's application of the enhancement in U.S.S.G. §2A6.1(b)(1) agreeing that "the mailing of the dead rat, together with an explicit, threatening letter and other threatening accoutrements, an escalation in a long history of harassing and threatening conduct toward A.E. and her family members, demonstrated an intent to carry out the homicidal threats Ellis made." *Id*. at *3.

In addition, the application of the 6-level enhancement under U.S.S.G. §2A6.1(b)(1) is equally appropriate in instances where the defendant takes active and overt steps evincing an intent to carry out the threats. *United States v. Sullivan*, 75 F.3d 297 (7th Cir. 1996) (enhancement applied where defendant, convicted of sending threatening communications shot windows out of victim's truck with a rifle several months before defendant sent threatening letters); *United States v. Worrell*, 313 F.3d 867, 876 (4th Cir. 2002) (applying enhancement where defendant physically abused victim in years prior to sending threatening letters); *United States v. Scott*, 42 F. App'x 264, 266 (10th Cir. 2002) (6-level enhancement in §2A6.1(b)(1) applied where defendant possessed weapons mentioned in the threatening e-mails to FBI agent and followed FBI agent to his home).

5

When considering the violent, racist tone of the letters in conjunction with Craft's other overt actions in this case, the United States has sufficiently shown Craft's intent to carry out her threats to kill members of the Pineda family. These actions were substantially and directly connected to the offense. In particular, members of the Pineda family testified regarding an incident in Spring/Summer of 2020—prior to Craft sending the threatening letters—where Craft directly threatened to run over a then nine-year-old Pineda child, while driving right next to her, merely because the child was riding her bike in the cul-de-sac. In addition, the evidence introduced at trial included Craft sending the Pineda family a threat that stated, "MOVE OUT OR BULLETS!" and then sending them a letter with two rounds of ammunition wrapped in a threat stating, "GET OUT." All of this in the context of receiving letters threatening direct violence against the family by Craft including direct threats of death: "Die stupid bitch move out"; "Die Die Stupid N-word Die."; "YOU will DiE B***h!"; "tWO DEaD n-LeTS", and "n-word LeAVE We hatE Your kind Last Chance."

It is not just Craft's overt acts toward the Pineda family that indicate an intent to carry out her racially motivated threats. Craft's intent is also evident in her private actions, in particular her communications with her friends and her obsession with the Pineda family. As the evidence at trial demonstrated, Craft began researching M.P.'s father after the family moved into the neighborhood and claimed the Pinedas were stealing his checks. In a July 2020 text message exchange with another neighbor, B.P. (who testified on Craft's behalf at trial), Craft appears to joke with this neighbor about running over the Pineda children saying

    Craft: they will try to say you tried to run them over

    Craft: wonton endangerment

    B.P.: I've thought about it… but I actually haven't tried it…yet !

    Craft: 😉

In another text message exchange with B.P., Craft sent B.P. the research she had done on M.P.'s father and cropped photographs of the Pineda family, including individual photographs of each of the Pineda children. She also sent some of those photos to her friend A.H. and included commentary about the Pinedas saying "they are not black" and "this is the 'black family'". She sent these cropped photos of the Pinedas to yet another friend J., who Craft had previously asked to run a background check on M.P.'s father, commenting "Here is the 'black' family". Craft texted her friend T.M. a cropped photo of the Pineda's son from a school yearbook with the comment that "This is their son who they say is black".

According to Craft's cell phone, she also conducted numerous Google searches of members of the Pineda family. More shocking, Craft Google searched "r hate crjme throwing bannas" and "lynching photo 2 black men indiana." Craft's actions demonstrate a frightening obsession and growing anger toward the family which ultimately escalated to her sending racially charged death threats to the Pinedas.

In addition to the trial testimony and evidence, the United States is providing video of an incident on July 16, 2021, where M.P. and victim child K.P. were driving on the highway and encountered Craft driving in her vehicle. *See* **Exhibit A**. Craft engaged in erratic driving to maneuver behind M.P. in an effort to tail and chase her on the highway. M.P. sped up to a dangerous rate of speed to try and escape Craft who continued to closely follow behind.

