```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF KENTUCKY
                         LOUISVILLE DIVISION


UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00094-DJH
                               )
          Plaintiff,           )
                               )
v.                             )
                               )
SUZANNE CRAFT,                 )
                               )         February 15, 2023
          Defendant.           )         Louisville, Kentucky


                             * * * * *

            TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
                BEFORE HONORABLE DAVID J. HALE
                 UNITED STATES DISTRICT JUDGE

                             * * * * *

APPEARANCES:

For United States:      Christopher C. Tieke
                        Stephanie M. Zimdahl
                        U.S. Attorney's Office
                        717 West Broadway
                        Louisville, KY 40202

For Defendant:          Angela M. Rea
                        Western Kentucky Federal
                           Community Defender, Inc.
                        629 S. 4th Avenue, Suite 200
                        Louisville, KY 40202

[Defendant present.]


                   Dena Legg, RDR, CRR, CCR-KY
                      Official Court Reporter
                       208 U.S. Courthouse
                       Louisville, KY 40202
                          (502) 625-3778

Proceedings recorded by certified stenographer, transcript
produced by computer.
```

1     (Begin proceedings in chambers at 9:51 a.m.  Defendant not
2  present.)
3         THE COURT:  All right.  Let's go on the record.  We
4  are in chambers with the lawyers only.  Let me ask them now
5  to -- you two are --
6         MS. ZIMDAHL:  Oddly aligned?
7         THE COURT:  -- oddly aligned.  Let me ask you-all to
8  put your appearances in.  First, we'll start with the United
9  States.
10        MS. ZIMDAHL:  Sure.  Stephanie Zimdahl and Chris Tieke
11 for the United States.
12        MS. REA:  Angela Rea for Ms. Craft.
13        THE COURT:  So, as you-all know, I don't as a typical
14 practice have a lot of bench or -- I'm sorry -- chambers
15 conferences.  It's just easier to do things in open court rather
16 than drag the court reporter and all her gear back to chambers,
17 but this is an unusual situation here as we are approaching
18 trial in U.S. v. Craft.
19     So, just briefly, I want to put this on the record.  I'm
20 going to provide you with a printout of an email that was
21 received here.  I'm not gonna comment further on it, and I'm not
22 going to invite reaction from you-all at this point, but I just
23 want to put it on the record.  And, then, if it is necessary for
24 us to follow up at another point, we will do so.
25     Two days ago, Dena, our court reporter, received on her

1   personal email account an email from a person describing herself
2   as a psychic who was engaged by the victim of the crime in this
3   case -- the alleged victim of the defendant's crimes with
4   information that she felt -- the email you can read for
5   yourself, but for purposes of describing it for the record, this
6   person, describing himself or herself as a psychic, says that
7   the victim, Michella Pineda, asked her questions about FBI Agent
8   Kristen Downs of a personal nature, which she says indicates
9   that there is an inappropriate personal relationship between the
10  victim and Kristen Downs.
11       Now, I'm gonna give this to you.  This is a printout.  By
12  the way, I have -- the only change I have made to it or had made
13  to it is Ms. Legg's personal email address is not there.  Other
14  than that, this is the way that it came to her and was forwarded
15  on here.  Again, I'm providing this without comment as to its
16  provenance, if you will.  I don't know what this is.
17       Let me tell you also that we, of course, have not responded
18  to the email; and we have also not forwarded the email to the
19  U.S. Marshals Service.  You-all may know that from time to time
20  we receive inappropriate emails which are then forwarded to the
21  Marshals Service for review and potential investigation.  This
22  is not in that category.  There's no overt or implicit threat to
23  the court.  So we did not take any such action.
24       And I'm not suggesting by having this on the record and
25  providing this to you that there is any authenticity to this

1   email.  This could be a total prank email.  I have no idea.  But
2   because it mentioned an FBI agent, because it mentioned the
3   alleged victim in this case, I determined that the most
4   appropriate thing to do was to provide it to you and make sure
5   that the record is clear that it was provided.
6       So that is all I wanted to accomplish at this point.  So we
7   are done.
8       (Conference in chambers concluded at 9:59 a.m.)
9       (Begin proceedings in open court at 10:39 a.m.)
10          DEPUTY CLERK:  3:22-CR-94, United States of America v.
11  Craft.
12          MR. TIEKE:  Good morning, Your Honor.  Chris Tieke and
13  Stephanie Zimdahl for the United States.
14          MS. REA:  Good morning, Your Honor.  Angela Rae with
15  Ms. Craft.  She's present to my left.
16          THE COURT:  Good morning.  We're here for our final
17  pretrial conference.  This matter is set for trial in a couple
18  of weeks, March the 6th.  I have reviewed all of the filings
19  made to date.  I know there are some substantive motions in
20  limine, and you-all are waiting on rulings.  We will get those
21  out to you shortly, within the next couple of days.  I have no
22  questions I need to ask about those.  I just wanted to make
23  you-all aware that those are in process.
24      Let me, first, before we get further into the hearing, ask
25  each side if they're at this stage ready for trial.

