```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )     Case No. 3:22-CR-00094-DJH
 4                                  )
              Plaintiff,            )     REDACTED
 5                                  )
     v.                             )
 6                                  )
     SUZANNE CRAFT,                 )
 7                                  )     March 6, 2023
              Defendant.           )     Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                            VOLUME 1
                       TRANSCRIPT OF JURY TRIAL
11               BEFORE HONORABLE DAVID J. HALE
                  UNITED STATES DISTRICT JUDGE
12
                            *  *  *  *  *
13
     APPEARANCES:
14   For United States:        Christopher C. Tieke
                               Stephanie M. Zimdahl
15                             U.S. Attorney's Office
                               717 West Broadway
16                             Louisville, KY 40202

17   For Defendant:           Angela M. Rea
                               Western Kentucky Federal
18                                Community Defender, Inc.
                               629 S. 4th Avenue, Suite 200
19                             Louisville, KY 40202

20   [Defendant present.]

21
                         Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                          208 U.S. Courthouse
23                        Louisville, KY 40202
                            (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1        (Begin proceedings in open court at 9:05 a.m.  Jury out.)

2             DEPUTY CLERK:  3:22-CR-94, United States of America v.

3   Craft.

4             THE COURT:  Let's start with appearances, please.

5             MR. TIEKE:  Good morning, Your Honor.  Chris Tieke and

6   Stephanie Zimdahl for the United States.

7             MS. REA:  Good morning, Your Honor.  Angela Rea with

8   Ms. Craft.  She is present to my left this morning.

9             THE COURT:  Good morning.  Let's start with a few

10  preliminaries.  First, for the United States, is the Government

11  ready to proceed in this case?

12            MR. TIEKE:  Your Honor, the United States is ready to

13  proceed.

14            THE COURT:  Ms. Rea, is the defendant ready to

15  proceed?

16            MS. REA:  We are, Your Honor.

17            THE COURT:  Let's first talk a bit about voir dire.

18  The number of jurors is still in flux.  I understand that one

19  was involved -- I hope not seriously, but we don't really know

20  yet -- in an accident nearby.  We have a couple of no-shows,

21  probably not a surprise given the closure of local schools.  So

22  I'm still waiting on that number for you.

23      We do, as I indicated in our final pretrial, plan to seat a

24  jury of 14.  I'm gonna ask you to take very good notes.  I don't

25  typically excuse for cause along the way.  So if someone

1    presents with an answer, even if it's an obvious basis for

2    excuse for cause, I'll send them back, and we'll just keep

3    track.  And I prefer to do it that way because I like to tell

4    the jury pool that they will not know the basis for their not

5    being selected.

6         Now, there are some exceptions to that.  If there is some

7    emergent problem with a member of the jury pool, we will

8    reconsider that.

9         Under the rule, the Government will have seven peremptory

10   challenges, the defense 11.  We will have an opportunity with

11   the jury pool out of the courtroom for you-all to go through and

12   exercise -- take the time to exercise your peremptories.  I

13   typically ask the parties to -- once they are done marking their

14   list, to show it to each other so that we can preview any Batson

15   issues that might need to be taken up.

16        Do we have a bird in the courtroom?  It sounds like there's

17   a chirping occasionally.  I don't know if it's an electronic

18   chirp or if there's an actual bird here or near.

19        Any questions about any of that thus far?

20            MS. REA:  No, Your Honor.

21            THE COURT:  I would like to readdress *Missouri v. Fry.*

22   We talked at the pretrial -- the final pretrial about whether

23   the Government had made an offer, and the Government confirmed

24   that.

25        And, Ms. Rea, you confirmed that that offer had been

1   communicated to your client.  I want to follow up now and

2   confirm that had that offer been accepted, you communicated to

3   her that she would likely face less time in custody, if

4   convicted -- or, rather, than if she was convicted on all counts

5   following trial.

6           MS. REA:  Yes, Your Honor, I did communicate that to

7   Ms. Craft.  It was part of the discussion that we had prior to

8   the expiration of the offer made by the U.S.

9           THE COURT:  Very well.  Does either side see any need

10  to follow up on the issues attendant to *Missouri v. Fry*?

11          MS. ZIMDAHL:  No, Your Honor.

12          MS. REA:  No, Your Honor.

13          THE COURT:  Let's talk now about the statement of the

14  case.  You-all submitted a proposed -- jointly approved,

15  proposed statement of the case.  I did modify it slightly.  My

16  preference for the use of the statement of the case with the

17  jury pool is to track the statutory language a little less

18  sharply and try and use more everyday language, if you will.

19     So have you looked -- have you had a chance to look at the

20  statement of the case that I think my law clerk provided to you

21  upon your arrival?

22          MR. TIEKE:  We have, Your Honor, and the United States

23  has no objections to the statement of the case.

24          MS. REA:  I have as well, Your Honor, and I have no

25  objections.

1          THE COURT:  All right.  Thank you.

2      Let's then talk about the preliminary jury instructions.

3  These are by the book.  These are given in every -- have been

4  given in every trial I've presided over.

5      The one modification, of course, is on the last page,

6  Section 6, the section on the use of pejorative words.  And

7  there is the jointly submitted -- which I think is spot on, the

8  jointly submitted instruction to the jury explaining how the

9  pejorative language will be limited.

10      Now, I have modified it again very slightly.  I think

11  "euphemism" is a good word, but I think "substitute" will be

12  better understood by the jury pool.  That was the main change, I

13  think.  Any objections to Section 6 of the preliminary jury

14  instructions?

15          MR. TIEKE:  No, Your Honor.

16          MS. REA:  And, no, Your Honor, not from the defense.

17          THE COURT:  Have both sides had an opportunity to pick

18  up the jury notebooks?  I see one there.

19          MR. TIEKE:  Yes, sir.

20          MS. REA:  Yes, Your Honor.

21          THE COURT:  And we can talk more later as the pool

22  develops, but based solely on the juror profiles provided in the

23  notebook, any objections or any need to discuss any of the juror

24  material at this stage?

25          MS. REA:  Not from the defense, Your Honor.

1          MR. TIEKE:  Not from the United States, Your Honor.

2          THE COURT:  This morning you-all submitted a number of

3     stipulations of fact.  I believe there are four of them; is that

4     correct?

5          MR. TIEKE:  There are four, Your Honor, yes.

6          THE COURT:  All right.  I'm gonna hand these back to

7     you and ask you -- somebody who signed this to put today's date

8     here.  It's a minor matter.  I could do it for you, but I would

9     prefer you-all do that.

10      We don't need to go very far with our discussion of your

11    stipulations at this stage.  I doubt they'll come into play

12    until tomorrow, at the earliest, but what I would like to

13    discuss is the preferred process for using the stipulations.

14        I typically will defer to the lawyers, if the parties agree,

15    to the timing of the stipulations.  I have a very casual

16    explanation I give to the jury when I read a stipulation.  I

17    simply -- and it's consistent with the form instructions, both

18    preliminary and at the end, to say to them that this is a

19    stipulation of fact I'm going to read.  It represents an

20    agreement of the parties, and as to an otherwise disputed fact,

21    they can accept it as true.  It's basically that simple.

22        So the question is, for each of these -- it would not be

23    true as a group, but for each individual stipulation of fact,

24    when is it best read?

25        And I will also add, I typically read the stipulations.  I

1    think it's best coming from me as the neutral.  It's an agreed

2    upon fact, as opposed to having it read by a witness or a

3    lawyer, especially -- I think it's inconsistent with having a

4    lawyer read it, frankly, because we say that lawyers' statements

5    are not evidence.

6         So unless you have already agreed to that -- that process,

7    when you would like these stipulations to be read, we'll -- I'll

8    just keep them.  And you can signal me at some point, at the end

9    of the testimony, "This is the appropriate point for the

10   stipulation on the iPhone to be read," and we can do that.

11        The other issue with respect to stipulations is that there

12   may be -- and this is also for another day.  We don't need to

13   resolve this this morning, but I want you to be aware -- there

14   may be an instruction which a stipulation touches upon.  There

15   may be an element that a stipulation is applicable to, and if

16   so, we can add that to the appropriate instruction.  The Sixth

17   Circuit has said that's perfectly fine, and it makes clear what

18   the impact of the stipulation is.

19        So I will ask you-all, as you get to the draft instructions,

20   which we hope to have to you maybe tomorrow, you can think about

