```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,     )    Case No. 3:22-CR-00094-DJH
 4                                 )
               Plaintiff,          )    REDACTED
 5                                 )
     v.                            )
 6                                 )
     SUZANNE CRAFT,                )
 7                                 )    March 7, 2023
               Defendant.          )    Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                            VOLUME 2
                      TRANSCRIPT OF JURY TRIAL
11              BEFORE HONORABLE DAVID J. HALE
                 UNITED STATES DISTRICT JUDGE
12
                            *  *  *  *  *
13
     APPEARANCES:
14   For United States:       Christopher C. Tieke
                              Stephanie M. Zimdahl
15                            U.S. Attorney's Office
                              717 West Broadway
16                            Louisville, KY 40202

17   For Defendant:           Angela M. Rea
                              Western Kentucky Federal
18                                Community Defender, Inc.
                              629 S. 4th Avenue, Suite 200
19                            Louisville, KY 40202

20   [Defendant present.]

21
                         Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                          208 U.S. Courthouse
23                        Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1      (Begin proceedings in open court at 8:46 a.m.  Jury out.)

2            THE COURT:  Good morning.

3            MULTIPLE SPEAKERS:  Good morning, Your Honor.

4            THE COURT:  We are back on the record in U.S. v.

5     Craft.  I am reliably informed that 12 of our 14 jurors are

6     accounted for.  We're still waiting for two more.

7      I wanted to talk about a couple of items before we begin

8     testimony today.  First on my list is the issue of the two

9     additional instructions that we have discussed, the first being

10    the limiting 404(b) instruction and, the second, the potential

11    instruction with respect to the evidence of the defendant's

12    daughter's use of racial slurs.  And the proposed instruction

13    would inform the jury that they are not to impute any such

14    improper conduct to the defendant.  So I asked you-all yesterday

15    to confer on those two instructions.  Let's start with the

16    404(b) instruction.  Any progress to report?

17            MS. ZIMDAHL:  Yes, Your Honor.  We have prepared and I

18    think agreed to a draft instruction on that.  I don't know that

19    we're gonna need it.  It may be -- we've conferred on the very

20    limited remaining topics that are 404(b), that those may not

21    come into evidence through the course of this trial.  We may not

22    introduce those, but we have it ready to go.  I'm happy to

23    provide it to the Court, if you'd like, at this time, or I can

24    read it, whatever you prefer.

25            THE COURT:  Yes, you can pass it up.  That would be

 1    fine.

 2        When you say you don't think it will be needed, is that

 3    because even with your case agent testimony, you don't

 4    anticipate that that -- at least on direct that that testimony

 5    will veer into any of the -- I can't remember now how many

 6    categories there are -- only a couple, one in particular and I

 7    think one on which I reserved that might implicate 404(b).

 8            MS. ZIMDAHL:  That's correct, Your Honor.  As we have

 9    reviewed it and discussed with Ms. Rea, I believe it is two

10    large categories.  It's interactions with other neighbors and

11    then the state court matter.

12        At this point, it is possible that we introduce that, and

13    that's why we have it prepared.  It may be though, as the course

14    of the trial unfolds, that that is not evidence that is

15    introduced in this trial, but we wanted to go ahead and have it

16    prepared and agreed upon so that it is not a last-minute need.

17            THE COURT:  Yes, that's exactly why I wanted you-all

18    to confer on it because, again, the commentary suggests --

19    strongly suggests that it be given contemporaneously with the

20    testimony in addition to the substantive instructions at the

21    close of the case.  So I would want it to be as seamless as

22    circumstances permit.

23        All right.  Then this -- I'm gonna just hand label this as a

24    joint submission.  This is agreed to?

25            MS. REA:  Yes, Your Honor.  In the event the evidence

1    is introduced, we have conferred, and we agree with that

2    instruction.

3             THE COURT:  And you'll signal both Ms. Rea as well as

4    me when --

5             MS. ZIMDAHL:  Yes.

6             THE COURT:  -- you think testimony will be elicited

7    that implicates this instruction?

8             MS. ZIMDAHL:  Yes, Your Honor.  In the event that we

9    introduce this through direct examination, we would absolutely

10   plan for it in advance and signal the Court when we believe this

11   would be appropriate.

12            THE COURT:  So you've limited it to the Government's

13   claim on the defendant's motive and identity?

14            MS. ZIMDAHL:  Yes, Your Honor, and this is

15   intentionally drafted directly at that state court evidence.

16   Should there be anything else that arises in the course of this

17   trial that we are not currently intending, we will propose a

18   separate and perhaps slightly different 404(b) limiting

19   instruction.  But at this point, that is where our current

20   intents and thoughts lie.

21            THE COURT:  All right.  I think, in my last ruling --

22   we did two orders, as you-all know.  I think I denied the

23   August 8 and August 9, 2019, evidence regarding the egging and

24   the ongoing feud with the across-the-street neighbor.  So it

25   would not be --

 1          MS. ZIMDAHL:  Yes.

 2          THE COURT:  -- implicated there.

 3      All right.  And the first couple of witnesses you have lined

 4  up will not implicate this proposed instruction?

 5          MS. ZIMDAHL:  That's correct.

 6          THE COURT:  All right.  Very well.  Then let's move to

 7  the second potential supplemental instruction.

 8          MS. ZIMDAHL:  Yes, Your Honor.  And that's the draft

 9  racial slurs instruction that the Court had proposed to the

10  parties.  I believe that we are in agreement with Ms. Rea on

11  that.  The only suggestion that the parties have is to add "that

12  in 2019 and 2020," because I believe there is going to be

13  testimony that Ms. Craft's daughter used racial slurs in 2020 as

14  well.

15          THE COURT:  So just adding another --

16          MS. ZIMDAHL:  Just adding another year.

17          THE COURT:  -- another year?

18          MS. REA:  Yes.  And, Judge, I agree.  I've read it as

19  well.  I think, with that change, that will accomplish what we

20  need to accomplish.

21          THE COURT:  And both parties agree that that also

22  needs to be read contemporaneously with any testimony about

23  those incidents?

24          MS. REA:  Yes, sir.

25          MS. ZIMDAHL:  Your Honor, and I might propose just

1   reading it either before or after a witness testifies, rather

2   than interjecting in the midst of testimony.  I think there will

3   be --

4          THE COURT:  Well, when I say "contemporaneously," I

5   just mean close in time to the testimony.  I don't necessarily

6   mean we'll interrupt the testimony and read it.

7      But I think it meets its purpose if at the end of the

8   testimony -- and by "end," I mean when both sides are done

9   questioning whichever witness will talk about it -- then the

10  instruction -- the agreed upon instruction is then read to the

11  jury.  And it will be included in the final instructions as

12  well, basically following the same pattern of the 404(b)

13  instruction.

14         MS. ZIMDAHL:  Yes, Your Honor.  And just in the

15  interest of candor to the Court, I expect that there are

16  numerous witnesses that this could apply to today.  I'll defer

17  to Ms. Rea if she would like to ask for that to be read

18  repeatedly throughout the day or once at the end of all the

19  witnesses.

20         THE COURT:  I'm not interested in reading it

21  repeatedly.  I think the jury will understand that.  I think I

22  could refer to it and say, "Please remember the instruction I

23  read to you with the last witness.  It applies here."  But I'm

24  not sure you're gonna want it read repeatedly.  At some point,

25  it circles back on itself and is counterproductive.

1          MS. REA:  I think, if we read it once and then remind

2     them, that would be sufficient.

3          THE COURT:  All right.  And I will trust that you will

4     prompt, by motion or objection, if you think it needs to be read

5     more than once or interjected.

6        All right.  And you will also -- I think the testimony will

7     probably be obvious, but I will trust the parties to, again,

8     signal when that agreed upon instruction is necessary.

9        Will that be used with the first two witnesses?

10         MS. ZIMDAHL:  Yes, Your Honor.  I would expect it to

11    be used with the first -- actually, not the first witness.  The

12    first witness today is a law enforcement witness, but after

13    that, the first several witnesses.

14         THE COURT:  Very well.  As I had indicated to the

15    jury, we'll take a break about every hour.  So I will ask

16    you-all to kind of keep track.  I don't want to -- I'm not gonna

17    strictly follow the hour rule.  My preference is to break at,

18    you know, the close of direct or the close of cross or in

19    between witnesses, if we can do it that way.

20       So if I ask you, "How much longer do you anticipate?" it may

21    not be because I'm trying to tell you to hurry up.  It may be.

22    I think you'll know the difference.  But if you're crossing the

23    same ground again and you hear me ask that, that's probably why.

24    Otherwise, I'm asking because I'm trying to manage the clock, if

25    you will.

1        Anything you-all need to talk about at this point?

2               MS. ZIMDAHL:  No, Your Honor.

3               MS. REA:  No, Your Honor.

4               THE COURT:  And you have your first witness ready?

5               MS. ZIMDAHL:  We do.

6               THE COURT:  Do we have a report on our --

7               COURT SECURITY OFFICER:  They're up and ready.

8               THE COURT:  We've got all 14?

9        All right.  Let's have them, then.

10              MS. REA:  And, Your Honor, can we do a restroom break

11     while we're waiting for the jurors to gather?

12              THE COURT:  Sure.

13              MS. REA:  Thank you.

14        (Recess at 8:56 a.m. until 8:59 a.m.  Jury out.)

15              THE COURT:  The other thing I meant to raise with

16     you-all are stipulations.  You'll let us know when -- I think

17     you said yesterday a stipulation may follow from this first

18     witness; is that right?

19              MR. TIEKE:  That's correct, Judge.  It'll be likely

20     right before he begins to introduce the mailings.  And I'll

21     alert the Court as to -- it's Stipulation Number 1.  So this

22     would be in the middle, but we could do it wherever.

23              THE COURT:  However you-all agree.  And I'll just --

24     Stipulation Number 1 is the -- I don't seem to have it.

25              MR. TIEKE:  I have another copy, Your Honor.

1          THE COURT:  I didn't give that back to you-all, did I?

2          MS. ZIMDAHL:  I don't believe so.

3          MS. REA:  I don't think I have an extra, but I --

4     yeah, I don't.

5       (Counsel conferring off the record.)

6          THE COURT:  It's strange.  For some reason, I have

7     three.  I have the iPhone.  I have the three pictures.  I have

8     the letter.

9       Hold up just one minute.  I'm gonna have to run back to

10    chambers and see if I -- oh, no, here it is.  It was just placed

11    out of order.

12      Okay.  So the one that -- I'm not gonna have to run back.

13    The one that has the subset beginning "On or about November 13,"

14    that's the one you're calling Stipulation Number 1?

15         MS. REA:  Yes, Your Honor.

16         MR. TIEKE:  Yes, Your Honor.

17         THE COURT:  All right.  Any objection to me hand

18    writing "Stipulation 1" on the upper right corner?  And that way

19    we'll keep track as we go.

20         MS. REA:  No, sir.

21         MR. TIEKE:  No, Your Honor.  The next trial I'll

22    number them.

23         THE COURT:  Actually, I'll do it lower left because of

24    the -- I expect this will be filed in the record.

25      And you want me to read this as is?  I usually don't mention

```
 1    the signatures, and I ignore the style case at the top.  I just

 2    read the stipulation.

 3              MS. REA:  That makes sense to me.

 4              MR. TIEKE:  That's fine, Your Honor.  Thank you.

 5         (Jury in 9:03 a.m.)

 6              THE COURT:  Good morning, members of the jury.  I

 7    trust you all had a restful evening and are excited to be back

 8    at work with us this morning.

 9         We are going to now begin, Mr. Tieke, with the Government's

10    first witness; is that correct?

11              MR. TIEKE:  Yes, Your Honor.  The United States calls

12    FBI Special Agent Matt Russell.

13         (SPECIAL AGENT MATT RUSSELL, called by the Government,

14    sworn.)

15                         DIRECT EXAMINATION

16    BY MR. TIEKE:

17    Q.  Good morning, Special Agent Russell.  Could you please state

18    your name for the jury.

19    A.  My name is Matt Russell.

20    Q.  And where are you employed now, and what is your title?

21    A.  I'm employed at the FBI Louisville, and I'm a special agent.

22    Q.  How long have you worked for the FBI?

23    A.  I started in July of 2011 at new agent's training, so

24    roughly just under 12 years.

25    Q.  And before coming to the Louisville Division, did you work
```

1    in a different field office?

2    A.   I did.  From December of 2011 until roughly May or June of

3    '17, I worked in New Orleans.

4    Q.   And then in 2017, you came here to Louisville?

5    A.   Yes.

6    Q.   What do you do in your role as a special agent?

7    A.   So I'm currently assigned to the Louisville Public

8    Corruption and Civil Rights Task Force; and we investigate

9    allegations of civil rights violations to include color of law,

10   FACE Act, and hate crime allegations.

11   Q.   So you mentioned a particular squad.  What's that particular

12   squad that you're in?

13   A.   The Public Corruption and Civil Rights Task Force.

14   Q.   And do you investigate civil rights violations as part of

15   that squad?

16   A.   Yes.

17   Q.   And what do those investigations involve?

18   A.   They involve allegations of color of law violations, FACE

19   Act violations, and hate crime allegations.

20   Q.   So you specifically investigate hate crimes?

21   A.   Yes, sir.

22   Q.   And what are the focus of those investigations?

23   A.   So those are allegations that someone committed a crime with

24   a bias in mind, whether it be a bias against someone's race,

25   religion, sexual orientation, things of that nature.

1    Q.  Just backing up generally, did you receive training with

2    respect to your duties as a special agent with the FBI?

3    A.  Yes.  So from July of 2011 until December of 2011, I was at

4    Quantico at our new agent's training academy.  And we did five

5    months roughly of field training, interview training, and

6    firearms training, things of that nature.

7    Q.  Do you constantly do training and refresher as part of your

8    duties as a special agent?

9    A.  Yes.

10   Q.  Now, have you received specific training relating to the

11   civil rights and hate crime investigations that you do as part

12   of your squad?

13   A.  I have, yes.  We received some training at the academy

14   during new agent's training, and I've also received training

15   through the Department of Justice, Civil Rights Division, and

16   through the National Advocacy Center.

17   Q.  And so just total, how long have you been in law

18   enforcement?

19   A.  Just under 12 years.

20   Q.  And as part of your role on that squad, do you investigate

21   crimes related to threats?

22   A.  Yes.

23   Q.  And did you participate in the investigation of the

24   defendant in this case?

25   A.  I did.

1   Q.  I want to direct your attention -- let's set the scene here

2   with the cul-de-sac.  Okay?  Where did the incidents at issue in

3   this case take place?

4   A.  So this happened on ████████████, which is a cul-de-sac

5   in the Lake Forest subdivision in Louisville, Kentucky.

6   Q.  And Lake Forest is a community here in Louisville, Kentucky?

7   A.  Yes.

8   Q.  And Louisville, Kentucky, is that in the Western District of

9   Kentucky?

10  A.  Yes, sir.

11  Q.  I'm gonna show you what's been marked as United States

12  Exhibit 1.  Are you familiar with the ██████████████

13  cul-de-sac in the Lake Forest community?

14  A.  Yes.

15  Q.  And is this that cul-de-sac?

16  A.  Yes.

17  Q.  And did the FBI pull a PVA map of the ████████████████

18  cul-de-sac during the course of this investigation?

19  A.  Yes.

20        MR. TIEKE:  I'd move to admit United States Exhibit 1

21  and publish, Your Honor.

22        MS. REA:  No objection.

23        THE COURT:  It will be admitted.

24     (Government Exhibit 1 admitted in evidence.)

25  BY MR. TIEKE:

1   Q.   Special Agent Russell, who lives here at 510 ███████?

2   A.   That's where the Pinedas live.

3   Q.   Could you just describe the Pineda family, please.

4   A.   Sure.  Connie and Michella are married, and they have five

5   kids together -- K.P., S.P.1███, S.P.2█, D.P.██, and S.P.3█.

6   Q.   And is this the family that received the threats that you're

7   investigating in this case?

8   A.   They are.

9   Q.   We'll just go around the cul-de-sac and set the scene a bit.

10  First, who lives here at 506 ██████?

11  A.   That is Mark and Vara Dyer's house.

12  Q.   And who's at 508 ██████?

13  A.   Mary and Brian Recktenwald.

14  Q.   And then you mentioned the Pinedas here at 510?

15  A.   Yes, sir.

16  Q.   Who lives at 509 ███████?

17  A.   Betty Probst.

18        MR. TIEKE:  If we can clear that, please.

19  Q.   And at the time of these incidents, how old was Ms. Betty

20  Probst?

21  A.   She was in her 70s.

22  Q.   And who lives at 507?

23  A.   Ms. Craft.

24  Q.   At the time of the incidents, how old was Ms. Craft?

25  A.   She was in her 50s.

1    Q.   Do you see Ms. Craft in the courtroom today?

2    A.   I do.

3    Q.   Could you please point her out for the jury.

4    A.   She's seated at the table over there with glasses.

5            THE COURT:  Mr. Tieke, let me interrupt just briefly

6    to ask you if you might ask Agent Russell to speak up just a

7    bit.

8        The microphones are sensitive, but it would be helpful if

9    you could speak up just a bit.

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Thank you.

12           MR. TIEKE:  Yes, Your Honor.

13       Special Agent, if you'd keep your voice up, please.

14           THE WITNESS:  I'll do that.

15           MR. TIEKE:  Thank you.

16       And, Your Honor, I'd like to let the record reflect that the

17   witness identified the defendant, Suzanne Craft.

18           THE COURT:  It will be so noted.  Thank you.

19   BY MR. TIEKE:

20   Q.   And who lives with her at 507 ███████████?

21   A.   Her daughter, S.W.███████ ██.

22           MR. TIEKE:  There we go.  Apologies.

23   Q.   So is that Ms. Craft's house there, 507, that we've been

24   talking about?

25   A.   Yes.

Russell - Direct

1   Q.   And who lives with her at 507 ███████?

2   A.   Her daughter, S.W.███ ██.

3   Q.   And who is S.W.███ ██' father?

4   A.   His name is Richard Watts.

5   Q.   And at the time of the mailings at issue in this case,

6   roughly how old was S.W.███ ██?

7   A.   Around 11 or 12 years old.

8        MR. TIEKE:  Can we clear that, please.  It's not

9   working?  Okay.  I just won't draw on it anymore.

10  BY MR. TIEKE:

11  Q.   Okay.  If we just go around the cul-de-sac, there's a house

12  next to the one I've circled at 500 ██████.  Who lives

13  there?

14  A.   Matt and Courtney Lanham.

15  Q.   Okay.  And in the course of the investigation, did the FBI

16  go and take photographs of this cul-de-sac?

17  A.   Yes.

18  Q.   And were those photographs put together in an interactive

19  spherical kind of format?

20  A.   They were.

21  Q.   I'm gonna show you what's been marked as United States

22  Exhibit 2.  Special Agent, do you recognize that?

23  A.   Yes.

24  Q.   Is that the interactive spherical photograph the FBI created

25  of the ████████████ cul-de-sac?

1  A.  Yes.

2  Q.  Is that a true and accurate photograph of the ████████

3  cul-de-sac on the date that these photos were done?

4  A.  It is.

5  Q.  And were those photos done more recently than the incidents

6  that took place in this case?

7  A.  They were.

8       MR. TIEKE:  Okay.  I'd like to move to admit and

9  publish this to the jury, Your Honor.

10      MS. REA:  No objection, Your Honor.

11      THE COURT:  It will be admitted.  This is U.S.

12  Exhibit 2?

13      MR. TIEKE:  Yes, Your Honor.

14   (Government Exhibit 2 admitted in evidence.)

15  BY MR. TIEKE:

16  Q.  Starting there at the brown house we're looking at on the

17  screen -- and this somewhat corresponds to the map that we just

18  looked at; correct?

19  A.  It does.

20  Q.  And so who lives at 506 ██████████████, which is that --

21  is that brown house 506 ████████?

22  A.  It is.

23  Q.  And who lives there?

24  A.  Mark and Vara Dyer.

25      MR. TIEKE:  Okay.  And if we can just play.

1        (Government playing video.)

2   Q.   As we come around the cul-de-sac, is that yellow house 508

3   ██████████?

4   A.   It is.

5   Q.   And who lives there?

6   A.   Mary and Brian Recktenwald.

7   Q.   And as we continue around the cul-de-sac, is this house sort

8   of straight back in the cul-de-sac the 510?

9   A.   It is.

10  Q.   And is the one in the middle there 510?

11       MR. TIEKE:  If we could stop it, please.

12  A.   Yes, the one in the middle is 510.

13  Q.   And is that the Pinedas' house?

14  A.   It is.

15  Q.   And is that their driveway right next to their house there?

16  A.   Yes.

17  Q.   It looks like they have a little fountain in their front

18  yard?

19  A.   They do.

20  Q.   And the Pinedas, were they the ones that received the

21  threats in this case?

22  A.   Yes.

23       MR. TIEKE:  And if we could continue on, please,

24  around the driveway -- around the cul-de-sac.

25       (Government playing video.)

1  Q.  Next door to the Pinedas at 509, whose house is that?

2  A.  Betty Probst.

3        MR. TIEKE:  And if we could stop there, please.

4  Q.  And is that brick house that we're looking at right there,

5  is that 507 ███████████?

6  A.  Yes, it is.

7  Q.  Is that Ms. Craft's residence?

8  A.  Yes, it is.

9  Q.  And is that her driveway right next to the brick mailbox?

10  A.  Yes.

11  Q.  And where is her garage located?

12  A.  If you're facing the house, it's on the left side, left side

13  of the house there.

14  Q.  Toward the back of that driveway?

15  A.  Yes.

16  Q.  So would you have to come in the driveway and turn kind of

17  right to go into the garage?

18  A.  You would.

19        MR. TIEKE:  Okay.  If we can continue around, please.

20     (Government playing video.)

21        MR. TIEKE:  If we could pause it there.

22  Q.  And who lives -- is this 505 ████████████ the final one?

23  A.  Yes.

24  Q.  Who lives there?

25  A.  Matt and Courtney Lanham.

1    Q.  And do his garages essentially face the cul-de-sac?

2    A.  They do.

3    Q.  And is his front door more on the other side of his house?

4    A.  Yes.

5    Q.  Is this a -- in your experience looking into this

6    cul-de-sac, is this a large or a small cul-de-sac?

7    A.  It's relatively small.

8    Q.  Are the houses relatively close together?

9    A.  They are.

10           MR. TIEKE:  If we could take that down, please.

11   Q.  I'm gonna show you -- for the witness only -- United States

12   Exhibit 3.  Do you recognize that photograph?

13   A.  I do.

14   Q.  Who's that a photograph of?

15   A.  Ms. Craft.

16   Q.  When was that photograph taken?

17   A.  Approximately August of 2020.

18   Q.  And is that a true and accurate photograph of the defendant,

19   Ms. Craft, in August of 2020?

20   A.  Yes.

21           MR. TIEKE:  Your Honor, at this time, I move to admit

22   United States Exhibit 3 and publish.

23           MS. REA:  No objection.

24           THE COURT:  It will be admitted.

25      (Government Exhibit 3 admitted in evidence.)

Russell - Direct

1   BY MR. TIEKE:

2   Q.  Is that a photograph of Craft at or near the time of

3   August 2020?

4   A.  It is.

5   Q.  And approximately when do the issues in this case run?

6   A.  October of 2020 to December of 2020.

7   Q.  Is that the particular mailings?

8   A.  Yes.

9   Q.  Okay.  Let's talk about the investigation in this case.

10           MR. TIEKE:  We can take -- clear it, please.  Thank

11  you.

12  Q.  At some point, did the FBI become involved in an

13  investigation involving threatening mailings using racial slurs?

14  A.  Yes.

15  Q.  And what was the investigation's focus?

16  A.  The focus was on kind of the nature of those threats, how

17  the threats were made, who the recipient of those threats were,

18  and then who may have sent the threats.

19  Q.  And were the recipients of those threats the Pineda family

20  at 510 ████████████?

21  A.  They were.

22  Q.  What agencies were involved in this investigation?

23  A.  So the FBI Public Corruption Task Force was involved in that

24  as well as the United States Postal Inspection Service.

25  Q.  Initially, was Louisville Metro Police Department involved

1    as well?

2    A.   They were.

3    Q.   When the FBI began to investigate the case in conjunction

4    with those other agencies, what steps did you-all do in the

5    investigation?

6    A.   We conducted interviews.  We obtained video surveillance

7    footage from the neighborhood.  We collected the threatening

8    letters and mailings and then sent those to our lab at Quantico

9    for analysis.

10   Q.   Did you collect surveillance footage from a number of

11   neighbors in the cul-de-sac?

12   A.   Yes.

13   Q.   Did you do a physical examination of the cul-de-sac?

14   A.   Walked around it, yes.

15   Q.   Did you do open source searches related to information in

16   the course of the investigation?

17   A.   Yes.

18   Q.   And you mentioned this, but during the course of the

19   investigation, did the FBI learn that the Pinedas had received

20   these threatening letters?

21   A.   Yes.

22   Q.   And what was the time frame during which they received these

23   communications?

24   A.   October of 2020 through December of 2020.

25   Q.   Were the bulk of those sent during the November 2020 time

1    period?

2    A.   Yes.

3    Q.   And were some of those sent through the mail?

4    A.   They were.

5    Q.   And were others found by the Pinedas in their yard?

6    A.   Yes.

7    Q.   Did the FBI take custody of the mailings and letters that

8    the Pinedas received?

9    A.   Yes.

10           MR. TIEKE:  Your Honor, at this time if the Court

11   would read -- I'd request that the Court read Stipulations of

12   Fact Number 1, please.

13           MS. REA:  No objection, Your Honor.

14           THE COURT:  Could I ask counsel to approach just

15   briefly before I do that.

16      (Bench conference on the record.)

17           THE COURT:  I just want to make sure I'm clear.  You

18   want me to read the stipulation before you get to these

19   exhibits?

20           MR. TIEKE:  Yes, just because it explains the chain

21   from Metro and then the -- it came to the custody of the FBI.

22           THE COURT:  Okay.

23           MR. TIEKE:  With the exception of one mailing that the

24   Pinedas provided directly to the FBI, that is not in the

25   stipulation.

1          THE COURT:  All right.  I just -- we're going 4

2   through -- I guess 9 is the missing number -- 4 through 12, save

3   for 9, but you haven't introduced those yet.  I'm just not sure

4   this will make much sense to the jury unless --

5          MR. TIEKE:  We can read it wherever you like.  I was

6   just essentially saying, whatever the -- whenever he takes

7   custody of it.

8          THE COURT:  You're in charge of your proof.  Yes, I

9   just -- I just want the jury to understand what it's talking

10  about, and we haven't gotten to those yet.  Do you want to ask a

11  couple of preliminary questions to --

12         MR. TIEKE:  I can explain to -- I can have him explain

13  how that went from LMPD -- that they were initially taken by

14  LMPD.  And then I'd say -- I'll just move this --

15         THE COURT:  Yeah, I'm just concerned that -- I can

16  read this and explain that you-all stipulate and agree as to

17  what happened to these exhibits, but we haven't talked about the

18  exhibits.  So they don't really know -- you see what --

19         MR. TIEKE:  I understand.

20         THE COURT:  -- my concern is?

21         MR. TIEKE:  I will just --

22         THE COURT:  And your discussion of these exhibits

23  wouldn't depend on the stipulation; right?

24         MR. TIEKE:  No.  In fact, he's simply just going to

25  put them into evidence so that we can use them later on so

1    that -- I think it might make sense if we just move it at the

2    end or after he introduces all of those.  We can read it, and

3    that will explain just the chain piece.

4              THE COURT:  Does that make sense?

5              MS. REA:  That's fine.

6              THE COURT:  All right.  Let's do it that way.

7         (End of bench conference.)

8    BY MR. TIEKE:

9    Q.  Special Agent Russell, when the FBI receives physical

10   evidence, how is it processed and handled?

11   A.  So when we receive something that's evidence, we bring it to

12   our office in Louisville.  We have an evidence control room

13   where we store the evidence securely.  It gets given an evidence

14   item number that's unique to that particular piece of evidence

15   and stored there until it's needed for trial or any other

16   reason.

17   Q.  And you keep that evidence secured in your custody until the

18   case is resolved?

19   A.  That's right.

20             MR. TIEKE:  Okay.  So let's first talk about the

21   letters that the Pinedas found in their yard.

22        If I may approach, Your Honor.

23             THE COURT:  Yes.

24   BY MR. TIEKE:

25   Q.  I'm handing you what's been marked as United States

Russell - Direct

```
 1    Exhibit 11.  Go ahead and open it.  Have you had a chance to
 2    review the contents of United States Exhibit 11?
 3    A.  Yes.
 4    Q.  Do you recognize that item?
 5    A.  Yes.  It's -- yeah.
 6    Q.  What is it?
 7    A.  It's one of the letters the Pinedas found in their yard.
 8    Q.  Is that letter in substantially the same condition as when
 9    the FBI received it in evidence on December 22nd, 2020?
10    A.  The letters that were -- or the cutouts, I guess, that were
11    attached -- the letters are no longer attached to the letter
12    itself, but the content of it is the same.
13    Q.  So when you see some of those loose letters, loose cutouts,
14    what happened with that?
15    A.  It could be that the glue that was used wore out, or it
16    could have been during the processing or analysis that was done
17    at the lab.
18    Q.  These were sent to the lab for processing and analysis?
19    A.  Yes.
20    Q.  So other than that issue with some of the lettering coming
21    off, is that lettering in substantially the same condition as
22    when the FBI received it into evidence on December 22nd, 2020?
23    A.  Yes.
24            MR. TIEKE:  Your Honor, I move to admit United States
25    Exhibit 11.
```

```
1            MS. REA:  No objection, Your Honor.

2            THE COURT:  It will be admitted.

3        (Government Exhibit 11 admitted in evidence.)

4    BY MR. TIEKE:

5    Q.  Would you please show a portion to the jury.

6        (Witness complying.)

7            MR. TIEKE:  If you could put it in the bag, I'll come

8    and get it from you.

9            THE COURT:  You might use the Elmo.

10           MR. TIEKE:  We'll publish it in more detail --

11           THE COURT:  I couldn't see it.  That's why I suggested

12   the Elmo, if it's quickly available.

13   BY MR. TIEKE:

14   Q.  When the Louisville Metro Police Department -- did they

15   initially have custody of this item?