The escalation of Craft's course of conduct against the Pinedas in this case clearly evidences an intent to carry out the threats and warrants the 6-level enhancement in §2A6.1(b)(1). What began with Craft hurling verbal slurs and threats against the family, including verbal threats of death directly to a child, turned to repeated painted slurs and threats on their driveway. It then escalated to Craft sending the victim family a barrage of threatening letters that crescendoed to a threat wrapped around physical bullets ordering the family to "GET OUT" and ultimately Craft trying to run the family off the highway.

**B.  The 2-level enhancement under U.S.S.G. §3C1.1 was appropriately applied.**

Under U.S.S.G. §3C1.1, a 2-level enhancement applies

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

The Application Notes to U.S.S.G. §3C1.1 provide a non-exhaustive list of examples to which the enhancement applies and includes the following example "(A) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *See* Application Note 4, U.S.S.G. §3C1.1.  Courts applying this enhancement have "consistently held that a defendant's attempt to affect the testimony or evidence against him is an obstruction of justice. *United States v. Pearson*, 40 F. App'x 887, 891 (6th Cir. 2002); *United States v. Brown*, 237 F.3d 625, 628 (6th Cir.2001) ("[T]he obstruction adjustment applies where a defendant engages in obstructive conduct with knowledge that he or she is the subject of an investigation or with the correct belief that an investigation of the defendant is probably underway."); *United States v. Waldon,* 206 F.3d 597, 608 (6th Cir.2000) (upholding an obstruction of justice where defendant asked a friend to report his car stolen).  "'[U]nlawfully influencing' a witness means intentionally engaging in conduct having a natural tendency to suppress or interfere with the discovery of truth." *See United States v. House*, 551 F.3d 694, 699 (7th Cir. 2008). "[A]n effort to influence a witness's testimony—albeit vicariously—is a prototypical example of obstruction of justice." *United States v. Major*, 33 F.4th 370, 382 (7th Cir. 2022).  Even where a defendant is trying to urge a witness to "tell the truth" from his point of view, such conduct may still constitute obstruction of justice if its purpose is to persuade a witness or co-defendant to alter her testimony. *Id*.

The testimony at trial was that in June 2022, R.W., Craft's former romantic partner and father of her daughter, S.W., informed Craft that he had previously met with the FBI and told them

8

that the two bullets the Pinedas received in a letter were in fact his bullets. (R.W. Tr. DN 64, Page ID #370). Craft became upset and attempted to influence R.W. to recant on his statement to the FBI. R.W. testified

> Q. Did she accuse you of changing your story?
>
> R.W. Yes, she accused me of changing my story.
>
> Q. Okay. And what story did she say you changed?
>
> R.W. That I'd been saying that they weren't my bullets.
>
> Q. From you recollection and every – what was your reaction to that?
>
> R.W. I got upset.
>
> Q. You were upset?
>
> R.W. Yeah.
>
> Q. And why were you upset?
>
> R.W. Because I've been saying those were my bullets the whole time.
>
> Q. If you could speak up.
>
> R.W. I've been saying they've been my bullets the whole time. They were mine.
>
> Q. Were you saying to her that those were your bullets the whole time?
>
> R.W. Yes.
>
> Q. And did you tell the FBI that those were your bullets?
>
> R.W. Yes.
>
> Q. Okay. And your reaction was what?
>
> R.W. I was upset.
>
> Q. Because?
>
> R.W. She sounded like she was lying. She was trying to set me up.

(R.W. Tr. DN 64, Page ID ##372-373).