1  MR. TIEKE: Your Honor, the United States is prepared
2  and ready for trial.
3  THE COURT: Ms. Rea.
4  MS. REA: Your Honor, we intend to be prepared for
5  trial. That is what we're working toward.
6  THE COURT: So let's go through a few of the items now
7  that I have on my agenda, and then we can take up any questions
8  that either side may have.
9  First, with respect to the jury selection process, let me
10 explain that we have sent notices to a pool of approximately 70
11 potential jurors. That's a slightly larger than normal pool,
12 but our intention here is to ensure that we have a sufficient
13 number of potential jurors given the sensitive nature of this
14 case.
15 And I've already reviewed the -- previewed the proposed voir
16 dire questions. So I understand each side also perceives the
17 case as raising potentially sensitive issues, and it will take a
18 little while to sort through all of that. And I think that a
19 slightly larger pool is necessary to ensure that we're able to
20 do that properly.
21 I intend to seat a jury of 14. Under the rule -- under
22 Rule 24, each side will then receive one extra peremptory
23 challenge. The Government then will have 7. The defense will
24 have 11. Any questions about those numbers or that process?
25 MR. TIEKE: Not from the United States, Your Honor.

1          MS. REA:  No, Your Honor.
2          THE COURT:  Now, with respect to seating alternative
3    jurors, my practice differs slightly from that prescribed in the
4    rule.  My preference is to seat -- when seating a jury in excess
5    of 12, as we'll be doing in this case, to -- not to identify
6    those alternate jurors at the outset but to simply seat the 14.
7    And then, at the close of the case, just prior to sending the
8    fully instructed jury back to deliberate, we will have a random
9    selection of two.  That's my preference.  I think that that
10   better suits the process.
11      And so I raise that with you now because I want to make sure
12   there is no objection to that slight variation on the rule.
13         MR. TIEKE:  No objection from the United States.
14         MS. REA:  No objection from the defense.
15         THE COURT:  With respect to the voir dire process, it
16   is my practice to handle voir dire.  I will invite your proposed
17   questions.  I've already done that.  I have reviewed them.  We
18   will incorporate those we find appropriate and nonduplicative.
19   Many of the ones submitted are already in our standard catalog
20   of voir dire questions.
21      While I will handle the voir dire, the questions, I will
22   permit, as appropriate, follow-up questions from counsel.  Those
23   follow-up questions are most typically handled at the bench, and
24   that is, when a member of the jury pool responds to a question,
25   I will oftentimes give them -- particularly if the answer might

1    call for personal or sensitive information in the response, I
2    will permit them to approach the bench and speak only with the
3    court and counsel.  It's at that point that I will permit a
4    follow-up or two, as appropriate.
5        Let me also say -- and this really only affects the
6    Government.  I'm only gonna want one lawyer up at a time.  So if
7    you-all will figure out how you want to handle that.  It really
8    slows down the process if every time someone raises their hand
9    and says, "Yes, I need to tell you -- I need to give you a
10   response, but I want to do it privately" and we got to assemble
11   four lawyers up here in order to do that.  So that's how we'll
12   proceed through voir dire.
13       I do expect voir dire to take most of the day.  I would hope
14   we could finish mid afternoon, but starting with 70 and given
15   the sensitive nature of the charges here and the questions that
16   will need to be asked in light of those charges, realistically,
17   it might take through the end of the day.
18       I do intend to seat a jury by the end of the day even if we
19   do not get past introductory instructions and the typical
20   end-of-day admonition.  If that's all we get to, that's fine,
21   but I do intend to do that.  So you might hear from me at some
22   point during voir dire that we need to keep our eye on the ball,
23   or some other sports metaphor that makes the point that we need
24   to keep this moving, so that we can get a fair and unbiased jury
25   seated by the end of the day so that the trial can start.