21   that as well.  Any questions about stipulations?

22             MR. TIEKE:  Your Honor, just one.  You mentioned that

23   we might possibly read those at the end.  I'm not sure -- and we

24   can obviously talk to Ms. Rea about this -- but we think it

25   might be appropriate to do it in the course of where it makes

1    sense with a particular witness, instead of just putting it at

2    the end.

3            THE COURT:  That's fine with me.  And if there's no

4    objection to that, if that's an agreed upon process, then you

5    can simply tell me when it's appropriate to read it.  We will

6    pause before calling another witness, and I will inform the jury

7    I have a stipulation to read to them.

8        And as I said a minute ago, it will come with a simple

9    explanation that a stipulation is simply an agreement by the

10   parties as to an otherwise disputable fact.  They can now accept

11   the following as true, and I read it.

12       We typically do not supply them with the stipulations of

13   fact at the end, although I'm not a stickler about that.  So if

14   there is anything in here that's complex or that might need to

15   be supplied with the instructions at the end of the case, we can

16   talk about that.

17       One of the stipulations -- I just, you know, briefly leafed

18   through them.  One of the stipulations, basically, just

19   stipulates as to the admissibility of three photographs; right?

20   That might be a stipulation that need not be read to the jury.

21   It might be that you simply move for admission of the photograph

22   and the defense says, "Consistent with the stipulation, no

23   objection."  We need not read that to the jury, since it's belt

24   and suspendering an otherwise simple process.

25       All right.  We'll take those up as we go.

1         Let's come back to voir dire.  Does either side recognize

2    any names in the book?  Did you -- as you reviewed the list of

3    jurors, did any names look familiar?

4              MS. REA:  I did not, Your Honor.

5              MS. ZIMDAHL:  Your Honor, there's just one from our

6    side --

7              THE COURT:  All right.

8              MS. ZIMDAHL:  -- that we would raise.  I don't know

9    that it's necessarily a concern, but that would be Juror

10   Number 25.

11             THE COURT:  Juror Number 25 is a retired police

12   officer, according to my notes; is that correct?

13             MS. ZIMDAHL:  That is correct.

14             THE COURT:  All right.  I'll just mark 25 as somebody

15   that is familiar with the Government.

16             MS. ZIMDAHL:  And, Your Honor, just one further note.

17   We do believe that that individual purchased the home of our

18   task force officer.  So there's a slight additional connection

19   we would just make known.  I don't believe that this is

20   necessarily disqualifying or anything of that nature, but

21   because we know it, we wanted to share it with everyone.

22             THE COURT:  It might be disqualifying.  I think

23   there's -- you do business with somebody who's associated with

24   one of the parties, we typically will excuse someone on that

25   basis.

1           Rather than make Juror Number 25 sit here all day long, if

2    both parties agree to an excuse for cause, I can communicate

3    with our jury administrator and let him leave.  Otherwise, he'll

4    be here through the course of the -- like I said, my preference

5    is to keep people around because someone may have a legitimate

6    for cause reason.  But if you let everyone go on the spot, it

7    makes it impossible for you to prioritize those reasons if the

8    pool starts to get thin so -- but this is one that seems a bit

9    obvious.  What's -- you raised it.  What's your view?

10          MS. ZIMDAHL:  Sure.  Let me just get a little bit more

11   relevant information.

12       Your Honor, I'll just add that it was approximately 15 years

13   ago, and there were no personal interactions, but -- so I don't

14   know, again, that it is necessarily disqualifying.  However,

15   given the nature of it, we wouldn't object to it on those facts.

16          THE COURT:  What's your view?

17          MS. REA:  And, Your Honor, we would be in agreement

18   with and requesting that that potential juror be excused because

19   of that business relationship.

20          THE COURT:  All right.  I think that's a reasonable

21   position.  Is it possible he could otherwise qualify?  Yes, I

22   think it's possible.  He's a retired police officer.  It's

23   different than an active duty sworn officer, but I do think,

24   given these circumstances, it's unlikely that he would make it

25   to the jury.

1    So I will note for the record then that, by agreement, Juror

2   Number 25 will be excused for cause, and I'll let you go ahead

3   -- or let our deputy clerk communicate with our jury

4   administrator.  Presuming he has already checked in, we will let

5   him go.

6    All right.  Moving on, then.  With respect to the voir dire,

7   I have reviewed, of course, and incorporated some of the

8   nonduplicative questions that have been proposed by the parties.

9   As we go through the questions, keep track; and if there is a

10   critical question missed or if an important question presents

11   itself during the course of the voir dire that was not apparent

12   during your preparation, we can discuss that at the end before

13   we close voir dire.

14    Remember, also, that I will ask one lawyer for each side to

15   stand and introduce themselves and those at their table early in

16   the voir dire process.  That's my practice.  And then I will ask

17   follow-up questions of the pool, if they know anyone at the

18   table, that sort of thing.

19    Let's talk also now briefly about the 404(b) issues that are

20   in our case here.  Ms. Rea has pointed out correctly that it is

21   appropriate to offer a limiting instruction when 404(b) evidence

22   that has been approved by the Court is presented to the jury.

23    Here there is a lot of 404(b) evidence or evidence that is

24   labeled as such, I guess, is the best way to approach it.  So

25   the challenge is disaggregating from the witnesses what is

1    404(b) and what is other testimony.  That's, I think,

2    potentially the case with, say, the case agent who may testify

3    -- or any law enforcement agent that may testify regarding res

4    gestae as well as 404(b).

5         And then, of course, there will be, I think -- from the

6    materials submitted in camera by the Government, I think there

7    will be witnesses limited to the 404(b) -- the approved 404(b)

8    category.  What we need to do is we need to have a method for

9    instructing the jury regarding the limitation of that evidence

10   consistent with the instructions of the Sixth Circuit.

11        So I don't anticipate we'll get to that today.  I don't

12   anticipate that will be an issue today.  My hope for today's

13   schedule is to get a jury seated and to get opening statements

14   done.  I seriously doubt we'll get beyond that today.

15        So to the extent that the parties can agree to a form

16   limiting instruction on 404(b) that is consistent with the rule

17   and the Sixth Circuit jurisprudence, then that would be my

18   preference.

19        If the parties cannot agree, I will develop an appropriate

20   404(b) instruction and present it, but what I'd need -- in

21   addition to the language of the instruction, what I also need is

22   timing and specificity.

23        The purpose of the instruction, as you-all know, is to limit

24   the use of the evidence to the specified and approved purpose.

25   In some cases, I think it's identification.  In some cases, I

1    think it's motive.  The Government might have cited one or two

2    others.  But the instruction will need to be consistent with the

3    Court's prior rulings, some of which I reserved, I realize that,

4    and we'll have to do that on the spot.  Even if we have to take

5    a break to do it, we will do it in order to get it right.

6       But my preference is that you-all continue in the

7    cooperative mode you've been able to utilize thus far and come

8    up with a limiting instruction.  Even if the jury, you know,

9    hears it six or eight times and gets bored with it, I think the

10   point will be made that they are to limit their use.

11      I think the Sixth Circuit case law would contemplate that

12   the limiting instruction be repeated at the end; and the

13   substantive instructions, along the lines of "you have heard

14   throughout the case limiting instructions on the use of certain

15   evidence," and it will repeat that they are to use and consider

16   that evidence only for the stated purpose in which it was given.

17      So any questions about that?  Is that asking too much of

18   you-all to be able to put your heads together and produce -- I

19   don't think it's that complicated, really.  I think what's

20   complicated is the part that you-all know better than I do,

21   which is when it should be given and for what purpose.

22         MS. ZIMDAHL:  Your Honor, I just want to ask one

23   clarifying question.  I want to make sure that we understand,

24   and this is what I think is a little complicated.  The United

25   States gave notice of a lot of acts, just in an abundance of

1    caution, that we believe and I believe the Court ruled are res

2    gestae rather than 404(b).

3              THE COURT:  Right.

4              MS. ZIMDAHL:  And I just want to make sure --

5              THE COURT:  I'm not talking about that.  If it's res

6    gestae, it doesn't get a 404(b) limiting instruction.

7              MS. ZIMDAHL:  Okay.  I believe the majority of the

8    acts that we are putting into evidence in this case are, in