16   A.  Yes.

17   Q.  When they had custody of that piece of evidence, did they

18   photograph it in the condition it was provided to them by the

19   Pinedas?

20   A.  They did.

21   Q.  Are you familiar with the Louisville Metro Police Department

22   photographs --

23   A.  Yes.

24   Q.  -- of this letter?

25   A.  Yes.
```

1   Q.  I'm gonna show you what's marked as United States

2   Exhibit 11A.

3            MR. TIEKE:  If we could scroll through those, please.

4   Q.  Do you recognize those photographs, Special Agent Russell?

5   A.  Yes.

6   Q.  What are they?

7   A.  It's a photograph or photographs of the letter that was

8   found in the Pinedas' yard.

9   Q.  Do those photographs truly and accurately depict the letter

10  identified as United States Exhibit 11?

11  A.  Yes.

12           MR. TIEKE:  Your Honor, I'd move to admit United

13  States Exhibit 11 at this time.  11A, excuse me.

14           MS. REA:  No objection, Your Honor.

15           THE COURT:  It will also be admitted.

16      (Government Exhibit 11A admitted in evidence.)

17  BY MS. REA:

18  Q.  Was this letter also sent off to the FBI laboratory to be

19  photographed?

20  A.  Yes.

21  Q.  Are you familiar with FBI lab photographs of this letter?

22  A.  Yes.

23  Q.  I'm gonna show you what's marked as United States

24  Exhibit 11B?

25           MR. TIEKE:  If we could scroll through those, please.

1    Q.   Do you recognize those photographs?

2    A.   I do.

3    Q.   What are they?

4    A.   Those are photographs that were taken at the FBI lab of

5    those -- that same letter.

6    Q.   Do those photographs truly and accurately depict the letter

7    identified as United States Exhibit 11 that the Pinedas found in

8    their yard?

9    A.   Yes.

10            MR. TIEKE:  Your Honor, I'd move to admit United

11   States Exhibit 11B.

12            MS. REA:  No objection.

13            THE COURT:  It will also be admitted.

14      (Government Exhibit 11B admitted in evidence.)

15            MR. TIEKE:  Let's turn to another letter that the

16   Pinedas found in their yard.

17      May I approach, Your Honor?

18            THE COURT:  Yes.

19   BY MR. TIEKE:

20   Q.   I'm gonna hand you what's been marked as United States

21   Exhibit 12.  If you could open that, please.  Have you had a

22   chance to review United States Exhibit 12?

23   A.   Yes.

24   Q.   Do you recognize that item?

25   A.   Yes.

1    Q.   What is it?

2    A.   It's a letter that was found in the Pinedas' yard.

3    Q.   Other than the issue of some of letters coming loose from

4    the -- that you talked about before and the FBI lab photograph

5    procedures, is that letter in substantially the same condition

6    as when the FBI received it in evidence on December 22nd, 2020?

7    A.   Yes.

8              MR. TIEKE:  Your Honor, I move to admit United States

9    Exhibit 12.

10             MS. REA:  No objection.

11             THE COURT:  It will be admitted.

12        (Government Exhibit 12 admitted in evidence.)

13             MR. TIEKE:  And hold that up for the jury and the

14   Court, please.

15        (Witness complying.)

16             MR. TIEKE:  Your Honor, may I approach the witness?

17             THE COURT:  Yes.

18   BY MR. TIEKE:

19   Q.   When the Louisville Metro Police Department initially had

20   custody of this envelope and letter, did they photograph it in

21   the condition it was provided to them by the Pinedas?

22   A.   Yes.

23   Q.   Are you familiar with the LMPD photographs of this letter?

24   A.   Yes.

25   Q.   I'm showing you what's marked United States Exhibit 12A.

1          MR. TIEKE:  If we could scroll through those, please.

2     Q.  Do you recognize those photographs?

3     A.  Yes.

4     Q.  What are they?

5     A.  Photographs of the letter we just opened.

6     Q.  Do those photographs truly and accurately depict the letter

7     identified as United States Exhibit 12?

8     A.  Yes.

9          MR. TIEKE:  Your Honor, I move to admit United States

10    Exhibit 12A.

11         MS. REA:  No objection, Your Honor.

12         THE COURT:  It will be admitted.

13      (Government Exhibit 12A admitted in evidence.)

14    BY MR. TIEKE:

15    Q.  Was that letter also sent off to the FBI laboratory to be

16    photographed?

17    A.  It was.

18    Q.  Are you familiar with the FBI lab's photographs of this

19    communication?

20    A.  Yes.

21    Q.  I'm gonna show you what's marked United States Exhibit 12B.

22         MR. TIEKE:  If we could scroll through those, please.

23    Q.  Do you recognize those photographs?

24    A.  Yes.

25    Q.  What are those photographs of?

1    A.   Photographs taken by the FBI lab of the photo we just

2    opened.

3    Q.   Of the letter the Pinedas found in their yard?

4    A.   Yes.

5    Q.   Do those photographs truly and accurately depict the letter

6    identified as United States Exhibit 12?

7    A.   Yes.

8              MR. TIEKE:  Move to admit United States Exhibit 12B.

9              MS. REA:  No objection, Your Honor.

10             THE COURT:  It will be admitted.

11        (Government Exhibit 12B admitted in evidence.)

12   BY MR. TIEKE:

13   Q.   I want to take you to some video that you found.  In the

14   course of the investigation, did you learn that at some point

15   the Pinedas had active Nest security cameras?

16   A.   Yes.

17   Q.   After the Pinedas found those two letters in the yard, did

18   they review footage from those security cameras?

19   A.   Yes.

20   Q.   And what did they find?

21   A.   They found two occasions where something was dropped in

22   their yard.

23   Q.   And what were the dates of those videos?

24   A.   October 18th, 2020, and November 1st, 2020.

25   Q.   And were those two separate days?

Russell - Direct

1    A.   They were.

2    Q.   And did we just finish up looking at two letters that were

3    thrown in their yard?

4    A.   Yes.

5    Q.   Did they provide that Nest camera footage to the FBI?

6    A.   They did.

7    Q.   Okay.  Let's now turn to the letters that the Pinedas

8    received in the mail.  Did the Pinedas also receive threats

9    through the mail?

10   A.   They did.

11          MR. TIEKE:  Your Honor, may I approach the witness?

12          THE COURT:  Yes.

13   BY MR. TIEKE:

14   Q.   I'm gonna show you what's been marked United States

15   Exhibit 4.  You can go ahead and open that, please.  Do you

16   recognize that item?

17   A.   I do.

18   Q.   What is it?

19   A.   It's a letter that the Pinedas received by mail.

20   Q.   Remember to keep your voice up.

21   A.   Yes.

22   Q.   Other than the issue of some of the letters coming loose

23   from the threat in the FBI lab procedures, is that mailing in

24   substantially the same condition as when the FBI received it

25   into evidence on December 22nd, 2020?

1    A.  It is.

2            MR. TIEKE:  I'd move to admit United States Exhibit 4.

3            MS. REA:  No objection.

4            THE COURT:  It will be admitted.

5        (Government Exhibit 4 admitted in evidence.)

6            MR. TIEKE:  If I may approach.

7            THE COURT:  Yes.

8    BY MR. TIEKE:

9    Q.  When the Louisville Metro Police Department initially had

10   custody of this mailing, did they photograph it in the condition

11   that the Pinedas provided it to them?

12   A.  They did.

13   Q.  Are you familiar with LMPD photographs of this mailing?

14   A.  Yes.

15           MR. TIEKE:  I'm showing you what's been marked as

16   United States Exhibit 4A.

17       If we could scroll through those, please.

18   Q.  Do you recognize those photographs?

19   A.  Yes.

20   Q.  What are those photographs of?

21   A.  Those are photographs of a letter the Pinedas received in

22   the mail that were taken by LMPD.

23   Q.  Do those photographs truly and accurately depict the mailing

24   identified as United States Exhibit 4?

25   A.  Yes.

1              MR. TIEKE:  I'd move to admit United States

2    Exhibit 4A.

3              MS. REA:  No objection.

4              THE COURT:  It will be admitted.

5        (Government Exhibit 4A admitted in evidence.)

6    BY MR. TIEKE:

7    Q.  Was that mailing, again, sent to the FBI laboratory to be

8    photographed?

9    A.  It was.

10   Q.  Are you familiar with the FBI lab photographs of this

11   mailing?

12   A.  Yes.

13   Q.  I'm gonna show you what has been marked as United States

14   Exhibit 4B.

15             MR. TIEKE:  If we could scroll through that, please.

16   Q.  Do you recognize those photographs?

17   A.  Yes.

18   Q.  What are they?

19   A.  Photographs taken by the FBI lab of the letter that was --

20   of a letter that was received by the Pinedas.

21   Q.  Do those photographs truly and accurately depict the mailing

22   identified as United States Exhibit 4?

23   A.  Yes.

24             MR. TIEKE:  We'll move to admit United States

25   Exhibit 4B.

```
1              MS. REA:  No objection.
2              THE COURT:  It will be admitted.
3         (Government Exhibit 4B admitted in evidence.)
4              MR. TIEKE:  Let's talk about another one.
5         Your Honor, may I approach the witness?
6              THE COURT:  Yes.
7    BY MR. TIEKE:
8    Q.  I'm going to hand you what's been marked as United States
9    Exhibit 5, if you could open that, please.  Do you recognize
10   that item?
11   A.  I do.
12   Q.  What is it?
13   A.  It's another mailing received by the Pinedas.
14   Q.  Other than the issue of some of the letters coming loose and
15   the FBI lab procedures, is that mailing in substantially the
16   same condition as when the FBI received it into evidence on
17   December 22nd, 2020?
18   A.  It is.
19             MR. TIEKE:  I'd move to admit United States Exhibit 5.
20             MS. REA:  No objection.
21             THE COURT:  It will be admitted.
22        (Government Exhibit 5 admitted in evidence.)
23             MR. TIEKE:  May I approach the witness, Your Honor?
24             THE COURT:  Yes.
25             MR. TIEKE:  If we can have the Elmo, please.  Thank
```

1    you, Dena.

2    BY MR. TIEKE:

3    Q.  When the Louisville Metro Police Department had custody of

4    that mailing, did they photograph it in the condition they

5    received it from the Pinedas?

6    A.  Yes.

7    Q.  Are you familiar with the LMPD photographs of this mailing?

8    A.  Yes.

9    Q.  I'm gonna show you what's marked United States Exhibit 5A.

10         MR. TIEKE:  If we could scroll through those, please.

11   Q.  Do you recognize those photographs?

12   A.  Yes.

13   Q.  Do those photographs truly and accurately depict the mailing

14   identified as United States Exhibit 5?

15   A.  Yes.

16         MR. TIEKE:  I would move to admit United States

17   Exhibit 5A.

18         MS. REA:  No objection.

19         THE COURT:  It will be admitted.

20      (Government Exhibit 5A admitted in evidence.)

21   BY MR. TIEKE:

22   Q.  Again, was this communication sent to the FBI laboratory to

23   be photographed?

24   A.  Yes.

25   Q.  Are you familiar with the FBI lab photographs of this

1   mailing?

2   A.  Yes.

3   Q.  I'd like to show you United States Exhibit 5B.  Do you

4   recognize those photographs?

5   A.  Yes.

6   Q.  Do those photographs truly and accurately depict -- excuse

7   me.  What are those photographs?

8   A.  Those are photographs taken by the FBI lab of a letter

9   received by the Pinedas.

10  Q.  Do those photographs truly and accurately depict the mailing

11  identified as United States Exhibit 5?

12  A.  Yes.

13          MR. TIEKE:  I'd move to admit United States

14  Exhibit 5B.

15          MS. REA:  No objection.

16          THE COURT:  It will be also be admitted.

17     (Government Exhibit 5B admitted in evidence.)

18  BY MR. TIEKE:

19  Q.  Special Agent Russell, is this mailing the subject of

20  Count 1 in this case?

21  A.  Yes.

22          MR. TIEKE:  Your Honor, if I may approach.

23          THE COURT:  You may.

24  BY MR. TIEKE:

25  Q.  I'm gonna hand you what's been marked as Government

1    Exhibit 6, if you could open that, please.  Do you recognize

2    that item?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's another mailing received by the Pinedas.

6    Q.  Other than the issue of some of the letters coming loose in

7    the FBI procedures, is that mailing in substantially the same

8    condition as when the FBI received it into evidence on December

9    22nd, 2020?

10   A.  Yes.

11           MR. TIEKE:  Your Honor, at this time I move to admit

12   United States Exhibit 6.

13           MS. REA:  No objection.

14           MR. TIEKE:  If I may approach, Your Honor.

15           THE COURT:  It will be admitted and you may.

16      (Government Exhibit 6 admitted in evidence.)

17   BY MR. TIEKE:

18   Q.  When LMPD had custody of this mailing, did they photograph

19   it in the condition it was provided to them by the Pinedas?

20   A.  Yes.

21   Q.  Are you familiar with the LMPD photographs --

22   A.  Yes.

23   Q.  -- of this mailing?  I'm showing you what's United States

24   Exhibit 6A, please.  Scroll through those.  Do you recognize

25   those photographs?

1    A.  Yes.

2    Q.  What are those?

3    A.  Photos of a letter received by the Pinedas that were taken

4    by the LMPD.

5    Q.  Do those photographs truly and accurately depict the mailing

6    identified as United States Exhibit 6?

7    A.  Yes.

8            MR. TIEKE:  Your Honor, I'd move to admit United

9    States Exhibit 6A.

10           MS. REA:  No objection.

11           THE COURT:  It will be admitted.

12    (Government Exhibit 6A admitted in evidence.)

13   BY MR. TIEKE:

14   Q.  Was this mailing also sent off to the FBI lab to be

15   photographed?

16   A.  Yes.

17   Q.  Are you familiar with the FBI lab photographs of this

18   mailing?

19   A.  Yes.

20   Q.  I'm gonna show you what's been marked as United States

21   Exhibit 6B.  Do you recognize those photographs?

22   A.  Yes.

23   Q.  What are they?

24   A.  Photographs taken by the FBI lab of a letter received by the

25   Pinedas.

1    Q.  Do those photographs truly and accurately depict the mailing

2    identified as United States Exhibit 6?

3    A.  Yes.

4            MR. TIEKE:  Your Honor, I'd move to admit United

5    States Exhibit 6B.

6            MS. REA:  No objection.

7            THE COURT:  It will be admitted.

8       (Government Exhibit 6B admitted in evidence.)

9    BY MR. TIEKE:

10   Q.  Special Agent Russell, is this mailing the subject of

11   Count 2 in this case?

12   A.  It is.

13   Q.  Let's go through another one.

14           MR. TIEKE:  Your Honor, may I approach the witness?

15           THE COURT:  Yes.

16   BY MR. TIEKE:

17   Q.  Special Agent Russell, I'm handing you what's been marked

18   United States Exhibit 7, if you could open that, please.  Do you

19   recognize United States Exhibit 7?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a letter received by the Pinedas.

23   Q.  Other than the issues with the letters -- with the cutouts

24   that we talked about before, is that mailing in substantially

25   the same condition as when the FBI received it into evidence on

1    December 22nd, 2020?

2    A.   Yes.

3             MR. TIEKE:   At this time, I'd move to admit United

4    States Exhibit 7.

5             MS. REA:   No objection.

6             THE COURT:   It will be admitted.

7        (Government Exhibit 7 admitted in evidence.)

8             MR. TIEKE:   May I approach the witness, Your Honor?

9             THE COURT:   Yes.

10            MR. TIEKE:   Thank you.

11   BY MR. TIEKE:

12   Q.   When Louisville Metro Police Department initially had

13   custody of this mailing, did they photograph it in the condition

14   it was provided to them by the Pinedas?

15   A.   Yes.

16   Q.   Are you familiar with the LMPD photographs of this

17   communication?

18   A.   Yes.

19   Q.   I'm gonna show you what's marked for identification as

20   United States Exhibit 7A.  Just scroll through those, please.

21   Do you recognize those photographs?

22   A.   Yes.

23   Q.   What are they?

24   A.   Photographs of a letter received by the Pinedas that LMPD

25   took.

1    Q.  Do those photographs truly and accurately depict the mailing

2    identified as United States Exhibit 7?

3    A.  Yes.

4            MR. TIEKE:  I'd move to admit United States

5    Exhibit 7A.

6            MS. REA:  No objection.

7            THE COURT:  It will be admitted.

8        (Government Exhibit 7A admitted in evidence.)

9    BY MR. TIEKE:

10   Q.  Again, was this mailing also sent to the FBI laboratory to

11   be photographed?

12   A.  It was.

13   Q.  Are you familiar with the FBI lab photographs of that

14   mailing?

15   A.  Yes.

16   Q.  I'm going to show you United States Exhibit 7B.  Do you

17   recognize those photographs?

18   A.  Yes.

19   Q.  What are they?

20   A.  Photographs taken by the FBI lab of a letter received by the

21   Pinedas.

22   Q.  Do those photographs truly and accurately depict the mailing

23   identified as United States Exhibit 7?

24   A.  Yes.

25            MR. TIEKE:  Move to admit United States Exhibit 7B,

 1  please.

 2          MS. REA:  No objection.

 3          THE COURT:  It will be admitted.

 4      (Government Exhibit 7B admitted in evidence.)

 5  BY MR. TIEKE:

 6  Q.  And is this mailing the subject of Count 3 in this case,

 7  Special Agent Russell?

 8  A.  Yes.

 9          MR. TIEKE:  We'll go through another mailing.

10      May I approach, Your Honor?

11          THE COURT:  Yes.

12  BY MR. TIEKE:

13  Q.  I'm handing you what's been marked as United States

14  Exhibit 8, if you could open that, please.  Do you recognize

15  United States Exhibit 8?

16  A.  Yes.

17  Q.  What is that?

18  A.  It's a letter received by the Pinedas.

19  Q.  It was mailed to them?

20  A.  It was.

21  Q.  Other than the issue of some of the letters coming loose in

22  the procedures we discussed, is that mailing in substantially

23  the same condition as when the FBI received it into evidence on

24  December 22nd, 2020?

25  A.  It is.

1              MR. TIEKE:  Your Honor, I move to admit United States

2    Exhibit 8.

3              MS. REA:  No objection.

4              THE COURT:  It will be admitted.

5         (Government Exhibit 8 admitted in evidence.)

6              MR. TIEKE:  May I approach the witness, Your Honor?

7              THE COURT:  Yes.

8    BY MR. TIEKE:

9    Q.  When the Louisville Metro Police Department initially had

10   custody of this mailing, did they photograph it in the condition

11   it was provided to them by the Pinedas?

12   A.  Yes.

13   Q.  Are you familiar with the LMPD photographs of this

14   communication?

15   A.  Yes.

16   Q.  I'd like to show you United States Exhibit 8A.

17             MR. TIEKE:  If we could scroll through those.

18   Q.  Do you recognize those photographs?

19   A.  Yes.

20   Q.  What are they?

21   A.  Those are photographs taken by LMPD of a mailing received by

22   the Pinedas.

23   Q.  Do they truly and accurately depict the mailing identified

24   as United States Exhibit 8?

25   A.  Yes.

Russell - Direct

1              MR. TIEKE:  Move to admit United States Exhibit 8A.

2              MS. REA:  No objection.

3              THE COURT:  It will be admitted.

4         (Government Exhibit 8A admitted in evidence.)

5    BY MR. TIEKE:

6    Q.  Was that mailing also sent off to the FBI lab to be

7    photographed?

8    A.  It was.

9    Q.  Are you familiar with the FBI lab photographs of this

10   mailing?

11   A.  I am.

12   Q.  Let's look at 8B, please.  Do you recognize those

13   photographs, Special Agent Russell?

14   A.  I do.

15   Q.  What are those?

16   A.  Those are photographs taken by the FBI lab of a mailing

17   received by the Pinedas.

18   Q.  Do those truly and accurately depict the mailing identified

19   as United States Exhibit 8?

20   A.  Yes.

21              MR. TIEKE:  Move to admit 8B, Your Honor.

22              MS. REA:  No objection.

23              THE COURT:  It will be admitted.

24        (Government Exhibit 8B admitted in evidence.)

25   BY MR. TIEKE:

1   Q.  And, Special Agent Russell, is this mailing the subject of

2   Count 4 in this case?

3   A.  Yes.

4   Q.  Let's talk about another mailing.  I'm gonna hand you what's

5   marked United States Exhibit 9.

6           MR. TIEKE:  If I may, Your Honor.

7           THE COURT:  Yes.

8   BY MR. TIEKE:

9   Q.  If you could open that, please.  Special Agent Russell, you

10  recognize United States Exhibit 9?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's a mailing received by the Pinedas.

14  Q.  Was this one provided directly to the FBI by the Pinedas?

15  A.  It was.

16  Q.  And who provided it?

17  A.  Michella Pineda.

18  Q.  When did she provide it?

19  A.  In March of 2021.

20  Q.  Other than the issue of some of the letters coming loose in

21  the FBI lab procedures, is this mailing in substantially the

22  same condition as when the FBI received it into evidence on

23  March 23rd, 2021?

24  A.  Yes.

25          MR. TIEKE:  I'd move to admit United States Exhibit 9.

```
1              MS. REA:  No objection.

2              THE COURT:  It will be admitted.

3         (Government Exhibit 9 admitted in evidence.)

4              MR. TIEKE:  May I approach the witness, Your Honor?

5              THE COURT:  Yes.

6    BY MR. TIEKE:

7    Q.  When the FBI received this mailing, did the FBI take

8    photographs of the item after it was received into evidence?

9    A.  Yes.

10   Q.  I'd like to show you United States Exhibit 9A.  Scroll

11   through those, please.  Do you recognize those photographs?

12   A.  Yes.

13   Q.  What are they?

14   A.  It's photographs of the letter that Michella Pineda provided

15   to the FBI.

16   Q.  Do those photographs truly and accurately depict the mailing

17   identified as United States Exhibit 9?

18   A.  Yes.

19              MR. TIEKE:  Your Honor, at this time, I'd move to

20   admit United States Exhibit 9A.

21              MS. REA:  No objection.

22              THE COURT:  It will be admitted.

23         (Government Exhibit 9A admitted in evidence.)

24   BY MR. TIEKE:

25   Q.  Again, was this mailing sent to the FBI laboratory to also
```

1   be photographed?

2   A.  It was.

3   Q.  Are you familiar with the FBI lab's photographs of this

4   mailing?

5   A.  Yes.

6   Q.  I'd like to show you United States Exhibit 9B.  Recognize

7   those photographs?

8   A.  Yes.

9   Q.  What are they?

10  A.  Photographs taken by the FBI lab of the letter provided by

11  Michella Pineda to our office.

12  Q.  Do those photographs truly and accurately depict the mailing

13  identified as United States Exhibit 9?

14  A.  Yes.

15         MR. TIEKE:  Your Honor, I'd move to admit United

16  States Exhibit 9B.

17         MS. REA:  No objection.

18         THE COURT:  It will be admitted.

19     (Government Exhibit 9B admitted in evidence.)

20  BY MR. TIEKE:

21  Q.  Special Agent Russell, is this mailing the subject of

22  Count 5 in this case?

23  A.  Yes.

24         MR. TIEKE:  Your Honor, may I approach?

25         THE COURT:  Yes.

1    BY MR. TIEKE:

2    Q.  Special Agent Russell, I'm handing you United States

3    Exhibit 10.  Will you open that, please.  Special Agent Russell,

4    do you recognize that item?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's a mailing received by the Pinedas.

8    Q.  Other than the issue of some of the letters coming loose

9    from the threat and the FBI lab procedures, is that mailing in

10   substantially the same condition as when the FBI received it

11   into evidence on December 22nd, 2020?

12   A.  Yes.

13   Q.  And is this one of the mailings that the Pinedas had

14   previously provided to LMPD?

15   A.  It is.

16         MR. TIEKE:  Your Honor, I'd move to admit United

17   States Exhibit 10 and publish.

18         MS. REA:  No objection.

19         THE COURT:  It will be admitted.

20      (Government Exhibit 10 admitted in evidence.)

21   BY MR. TIEKE:

22   Q.  Special Agent Russell, does that letter contain two bullets?

23   A.  Yes.

24   Q.  Can you show those to the jury.

25      (Witness indicating.)

1          MR. TIEKE:  Your Honor, if I may approach.

2          THE COURT:  Yes.

3    BY MR. TIEKE:

4    Q.  It's difficult to see, Special Agent Russell.  Is this one

5    addressed to Michelle Pineda?

6    A.  It appears to be, yes.

7    Q.  510 ████████?

8    A.  Yes.

9    Q.  When the Louisville Metro Police Department initially had

10   custody of this letter, did they photograph it in the condition

11   it was provided to them by the Pinedas?

12   A.  Yes.

13   Q.  Are you familiar with the LMPD photographs of this letter?

14   A.  Yes.

15   Q.  I'm gonna show you what's marked United States Exhibit 10A.

16          MR. TIEKE:  If we could scroll through those, please.

17   Q.  Do you recognize those photographs?

18   A.  Yes.

19   Q.  What are they?

20   A.  The photographs taken by LMPD of a mailing received by the

21   Pinedas.

22   Q.  Do those photographs truly and accurately depict the letter

23   identified as United States Exhibit 10?

24   A.  Yes.

25          MR. TIEKE:  Your Honor, at this time, I'd move to

1   admit United States Exhibit 10A.

2              MS. REA:  No objection.

3              THE COURT:  It will be admitted.

4        (Government Exhibit 10A admitted in evidence.)

5   BY MR. TIEKE:

6   Q.  Again, was this letter sent to the FBI laboratory to be

7   photographed?

8   A.  It was.

9   Q.  Are you familiar with the FBI lab photographs of this

10  letter?

11  A.  Yes.

12  Q.  I'd like to show you United States Exhibit 10B.  Do you

13  recognize those photographs?

14  A.  Yes.

15  Q.  What are they?

16  A.  Those are photographs taken by the FBI lab of a letter

17  received by the Pinedas.

18  Q.  Do those photographs truly and accurately depict the letter

19  identified as United States Exhibit 10?

20  A.  Yes.

21             MR. TIEKE:  Your Honor, I'd move to admit United

22  States Exhibit 10B.

23             MS. REA:  No objection.

24             THE COURT:  It will be admitted.

25       (Government Exhibit 10B admitted in evidence.)

Russell - Direct

```
1              MR. TIEKE:  Your Honor, at this point, I'd request the
2    court read the Stipulation of Fact Number 1.
3              THE COURT:  All right.  Would counsel approach just
4    briefly before I do that.
5         (Bench conference on the record.)
6              THE COURT:  Do we need to add -- I don't think it
7    needs to be put in the stipulation that the -- I just wrote a
8    note that the stipulation includes all subparts of each primary
9    exhibit number.  For example, Exhibit 4 includes 4, 4A, and 4B.
10             MS. REA:  I don't think we need to.  If the Court
11   wants to add that, I don't have a problem with it.
12             THE COURT:  We admitted --
13             MS. REA:  They've been admitted so --
14             THE COURT:  Right.  They've all been admitted, the
15   subparts.  I just want to make sure that the jury's not confused
16   because we're not using any subparts in the stipulation.
17             MR. TIEKE:  Yeah, I think it makes sense to stay
18   without it because technically the lab photographs didn't really
19   come into -- didn't essentially follow a chain of evidence.
20             THE COURT:  So we don't need the subparts?
21             MR. TIEKE:  I do not believe we need the subparts,
22   Your Honor.
23             THE COURT:  All right.  I'll leave it out, then.
24             MR. TIEKE:  Thank you.  And just for timing, I'm
25   almost finished.
```

1          THE COURT:  I was just gonna ask you, do you want to

2    take a break after I read the stipulation, or do you think you

3    can finish your direct?

4          MR. TIEKE:  I can finish the direct in the next few

5    minutes.  Thank you.

6       (End of bench conference.)

7          THE COURT:  Members of the jury, I'm now going to read

8    you a stipulation.  A stipulation is simply an agreement between

9    the parties as to a fact that might otherwise be in dispute.

10   Here is the stipulation:

11      The defendant, Suzanne Craft, through her counsel, and the

12   United States, by its counsel, stipulate and agree to the

13   following set of facts:

14      On or about November 13, 2020, the items identified as

15   United States Exhibits 4, 5, 6, 7, 8, 10, 11, and 12 were taken

16   into custody as evidence by the Louisville Metro Police

17   Department.  That's LMPD.

18      Subsequently, on or about December 16, 2020, the items

19   identified as United States Exhibits 4, 5, 6, 7, 8, 10, 11, and

20   12 were transferred from the custody of LMPD to the custody of

21   the United States Postal Inspection Service, where they were

22   maintained in evidence.

23      Later, on or about December 22, 2020, the items identified

24   as United States Exhibits 4, 5, 6, 7, 8, 10, 11, and 12 were

25   transferred from the custody of the United States Postal

1    Inspection Service to the custody of the Federal Bureau of

2    Investigation, where they were maintained in evidence.  The

3    parties do not dispute these facts.  You may accept what I have

4    read to you as true.

5        Anything further with respect to the parties' stipulation?

6            MR. TIEKE:  No.  Thank you, Your Honor.

7            MS. REA:  No, Your Honor.

8            THE COURT:  Thank you.

9    BY MR. TIEKE:

10   Q.  At some point in your investigation, was the FBI provided a

11   bullet that appeared to match the bullet in the letter the

12   Pinedas found?

13   A.  Yes.

14   Q.  Who provided that bullet?

15   A.  Richard Watts.

16   Q.  And, again, who is Richard Watts?

17   A.  Richard Watts is Suzanne Craft's ex-partner and father of

18   her daughter, S.W.█.

19   Q.  Did he provide that bullet to the FBI on September 8th,

20   2022?

21   A.  Yes.

22   Q.  And had he previously lived with Ms. Craft?

23   A.  Yes.

24   Q.  Approximately when did he move out of Craft's residence?

25   A.  Around 2017.

Russell - Direct

1   Q.   And that was the residence at 507 ██████████?

2   A.   Yes.

3   Q.   So did he move out long before these mailings had occurred?

4   A.   Yes.

5        MR. TIEKE:  Your Honor, if I may approach the witness.

6        THE COURT:  Yes.

7   BY MR. TIEKE:

8   Q.   Special Agent Russell, I'm handing you United States

9   Exhibit 13.  Do you recognize that item?

10  A.   Yes.

11  Q.   What is it?

12  A.   It's a bullet received from Richard Watts.

13  Q.   Is that bullet in the same or substantially same condition

14  as when it was provided to the FBI by Richard Watts?

15  A.   Yes.

16       MR. TIEKE:  Your Honor, at this time, I'd move to

17  admit United States Exhibit 13 and publish.

18       MS. REA:  No objection.

19       THE COURT:  It will be admitted.

20     (Government Exhibit 13 admitted in evidence.)

21       MR. TIEKE:  Special Agent Russell, could you show that

22  to the jury, please.

23     (Witness indicating.)

24       MR. TIEKE:  And, Your Honor, may I approach?

25       THE COURT:  Yes.

1   BY MR. TIEKE:

2   Q.  Did the FBI take evidentiary photographs of this bullet that

3   Richard Watts provided?

4   A.  Yes.

5   Q.  I'm showing you what's been marked as United States

6   Exhibit 14.  Special Agent Russell, do you recognize those

7   photographs?

8   A.  Yes.

9   Q.  What are they?

10  A.  Those are photographs taken at the FBI of the bullet

11  provided by Richard Watts.

12  Q.  Do they truly and accurately reflect the condition of the

13  bullet when the FBI received it from Richard Watts?

14  A.  Yes.

15       MR. TIEKE:  Your Honor, I move to admit United States

16  Exhibit 14 and publish.

17       MS. REA:  No objection.

18       THE COURT:  It will be admitted.

19     (Government Exhibit 14 admitted in evidence.)

20       MR. TIEKE:  If we could just scroll through those,

21  please.  Thank you.

22  BY MR. TIEKE:

23  Q.  One last thing, Special Agent Russell.  When was Suzanne

24  Craft arrested in this case?

25  A.  August 19, 2022.

Russell - Direct

1    Q.   Was she fingerprinted as part of her arrest?

2    A.   She was.

3    Q.   As part of the fingerprinting process, did the FBI provide

4    those fingerprints to what's known as JABS?

5    A.   Yes.

6    Q.   What is JABS?

7    A.   It stands for the Joint Automated Booking System.

8    Essentially, it's a digital system that we use when we book

9    individuals where we include like their identifiers, what

10   they've been charged with, their fingerprints, and things of

11   that nature.

12   Q.   And then do those fingerprints get put into a database?

13   A.   They do.

14   Q.   What's that database?

15   A.   It's called NGI for short.

16   Q.   What's NGI stand for?

17   A.   Next Generation Identification System.

18   Q.   What does NGI do?

19   A.   So it's a repository, essentially, for things like

20   fingerprints the lab can use for future analysis.

21          MR. TIEKE:  Your Honor, if I might have a moment to

22   confer.

23          THE COURT:  Yes.

24          MR. TIEKE:  Thank you.

25      Thank you, Your Honor.  That's all the questions I have for

1    this witness.

2              THE COURT:  Thank you.

3         Before we begin any cross-examination, we're going to take

4    our first break of the day.  So we'll take about 10, 15 minutes

5    to allow you to refresh yourself, and I think the jury room will

6    have some water available.  Good.  And we'll see you back here

7    shortly.

8         (Jury out 10:23 a.m.)

9              THE COURT:  Do we need to talk about anything before

10   we break?

11             MS. REA:  No, Your Honor.

12             MS. ZIMDAHL:  I don't think so.

13             MR. TIEKE:  No, Judge.

14             THE COURT:  That was emphatic.  All right.  We'll see

15   you back here in about ten minutes.

16        And, Ms. Rea, the witness will be yours at that point.

17             MS. REA:  Thank you, Judge.

18             THE COURT:  Of course, Agent, you know you remain

19   under oath.

20             THE WITNESS:  Yes, sir.

21        (Recess at 10:24 a.m. until 10:44 a.m.  Jury out.)

22             MS. REA:  Your Honor, would you like me to start here

23   or from the --

24             THE COURT:  No, that's fine.

25        Do we need to take a break in place after the agent's