9

In addition, the evidence at trial was that on July 28, 2022, at approximately 12:48 p.m., counsel for the United States sent counsel for Craft a letter indicating that Craft was the target of a federal investigation into potential federal criminal violations involving the mailing of threatening communications and the interference of the right to fair housing. That same day, and no later than 8 p.m., the contents of the letter were communicated to Craft. At approximately 9:30 p.m. on that same day, R.W. received a voicemail from S.W. calling from Craft's cell phone. *See* United States Exhibit #'s 30 and 31. In that voicemail, S.W. discussed the bullets, their whereabouts, and seemed to attempt to influence R.W.'s recollection relating to the bullets sent to the Pinedas. R.W. testified at trial that he believed Craft had asked S.W. to make that call. (R.W. Tr. DN 64, Page ID # 380). And in fact, Craft admitted she had S.W. make this call. (Craft Tr. DN 65, Page ID #431). R.W. also testified that in that voicemail, S.W. stated she had seen the bullets in a location where R.W. had never had them. (*Id.*). R.W. testified about his reaction to the voicemail

> Q. What was your reaction to this voicemail?
>
> R.W. It was weird. I got upset a little bit.
>
> Q. Why'd you get upset?
>
> R.W. It just seems like she [S.W.] was forced to make a phone call.

(R.W. Tr. DN 64, Page ID #380).

Another example of obstruction detailed in the Application Notes to U.S.S.G. §3C1.1 includes "(B) committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." *See* Application Note 4, U.S.S.G. §3C1.1. Of course, as the Application Notes also caution, "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right." […] "in applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may

result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." *See* Application Note 2, U.S.S.G. §3C1.1. Courts interpreting this enhancement based on false testimony have found that the enhancement is authorized under U.S.S.G. §3C1.1 if the district court's finding encompasses the factual predicates for a finding of perjury. *See United States v. Dunnigan,* 507 U.S. 87 (1993) (if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.). As the Sixth Circuit has explained

> [u]nder the precedents of the Supreme Court and of this court, then, the district court must fulfill two requirements; first, it must identify those particular portions of the defendant's testimony that it considers to be perjurious, and second, it must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury.

*See United States v. Sassanelli,* 118 F.3d 495, 501 (6th Cir. 1997). A finding that a defendant was untruthful with respect to material matters in the case that were designed to substantially affect the outcome, especially when the defendant's testimony is contradicted by that of other witnesses, meets this standard. *United States v. Carden*, 28 F.3d 1214 (6th Cir. 1994).

The Court heard all the testimony in this case, including Craft's. In particular, the Court heard Craft's testimony during which she denied being involved in the events in this case, including events which are captured on video. The United States submits that such testimony was not the result of confusion, mistake, or faulty memory and permits this Court to make the necessary findings to apply this enhancement.

### III. SENTENCING FACTORS

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). Title 18, United States

11

Code, Section 3553(a) guides the Court regarding factors to consider when imposing a sentence. That section directs courts to consider the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

    . . .

(5) any pertinent policy statement--

    . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

It is the position of the United States that the requested sentence of 120 months imprisonment is necessary to accomplish the sentencing purposes of 3553(a).

    **1.**     **Nature and Circumstances of the Offense**

There can be no question that Craft engaged in extremely egregious and vile crimes that have forever traumatized the Pineda family. Almost immediately after moving into what they hoped would be their forever home in the Lake Forest neighborhood, the Pinedas drew the wrath of their neighbor, Suzanne Craft. Craft's harassment was unrelenting. Beginning with verbal threats to kill the Pineda's nine-year-old child, Craft followed with a chilling racist jingle directed at the family, and driveway paintings with Nazi symbolism. (PSR, DN 68 at Page ID

##463-464). From there, Craft's behavior only intensified. She followed-up with a salvo of letters with a return address of "N-let Destroyer" containing racially charged threats of violence against the family and culminating in a threat wrapped around two physical bullets ordering the family to "GET OUT." (*Id*. at Page ID #465).