1         Let me pause there and ask the same question.  Any questions
2    or objections regarding that process?
3              MR. TIEKE:  Not from the United States.
4              MS. REA:  Not from the defense, Your Honor.
5              THE COURT:  Let's talk a bit now about instructions.
6    We will -- as with the proposed voir dire questions, we will
7    receive and review all of the proposed instructions submitted by
8    each side.  Hopefully -- and this is -- I'm not gonna give you
9    this with precision, but hopefully by the second day --
10   hopefully by the morning of the second day, we will give you a
11   draft set of instructions.  They will be marked "draft."
12        And what I will do is I will ask you-all to review those.
13   And then we will schedule an instructions conference at some
14   point either over a lunch break or more likely at the end of the
15   day once the jury is excused for the day.
16        And the way that I prefer to handle that is we will not go
17   through line by line every single instruction.  What we will do
18   is I will ask you-all to confer -- the lawyers to confer in
19   advance of the instructions conference and identify for the
20   court those instructions to which you object, in whole or in
21   part; those instructions which one side or the other has an
22   issue; or those instructions that are not included that you wish
23   to be included.  That will be -- that will form the agenda of
24   the instructions conference.
25        I would anticipate the bulk of the instructions -- you know,

1   more than half are standard instructions used in every jury
2   trial.  We will not need to deal with those, I wouldn't
3   anticipate.  If one needs to be tweaked for the specific
4   circumstances of the case, we can do that, but I don't want to
5   waste a lot of time going through standard jury instructions.  I
6   want to deal with the ones -- the substantive instructions to
7   which there is an objection.  If both sides agree to a
8   substantive instruction, we can move on.
9       I think you understand where we're going with this.  We need
10  to be as efficient as possible in sorting out where there are
11  objections or disagreement between the parties, which I'll be
12  happy to resolve, or suggestions.
13      In many of the trials I've had, the communications from
14  counsel may be called an objection, but really it's as much a
15  suggestion for improvement, which I'll be happy to take, as
16  anything.  So that's how we will handle the instructions.  Any
17  questions or objections regarding that process?
18              MR. TIEKE:  Not from the United States, Your Honor.
19              MS. REA:  And not from the defense, Your Honor.
20              THE COURT:  Now, with respect to courtroom technology
21  and exhibits, you-all are experienced trial counsel here, but if
22  you need to interact with the court reporter regarding the
23  courtroom technology, you're welcome to do that.  You can make
24  arrangements to come in in advance of the trial and preview or
25  practice with the technology, if you wish to do so.

1       Now, with respect to exhibits, they need to be provided to
2  the court reporter on a USB drive.
3       Did I get that right, Dena?
4            THE REPORTER:  Yes, sir.
5            THE COURT:  Let's now talk about the parties'
6  communications regarding any potential offers of compromise.
7  Ms. Zimdahl, Mr. Tieke, has the United States made an offer of
8  compromise to the defendant?
9            MR. TIEKE:  Yes, Your Honor.
10           THE COURT:  And, Ms. Rea, can you confirm that that
11 offer of compromise has been communicated to your client?
12           MS. REA:  I can, Your Honor.  It has been.
13           THE COURT:  And can you also confirm that -- and I
14 don't want details of the offer, but I do want to make clear
15 that if accepting the offer of compromise would result in an
16 outcome that is better for her than a conviction on all counts
17 at trial, that that has been explained to her.
18           MS. REA:  Yes, Your Honor, it has.
19           THE COURT:  Very well.  Any questions or objections to
20 any of that process?
21           MR. TIEKE:  Not from the United States, Your Honor.
22           THE COURT:  Anything else that you need to bring up
23 regarding particularly the issue of the offer of compromise?
24           MS. REA:  No, sir.
25           THE COURT:  All right.  Let's see here.  We need to