9    fact, the acts that the Court ruled are res gestae.  There may

10   be a few additional that fall into that "other" category, and

11   those are --

12             THE COURT:  I'm counting three or four.

13             MS. ZIMDAHL:  Yeah.

14             THE COURT:  But depending upon -- what I don't know is

15   what to expect from law enforcement that are gonna talk about --

16             MS. ZIMDAHL:  Sure.

17             THE COURT:  -- potentially multiple categories of

18   information, and they may slip into a 404(b).  If they do, I

19   expect both sides will be ready to on the one hand object, on

20   the other hand advise the Court that 404(b) is coming or 404(b)

21   was just touched upon, at which point we may need a limiting

22   instruction.

23             MS. ZIMDAHL:  Absolutely.  I just wanted to clarify

24   that point given that we had provided notice of so many

25   different acts that -- I think we understood the ruling, but I

 1    thought I better clarify at this point.

 2        We'll absolutely -- I don't think that's too complicated at

 3    all for us to work together on that piece and get you a limiting

 4    instruction and be prepared to address it, if needed and when.

 5            THE COURT:  Very well.

 6        All right.  Anything else either side wishes to bring up at

 7    this point before I give you a brief break so that you can get

 8    organized?  And then we will come back and invite the jury pool

 9    in.  Hopefully, by that point, I'll have a specific number for

10    you.  I expect it will still be a generous number.  We started

11    with a larger than normal pool.

12        We're still dealing, to some degree, of course, with the

13    impact of the pandemic, but we've also had this weather problem

14    and schools cancelled in some places.  So we have a larger

15    than -- we're starting with a larger than normal pool.  I don't

16    think we'll have any problem getting to 14, but I will give you

17    that number hopefully right before we call them in.

18        Anything?

19            MR. TIEKE:  No, Your Honor.

20            MS. REA:  Just briefly, Your Honor, a couple of

21    things.  One, I think both sides will be requesting separation

22    of witnesses when we get to that point.

23        The other thing I would let the Court know of is, due to a

24    medical condition, Ms. Craft will need frequent breaks.  And I

25    don't know if it would be best for the Court to establish a

1    schedule so we're breaking every hour, or if there's some other

2    way that you would like us to make that known, but I did want to

3    put it on the radar.

4            THE COURT:  That's fine.  I appreciate that.  No, I

5    won't do a hard schedule, just because five minutes on either

6    side is often better than the straight up on the hour.

7        In my experience, we always have members of the jury pool

8    who have similar issues.  And so I try and break every hour, but

9    it's -- it will be roughly -- we might come back and go for

10   45 minutes and then take a break, or it might be 65 minutes, but

11   it'll be roughly every hour.

12       If a problem presents itself and an earlier break is needed,

13   you can just -- you can just stand up and make that motion.

14           MS. REA:  Thank you.

15           THE COURT:  I'll know what you're talking about.

16       Again, anything else?

17           MR. TIEKE:  No, Your Honor.

18           THE COURT:  All right.  What do you-all need, about

19   15 minutes, to organize and get ready?

20           MS. REA:  Yes.

21           THE COURT:  We will -- actually, let's talk a little

22   bit about schedule and logistics.  If we have the jury pool in

23   here at 9:45, 9:50 roughly, we'll probably go for at least an

24   hour and then give them a break as well as you-all.

25       I'm pretty thorough with voir dire, maybe thorough to a

1  fault, but I am fairly thorough.  So I don't -- I'm not gonna

2  make any aggressive predictions on how quickly we can seat a

3  jury.  I think it's gonna take a while, and I'm fine with that.

4  So I want you-all to understand that.

5      Despite being thorough and despite not being in an

6  inordinate hurry, I also don't want to waste time.  So let me

7  remind you-all that I only want one lawyer approaching the

8  bench, if somebody needs to come up and speak privately.  That

9  really only applies to you-all, of course.

10     And while I will permit follow-up questions -- in fact, I

11  will expect them in some circumstances to make sure that we have

12  covered all of the bases.  I don't think I need to say this to

13  this group of experienced lawyers, but I don't want that abused.

14  Right?  So let's keep the follow-up questions on point, germane

15  to the issue presented by the juror's original response, and

16  let's keep things moving.

17     It's been my experience that we have some jurors who don't

18  want to talk and are compelled to do so, you know, by their

19  conscience, having been sworn and told, "We need your honest

20  answers."  So it'll be pulling teeth, and others want to tell us

21  about their last trip to the grocery store.  They really want to

22  help.  So our job will be to figure out what is the important

23  part of their response, or what is the important part they have

24  not yet told us about?  And I will rely upon your follow-up

25  questions to do that if mine don't get us there.

1      There's no manual on that, really, and I will not have a

2  stopwatch.  And I will not be keeping track of follow-up

3  questions, but I'm just asking you to be reasonable, use your

4  discretion as well.

5      There should be headphones.  Do you have the appropriate

6  equipment, Ms. Rea, so that your client can hear the bench

7  conferences?

8           MS. REA:  I have some earbuds, yes.

9           THE COURT:  Good.  If during the course of the voir

10  dire while -- I just want to make sure here.

11     All right.  During the course of the voir dire, if Ms. Craft

12  needs to speak with you while you're up here, she can just raise

13  her hand, and we will pause.

14     All right.  I'm gonna give you 15 or 20 minutes.  Is that

15  sufficient?

16          MR. TIEKE:  Yes, Your Honor.

17          MS. REA:  Yes, Your Honor.

18          THE COURT:  Thank you.

19     (Recess at 9:36 a.m.)

20     (Voir dire not requested as part of this transcript.)

21     (Proceedings continued in open court at 3:44 p.m.  Jury in.)

22          THE COURT:  Members of the jury, now that you have

23  been sworn, I will give you some preliminary instructions to

24  guide you in your participation in this trial.

25     First, it will be your duty from the -- to find from the

1    evidence what the facts are.  You and you alone will be judges

2    of the facts.  You will then have to apply to those facts the

3    law as the Court will give it to you.  And when I refer to "the

4    Court," I am referring largely to my role.

5        You must follow that law whether you agree with it or not.

6    Nothing I may say or do during the course of the trial is

7    intended to indicate or should be taken by you as indicating

8    what your verdict should be.

9        The evidence from which you will find the facts will consist

10   of the testimony of witnesses, documents, and other things

11   received into the record as exhibits and any facts that the

12   lawyers stipulate or agree to or that the Court -- again, that's

13   me -- may instruct you to find.

14       Certain things are not evidence and must not be considered

15   by you.  I will list them for you now.  First, statements,

16   arguments, and questions by lawyers are not evidence.

17   Objections to questions are not evidence.

18       Lawyers have an obligation to their clients to make

19   objections when they believe evidence being offered is improper

20   under the rules of evidence.  You should not be influenced by

21   the objection or by my ruling on it.

22       If the objection is sustained, ignore the question.  If the

23   objection is overruled, treat the answer like any other.  If you

24   are instructed that some item of evidence is received for a

25   limited purpose only, you must follow that instruction.

1       Three, testimony that I have excluded or told you to

2   disregard is not evidence and must not be considered.

3       Four, anything you may have seen or heard outside the

4   courtroom is not evidence and must be disregarded.  You are to

5   decide the case solely on the evidence presented here in the

6   courtroom.

7       There are two kinds of evidence, direct and circumstantial.

8   Direct evidence is direct proof of a fact, such as testimony of

9   an eyewitness.  Circumstantial evidence is proof of facts from

10  which you may infer or conclude that other facts exist.  I will

11  give you further instructions on these as well as other matters

12  at the end of the case, but keep in mind that you may consider

13  both kinds of evidence.

14      It will be up to you to decide which witnesses to believe,

15  which witnesses not to believe, and how much of any witness's

16  testimony to accept or reject.  I will give you some guidelines

17  for determining the credibility of witnesses at the end of the

18  case.

19      As you know, this is a criminal case.  There are three basic

20  rules about criminal cases that you must keep in mind.  First,

21  the defendant is presumed innocent until proven guilty.  The

22  indictment brought by the Government against the defendant is

23  only an accusation, nothing more.  It is not proof of guilt or

24  anything else.  The defendant, therefore, starts out with a

25  clean slate.

1    Second, the burden of proof is on the Government until the

2  very end of the case.  The defendant has no burden to prove her

3  innocence or to present any evidence or to testify.  Since the

4  defendant has the right to remain silent, the law prohibits you