```
 1   testimony concludes?  I understand the next witness is a minor;
 2   is that right?
 3            MS. ZIMDAHL:  It is, Your Honor.  I think it's up to
 4   the Court's preference.  We have our victim witness coordinator
 5   here, who can go and kind of queue them to go down the hall.
 6   They're ready.  It may just take a touch longer than the normal
 7   course to get our next witness down and available to come up the
 8   hallway.
 9            THE COURT:  That's fine.
10            MS. ZIMDAHL:  However the Court prefers.
11            THE COURT:  No, we'll just sit and wait.  I didn't
12   know if that was the only issue or if you had some other --
13            MS. ZIMDAHL:  No, no other issues, just the logistics
14   of moving that witness around.  And I will preview, the next two
15   witnesses are minor witnesses.
16            THE COURT:  All right.  Ms. Rea, I think you said you
17   thought you had roughly 20 minutes cross?
18            MS. REA:  Give or take five.
19            THE COURT:  That's fine.
20            MS. REA:  Yes, Your Honor.
21            THE COURT:  While the jury's coming in, we've passed
22   back to you the updated versions of the agreed upon 404(b)
23   instruction and the instruction regarding the evidence of the
24   defendant's daughter's language that we've talked about.  So you
25   have those at your desk.  And if and when they're necessary, you
```

1   can signal.  I won't be reading -- by the way, I won't be

2   reading the heading, just the instruction.

3        (Jury in 10:46 a.m.)

4             THE COURT:  Ms. Rea, you may proceed with your

5   cross-examination.

6             MS. REA:  Thank you, Your Honor.

7                       CROSS-EXAMINATION

8   BY MS. REA:

9   Q.  Good morning, Agent Russell.  I have a few questions for

10  you, not very many.  The first thing I want to ask you about is

11  with respect to the spherical photograph that was Exhibit 2, if

12  I could bother the U.S. to play that.

13       As we move around the cul-de-sac, passing the Recktenwald

14  house, and there is a driveway -- two driveways, rather, between

15  the Recktenwald house and the Pineda house; correct?

16  A.  Yes.

17  Q.  Okay.  So the Pinedas' driveway, if you are facing their

18  house, is to their left.  The Recktenwald driveway, if you're

19  facing their house, is to their right; right?

20  A.  Yes.  If you're facing the Recktenwald's house?

21  Q.  Yes, ma'am -- or yes, sir.

22  A.  Yes.

23  Q.  And then we keep on going.

24             MS. REA:  And can we pause for just a second.  Thank

25  you.

1    Q.  And the residence that we see there to the right of the

2    Pineda residence, that's where Ms. Betty Probst lives; correct?

3    A.  Yes, ma'am.

4    Q.  The elderly lady.  Okay.  And while I'm asking about these

5    photos, this photo, this spherical photo represents how the

6    cul-de-sac appeared at the time that the photo was taken; right?

7    A.  That's correct.

8    Q.  Which was February 22nd of this year?

9    A.  Yes, ma'am.

10   Q.  Okay.  So, obviously, the arrangement of the houses and the

11   driveways is still the same; correct?

12   A.  That's correct.

13   Q.  But other features can change over time?

14   A.  Sure.

15   Q.  Trees grow, get cut down.  Things like that could be

16   different?

17   A.  Yes.

18       MS. REA:  Okay.  And then can we continue a little

19   bit.  Go ahead and stop for me, please.  Thank you.

20   Q.  And now the house that has moved into view, the red brick,

21   that is 507 ███████, which is where Ms. Craft lives; correct?

22   A.  Correct.

23   Q.  And much like the driveways with the Pinedas and the

24   Recktenwald residence, both her driveway and Ms. Probst's

25   driveway are next to each other?

1    A.   Yes.

2    Q.   Right.  Separated by that strip of grass?

3    A.   Yes.

4         MS. REA:  Okay.  That's all questions I have about

5    that.  Thank you very much.

6    Q.   I want to go through -- and I'm gonna use the Elmo or the

7    document camera to do it -- some of the photos of the various

8    exhibits that were collected.

9         Before I do that, the items -- most of the items, all except

10   for one, came into the possession of the FBI on December 22nd,

11   2020.  Do I have that right?

12   A.   That sounds right.

13   Q.   Okay.  And they came into the possession of the FBI

14   after first going to LMPD, then the United States postal

15   inspector; is that right?

16   A.   That's right.

17   Q.   And then you guys got it from there?

18   A.   We did.

19   Q.   And LMPD, your understanding is they attained the items by

20   collecting them directly from the Pineda family?

21   A.   That's correct.

22   Q.   And you said it in your testimony with the U.S.  The

23   photographs that are taken reflect the condition of these items

24   at the time that they were in possession of the FBI; right?

25   You're taking pictures of them how they look when you have them.

1   A.   Correct.

2   Q.   Right?

3   A.   Correct.

4   Q.   And the same thing with LMPD.  They're taking pictures of

5   the items as they looked at the time that they possessed them.

6   A.   I think that's fair.

7   Q.   It's a fairly obvious question.  No more than that.  So I'm

8   gonna start just by kind of explaining -- kind of talking

9   through what -- what these things look like.  And the first one

10  I'm gonna look at -- this is from Exhibit 12A.  This particular

11  item had an outer -- and most of them did, but with respect to

12  Exhibit 12 and the photo of 12A has the outer envelope and the

13  inner envelope; right?

14  A.   Yes.

15  Q.   So the thing that we see above the item with the letters

16  glued on, that's the other side of an outer envelope?

17  A.   It looks like it, yeah.

18  Q.   Okay.  And then the thing with the letters glued on is the

19  item that was inside of that is how it's put together?

20  A.   That's right.

21  Q.   Okay.  Some of these items, when you retrieve them from

22  their packaging -- or not retrieve them, when you looked at them

23  in their packaging, those letters had started to loosen and some

24  had come off; correct?

25  A.   Yes, correct.

Russell - Cross

1   Q.  And that's old glue, loosened glue, whatever.  They just

2   fell off after a period of time.

3   A.  Correct.

4   Q.  Okay.  And that's because at some point somebody not only

5   cut all of those letters out but physically glued them onto any

6   of the items that we see them affixed to?

7   A.  I mean, yeah, they were attached in some manner.

8   Q.  They were attached some way.  And in this one, you can see

9   kind of dark spots, like around the T and places like that,

10  that's darker than the rest of the envelope, whether it's glue,

11  whether it's something else?

12  A.  Yes.

13  Q.  I'm not gonna go through all of them, but just kind of to

14  talk about what's what.  This is from Exhibit 8A.  Similarly,

15  the thing -- and I guess I should do -- orient that so it makes

16  sense.  The thing that is on top is the outer envelope; correct?

17  A.  Correct.

18  Q.  And that has a postmark date of 6 November 2020; right?

19  A.  Yes, ma'am.

20  Q.  And the thing that is on the bottom is the item that was

21  placed inside or was located inside that outer envelope?

22  A.  Correct.

23  Q.  Okay.  And at the bottom of the upper envelope, below the

24  handwritten ZIP code, we see a printed ZIP code and, I guess,

25  extended ZIP code.  Do you see that?

1   A.   Can you -- you're saying the center of the envelope?

2   Q.   So the envelope that is addressed to Michelle Pineda, the

3   bottom of that, there's a printed ZIP code and then another

4   number after that; right?

5   A.   Yes.

6   Q.   And the printed ZIP code is the same as the handwritten ZIP

7   code, correct, 40245?

8   A.   Yes.

9   Q.   And then the extension is 58 -- excuse me -- 510810.  Do you

10   see that?

11   A.   Yes.

12   Q.   Do you know if that is an extension that is related to

13   ████████████████?

14   A.   I don't.

15   Q.   Okay.  Now we're gonna -- I would ask you to take a look

16   at -- there's three separate items that are connected to

17   Exhibit 5.  So photos from 5A and 5B.  And this item, likewise,

18   we have an outer envelope that is addressed to Ms. Pineda, and

19   then within it is another item; right?

20   A.   Right.

21   Q.   Okay.  And the other item that was inside of that envelope,

22   the postmark on that says 10-19-2020; correct?

23   A.   The item inside the outer envelope?

24   Q.   Yes, sir.

25   A.   Yes, that's right.

1    Q.  And just to be clear, so we're straight on both of them, the

2    postmark on the outer envelope, the one that is addressed to

3    Ms. Pineda, is 2 November 2020?

4    A.  Yes.

5    Q.  Okay.  That lower item where we got the scribbles, the last

6    scribbled line, there are still some numbers that are not

7    obscured; right?

8    A.  Yes.

9    Q.  And that's a 5108?

10   A.  Yes.

11   Q.  I'll ask you to look at another photo from 5B.  This is the

12   same item; correct?

13   A.  Yes.

14   Q.  And in many of these photographs, the photographs that we

15   see from the FBI, something like this has been done.  The item

16   has been opened up for more examination just as part of the

17   investigation; right?

18   A.  Right.

19   Q.  Okay.  And also with this view of the envelope, it has been

20   unfolded both -- this is gonna sound silly, but I'll show you

21   the other photo if I need to -- both from the left and then the

22   envelope itself has been unfolded so it's one flat piece of

23   paper?

24   A.  It is one flat -- yeah, I can see it.

25   Q.  So what I'm -- for distinction, I'm gonna go back to the

1    previous photo.  The item at the bottom, you can't see the edge

2    of that scribbled area; right?

3    A.   Yes, it's cut off on the left side.

4    Q.   Yeah, it's cut off, and it -- it does not stop before the

5    edge of -- the folded edge stops.

6       I'm gonna ask you to look at and ask you a couple of

7    questions about photos of Exhibit 9.  So this is from 9A, and

8    this is an envelope with window sections, and that -- this would

9    be the item that was found inside of an outer envelope; right?

10   A.   Yes.

11   Q.   Because there's no address to anybody on this.  And the

12   postmark that we see on this item is 22 October 2020?

13   A.   Yes.

14   Q.   Okay.  And, again, we have a ZIP code printed at the bottom

15   that's 40245 and then 510807, which is -- might not be the exact

16   same extension.  It's a similar extension that we've seen on the

17   other ones; right?

18   A.   Yes.

19   Q.   Okay.  And this is just for comparison.  This is the same

20   item, but what has happened is the different pieces of the item

21   have been spread out so that they can all be visible; right?

22   A.   Yes.

23   Q.   I'm gonna ask you about Item 10 and the photos associated

24   with it.  So this was part of Exhibit 5A, and these are the LMPD

25   photos; correct?

Russell - Cross

1    A.   They are.

2    Q.   Okay.  And as far as you know, this was the condition that

3    the item was in or reflects the condition that the item was in

4    when LMPD received it?

5    A.   Yes.

6    Q.   Except, I guess, the inner thing could have been taken out

7    of the outer thing; right?

8    A.   Yes.

9    Q.   Okay.  And likewise, same item, but we've taken it apart a

10   little more; is that right?

11   A.   That's right.

12   Q.   Okay.  So at the time that LMPD received it, when they

13   started to take it apart and photograph it, the rounds were

14   contained or kind of wrapped up in that plastic glove material;

15   right?

16   A.   Based on this photo, yes.

17   Q.   Based on this photo.  And also inside it and further inside

18   that cardboard fold; right?

19   A.   Yes.

20   Q.   I think that's all of the photos.  I want to look with you a

21   little bit at the actual Exhibit 10.

22        Okay.  And I'm just gonna use the document camera to work

23   through these items.  And it's -- when this item was examined by

24   the FBI lab -- and I'm not gonna ask you specific questions

25   about the examination.  That's not your thing, but part of what

1    they do is examine different parts of it, look to analyze

2    different parts of the things that were altogether in that outer

3    envelope; right?

4    A.   Yeah.  I mean, I'm not real familiar with their exact

5    process, but yes.

6    Q.   So we have multiple envelopes of things, and just -- I'm not

7    gonna lay them all out there.  For example, that is a piece of

8    what would appear to be an inner envelope that was inside of

9    Exhibit 10.

10   A.   Yes.

11   Q.   Okay.  And then that's a -- that is another subpiece of that

12   exhibit; right?

13   A.   Yes.

14   Q.   And the markings on there are -- are those lab markings?

15   A.   Yes.

16   Q.   Okay.  My point being, all of these items, they have been

17   taken apart.  They were not given to the FBI in all of these as

18   individual pieces.  They were given as the one unit; correct?

19   A.   Correct.

20   Q.   Okay.  Let me put it all back.  And before those items

21   came -- I've got another bag -- in the possession of the FBI,

22   they were collected, most of them, from the Pinedas by LMPD on

23   November 13, 2020.  Is that your understanding?

24   A.   That's my understanding.

25   Q.   Except for one item that was collected in March of 2021.

1   A.   That's correct.

2   Q.   Okay.  And you don't have -- prior to their collection on

3   either November 13 or March of 2021, you don't know where they

4   were, those items?

5   A.   No.

6   Q.   They were in the Pinedas' possession.  You don't know more

7   than that, where they were, how long they were there, how they

8   were kept, anything like that?

9   A.   That's correct.

10   Q.   Okay.  The video -- were you involved also in collecting

11   some video in this case?

12   A.   I was.

13   Q.   Okay.  And was that video that was collected from the

14   Pinedas, some of it?

15   A.   Yes.

16   Q.   Was it also collected from anybody else?

17   A.   There was video collected from others, yes.

18   Q.   From Matt Lanham?  Was he one of those people?

19   A.   Yes.

20   Q.   Okay.  And with respect to those videos, the videos that the

21   Pinedas provided to you are just that.  They are videos that

22   they provided to you?

23   A.   Yes.

24   Q.   As in they brought maybe a flash drive, something like that,

25   and then you took possession of it?

Russell - Redirect

1   A.   We went to them, but --

2   Q.   Okay.  One other thing that you collected in this case is

3   the round that was collected from Richard Watts; right?

4   A.   Yes, ma'am.

5   Q.   And do you remember when you collected that?

6   A.   I believe it was September 8th.

7   Q.   I was gonna say, do you think it was September 8th, 2022?

8   So he met with you and provided that round to you at that point;

9   right?

10   A.   Yes.

11          MS. REA:  Okay.  One moment.  I think that may be all

12   I have.

13      I don't have any other questions for you, agent.  Thank you.

14          THE WITNESS:  Thank you.

15          THE COURT:  Mr. Tieke, any redirect?

16          MR. TIEKE:  Briefly, Your Honor.

17                    REDIRECT EXAMINATION

18   BY MR. TIEKE:

19   Q.   Special Agent Russell, just a few follow-up questions.

20   Ms. Rea asked you about 509 ████████ and Ms. Probst.

21   A.   Yes.

22   Q.   Does she still live at 509 ███████████████?

23   A.   No.

24   Q.   Where does she -- where does Ms. Probst live now?

25   A.   She's in an assisted living-type facility is my

1    understanding.

2    Q.   Okay.  Ms. Rea asked you about where those mailings were at

3    prior to being collected by LMPD.  Prior to the collection by

4    LMPD, those -- were those mailings with the Pinedas?

5    A.   They were.

6    Q.   And then the Pinedas provided them to LMPD?

7    A.   That's correct.

8    Q.   And is that because the Pinedas were the ones receiving

9    them?

10   A.   Yes.

11   Q.   She asked about some videos that you collected as well.

12   Were those videos that the Pinedas had in their possession?

13   A.   Yes.

14   Q.   And did you go to the Pinedas and review their video system?

15   A.   We did.

16   Q.   And is that from where you collected the videos for this

17   case?

18   A.   Yes, from them.

19            MR. TIEKE:  No further questions, Your Honor.  Thank

20   you.

21            MS. REA:  Nothing else, Your Honor.  Thank you.

22            THE COURT:  May the witness be excused?

23            MR. TIEKE:  Yes, Your Honor.

24            THE COURT:  You may step down.  Thank you.

25            THE WITNESS:  Thank you.

1          THE COURT:  The Government may call their next

2     witness.

3          MS. ZIMDAHL:  Your Honor, the Government would call

4     K.P.⬛ to the stand.

5          MR. TIEKE:  Your Honor, we request Mr. Russell be

6     released from his subpoena at this time.

7          THE COURT:  Yes, that's fine.

8          MS. ZIMDAHL:  Your Honor, may I approach to bring some

9     water to the stand?

10          THE COURT:  Yes.

11     (K.P.⬛, called by the Government, sworn.)

12                    DIRECT EXAMINATION

13     BY MS. ZIMDAHL:

14     Q.  Good morning.

15     A.  Good morning.

16     Q.  Your given name is K.P.⬛; is that correct?

17     A.  Yes.

18     Q.  And your family often calls you "K.P."?

19     A.  Yes.

20     Q.  Is it okay if I call you K.P. here today?

21     A.  Yeah.

22     Q.  How old are you, K.P.?

23     A.  I'm 18.

24     Q.  Just recently turned 18?

25     A.  Yeah.

1    Q.   And are you currently in college?

2    A.   Yes.

3    Q.   And could you tell the members of the jury where you go to

4    school.

5    A.   The University of Louisville.

6    Q.   And is that all online?

7    A.   Yes.

8    Q.   Do you attend any classes in person?

9    A.   No.

10   Q.   Where do you currently live?

11   A.   510 ██████████████.

12   Q.   What neighborhood is that in?

13   A.   Lake Forest.

14   Q.   And when did you move to Lake Forest, K.P.?

15   A.   In 2019.

16   Q.   How old were you when you moved to Lake Forest?

17   A.   I was -- I'd just turned 14.

18   Q.   Where did you live before you moved to Lake Forest?

19   A.   I was in the Philippines.

20   Q.   And, K.P., could you tell us a little bit about what you

21   were doing in the Philippines?

22   A.   I was given the opportunity to play softball out in the

23   Philippines for Team Philippines in the Junior Olympics.  So I

24   played out there in the Canada Cup to qualify for the Junior

25   Olympics.

1    Q.  That sounds pretty cool.

2    A.  Yeah.

3    Q.  That sounds like a pretty exciting thing to get to do, a

4    pretty cool opportunity.  Prior to moving to the Philippines,

5    where did you live?

6    A.  Prior to there, we were in a hotel -- or we were in

7    California.

8    Q.  So you lived quite a few places before you came here to

9    Louisville?

10   A.  Yeah.

11   Q.  And with the time in the Philippines playing Olympic-level

12   softball?

13   A.  Yeah.

14   Q.  Tell us a little bit about where you live in Lake Forest.

15   Do you live on a cul-de-sac?

16   A.  Yes.

17   Q.  I'm gonna show just you on your screen there Government

18   Exhibit 16.  K.P., is this a picture of your house?

19   A.  Yes.

20   Q.  Does it truly and accurately depict what your house looks

21   likes?

22   A.  Yeah.

23         MS. ZIMDAHL:  Your Honor, I'd move to admit Government

24   Exhibit 16.

25         MS. REA:  No objection.

1          THE COURT:  It will be admitted.

2      (Government Exhibit 16 admitted in evidence.)

3          MS. ZIMDAHL:  If we could publish this, please.

4  BY MS. ZIMDAHL:

5  Q.  K.P., is this a picture of your house?

6  A.  Yes.

7  Q.  And is this at 510 ▮▮▮▮▮▮▮▮▮?

8  A.  Yes, ma'am.

9  Q.  Is this where you lived when you moved to Lake Forest in

10  2019?

11  A.  Yes, ma'am.

12  Q.  Is this where you live now?

13  A.  Yes, ma'am.

14  Q.  And could you tell us, who do you live there with?

15  A.  I live with my two moms and my four younger siblings.

16  Q.  Okay.  And your moms, are they Michella and Connie?

17  A.  Yes, ma'am.

18  Q.  Is it okay if I refer to them today sometimes as "Mom

19  Michella" and "Connie," just to keep things straight?

20  A.  Yeah.

21  Q.  Okay.  I know you may not refer to them by their first name;

22  so it's okay if I do that here today?

23  A.  That's fine.

24  Q.  Could you tell us about your siblings.

25  A.  I have four younger siblings.  S.P.1▮▮▮ is 15.  S.P.2▮ is

1    12.  S.P.3▉ is 2, and D.P.▉ is 5.

2    Q.  I'm gonna show you Government Exhibit 15, again, just you on

3    your screen.  What is this?

4    A.  That's my family picture.

5    Q.  Is this a true and accurate picture of your family from the

6    time it was taken?

7    A.  Yes.

8         MS. ZIMDAHL:  And I would move to admit now Government

9    Exhibit 15.

10        MS. REA:  No objection.

11        THE COURT:  It'll be admitted.

12        MS. ZIMDAHL:  If I could publish this, please.

13     (Government Exhibit 15 admitted in evidence.)

14   BY MS. ZIMDAHL:

15   Q.  K.P., could you tell the members of the jury what this is.

16   A.  This is my family.  My mom, Connie, is the one in the white

17   shirt.  Michella is the one in the blue shirt.  S.P.3▉ is the

18   little one that's 2.  She's in the middle of them.  D.P.▉ is in

19   front of Connie, and he's 5.  S.P.2▉ is right next to D.P.▉

20   sitting in front of Michella, and she's 12.  I'm behind Connie

21   and next to me is S.P.1▉▉, and he's 15.

22   Q.  And, K.P., how would you describe your own racial and ethnic

23   identity?

24   A.  I'm half Black and half Asian.

25   Q.  And how about your other siblings?  Are they also biracial?

1    A.  Yes.

2    Q.  Could you tell us a little bit about that.

3    A.  S.P.1▮▮▮ is Black, White, and Asian.  S.P.2▮, D.P.▮▮, and

4    S.P.3▮ are both -- or all three of them are White and Asian.

5    Q.  And is it fair to say that you and your younger brother,

6    S.P.1▮▮▮, are darker complected in skin tone than your younger

7    siblings?

8    A.  Yes.

9    Q.  And you and S.P.1▮▮▮ -- we can kind of see this in the way

10   your family picture's put together.  Are you and S.P.1▮▮ the

11   oldest in the family --

12   A.  Yes, ma'am.

13   Q.  -- in terms of your siblings?  Is S.P.2▮ the next youngest

14   in your family?

15   A.  Yeah.

16   Q.  And just since we have this picture up, she's seated on the

17   floor in the black and white shirt?

18   A.  Yes.

19   Q.  Does S.P.2▮ have a pretty significant medical condition?

20   A.  Yeah.

21   Q.  Could you tell us a little bit about that.

22   A.  S.P.2▮ is a Type 1 diabetic.  So I'm usually in charge of

23   taking her blood sugar or giving her insulin when she needs it.

24   Q.  As the oldest in the family, do you often get sent to check

25   up on her and take care of her and keep an eye on her?

1    A.   Yeah.

2    Q.   It kind of comes with the territory sometimes?

3    A.   Yeah.

4    Q.   K.P., I'd like to turn your mind to the spring and summer of

5    2019.  So a little bit after your family moved to Lake Forest.

6    Okay?

7    A.   Okay.

8    Q.   After you moved to your home, did you meet a child in the

9    neighborhood by the name of S.W.█?

10   A.   Yes.

11   Q.   About how old was S.W.█ then?

12   A.   I think she was 12.

13   Q.   Did you know where she lived at the time?

14   A.   Not when I first met her, but I later found out, yes.

15   Q.   And where did she live?

16   A.   507 ███████████████.

17   Q.   And where was that in relation to your home?

18   A.   It's like one house away.  There's -- there's like a house

19   in between the houses.

20   Q.   Could we please put up Government's Exhibit 2.  I'm gonna

21   ask if we can fast-forward this just a little and get to your

22   house, K.P..

23        (Government playing video.)

24   Q.   That blue house with the chimney, is that your house?

25   A.   Yes, ma'am.

1        (Video continuing.)

2   Q.   And could you tell me when we get to the house where the

3   child you knew as S.W.█ lived.

4   A.   Okay.  Her house is the one behind the white car.  So this

5   one right here.

6        MS. ZIMDAHL:  Okay.  And if the record would just

7   reflect she's just pointed to the red brick house in this

8   photograph.

9   Q.   And, K.P., do you know who S.W.█ lived with in her home

10  there on the cul-de-sac and who was --

11  A.   Yes, ma'am.

12  Q.   I'm sorry?

13  A.   I said, yes, ma'am.  Sorry.

14  Q.   Thank you.  It is helpful if you'll always answer with words

15  instead of uh-huh or uh-uh.  We often do that in normal speech,

16  and it's just hard for the court reporter to pick up.

17       Who did you know S.W.█ to live with at her home here in this

18  photograph?

19  A.   She lived with Ms. Craft.

20  Q.   And did you ever have occasion to see or meet Ms. Craft?

21  A.   Yeah.

22  Q.   Was that after you moved into your home?

23  A.   Yes, ma'am.

24  Q.   We can take this photo down.  And, K.P., do you see

25  Ms. Craft here in the courtroom today?

1   A.   Yeah.

2   Q.   And where is she located?

3   A.   She's that one right there.

4        MS. ZIMDAHL:  And if the record could reflect the

5   identification of the defendant, please.

6        THE COURT:  It will so reflect.

7   BY MS. ZIMDAHL:

8   Q.   K.P., after you moved into your home -- you know, your new

9   home in Lake Forest in the spring/summer of 2019, would you and

10  your siblings see S.W.⬛ outside when you were playing?

11  A.   Yes.

12  Q.   Did your siblings and you or did you initially play with

13  S.W.⬛ when you first moved in?

14  A.   No.

15  Q.   Why not?

16  A.   S.W.⬛ would always pick on S.P.2⬛.

17  Q.   So I'd like to turn your attention to a specific incident

18  later in the summer.  So a little while after you've all moved

19  in.  Did your sister S.P.2⬛ repeat an ugly word at the dinner

20  table?

21  A.   Yes.

22  Q.   You remember that event?

23  A.   Yes.

24  Q.   And was that word a racial slur?

25  A.   Yes.

1   Q.  Just prior to that event, had you seen S.P.2▮ outside with

2   anyone?

3   A.  Yes.

4   Q.  Who was S.P.2▮ outside with?

5   A.  S.P.2▮ was outside with S.P.1▮▮▮, but S.W.▮ was also

6   outside at the time.

7   Q.  After that was repeated, did your moms tell you to do

8   anything, you and your siblings, with regards to S.W.▮?

9   A.  Yes.

10  Q.  What was that?

11  A.  She said to not play with S.W.▮, like stay away from her.

12  Q.  Did you and your siblings follow that instruction?

13  A.  Yes.

14  Q.  K.P., can you think forward in time with me to March 22nd of

15  2020.  So a little forward from the time we just talked about.

16  So we're thinking a little bit after the COVID pandemic has

17  started to March of 2020.  Are you personally aware of an

18  incident that occurred on March 22nd of 2020?

19  A.  Yes.

20  Q.  Did the first incident that day occur when you and S.P.2▮

21  were playing outside in the cul-de-sac?

22  A.  Yes.

23  Q.  And can you tell us where you were physically located?

24  A.  We were, like, riding bikes in the cul-de-sac.

25  Q.  And you said "we."  Who was outside with you?

1    A.   Me and S.P.2⬛.

2    Q.   What was S.P.2⬛ doing?

3    A.   She was also riding a bike.

4    Q.   Was anyone else outside?

5    A.   S.W.⬛ had come outside later, like, as we started riding

6    bikes.

7    Q.   While you were outside that day, did S.W.⬛ say anything to

8    you and S.P.2⬛?

9    A.   Yes.

10   Q.   I'm gonna ask you to tell us, please, what did S.W.⬛ say?

11   A.   As we were riding the bikes down the cul-de-sac, we would

12   pass her house and she called me a nigglet.  Sorry.  She --

13   sorry.  She -- every time that we would pass her house, she

14   would repeat it multiple times, and it was just -- at the time I

15   did not know what that word meant.  And so I just told S.P.2⬛

16   that we would just ignore it, and we kept riding on.

17   Q.   And you said she said it more than once?

18   A.   Yes.

19   Q.   Multiple times?

20   A.   Yes.

21   Q.   Did she use another word while you were outside that day

22   that you did know what it meant?

23   A.   Yes.

24   Q.   Tell us about that, please.

25   A.   The last time that we had passed her house, she had called

1   me a nigger.  And me and S.P.2█ rode up to our driveway, and we

2   dropped our bikes, and we ran inside to tell my mom.

3   Q.  You mentioned just a moment ago that you had not heard the

4   N-let word, and you didn't know what that meant.  At the time

5   did you know what the other N-word meant?

6   A.  Yes.

7   Q.  Who did you think S.W.█ was referring to when she said the

8   N-word?

9   A.  To me.

10  Q.  Why did you think that?

11  A.  Because -- well, S.P.2█'s White looking.  She's, you know,

12  White passing, and I'm the only -- I was the only Black one

13  outside at the time.

14  Q.  How did it feel to be referred to that way that day?

15  A.   It's humiliating to say the least.  It -- I've never

16  actually heard the word like in person before.  So to hear it --

17  to hear it out -- like out loud, it kind of just threw me off,

18  and it just made me feel like gross.

19  Q.  K.P., what did you-all do, you and S.P.2█, after you started

20  to leave the cul-de-sac?  I know you just told us that you went

21  back to your house.  What did you do next?

22  A.  We went inside to tell me my mom.

23  Q.  And when you say your mom, who are you referring to?

24  A.  Oh, Michella.

25  Q.  What did you do after you told your mom?

1   A.  My mom told me to tell S.W.█ to leave us alone.  So I went

2   outside.  I ran across our grass, and I stopped at Ms. Betty's

3   driveway, and S.W.█ was by her garage.  So I yelled at S.W.█,

4   and I told her to "leave us alone, you racist bitch."  Sorry.

5   Q.  So just to make sure that everyone heard what you said, you

6   told S.W.█ "to leave us alone, you racist bitch"; is that

7   correct?

8   A.  Yes, ma'am.

9   Q.  Did you go back inside your house after you said this to

10  S.W.█?

11  A.  Yes.

12  Q.  What happened after you went back inside your house?

13  A.  I went inside and I told my mom what I had said.

14  Q.  What happened after that?

15  A.  My mom had said that she shouldn't have sent me outside to

16  say that.

17  Q.  Did something happen after that?

18  A.  Yes.

19  Q.  Can you tell us what happened?

20  A.  A couple minutes later, I heard banging at the door.  So me

21  and mom walked into the dining room, and we had saw S.W.█ by the

22  mailbox.  And a couple of seconds later, we heard Ms. Craft bang

23  on the door again, and I heard Ms. Craft say, "S.W.█, what the

24  fuck did that nigger say to you?"

25  Q.  Okay.  Let me break that down a little bit.  So you said you

1  heard banging on the door, and you walked into the dining room.

2  Is that what you said?

3  A.  Yes.

4  Q.  And you said you saw S.W.█, Ms. Craft's daughter, by the

5  mailbox.  How are you able to see S.W.█ by the mailbox?  Can you

6  explain that?

7  A.  The way that our house is built, the dining room window,

8  it's like a straight shot out to the mailbox.

9  Q.  Okay.  So you, from where you were in your house, had a view

10  out to the street?

11  A.  Yes.

12  Q.  And where was S.W.█?

13  A.  S.W.█ was by the mailbox.

14  Q.  And you heard banging on the door?

15  A.  Yes, ma'am.

16  Q.  Were you able to see Ms. Craft?

17  A.  No.

18  Q.  Had you heard her voice before?

19  A.  Yes.

20  Q.  So whose voice did you hear?

21  A.  I heard Ms. Craft's voice.

22  Q.  You were able to recognize it as her voice?

23  A.  Yes.

24  Q.  And what did she say?

25  A.  She said, "S.W.█, what the fuck did that nigger say to you?"

1    Q.   And, K.P., when Ms. Craft -- when Ms. Craft said the N-word,

2    who did you think she was referring to?

3    A.   To me.

4    Q.   And why did you think that?

5    A.   Because I just went outside and called her daughter a racist

6    bitch.

7    Q.   And when you said you were inside with your mom -- I just

8    want to clarify -- you were inside with Michella?

9    A.   Yes, ma'am.

10   Q.   And what did you and your mom Michella do when this

11   happened?

12   A.   After we heard Ms. Craft say that, my mom told me to get on

13   the ground, and we crawled past the front door to the living

14   room.  And then we went into the garage to the back -- to the

15   backyard to tell my other mom, Connie, what had just happened.

16   Q.   So why is it that you got down and crawled on the floor?

17   A.   Because there are windows by the front door, and we didn't

18   want Ms. Craft to see us, and the front door was also unlocked

19   at the time.

20   Q.   What were you afraid of?

21   A.   I was afraid that Ms. Craft was gonna come inside because

22   she sounded, like, pretty mad.  I was afraid that she was gonna

23   come inside.  And my mom was pregnant at the time, and I just --

24   I was afraid that she might hit my mom or something.  I was

25   just -- I didn't know what was gonna happen.

1    Q.  And you said you crawled to the back of your house?

2    A.  We crawled to the living room.  And as we got into the

3    living room, we stood up and went into the garage, and then we

4    went to the backyard.

5    Q.  Was your mom Connie back there?

6    A.  Yes, ma'am.

7    Q.  What did you do after you and your mom Michella got your mom

8    Connie?

9    A.  My mom Michella told my mom Connie what had happened, and

10   they told me to bring all the kids inside.

11   Q.  Did you do that?

12   A.  Yes.

13   Q.  Did everyone in your family then come in the house?

14   A.  Yes.

15   Q.  Moving forward, did you see Ms. Craft again later that same

16   day?

17   A.  Yes.

18   Q.  Where were you when you saw her?

19   A.  I was on the rock in front of our house, and -- yeah, I was

20   on the rock in front of our house.

21   Q.  And what were you doing on the rock in front of your house?

22   A.  I was watching S.P.2⬛ because S.P.2⬛ wanted to go outside.

23   So I was watching her ride the bike.

24   Q.  So S.P.2⬛ was riding her bike?

25   A.  Yes, ma'am.

1    Q.  Was she in the cul-de-sac that's in front of your house?

2    A.  Yes, ma'am.

3    Q.  What did you see happen?

4    A.  Ms. Craft's car came down the street, parked next to S.P.2⬛

5    or stopped next to S.P.2⬛.  And so when she stopped next to

6    S.P.2⬛, I stood up and -- I stood up and I took a couple steps

7    forward.

8         And Ms. Craft's window rolled down, and she said to S.P.2⬛,

9    "Ride on my side of the road, and I'll run your ass over."  She

10   then pulls into her driveway.  S.P.2⬛ turns her bike around,

11   rides up our driveway, drops the bike, and we both run in the

12   house to tell our mom.

13   Q.  So you were able to hear Ms. Craft say those words to

14   S.P.2⬛?

15   A.  Yes.

16   Q.  How did S.P.2⬛ react to hearing those words?

17   A.  S.P.2⬛ was crying.  Like, she -- she was crying.  She was

18   really scared, and I've never seen this look on her face before

19   ever.  And she just kept repeating, "She's gonna kill me.  She's

20   gonna kill me.  She's gonna kill me."

21   Q.  What did you do after this happened?

22   A.  We went inside to tell our mom.  And our mom was by the

23   door, and I told mom what had happened.

24   Q.  What happened after you told your mom what had happened?

25   A.  My mom told me to take S.P.2⬛ upstairs.  So I took her

1   upstairs, and I told S.P.2█ that everything's gonna be okay.

2   "She's not gonna hurt you."  And I told S.P.1████ to watch

3   S.P.2█, and I went downstairs to go look for my mom.

4   Q.  When you went downstairs to look for your mom, just

5   generally, what did you see?

6   A.  Nobody was in the house.  And that's when I went outside,

7   and they were in the front yard.

8   Q.  And who's "they" that was in the front yard?

9   A.  Both of my parents were outside in the front yard.  They

10  were up by the house, by the little sidewalk passageway we have.

11  D.P.██ was also outside.  Ms. Craft was outside, and she was on

12  her bike.  She was riding it like in front of our house, but not

13  like around the cul-de-sac.  She was riding it like in front of

14  our house like a figure eight, and I think S.W.█ was down the

15  street.

16          MS. ZIMDAHL:  Can we put up Government Exhibit 16 just

17  briefly.

18  Q.  And, K.P., you said out by the walkway in front of your

19  house.

20  A.  Yes.

21  Q.  Can you point out on here -- on this photo kind of where

22  your parents --

23  A.  My parents were by that little flower thing.

24  Q.  And you mentioned that Ms. Craft was riding a bike.

25  A.  Yes.

1   Q.   Had you ever seen Ms. Craft ride a bike before?

2   A.   No, not until that day.

3   Q.   And you said she wasn't riding it normally.  Can you

4   describe for the jury what she was doing.

5   A.   She was riding the bike in like a figure eight in front of

6   our house.  So instead of riding it around the cul-de-sac like

7   me and S.P.2█ usually do, she was riding to like Ms. Betty's,

8   which is the next-door neighbor.  So Ms. Betty's, like, maybe

9   mailbox up, back towards our mailbox and back.

10         MS. ZIMDAHL:  We can take this down.  Thank you.

11  Q.   You mentioned S.W.█ was also outside at this time.

12  A.   Yes.

13  Q.   Did you hear yelling at this point?

14  A.   Yeah.

15  Q.   Arguing?

16  A.   Yeah.

17  Q.   At some point after this, did everyone in your house come

18  back inside?

19  A.   Yes.

20  Q.   Did Ms. Craft remain outside of your house after all of your

21  family had gone back inside?

22  A.   Yes.

23  Q.   What was she doing?

24  A.   She was just standing there next to her bike, looking like

25  into our house.

1    Q.  Into whose house?

2    A.  Into our house.

3    Q.  Into your house?

4    A.  Yes.

5    Q.  Do you recall how long she did that?

6    A.  I think it was 20 minutes or more.

7    Q.  How did that make you feel?

8    A.  I was scared at the time because, again, I don't know this

9    lady.  Like, I've never actually interacted with her until,

10   like, these moments.  And she's just very angry, and it was just

11   like a very scary thing because, like, you don't know what she's

12   gonna do next.

13   Q.  After that incident in March, K.P., in June of 2020, did you

14   learn that the driveway of your home had been painted with

15   words?

16   A.  Yes.

17   Q.  And did you come to learn that that happened on multiple

18   occasions?

19   A.  Yes.

20   Q.  Do you know approximately how many times?

21   A.  I think it was three.

22   Q.  Did you see those driveway paintings yourself on the

23   physical driveway?

24   A.  No.

25   Q.  Why not?

1    A.  Because my mom had said to stay away from the windows.  And

2    I think, the way that our house is built, you wouldn't be able

3    to see them from the windows.

4    Q.  You followed your mom's directions?

5    A.  Yes, ma'am.

6    Q.  You didn't go outside and look?

7    A.  No.

8    Q.  Did you ultimately learn what was painted on your

9    driveway --

10   A.  Yes.

11   Q.  -- on those occasions?

12   A.  Yes.

13   Q.  How did you learn about it?

14   A.  I looked it up, and I saw it on the news.

15   Q.  How did it make you feel that this was painted on your

16   driveway?

17   A.  Again, it's humiliating that it was on the driveway, and I

18   don't know how long it was there for.  I know mom tried to clean

19   it up pretty quickly, but still, it had to be there for hours in

20   the morning because she doesn't get up with S.P.3█ until later

21   in the afternoon.

22       And I don't know how many people have passed our driveway

23   knowing that it said those things on it and how many people said

24   nothing and how many people looked at it and just -- it's just,

25   like, embarrassing to have that on your driveway and that be

1    thought about you.

2    Q.   And you mentioned your moms working to get it cleaned up

3    each time this happened.  Did you know that your moms were

4    trying to get it off the driveway quickly?

5    A.   I think so, yeah.

6    Q.   And they worked hard to get that removed?

7    A.   Yeah.

8    Q.   K.P., did you also know that in October or November time

9    frame of 2020, your family was also receiving letters containing

10   some scary things in them?

11   A.   Yes.

12   Q.   And before we get into the details of that, I just want to

13   ask you generally, how did your family go about bringing mail

14   into the house?

15   A.   Usually whoever goes out there first brings in the mail.  So

16   if I -- me or my brother or S.P.2⬛ would go outside, grab the

17   mail, put it on the counter by the baby bottles, and it would

18   just get stacked up.

19   Q.   Were your moms, Michella and Connie, generally the ones who

20   opened the mail after it was brought in?

21   A.   Yes.

22   Q.   Did you frequently open it?

23   A.   No.

24   Q.   Were there a lot of things in the mail that you were curious

25   or wanted to get?

1   A.   No, there's not really anything for me in there.

2   Q.   So turning back to what I started with, Novemberish time

3   frame of 2020, you said you did learn that your family was

4   receiving mailings with some scary content?

5   A.   Yes.

6   Q.   Did you see those letters when your family received them?

7   A.   Oh, no, not when my family received them, no.

8   Q.   Not at the time?

9   A.   No.

10  Q.   Did both of your moms try to shield you from seeing the

11  content of those letters?

12  A.   Yes.

13  Q.   But you did know about them?

14  A.   Yeah.

15  Q.   You generally knew what was in them?

16  A.   Yeah.

17  Q.   How did you know about that?

18  A.   I saw it on the news, like on -- I think Google has them.

19  Q.   Did you hear your moms talking about them?

20  A.   Yeah.

21  Q.   Was this a topic of conversation in your home?

22  A.   Yeah.  They tried to -- like, everything that had happened,

23  even the driveway and stuff like that and the letters, those are

24  all, you know, adult topics and adult conversations.  So they

25  try to keep that away from, you know, the kids so we don't have

1    to worry about anything, but I -- you know, I still end up

2    hearing some of the things that they would say about it.

3    Q.   What did you generally understand those letters to be about?

4    A.   I know that -- I know they were threatening, and I know that

5    they were pretty much threatening us to move out or, you know,

6    that we're gonna die.  So it was just something that was really

7    scary.

8    Q.   How did you feel during that time when your family was

9    receiving those threatening letters?

10   A.   It was really scary.  It was one of the scariest times of my

11   life.  It had changed a lot of -- a lot of everything in the

12   house.

13        At the time of the letters -- I think around the time of the

14   letters happening, my parents had stopped -- had asked us to

15   stop taking in the mail.  And we had started sleeping downstairs

16   in the living room.  My mom and I brought down her mattress, and

17   we all slept in the living room on -- either all on that

18   mattress or one of us would be on the couch.  Again, it was one

19   of the scariest times in my life because I don't know if she

20   would actually follow through with it.

21   Q.   And you mentioned that you all moved down to sleep together

22   in the living room.  Why did you pick the living room?

23   A.   My mom said it was away from all the windows.

24   Q.   Has this impacted even to today how you all sleep?

25   A.   Yes.

1   Q.  How so?

2   A.  Mom still sleeps downstairs in the living room while me,

3   S.P.1＿＿, and S.P.2▉, we all sleep in our rooms now.  But

4   S.P.2▉ sleeps with her windows and blinds open so she can see

5   what goes on outside; and I sleep with my blinds shut and a

6   blanket over the window so I don't see what's going on outside.

7   Q.  K.P., because of these threats, have you changed the

8   activities you participate in?

9   A.  Yes.

10  Q.  Why?

11  A.  I gave up softball last year.  My senior year was my last

12  year, and that was a hard thing for me to do because I've been

13  playing for 14 years of my life.  I gave it up because I knew

14  that being away from my family and playing softball isn't

15  important anymore.

16      I don't want to drive anymore.  My parents had to force me

17  to get my permit because I'm afraid of driving and being away

18  from my family.  I don't go to college -- like, I go to college,

19  but all my classes are online because I don't want to be too far

20  away from my family in case something happens.  I'm sorry.

21  Q.  It's okay.  Take your time.

22  A.  I don't go out because, again, going out and being away from

23  my family is -- it's not important.  I don't need to be away.

24  My family is all I have.  And if something happens to them and

25  I'm not there to, like, protect them or at least, you know, be

1    there with them while it's happening, then I haven't done what

2    I'm supposed to be doing in my life.  This whole situation has

3    just ruined, like, absolutely everything.

4         Like, we live on edge and nobody should have to live on edge

5    in their own house.  Nobody should be feeling the way that they

6    feel in their own home.  It's just -- it's just a lot.

7              MS. ZIMDAHL:  You can take a minute, absolutely.

8              THE WITNESS:  I'm sorry.

9              MS. ZIMDAHL:  It's okay.

10        Your Honor, I have no further questions.

11             THE COURT:  Ms. Rea.

12             MS. REA:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14   BY MS. REA:

15   Q.  Hi, K.P.  My name's Angela.  I don't -- I just have a few

16   questions for you.  You talked through with the prosecutor how

17   old your siblings are now.

18   A.  Yes.

19   Q.  So back in 2019, when you moved into the neighborhood, how

20   old were you then?

21   A.  I was 14.  I'd just turned 14 at the time.

22   Q.  Okay.  And how old was S.P.1⬛⬛⬛?

23   A.  S.P.1⬛⬛⬛ was 12.

24   Q.  Okay.  And how old was S.P.2⬛?

25   A.  S.P.2⬛ was 8.

1   Q.   Okay.  And then you have one sibling that wasn't born yet?

2   A.   Right.

3   Q.   And then another that was --

4   A.   I think he was 2 turning 3.

5   Q.   Okay.  And that's D.P.▆?

6   A.   Yes, ma'am.

7   Q.   Okay.  I'm gonna ask you some questions about what you

8   testified about happening in March of 2020 in the cul-de-sac.

9   What you described happening was -- occurred when you and S.P.2▆

10  were riding your bikes around the cul-de-sac?

11  A.   Yes, ma'am.

12  Q.   And you said S.W.▆▆▆ ▆ was out there.

13  A.   Yes, ma'am.

14  Q.   Where was she?

15  A.   She was -- there's this chair that's in front of her --

16  outside of her front door.

17  Q.   Okay.

18  A.   There's like a little -- not like porch, but there's like

19  a --

20  Q.   Like a stoop maybe?

21  A.   Yeah.

22  Q.   Okay.  And was she sitting in that chair?

23  A.   That's where she was sitting, yes, ma'am.

24  Q.   Okay.  And there were two words that you said she said to

25  you.  One of them you had never heard before; right?

1    A.   Right.

2    Q.   And you said that she said that multiple times.

3    A.   Yes.

4    Q.   Is it the sort of thing where you say she was saying it like

5    every time you'd ride by?

6    A.   Yes, ma'am.

7    Q.   Okay.  And you heard it from where you were in the

8    cul-de-sac?

9    A.   Yes, ma'am.

10   Q.   Okay.  And then there was one time when she said the other

11   word, the N-word that you knew; right?

12   A.   Yes, ma'am.

13   Q.   Was that the same thing?  She was sitting on the -- in the

14   chair on the stoop, and you were riding in the cul-de-sac?

15   A.   Yes, ma'am.

16   Q.   Okay.  And you heard that word from where you were?

17   A.   Yes.

18   Q.   Okay.  And you told your mom about it?

19   A.   Yes.

20   Q.   And just to be clear, you're talking about your mom

21   Michella?

22   A.   Yes.

23   Q.   Okay.  When you told her about that, did she tell you to

24   deal with it, to address it?

25   A.   Yeah.

1   Q.  Okay.  And that's when you went back out and you had the

2   conversation with S.W.█?

3   A.  Yes.

4   Q.  Okay.  After that is when you come back into your house.

5   And shortly thereafter, you said your -- your moms, Connie and

6   Michella, were outside of the house?

7   A.  No.

8   Q.  Okay.  I want to get the timeline right.  That's what I'm

9   trying to get right.

10  A.  When I had came in the house, it was just Michella that was

11  in the house.

12  Q.  Okay.  And you told her?

13  A.  Yes.

14  Q.  Okay.  And this is after you'd had the conversation with

15  S.W.█?

16  A.  Yes.

17  Q.  And then she -- at some point soon after that, did she go

18  outside into the cul-de-sac?

19  A.  No.

20  Q.  Okay.

21  A.  We were in the house, and that's when -- that's when I told

22  my mom what I had said.  She says, "I shouldn't have sent you

23  out there."  And a couple minutes later, that's when Ms. Craft

24  came banging on the door.

25  Q.  Okay.  And then what happened after she came banging on the

1    door?

2    A.  We went into the dining room because the -- we were in the

3    kitchen, and we walked into the dining room.

4    Q.  Okay.

5    A.  We looked out the dining room window, and we saw S.W.▮ was

6    at the mailbox.

7    Q.  Okay.

8    A.  Ms. Craft started banging on the door again.  And Ms. Craft

9    said, "S.W.▮, what the fuck did that nigger say to you?"

10   Q.  Okay.  And did Ms. Craft leave?

11   A.  No.  She was still at the door.

12   Q.  Okay.  But there came a point later on when S.P.2▮ was back

13   in the cul-de-sac; right?

14   A.  Right, and that was after the whole situation happened.

15   After we went outside, we told my mom Connie what had happened.

16   Then everybody came back in the house.  And I think a couple

17   hours later, when everything died down, S.P.2▮ was begging to go

18   outside.  So mom told me to go outside and watch S.P.2▮.  So I

19   did.

20   Q.  Okay.  So the first interaction when you're riding around

21   the cul-de-sac -- I in no way expect you to remember what time.

22   It's been two years, almost three years -- three years,

23   actually -- what time of day generally was that?

24   A.  The second one?

25   Q.  The first one.

1    A.  Oh, the first one?  It was -- I think it was early in the

2    afternoon, maybe around like 1:00 or something.

3    Q.  Okay.  And after you said Ms. Craft was banging on the door

4    and made the statement, there's a period of a couple or a few

5    hours later where S.P.2█ is allowed to go back outside and ride

6    her bike in the cul-de-sac?

7    A.  Yes.

8    Q.  Okay.  And that is when you say the second interaction

9    happened with Ms. Craft?

10   A.  Yes.

11   Q.  Okay.  And it's -- so she's riding her bike in the

12   cul-de-sac but not around the cul-de-sac, is that fair to say,

13   how you remember it?

14   A.  She was -- she was riding around the cul-de-sac.  She

15   wasn't -- she's not allowed to go up the street by the stop

16   sign.  She's just allowed to go around the cul-de-sac.  That's

17   where S.P.2█ was.

18   Q.  Okay.  So we're talking about March of 2020 when she's

19   riding her bike.  Are you saying she was going around, or she

20   was on your side?

21   A.  S.P.2█?

22   Q.  No, no, no.  I'm talking about Ms. Craft.

23   A.  Oh, I'm sorry.  I got confused.  Ms. Craft was just riding

24   on our side.

25   Q.  Okay.  And what happened when you saw her riding the bike in

1    the cul-de-sac?

2    A.  Wait.  I'm sorry.  I'm confused again.

3    Q.  That's okay.  The "her" -- and that's my fault because I'm

4    saying, "What happened when she was riding her bike?"  When you

5    saw Ms. Craft riding her bike in the cul-de-sac.

6    A.  Okay.  So after the situation with S.P.2█?

7    Q.  Yes.

8    A.  Like after she came up to S.P.2█?

9    Q.  How you remember it, yes.

10   A.  So -- okay.  So then it's not when she was riding her bike.

11   This is before that.  There was an incident -- because there

12   were three incidents that happened that day.  There's the one

13   where she came banging on the door, and then there's the one

14   where she told S.P.2█ that she was gonna run her over.  That's

15   the second incident that happened that day.

16       S.P.2█ said that she wanted to ride her bike.  So she's

17   telling mom, "Can we go outside and ride our bike?"  Mom said

18   that I need to go outside and watch S.P.2█.  I was on the rock

19   in front of our house by the mailbox.  S.P.2█'s riding the bike

20   around the cul-de-sac.

21       Ms. Craft's car comes down the street, stops next to S.P.2█.

22   S.P.2█ was probably by Ms. Betty's -- I think her mailbox maybe.

23   She stops next to S.P.2█.  That's when I stood up, and I took a

24   couple steps forward.  And she rolled down her window and she

25   said, "Ride on my side of the road, and I'll run your ass over."

1   She goes into her driveway.  S.P.2▮ turns around, goes up the

2   cul- -- or not the cul-de-sac, up the driveway, drops her bike,

3   and me and her both go inside to tell mom.

4   Q.  Okay.  And then when I was asking about Ms. Craft riding

5   around and --

6   A.  After riding around on the bike --

7   Q.  That's after that?

8   A.  -- that's after that.  After we go inside to tell moms, mom

9   tells me to take S.P.2▮ upstairs.  I take S.P.2▮ upstairs.  I

10  reassure her that everything's gonna be okay.  I tell S.P.1▮▮▮

11  to watch S.P.2▮.  And then I go downstairs to look for my mom,

12  and I find both of my parents outside in the front yard.  And

13  that's when Ms. Craft is riding her bike.

14  Q.  Okay.  And is that when you heard yelling and arguing?

15  A.  Yes, ma'am.

16  Q.  Okay.  And you said everybody went inside the house?

17  A.  Yes.

18  Q.  Okay.  But Ms. Craft was outside?

19  A.  Yes.

20  Q.  And she stayed outside of your house for some period of

21  time?

22  A.  Yes.

23  Q.  And that period of time was about 20 minutes?

24  A.  Or more, yes.

25  Q.  Okay.  Or more.  And you had told your mom that you had

1    heard Ms. Craft make the statement about "I'm gonna run you

2    over"?

3    A.   Right.

4    Q.   Okay.  And you said you felt scared?

5    A.   Yes.

6    Q.   And did your mom know that you felt scared?

7    A.   Yeah.

8    Q.   Okay.  I'm gonna ask you just a couple questions about the

9    mail.  You said whoever goes out first gets the mail.

10   A.   Pretty much, yeah.

11   Q.   And that included you, S.P.2█, and S.P.1████; correct?

12   A.   Yes, ma'am.

13   Q.   So the three older children would -- or your moms, I guess?

14   A.   Yes, ma'am.

15   Q.   Who would get the mail just depending on who's around;

16   right?

17        Okay.  And you didn't look at the mail.  It just got -- you

18   just put it on a counter, and the adults can handle the mail?

19   A.   Yes, ma'am.

20   Q.   Did that -- so you didn't ever notice particular items that

21   were in the mail when you did that?

22   A.   No.

23        MS. REA:  Okay.  I think that's all.

24        MS. ZIMDAHL:  Your Honor, we have no further questions

25   for this witness.

1           MS. REA:  Nothing else, Your Honor.  Thank you.

2           THE COURT:  May the witness then be excused?

3           MS. ZIMDAHL:  Yes, Your Honor.

4           THE COURT:  You may step down.

5      If I could have counsel approach briefly.

6      (Bench conference on the record.)

7           THE COURT:  Two questions.  One, do we need the agreed

8   instruction limiting the use of the --

9           MS. REA:  Oh, yeah, I think this would be the time.

10          MS. ZIMDAHL:  I think this would be a good time for

11  that.

12          THE COURT:  Jaylen has that.  It follows -- this is

13  it.  He fixed the extra --

14          MS. REA:  He brought it by.

15          MS. ZIMDAHL:  Yeah.

16          MS. REA:  I think it's fine.  It's completely fine.

17          THE COURT:  All right.  So you want me to read that

18  now?

19          MS. REA:  That makes sense.

20          THE COURT:  Okay.  And it is about eight before noon.

21  Do you want to get your --

22          MS. ZIMDAHL:  If we could because it's another one of

23  the Pinedas' children.

24          THE COURT:  Right.  How long do you think?

25          MS. ZIMDAHL:  I'd say half the time this witness took.