This Court heard testimony about the devastating effect this had on the Pineda family. The Pinedas all slept together in one room in the interior of the house because they feared for their safety. (*Id*. at Page ID #468). The Pineda's oldest child recounted how she gave up her dream of playing softball, did not want to drive or go to college, and stayed home because she feared leaving her family. (*Id*.). The Pineda's oldest son talked about how he became reclusive and stopped going outside and about how his younger sister, who was verbally threatened with being run over by Craft, stayed up all night peering out her bedroom windows on the lookout for acts of terror from Craft. (*Id*.). M.P. and C.P. testified that they feared for the safety of their family, began homeschooling their children, and to the many ways the family continues to suffer from Craft's senseless acts of hatred. (*Id*.).

The deplorable facts of this case that this Court heard at trial speak for themselves. But perhaps what is most disturbing is that Craft chose as the target of some of her vitriol the Pineda's children. And she did so because of their race. Such serious and offensive criminal conduct demands an appropriately stringent sentence.

    **2.**    **History and Characteristics of the Defendant**

Craft's history and characteristics support a sentence of 120 months' imprisonment. Though Craft is a Criminal History Category I for purposes of determining her sentencing guideline range, she does have a history of criminal conduct that includes multiple DUIs, theft, and unlawful use of drug paraphernalia. (PSR, DN 68 Page ID ##470-473). Relevant to her actions in this case and reflective of her character, is an indication that during her prior employment for a delivery service, two different people contacted her employer and advised of Craft using racist

13

language, including the n-word. (*Id*. at Page ID #467). Her character is also revealed in her failure to assist USPO in the preparation of the PSR, particularly her failure to report any assets and liabilities noting that it is "not known." (*Id*. at Page ID #477.) Consider also Craft's testimony at trial regarding events which are captured on video. To this day, Craft has refused to accept responsibility for her actions and her actions in this case are reflective of her character.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

Each of the factors under § 3553(a)(2)(A) weigh in favor of a lengthy, 120-month sentence. The offense in this case was extensive and pervasive and stopped only because of the intervention of law enforcement. Craft's decision to repeatedly engage in sending her neighbors the most egregious and racially motivated threats requires this Court to respond with a sentence that reflects the seriousness of this offense and promote respect for the law. As for providing just punishment for this offense, the sentence must reflect the gravity of Craft's conduct and be "of the type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense." *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010) (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59). Though no sentence can possibly give the Pineda family what Craft has taken from them, a sentence of 120 months' imprisonment would best reflect these three sentencing goals.

### 4. The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See, e.g., United States v. Pettaway,* 560 F. App'x 172, 174 (4th Cir. 2014) (high end sentence was necessary to provide deterrence and protect the public, based on defendant's history of sending threatening mailings). 18 U.S.C. §3553(a)(2)(B) dictates that a sentence of 120 months' imprisonment is appropriate in this case because Craft's sentence should be lengthy in order to deter her. It is worth nothing that

14

Craft was not deterred by state charges relating to the driveway paintings, home incarceration as part of her pretrial conditions in state court, and findings of contempt in state court for violating those pretrial conditions. None of this deterred her from terrorizing the Pinedas. A strong message from this Court is necessary to deter Craft from engaging in this conduct in the future.

In addition, a lengthy sentence in this case is necessary to deter the criminal conduct of others, that is, to deter those who might otherwise be inclined to send racially charged threats to members of this community. It is beyond question that the use of the n-word is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is perhaps the most offensive and inflammatory racial slur in the English language and its use in this context can only be expressive of racial hatred and bigotry. Craft's racially motivated acts of hatred and violence in this case are representative of the type of intolerant and racist attitudes that belong to a long-forgotten era. This Court is in the position to send a loud and clear message that this community will not retreat into that past.

**5.     The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

The only thing that stopped Craft from terrorizing the Pinedas was her arrest. A lengthy sentence is necessary to protect the Pinedas and the public from Craft, a woman who places the public–especially children—at great risk and, under § 3553(a)(2)(C), her sentence must be designed to mitigate that risk. For an undeterrable offender such as Craft, whose conduct has already caused substantial, life-long harm to the Pinedas, the threat she continues to pose to the Pinedas and the community if released is hardly measurable. Simply put, a 120-month sentence is necessary to protect the Pinedas and the public from Craft.