1 talk also about a statement of the case.  I am going to provide
2 you, probably a couple of days in advance of the trial, a
3 simple, straightforward, single paragraph statement of the case.
4 This is what would be read to the jury pool at the outset of the
5 voir dire process so that they can have an idea of the nature of
6 the allegations here and the nature of the proof to come.
7     What I would prefer is that, upon receipt, counsel confer
8 and then any objections or suggestions be transmitted to the
9 court.  You can do that via email to the court's email address
10 or directly to Natalie, copying the other side, of course.
11     Let me talk just a little bit about sort of general practice
12 at the end of the case.  I like to divide up instructions at the
13 end.  I don't know if any of you-all have tried a case in front
14 of me yet, but your colleagues certainly have, so -- I haven't
15 varied my trial practice a great deal.
16     My preference is to give the substantive instructions prior
17 to closings.  Then after the closing arguments are completed --
18 my preference in doing that is, frankly, I think it's better for
19 the lawyers to know exactly what will be said and to be able to
20 talk to a recently enlightened jury about those instructions as
21 necessary.
22     I do save the final procedural instructions for after
23 closing arguments.  Those are the standard issue instructions
24 that begin, "Now that you have received the proof and heard
25 closing arguments, it is now your duty and obligation to decide

1  the case.  Here's how that works."  Those instructions I give
2  after closing arguments.
3      And then we will -- at the conclusion of those final
4  procedural instructions, we will then, as I mentioned earlier,
5  randomly select two to act as alternates.  I will then ask those
6  two to remain in the courtroom.  We will send the jury out.
7      I provide one copy of the written instructions to go back
8  with the jurors.  And we typically send also the -- all of the
9  evidence back with them as well because this is a case that does
10 not include evidence -- there's no firearm or drug paraphernalia
11 or drug tests and that sort of thing here; correct?
12            MR. TIEKE:  No, Your Honor.  There would only be --
13 the physical evidence would be the mailings and then a bullet --
14 well, two bullets and the mailings and then another bullet.  So
15 three total bullets and then physical mailings, those would be
16 the only physical objects.
17            THE COURT:  Well, we can talk about whether the
18 bullets will go back with the jury.  That would be -- typically
19 what we do is -- when there's a firearm or something of that
20 nature, we permit a photograph that's already been entered.  I
21 presume somewhere in your evidence there's a photograph of these
22 shells; correct?
23            MR. TIEKE:  Yes, sir.
24            THE COURT:  That would go back.  And then we tell them
25 we will make available to them if they would like to inspect the

1  actual physical bullets.  That's typically how we do it.  We
2  don't need to decide that today.  We can wait and sort through
3  that at the end.
4     I also typically send back a copy of the indictment that has
5  been referred to earlier, but I am not a stickler about that.
6  And so if we need to talk about that, we can at the appropriate
7  time.  That is also not something that we need to talk about or
8  decide today.
9     I think that's all I need to raise with you from my agenda.
10 Let me start with the Government.  Do you-all have any other
11 questions or issues you need to bring up at this point?
12           MR. TIEKE:  Just, Your Honor, for witness scheduling
13 purposes, would the Court generally prefer 9:00 to 5:00 for that
14 with obvious exceptions at some points?
15           THE COURT:  I do.  It will also, of course, depend a
16 little bit upon the jury's personal issues.  I am sensitive to
17 members of a jury who say, "I have to be gone from the
18 courthouse by 4:30.  I've got childcare issues.  I've got job
19 issues," whatever the case may be.  So generally speaking, yes,
20 but subject to modifying that.
21           MR. TIEKE:  Understood.
22           THE COURT:  Anything else?
23           MR. TIEKE:  Not from the Government, Your Honor.
24           THE COURT:  Ms. Rea?
25           MS. REA:  No, Your Honor, not from me.  Thank you.

1          THE COURT:  Thank you.
2       We will get a memorandum of hearing entered in the record
3    that will indicate that we have discussed a number of pretrial
4    issues.  Both sides announced that they intended to be ready to
5    go.  And it will also indicate that a telephonic status
6    conference may be scheduled by subsequent order -- if in the
7    course of finalizing my rulings on the outstanding motions I
8    come up with an issue I need to discuss, it's possible that
9    you'll hear from Natalie to schedule something.
10      And, also, if either side wishes to raise an issue with the
11   court, it is best done quickly via a telephonic status
12   conference.  At this stage, it is unnecessary for you to file a
13   motion to that effect.  Simply, again, email Natalie.  Copy
14   opposing counsel, and we'll do our best to get something
15   scheduled as quickly as we can.
16      Again, anything else?
17          MR. TIEKE:  Not from the United States, Your Honor.
18   Thank you.
19          MS. REA:  No, Your Honor.
20          THE COURT:  Thank you.
21      (Proceedings concluded at 11:00 a.m.)

C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

```
        s/Dena Legg                    September 21, 2023
Certified Court Reporter No. 20042A157  Date
Official Court Reporter
```