5  from arriving at your verdict by considering that the defendant

6  may not have testified.

7    Third, the Government must prove the defendant's guilt

8  beyond a reasonable doubt.  I will give you further instructions

9  on this point later, but bear in mind that in this respect, a

10  criminal case is different from a civil case.

11    The defendant, Suzanne Craft, is charged with mailing

12  threatening communications containing a threat to injure a

13  particular group of victims.  The United States alleges that the

14  defendant, Suzanne Craft, selected the victims of the

15  threatening communications because of their race or color.  The

16  defendant has pleaded not guilty and denies these allegations.

17    For you to find the defendant guilty of mailing threatening

18  communications containing a threat to injure a particular group

19  of victims, you must be convinced that the Government has proved

20  each and every one of the following elements beyond a reasonable

21  doubt:

22    First, that the defendant knowingly mailed or caused to be

23  mailed by the United States Postal Service a communication.

24    Second, that the communication contained a threat to injure

25  a particular person or a particular group of individuals.

1    And, third, that the defendant mailed the communication for

2    the purpose of making a threat.

3    If you find the defendant guilty of any or all of the

4    charges in the indictment, you must then determine beyond a

5    reasonable doubt whether the defendant sent the particular

6    threatening communication because of the actual or perceived

7    race or color of the victims.

8    To prove that the defendant acted because of the victim's

9    group or group of victims' actual or perceived race or color,

10   the Government must prove beyond a reasonable doubt that the

11   threats would not have been made but for the fact of the

12   victim's actual or perceived race or color.

13   Now a few words about your conduct as jurors.  You as jurors

14   must decide this case based solely on the evidence presented

15   here within the four walls of this courtroom.  This means that

16   during the trial you must not conduct any independent research

17   about this case, the matters in the case, and the individuals or

18   businesses involved in this case.

19   In other words, you should not consult dictionaries or

20   reference materials, search the internet, websites or blogs or

21   use any other electronic tools to obtain information about this

22   case or to help you decide the case.  Please do not try to find

23   out information from any source outside the confines of this

24   courtroom.

25   Until you retire to deliberate, you may not discuss this

1    case with anyone, even your fellow jurors.  After you retire to

2    deliberate, you may begin discussing the case with your fellow

3    jurors, but you cannot discuss the case with anyone else until

4    you have returned a verdict and the case is at an end.

5        I know, of course, that most of you use cell phones,

6    smartphones, access the internet, and use other tools of

7    technology.  You must also not talk to anyone at any time about

8    this case or use these tools to communicate electronically with

9    anyone about the case.  This includes your family and friends.

10       You may not communicate with anyone about the case on your

11   cell phone, smartphone, through email, iPhone, text messaging,

12   Twitter, any blog or website, including Facebook, Google Plus,

13   LinkedIn, Instagram, Snapchat, or YouTube.  You may not use any

14   other similar technology of social media even if I have not

15   specifically mentioned it here.

16       I expect that you will inform me immediately if you become

17   aware of another juror's violation of these instructions.  A

18   juror who violates these restrictions jeopardizes the fairness

19   of these proceedings and a mistrial could result, which would

20   require the entire process to start over.

21       Finally, do not form any opinion until all the evidence is

22   in.  Keep an open mind until you start your deliberations at the

23   end of the case.

24       I hope that for all of you this case is interesting and

25   noteworthy.  If you want to take notes during the course of the

1    trial, you may do so.  However, it is difficult to take detailed

2    notes and pay attention to what the witnesses are saying at the

3    same time.  If you do take notes, be sure that your note-taking

4    does not interfere with your listening to and considering all of

5    the evidence.

6        Also, if you do take notes, do not discuss them with anyone

7    before you begin your deliberations.  Do not take your notes

8    with you at the end of the day.  Be sure to leave them here in

9    the jury room.

10       If you choose not to take notes, remember that it is your

11   own individual responsibility to listen carefully to the

12   evidence.  You cannot give this responsibility to someone who is

13   taking notes.  We depend on the judgment of all members of the

14   jury.  You all must remember the evidence in this case.

15       The trial will soon now begin.  First, the Government will

16   make an opening statement, which is simply an outline to help

17   you understand the evidence as it comes in.  Next, the

18   defendant's attorney may but does not have to make an opening

19   statement.  Opening statements are neither evidence nor

20   arguments.

21       The Government will then begin to present its witnesses, and

22   counsel for the defendant may cross-examine them.  Following the

23   Government's case, the defendant may, if she wishes, present

24   witnesses whom the Government may cross-examine.

25       After all of the evidence is in, the attorneys will present

1    their closing arguments to summarize and interpret the evidence

2    for you, and I will then instruct you on the law.  After that,

3    you will retire to deliberate on your verdict.

4        Now, finally, this case involves the oral and written use of

5    racial slurs.  The lawyers and the Court will use substitutes in

6    place of these racial slurs when addressing you and the

7    witnesses.  However, at times the victims and witnesses in this

8    case will use the actual words that were spoken and written

9    because the use of the actual words is at issue in this case.

10   In addition and for the same reason, exhibits shown to you will

11   contain the actual words written.

12       That concludes our preliminary jury instructions.  By

13   agreement with the lawyers, we're going to take a brief break

14   now to allow the lawyers to prepare for their opening

15   statements.

16       It is close to 4:00.  I believe that we will have enough

17   time for you to hear opening statements by the Government and by

18   the defendant, if the defendant wishes to go forward, before we

19   let you go home for the day.  At that point, also, we'll talk

20   about some logistics, some start times, some end times, and any

21   challenges that any of you might have keeping to that schedule

22   that we will do our best to work with.

23       All right.  So we will take about a ten-minute break and

24   return about 4:05.  You heard me say during the voir dire breaks

25   not to talk about the case.  You just heard that in the

 1    preliminary instructions.  You'll hear me repeat it at every

 2    break.

 3        Please don't talk about the case with each other or anyone

 4    else.  You're just now beginning the case.  There's not much for

 5    you to talk about anyway, but keep your discussions about

 6    noncase matters, and I'll see you in about ten minutes.

 7        (Jury out 3:57 p.m.)

 8        THE COURT:  You may be seated.  The jury has left the

 9    courtroom.

10        I believe, Counsel, you had mentioned there might be some

11    matters that need to be discussed in advance of the parties'

12    opening statements.

13        MS. ZIMDAHL:  Yes, Your Honor.  One of the primary

14    issues we just wanted to flag and address with the Court was

15    that we at least plan to touch on that 2019 incident.  I know

16    the Court had reserved ruling on that.  We had flagged it in our

17    404(b) list for the defendant.

18        It's our position it's not 404(b) in the sense that it's not

19    even an act of Ms. Craft, but we did want to raise that before

20    we speak on it, since the Court was reserving ruling, and make

21    sure that it was an area in which we could tread in opening

22    statement and that we had flagged that for the Court at this

23    time.

24        THE COURT:  Is this your Category Number 1?

25        MS. ZIMDAHL:  I believe it is.  Before I misspeak, let

1    me make sure that that is correct in terms of the ruling.  That

2    is the incident in the late summer involving the use of a racial

3    slur in the cul-de-sac.

4             THE COURT:  The racial slur is alleged to have been

5    used by the defendant's daughter; is that correct?

6             MS. ZIMDAHL:  That's correct.

7             THE COURT:  Any response?

8             MS. REA:  Your Honor, very little response beyond what

9    we've already argued in our filings.  I would say I think the

10   404(b) implication -- acknowledging that the evidence to be

11   introduced will be about Ms. Craft's daughter, the subtext of

12   that is it came from somewhere and that it came -- her knowledge

13   of the word and her use of the word came from Ms. Craft.  So

14   based on that, I do still think it's an other bad act piece of

15   evidence.  I don't have any additional argument to offer beyond

16   what we've already given to the Court.

17            THE COURT:  Here's where I come down:  I think it is

18   res gestae.  I think it is background.  Now -- and I think it's