```
 1   So shorter.  Maybe even less than that.

 2            THE COURT:  So we can --

 3            MS. ZIMDAHL:  If you don't mind.

 4            THE COURT:  Your direct is -- would then be in the

 5   nature of about ten minutes?

 6            MS. ZIMDAHL:  Fifteen.  I tend to be wordy.

 7            THE COURT:  Ten to fifteen.  All right.  How about 12

 8   and a half?

 9            MS. ZIMDAHL:  I'll try my best to keep it tight.

10            THE COURT:  And then your cross?

11            MS. REA:  I won't have very much.

12            THE COURT:  All right.  Do you anticipate needing the

13   instruction read a second time after this next witness?

14            MS. REA:  I think, because it's -- I'm trying to think

15   if we can go ahead and, when you're reading it now, say this

16   could refer to other witnesses that testify later today, I

17   think, or right now.

18            THE COURT:  I can change it slightly to read --

19   instead of reading, "The United States has presented evidence,"

20   I can change it to read, "The United States has presented and

21   may present further evidence that" --

22            MS. REA:  Yeah, I think that's a good way to deal with

23   it.

24            MS. ZIMDAHL:  Yeah.  No secret it will be presented, I

25   think, multiple times today.
```

1          THE COURT:  Now, if we add this to the final jury

2     instructions, we'll take that phrase out so it's in the past

3     tense.

4        All right.  Do you want to see this then before I read it?

5          MS. ZIMDAHL:  That's perfectly fine.  Thank you, Your

6     Honor.

7          THE COURT:  I'll read that now, and you can ask them

8     to bring her around while I'm reading this.

9          MS. ZIMDAHL:  Yes.

10       (End of bench conference.)

11         THE COURT:  Members of the jury, I have a brief

12    instruction that I need to give you now.  The United States has

13    presented and may present further evidence that in 2019 and

14    2020, the defendant -- Ms. Craft's daughter used racial slurs

15    against one of the victim children.

16       You may not, one, attribute the racial slurs to Ms. Craft;

17    two, infer that Ms. Craft taught her daughter to use the racial

18    slurs; or, three, infer that Ms. Craft instructed her daughter

19    to use the racial slurs against one of the victim children.

20    Thank you.

21       Ms. Zimdahl, are you prepared to present your next witness?

22         MS. ZIMDAHL:  Yes, Your Honor.  We would call

23    S.P.1███ to the stand at this time.

24       Your Honor, may I approach just to remove the cup?

25         THE COURT:  Yes.

S.P.1⬛ - Direct

```
 1              MS. ZIMDAHL:  Thank you.

 2              THE COURT:  Actually, while we're waiting for the

 3    witness to come around, let me see counsel again just briefly.

 4       (Bench conference on the record.)

 5              THE COURT:  I should have asked you when you were

 6    here, what about the 404(b) limiting?  That testimony, I

 7    think -- does it cover it?

 8              MS. ZIMDAHL:  Yeah, I don't think --

 9              MS. REA:  I don't think --

10              MS. ZIMDAHL:  -- there's any other, so I think we

11    don't need it.

12              THE COURT:  That's fine.  Like I said, I'm relying on

13    you-all to signal that.  I just thought I would double-check.

14              MS. ZIMDAHL:  I believe we're in agreement that it's

15    not needed.

16              THE COURT:  That's fine with me.

17              MS. ZIMDAHL:  And that will be for the next one.

18    Thank you, Your Honor.

19       (End of bench conference.)

20       (S.P.1⬛, called by the Government, sworn.)