**IV.     FACTORS WARRANTING AN UPWARD DEPARTURE**

As the PSR notes, there are factors present in this case that may, and the United States urges do, warrant an upward departure. The Application Notes to U.S.S.G. §2A6.1 contemplate

15

an upward departure in instances when the offense involved "substantially more than two threatening communications to the same victim" or "multiple victims." In addition, pursuant to U.S.S.G. §5K2.3 an upward departure may be warranted in instances where the victims suffered extreme and severe psychological injury. Finally, U.S.S.G. §5K2.8 discusses an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim."

In this case, over a two-month period, Craft sent substantially more than two threats to the Pinedas with such threats, at times, targeting the family generally and at other times, directing her hate at M.P. or the Pineda children specifically.

Perhaps more than the number of threats is the extreme psychological injury the Pinedas suffered as a result of Craft's extremely heinous, cruel, egregious, and degrading conduct. Look no further than the statement of K.P., the Pineda's oldest child, to this Court describing how

> [t]o be hated just because of your skin color is something that is absolutely disheartening. It's also something that I would've never imagined I would experience in my whole life. Thinking about it now, it makes me feel as if we were dehumanized just for being people of color. That again is something no one should ever have to experience. I wouldn't wish that upon anyone. This is where it all went downhill. This is where our nightmares turned into a reality.

K.P. further describes how because of Craft, her family will never be the same.

> All of us have been going to counseling and we have been diagnosed with anxiety, depression and ptsd. My siblings have all changed significantly. They don't come out of their rooms. They are very closed off and very quiet. When we do have conversations about what we went through, you can hear the fear in their voices. No child should have to go through what we went through. As their oldest sibling, I want to take their fear and pain away and deal with it myself. They deserve to have a good childhood, this shouldn't be a core memory for them. They should be going to hang out with friends and play outside, not living in fear. I am too afraid to leave the house in fear that something might happen to my family while I am gone. I won't go to in person classes, all my schooling is online. I don't go out with friends, I stay home and I just make sure I am always with my family. I just hope that my family can finally get some justice so we can start to rebuild ourselves again. We deserve to feel like we are safe and happy again. Ms. Craft has torn my family down, and the only thing I ask for is for her to be held accountable for the damage she has done.

16

M.P. whose children received death threats and who received death threats herself, describes the effect on her family and the irreparable damage Craft caused

> What Ms Craft has done to us has damaged my family in so many ways. As a nurse I would almost have preferred a physical injury that I could treat. I don't know how to treat the injuries done to my kids. [Redacted] wakes up with night terrors. My 6 yr old knows Ms. Craft as the bad lady across the street and when the doorbell rings all the kids immediately freeze and stay silent until they leave. They started this after Ms Craft came yelling and pounding on my door. This has made me realize my kids are suffering and traumatized in so many ways. As a parent, I know my only job is to prepare them for the next stages in their life. I understand I have not done that with my kids and I hope we can get some closure and peace after today.

An upward departure is appropriate in this case.

## VI. CONCLUSION AND SENTENCING RECOMMENDATION

For the reasons set forth herein, the United States respectfully requests the Court apply the Sentencing Guidelines, as outlined above, follow the statutory directives set out in 18 U.S.C. § 3553(a), and impose a sentence of 120 months' imprisonment followed by a three-year term of supervised release and a fine at the low-end of the applicable guideline range.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

Stephanie M. Zimdahl
Christopher C. Tieke
Assistant U.S. Attorneys
717 West Broadway
Louisville, Kentucky 40202
PH: (502) 582-5911
FAX: (502) 582-5097
Email: Christopher.tieke@usdoj.gov
Stephanie.zimdahl@usdoj.gov

17

## CERTIFICATE OF SERVICE

      I hereby certify that on June 26, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

                                          Stephanie M. Zimdahl
                                          Christopher C. Tieke
                                          Assistant United States Attorneys