19   going to be permitted to be used, but I also think -- to your

20   last point there, Ms. Rea, that a limiting instruction is

21   appropriate here.  We've done some preliminary research on a

22   potential instruction.  There is not a lot of law in this area,

23   frankly.

24       I've found no pattern instruction, but I have found cases

25   that indicate where it is appropriate for a jury to hear a

1   limiting instruction to the effect that statements made by an

2   uncharged person are not imputed to the defendant and should not

3   be considered as such by the jury.  So we can talk about that

4   more in depth, if you-all want to do that before you get into it

5   in your opening.

6       But I think the incident -- I did initially reserve ruling.

7   I wanted to go back and look at this and consider it some more.

8   I do think it is res gestae.  I think it is contextual.  I think

9   it's important for the context of the Government's proof, but I

10  am concerned that -- to your point, Ms. Rea, that -- I can't

11  recall now off the top of my head.  How old was her daughter at

12  the time?

13          MS. REA:  Eleven at the time.

14          THE COURT:  So a very young girl.  The natural

15  assumption is gonna be she heard that from only one person, and

16  I don't think there's going to be any proof on that; right?

17          MS. ZIMDAHL:  No, Your Honor.  And we are offering

18  this for the course of the story, just as you've said.  This

19  sets off sort of a chain of events in terms of how the family

20  starts limiting contact, and that is why and one of the reasons

21  I simply want to mention it briefly.  It is not a large part of

22  the opening, but it seems a strange event to leave out is why

23  I'm flagging it now as well.

24      I think we'd want to discuss that potential limiting

25  instruction a little bit further.  There may be implications

1    that both sides need to think about a little bit further, but I

2    don't see any significant problem with that in theory either at

3    this point.

4              THE COURT:  I would expect you would want to flesh it

5    out.  My preference would be that you agree on the instruction.

6    The question is when do you want to do that?  Do you need to do

7    that now before your opening?

8              MS. ZIMDAHL:  I don't think so, unless Ms. Rea

9    believes that it's necessary.

10             MS. REA:  I don't think we need to do it before

11   opening.

12             THE COURT:  And so then we can talk about it -- after

13   openings are done and the jury's excused for the evening, we can

14   talk about where in your witness list -- I presume it'll be

15   fairly early.

16             MS. ZIMDAHL:  Yes.

17             THE COURT:  So if we're gonna talk about it, we might

18   need to talk about it this evening or first thing in the morning

19   to make sure that we're all on the same page as to the nature of

20   the proposed instruction and the timing of the proposed

21   instruction.  Right?  Anything further on that point?

22             MS. REA:  No, sir.

23             MS. ZIMDAHL:  Nope.  The only other thing I have --

24   just in reference to opening, I've already shared the slides

25   with Ms. Rea.  We do intend to use just some short opening

1    slides.  They do involve the mailings and some of the paintings

2    in the case, just sort of as a heads-up to the Court.  I know

3    the jury will know this right out of the box then but wanted to

4    let everyone know that's coming.

5              THE COURT:  You know what's coming?

6              MS. REA:  I do, Your Honor.  I have seen them.

7              THE COURT:  Some of them are subject to the

8    stipulations you've already reached; is that right?

9              MS. ZIMDAHL:  Yes.  I don't believe there's any issues

10   with these coming into evidence.  It's more just the nature of

11   what's going to be on them that I wanted to --

12             THE COURT:  Well, I gave the instruction.  I saw a lot

13   of blank faces, but I saw a few raised eyebrows.  So I think, as

14   the trial unfolds, they'll understand a little better.  Perhaps

15   it was a bit confusing.  I don't think so.  I don't think so.  I

16   think we have a smart, engaged jury, and I think that -- I think

17   that they understood what we were telling them through that

18   agreed instruction about the use of substitute words when

19   possible.

20      All right.  Anything else before we bring them back?  And

21   you'll be ready to go?  Do you want to start setting up now?

22             MS. ZIMDAHL:  Your Honor, if we could have just a

23   couple additional minutes to get things set.

24             THE COURT:  Go ahead.  I'll just stay here.  There's

25   no reason to reset everything.

1    Ms. Rea, will you also be using any of the A/V equipment

2  or --

3            MS. REA:  I will not, Your Honor.

4            THE COURT:  Are you ready?

5            MS. ZIMDAHL:  Yes, Judge.

6            THE COURT:  I'm gonna let you begin from there, and

7  I'll call you up.

8            MS. ZIMDAHL:  Okay.

9            THE COURT:  You can bring them in.

10       (Jury in 4:12 p.m.)

11            THE COURT:  As I mentioned just after the instructions

12  before our brief break, we will now hear opening statements,

13  first from the United States.

14       Ms. Zimdahl, are you ready?

15            MS. ZIMDAHL:  Yes, Your Honor.

16            THE COURT:  Please proceed.

17            MS. ZIMDAHL:  "Two dead N-lets, go N-words" written on

18  a funeral home advertisement.

19       "N-words leave.  We hate your kind, last chance."

20       "You had enough N-word bitch."

21       "Move out or bullets."

22       "You will die, bitch" and then an envelope containing two

23  bullets and a threat, "get out."

24       These are some of the threats that the Pineda family

25  received at their home between November and December of 2020.

1    This family, a beautiful American family consisting of mom,

2    Michella Pineda, and her wife, Connie Pineda, and their five

3    children.  The Pineda family moved to the Lake Forest

4    neighborhood in 2019, hoping to fulfill their dream of living in

5    their forever home in a quiet neighborhood.

6        That dream was shattered when they became the target of

7    racial slurs that escalated to receiving these threatening

8    letters, many of which were targeted at their children, threats

9    that left them living in terror, in fear for their safety and

10   for the safety of the children that they loved so dearly.

11       Ladies and gentlemen, as you will learn, those children, the

12   Pinedas' children, are multiracial, and their two older children

13   identify as Black and Asian due to their genetic history.  And

14   it did not take long before this fact drew the ire of one of

15   their new neighbors, the defendant, Suzanne Craft, and made them

16   the focal point of their harassment and threats.

17       And now, ladies and gentlemen of the jury, I'd like you

18   to -- I'd like to ask you to just excuse my language as I talk

19   to you here today.  I know I've already said and read some

20   things that are very offensive, but, ladies and gentlemen, those

21   are not my words.  Those are the words that the defendant chose

22   to use.

23       So I'd like to spend a little bit of time and tell you about

24   the events that brought us here together today.  In the spring

25   of 2019, the Pineda family moved to a new home in the Lake

1    Forest neighborhood.  They bought a house at 510 ███████

2    ████.  And at the time, their family consisted of Michella and

3    Connie Pineda and four children -- K.P., S.P.1███, S.P.2█, and

4    D.P.██.  And they would later welcome that little girl you see

5    in the middle, S.P.3█, in 2020, during the events in this case.

6        Soon after they moved to the neighborhood, they do what most

7    families do when they move in.  They start meeting their new

8    neighbors and among those was the defendant in this case,

9    Suzanne Craft, and her daughter, S.W.█.

10       Now, Ms. Craft lived one house away from the Pinedas at 507

11   ████████████████.  You will hear that the Pinedas met Ms. Craft

12   and her daughter shortly after moving in, and sometimes the

13   Pinedas' children would be outside playing at the same time that

14   S.W.█ was outside playing.  The kids weren't really friends,

15   though.  S.W.█ wasn't especially nice to S.P.2█, but the

16   families maintained a cordial relationship.

17       A few months after the Pinedas moved in, there was an

18   incident in the cul-de-sac.  Craft's daughter, S.W.█, referred

19   to one of the Pinedas' children using a racial slur.  This led

20   to Michella and Connie Pineda telling their children, "Stay away

21   from S.W.█.  don't play with her.  Limit your contact."

22       They tried to continue to maintain a cordial relationship,

23   but they wanted their children to limit contact due to that

24   racial slur and the language that had been used around their

25   children.

1    Unfortunately, limiting contact wasn't enough.  And on

2    March 22nd of 2020, S.W.█ again called the Pinedas' daughter

3    K.P. an N-let and an N-word while K.P. and S.P.2█ were outside

4    on the cul-de-sac.  K.P. tells S.W.█, "Leave them alone," and

5    she labels her a racist.

6        Shortly after, the defendant arrives at the Pinedas' home

7    banging on the door yelling, "What the 'F' did that N-word say

8    to you?"

9        Scared, Michella and K.P. crawl to the backyard to get

10   Connie and to get help.  When they come around front, they see

11   the defendant, Craft, driving away.  Thinking that Craft has

12   left the neighborhood, the Pinedas allow their daughter S.P.2█

13   to go back into the cul-de-sac to ride her bike right around

14   that small cul-de-sac they live on under the watchful eye of her