21                        DIRECT EXAMINATION

22    BY MS. ZIMDAHL:

23    Q.  I'm checking my watch to make sure I get "good morning" or

24    "afternoon" right.  It looks like we're one minute shy, and it's

25    good morning, S.P.1⬛.  Is it okay if I call you S.P.1⬛
```

1   here today?

2   A.  Yes, ma'am.

3   Q.  S.P.1█████, can you tell us how old you are?

4   A.  I am 15 years old.

5   Q.  You got a birthday coming up soon?

6   A.  Yes.

7   Q.  Almost 16.

8   A.  Yes.

9   Q.  Are you in high school?

10  A.  Yes.

11  Q.  What grade are you in?

12  A.  I'm a sophomore right now.

13  Q.  Where do you attend school?

14  A.  Pathfinder's School of Innovation.

15  Q.  Is that an online school?

16  A.  Yes, ma'am.

17  Q.  And, S.P.1█████, where do you live?

18  A.  510 █████████ in Lake Forest.

19  Q.  Okay.  If you can keep your voice up.  That seems to be the

20  story today.  We all got to speak up a little bit.  I think our

21  microphones are not as strong as we would like, so if we can try

22  to work on that.  We're all gonna try to do that today.

23      S.P.1█████, when did you move to Lake Forest?

24  A.  It was April of 2019.

25  Q.  And help me with math here.  If you are 15 going on 16,

1   about how old were you when you moved to Lake Forest?

2   A.  I had just turned 12 years old.

3   Q.  And, S.P.1▆▆, do you live on a cul-de-sac?

4   A.  Yes, ma'am.

5   Q.  Some people refer to that as a "court"; is that right?

6       I'm gonna show you a picture.

7           MS. ZIMDAHL:  If we can put up Government Exhibit 16.

8   Q.  S.P.1▆▆, is this your house?

9   A.  Yes, it is.

10  Q.  Where you live on ▆▆▆▆▆▆▆▆▆▆?

11  A.  Yes.

12  Q.  In Lake Forest?

13  A.  Yes.

14  Q.  And is that where you've lived since 2019?

15  A.  Yes.

16  Q.  Who do you live there with?

17  A.  I live with my two moms and my four siblings.

18          MS. ZIMDAHL:  If we can now put up Government's

19  Exhibit 15, please.

20  Q.  S.P.1▆▆, is this a picture of your family?

21  A.  Yes, it is.

22  Q.  And can you tell us who is pictured here in your family

23  photo?

24  A.  My older sister, K.P.▆▆; my oldest mom, Connie; my other

25  mom, Michella; my younger sister, S.P.2▆; my younger brother,

1   D.P.⬚; and my youngest sister, S.P.3⬚.

2   Q.  You have one older sister, and that's K.P.; right?

3   A.  Yes.

4   Q.  Is she standing next to you in this photo?

5   A.  Yes.

6   Q.  And three younger siblings?

7   A.  Yes.

8   Q.  Okay.  And your younger sister, S.P.2⬚, is she seated on the

9   floor?

10  A.  Yes, she is.

11  Q.  All right.  And does she have a significant medical

12  condition?

13  A.  Yes.

14  Q.  And is that Type 1 diabetes?

15  A.  Yes, it is.

16  Q.  Do you and your family help her manage that?

17  A.  Yes.

18  Q.  S.P.1⬚, could you turn your attention to the spring and

19  summer of 2019, shortly after you and your family moved to your

20  new neighborhood.  After you moved into your new home, did you

21  meet a child by the name of S.W.⬚?

22  A.  Yes, I did.

23  Q.  About how old was S.W.⬚ when you met her?

24  A.  She was 11 years old.

25  Q.  Did you say 11?

1   A.   Yes.

2   Q.   Do you know where S.W.▌ lived?

3   A.   She lived with her mother.

4   Q.   Did she live on the cul-de-sac?

5   A.   Yes.

6   Q.   Do you know what house she lived in?

7   A.   She lived pretty much right next to us.

8   Q.   Okay.  Was she directly next to you, or were there any

9   houses in between?

10  A.   She was one house away from us.

11       MS. ZIMDAHL:  If we could put up Government Exhibit 2,

12  please, and just fast-forward a little bit.

13  Q.   And start with your house, S.P.1� ▌.  Let me know when you

14  see your house.

15  A.   I see it right here.

16  Q.   That blue house, is that your house?

17  A.   The white and brown.

18  Q.   Okay.  Right there --

19  A.   Yes.

20  Q.   -- that we stopped at?  That's your house at 510 ▬▬▬▬▬?

21  A.   Yes.

22       MS. ZIMDAHL:  Okay.  And if we could keep going.

23  Q.   When you get to the house that S.W.▌ lived in, if you could

24  let us know.

25  A.   It's right here.

1            MS. ZIMDAHL:  If we could stop.

2    Q.  And so this house right here behind the white vehicle, that

3    red brick, is that S.W.█'s house?

4    A.  Yes, it is.

5            MS. ZIMDAHL:  If the record could reflect that he's

6    identified 507 ███████████████████.

7            THE COURT:  Yes.

8    BY MS. ZIMDAHL:

9    Q.  So S.W.█'s home was one house separated from yours; is that

10   correct?

11   A.  Yes, ma'am.

12   Q.  And you mentioned that she lived there with her mother?

13   A.  Yes.

14   Q.  And did you know her mother to be Ms. Craft?

15   A.  Yes.

16   Q.  Now, in the spring and summer of 2019, after you-all had

17   moved in, did you and your siblings play with S.W.█?

18   A.  No.

19   Q.  Why not?

20   A.  Because she had picked on S.P.2█.

21   Q.  Why did she pick on S.P.2█ or how so?  How was she mean to

22   S.P.2█?

23   A.  She would pick on S.P.2█ for how she had dressed.

24   Q.  And how old was S.P.2█ back then in 2019?

25   A.  S.P.2█ was 8, turning 9.

1    Q.  Eight turning nine?

2    A.  Yes.

3    Q.  S.P.1█████, I'd like to turn your attention to the later

4    summer of 2019, to a specific time when you were outside in the

5    cul-de-sac with your sister S.P.2█ playing.  Was there an

6    incident when you heard S.W.█ using a racial slur when she was

7    talking to your sister?

8    A.  Yes.

9    Q.  Were you personally present that day?

10   A.  Yes, I was.

11   Q.  And did you personally hear what was said?

12   A.  Yes.

13   Q.  What did you hear S.W.█ say?

14   A.  S.W.█ had said the N-word.

15   Q.  The N-word?

16   A.  Yes.

17   Q.  Okay.  I'm gonna ask you today if you could please say

18   exactly the word that was said and what was said.

19   A.  S.W.█ had said "nigger."

20   Q.  What was your reaction when you heard that word?

21   A.  I was scared and shocked.

22   Q.  And who did you believe that S.W.█ was referring to when she

23   said the N-word?

24   A.  My older sister.

25   Q.  And by your "older sister," do you mean K.P.?

S.P.1⬚ - Direct

1    A.   Yes, I do.

2    Q.   Was anyone else outside?

3    A.   Besides me and S.P.2█ and S.W.█, no, not that I know of.

4    Q.   So you, S.W.█, and S.P.2█.  And then what did you hear S.W.█

5    say?

6    A.   She had asked S.P.2█ who that was.  S.P.2█ said, "That was

7    my sister."  And then S.W.█ said, "Your sister's a nigger."

8    Q.   And you've told us how you felt.  What did you do after that

9    occurred?

10   A.   I'd went in the house with S.P.2█.

11   Q.   After it occurred, that day that S.W.█ referred to your

12   older sister using the N-word, did it come to be that your

13   mothers learned that S.W.█ had used that racial slur in front of

14   S.P.2█?

15   A.   Yes.

16   Q.   What did your moms tell you to do with regards to S.W.█

17   after this occurred?

18   A.   She told us to stay away from her.

19   Q.   Did you follow your moms' directions to stay away from

20   S.W.█?

21   A.   Yes.

22   Q.   Did your siblings?

23   A.   Yes.

24   Q.   Now, S.P.1█████, I'd like you to think forward in time to

25   another incident, to a day in March of 2020, specifically to

1   March 22nd.  Was there another incident that day that involved

2   your younger sister, S.P.2⬛, and Ms. Craft and S.W.⬛, her

3   daughter, outside in the cul-de-sac?

4   A.  Yes.

5   Q.  Are you personally aware of something that occurred that

6   day?

7   A.  Yes.

8   Q.  Were you home that day?

9   A.  Yes.

10  Q.  Did you stay inside your house?

11  A.  Yes.

12  Q.  Where were you inside your house that day?

13  A.  I was inside my room.

14  Q.  Could you hear things that were going on?

15  A.  Yes.

16  Q.  What could you hear?

17  A.  I just heard yelling.

18  Q.  So you couldn't see what happened outside; is that correct?

19  A.  No.

20  Q.  Only hear things?

21  A.  Yes.

22  Q.  Why did you stay inside your room that day?

23  A.  I was scared to even walk out.

24  Q.  At some point on that day, in the afternoon, did S.P.2⬛ come

25  into your room?

1    A.   Yes.

2    Q.   How did she look?

3    A.   She was terrified.

4    Q.   How was she acting?

5    A.   Scared.  She was just stuttering a lot.

6    Q.   How was she generally behaving?

7    A.   She was just shaking.  She couldn't really say anything that

8    day.

9    Q.   After she came into your room, did she say anything to you

10   about what had just happened to her?

11   A.   Yes.

12   Q.   What did she say?

13   A.   She said Ms. Craft was gonna run her over.

14   Q.   After that day in March of 2020 and after what had happened

15   to S.P.2█, did you learn that, in June of 2020, the driveway at

16   your home had been painted multiple times with racial slurs?

17   A.   Yes.

18   Q.   Did you see the driveway paintings yourself?

19   A.   No.

20   Q.   Why not?

21   A.   My parents had told me to stay away from it.

22   Q.   Did you ultimately learn what had been painted on the

23   driveway?

24   A.   Yes.

25   Q.   How did you learn this?

1    A.   I learned it on the news.

2    Q.   You read about it in the news?

3    A.   Yes.

4    Q.   What did you learn from the news?

5    A.   That there had been racial -- racial words put on my

6    driveway.

7    Q.   Generally, what did you learn that those driveway paintings

8    said?

9    A.   The N-word.

10   Q.   How did that make you feel?

11   A.   It made me scared.

12   Q.   And, S.P.1█████, turning forward a little bit in time from

13   those driveway paintings to November of 2020, did you also learn

14   that your family was receiving threatening letters and mailings

15   that had some scary things in them?

16   A.   Yes, I did.

17   Q.   Did you personally see those letters and mailings when your

18   family received them?

19   A.   No.

20   Q.   Did your moms try to keep you from seeing the contents of

21   those letters?

22   A.   Yes.

23   Q.   Despite not seeing the physical letters, did you generally

24   know they were coming?

25   A.   Yes.

1   Q.  Did you generally know what they were about?

2   A.  Yes.

3   Q.  Did you generally know what they said?

4   A.  No.

5   Q.  What did you think was in those letters?

6   A.  Something threatening.

7   Q.  Something what?

8   A.  Threatening.

9   Q.  Okay.  How did you know this?

10  A.  Because I saw them on the news.

11  Q.  Did you overhear your mom Michella and your mom Connie

12  discussing things that were going on?

13  A.  Yes.

14  Q.  How did you feel when your family was receiving these

15  letters?

16  A.  I was terrified.

17  Q.  And, S.P.1⬛, did things change in your life and the life

18  of your family because of these threatening letters?

19  A.  Yes.

20  Q.  Can you tell us a little bit about that.

21  A.  After those letters, we all stayed downstairs in the main

22  living room and just slept there.  And for a while, it just --

23  we all slept down there, and we weren't told why.

24  Q.  And you mentioned that you all slept down in the living

25  room.  Do you know why you were told to sleep in the living

1    room?

2    A.   My mom just said it's safer for us down there.

3    Q.   Has it changed the way that your younger sister, S.P.2█,

4    sleeps?

5    A.   Yes.

6    Q.   Can you tell us about that?

7    A.   Sometimes now S.P.2█ will barely get any sleep.  She'll be

8    up most of the night and just barely get two hours; and other

9    times she'll sleep the day away.

10   Q.   Has this changed the activities that you participate?

11   A.   Yes.

12   Q.   How so?

13   A.   Now I mostly just stay to myself in my own room.

14   Q.   Have you stopped playing outside?

15   A.   Yes.

16   Q.   Did your parents take down the trampoline?

17   A.   Yes.

18   Q.   Put away the outside toys?

19   A.   Yes.

20   Q.   Limit your -- ability of your sister to bike outside in the

21   cul-de-sac?

22   A.   Yes.

23   Q.   Has it changed the overall dynamic of your family,

24   S.P.1████?

25   A.   Yes.

1          MS. ZIMDAHL:  Your Honor, I have no further questions

2     for this witness.

3          THE COURT:  Ms. Rea?

4          MS. REA:  Your Honor, I don't have any questions for

5     him.

6          THE COURT:  May the witness then be excused?

7          MS. ZIMDAHL:  Yes, Your Honor, he may.

8          THE COURT:  You may step down.

9       Members of the jury, we will now take our midday lunch

10    break.  I'm gonna ask you to be back here in one hour.  I'm

11    going to also remind you of the admonition not to talk about the

12    case among yourselves.

13      And, also, now that you might be walking about the

14    building -- there's the snack bar in the basement -- you're not

15    to talk about the case with anyone else.  If anyone approaches

16    you to talk about the case, please report that immediately to

17    the CSO or to me.  I don't expect that will happen, but I tell

18    you that because I don't want you to feel compelled to speak

19    with anyone beyond the mere courtesy of a hello.  You don't need

20    to talk about the case.

21      And we will be ready to go with the next witness when you

22    return.  Thank you.

23      (Jury out 12:13 p.m.)

24          THE COURT:  All right.  You may be seated.  The jury

25    has left the courtroom.

1          Is there anything we need to take up before the lunch break?

2               MS. REA:  No, Your Honor.

3               MR. TIEKE:  No, Your Honor.

4               THE COURT:  And you'll be ready with your next

5     witness?

6          All right.  Then I will see you back here.  Let's plan to

7     come back -- let's see.  I have the jury coming back at ten

8     after.  Let's see if you can come back at five after, in case we

9     have anything early.  Thank you.

10         (Recess at 12:15 p.m. until 1:15 p.m.  Jury out.)

11              THE COURT:  We're back on the record in U.S. v. Craft.

12    The jury is not present.

13         Counsel, are we ready to proceed with the Government's next

14    witness?

15              MR. TIEKE:  Yes, Your Honor.

16              THE COURT:  And, let's see, it's not quite 1:15.  How

17    many witnesses would you anticipate you could be prepared to

18    present today?

19              MR. TIEKE:  Your Honor, I suspect that the next two

20    witnesses are relatively long, but we will have another witness

21    on standby, should the time be available.

22              THE COURT:  Very well.  Anything we need to take up

23    before the jury's brought back?

24              MS. REA:  No, Your Honor.

25              MR. TIEKE:  No, sir.

```
 1        (Jury in 1:16 p.m.)
 2            THE COURT:  Good to see everyone made it back from
 3    lunch.  We're gonna continue with testimony now.
 4        Mr. Tieke, you may call the Government's next witness.
 5            MR. TIEKE:  Thank you, Your Honor.  The United States
 6    calls Michella Pineda.
 7        (MICHELLA PINEDA, called by the Government, sworn.)
 8                     DIRECT EXAMINATION
 9    BY MR. TIEKE:
10    Q.  Good afternoon, ma'am.
11    A.  Good afternoon.
12    Q.  Would you please just state your name for the jury.
13    A.  Sure.  It's Michella Pineda.
14    Q.  And so your name is Michella with an "A" at the end?
15    A.  With an A.
16    Q.  Not an E?
17    A.  Not an E.
18    Q.  Have you ever formally gone by the name Michelle with an E?
19    A.  Never.
20    Q.  Have you always introduced yourself as Michella?
21    A.  Always.
22    Q.  What do you do for a living?
23    A.  I am retired at the time.  I'm a nurse, for now retired.
24    Q.  And did you previously work as a nurse?
25    A.  I did.
```

1    Q.   And how long were you a nurse?

2    A.   2001, I got my nursing license.

3    Q.   And how long were you a nurse -- when did you stop working?

4    A.   Sixteen weeks ago -- 16 months ago was my last contract.

5    Q.   So were you a nurse from roughly 2001 to 2021?

6    A.   Yes.

7    Q.   Where were you a nurse at?

8    A.   I am a travel -- I travel with a registry, and I generally

9    go to Camp Pendelton, a Naval hospital, and San Diego National

10   Medical Center.

11   Q.   So were you -- you were a traveling nurse?

12   A.   Yes.

13   Q.   And so prior to that and at least some points during this,

14   were you in the military?

15   A.   I was.

16   Q.   Okay.  And so what branch of the military?

17   A.   The Navy.

18   Q.   How long -- initially were you -- when did you join the

19   military?

20   A.   In '97.

21   Q.   And your initial stint -- how long was your initial stint in

22   the Navy?

23   A.   Just under four years.

24   Q.   And what was your job during that four-year time period when

25   you were initially in the Navy?

1    A.  I was a hospital corpsman and a field medical corpsman for

2    the Marine Corps.

3    Q.  And where did you serve in that role?

4    A.  I served in Camp Lejeune, Camp Jackson.  I served in

5    Quantico attached to a Marine division.  I served in Bethesda

6    National Medical Center, and I was attached to the USNS Comfort

7    during 9/11.

8    Q.  And so you mentioned your first stint in 2000.  It sounds

9    like there was some service afterward.  Could you just tell the

10   jury some of that Navy service afterward?

11   A.  Yes.  After 9/11, I just kind of needed a mental break for a

12   little bit.  We were sent up to New York as a -- it was supposed

13   to be a rescue mission, but we turned into a relief mission for

14   the police department and the firefighters.  And I just needed a

15   little bit of a break and decide if I wanted to continue and

16   reenlist after that.

17   Q.  And so you reenlisted.  And then how long was that stint?

18   A.  Eight years, just under eight years.

19   Q.  Pardon me?  Eight years?

20   A.  Just under eight years, yes.

21   Q.  Just tell the jury about your family.

22   A.  So I have a beautiful family.  My wife and I have been

23   together for 19 years, and we have five amazing children.  Our

24   oldest is K.P.███.  She's 18 and she goes to U of L.  So we're

25   proud about that.

1      Our second oldest is S.P.1█████.  He's 15, and he's a very

2   gentle soul, quiet but -- I call him my gentle giant because

3   anybody is a giant to me.

4      But our middle child, her name is S.P.2█.  She's 12 and

5   she's a Type 1 diabetic.  So we just kind of hold her a little

6   closer to us, a very sweet girl, though.

7      And our two little ones are a 5-year-old.  His name is

8   D.P.███ and a silly kid.  And his little sister, her name is

9   S.P.3█.  She's 2.  She's a typical 2-year-old.

10  Q.  Well, let's see your family.

11          MR. TIEKE:  If we could pull up what's been admitted

12  as United States Exhibit 15, please.

13  Q.  And there's your family?

14  A.  That's my family.

15  Q.  Could you just point out your wife, Connie, in that

16  photograph.

17  A.  Sure.  That's my wife.

18  Q.  All right.  In the white T-shirt there.  And can you go

19  through just this photograph here and tell the jury each of

20  those children that you introduced to them earlier.

21  A.  Okay.  So K.P.████ is the one standing behind my wife.  I

22  believe she was here earlier.  And next to her is S.P.1█████.

23  He's standing right behind me.  The two that are sitting on the

24  floor -- the one that's in front of me is my mini me.  That's

25  S.P.2█.  And the one with the silly smile is D.P.███.  And the

Michella Pineda - Direct

1    little stinker in the middle is our 2-year-old, S.P.3█.

2    Q.  Can you just describe the ethnic and racial background of

3    your children.

4    A.  Yeah.  So K.P.███'s donor was full Black.  And we chose a

5    Black donor because my wife at the time, when I met her, she was

6    in the process of adopting a mixed child.  So we wanted -- we

7    didn't want anybody to stand out.  And when we were ready for

8    S.P.1████, a donor wasn't available, so we chose a half

9    Black/half White donor.

10        And we just didn't think about it for a while.  We thought

11   we were done, but we weren't.  So when it came to the other

12   three, they all had the same donor; and the donor is White, full

13   White.

14   Q.  So we have K.P.███.  What is her -- how would you describe

15   her racial makeup?

16   A.  I just say Black and Asian.  She calls herself "Blasian" or

17   something.

18   Q.  And S.P.1████?

19   A.  We say he's Black, White, Filipino.

20   Q.  And then the rest of your children?

21   A.  They are lily-white, but they're three-quarters White and a

22   quarter Filipino.

23   Q.  And, specifically, can you describe the complexion of your

24   children?

25   A.  Yeah.  So K.P.███ is the darkest and -- of all of the

1    children.  And S.P.1███'s -- I'd say he's a little bit darker

2    than me but lighter than K.P.███.  And the three little ones are

3    pretty fair skin.

4    Q.  And so both of your oldest children, those are the darkest

5    complected of your children?

6    A.  They are.

7    Q.  Let's talk about how you came to Lake Forest.  For a time

8    were you and your family living in the Philippines?

9    A.  We were.

10   Q.  And can you tell the jury why you were living in the

11   Philippines.

12   A.  So my oldest, K.P.███, she's a very gifted ball player, and

13   she had the opportunity to play ball in -- softball in the

14   Philippines.  And the team was trying out to make it into the

15   Junior Olympics and to play for Team Philippines.  So I have

16   family there and I said, "This is a good opportunity.  Let's go.

17   We don't get this opportunity again."

18   Q.  And so did you move to the Philippines from the United

19   States?

20   A.  Yes.

21   Q.  Okay.  And so after the Philippines, when did you move back

22   here to Louisville, Kentucky?

23   A.  January of 2019.

24   Q.  And so when you first got back to Louisville in January of

25   2019, where did you first live?

Michella Pineda - Direct

```
 1    A.   We were in a hotel.

 2    Q.   And were you looking for houses?

 3    A.   Daily.

 4    Q.   Yeah.  Tough market?

 5    A.   It was rough.

 6    Q.   And so eventually did you find one?

 7    A.   We did.

 8    Q.   And so when did you move into your home in the Lake Forest

 9    community?

10    A.   It was April of '19.

11    Q.   And when you moved in in April of 2019, how old were your

12    children at that time?

13    A.   D.P.■ had just turned 2 and S.P.2■ was 8 and S.P.1■ had

14    just turned 12 the month prior, a couple weeks prior, and

15    K.P.■ was 14.

16    Q.   And little S.P.3■ had yet to join the family; right?

17    A.   She didn't exist yet.

18    Q.   When you moved into the Lake Forest neighborhood, what's

19    your address there?

20    A.   It's 510 ■■■■■■■■■■.

21    Q.   And that's in a cul-de-sac; right?

22    A.   It is.

23    Q.   When you purchased the house, had it been remodeled?

24    A.   It had.

25    Q.   New paint on the walls?
```

Michella Pineda - Direct

```
 1   A.  Yes.

 2   Q.  Things like that?

 3   A.  Yes, they remodeled the kitchen, new paint on the main floor

 4   from what I knew, and remodeled the master bathroom.

 5   Q.  If we could pull up Exhibit 16, which is a photo of your

 6   house.  Is this your house there at 510 ███████?

 7   A.  Yes.

 8   Q.  And I'm gonna show you what's been marked as United States

 9   Exhibit 17.  Do you recognize that photograph?

10   A.  Yes.

11   Q.  What is that?

12   A.  That's my mailbox.

13   Q.  Does it truly and accurately reflect your mailbox at 510?

14   A.  Yes, it does.

15        MR. TIEKE:  Your Honor, I'd move to admit Exhibit 17

16   and just publish.

17        MS. REA:  No objection.

18        THE COURT:  It will be admitted.

19      (Government Exhibit 17 admitted in evidence.)

20        MR. TIEKE:  Thank you.

21   BY MR. TIEKE:

22   Q.  And so is that your mailbox there?

23   A.  Yes.

24   Q.  And it's at the end of your driveway?

25   A.  Yes.
```

1              MR. TIEKE:  If we could go to -- please pull up 16,

2     please.  Thank you.

3     Q.  When you bought this house in ███████████ in Lake

4     Forest, was it a place y'all wanted to stay?

5     A.  Yes.

6     Q.  Did you want it to be your forever home?

7     A.  Yes, at least for a long, long, long time home.

8     Q.  And why?

9     A.  Through my military time and just coming back from the

10    Philippines, I was always stationed out to sea and the kids were

11    always either coming with me when I had a contract.  They would

12    come visit me when I had time off nursing.  So they were always

13    moving and moving or we were moving and moving.  So I just

14    wanted them to feel like they have a safe place that's theirs,

15    their own room.  No one's gonna take it away.

16    Q.  A place to put down some roots?

17    A.  Yes.

18    Q.  Let's take a look at your cul-de-sac.  So I'd like to show

19    you what's been admitted as United States Exhibit 1.  And we'll

20    go through this pretty quickly, but is this a map of the

21    cul-de-sac?

22    A.  Yes.

23    Q.  And is that your house there at 510?

24    A.  Yes.

25    Q.  And where does the defendant, Ms. Craft, live?

1    A.  She lives on --

2    Q.  You can circle, if you want.

3    A.  Okay.  This house right here.

4    Q.  And that's 507 ███████?

5    A.  Yes.

6    Q.  Do you see Craft in the courtroom today?

7    A.  Yes.

8    Q.  Can you please identify her.

9    A.  It is the lady sitting over there behind the computer

10   screen.

11   Q.  The glasses?

12   A.  Yes.

13        MR. TIEKE:  Your Honor, I'd like the record to please

14   reflect that the defendant -- the witness has identified the

15   defendant, Suzanne Craft.

16        THE COURT:  It will so reflect.

17   BY MR. TIEKE:

18   Q.  And who lives at 507 ███████ with Craft?

19   A.  Her daughter, S.W.█ C█████.

20   Q.  Do you know her last name to be Craft, or do you just know

21   her as S.W.█?

22   A.  I call her S.W.█, but I just assume her last name is Craft.

23   Q.  But you don't know for sure?

24   A.  I don't know for sure.

25   Q.  When you moved in, how old was S.W.█?

1    A.   She's a year younger than S.P.1█████.   So she must have been

2    around 12 or 13 -- or 12 or 11, yeah.

3    Q.   Eleven or twelve?

4    A.   Yeah.

5         MR. TIEKE:   If we could look at United States

6    Exhibit 2, please.   And so if we could pause it.

7    Q.   Do you know who lives at 507 or -- excuse me -- 506

8    ████████████?

9    A.   Yes.

10   Q.   Who would that be?

11   A.   Ms. Vara and Mark Dyer.

12        MR. TIEKE:   If we can continue around.   The yellow

13   house, when you -- if we could pause it, please.

14   Q.   When you first moved in, who lived there at 508 ████████████

15   in that yellow house?

16   A.   The Conleys.

17   Q.   And then eventually did the Conleys move out?

18   A.   They did.

19   Q.   And then who moved into 508 ████████████?

20   A.   Ms. Mary and Brian Recktenwald.

21        MR. TIEKE:   Okay.   And if we can continue around,

22   please.

23   Q.   Is this your house coming up here, 510 ████████████?

24        MR. TIEKE:   We can pause, please.

25   A.   Yes.

1    Q.  Your driveway, is it just to the -- as we face the house,

2    it's just to the left there?

3    A.  Yes.

4    Q.  Y'all have a little fountain out front?

5    A.  We do.

6    Q.  Is your house kind of -- it's in the middle of the

7    cul-de-sac as you go down?

8    A.  Yes.

9          MR. TIEKE:  Okay.  We can continue on, please.

10   Q.  And who's next door to you?

11   A.  That's Ms. Betty P.

12   Q.  And roughly when you -- how old was -- is Ms. Betty P?

13   A.  I believe she's in her late 60s possibly.

14         MR. TIEKE:  If we could continue on.

15   You can stop, please.  Thank you.

16   Q.  And is this Ms. Craft's house, the red brick one?

17   A.  It is.

18   Q.  507?

19   A.  Yes.

20   Q.  And is this her driveway?

21   A.  Yes.

22   Q.  And could you point out where her garage is at in that

23   driveway?

24   A.  Sure.  So you just turn into here, and that's her garage.

25         MR. TIEKE:  Okay.  If we could continue on, please.

1    Thank you.

2        And we can stop here.

3    Q.   Who lives on this -- in this house here?

4    A.   That's Matt Lanham.

5    Q.   Is that 505 ███████████?

6    A.   Yes.

7    Q.   Are the houses relatively close in this cul-de-sac?

8    A.   They are, yeah.

9        MR. TIEKE:  We can take that down, please.  Thank you.

10   Q.   Let's talk about when you first moved in in April 2019.

11   When you first -- that's when you moved into your house at 510

12   ████████████; right?

13   A.   Yes.

14   Q.   And when you first moved in, did Craft and her daughter come

15   over to your house on the day that you moved in?

16   A.   They did.

17   Q.   And did they come inside?

18   A.   They did.

19   Q.   Were you inside?

20   A.   I was.

21   Q.   And who was inside with you in the house when Craft and her

22   daughter came over?

23   A.   D.P.██, the 2-year-old, and S.P.2█.

24   Q.   And where did you-all meet at?

25   A.   She came into my kitchen.

Michella Pineda - Direct

1   Q.  And so at this time, you were in the kitchen.  And then

2   where was -- where was Connie at?

3   A.  Connie was at the storage unit.

4   Q.  Moving -- kind of moving stuff in?

5   A.  Yes.

6   Q.  And was she doing that through the garage in your house, up

7   your driveway and into the garage there?

8   A.  Yes.

9   Q.  And who was with Connie?

10  A.  My half brother, who was from the Philippines visiting, and

11  the two oldest kids.

12  Q.  K.P.█ and S.P.1█?

13  A.  K.P.█ and S.P.1█.

14  Q.  And how long were Ms. Craft and her daughter in the kitchen?

15  A.  Between 15 to 20 minutes.

16  Q.  And what was the purpose of that visit?

17  A.  She dropped some -- a meal of like spaghetti and -- in a

18  bag, to introduce herself and just to chitchat about the

19  different neighbors that she didn't care for.

20  Q.  So she brought you a meal and just introduced herself?

21  A.  Yes.

22  Q.  And so on that occasion -- did S.W.█ on that occasion -- did

23  she have occasion to see K.P.█ or S.P.1█ when they came

24  over that first time?

25  A.  No.

1   Q.  And was that because they were helping Connie move the stuff

2   into the garage?

3   A.  Yes.

4   Q.  You mentioned Ms. Craft brought you some food.  What did you

5   notice about the food?

6   A.  Yeah, so it was a spaghetti box and -- basically, a meal for

7   spaghetti with expired frozen bread and one V-8 can and a

8   receipt.

9   Q.  When you looked at that receipt, what did you notice about

10  the receipt?

11  A.  It said "FS balance" nine something.

12  Q.  And what did you take that to mean?

13  A.  That they were -- whatever was purchased on that was

14  purchased with food stamps.

15  Q.  And so what did you decide to do with the food?

16  A.  We had talked about it, and we just decided it would be rude

17  to bring it back.  So we -- my dad threw the bread in the

18  freezer, and we just kept it.

19  Q.  And so when you first moved in, were you cordial with

20  Ms. Craft?

21  A.  Very.

22  Q.  Did you text with her?

23  A.  Yes.

24  Q.  And when you first moved in, did your children -- did they

25  play outside in front of your house in the cul-de-sac?

1    A.   They did.

2    Q.   Did the kids often go outside and ride their bikes?

3    A.   They did.

4    Q.   Did they interact with Craft's daughter, S.W.█?

5    A.   I didn't see any interaction.

6    Q.   From your observations of -- did you watch them play out

7    front?  Did you watch your children play out front?

8    A.   I would always keep a pretty close eye on them.

9    Q.   And from your observations, what did S.W.█ do when your kids

10   were playing outside?

11   A.   She would kind of pace down her driveway in front.

12   Sometimes she would circle on foot around the cul-de-sac, and

13   sometimes she would ride her bike all the way down to the end.

14   Q.   So was it -- the kids were outside at the same time, but

15   were they really playing together?

16   A.   No, no.

17   Q.   And let's talk about when you-all first moved in as well.

18   And when you moved into your house at 510 ████████████████, was

19   your basement flooded?

20   A.   Immediately when we walked in the house, it was flooded.

21   Q.   And so in the course of cleaning up that shocking event, you

22   know, the basement flooding, did you find stuff that had been

23   left behind from the previous owners?

24   A.   Pretty much the basement was furnished.

25   Q.   And what did you find?  What was the sort of things that

1    were left behind by the previous owners?

2    A.   There was recliners and stands that would go in a living

3    room down there.   There was a beautiful pool table in there and

4    a desk, chairs, a whole National Geographic collection.   There

5    was an old, like, refrigerator/freezer.   There was several,

6    like, office chairs, and there were -- what are those -- like,

7    when you remodel the wood that goes on the walls or around the

8    windows, the wood, those long strips, there was lots of those,

9    and there were several paint cans on the floor and a couple of

10   spray cans.

11   Q.   So did you find some old paint cans?

12   A.   I did.

13   Q.   And what did you do with the paint cans?

14   A.   I put them in a box, and I had Connie bring them upstairs

15   and told her to put "free" with everything else outside.

16   Q.   And so you -- did you take the old paint cans from the

17   basement and put them out on the curb and put "free" on them?

18   A.   Yeah, because they had rust.   They were starting to rust on

19   the bottom.   I just didn't know what would happen.

20   Q.   And was that in April or May 2019, when you first moved in?

21   A.   Yes.

22   Q.   Leaving that first initial flood, let me take you to early

23   spring 2019.   Sometime in the late spring or summer 2019, was

24   there an incident involving your children and Craft's daughter,

25   S.W.█?

1    A.   Yes.

2    Q.   Did you hear S.P.2█ at the dinner table describe how

3    Ms. Craft's daughter, S.W.█, used a racial slur around her?

4    A.   Yes.

5    Q.   And what did you do when you heard that?

6    A.   I immediately just yelled at her, "What the hell did you

7    just say?"

8    Q.   To S.W.█?   Or excuse me.   To S.P.2█?

9    A.   Yes, my daughter.

10   Q.   And what did you talk to S.P.2█ about?

11   A.   I pulled her out into the other room and I asked her, "Where

12   did you hear this from?"   I asked her, "Are you sure?   And do

13   you know what this word means?"   And then I told her, "I -- we

14   don't talk like this.   I never want to hear you say this ever

15   again and stay away from this kid.   Don't play with her.   Don't

16   talk to her.   Don't smell her, don't nothing.   Leave her alone."

17   Q.   So you told your kids to stay away from S.W.█?

18   A.   Stay away.

19   Q.   But even after this incident, did you still remain cordial

20   with Craft?

21   A.   I did.

22   Q.   Keep up the neighbor relations as best you could?

23   A.   I tried.

24   Q.   So let me take you to March 22nd, 2020.   Was there another

25   incident involving your children and Craft's daughter, S.W.█, on

 1   March 22nd, 2020?

 2   A.   Yes.

 3   Q.   Can you please tell the jury what first happened on that

 4   day.

 5   A.   So S.P.2█ and K.P. were out riding bikes together, and I was

 6   cleaning the kitchen.  I was occasionally looking out the

 7   window.  And it wasn't too long they came in the house and came

 8   into the kitchen and approached me, said that -- "Mom,

 9   S.W.█'s -- S.W.█'s calling us nigglet."  And she said, "And then

10   she called me nigger."

11   Q.   And that's K.P.███, the darkest complected of your children?

12   A.   Yes.

13   Q.   And so did you send K.P.███ out to essentially deal with the

14   issue?

15   A.   I did.

16   Q.   And did S.P.2█ stay inside?

17   A.   She did.  I told her -- after K.P.███ had left, I said to go

18   out back and tell your mom, your other mom.

19   Q.   Connie?

20   A.   Yes.

21   Q.   And did K.P. go outside and confront Craft's daughter,

22   S.W.█?

23   A.   I saw her run across the yard.

24   Q.   Did she come back?

25   A.   She ran back in a few seconds later.

Michella Pineda - Direct

1   Q.  What happened next?

2   A.  She came in.  She said, "Mom" -- I said, "What exactly did

3   you say to her?"  She told me and I said, "K.P., I shouldn't

4   have sent you out there, and I'm sorry.  I should have dealt

5   with this myself."  And it was almost -- it felt like instantly

6   after that like -- it was like "bang, bang, bang, bang."

7   Q.  And where were you-all at when that happened?

8   A.  We were in the kitchen.

9   Q.  Okay.  So you heard banging on your front door, and did you

10  hear anything else?

11  A.  We took a few steps into the dining room, looked out the

12  front window.

13  Q.  What did you see?

14  A.  I saw S.W. C standing --

15  Q.  Where was she at?

16  A.  -- right by my mailbox.

17  Q.  And from where you're at in the living room, how can you see

18  down to your mailbox?

19  A.  I was in the dining room.

20  Q.  Or the dining room.  Excuse me.  Thank you.

21  A.  A straight shot.

22  Q.  So you're in the dining room, and you see S.W. down by the

23  mailbox.  And what do you hear?

24  A.  "S.W., what the fuck did that nigger call you -- say to you

25  again?"

```
 1   Q.   Did you recognize that voice?

 2   A.   Yes.

 3   Q.   Whose voice was it?

 4   A.   It was Craft's.

 5   Q.   And how do you know that?

 6   A.   It's Ms. Craft's voice.  I know.

 7   Q.   And had you met her on previous occasions and talked to her?

 8   A.   Yes.

 9   Q.   Including the time she came over to the kitchen?

10   A.   Yes.

11   Q.   And when Ms. Craft said that, who do you think she was

12   referring to?