15   sister K.P..  that's what big sisters do.  They watch their

16   little sisters play.

17       So they're outside when Craft drives back in her car, pulls

18   up next to S.P.2█, rolls down the window and threatens to run

19   her over.  S.P.2█ flees back home terrified.  Her mothers come

20   outside learning what's happened, and they confront Craft.

21   Yelling ensues and, after a time, the Pineda family goes back

22   inside, leaving the defendant standing outside their home

23   intimidatingly for a period of time.

24       Ladies and gentlemen, the verbal slurs, these were not

25   enough for Craft because on the morning of June 7th of 2020,

1    Michella and Connie Pineda awoke to find something terrible

2    outside their home.  Their driveway was painted in orange paint

3    with the words "go away N-words."  They were scared.  They were

4    humiliated.  They were angry.  They were worried about their

5    children, especially K.P. and S.P.1███, those two older

6    children.  They're multiracial, Black children at whom they

7    thought these words were directed.

8        They called the police.  They worked to clean this up off

9    their driveway, and they worked very hard to keep their children

10   from seeing this because they didn't want them to be scared and

11   afraid.

12       The Pinedas also activated their security cameras at this

13   time, and they moved them to a tree -- one of those cameras to a

14   tree closer to this driveway.  And it was a very good thing they

15   did that because just over a week later, on June 16th of 2020,

16   they awoke once again to find yet another driveway painting.

17   This time it says "no N-words" with a swastika underneath.

18       Once again, it's an orange paint.  Once again, the Pinedas

19   are scared.  They're humiliated.  They're angry.  And, again,

20   they believed this was directed at their older children.

21       The Pinedas called the police, and this time they checked

22   the footage on their recently activated Nest security camera.

23   They looked in the early morning hours of June 16th, in that

24   time leading up to when they found that driveway painting.  And

25   there they found footage of the defendant, Suzanne Craft,

1   walking from her home at 507 ███████████ to their driveway

2   in those early morning hours and painting the racial slurs and

3   then walking back toward her home.

4       On the morning of June 27th, the Pinedas awake again to find

5   another racial slur, this time on the morning of the Lake Forest

6   homeowners' yard sale, a day when the neighborhood is full of

7   cars and traffic.  This time it's written in gold paint and it

8   says "go N-words" with a swastika underneath.

9       There again, full of all the feelings one can imagine in

10  this moment, scared, humiliated, angry, they call the police.

11  And they go and they check the footage on their Nest camera.

12  They look to the early morning hours of June 27th, the hours

13  leading up to this painting, and there they find footage of the

14  defendant, Suzanne Craft, coming from her home, painting the

15  racial slur on their driveway, and heading back to her home.

16      Now, ladies and gentlemen, you're gonna hear in the course

17  of this case that the Pineda family was scared.  They were

18  humiliated, and they were frustrated because they tried multiple

19  times to get help to get the defendant to stop painting slurs on

20  their driveway and hurling slurs at their family.

21      The Louisville Metro Police Department and their homeowners

22  association in Lake Forest had done nothing to bring an end to

23  this harassment and the threats against them.  And they felt

24  helpless in making it stop and getting these threats against

25  their children to come to an end; and so they turn to Facebook.

1    They posted about what was happening there, and they broadcast a

2    plea for help.  And through that a civil lawyer reaches out to

3    them, and that lawyer suggests that they file a civil lawsuit

4    for damages and for an injunction.  The civil lawyer suggests

5    that if they do this, they can try to get Ms. Craft to stop.

6        And so in July of 2020, the Pinedas file a civil lawsuit

7    against Defendant Craft and the Lake Forest homeowners

8    association in an attempt to try to stop -- to try to force an

9    end to Craft's threatening harassment of their family and their

10   children.  Unfortunately, none of this worked, and Craft's

11   threats against the family only escalated.

12       In November and December of 2020, the Pineda family began to

13   receive threatening mailings.  They found threatening letters in

14   the mail and in their yard.  These letters were all addressed to

15   "Michelle Pineda."  And you may have heard me say -- that's not

16   quite her name.  Her name is Michella Pineda, but it is in fact

17   how the defendant, Ms. Craft, referred to Michella.

18       These threatening letters all shared similar

19   characteristics.  They're all cutout letters glued onto

20   cardboard or other pieces of paper or mailings.  They all

21   contain threats against the Pineda family, and most of them

22   contain racial slurs within the threats themselves, either

23   within the individual threat or on the return address of the

24   envelopes that you're gonna see through the course of this

25   trial.  And for many threats, that return address is "N-let

1    Destroyer," and that is consistent across many of these

2    envelopes.

3        Michella Pineda finds that first threatening mailing

4    addressed to the mistaken version of her name, cutout letters

5    spelling out "go N-word" on a funeral home advertisement.  It's

6    chilling to say the least.

7        And then one day, while she's working in the yard blowing

8    leaves, Connie Pineda discovers a ziplock bag by her fountain.

9    That bag contained a threatening letter.  And then the Pinedas

10   find another one in the yard.  And those two letters contained

11   threats that read, "You had enough, N-word, bitch?"  And another

12   one, "Die stupid bitch, move out."

13       After finding those two threats in their yard, the Pinedas

14   go and they check their security cameras.  And they look in the

15   weeks leading up to the time that they found those two letters,

16   and sure enough, they find something on two separate dates, on

17   October 18th of 2020 and November 1st of 2020.

18       On both of those dates, the Pinedas find video footage of

19   the defendant, of Suzanne Craft coming from her home, dropping

20   something in their yard, in the same location where they find

21   the threatening letters, and then returning to her home.  In one

22   of those videos, she can be seen going into her garage and

23   driving away in her car just after leaving something in their

24   yard.

25       Now, ladies and gentlemen, these mailed threats, they just

1    kept coming.  They're brought into the house from the mailbox to

2    be found and opened by Michella and Connie Pineda.  A horrible

3    pattern was emerging.  An envelope addressed to "Michelle

4    Pineda" often with the return address of "N-let Destroyer" and a

5    threat to harm a member of the Pineda family, threats that read:

6    "Two dead N-lets.  N-words, we hate your kind.  Last chance.

7    You will die, bitch.  Die, die, stupid N-word.  Move out or

8    bullets."

9        And these threats start to come true.  They escalate because

10   one afternoon, while Michella is outside with Connie and one of

11   their neighbors, she retrieves an envelope from the mailbox, and

12   in that was another threat.  And this time it was a pasta box

13   wrapped around these two bullets with the note "Get out."

14       Ladies and gentlemen, the Pinedas, they took these threats

15   seriously.  They were scared.  They changed their behaviors, and

16   they took measures to keep their family safe, especially because

17   they were very worried about the children they thought they were

18   most directed at.

19       They kept those children inside.  They didn't let them go

20   out and play in the same way anymore.  They took their

21   trampoline down.  They didn't let them ride their bikes in the

22   cul-de-sac.  They all started sleeping together in one room, a

23   room that had no windows.

24       And so that brings us to the charges in this case.  In this

25   case, the defendant is charged with five counts of sending

1   threatening communications to the victims using the United

2   States mail.  The Government has also alleged that the defendant

3   engaged in these offenses against the victims because of their

4   actual or perceived race or color.  I'm not gonna talk to you

5   much about the law today.  That's gonna be for another day, and

6   Judge Hale will tell you a lot more about the law at the end of

7   this case.

8       I will tell you that the Government, we must prove these

9   charges beyond a reasonable doubt, just as the Government must

10  in cases across this country, and that's exactly what we're

11  going to do this week.  And so I want to take just a few more

12  minutes of your time and tell you how we're gonna do that, what

13  kind of evidence you're gonna hear and who you're going to hear

14  it from.

15      You're going to hear this week from members of the victim

16  family themselves.  You're going to hear from them in their own

17  words what they heard, what they saw, and what happened to them.

18  They will tell you about the things that the defendant said.

19  They will tell you about the things she did and the racial slurs

20  that she used to refer to them.

21      You will see pictures of the racial slurs painted on their

22  driveway, and you will see the threatening letters and mailings

23  themselves.  You're also going to see those videos I've