13   A.   K.P.███.

14   Q.   Why was that?

15   A.   I just sent my daughter out there.

16   Q.   To confront her daughter?

17   A.   To confront her.

18   Q.   And so who else was in that living room with you?

19   A.   The dining room?

20   Q.   Dining room.

21   A.   K.P.███.

22   Q.   Who else was in the dining room?  I'm sorry.

23   A.   Just K.P.███ and myself.

24   Q.   And your dining room, is that -- that's near your front

25   door?
```

Michella Pineda - Direct

1    A.   Yes.

2    Q.   And, also, were you pregnant at this time?

3    A.   I was.

4    Q.   How far along?

5    A.   About eight months pregnant.

6    Q.   And so you and K.P.██ are standing in the dining room, and

7    you hear the banging.  What do you do next?

8    A.   After she said that, it was like "bang, bang, bang" again.

9    I dropped to the ground, and I told my daughter to get down and

10   Army crawled past the front door.

11   Q.   Were you scared?

12   A.   I was very scared.

13   Q.   And you Army crawled.  Where'd you crawl to?

14   A.   Past the front door into the living room, and then we got up

15   and went out the garage door.

16   Q.   Where were you going?  Who were you going to get?

17   A.   My wife.

18   Q.   Connie?

19   A.   Yes.

20   Q.   So after you get Connie, what do you-all do next?

21   A.   I said, "Connie, Ms. Craft's busting the door down."  And

22   she said, "Tell the kids to get in the house."  And she said,

23   "What happened?"  I briefly told her what happened.  We walked

24   around past the garage to the front, and we were going to

25   confront her.

Michella Pineda - Direct

1   Q.  When you came around front, what did you see?

2   A.  I saw Ms. Craft's car like go down that little lip of the

3   driveway, of her driveway, and past our house down the street.

4   She took a right.

5   Q.  So she was driving out of the neighborhood?

6   A.  Yes.

7   Q.  So let's fast-forward just a couple of hours on that same

8   day.  Was there an incident with Craft and her vehicle in the

9   cul-de-sac involving your children?

10  A.  Yes.

11  Q.  And please tell the jury what happened.

12  A.  S.P.2█ was bugging and bugging me to go back outside, and I

13  told her that she can go out for a little bit.  Dinner was

14  almost ready and -- but I made her older sister, K.P.████, go out

15  there with her.

16  Q.  And where were you at?

17  A.  I was finishing dinner in the kitchen.

18  Q.  And from your kitchen, can you see through those same -- at

19  least one of the same windows in your dining room out to the

20  cul-de-sac?

21  A.  Full view.

22  Q.  And at some point what did you see happen?

23  A.  Yeah, I was looking up every few minutes, and I happened to

24  look up.  I saw Ms. Craft's car come to a stop right next to

25  S.P.2█.  S.P.2█ had one leg on the road, one on -- like her hip

Michella Pineda - Direct

1    on the bike like she was seeing her come so she stopped.  The

2    window rolled down.  I couldn't hear anything.  I knew something

3    was happening.

4    Q.  So after that did S.P.2█ run inside?

5    A.  She did.

6    Q.  How'd she look?

7    A.  Her eyes were big.  She looked terrified.

8    Q.  What did S.P.2█ say that Craft said to her?

9    A.  She just said, "Mom, she's gonna kill me.  She's gonna hit

10   me with her car, and she's gonna kill me."

11   Q.  At some point after that, did you and Connie go out front

12   and confront Craft?

13   A.  We did.

14   Q.  By this time had she gotten out of her car?

15   A.  She was.

16   Q.  What was she doing?

17   A.  She was on her bike riding it right in front of our

18   driveway, just right in front of our driveway.

19   Q.  You ever seen her ride her bike before that day?

20   A.  I've never seen her on a bike before or after.

21   Q.  And when you went out to confront her, were you angry?

22   A.  Very angry.

23   Q.  What did you say to Craft?

24   A.  I said, "What the hell did you say to my daughter?  Don't

25   you ever say shit to my kids.  I don't say shit to your

Michella Pineda - Direct

1    daughter.  I'm tired of this racist bullshit."  And at the end I

2    said to her, "I'm not gonna have this conversation with you

3    anymore.  Just get back on your bike and ride your Billy bad ass

4    back home," and I went in the house.

5    Q.  And so did you let Connie handle anything else after that?

6    A.  Yes.

7    Q.  Did you actually have your baby a few days after this

8    incident?

9    A.  I did.

10   Q.  Early?

11   A.  Early.

12   Q.  Let me take you to June 7th, 2020.  On June 7th, 2020, did

13   you find a racial slur painted on your driveway?

14   A.  Yes.

15   Q.  Did you personally observe the painting?

16   A.  I did.

17   Q.  And what color was the paint?

18   A.  Like an orangish.

19          MR. TIEKE:  Your Honor, may we approach for a moment?

20          THE COURT:  Yes.

21      (Bench conference on the record.)

22          MR. TIEKE:  I don't -- this other stipulation, I don't

23   think we need to read it.  It's just to the photographs.

24          MS. REA:  Paintings?  No, I don't think so either.

25   She can -- we can read it.  We can not, but if she can

1    authenticate them --

2              MR. TIEKE:  Yeah, I think Ms. Rea has agreed that

3    those are indeed what the paintings say.  So I was not gonna

4    march her through authenticating them, but I can, if possible,

5    or we can just skip that, and I will just show it to her and ask

6    her if that's the painting and just move to admit so we don't

7    have to read the stipulation.

8              MS. REA:  That's fine.

9              THE COURT:  The 404(b) stipulation?

10             MR. TIEKE:  No, the stipulation regarding the driveway

11   paintings.  I'm not sure of the number.

12             THE COURT:  All right.  This one?

13             MR. TIEKE:  Yes, Your Honor.  I don't know that we

14   would need to read it because I'm just gonna admit Exhibit 18,

15   19, 21.

16             MS. REA:  Okay.

17             MR. TIEKE:  I will just ask her if that's the painting

18   and then just move to admit without foundational questions.

19   That would essentially accomplish it.

20             MS. REA:  Okay.

21             THE COURT:  Okay.  So what would have been Stipulation

22   Number 2 will be withdrawn?

23             MR. TIEKE:  Yes.

24             MS. REA:  Yes, Your Honor.

25             MR. TIEKE:  I'll just do it --

1          MS. REA:  Okay.

2          THE COURT:  That's fine.

3      (End of bench conference.)

4   BY MR. TIEKE:

5   Q.  Ma'am, I would like to show you what's previously been

6   marked as United States Exhibit 18, if we can scroll through.

7   Are these photographs of the June 7th, 2020, driveway -- paint

8   on your driveway?

9   A.  Yes.

10         MR. TIEKE:  Your Honor, I'd move to admit United

11  States Exhibit 18 and ask to publish.

12         MS. REA:  No objection.

13         THE COURT:  It will be admitted.

14     (Government Exhibit 18 admitted in evidence.)

15         MR. TIEKE:  So if we could scroll through, and if we

16  can go to page 2.

17  MR. TIEKE:

18  Q.  Are these photographs of the painting you found on your

19  driveway on June 7th, 2020?

20  A.  Yes.

21  Q.  And what does that orange paint say?

22  A.  "Go away niggers."

23  Q.  Who do you think that N-word was referring to?

24  A.  My two older children, S.P.1███ and K.P.██.

25  Q.  What was your reaction when you saw this?

Michella Pineda - Direct

1    A.   I was embarrassed.

2    Q.   Why?

3    A.   We just moved here, and I just didn't want to have the --

4    anybody looking at this or thinking anything of my kids.  It's

5    embarrassing.

6    Q.   Are you aware Ms. Craft had a painting on her driveway too

7    that same day?

8    A.   I am.

9    Q.   Did you see that one?

10   A.   I never seen it.

11   Q.   On this day, June 7th, 2020, did neighbors gather and look

12   in your driveway?

13   A.   Yes.

14   Q.   Did you call the Louisville Metro Police?

15   A.   Yes.

16   Q.   And did they come?

17   A.   They did.

18   Q.   And did you-all eventually have to clean up your driveway?

19   A.   We did.

20   Q.   How'd you do that?

21   A.   With a washer, the pressure washer, power washer.

22   Q.   And did you try and keep your kids from seeing this?

23   A.   Yeah, I did.

24   Q.   Did you tell them?  What did you tell them?

25   A.   I told K.P.███ to stay away from the window and to make sure

```
 1    her siblings stay out of the window.
 2    Q.  And at the time of this June 7th, 2020, driveway painting,
 3    did you have Nest security cameras?
 4    A.  We did.
 5    Q.  And at this time, where were they located?
 6    A.  One was on top of the garage, and the other one was in the
 7    front of the house above the kitchen.
 8    Q.  And were they activated at the time of the June 7th, 2020,
 9    driveway incident?
10    A.  They were not activated.
11    Q.  And why weren't they activated?
12    A.  I didn't know that you had to purchase anything additional
13    for that.
14    Q.  You just thought you put the cameras up?
15    A.  That's what the guy who sold it to me told me.
16    Q.  And so after this June 7th, 2020, incident, the driveway
17    painting, did you activate those cameras?
18    A.  I did.
19    Q.  And did you also move one of those Nest cameras essentially
20    over to a tree on the property line between you and the yellow
21    house that the Recktenwalds live at 508?
22    A.  Yes.
23    Q.  Okay.  So let me take you now to June 16th, 2020.  On June
24    16th, 2020, did you find another racial slur painted on your
25    driveway?
```

1    A.   Yes.

2    Q.   Did you personally observe this painting?

3    A.   Yes.

4    Q.   What color was the paint?

5    A.   Orangish.

6    Q.   I'm gonna show you what's been marked as United States

7    Exhibit 19.  Scroll through, please.  Do you recognize that as

8    the painting on your driveway on June 16th, 2020?

9    A.   Yes.

10           MR. TIEKE:  Your Honor, I move to admit Exhibit --

11   United States Exhibit 19 and publish.

12           MS. REA:  No objection.

13           THE COURT:  It will be admitted.

14       (Government Exhibit 19 admitted in evidence.)

15           MR. TIEKE:  Can we click to the next one.

16   BY MR. TIEKE:

17   Q.   Are those the photographs of what you and your family found

18   on your driveway on June 16th, 2020?

19   A.   Yes.

20   Q.   What's that painting say?

21   A.   "No niggers" with a swastika.

22   Q.   Can you -- who do you think that that was referring to?

23   A.   K.P.████ and S.P.1████.

24   Q.   The two oldest kids?

25   A.   Yes.

1    Q.  What was your reaction to this?

2    A.  It was mixed.  I was embarrassed -- more embarrassed, and I

3    was pretty irritated.

4    Q.  You mentioned that you had now activated your Nest camera

5    system.  Did your Nest camera system capture this spray-painting

6    incident?

7    A.  Yes.

8    Q.  Did you save that video?

9    A.  Yes.

10   Q.  I'm gonna put up a screenshot from your computer of the

11   video you saved.

12          MR. TIEKE:  This is for the witness only.  This is

13   United States Exhibit 20A.

14   Q.  Do you recognize that?

15   A.  Yes.

16   Q.  Is that a screenshot of the file that you saved to your

17   computer with the Nest camera footage file from June 16th, 2020?

18   A.  Yes.

19   Q.  Does that screenshot truly and accurately reflect the

20   screenshot from your computer of your Nest cam footage file from

21   June 16, 2020?

22   A.  Yes.

23          MR. TIEKE:  At this time, I'd like to move to admit

24   United States Exhibit 20A.

25          MS. REA:  No objection.

Michella Pineda - Direct

```
 1              THE COURT:  It would be admitted.

 2          (Government Exhibit 20A admitted in evidence.)

 3              MR. TIEKE:  And publish, please.  Thank you.

 4          Carisa, if we can blow that up, please.

 5      BY MR. TIEKE:

 6      Q.  Is this a screenshot from your computer?

 7      A.  Yes.

 8      Q.  What time was that video taken?

 9      A.  3:27 a.m.

10      Q.  On June 16th, 2020?

11      A.  Yes, sir.

12              MR. TIEKE:  We can pull that down.

13      Q.  The accompanying video that's marked as United States

14      Exhibit 20B, have you previously --

15              MR. TIEKE:  If we could pull that up, please.

16      Q.  Have you previously viewed this video?

17      A.  Yes.

18      Q.  Is this a video of the June 16th, 2020, driveway painting?

19      A.  Yes.

20      Q.  Does it truly and accurately reflect your Nest camera video

21      from June 16th, 2020?

22      A.  Yes.

23              MR. TIEKE:  I'd like to move to admit and publish

24      United States Exhibit 20B, the June 16th, 2020, video.

25              MS. REA:  No objection.
```

1    THE COURT:  It will be admitted.

2    (Government Exhibit 20B admitted in evidence.)

3  BY MR. TIEKE:

4  Q.  Before we play it, let's kind of set the scene here.

5  Where's this camera located?

6  A.  It's on the tree in between the property of myself and the

7  Recktenwalds.

8  Q.  Is this the one you moved after the June 7th one?

9  A.  Yes.

10  Q.  And so is this your driveway here?

11  A.  Yes.

12  Q.  Here's your -- is this your fountain over here?

13  A.  Yes.

14  Q.  Can you circle Ms. Craft's house on this video.

15  A.  Sure.  It's --

16    [Witness indicating.]

17  Q.  And is this her driveway here?  I'm sorry.  I'm not very

18  good at drawing.

19  A.  Yeah, it is.  That's a trash can out there.  So, yes, that's

20  her driveway.

21  Q.  Because is this her mailbox and --

22  A.  Yes.

23  Q.  So does her driveway run that direction?

24  A.  Yes.

25  Q.  And you mentioned her garage is on the side of her house,

Michella Pineda - Direct

1  back here in the back?

2  A.  Yes.

3       MR. TIEKE:  If we could play that video, please.

4       (Government playing video.)

5  Q.  From your observations of Craft, does that look like her on

6  the video?

7  A.  Yes.

8  Q.  What does it appear Craft's doing on this video?

9  A.  Spray-painting my driveway.

10      MR. TIEKE:  If we could pull up Exhibit 19, page 2,

11  please.

12  Q.  And the next morning did y'all find that on your driveway?

13  A.  We did.

14  Q.  And after you found your driveway painted on June 16th,

15  2020, is that when you went back and found this footage from

16  your Nest camera?

17  A.  Yes.

18  Q.  Did you alter that footage in any way?

19  A.  No.

20  Q.  And did you subsequently provide that to the FBI?

21  A.  Yes.

22  Q.  On that June 16th morning, did you also find anything in

23  your yard?

24  A.  I did.

25  Q.  What'd it smell like?

1    A.   Strong smell of bleach.

2    Q.   Did you find it in the area where that person on the video

3    kind of moved out -- up past and out of the camera sight?

4    A.   Yes.

5    Q.   Did you have to power wash and clean up this painting?

6    A.   Yes.

7    Q.   And, again, did you try and keep your kids from seeing it?

8    A.   Yes.

9    Q.   Did you post pictures of the June 7th and June 16th

10   paintings on your Facebook page?

11   A.   We did.

12   Q.   And did you also post that video, the Nest video from that

13   June 16th?

14   A.   Yes.

15   Q.   Let me talk to you about June 27th, 2020.  Again, on June

16   27th, 2020, did you find a third racial slur painted on your

17   driveway?

18   A.   Yes.

19   Q.   Did you personally see this driveway painting?

20   A.   I did.

21   Q.   What color was the paint?

22   A.   Goldish.

23   Q.   I'm gonna show you what's previously been marked as United

24   States Exhibit 21.

25           MR. TIEKE:  For the witness only, please.

1          If we can page through those, please.

2     Q.   You recognize those as the June 27th, 2020, paintings on

3     your driveway?

4     A.   Yes.

5               MR. TIEKE:   Your Honor, I move to admit United States

6     Exhibit 21.

7               MS. REA:   No objection.

8               THE COURT:   It will be admitted.

9        (Government Exhibit 21 admitted in evidence.)

10              MR. TIEKE:   And publish, please.

11    BY MR. TIEKE:

12    Q.   Is that you-all cleaning it up eventually?

13    A.   Yes.

14              MR. TIEKE:   If we could go up a couple pages, page 2.

15    Q.   What's that painting say?

16    A.   "Go niggers" with a swastika.

17    Q.   What was your reaction now that your driveway had been

18    painted for the third time?

19    A.   I was pretty upset.

20    Q.   Did your Nest camera system capture this spray-painting

21    incident?

22    A.   Yes.

23    Q.   Did you save that video?

24    A.   Yes.

25    Q.   I'm gonna put up a screenshot from your computer of the

1   video you saved.  This is United States Exhibit 22A.  Is this a

2   screenshot of the files you saved -- the file you saved on your

3   computer with the Nest camera footage from June 27th, 2020?

4   A.  Yes.

5   Q.  Does that screenshot truly and accurately reflect the

6   screenshot from your computer of your Nest cam footage file from

7   June 27th, 2020?

8   A.  Yes.

9         MR. TIEKE:  Your Honor, at this time I'd like to move

10  to admit United States Exhibit 22A.

11        MS. REA:  No objection, Your Honor.

12        THE COURT:  It will be admitted.

13     (Government Exhibit 22A admitted in evidence.)

14  BY MR. TIEKE:

15  Q.  Is this a screenshot from your computer saving the June

16  27th, 2020, incident?

17  A.  Yes.

18  Q.  What time was that video captured?

19  A.  2:41 a.m.

20        MR. TIEKE:  Look at the accompanying video marked --

21  video files, United States Exhibit 22B, please, for the witness.

22  If we can play a second for her so she can see it.  That's good.

23  Stop.

24  Q.  Have you previously viewed this video?

25  A.  Yes.

1  Q.  Is this a video of the June 27th, 2020, driveway painting

2  incident?

3  A.  Yes.

4  Q.  Does it truly and accurately reflect your Nest camera video

5  of June 27th, 2020?

6  A.  Yes.

7        MR. TIEKE:  Your Honor, I move to admit 22B, which is

8  the June 27th, 2020, video and publish.

9        MS. REA:  No objection.

10        THE COURT:  It will be admitted.

11     (Government Exhibit 22B admitted in evidence.)

12  BY MR. TIEKE:

13  Q.  And, again, if we might, same Nest camera?

14  A.  Yes.

15  Q.  And is this your driveway here?

16  A.  Yes.

17  Q.  Your fountain?

18  A.  Yes.

19  Q.  Ms. Craft's house over here?

20  A.  Yes.

21  Q.  And her driveway over here?

22  A.  Yes.

23  Q.  And, again, this is the middle of the night?

24  A.  Yes.

25        MR. TIEKE:  If we can please play that video, please.

1    Thank you.

2        (Government playing video.)

3    Q.   From your observations of Craft, does that look like her in

4    the video?

5    A.   Yes.

6    Q.   Does Craft come down her driveway?

7    A.   Yes.

8    Q.   And what's she appear to do when she gets to your driveway?

9    A.   Ink my driveway.

10   Q.   And then where does she walk back up?

11   A.   Her driveway.

12   Q.   Is that her garage light back here?

13   A.   Yes.

14          MR. TIEKE:  If you could pull up Exhibit 21, please,

15   page 2.

16   Q.   And then later in the morning of June 27th, 2020, did you

17   find that on your driveway?

18   A.   I did.

19   Q.   And, again, did this prompt you to go back and check the

20   Nest videos, and is that when you found video we just watched?

21   A.   Yes.

22   Q.   Did you alter that video in any way?

23   A.   No.

24   Q.   Did you subsequently provide that video to the FBI?

25   A.   Yes.

1    Q.  When you found this, what did you first do?

2    A.  I asked my wife to pull my truck out of the garage and -- my

3    SUV out of the garage and cover it.

4    Q.  Why?

5    A.  We were having a semiannual yard sale, and there was a lot

6    of people.

7    Q.  Was that a neighborhood-wide yard sale?

8    A.  Yes.

9    Q.  And it's the morning of the neighborhood-wide yard sale?

10   A.  Yes.

11   Q.  So you told Connie to put your truck over it?

12   A.  I did.

13   Q.  Did you again try to keep your kids from seeing it?

14   A.  Yes.

15   Q.  And, again, we saw photos of this, but did you-all clean it

16   up?

17   A.  We did.

18   Q.  Did you post pictures of the June 27th driveway painting on

19   your Facebook?

20   A.  We did.

21   Q.  Did you also post the Nest video of the June 27th incident

22   on your Facebook?

23   A.  Yes.

24   Q.  Why?

25   A.  It seemed like nothing was happening, and it was just

Michella Pineda - Direct

1    happening.  Like every time we thought something was okay, it

2    would just -- something, something.  We were just -- we didn't

3    know what else to do.  Nobody would help us.  There was no

4    accountability for anybody.

5    Q.  And you called the police on all these incidents?

6    A.  We did.

7    Q.  And what were they telling you?

8    A.  They came into the house.  They watched the cameras.  They

9    immediately identified her, but they couldn't do anything.

10   Q.  Did they tell you to talk to the HOA?

11   A.  They said to "notify your HOA."

12   Q.  And so you post it on Facebook to get the word out?

13   A.  Yes.

14   Q.  I want to talk about August of 2020.  In August of 2020, did

15   you hear Craft use racial slurs directed at your family?

16   A.  Yes.

17   Q.  Will you tell the jury about that day.

18   A.  Yeah.  The four older kids -- so K.P.███, S.P.1███, S.P.2█,

19   and D.P.█ -- were out back.  I saw Ms. Craft in the yard, and I

20   was watching her as she walked past her driveway and into

21   Ms. Betty P's house.

22   Q.  And Betty P's your direct neighbor?

23   A.  To my left, yes.  And so I just continued what I was doing

24   in the kitchen, but I kept an eye.  And I could see figures on

25   Ms. Betty P's balcony.  And I walked to the back of the house so

1    I could look at -- a better look at the balcony and the windows,

2    and I saw Ms. Craft and Ms. Betty P out there.

3    Q.   On the back patio of Ms. Betty P's house?

4    A.   On one of her back patios, the closest to my fence, yes.

5    Q.   And that was Craft and Betty P?

6    A.   Yes.

7    Q.   And which of your kids were out back playing?

8    A.   K.P.████, S.P.1████, S.P.2██, and D.P.██.

9    Q.   Did you go out back at some point?

10   A.   I did.

11   Q.   What'd you hear?

12   A.   I heard at first a lot of laughing and just hooting.  And I

13   told the kids, "Go through the garage, get in the house," and I

14   kind of hid right next to the fence.  I heard Ms. Craft say --

15   sing, "Nigglet, nigglet, nigglets hanging in a tree; one for

16   you, Betty, and a nigger for me."

17   Q.   How'd you know it was Craft's voice?

18   A.   I know Ms. Craft's voice.  It was her.

19   Q.   And how was she saying that?

20   A.   It was like singing a tune, and Ms. Betty just laughed.

21   Q.   I want to switch topics now.  How did you link up with a

22   civil attorney?

23   A.   Through our Facebook post, just posting videos, pictures,

24   this is what's happening.  She responded to the post publicly,

25   said her name is this and to contact her, and that's exactly

1    what we did.

2    Q.   So you contacted her on July 8th, 2020, just after the

3    driveway paintings, but it's before you heard this out back?

4    A.   Yes.

5    Q.   And that was July.  On July 8th, 2020, did your family file

6    a civil lawsuit against Craft and the Lake Forest homeowners

7    association?

8    A.   We did.

9    Q.   Why'd you file a civil lawsuit?

10   A.   There was no accountability.  Nobody would help us.  There

11   was no charges.  We wanted this to stop.  We didn't care about

12   anything else.  We just wanted it to stop, and Vanessa was gonna

13   help us.  She was the only person that was coming to us to help

14   us at that time, so --

15   Q.   And so was your civil lawsuit for an injunction to attempt

16   to stop this?

17   A.   Yes.

18   Q.   Did you also ask for damages?

19   A.   Yes.

20   Q.   What kind of damages?

21   A.   We never discussed damages.  The only thing that was ever

22   discussed was that we could get the driveway sealed, whatever

23   that was, and like professionally cleaned and sealed, so --

24   Q.   Did you file a civil lawsuit to get a bunch of money?

25   A.   No.

1    Q.   Were you and Connie financially stable on your own?

2    A.   Yes.

3    Q.   How?

4    A.   I medically retired from the Navy, and I get VA

5    compensation, and I have a trust for the rest of my life from my

6    father.

7    Q.   And does Connie also have retirement?

8    A.   She has full retirement.

9    Q.   I mean, but if you fell on hard times, do you essentially

10   have a safety net?

11   A.   Yes.

12   Q.   Is that your family?

13   A.   Yes.

14   Q.   Is that the trust you mentioned?

15   A.   Well, I get the trust regardless monthly, but I --

16   Q.   Your family is well off enough to provide you a safety net?

17   A.   Very well off.

18   Q.   Let's talk about the fall now of 2020.  At some point in the

19   fall of 2020, did you find letters and other items in your yard?

20   A.   Yes.

21   Q.   Can you tell the jury about that.

22   A.   We were cleaning up.  It was -- leaves were starting to get

23   crazy.  So I was on the riding lawn mower doing the heavy work,

24   and my wife was blowing.  She was blowing where the fountain is

25   and trying to get all the leaves in a pile.  She had called me

1    over.  So I drove the truck up to the -- the riding truck,

2    whatever, to her, and she handed me a bag that she'd found down

3    right behind the fountain.  I put it on top of the rider, and I

4    opened it.

5    Q.  At that point or another point in the fall when you-all were

6    doing yard work, did you find another letter as well?

7    A.  Yes.

8    Q.  And so in November of 2020, did you find two separate

9    letters in your yard?

10   A.  Yes.

11   Q.  And did those letters share the same characteristics?

12   A.  Yes.

13   Q.  What are those characteristics?

14   A.  Racial epithets.

15   Q.  Did they have cutout letters?

16   A.  They were like cut out from another magazine and glued to

17   stuff.

18   Q.  And those were in your yard?

19   A.  Yes.

20   Q.  I'm showing you what's previously been admitted as United

21   States Exhibit 11A.  We can scroll through those, please.

22          MS. REA:  Your Honor, may we approach?

23          THE COURT:  Yes.

24      (Bench conference on the record.)

25          MS. REA:  Ms. Craft is asking for a restroom break.

1              MR. TIEKE:  Yes.

2              MS. REA:  Is that okay?

3              MR. TIEKE:  That's fine.

4              THE COURT:  All right.  Let's take a break then.

5              MS. REA:  Thank you.

6         (End of bench conference.)

7              THE COURT:  Members of the jury, we're now going to

8    take our afternoon break.  So we'll go about 10 or 15 minutes.

9    Remember the admonition not to talk about the case amongst

10   yourselves or with anyone else.  We'll see you back shortly.

11        (Jury out 2:30 p.m.)

12             THE COURT:  You may be seated.  The jury is now

13   outside the courtroom.

14        Is there anything, Counsel, that we need to talk about

15   during the break?

16             MR. TIEKE:  No, Your Honor.

17             MS. REA:  No, Your Honor.

18             THE COURT:  I'll see you back in a few minutes then.

19        (Recess at 2:31 p.m. until 2:48 p.m.  Jury out.)

20             THE COURT:  We're back on the record.  The jury has

21   not yet returned to the courtroom.

22        Is there anything we need to take up before we continue with

23   the witness testimony?

24             MR. TIEKE:  Not from the United States, Your Honor.

25             MS. REA:  No, Your Honor.

1          (Jury in 2:50 p.m.)

2               THE COURT:  Please continue, Mr. Tieke.

3               MR. TIEKE:  Thank you, Your Honor.

4    BY MR. TIEKE:

5    Q.  Now, Michella, I left August 2020 too soon; so I want to

6    take you back there.  I'd like to pull up United States

7    Exhibit 3.  Do you recognize the person in that photograph?

8    A.  Yes.

9    Q.  Is that Ms. Craft?

10   A.  Yes.

11   Q.  Is that how she looked to you back in August 2020?

12   A.  Yes.

13   Q.  When you heard her sing that song in the backyard?

14   A.  Yes.

15               MR. TIEKE:  We can take that down.

16   Q.  Now, let me return back to the fall of 2020, when you were

17   finding letters in your yard.  We were just starting to look at

18   one of those.

19               MR. TIEKE:  So if we could bring back up the photos

20   that have been admitted as Exhibit 11A, please, and let's scroll

21   through those.

22   Q.  Are these photographs depicting one of the letters you found

23   in your yard?

24   A.  Yes.

25   Q.  What's that letter say?

Michella Pineda - Direct

1    A.   "You had enough nigger bitch."

2    Q.   And you-all found this one in the yard?

3    A.   Yes.

4    Q.   In a plastic bag?

5    A.   Yes.

6    Q.   Now let's look at Exhibit 11B, which are the FBI lab

7    photographs of this same letter.

8         MR. TIEKE:  Can you scroll through those, please.

9    Q.   The same letter we were looking at that you found in your

10   yard?

11   A.   Yes.

12   Q.   Let's look at the other one that you found in your yard.

13   I'd like to show you Exhibit 12A, if we could scroll through

14   that, please.  Are these photographs depicting a separate letter

15   that you found in your yard?

16   A.   Yes.

17   Q.   In November 2020?

18   A.   Yes.

19   Q.   Again, in a plastic bag?

20   A.   Yes.

21   Q.   And what does that letter say?

22   A.   "Die stupid bitch move out."

23   Q.   Now I'll show you Exhibit 12B, which are FBI lab photographs

24   of the same letter.

25        MR. TIEKE:  If you can scroll through those, please.

1    Q.   Is this the same letter we were looking at?

2    A.   Yes.

3            MR. TIEKE:  If we could go to 12B-5, please.

4    Q.   And did this letter contain a piece of a Barilla pasta box?

5    A.   Yes.

6            MR. TIEKE:  12B-6, please.

7    Q.   Is there something in cutout letters on the back of that

8    pasta box?

9    A.   Yes.

10   Q.   And what's that say?

11   A.   "Die bitch."

12   Q.   What was your reaction when you found these two letters in

13   your front yard?

14   A.   I was terrified.

15   Q.   Terrified?

16   A.   Terrified.

17   Q.   Why?

18   A.   It had escalated so serious, and it just was very scary.

19   Q.   Escalated from driveway paintings?

20   A.   Yes.

21   Q.   Now, when you found these letters in your yard, did you

22   review your Nest cameras to see if you could find any videos of

23   someone putting anything in your yard?

24   A.   Yes.

25   Q.   Did you find videos of someone putting something in your

1   yard?

2   A.  I did.

3   Q.  Did you find one from October 18th, 2020?

4   A.  Yes.

5   Q.  November 1st, 2020?

6   A.  Yes.

7           MR. TIEKE:  This is United States Exhibit 23A, please,

8   for the witness only.

9   Q.  Now, are these screenshots of the files that you saved to

10  your computer with the Nest camera footage from October 18th,

11  2020?

12  A.  Yes.

13  Q.  Do these screenshots truly and accurately reflect

14  screenshots from your computer of your Nest cam footage files

15  from October 18th, 2020?

16  A.  Yes.

17          MR. TIEKE:  I'd like to move to admit United States

18  Exhibit 23A.

19          MS. REA:  No objection.

20          THE COURT:  It will be admitted.

21     (Government Exhibit 23A admitted in evidence.)

22  BY MR. TIEKE:

23  Q.  So, Michella, we'll kind of take these one at a time.  Are

24  these the screenshots of the computer files from that October

25  18th, 2020, incident?

1    A.   Yes.

2    Q.   Did you capture what appears to be three separate videos?

3    A.   Yes.

4         MR. TIEKE:   If we could blow that up, please.

5    Q.   One from 1:41 a.m.?

6    A.   Yes.

7         MR. TIEKE:   And if we can pull up -- blow the second

8    one up, please.

9    Q.   Another from 1:46 a.m.?

10   A.   Yes.

11   Q.   And one from 1:47 a.m.?

12   A.   Yes.

13        MR. TIEKE:   Let's look at the corresponding videos.

14   I'm gonna show you what's been marked as United States

15   Exhibit 23B.  If we can play a clip, please.

16      (Government playing video.)

17   Q.   Have you previously viewed this video prior to your

18   testimony here today?

19   A.   Yes.

20   Q.   Does it truly and accurately reflect your Nest camera video

21   from October 18th, 2020, at approximately 1:41 a.m.?

22   A.   Yes.

23        MR. TIEKE:   I'd like to show you what's been marked as

24   United States Exhibit 23C, if we can play the first clip.

25      (Government playing video.)

1    Q.  This is from a different camera; right?

2    A.  Yes.

3    Q.  Now, have you previously viewed this video, 23C, prior to

4    your testimony here today?

5    A.  Yes.

6    Q.  Does it truly and accurately reflect your Nest camera video

7    from October 18th, 2020, at approximately 1:46 a.m.?

8    A.  Yes, it does.

9    Q.  Let's look at the final one, 23D, please, back to that other

10   camera.  I'm showing you what's been marked as United States

11   Exhibit 23D.  Have you previously viewed this video prior to

12   your testimony here today?

13   A.  Yes.

14   Q.  Does it truly and accurately reflect your Nest camera video

15   from October 18th, 2020, at approximately 1:47 a.m.?

16   A.  Yes.

17           MR. TIEKE:  Your Honor, at this time, I'd move to

18   admit United States Exhibits 23B, 23C, and 23D.

19           MS. REA:  No objection.

20           THE COURT:  They will be admitted.

21      (Government Exhibits 23B, 23C, 23D admitted in evidence.)

22   BY MR. TIEKE:

23   Q.  Let's start --

24           MR. TIEKE:  Thank you.

25      Let's start with 23B, October 18th, 2020, at 1:41 a.m.  If

1    we can stop.  Thank you.

2    Q.  Let's set the scene again.  Is this your driveway here?

3    A.  Yes.

4    Q.  And is this that camera that y'all moved to the tree after

5    June 7th, 2020?

6    A.  Yes.

7    Q.  And is this your fountain right here?

8    A.  Yes.

9    Q.  And is this Ms. Craft's house over here?

10   A.  Yes.

11   Q.  And is this the light above her garage on the side of her

12   house?

13   A.  Yes.

14           MR. TIEKE:  If we could play 23B, please.

15       (Government playing video.)

16   Q.  Does this person in the video approach your yard from

17   Craft's house?

18   A.  Yes.

19   Q.  From where at Craft's house?

20   A.  Inside her garage.

21   Q.  Does that person come down Craft's driveway?

22   A.  Yes.

23   Q.  Over to your yard?

24   A.  Yes.

25   Q.  And what's that person appear to be doing?

1    A.  Placing something in my fountain area.

2    Q.  In the area where it appears that Craft throws something, is

3    that the area where you found one of those letters in your yard?

4    A.  Yes.

5    Q.  And then does the person on that video walk back up Craft's

6    driveway?

7    A.  Yes.

8    Q.  In her garage?

9    A.  Yes.

10   Q.  Let's go to 23C, October 18th, 2020, at 1:46 a.m.  And this

11   is a different Nest camera you-all have; right?

12   A.  Yes.

13   Q.  Where's this one at?

14   A.  It's located above my kitchen window.

15   Q.  And is this your-all's fountain?

16   A.  Yes.

17   Q.  And is Ms. Craft's house over in this direction?

18   A.  Yes.

19   Q.  And are those the lights above her garage?

20   A.  Yes.

21   Q.  And this is 1:46 a.m.?

22   A.  Yes.

23   Q.  A couple minutes after the video we just previously watched?

24   A.  Yes.

25            MR. TIEKE:  I'd like to direct your attention up to

1  that area near Ms. Craft's garage, if we could play the video,

2  please.

3      (Government playing video.)

4  Q.  What do you see in this video?

5  A.  Ms. Craft backing out of her garage.

6  Q.  Does it appear that headlights or something come on over

7  there?

8  A.  Yes.

9  Q.  What's that screeching sound?

10 A.  The sound of her brakes.

11 Q.  How do you know that?

12 A.  I heard that noise for many months.

13      MR. TIEKE:  Let's go to 23D, please, which is October

14 18th, 2020, at 1:47 a.m.

15 Q.  So is this now back to the tree Nest camera on the tree that

16 borders the Recktenwald's property?

17 A.  Yes.

18 Q.  So is this video now picking up after Craft is seen walking

19 around her garage and apparently getting in the car?

20 A.  Yes.

21      MR. TIEKE:  If we could please play this video.

22      (Government playing video.)

23 Q.  And what did she do here?

24 A.  Pulled out of her garage and backed down her driveway and

25 left.

1    Q.   How do you know that is her vehicle?

2    A.   It's the same white Lexus she's been driving.

3    Q.   Did it come from her garage?

4    A.   It came from her garage, her house.

5    Q.   And so this is 1:47 a.m.  And is that just a couple minutes

6    after the video of her walking into the yard, throwing something

7    in it, and walking back to her garage?

8    A.   Yes.

9         MR. TIEKE:  Let's go to the November 1st, 2020, video

10   that you talked about.

11      This is United States Exhibit 24A for the witness, please.

12   Q.   Is this a screenshot of the file that you saved to your

13   Nest -- or to your computer with the Nest camera footage from

14   November 1st, 2020?

15   A.   Yes.

16   Q.   Does that truly and accurately reflect the screenshot from

17   your computer of your Nest cam footage file from November 1st,

18   2020?

19   A.   Yes.

20        MR. TIEKE:  Your Honor, at this time I'd move to admit

21   United States Exhibit 24A and publish.

22        MS. REA:  No objection.

23        THE COURT:  It will be admitted.

24      (Government Exhibit 24A admitted in evidence.)

25   BY MR. TIEKE:

 1   Q.  Is this a screenshot from your computer reflecting your file

 2   for the video from November 1st, 2020?

 3   A.  Yes.

 4   Q.  And what is the time of that video on November 1st, 2020?

 5   A.  2:42 a.m.

 6          MR. TIEKE:  The accompanying video is marked United

 7   States Exhibit 24B, if we could show that to the witness,

 8   please.

 9   Q.  Have you previously viewed this video in preparation for

10   your testimony today?

11   A.  Yes.

12   Q.  Is this a video of the -- is this a video of the November

13   1st, 2020, Nest cam footage?

14   A.  Yes.

15   Q.  Does it truly and accurately reflect your Nest camera video

16   footage from November 1st, 2020?

17   A.  Yes.

18          MR. TIEKE:  Your Honor, at this time I'd move to admit

19   United States Exhibit 24B and publish.

20          MS. REA:  No objection.

21          THE COURT:  It will be admitted.

22      (Government Exhibit 24B admitted in evidence.)

23      (Government playing video.)

24          MR. TIEKE:  Sorry.  Before we play -- if we could

25   stop.

Michella Pineda - Direct

1    BY MR. TIEKE:

2    Q.  Again, this is your driveway here?

3    A.  Yes.

4    Q.  And your fountain here?

5    A.  Yes.

6    Q.  Ms. Craft's house here?

7    A.  Yes.

8    Q.  And the million dollar question:  What's that humming sound

9    in the video?

10   A.  Oh, they're our blowups for Halloween.

11   Q.  Halloween blowups?

12   A.  Yes.

13   Q.  Like a motor running on it?

14   A.  All night.

15        MR. TIEKE:  So it may be a little loud, Madam Clerk.

16       If we could -- now let's go ahead and play the video.

17       (Government playing video.)

18   Q.  Is that person in the video approaching your yard from

19   Craft's house?

20   A.  Yes.

21   Q.  From where in Craft's house?

22   A.  From Ms. Craft's garage.

23   Q.  Come down Craft's driveway?

24   A.  Yes.

25   Q.  And what does Craft appear to be doing here?

1    A.  Placing something in the fountain area.

2    Q.  Is that area where it appears Craft's throwing something, is

3    that area where you found one of the letters we talked about

4    that you found in your yard?

5    A.  Yes.

6    Q.  After dropping that item, what did Craft do?

7    A.  Walks back up her driveway.

8    Q.  Now, these two videos, did you locate and find them on your

9    Nest system after finding the two letters in your yard

10   containing the threatening messages?

11   A.  Yes.

12   Q.  After finding these two videos, you saved them?

13   A.  Yes.

14   Q.  Did you alter these videos?

15   A.  No.

16   Q.  Did you later provide these videos to the FBI?

17   A.  Yes.

18   Q.  At the same time -- roughly the same time that you found

19   these letters in your yard, were you receiving threatening

20   communications in the mail?

21   A.  Yes.

22   Q.  Did those mailings share similar characteristics with the

23   threatening letters that you found in your yard?

24   A.  Yes.

25   Q.  Did those mailings and envelopes in your yard contain

1  racially charged threats of violence against you and your

2  family, specifically your children?

3  A.  Yes.

4  Q.  Were the mailings done in cutout letters?

5  A.  Yes.

6  Q.  Using similar language?

7  A.  Yes.

8  Q.  Michella, let's go ahead and take a look at those mailings.

9  I'm showing you what's previously been admitted as United States

10  Exhibit 4A, which are the LMPD photographs of a November 2nd

11  mailing.

12        MR. TIEKE:  If we could scroll through, please.

13  Q.  Now I'm gonna show you what's previously been introduced as

14  United States Exhibit 4B, which are the FBI lab photographs of

15  the same mailing.

16        MR. TIEKE:  Scroll through those, please.

17  Q.  You recognize those photographs as capturing one of the

18  mailings that your family received?

19  A.  Yes.

20        MR. TIEKE:  If we could go to page 4A-1, please.

21  Q.  Now, it's addressed to "Michelle Pineda."  Is that how you

22  spell your name?

23  A.  No.

24  Q.  You spell your name with an "A" at the end?

25  A.  Yes.

1    Q.  In your past interactions, has Craft referred to you

2    incorrectly as "Michelle" and not Michella?

3    A.  Yes.

4    Q.  And is this mailing addressed to your address?

5    A.  Yes.

6    Q.  510 ███████████?

7    A.  Yes.

8    Q.  Do you recall if you pulled this mailing from your mailbox?

9    A.  Yes.

10   Q.  Did you open it?

11   A.  Yes.

12          MR. TIEKE:  If we could go to page 4A-4, please.

13   Q.  Inside this mailing, was there what appeared to be something

14   folded up?

15   A.  Yes.

16          MR. TIEKE:  4A-5, please.

17   Q.  And inside did you find cutout lettering saying "go N-word"

18   in an Owen Funeral Home advertisement?

19   A.  Yes.

20   Q.  Is that what you remember receiving?

21   A.  Yes.

22          MR. TIEKE:  4A-9, please.

23   Q.  Is this a closer shot of the threat that you saw?

24   A.  Yes.

25   Q.  How'd this make you feel?

1   A.   Panicked and terrified.

2   Q.   And who did you think that it was referring to?

3   A.   K.P.███ and S.P.1███.

4   Q.   Your two oldest dark complected kids?

5   A.   Yes.

6            MR. TIEKE:  You can take that down, please.

7   Q.   Did you-all keep your mail in a certain place in your house?

8   A.   We tried to.

9   Q.   Where'd you keep it?

10  A.   Right behind the rack where we put the baby bottles to dry.

11  Q.   And at times prior to this mailing, did your kids get your

12  mail?

13  A.   Yes.

14  Q.   And so after you personally found this mailing in the

15  mailbox, did you go back and search that mail pile for

16  additional letters?

17  A.   Yes.

18  Q.   And did you wear rubber gloves or anything like that when

19  you were doing it?

20  A.   No.

21  Q.   You just went back and searched your mail pile?

22  A.   Yes.

23  Q.   And did you find more threatening letters?

24  A.   Yes.

25  Q.   Did you open those?

Michella Pineda - Direct

1   A.   Yes.

2   Q.   Did you tell your kids not to get the mail anymore?

3   A.   Yes.

4   Q.   Why?

5   A.   I didn't want them to be scared.  I didn't want them to know

6   what was going on.

7   Q.   Did you want them to -- did you try to prevent them from

8   coming across another one of these?

9   A.   Yes.

10  Q.   All right.  Let's talk about those mailings that you found

11  when you went back and looked in your mail pile.  I want to show

12  you what's been introduced as United States Exhibit 5A, which

13  are the LMPD photographs of a mailing postmarked November 2nd,

14  2020.

15          MR. TIEKE:  If we could scroll through those, please.

16      Now let's look at Exhibit 5B, please, which are the FBI lab

17  photographs of this same mailing, if we could scroll through

18  those, please.

19  Q.   Do you recognize those sets of photographs as one of the

20  mailings your family was sent?

21  A.   Yes.

22          MR. TIEKE:  If we could go to 5A-1, please.

23  Q.   And, again, it's addressed to Michelle Pineda?

24  A.   Yes.

25  Q.   And, again, is that how you spell your name?

1   A.   No.

2   Q.   And, again, in the past has Craft referred to you as

3   "Michelle" with an "E"?

4   A.   Yes.

5   Q.   And was this mailing addressed to your address?

6   A.   Yes.

7        MR. TIEKE:  Page 5A-4, please.

8   Q.   Inside the mailing, was there what appears to be another

9   envelope with the addressee scribbled out?

10  A.   Yes.

11       MR. TIEKE:  And now one from the FBI photos, 5B-3,

12  please.

13  Q.   When you received this, were you able to see who that inside

14  envelope was originally addressed to?

15  A.   No.

16       MR. TIEKE:  5B-4, please.

17  Q.   And on the back of that interior envelope on the inside,

18  what do those cutout letters say?

19  A.   "Niggers leave.  We hate your kind.  Last chance."

20  Q.   How'd this make you feel?

21  A.   I was pretty -- pretty panicked and pretty terrified.

22  Q.   Did you take it seriously?

23  A.   Very.

24  Q.   Were you scared for your family?

25  A.   Yes.

Michella Pineda - Direct