24  mentioned that were captured on the Pinedas' Nest camera system.

25  In those videos, you're going to see a woman who looks like the

1   defendant walk from 507 ███████████, her home, to the

2   Pinedas' home to paint racial slurs on the driveway and to drop

3   items in the yard in the same place that they find those

4   threatening letters.

5       You're also gonna hear this week from other neighbors who

6   lived in that cul-de-sac, ███████████ in the Lake Forest

7   neighborhood, and you're gonna hear what those neighbors --

8   things they heard, things they saw.  You're also gonna hear from

9   one neighbor who has video camera footage from the dates in

10  question showing a person walking from 507 ███████████,

11  bending over and painting something on the Pinedas' driveway.

12      You're also going to hear this week, ladies and gentlemen,

13  from the father of the defendant's daughter, S.W.█.  you will

14  hear from him about how Craft sent him a picture of the two

15  bullets that had been sent to the Pineda family in a threatening

16  letter.  You will hear that when he saw that, he immediately

17  recognized those two bullets as his bullets, bullets he had

18  saved as part of a set of three from his time in the military,

19  bullets that he had last seen when he lived with Ms. Craft at

20  507 ███████████, and bullets that he found to be missing

21  after he found out they had been sent to the Pinedas.

22      You're also gonna hear this week from law enforcement

23  officers.  You're gonna hear about their investigation in this

24  case.  You're going to hear from an FBI agent, a special agent

25  with the FBI.  You're gonna hear from an FBI task force officer,

1   and you're also going to hear from a postal inspector with the

2   United States Postal Inspection Service.

3       They're gonna tell you about the many steps they took to

4   investigate this case and to investigate the threats against the

5   Pineda family.  They're gonna tell you about some of the

6   evidence and items that they sent to the FBI laboratory, and

7   because of that, you're also going to hear from some laboratory

8   witnesses this week.

9       You're gonna hear from a fingerprint examiner from the FBI

10  laboratory who's gonna talk to you about fingerprint evidence.

11  And one of the things you are going to hear is about how she

12  found Defendant Craft's fingerprints on one of the threats, on

13  that actual cutout interior piece of the threat that reads, "You

14  will die, bitch."

15      You're also going to hear from a forensic examiner who

16  specializes in DNA.  He is gonna tell you about testing the

17  materials and the mailings in this case for DNA.  You're gonna

18  hear from him that he only found two testable samples of DNA,

19  and from those, he did not make an identification against

20  Defendant Craft.  You will also learn from him that it is common

21  to come into contact with an item and not leave behind DNA.

22      Finally, there's one other lab witness I want to tell you

23  about, and that's a questioned documents examiner.  That's sort

24  of a fancy name for saying a lab witness who comes and they look

25  at all the different documents in a case.  And this particular

1    document examiner is going to testify about his review in this

2    case and how he determined that one of the items had scribbled

3    out writing on it.  And using laboratory techniques, he was able

4    to see below that scribbled out writing.

5        He will tell you that he was able to determine that

6    underneath that scribbled out writing, the letter was actually a

7    Girl Scouts envelope addressed to the defendant's daughter at

8    507 ██████████████.  So the threat that had been mailed to the

9    Pinedas was actually glued to a piece of mail that had

10   originally been sent to 507 ████████████████ at Ms. Craft's

11   residence.

12       Now, before I wrap up, there's just one other thing I want

13   to flag for you, and that is the charges I mentioned earlier

14   where I said that the Government has alleged and we're going to

15   ask you to find at the end of this case that Defendant Craft

16   engaged in these offenses because of the victim's perceived race

17   or color.  Race does not have to be the only reason that the

18   defendant engaged in these offenses.  It only has to be that the

19   prosecution has to prove that it is one of the reasons, that is,

20   if it were not for the fact that the Pineda family included

21   multiracial children, children that she perceived to be

22   multiracial, Black children, she would not have threatened them.

23       And, ladies and gentlemen, after you see the evidence in

24   this case, including the direct language of those threats

25   themselves, we submit to you that is not going to be a hard

1    conclusion to make.  "Two dead N-lets" is pretty clear about the

2    type of threat it intends to convey and the racial animus that

3    is behind it.

4         The evidence in this case will prove that the defendant sent

5    threatening communications to the victims using the United

6    States mail and that she did so because of the victim's race or

7    color.  That is why, once you have heard all the evidence in the

8    case, my colleague here is going to stand before you and ask you

9    to follow the evidence in this case to the only place that it

10   naturally leads, and that is to find the defendant guilty on all

11   five counts.  Thank you.

12              THE COURT:  Ms. Rea.

13              MS. REA:  Thank you, Your Honor.

14        Good afternoon.  As you've heard, Ms. Craft already lived in

15   ███████████████████ in April of 2019 when the Pineda family moved

16   in.  She had lived there for quite some time.  She lived there

17   with her daughter, S.W.█, who was around about 11 years old at

18   the time -- 11 years old at the time.  She would turn 12 in

19   December of 2019.  S.W.█'s father did not live with them.  He

20   lived at his own residence.  S.W.█ spent time with him just

21   about every other weekend, and you'll hear about that as well.

22        When the Pineda family moved in, things indeed were cordial

23   at first.  There were text messages exchanged, exchanged -- it

24   was a cordial relationship for some period of time, but we agree

25   it did not remain that way.  You are going to hear and see

1    evidence of paintings on driveways.  You are going to hear and

2    see evidence about mailings.

3         I want to flesh out the scene just a little bit more.  The

4    cul-de-sac, obviously, has more than the two houses.  So there's

5    the 507 where Ms. Craft lives with her daughter.  The Pinedas

6    live at 510.  There's a residence in between those on the

7    cul-de-sac where an elderly lady named Ms. Betty Probst lived at

8    the time.  So when you're seeing the videos, when you're hearing

9    about things, it's important to know the lay of the entire

10   cul-de-sac and where people are.  And you'll hear about where

11   some of the other people lived as well, which will give you the

12   perspective of what's going on.

13        When you see the videos that you will see in connection with

14   the driveway paintings, in connection with the mailings, look at

15   them carefully.  What I will ask you to do is look at what they

16   show you.  Also, look at what they do not show you.  Look at

17   when they start.  Look at when they stop.  Look at specifically

18   particularly where you see the person come from before going to

19   the Pineda driveway or the yard area, where you see the person

20   return to.  Those kind of details are gonna be things that are

21   important.  They're gonna be things that we are gonna continue

22   to talk to you about.

23        You're also going to hear that on the day of the first

24   painting in the Pineda driveway, there was also one in

25   Ms. Craft's driveway, similar language with a racial slur.

1    You're going to hear that a period of time prior to that, a

2    couple weeks prior to that, there was a sexually explicit term

3    in her yard burned as if made by chemicals or bleach or yard

4    killer, something like that.  You're gonna zoom out and hear

5    other facts about what was going on in the neighborhood at the

6    time.

7        Also, when you look at these videos, in addition to looking

8    at where the person specifically comes from, where they start,

9    where they stop, what you don't see, look closely at what the

10   person actually looks like.  I anticipate you will see some

11   relatively contemporaneous photos of Ms. Craft.  I will ask you

12   to compare with particularity her build, you know, her

13   shoulders, her feet, her overall physique because you will be

14   asked to make a determination of whether Ms. Craft is indeed the

15   person that you see in those videos.

16       You are, as the U.S. said, also gonna hear about some

17   physical evidence.  You are gonna hear that Ms. Craft's

18   fingerprints, two of them, were found on a piece of mail that

19   was delivered to her.  You are going to hear that the item that

20   was packaged with the bullet note -- it's gloves.  It's the

21   hospital gloves that you saw there in the wrist area.  You will

22   hear about those.  That's where testable DNA was found, and

23   Ms. Craft is not a contributor to that DNA on those gloves.  So

24   that is the physical evidence that you will hear.

25       In addition to listening carefully to what witnesses tell

1    you, keep track of, keep your eye on why they are telling you

2    what it is they are telling you, where their motivations come

3    from.

4        And very lastly, you all came here with your common sense in

5    tow and think about what makes sense, whether it makes sense

6    that Ms. Craft would commit the crimes that she is accused of

7    committing and do so in the fashion that she is accused of