```
 1   Q.  Were you scared for your kids?

 2   A.  Yes.

 3   Q.  Did you keep finding more letters when you went through the

 4   mail pile?

 5   A.  Yes.

 6        MR. TIEKE:  Let's look at 6A, please, which are the

 7   LMPD photos of a mailing postmarked November 5th, 2020, if you

 8   could scroll through those, please.

 9   Q.  Now, the FBI lab photographs of the same mailing, which are

10   Exhibit 6B, you recognize those two sets of photographs as one

11   of the mailings your family received?

12   A.  Yes.

13        MR. TIEKE:  If we could go to 6A-1, please.

14   Q.  It's addressed to Michelle Pineda again.

15   A.  Yes.

16   Q.  That's not how you spell your name?

17   A.  No.

18   Q.  And is this mailing addressed to your address?

19   A.  Yes.

20   Q.  And now what's the return address on this one?

21   A.  "Nigglet Destroyer."

22   Q.  And where have you heard that word before?

23   A.  From Ms. Craft on Betty's patio.

24        MR. TIEKE:  If we could go to 6A-4, please.

25   Q.  Inside of this mailing was there what appears to be a yellow
```

Michella Pineda - Direct                    Volume 2, Page 191

1    envelope?

2    A.  Yes.

3    Q.  And what did the cutout letters say this time?

4    A.  "Move out or bullets."

5    Q.  How did this make you feel?

6    A.  Sheer panic.

7    Q.  What'd you take this to mean?

8    A.  Someone was gonna try to kill my kids.

9    Q.  Were you scared for your children?

10   A.  Very.

11   Q.  Did you continue to find more mailings?

12   A.  Yes.

13   Q.  I'm going to show you what's been introduced as Exhibit 7A,

14   which are the LMPD photos of a mailing postmarked November 6th,

15   2020.

16       Let's look at 7B, please, which are the FBI lab photographs

17   of the same mailing.  Do you recognize that set of photographs

18   as one of the mailings your family received?

19   A.  Yes.

20   Q.  7A-1, please.  Is it again addressed incorrectly to Michelle

21   Pineda?

22   A.  Yes.

23   Q.  And is this mailing addressed to your address?

24   A.  Yes.

25   Q.  Is the return address the same as the last one, "N-let

1    Destroyer"?

2    A.   Yes.

3    Q.   Page 7A-2, is that a closer shot of the return address?

4    A.   Yes.

5    Q.   Same return address as the previous mailing we looked at?

6    A.   Yes.

7             MR. TIEKE:   7A-10, please.

8    Q.   Inside of this mailing was there what appears to be another

9    piece of a Barilla pasta box?

10   A.   Yes.

11   Q.   Did you find another piece of this same pasta box in one of

12   the mailings that we found in your yard?

13   A.   Yes.

14   Q.   One of the ones we looked at earlier?

15   A.   Yes.

16   Q.   And did the part of the box you found in your yard earlier,

17   did it have "die bitch" on it?

18   A.   Yes.

19             MR. TIEKE:   7A-9, please, if we could go to what's on

20   the back of this piece.

21   Q.   What's that say?  Does that say "two dead N-lets"?

22   A.   Yes.

23   Q.   What do you think that was in reference to?

24   A.   K.P.███ and S.P.1████.

25   Q.   Were you scared for your children?

Michella Pineda - Direct

1   A.  Yes.

2   Q.  Let me show you what has previously been introduced as 8A.

3   It's LMPD photos of another mailing postmarked November 6,

4   2020.

5            MR. TIEKE:  Scroll through those, please.

6   Q.  Now I'm gonna show you 8B, which are FBI lab photographs of

7   the same mailing.  Do you recognize that set of photographs as

8   photographs of one of the mailings your family received?

9   A.  Yes.

10            MR. TIEKE:  Page 8A-1, please.

11  Q.  Is it again addressed to Michelle Pineda incorrectly?

12  A.  Yes.

13  Q.  And it's addressed to your address?

14  A.  Yes.

15  Q.  510 ███████████.  And is the return address the same as the

16  previous two we've seen?

17  A.  Yes.

18  Q.  "N-let Destroyer?"

19  A.  Yes.

20            MR. TIEKE:  Page A-5, please.

21  Q.  Inside of this mailing was there what appears to be another

22  envelope?

23  A.  Yes.

24            MR. TIEKE:  Page A-6, please.

25  Q.  And a closer shot.  And what's written on that envelope?

Michella Pineda - Direct

1    A.   "You will die, bitch."

2    Q.   How'd that make you feel?

3    A.   I was afraid for my life.

4    Q.   Did you take it seriously?

5    A.   Very.

6         MR. TIEKE:  We can take that down, please.

7    Q.   Did you provide those mailings and letters we've been

8    discussing to LMPD?

9    A.   Yes, yes.

10   Q.   Okay.  Later did you find an additional mailing, and did you

11   provide it directly to the FBI?

12   A.   Yes.

13   Q.   Where'd you find this mailing?

14   A.   It was behind the baby bottles.  There's a board where we

15   write notes, and it was shoved back there with junk mail.

16   Q.   And so did you find it after you provided those other

17   letters to Louisville Metro Police Department?

18   A.   Yes.

19        MR. TIEKE:  I'm gonna show you what's previously been

20   admitted as United States Exhibit 9A, which are the FBI

21   photographs of the letter postmarked December there, if we could

22   scroll through.

23      Now I'm gonna show you what's previously been introduced as

24   United States Exhibit 9B, which are the FBI lab photographs of

25   the same mailing, if we could go to page 9A-1.

1    Q.  Is this one again addressed to Michelle Pineda?

2    A.  Yes.

3    Q.  And is it addressed to your address?

4    A.  Yes.

5    Q.  And what's the return address on this one?

6    A.  "Nigglet Destroyer, 505 ███████████, 40245."

7    Q.  So "N-let Destroyer" like the other mailings?

8    A.  Yes.

9    Q.  And this one has an address listed in the return address;

10   right?

11   A.  Yes.

12   Q.  Do you know who lives at 505 ████████████?

13   A.  Yes.

14   Q.  Who is it?

15   A.  Mr. Matt and his wife.

16   Q.  Matt Lanham?

17   A.  Yes.

18   Q.  You ever have any issues with the Lanhams?

19   A.  No.

20        MR. TIEKE:  Page 9B-6.  Thank you.

21   Q.  Was this inside that letter?

22   A.  Yes.

23   Q.  What does that appear to say?

24   A.  "Die, die, die stupid nigger."

25   Q.  Is this method of cutout letters consistent with the other

1    letters and mailings?

2    A.   Yes.

3    Q.   Is the substance similar to the other letters and mailings?

4    A.   Yes.

5    Q.   And, again, did you take this threat seriously?

6    A.   Yes.

7    Q.   Let's talk about one last letter.  Did your family receive a

8    threatening letter containing bullets?

9    A.   Yes.

10   Q.   Can you tell us about that day.

11   A.   My wife and I were outside.  We were giving our neighbor,

12   Brian Recktenwald, a bunch of bricks that were on the side of

13   our house, and we were pushing the wagon filled with bricks to

14   the properties in between ours.  And I was kind of handing them

15   over, and he was throwing them over to his property.

16   Q.   And so Brian's at 508, the yellow house?

17   A.   Yes.

18   Q.   And so you were there, Brian was there.  Who else was there?

19   A.   Connie.

20   Q.   Connie.  And you all were out there together.  And then who

21   went to get the mail?

22   A.   I did.

23   Q.   And what happened next?

24   A.   I walked up to the mailbox, and I pulled out a letter.  And

25   I was reading it as I was walking back up to where Brian and

1    Connie were.

2    Q.   And when you opened it, what did you find?

3    A.   I found a white envelope inside.

4    Q.   Stuffed with some stuff?

5    A.   Like a purple glove and some cutout stuff and --

6    Q.   Well, let's just look at it.  Okay?

7           MR. TIEKE:  Exhibit 10A, please.  I'm showing the LMPD

8    photos of this letter.

9    Q.   Now I'm gonna show you United States Exhibit 10B, which are

10   the FBI lab photographs of the same letter.  Do you recognize

11   that as the letter your family received?

12   A.   Yes.

13   Q.   The one you got out of that -- the one you retrieved on that

14   day when you were outside with Brian and Connie?

15   A.   Yes.

16           MR. TIEKE:  If we could go to 10A-1, please.

17   Q.   It's addressed to Michelle again.

18   A.   Yes.

19   Q.   And that's not how you spell your name?

20   A.   No.

21   Q.   Is it addressed to your address?

22   A.   Yes.

23           MR. TIEKE:  If we could go to 10A-3, please.

24   Q.   And inside was there like another envelope like you

25   described, stuffed with some stuff?

1   A.   Yes.

2           MR. TIEKE:   10A-4, please.

3   Q.   Was there a Fifth Third Bank envelope?

4   A.   Yes.

5           MR. TIEKE:   If we could blow up --

6   Q.   And are the bullets -- they're inside another piece of that

7   pasta box we've seen and some other letters we've talked about?

8   A.   Yes.

9           MR. TIEKE:   10B-8, please.   Thank you.

10   Q.   On the back of that pasta box, were there additional cutout

11   letters?

12   A.   Yes.

13   Q.   What's that say?

14   A.   "Get out."

15   Q.   Page 10B-9, is that a photograph of the bullets you found in

16   that letter?

17   A.   Yes.

18           MR. TIEKE:   I want to show you the physical bullets

19   which are part of United States Exhibit 10, if we could have the

20   Elmo, please.

21   Q.   Are those the actual bullets you found in that letter?

22   A.   Yes.

23           MR. TIEKE:   We can take that down, please.

24   Q.   What was your reaction to this?

25   A.   I took it and put it in the freezer.

1    Q.  Were you scared?

2    A.  I was so scared, I really wasn't thinking.

3    Q.  Why'd you put it in the freezer?

4    A.  It was the meat freezer, and the kids don't go in that

5    freezer.

6    Q.  You didn't want the kids to see it?  No?

7    A.  No.

8    Q.  Take your time.  Michella, let's just talk about one last

9    thing.  Okay?

10   A.  Okay.

11   Q.  Was your family scared when they received these mailings?

12   A.  Yes.

13   Q.  Did you take them seriously?

14   A.  Very.

15   Q.  How did these events affect your family?

16   A.  This is -- this has just destroyed my family.  There was

17   these just large cracks in our -- in this foundation that our

18   family -- we exist on, and over time it's just gotten so big

19   that it's just unrepairable at this moment.

20   Q.  Were you personally scared?

21   A.  Very.

22   Q.  Did you try to shield your kids from all this?

23   A.  Yes.

24   Q.  And when you first moved in, your kids, they played out in

25   the cul-de-sac?

Michella Pineda - Direct

1    A.   Yes.

2    Q.   Did that change?

3    A.   Yes.

4    Q.   When did it change?

5    A.   They slowly stopped going out after the kitchen incident

6    where the word was used.  And once they -- we started getting

7    these letters, they weren't allowed out without me, and they

8    didn't play.  If I was gardening, they could come out with me,

9    but they weren't allowed out.

10   Q.   Did you all sleep together in the same room?

11   A.   Yes.

12   Q.   Where was that room?

13   A.   I brought my bed down into the living room, and we all

14   stayed there.

15   Q.   You all stayed there together as a family?

16   A.   Yes.

17   Q.   And you know exactly how many days you did that, don't you?

18   A.   Yes.

19   Q.   How many days did you do that?

20   A.   74 nights.

21   Q.   Do you still sleep in the living room?

22   A.   Yes.

23   Q.   Why?

24   A.   Because my room is so far, and I want to be the first person

25   to protect my kids if they come in.

```
 1              MR. TIEKE:  Your Honor, I don't have any further
 2      questions for this witness.
 3              THE COURT:  Ms. Rea.
 4              MS. REA:  Thank you, Your Honor.
 5              MR. TIEKE:  Your Honor, may we approach?
 6              THE COURT:  Yes.
 7              MR. TIEKE:  Thank you.
 8          (Bench conference on the record.)
 9              MR. TIEKE:  Does she need to go to the bathroom?
10              MS. REA:  She hasn't said.  I can ask her if she wants
11      a break.  It's been about an hour.
12          Should I ask Ms. Craft if she wants a bathroom break before
13      I start?
14              THE COURT:  That's entirely up to you.  That's fine
15      with me.
16              MR. TIEKE:  I just wanted to make sure.  I notice I
17      went a little long.
18          (End of bench conference.)
19              THE COURT:  Members of the jury, we're going to take
20      about a ten-minute bathroom break now.  Remember the admonition
21      not to discuss the case.
22          (Jury out 3:51 p.m.)
23              THE COURT:  You may be seated.  The jury has left the
24      courtroom.
25          Does either side need to raise anything at this point?
```

Michella Pineda - Cross

```
 1              MS. REA:  No, Your Honor.

 2              MR. TIEKE:  No, Your Honor.

 3              THE COURT:  Thank you.  We'll take about a ten-minute

 4      break.

 5          (Recess at 3:51 p.m. until 4:08 p.m.  Jury out.)

 6              THE COURT:  We're back on the record in U.S. v. Craft.

 7      The jury has not yet reentered the courtroom.

 8          Ms. Rea, can you ballpark the length of your expected cross?

 9              MS. REA:  Your Honor, I think I will not be more than

10      a half hour.  If I were to be more than that, I would -- it

11      won't be much.

12              THE COURT:  I anticipate you would have some redirect.

13      I think it's likely we'll end the day with Ms. Pineda's

14      testimony.  So we can talk then about how we'll start tomorrow

15      once we have excused the jury.

16          (Jury in 4:09 p.m.)