8    committing them on camera when, after the Facebook postings, the

9    fact that there was a recording was known to everybody in the

10   cul-de-sac.  I'll ask you to apply that common sense when you're

11   examining the evidence.

12       And once you have received all of the evidence from the

13   witnesses that -- as it's presented to you, you will then be

14   instructed on the law, and you'll have to apply that to

15   determine whether or not the United States has proven to you

16   beyond a reasonable doubt all of the elements of these charges.

17       I will at that point get back up and talk to you and, again,

18   really asking you to apply that common sense to think about the

19   whys, to think about the big picture of what happened and who

20   did what.  And I'll ask you to find Ms. Craft not guilty of all

21   five of these counts at the close of all of the evidence.  I

22   think, when you've applied that common sense, when you've looked

23   closely at the evidence, it is the only verdict that you'll be

24   able to reach.

25       Thank you.

1           THE COURT:  Thank you, Ms. Rea.

2      Ladies and gentlemen of the jury, that is going to conclude

3  your workday.  The lawyers and I will stay here, and we will

4  have a bit more work to do in preparation for tomorrow, but I

5  wanted to talk to you now a bit about scheduling.

6      The typical trial day runs from about 9:00 to 4:30.  That's

7  typically how we try and schedule things.  We do recognize that

8  folks serving on juries, from time to time, have issues that pop

9  up, and you have our jury administrator's contact.  You need to

10 let her know if you have any problems along the way.

11     Let me ask you-all, does anybody have a problem making it in

12 in the morning by 8:40?

13     All right.  So I'm gonna ask you all to report in by 8:40 in

14 the morning, and we will plan to begin with the Government's

15 first witness right around 9:00.

16     As I also said earlier, we will typically take a break about

17 every hour, roughly.  Sometimes we'll extend that a little bit

18 -- if a natural break is soon to come, we'll extend that a bit,

19 but you can plan for a break roughly about every hour.

20     We will also break for roughly 45 minutes to an hour and

21 15 minutes for lunch.  Sometimes we will be giving you a longer

22 lunch break because we're going to do a little bit of work for

23 the afternoon session in advance.

24     Again, trials are not like they are on TV.  There's a lot

25 that goes on, and some of the delays that -- you might think,

1    "Well, we're sitting here waiting.  It would be better to get

2    the trial going along."  Some delays actually ultimately save

3    time because the lawyers and I are working on issues that might

4    later save some time.

5        But I want you to think about delays in this way:  If there

6    is at any point a delay, I will do my best to warn you of it in

7    advance.  But if I don't have an opportunity for that, to the

8    extent you express any annoyance at anyone for that delay,

9    please direct that to me and not to the lawyers or the parties.

10   We will do our best to avoid unnecessary delays, but a heads-up:

11   Delays are inevitable in every trial.  And, like I said, we'll

12   do our best to work through them.

13       So I'm going to let you go for the evening now and ask you

14   to report back at 8:40 in the morning, and it will be our goal

15   to begin by 9:00 with testimony.  And we'll go through to the --

16   roughly to the noon hour for an extended lunch break.

17       All right.  Remember also that you are not permitted to talk

18   about the case with one another or with any family members.

19   When you go home and your significant other or children,

20   partner, whomever it may be, is excited to hear about your

21   trial, you have to say, "The judge told me I can't talk about

22   it."  Once your verdict is in, you can talk about it all you

23   want.  So you just have to tell them to hold off on questions

24   until the case is over.

25       Now, in my preliminary instructions, I mentioned

1    note-taking.  You will have, when you come in tomorrow,

2    notebooks.  As I indicated in my preliminary instructions, if

3    you wish to take notes, use them.  If you don't want to take

4    notes, don't use them.  If you want to do something in between,

5    that's fine too.  Just recall the instructions that I gave you

6    on note-taking.

7         All right.  That will suffice.  I will see you at 8:40 in

8    the morning or roughly 9:00.  The jury administrator will see

9    you about 8:40.  Thank you.

10        (Jury out 4:47 p.m.)

11             THE COURT:  All right.  The jury has left the

12   courtroom.  Let's talk about any legal or procedural matters we

13   need to address before tomorrow morning.

14             MS. REA:  Your Honor, I think we could maybe talk

15   after we leave here today about a potential limiting

16   instruction.  I don't have any other issues to address.

17             MR. TIEKE:  Judge, one of the stipulations comes up

18   for the first witness.  It is the one that would have to do with

19   the chain of custody.  My intent would be to have that read at

20   the point that we begin to introduce those, the letters, unless

21   the Court, as it mentioned, would prefer to do it at the

22   beginning or the end.  I would suggest that it makes the most

23   sense to have it read before the FBI agent begins to introduce

24   the letters.

25             THE COURT:  Again, I don't have a strong feeling one

1    way or the other at what point.

2        Ms. Rea, do --

3            MS. REA:  I don't have any objection to proceeding

4    that way.  I think there's logic to it.

5            THE COURT:  Your stipulations aren't numbered.

6    They're all dated the same day.  So are you talking about the

7    stipulation that begins, "On or about November 13, 2020"?

8            MR. TIEKE:  Yes, sir.

9            THE COURT:  All right.  So we'll call that Stipulation

10   Number 1.  That is the one that reads:  "On or about

11   November 13, 2020, the items identified as Exhibits 4, 5, 6, 7,

12   8, 10, 11, 12 were taken into custody," and then it goes on from

13   there; correct?

14           MR. TIEKE:  Yes, sir.

15           THE COURT:  All right.  And so you can just -- at the

16   end of the testimony -- prior to cross or at the very end?

17           MR. TIEKE:  Your Honor, I would just request it in the

18   middle, right before I introduce those to set up the chain.  And

19   then essentially it comes -- you know, that ends with it coming

20   to the FBI agent, and then the FBI agent would subsequently put

21   it in.

22           THE COURT:  All right.

23           MS. REA:  I have no --

24           THE COURT:  That doesn't mean a lot to me.  I mean,

25   that's fine.

1              MS. REA:  I have no objection to that.

2              THE COURT:  All right.  We have now two instructions

3    that one of -- the 404(b) will need to be, I think, given close

4    in time to the testimony that it addresses as well as at the

5    end.  I believe the commentary suggests that or directs it, to

6    the extent that the commentary can, strongly suggests it, I

7    suppose.  So I'll need you-all to address that and then,

8    secondly, the instruction that I raised with you-all that

9    follows from your concern, Ms. Rea, about the actions of the

10   defendant's young daughter and not having her words or actions

11   imputed to the defendant, given that she was not present and

12   there's no other evidence to suggest she was directed in that

13   manner.

14      So I'll have -- if you-all will stick around for a few

15   minutes, I will have Jaylen provide you with a draft of that,

16   and you can discuss it.  Again, this is atypical.  This is an

17   atypical instruction, I would say.  I think it follows from the

18   circumstances and facts here and is appropriate as a result.

19   It's as drafted simple and straightforward, but I want you-all

20   to review it and give feedback, and we'll flesh it out.

21      So let's just plan on meeting here in the courtroom at 8:30

22   in the morning.  Will that be enough time?

23              MR. TIEKE:  Yes, sir.

24              MS. REA:  Yes, sir.

25              THE COURT:  Anything else we need to talk about this

```
 1   afternoon before we adjourn for the day?

 2              MS. REA:  No, Your Honor.

 3              MR. TIEKE:  No, Your Honor.  Thank you.

 4              THE COURT:  Thank you.

 5         (Proceedings concluded at 4:52 p.m.)

 6                    C E R T I F I C A T E

 7       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

 8   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

 9


10
         _____        September 21, 2023
11   Certified Court Reporter No. 20042A157      Date
     Official Court Reporter
12

13                    REDACTION CERTIFICATE
          I certify that the foregoing is a true and correct copy of
14   the transcript originally filed with the clerk of court on
     09/21/23 and incorporating redactions of personal identifiers
15   requested by the following attorney of record: Angela M. Rea in
     accordance with Judicial Conference policy.  Redacted characters
16   appear as a black box in the transcript.

17         s/Dena Legg                     October 30, 2023
         _____         _____
     Certified Court Reporter No. 20042A157  Date
18   Official Court Reporter

19

20

21

22

23

24

25
```

1                                    INDEX

2

PRETRIAL CONFERENCE                                    3

PRELIMINARY INSTRUCTIONS                              18

GOVERNMENT OPENING                                    31

DEFENSE OPENING                                       44

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25