17              THE COURT:  Please proceed.

18              MS. REA:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20      BY MS. REA:

21      Q.  Good afternoon, Ms. Pineda.

22      A.  Good afternoon.

23      Q.  My name's Angela Rea.  I've got some questions for you.  If

24      at any time I ask something poorly or I ask too many questions,

25      you don't know what I'm asking, just tell me.  Okay?
```

1   A.   Yes, ma'am.

2   Q.   And I would ask -- you are soft-spoken.  I'm loud.  Keep

3   your voice up, please.

4   A.   Yes, ma'am.

5   Q.   I want to ask you first just some background questions with

6   respect to not only how things were in April of 2019, but some

7   of the -- or from April 2019, but some of the exhibits that we

8   have seen.  And I'll start with the videos and the screenshots

9   from the videos that we've seen here today.  Many of those have

10  titles; correct?

11  A.   Yes, ma'am.

12  Q.   And those are titles that you gave them?

13  A.   Yes, ma'am.

14  Q.   When you're saving them in your system?

15  A.   Yes, ma'am.

16  Q.   Okay.  So it's not a title that any law enforcement or

17  anybody else applied to it?

18  A.   No, ma'am.

19  Q.   Okay.  We've also heard some about Facebook postings.  And

20  do you and your wife have a joint Facebook account?

21  A.   Yes, ma'am.

22  Q.   Do both of you post on that account?

23  A.   It's -- both of us do post, yes.

24  Q.   Both of you do post?

25  A.   Yes, ma'am.

1    Q.   Okay.  So a particular post could be from you or it could be

2    from your wife, Connie?

3    A.   Yes, ma'am.

4    Q.   Okay.  But you don't share an email account; correct?

5    A.   No, ma'am.

6    Q.   Okay.  And, of course, you have -- I shouldn't say of

7    course.  You have separate phone numbers too?

8    A.   Yes, ma'am.

9    Q.   When you moved into the Lake Forest subdivision in April of

10   2019, what was the setup with cameras at your residence?

11   A.   When we first moved in there, we did not have cameras the

12   first couple of weeks, no.

13   Q.   Okay.  And then what?

14   A.   Then I purchased a two-pack of Nest cameras and --

15   Q.   Okay.

16   A.   -- we placed them on the house.

17   Q.   Okay.  And you placed -- was it one over the kitchen, and

18   was the other one over the garage?

19   A.   I believe so.

20   Q.   Okay.  And that -- if that was a few weeks, that would still

21   be the spring/summer of 2019?

22   A.   I'm not sure the exact date that I purchased them.

23   Q.   And I'm not trying to ask you, but it would have been -- you

24   said the next few weeks, so --

25   A.   Within the next few weeks, I'm pretty sure I purchased them

1   from Target.

2   Q.   Okay.  And did you install them?

3   A.   Not immediately.

4   Q.   Okay.  Did you install them within a few weeks after that?

5   A.   Probably not because we had a garage full of furniture that

6   was more important.

7   Q.   Okay.  What do you remember about actually installing them

8   and getting going what you had?

9   A.   I don't remember much.  I didn't actually get on the ladder

10  and install them.

11  Q.   Did somebody else do that?

12  A.   My wife did.

13  Q.   Okay.  Were you using those cameras during the late summer

14  of 2019?

15  A.   We never -- they were just up there more for decoration or

16  scare tactic type -- just hopefully, you know, if there's -- if

17  there's cameras there, then someone would more than likely not

18  take something in your driveway.

19  Q.   Okay.  And now I'll shift gears a little bit and talk about

20  your first interaction with Ms. Craft.  That was the day you

21  moved in; right?

22  A.   Yes, ma'am.

23  Q.   When she came over to your residence?

24  A.   Yes, ma'am.

25  Q.   And her daughter came over to your residence too?

1    A.  Yes, ma'am.

2    Q.  And are you also aware of the Nextdoor app?

3    A.  I am now.  Well, after some time I became aware of it.

4    Q.  Okay.  Are you neighbored -- I'm not gonna pretend to know

5    what it is.  I guess it's a connection on the app.  Did you

6    become neighbored with Ms. Craft pretty quickly?

7    A.  From the app, no.  We became on the app with -- the

8    Recktenwalds invited us on the app after things started

9    happening.

10   Q.  After things started happening like what?

11   A.  When it ended up -- our picture of our home ended up on the

12   app.

13   Q.  Okay.  So you were not connected with Ms. Craft via that

14   app?

15   A.  I was -- not that I'm aware of.

16          MS. REA:  Okay.  And if I could share my screen just

17   to the witness.

18   Q.  So can you see that, Ms. Pineda?

19   A.  Yes, ma'am.

20   Q.  Okay.  Is that your phone number at the time?

21   A.  That was -- we had two phones when we first got back, a

22   starter phone.  So it was shared between myself and pretty much

23   the kids.

24   Q.  Okay.  And does that indicate that "neighboring" on 4-24 of

25   2019?

1    A.   I'm not sure what "neighboring" means, ma'am.

2    Q.   I don't do Nextdoor, so I won't pretend to.  But were you

3    neighbored on that day?

4    A.   I didn't join any -- I didn't join anything that day.  I was

5    unpacking that day.  I do remember sending her the message

6    saying "Michella and neighbored" -- I misspelled "neighbor."  I

7    meant to put "Michella" -- that's me -- "and I'm your neighbor.

8    Here's my number in case of emergency or something."

9    Q.   Okay.  So that's actually just a text message from you?

10   A.   That is just a text message.

11   Q.   Okay.  Thank you very much.  I was not trying to be

12   confusing.  So that's just you saying you're her neighbor and

13   giving her your contact info?

14   A.   That's all it was.

15          MS. REA:  Got you.  We can take that down from her.

16   Thank you.

17   Q.   After that there was a period of time when you and Ms. Craft

18   continued to exchange text messages.

19   A.   Yes.

20   Q.   And they were friendly text messages?

21   A.   They were cordial, yes.

22   Q.   Okay.  They included -- you mentioned to her your pregnancy

23   and your sickness with the pregnancy?

24   A.   My wife actually mentioned that.  You can ask her about

25   that, but there were many that were done by me.  There were many

Michella Pineda - Cross

1    that were done by her and --

2    Q.   Okay.  Explain what you mean by your wife mentioned the

3    pregnancy.

4    A.   My wife deals with calling the doctors.  She deals with

5    writing emails for the kids.  She deals with calling doctors for

6    my pregnancy.  She will call the doctor and say, "I'm

7    experiencing this and this.  My blood pressure is this," and

8    they'll gave her my next appointment.

9         So I have anxiety from the military and severe PTSD from

10   things that I witnessed, and I just -- if I don't know or I'm

11   not comfortable, I can't -- it's not easy for me to communicate.

12   So I -- a lot of it's left -- she'll actually do the

13   communicating with my permission.  She actually does the

14   physical calling or sending stuff.

15   Q.   Okay.  And does she respond or engage in texts as if she is

16   you?

17   A.   Yes, she does.

18        MS. REA:  Okay.  So can I show my screen just to

19   Ms. Pineda again.

20   Q.   So this message that we're looking at on 8-7-2019 that says

21   "I've been pretty sick," that is actually from Connie?

22   A.   Honestly, ma'am, it's -- this is so long ago.  She was

23   blocked soon after, and there was just -- it's just so minute in

24   everything we've been through.

25   Q.   I didn't mean to scroll past it.

1    A.  I really couldn't pinpoint a little text of many of which

2    ones she did, which one I did, which one K.P. ███ did.  I really

3    honestly couldn't do that.

4    Q.  Okay.  It is a text from this phone that is sharing

5    information about your health and your pregnancy?

6    A.  Yes.

7    Q.  And is cordial?

8    A.  It's very cordial.

9    Q.  And that's from August 7 of 2019.

10   A.  Yes.

11          MS. REA:  Okay.  And we can take that down again.

12   Q.  Did you discuss with Ms. Craft looking at your cameras to

13   see if they captured things that happened on her property?

14   A.  I don't honestly remember.

15   Q.  Okay.  Were your cameras working in August of 2019?

16   A.  If they were, they were just for show.  They were -- we

17   didn't know we had to get a subscription.  So we wouldn't even

18   have known anything.

19   Q.  Okay.  So if this phone, whether you or Connie or your

20   daughter, sent a message to her offering to look at your camera

21   footage, that was not accurate?

22   A.  That was being cordial to somebody who we had -- we were

23   just trying to be cordial to.

24   Q.  But you said it knowing that there was no camera footage to

25   look at?

1    A.   I didn't.  I'm not saying that I said it.

2    Q.   Someone said it during a time period in which there was no

3    camera footage to look at?

4    A.   May or may not have been.  I'm not sure the exact date

5    camera footage was -- I mean, if the camera was on there, I'm

6    not sure.  We were just -- we were just being cordial until we

7    just couldn't be cordial anymore.

8    Q.   Okay.  You had the two Nest cameras.  Did you have any

9    others at your house?

10   A.   At that time, no.  We eventually got a Ring.

11   Q.   A doorbell camera like everybody has; right?

12   A.   Everybody but everybody has.

13   Q.   Okay.  When did you get that?

14   A.   I'm not really sure.  I'm not sure.

15   Q.   Can you ballpark it for me?

16   A.   I really can't.  I mean, there's a lot going on with babies

17   coming into the world.

18   Q.   2019?  2020?  2021?

19   A.   Yeah, something that minute, I really just couldn't --

20   wouldn't even be able to --

21   Q.   Have you ever reviewed footage from that camera for any

22   purpose?

23   A.   I've never figured out how to get on the camera of the

24   Nextdoor app -- or whatever that's called, the Ring app.  I've

25   never figured out how to work the camera systems.

1  Q.  So you've -- whenever that camera was installed, whenever it

2  was activated, as you sit here right now, you've never looked at

3  that footage?

4  A.  I've never been able to go back and look at stuff.  If

5  something popped up -- you know, someone rings the doorbell, you

6  can see and respond to the kids playing with the buttons, but I

7  can't pinpoint ever knowing a date or a time or a year or a

8  century that I could figure out this -- the actual workings of

9  this app.

10  Q.  And I'm just trying to distinguish.  What it sounds like

11  you're saying -- and I don't want to put words in your mouth --

12  is you get an alert, and you can see something that is going on

13  in the moment that the alert is received.

14  A.  I get a doorbell ring and kids saying, "Hey, Mom."  And I

15  say, "Stop playing with the doorbell."

16  Q.  Okay.

17  A.  Yeah.

18  Q.  But you've never taken that next step and gone back and

19  said, "Oh, what might have been recorded on whatever date of

20  whatever year?"

21  A.  I'm not sure if I have.  I mean, I honestly don't recall

22  ever doing that myself.

23  Q.  Okay.  And I can only ask you about yourself, obviously.

24  A.  Yes.

25  Q.  So you have not done that or reviewed any -- anything that

1    may or may not exist?

2    A.   I don't recall.

3    Q.   And you don't know when that camera was put in place?

4    A.   I don't recall.

5    Q.   Okay.  Not season, not year, nada?

6    A.   Nada.

7    Q.   Okay.  The first incident that happened with S.W.█, with

8    Ms. Craft's daughter, did that happen in the summerish of 2019?

9    A.   It happened in 2019, either late spring or early summer.

10   Q.   Okay.  And you have said that you heard S.P.2█ repeat the

11   word when she was in the house; correct?

12   A.   At the dinner table.

13   Q.   At the dinner table.  You didn't address that with Ms. Craft

14   at that time?

15   A.   No, ma'am.

16   Q.   Nor with the HOA at that time?

17   A.   I don't -- I never addressed it.  If it had been

18   addressed -- like I said, my wife does the emails, and she would

19   have addressed it with the HOA.

20   Q.   Okay.  So any communication between the -- and I'm using

21   that as shorthand -- between the Lake Forest Community

22   Association would be -- that would be something that Connie

23   handles?

24   A.   Yes.

25   Q.   Okay.  And I'm going back to your cameras just a little bit.

1    Bear with me, not dates.  Once the system was up and going --

2    which we have seen video from June 16 of 2020.  So we know that

3    it was present at that time; right?

4    A.   Yes, ma'am.

5    Q.   So once the system is up and going, did you -- was it set up

6    so that you would receive alerts when there was movement, when

7    the cameras were triggered?

8    A.   Not at the time.

9    Q.   Okay.  And just to talk through, from your observation

10   watching the footage when you get it, it's a motion-activated

11   camera; right?

12   A.   No, ma'am.  It records all the time, but you have to -- I've

13   learned later on that you can set zones up.  So then if they do,

14   then it will -- well, it records all the time, but then

15   that's -- if you have the zone set up, that's when it will alert

16   you.

17   Q.   Okay.  So it's running and collecting footage 24/7?

18   A.   It's internet ran.  So it's at the end of my driveway, and

19   my box is in the computer room, which is at the way -- in the

20   back of the room.  So it has a mind of its own and --

21   Q.   It's running 24/7 as long as the WiFi is running; is that

22   what you're saying?

23   A.   That's what I'm saying.

24   Q.   So it is not triggered by motion that is within its view?

25   A.   It is now.  Like, it's zoned now that we've learned to zone

 1    it, but -- and that's when you would get a notification.

 2    Q.  Okay.  And the zoning -- I'm learning about these things so

 3    bear with me.  The zoning is about when you want to receive an

 4    alert; correct?

 5    A.  No, ma'am.  It's if somebody enters that zone, it will alert

 6    you.

 7    Q.  Okay.  But it's not about the recording?

 8    A.  No.  It's -- it stays, like, on a recording that you can

 9    review for 30 days, yeah.

10    Q.  Okay.  And that's the case -- you can review it for 30 days

11    as long as your WiFi didn't go out and you missed a bit; right?

12    A.  Yes.

13    Q.  Okay.  And with that system or in conjunction with that

14    system, did you have any like motion-sensitive lights that would

15    come on if there was motion in your driveway or your yard or

16    anything like that?

17    A.  I only have one motion sensored light, and it's by the

18    garage.

19    Q.  Okay.  Bear with me as I shuffle through papers.  I want to

20    ask you a few questions about the March 2020 interaction that

21    we've heard about.  When you first heard from S.P.2█ and K.P.

22    about what they said happened in the cul-de-sac, your initial

23    response was to tell K.P. to handle it; correct?

24    A.  Yes.

25    Q.  Okay.  And then thereafter what you've said is you've

1    decided you should have handled it yourself or asked your wife

2    to handle it?

3    A.   I apologized to my daughter when I saw her face and realized

4    I should have just handled it or asked my wife to handle it

5    because I was pregnant, so --

6    Q.   Okay.  There came a point after -- in the course of that

7    afternoon or evening we've heard about when there was an

8    argument/confrontation with Ms. Craft; correct?

9    A.   Yes.

10   Q.   And that was, if I have the sequence of events right, first,

11   K.P. and S.P.2█ come in the house.  They relate to you what has

12   happened in the cul-de-sac.  Then K.P. goes out, has a

13   conversation with S.W.█.  then you say Ms. Craft is banging on

14   the door.  I shouldn't do that all at once because it's gonna be

15   confusing.  So then -- we'll stop there.  Ms. Craft was banging

16   on the door and -- at that point and you guys are in the house;

17   right?

18   A.   Yes, ma'am.

19   Q.   Somebody might have been in the backyard.

20        Okay.  And she leaves at some point; correct?

21   A.   Yes, ma'am.

22   Q.   And S.P.2█ is allowed to go out thereafter, some period

23   thereafter and ride her bike in the cul-de-sac again?

24   A.   It was several hours later, yes, ma'am.

25   Q.   Okay.  The confrontation that I was asking you about took

1    place after that, after Ms. Craft had come back; correct?

2    A.   Yes, ma'am.

3    Q.   Okay.  And based on the information that you had that you've

4    told us about, S.P.2█ said that Ms. Craft threatened to run her

5    over.

6    A.   Yes.  S.P.2█ said, "She's gonna kill me, and she's gonna hit

7    me with her car" that day.

8    Q.   Okay.  And you said Connie handled that and anything after

9    that?

10   A.   No, that's not what I said.

11   Q.   Okay.  What'd you say?

12   A.   I said that after S.P.2█ came in terrified, that we went

13   out -- I went outside.  And I went back and I told my wife what

14   had happened, and I -- we walked around the front.  And I said,

15   "You have 30 seconds to respond to her or I'm gonna do it."

16   Q.   Okay.  And was that the end of that event?

17   A.   That's -- when I said that, that's what started the

18   confrontation.

19   Q.   After the confrontation, was there any other events that

20   happened that evening?

21   A.   No, ma'am.  I thought it was squashed.

22   Q.   Okay.  So the driveway painting takes place June 7 of 2020.

23   And you noted that that was paint that was orangish in color

24   when you saw it on the driveway?

25   A.   Yes, ma'am.

1    Q.   Okay.  And at that time, you said you -- the cameras weren't

2    working at that point.  So you didn't capture anything?

3    A.   No, ma'am.

4    Q.   Okay.  That orangish color, did that color have any meaning

5    to you?

6    A.   No, ma'am.

7    Q.   Does it now?

8    A.   It was done twice and -- it was done twice, so --

9    Q.   Okay.  When you moved paint -- found paint in your basement,

10   do you know what colors that was?

11   A.   Honestly, I didn't really look.  It was a bunch of cans, a

12   bunch of rusted, dusty -- and it was fast.  I just wanted to get

13   stuff out of there that didn't belong.  So we just -- really

14   just put it in a box and had my wife deal with it.

15   Q.   And did you have a conversation about those paint cans and

16   moving them out in the last couple weeks with the FBI?

17   A.   Yes.

18   Q.   Okay.  Had they asked you about that prior to that?

19   A.   I don't believe I've ever been asked about paint cans or

20   moving anything out.

21   Q.   Okay.  And had you told them prior to that about paint cans?

22   A.   I hadn't told them about moving anything out.

23   Q.   Including paint cans?

24   A.   Including paint cans, yeah.

25   Q.   Okay.  The second driveway painting that's on 6-18 of 2020,

1    that was -- that event -- information about it was posted on the

2    Facebook page; correct?

3    A.  I believe so.

4    Q.  And was it posted within a day or two?

5    A.  I don't know.

6          MS. REA:  Okay.  May I show the screen just to her,

7    please.

8    Q.  So just -- I'm gonna scroll up just so you see the title of

9    the page, the name of the page.  So does this appear to be posts

10   from the shared Facebook page?

11   A.  The Michella Connie Pineda?

12   Q.  Yes, ma'am.

13   A.  Yes, ma'am, that's our page.

14   Q.  And then I am showing you a post.  Take a look at that.  I

15   will scroll.  Does that refresh your recollection of when that

16   information was posted?

17   A.  Posted July 19th.

18   Q.  June 19th?

19   A.  I'm sorry.

20   Q.  That's okay.  June 19th of 2020?

21   A.  Yes, ma'am.

22   Q.  At 10:00 in the morning?

23   A.  Okay.  Yes, ma'am.

24   Q.  10:03:37, yes.  And that post included photos of the yard

25   and the driveway; correct?

1   A.   Yes, ma'am.

2   Q.   A photo of Ms. Craft?

3   A.   Yes, ma'am.

4   Q.   It also included video uploads from the camera system; is

5   that right?

6   A.   Yes, ma'am, if you say so.

7   Q.   So anyone who would have had access to your Facebook page

8   also would have been able to see those videos --

9   A.   Yes, ma'am.

10  Q.   -- on June 19 of 2020?

11  A.   Yes.

12  Q.   Okay.  I want to ask you a few questions about the items

13  that were found, the letters, the notes, the mailings.  Before I

14  do that, a quick question.  You testified on direct about a

15  lawsuit that was filed; correct?

16  A.   On direct?

17  Q.   When she asked you questions or when he asked you questions.

18  A.   I responded to him about a lawsuit filed, yes, ma'am.

19  Q.   And that was filed in July of 2020?

20  A.   Yes.

21  Q.   Okay.  And you said you didn't have a number as far as

22  monetary is what you told Mr. Tieke; right?

23  A.   I've never spoken about numbers to my lawyer.

24  Q.   But it is a lawsuit that is seeking monetary damages in

25  addition to an injunction?

1    A.  Well, unless they can pay my 15-year-old with Pokémon cards.

2    Q.  Specifically punitive and compensatory damages; correct?

3    A.  I'm not a lawyer.  I don't really know the lingo, but

4    that's -- you know, that's what you do, you know, when you sue

5    people.  So I'm assuming it would be monetary.

6    Q.  Okay.  And I may have misspoken.  What I meant to ask is

7    it's seeking compensatory and punitive damages.

8    A.  I'm not sure.  You'd have to -- you'd have to kind of break

9    that down to me.

10   Q.  Okay.  Would it help if I show you the complaint?

11   A.  Yeah, I've seen the complaint.

12   Q.  Okay.  And I'll skip to the end of it.  It won't take too

13   long.  It is -- you signed the complaint; correct?

14   A.  Yes, ma'am.

15   Q.  Okay.  Saying you have read it, know the contents, and

16   verify it to be true?

17   A.  I did sign it.

18   Q.  And that's what it says above your name?

19   A.  Yes.

20   Q.  Okay.  And page 1 -- I apologize for the scroll.  Page 2,

21   excuse me, says -- what it says is that it is seeking

22   compensatory and punitive damages.

23   A.  It does.

24   Q.  Okay.  It's a suit against Ms. Craft.  It is also a suit

25   against the Lake Forest Community Association; correct?

1    A.  Yes, ma'am.

2           MS. REA:  Okay.  And we can take that down.

3    Q.  I want to ask you some questions about the items that were

4    found.  Was the first item that you-all found in your yard or

5    was it in your mailbox?

6    A.  We found that in our yard.

7    Q.  In the yard?

8    A.  Yes.

9    Q.  Okay.  What did you do with that item?

10   A.  We notified our lawyer.  We put them in a bag and put them

11   in the meat freezer.

12   Q.  So that's where the very first item went?

13   A.  Yes.

14   Q.  Okay.

15   A.  After we took pictures, yes.

16   Q.  Okay.  And those items -- or the fact that you received

17   those items, that was something that was also posted on the

18   Facebook page?

19   A.  Yes.

20   Q.  If you don't know, that's okay.  I can --

21   A.  I'm not sure what exactly, when exactly.  If they're posted,

22   they're posted, you know.

23          MS. REA:  Okay.  And I will not ask to show it to her

24   yet, but when I get there.

25       Okay.  Can I show it to just Ms. Pineda, please.

1    Q.  Does that refresh your recollection and were there postings

2    about items that were found?

3    A.  I'm sorry.  Could you repeat the question.  I was --

4    Q.  Yes.  Was there a post about items found in your yard?

5    A.  There was a post about the items found.

6    Q.  And that post was on November the 6th of 2020.

7    A.  Yes.

8    Q.  And it -- and that post mentions threatening letters;

9    correct?

10   A.  It does.

11   Q.  So there had to be some threatening letter, don't know how

12   many that were found before the post, or you would -- someone

13   wouldn't have known to post about it; right?

14   A.  The threatening letters were found around the time.

15   Q.  Okay.  Photos of some of the items were also posted on your

16   Facebook page; correct?

17   A.  Yes.

18   Q.  Okay.  And that post was made on November 11, 2020; is that

19   right?

20   A.  Yes.

21   Q.  Okay.  That post includes, in addition to photos of some

22   of -- well, I'll ask a better question.  That post includes

23   photos of some of the items; correct?

24   A.  It looks like it.

25   Q.  Okay.  Including the mailing with the projectiles; right?

1    A.   Yes.

2    Q.   It also includes some either videos or screenshots from

3    videos; right?

4    A.   Yes.

5    Q.   And does it appear to you it includes actual videos?

6    A.   It looks like it's a recording of a video.

7    Q.   Okay.  So anyone that was able to see your Facebook page

8    would have been aware of that post as of November 11 of 2020?

9    A.   Yes, ma'am.

10             MS. REA:  Okay.  We can take that down.  Thank you.

11   Q.   I'm going to ask you a question about a specific item using

12   the document camera.  What I have put up here is a photo from

13   Exhibit 4A, which you identified as an item that you removed

14   from the mailbox; correct?

15   A.   I believe so.

16   Q.   Okay.  And some of them you have said were in the yard, some

17   of them were in the mailbox.

18   A.   I mean, it was a long time ago.  It's just the best that I

19   can remember at the time.

20   Q.   When you were speaking with Ms. Tieke, this isn't one you

21   identified as being found in the mailbox; right?  [Verbatim.]

22   A.   That's what I remember today, yes.

23   Q.   After taking that item from the mailbox, what did you do

24   with items like this?

25   A.   I had Connie come in the garage, and we looked at it better

1    without the prying eyes of the kids, and we just had a

2    conversation.  It was like, where are we going to -- where are

3    we gonna put this?  Where are we gonna keep this?  So just --

4    they ended up in the freezer.

5    Q.  Okay.  Do you recall if you received -- if you removed items

6    from the mailbox in between the time of whatever the one is that

7    you first -- that you took out -- we think it was 4A -- and the

8    item that was retrieved from the mailbox when Brian Recktenwald

9    was there?

10   A.  I recall taking the bullets from the mailbox.

11   Q.  Was Brian Recktenwald there for that?

12   A.  He was.

13   Q.  Okay.  In between that and when you personally took another

14   item from the mailbox, did you personally take -- remove any of

15   these other things from the mailbox?

16   A.  I can't recall.  I cannot recall right now to tell you, yes,

17   I walked down to the mailbox, and I picked this up, or was it

18   here?  And I -- I just couldn't say that to be true.

19   Q.  Okay.  It was -- when you found the one that we've looked

20   at, 4A, and looked at it, it was pretty upsetting; correct?

21   A.  Of course.

22   Q.  And as you sit here right now, you don't remember retrieving

23   anything else of that nature from the mailbox in advance of the

24   thing with the bullets?

25   A.  I don't recall except the bullets.  The bullets stand out

1    clearly and -- I don't recall, and I'm not gonna say that I did

2    this and I took it out or I didn't take it out.  I'm not gonna

3    say that.  I just don't recall it right now, and I'm sorry.

4    Q.  And after retrieving an item from the mailbox -- you already

5    had items in a stack of mail somewhere that nobody had gone

6    through, and you found them then?

7    A.  That's where they'd been found.

8    Q.  That's -- excuse me?

9    A.  That's where -- like, they had been found in a stack.

10   That's where our mail is -- it gets piled up and piled up.  So I

11   searched through the pile.

12   Q.  Okay.  And the other items that were sent through the mail,

13   because they have postmarks through the mail, do you know if

14   they were all in that stack?

15   A.  I can't for sure say they were all in the stack.  I can't

16   for sure say two, one, six, a hundred.  I just cannot say.  No

17   matter how many times I get asked, I just can't say.  I

18   apologize.

19   Q.  So you don't know if after receiving Exhibit 4A, which was

20   jarring, which was upsetting, if there were other items that

21   were taken out of the mailbox by somebody else and put in the

22   stack?

23   A.  I can't say the details.  I can say I was scared.  I can say

24   we slept downstairs.  I can say we were worried about being --

25   these threats and my kids and their lives and their lives and

1   their lives, and that's all I cared about was their life.  I

2   didn't care -- did I pick this up?  Did I not pick this up?  Did

3   I find it here?  I cared about my kids' lives, and that's all

4   that I can really say for sure.

5   Q.  And the source of some of that at this point was what you

6   were finding in the mail?

7   A.  It was what was said of what was in the mail.

8   Q.  And that's how it was coming at you?

9   A.  Yes.  It was scary.

10  Q.  And it's something you want to pay attention to?

11  A.  Do you want to pay attention to it, or do you want to just

12  keep your kids alive?

13  Q.  You want to know if it's coming, right, or when it's --

14  A.  Yes.

15  Q.  -- what's arriving?

16  A.  I mean, yeah, I just --

17  Q.  The day that the item with the bullets was retrieved from

18  the mailbox, did you retrieve it because you saw the mail being

19  delivered?

20  A.  I saw the mailman go around the -- like start to go around

21  the cul-de-sac, and I started to walk towards Ray.

22  Q.  And I didn't hear you.

23  A.  I saw the mailman come around the cul-de-sac, and he was at

24  each mailbox.  So I started to walk towards the mailman.

25  Q.  Okay.  You thought the mail had been delivered, so you got

1    the mail?

2    A.   The mail had not been delivered as I walked down there

3    yet --

4    Q.   Okay.

5    A.   -- as I started to approach.

6    Q.   Okay.  And then did he deliver the mail?

7    A.   He put something white inside my mailbox.

8    Q.   Okay.  And it's the -- the person who delivers your mail is

9    putting something in your mailbox; right?

10   A.   Yes.

11   Q.   Okay.  And that's the item that you retrieved when Brian

12   Recktenwald was standing there?

13   A.   Yes.

14   Q.   Okay.  And we know from the Facebook posts that there was a

15   photo of that that was posted on November 11th.  So that item

16   was received on or prior to November 11th; correct?

17   A.   It must have been.

18   Q.   Okay.  After that item went into the meat freezer, then what

19   happened to it?

20   A.   We went to the police department and brought it to the

21   police department.

22   Q.   Okay.  Do you know when you did that?

23   A.   I don't know.

24         MS. REA:  Okay.  I think that may be all I have,

25   Ms. Pineda.  Give me one moment.

```
 1                THE WITNESS:  Okay.

 2                MS. REA:  I don't have any other questions for you,

 3     ma'am.  Thank you.

 4          I will clear myself out of the way.

 5                THE WITNESS:  Thank you.

 6                THE COURT:  Mr. Tieke, do you have redirect?

 7                MR. TIEKE:  Yes, briefly, Your Honor.

 8                         REDIRECT EXAMINATION

 9     BY MR. TIEKE:

10     Q.  Ma'am, did you receive a number of threatening mailings?

11     A.  Yes.

12     Q.  And some found in your yard?

13     A.  Yes.

14     Q.  Some found in the mail?

15     A.  Yes.

16     Q.  And, I mean, is it difficult as you sit here to remember

17     which of the mailings contained threats saying "go N-word, move

18     out or bullets, two dead N-lets, you will die bitch"?  Is it

19     tough to figure out which one was which in what order and when

20     you received them?

21     A.  I just believe it was so inconsequential, I just can't

22     remember.  And I apologize.

23     Q.  So it's fairly hard to distinguish which one said what at

24     what time?

25     A.  Yes.
```

1    Q.  But you recall the majority being found in the pile inside?

2    A.  Yes.

3    Q.  And is it hard to recall one mailing from another because at

4    the time you were receiving these, they would come in rapid

5    succession or that you found them in rapid succession?

6    A.  Yes.

7    Q.  Ms. Rea asked you a little bit about how y'all use your cell

8    phones.  Do you and Connie, your wife, often use the same cell

9    phone?

10   A.  Yes.

11   Q.  Do you often tell Connie what to put in texts sometimes?

12   A.  Yes.

13   Q.  Do you tell K.P.███ what to say in texts sometimes?

14   A.  She's my little secretary.

15   Q.  There was a fair amount of talk about some cameras.  When

16   you initially purchased these Nest cameras, were you aware

17   that -- did they have a free initial trial or anything like that

18   that you can recall --

19   A.  I don't recall.

20   Q.  -- that might have lasted for a short time or anything?  And

21   you mentioned that you specifically recall activating them after

22   the June 7th incident at least.

23   A.  Yes.

24   Q.  And you mentioned that they pull down footage or they record

25   continuously.  Is that what you know about them?

1    A.   Yes.

2    Q.   And is the way that you get videos from those is to pull it

3    down from that system?

4    A.   Yes.

5    Q.   And save it to the files?

6    A.   Yes.

7    Q.   And if you don't do that within a certain time period, is it

8    gone?

9    A.   Gone forever.

10   Q.   Okay.  So you don't have it if you didn't save it?

11   A.   No.

12   Q.   There was talk about a confrontation after March -- the

13   March 2020 incident.  Did you and Connie run out front together

14   after that?

15   A.   The second time?

16   Q.   The second -- after the incident with Ms. Craft in the car

17   in the cul-de-sac.

18   A.   We did.

19   Q.   And you talked about this on direct, but you had words with

20   Ms. Craft; right?

21   A.   I did.

22   Q.   You asked her why she was engaging your children in that

23   way?

24   A.   I did.

25   Q.   And at some point did you just let Connie stay out there and

1   deal with it?

2   A.   I did.

3   Q.   And you went inside to take care of the kids?

4   A.   Yes.

5   Q.   You did file a lawsuit in July 2020.

6   A.   Yes.

7   Q.   And is that roughly a couple weeks after the third time your

8   driveway had been painted in the month of June?

9   A.   Yes.

10   Q.   Were you upset that your driveway was being vandalized?

11   A.   I was very upset.

12   Q.   Three times in June of 2020?

13   A.   Yes.

14   Q.   And then you filed a lawsuit in early July after an attorney

15   reached out to you?

16   A.   Yes.

17   Q.   And you told the jury this on direct, but your lawsuit was

18   also seeking an injunction, wasn't it --

19   A.   Yes.

20   Q.   -- to stop the driveway paintings?

21   A.   We wanted it to stop.

22   Q.   Is that because you weren't getting any relief from

23   Louisville Metro?

24   A.   Yes.   They wouldn't help us.

25   Q.   The homeowners association?

1   A.   Nobody would listen.

2   Q.   Ms. Rea asked you about some Facebook posts.  Did you post

3   these around the time that you received the letters

4   approximately?

5   A.   Approximately.

6   Q.   So could it have been a day after you got them, a couple

7   days after, three days after?

8   A.   Yes.

9   Q.   Four days after?

10  A.   It could have been a week after.

11  Q.   So you posted around the time you were receiving them?

12  A.   Yes.

13          MR. TIEKE:  Thank you, ma'am.

14       No further questions, Your Honor.

15          MS. REA:  Nothing else, Your Honor.

16          THE COURT:  May the witness be excused?

17          MR. TIEKE:  Yes, Your Honor.

18          THE COURT:  Thank you.  You may step down.

19          THE WITNESS:  Thank you.

20          THE COURT:  Members of the jury, we're going to end

21  for the day now.  Does anybody have or anticipate any problems

22  being back here tomorrow at the same time, 8:40?

23       All right.  We will plan for you to check in tomorrow by

24  8:40.

25       Remember the admonition.  The case is still ongoing.  You

1   must not form any opinions yet about the results or the outcome

2   of the case.  Keep an open mind.  Do not talk about the case

3   with each other, your family, or anyone else.  And, of course,

4   please let us know if anybody tries to talk to you about the

5   case.  Again, I don't think that's gonna happen, but just on the

6   off chance it does, we would want you to report back to us

7   immediately.

8       Thank you and we'll see you tomorrow morning.

9       (Jury out 4:57 p.m.)

10          THE COURT:  You may be seated.  The jury has now left

11  the courtroom.

12      Let's talk about our schedule tomorrow.  I would like to

13  talk about -- I believe, Ms. Zimdahl, Mr. Tieke, you-all have a

14  witness scheduled or listed to talk about an additional video

15  showing the driveway paintings; is that correct?

16          MR. TIEKE:  Yes, Your Honor.

17          THE COURT:  Is that necessary at this stage?  Does it

18  offer anything different than what has already been entered into

19  evidence?

20          MR. TIEKE:  The 16th -- the video of the 16th is -- if

21  you noticed from --

22          THE COURT:  Is that the first orange, second orange,

23  or gold?  That's how I'm remembering the three.

24          MR. TIEKE:  Second orange, second orange video.

25  This -- the Pinedas' video only had a clip where it ended at the

1    individual stopping the painting on the driveway.  This clip

2    picks up where that individual returns to on the 16th, and I

3    think that that's important to show the jury where that

4    individual returns to.

5              THE COURT:  All right.  I might ask you to have that

6    teed up in the morning.  We'll meet here at 8:30.  I'd like to

7    look at it.

8        I'm a little worried about the cumulative nature of this

9    evidence.  I think you've demonstrated the driveway paintings

10   occurred.  That is not charged conduct.  So at some point, I am

11   concerned that it becomes a bit cumulative; and so I'll want to

12   see that.

13       And at a minimum, we'll need to talk about narrowing the

14   testimony from your 25-minute estimate, given that you-all have,

15   I think, adequately placed into evidence information regarding

16   the three driveway painting incidents, but I'll hear more about

17   that in the morning.

18       All of your other witnesses are teed up and ready to go?

19             MS. ZIMDAHL:  They are, Your Honor.

20             THE COURT:  Anything from the defense, Ms. Rea, that

21   we need to take up now?

22             MS. REA:  No, Your Honor.

23             THE COURT:  Anything else that you-all would like to

24   bring up?

25             MR. TIEKE:  No, Your Honor.  Thank you.

1          THE COURT:  I will tell you that I expect tomorrow

2    morning, whether it be at the first meeting or by the break, we

3    will have some draft instructions for you, I anticipate.  And we

4    can -- I think we'll have plenty of time to pick a break to talk

5    about those, but we'll get those to you so that you can begin

6    your initial review.

7        That's all I have.  So if you-all don't have anything else

8    that we need to talk about, then I'll leave you to it.  Thank

9    you.

10        (Proceedings concluded at 5:01 p.m.)

11               C E R T I F I C A T E

12        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

13    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14

15
          _____s/Dena Legg_____          September 21, 2023
16    Certified Court Reporter No. 20042A157    Date
      Official Court Reporter
17

18                  REDACTION CERTIFICATE
          I certify that the foregoing is a true and correct copy of
19    the transcript originally filed with the clerk of court on
      09/21/23 and incorporating redactions of personal identifiers
20    requested by the following attorney of record: Angela M. Rea in
      accordance with Judicial Conference policy.  Redacted characters
21    appear as a black box in the transcript.

22
          _____s/Dena Legg_____          October 30, 2023
23    Certified Court Reporter No. 20042A157  Date
      Official Court Reporter
24

25

1                                    INDEX

2     GOVERNMENT WITNESSES:

3     SPECIAL AGENT MATT RUSSELL
          Direct Examination By Mr. Tieke              10
4         Cross-Examination By Ms. Rea                 61
          Redirect Examination By Mr. Tieke           72
5
      K.P.███
6         Direct Examination By Ms. Zimdahl           74
          Cross-Examination By Ms. Rea                 99
7
      S.P.1███
8         Direct Examination By Ms. Zimdahl          111

9     MICHELLA PINEDA
          Direct Examination By Mr. Tieke            126
10        Cross-Examination By Ms. Rea               202
          Redirect Examination By Mr. Tieke          228
11

12
                                   EXHIBITS
13
      GOVERNMENT:
14    1 - map                                         13
      2 - photo                                       17
15    3 - photo                                       20
      4 - mailing                                     34
16    4A - photos                                     35
      4B - photos                                     36
17    5 - mailing                                     36
      5A - photos                                     37
18    5B - photos                                     38
      6 - mailing                                     39
19    6A - photos                                     40
      6B - photos                                     41
20    7 - mailing                                     42
      7A - photos                                     43
21    7B - photos                                     44
      8 - mailing                                     45
22    8A - photos                                     46
      8B - photos                                     46
23    9 - mailing                                     48
      9A - photos                                     48
24    9B - photos                                     49
      10 - mailing                                    50
25    10A - photos                                    52
      10B - photos                                    52

```
 1     11 - mailing                          27
       11A - photos                          28
 2     11B - photos                          29
       12A - photos                          31
 3     12B - photos                          32
       12 - mailing                          30
 4     13 - bullet                           56
       14 - photos                           57
 5     15 - photo                            78
       16 - photo                            77
 6     17 - photo                           133
       18 - photo                           152
 7     19 - photos                          155
       20A - photo                          157
 8     20B - photo                          158
       21 - photos                          161
 9     22A - photo                          162
       22B - photo                          163
10     23A - photos                         175
       23B, 23C, 23D - video                177
11     24A - photo                          181
       24B - video                          182

12

13     DEFENDANT:
       No exhibits
14

15

16

17

18

19

20

21

22

23

24

25
```