1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                         LOUISVILLE DIVISION

3
     UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00094-DJH
4                                   )
             Plaintiff,             )    **REDACTED**
5                                   )
     v.                             )
6                                   )
     SUZANNE CRAFT,                 )
7                                   )    March 8, 2023
             Defendant.             )    Louisville, Kentucky
8

9                            * * * * *

10                            VOLUME 3
                      TRANSCRIPT OF JURY TRIAL
11              BEFORE HONORABLE DAVID J. HALE
                  UNITED STATES DISTRICT JUDGE
12
                             * * * * *
13
     APPEARANCES:
14   For United States:       Christopher C. Tieke
                              Stephanie M. Zimdahl
15                            U.S. Attorney's Office
                              717 West Broadway
16                            Louisville, KY 40202

17   For Defendant:          Angela M. Rea
                              Western Kentucky Federal
18                              Community Defender, Inc.
                              629 S. 4th Avenue, Suite 200
19                            Louisville, KY 40202

20   [Defendant present.]

21
                      Dena Legg, RDR, CRR, CCR-KY
22                      Official Court Reporter
                        232 U.S. Courthouse
23                      Louisville, KY 40202
                          (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.

1      (Begin proceedings in open court at 9:05 a.m.  Jury out.

2    Defendant out.)

3           THE COURT:  All right.  Good morning, we're back on

4    the record in U.S. v. Craft.

5      Ms. Rea, you -- I think you mentioned your client is down

6    the hall --

7           MS. REA:  Yes, Your Honor.

8           THE COURT:  -- on her way back into the courtroom.

9           MS. REA:  Yes, sir.

10          THE COURT:  All right.  Well, we're starting a little

11   bit behind schedule this morning.  That is owing to some work we

12   were doing on the draft instructions.  So I anticipate that

13   during the first break of the morning, we'll have draft

14   instructions to pass along to you.

15     I anticipate there will be at least some modifications

16   necessary.  We always, of course, tailor parts of the standard

17   instructions based upon the parties' positions and arguments

18   taken.  So we can address those possibilities.

19     We'll talk during the midday break about when we want to

20   schedule an instructions conference.  Probably, it would seem to

21   me, on Thursday, tomorrow.

22     All right.  What is the -- what's the current schedule

23   looking like?

24          MR. TIEKE:  Your Honor, we'll have Ms. Connie Pineda.

25   And then we intend to proceed from there to a few of the

1    neighbors, Mr. Lanham, Mr. Recktenwald, and that would get us

2    likely through the morning potentially with maybe one additional

3    witness, an officer with the LMPD that would likely be maybe ten

4    minutes.  So we might be able to fit all four of those in in the

5    morning.

6           THE COURT:  All right.  What about the issue with

7    respect to -- remind me again why the neighbor with the video,

8    his testimony would not be simply cumulative with respect to the

9    driveway painting.

10          MR. TIEKE:  Sure, Your Honor.  I don't think there's

11   any argument from the parties that this would be cumulative.  I

12   know that the Court raised that issue.

13      It's the United States' understanding that the defendant --

14   the defense would have -- would like to examine this witness

15   also on a separate issue that maybe hasn't even been raised yet.

16   His testimony is also relevant for the separate reason of the

17   fact that his address is used on the mailing that's the subject

18   of Count 5 as well, the 505 address.

19      In addition, he also has video evidence that would color the

20   second orange painting with additional information, being that

21   it would pick up with where that individual returns after doing

22   the second orange painting, because if the Court will recall,

23   the video that we've introduced stops at the end of the

24   painting, and this would show that individual returning.

25      And, in fact, I think that addresses a point that was raised

1    directly in the defense's opening statements regarding not

2    conceding, number one, that it's her on the video; and, number

3    two, the inference to watch where people went and watch where

4    people go on these videos.  That clears up that -- any issue

5    that the jury would have with where that individual goes after

6    that painting.  And in addition to that, Mr. Lanham also has

7    video of the gold painting showing a view of where that person

8    comes from and then returns to, namely being Craft's driveway.

9         (Defendant entering courtroom.)

10              MR. TIEKE:  And so it's not our intent to belabor

11   these driveway paintings, but we do think that this is, you

12   know, important and relevant evidence that would answer some

13   questions for the jury about issues that the defense raised as

14   to where folks go, what folks do.  And in addition, for the

15   reasons that it's my understanding that the defense has -- would

16   also like to examine this witness for other reasons.

17              MS. REA:  Thank you, Your Honor.

18       We did indeed also place Mr. Lanham under subpoena.  We

19   intended to call him and to examine him.  The driveway

20   paintings, you know, being what they are -- and I know we've

21   heard a lot about them.  He is actually the only person that I'm

22   aware of that has video from the first evening.  That's why we

23   intended to call him.

24       I did not intend to make any objection about evidence that

25   the United States was going to present through him being

1    cumulative.  And then we had just some other questions for him

2    as well.  I will also say, I think -- my anticipation would be

3    that his testimony with respect to these issues is not going to

4    be as extensive as prior witnesses.  I think it'll be briefer.

5              THE COURT:  All right.  Well, of course, as you-all

6    know, I permitted the evidence regarding the driveway paintings,

7    even though that is not charged conduct, because it's --

8    represents background, res gestae.  It would alternatively,

9    under 404(b), I think be admissible for purposes of

10   identification and motive.

11       But I appreciate, Mr. Tieke, your -- your observation that

12   the Government does not intend to belabor the evidence of the

13   driveway painting.  I do think the jury has heard quite a bit

14   about those three incidents.  The record, I think, clearly shows

15   the driveways were painted.  And so that -- so to the extent

16   that you are adding to it for the reasons that you've indicated,

17   that's fine, but I don't think we need to go back and

18   reestablish that the driveway was painted.  I think we've heard

19   that evidence in sufficient amounts so -- very well.  Then we'll

20   proceed.

21       He will be the second witness; is that right?

22             MR. TIEKE:  Yes, Your Honor.  We anticipate him being

23   the second witness.

24       And I think Ms. Zimdahl has some points regarding how we've

25   essentially attempted to expedite the next witness with respect

1  to the driveway paintings as well.

2          MS. ZIMDAHL:  Your Honor, if I may address those.  Our

3  next witness is Connie Pineda.  She's another member of the

4  victim family.  I'm presenting her, and I do plan to address the

5  driveway paintings with her.  I plan to show those to her, just

6  in full candor to the Court.  I don't plan to replay the videos.

7      I do think there has at least been touching on this idea

8  that the victim family is either shading their testimony or

9  fabricating this.  So I think it is fair to at least raise with

10  her what happened, her experience with this.  I don't plan to

11  belabor it, and we'll move quickly.

12      I do plan to show her the videos as they relate to the

13  letters in the yard.  I think those are a completely separate

14  subset and subject of the case.  So I did just want to raise

15  that with the parties and the Court today.

16          THE COURT:  All right.  Any response, Ms. Rea?

17          MS. REA:  No, Your Honor.

18          THE COURT:  All right.  Let's -- are we ready to have

19  the jury return to the courtroom?

20          MS. ZIMDAHL:  Yes, Your Honor.

21          MS. REA:  Yes.

22          THE COURT:  All right.  Let's have the jury return to

23  the courtroom, and let's -- your first witness is ready to

24  proceed?

25          MR. TIEKE:  Yes, Your Honor.

```
 1              MS. ZIMDAHL:  Yes.
 2              THE COURT:  While we're waiting on them, let me remind
 3    counsel of our discussion about the agreed upon 404(b)
 4    instruction.  If it becomes necessary, I am relying on you to
 5    signal --
 6              MS. REA:  Yes, Your Honor.
 7              MS. ZIMDAHL:  Yes, Your Honor.
 8              THE COURT:  -- about that.
 9        (Jury in 9:15 a.m.)
10              THE COURT:  Good morning, members of the jury.
11              MULTIPLE SPEAKERS:  Good morning.
12              THE COURT:  Does everyone have their notebooks
13    straight?
14              MULTIPLE SPEAKERS:  Yes.
15              THE COURT:  All right.  Good.  We got to make sure
16    about that.
17        All right.  We are ready now to proceed.  We're starting
18    just a few minutes behind, but in my experience, we are keeping
19    about as close to schedule as modern trials permit.  So I'm
20    happy to report that to you.  We are going to continue with
21    testimony now.
22        Is the United States prepared to call its next witness?
23              MS. ZIMDAHL:  We are, Your Honor, and the United
24    States would call Connie Pineda to the stand.
25        (CONNIE PINEDA, called by the Government, sworn.)
```

1                        DIRECT EXAMINATION

2    BY MS. ZIMDAHL:

3    Q.  Good morning, Ms. Pineda.  Could you state your name for the

4    jury, please.

5    A.  Connie Pineda.

6    Q.  And, Ms. Pineda, where do you live?

7    A.  510 ███████████████.

8    Q.  And is that home in the Lake Forest subdivision in

9    Louisville, Kentucky?

10   A.  Yes.

11   Q.  Who do you live there with?

12   A.  My wife and five kids.

13   Q.  I'm gonna show you now what's been marked as Government's

14   Exhibit 15.  It's already in evidence.

15               MS. ZIMDAHL:  So if we could put that up, please.

16   Q.  Connie, is this a picture of your family?

17   A.  Yes.

18   Q.  And is that your wife, Michella, in the picture?

19   A.  Yes.

20   Q.  And your five children?

21   A.  Yes.

22   Q.  Now, you mentioned your wife.  What is her name?

23   A.  Michella.

24   Q.  Does your wife's name, Michella, does that end with an "A"

25   at the end?

1   A.   Yes.

2   Q.   Does your wife ever go by Michelle formally?

3   A.   No.

4   Q.   Does she ever go by Michelle with friends?

5   A.   No.

6   Q.   Is it only Michella with an "A" at the end?

7   A.   Yes.

8   Q.   Now, Connie, do you sometimes refer to her as "Chell"?

9   A.   Yes.

10   Q.   As a nickname?

11   A.   "Chell" or "Chella."

12   Q.   And so you might sometimes say that today when you're

13   referring to her?

14   A.   Yes.

15   Q.   Connie, do you your and wife, Michella, do you share a

16   Facebook page?

17   A.   Yes.

18   Q.   Do you also sometimes text from Michella's phone for her?

19   A.   Yes.

20   Q.   Send things out that she might ask you to respond to?

21   A.   Yes.

22   Q.   Like married couples sometimes do?

23   A.   Yes.

24   Q.   Connie, what do you do for a living?

25   A.   I'm retired.

Connie Pineda - Direct

1   Q.   And where did you retire from?

2   A.   Mag-Instrument.

3   Q.   What did you do for Mag-Instrument before you retired?

4   A.   I was a lead person for second operations and C&C.

5   Q.   How long did you work for Mag-Instrument?

6   A.   Twenty-two years.

7   Q.   Connie, do you have a pension from your job at

8   Mag-Instrument?

9   A.   Yes.

10  Q.   And looking at this picture that we have up in front of us,

11  I imagine that you have plenty to keep you busy these days with

12  these five kids.

13  A.   Yes.

14  Q.   Are you homeschooling some of them right now?

15  A.   Yes.

16  Q.   Approximately when did your family move into the Lake Forest

17  neighborhood?

18  A.   April of 2019.

19         MS. ZIMDAHL:   And if we could put up Government

20  Exhibit 16, please.

21  Q.   Is this your house at 510 ██████████████████?

22  A.   Yes.

23  Q.   Is that your wife pictured in front of your home?

24  A.   Yes.

25  Q.   By that fountain area there?

1   A.   Yes.

2   Q.   And did you and Michella do quite a bit of work to fix up

3   the yard at your home after you moved in?

4   A.   Yes.

5   Q.   Clean up that fountain area?

6   A.   Yes.

7   Q.   Get it looking nice?

8   A.   Yes.

9   Q.   How did you feel about this house when you first moved in?

10  A.   We didn't care too much for the outside, but we fell in love

11  with the inside.

12  Q.   Did you have hopes that you would live in this house for a

13  long time?

14  A.   Yes.   This was supposed to be our forever home.

15  Q.   And why was that?

16  A.   Because with Chell in the military, we moved around a lot.

17  Like, every couple years we would uproot the kids, and we didn't

18  want to uproot them anymore.   So we had planned on staying here,

19  thought we'd have grandkids here.

20  Q.   And how long had you -- have you and Michella been together

21  at this point?

22  A.   When we moved in or now?

23  Q.   You can tell us both.

24  A.   When we moved in, we were together 15 years; and now it's

25  been 19 years.

1  Q.  When you first moved into your home at ███████████, did

2  you run into some issues with the basement having flooded?

3  A.  Yeah.

4  Q.  What happened with that?

5  A.  We had just signed loan docs.  And I walked into the house,

6  just kind of walking through, checking everything out, went and

7  checked out the basement, and that's when I noticed there was

8  like six inches of water.

9  Q.  Did you have to deal with that right away?

10  A.  Absolutely.

11  Q.  Get the water cleaned up?

12  A.  Yeah.  Tried to call the real estate agent so they can get

13  ahold of their agent to see if there was anything we can do with

14  insurance or whatever.

15  Q.  And in the course of cleaning up that flood, did you find

16  things that you had to clean out of the basement?

17  A.  Yeah, like a whole house that they left for us because I

18  guess they didn't want to bring it up the stairs.  So, yeah, the

19  whole basement was full of stuff.

20  Q.  What did you do with the things that you cleaned out of the

21  basement?

22  A.  We brought it out in front of our house and put "free" on

23  it.

24  Q.  Can you tell us about some of the things that you took out

25  of the basement and put outside to give away or throw away as

1   free?

2   A.   There was a pool table, two like rocking chairs, old school

3   TV, magazines, books, a desk, a little roller chair/desk like

4   that one -- or chair, some wood trimming, paint, and I think

5   that's it.  There might be more, but I can't remember right now.

6   Q.   It sounds like a whole lot of things were down there.

7   A.   Yeah -- oh, a refrigerator, a big refrigerator.  That's

8   still there.

9   Q.   So you kept the refrigerator?

10  A.   Yeah.  We couldn't get it up.

11  Q.   Too heavy?

12  A.   Yeah.

13  Q.   And everything else, did you take it out, all those items,

14  and put them outside?

15  A.   Yes, yes.

16  Q.   Where did you put them?

17  A.   Out in the front, like right by our mailbox.

18  Q.   Okay.  By your mailbox?

19  A.   Uh-huh.

20  Q.   And when you moved into this home, this house that we see

21  here, had it been recently remodeled?

22  A.   Yeah, that's what we were told.

23  Q.   You were told that when you moved in?

24  A.   Yes.

25            MS. ZIMDAHL:  You can take that photo down.  Thank

1    you.

2    Q.  Now, Connie, when you moved in, did you meet a woman by the

3    name of Suzanne Craft sometime after you moved in?

4    A.  Yes.

5    Q.  Did she also live on the cul-de-sac, ███████████████?

6    A.  Yes.

7    Q.  Where was her home, Ms. Craft's, in relation to yours?

8    A.  Two doors down.

9    Q.  Do you remember her address?

10   A.  Yeah.

11   Q.  What was that?

12   A.  507 ████████████.

13   Q.  Is there a house between Ms. Craft's house?  You said two

14   doors down.  So is there a house between her house and your

15   house?

16   A.  Yes.

17   Q.  And at the time, a couple of years ago, who lived between

18   you and Ms. Craft?

19   A.  Ms. Betty.

20   Q.  Is Ms. Betty's last name Probst?

21   A.  Yes.

22   Q.  And is she an older lady?

23   A.  Yes.

24   Q.  Where does Ms. Betty Probst live now?

25   A.  She's staying at an assisted living home.

1    Q.   And have you visited her there?

2    A.   Yes.

3    Q.   Have you been helping to take care of her home?

4    A.   Yes.

5    Q.   Now, Connie, I'm gonna ask you, do you see Suzanne Craft

6    here in court today?

7    A.   Yes.

8    Q.   Could you please point her out and identify her.

9    A.   She's wearing a black jacket.

10            MS. ZIMDAHL:  Your Honor, could the record reflect the

11   identification of the defendant.

12            THE COURT:  It will so reflect.

13            THE WITNESS:  I'm sorry?

14            MS. ZIMDAHL:  The record's just gonna reflect the

15   identification of the defendant.

16   BY MS. ZIMDAHL:

17   Q.   When you moved into your home around April of 2019, did you

18   see Suzanne Craft around that time?

19   A.   Yeah, briefly.

20   Q.   When was that?

21   A.   I had just gotten back home from the storage unit, and I

22   walked in the house to tell Chell that I was home, and I saw

23   Craft standing there.

24   Q.   What were you doing at the storage unit?

25   A.   Getting all of our boxes.  They'd been there for a couple

1    years.

2    Q.  Was that when you-all had been living elsewhere for a while?

3    A.  Yes.

4    Q.  In the Philippines?

5    A.  Yes.

6    Q.  So Ms. Craft was in your home, and you were moving in.  Was

7    someone helping you move at the time?

8    A.  Yes, my wife's half brother and her father.

9    Q.  Were your older children with you as well?

10   A.  Yes.

11   Q.  And who were those children?

12   A.  S.P.1███ and K.P.███.

13   Q.  Did they come in the house with you, or did they remain

14   outside moving items?

15   A.  No, they stayed outside moving the boxes into the garage.

16   Q.  When you saw the defendant, Suzanne Craft, that day, did she

17   bring anything to your family?

18   A.  Yes.

19   Q.  What did she bring?

20   A.  A bag to like make spaghetti.  It was spaghetti, spaghetti

21   sauce, some bread, and something to drink.

22   Q.  Did you notice anything about that food?

23   A.  Yeah, it was expired.

24   Q.  Did you see the receipt that was in connection with the food

25   that the defendant brought to you?

1    A.   Yes.

2    Q.   And what, if anything, did you notice about that receipt?

3    A.   Chell had said that the receipt said "FS balance."  And I

4    asked her what that meant, and she said "food stamp balance."

5    Q.   And what, if anything, did you take that to mean about the

6    financial condition of the defendant?

7    A.   That maybe she needed some help, maybe she was struggling a

8    little bit.

9    Q.   Did you then discuss with your wife potentially returning

10   that food to Ms. Craft?

11   A.   Yes.

12   Q.   And what did you decide?

13   A.   We decided not to because she might be embarrassed and that

14   it was rude.

15   Q.   Now, did you later learn that the defendant lived with her

16   daughter, S.W.█, at 507?

17   A.   Yes, yes.

18   Q.   Approximately how old was S.W.█ at that time, back in 2019,

19   when you first moved in?

20   A.   Maybe 10 or 11.

21   Q.   Were you and your family, Michella and your children, were

22   you generally cordial with Ms. Craft and her daughter after you

23   moved in?

24   A.   Yes.

25   Q.   Friendly?

1    A.   Yes.

2    Q.   Neighborly?

3    A.   Yes.

4    Q.   Did you hang out with them a lot?

5    A.   No.

6    Q.   Did your children play outside in the cul-de-sac with S.W.█?

7    A.   No.

8    Q.   Were they outside at the same time?

9    A.   Yeah.

10   Q.   But they didn't generally play together?

11   A.   No.

12   Q.   Now, turning your attention to August -- late summer, mid

13   summer, sometime in that time frame of 2019, shortly after

14   you've moved in, was there an incident involving your children

15   and Craft's daughter, S.W.█?

16   A.   Yes.

17   Q.   Did that incident involve the defendant's daughter, S.W.█,

18   using a racial slur around your children --

19   A.   Yes.

20   Q.   -- S.P.2█ and K.P.?

21   A.   Yes.

22   Q.   And you learned about that?

23   A.   I'm sorry?

24   Q.   Did you learn about that?

25   A.   Yes.

1  Q.  What, if anything, did you and Michella instruct your

2  children to do after you learned that S.W.█ had used a racial

3  slur?

4  A.  Just to stay away from her, and if you see her outside, just

5  come in the house.

6  Q.  Did your children follow your instructions?

7  A.  Yes.

8  Q.  Following that incident, did you have many interactions with

9  Ms. Craft?

10  A.  No.

11  Q.  So I'd like to move forward, okay, if you could think

12  forward with me to March 22nd of 2020.  Was your wife, Michella,

13  pregnant at this time?

14  A.  Yes.

15  Q.  Quite far along?

16  A.  Yes.

17  Q.  Were there multiple incidents that day at your home

18  involving the defendant?

19  A.  Yes.

20  Q.  So if we could turn to the first incident that day.  Were

21  you in the backyard smoking that day when Michella came to get

22  you?

23  A.  Yes.

24  Q.  And did you learn from Michella that Ms. Craft was banging

25  on your front door?

1    A.   Yes.

2    Q.   And did you also learn that Ms. Craft had used a racial

3    slur?

4    A.   Yes.

5    Q.   What did you do when you learned this?

6    A.   After she told me what Ms. Craft said, we walked around to

7    the front door to see if she was still there, but I had saw her

8    pulling off and leaving.

9    Q.   So I want to go through that a little bit slowly.  And you

10   said you saw "her" pulling off and leaving.  Who did you see

11   leaving?

12   A.   Craft.

13   Q.   And when you said "pulling off and leaving," can you

14   describe what you mean by that?

15   A.   She would -- she was backing out of the driveway and then

16   went around the cul-de-sac and left.

17   Q.   Whose driveway was she backing out of?

18   A.   Hers.

19   Q.   And is that her home at 507?

20   A.   Yes.

21   Q.   And what was she driving?

22   A.   A white Lexus.

23   Q.   And how did you know that that white Lexus was her vehicle?

24   A.   I seen her as she was coming around.

25   Q.   And have you previously seen her drive that same white Lexus

Connie Pineda - Direct

1    before?

2    A.  Yes.

3    Q.  Just generally to try to place this in time, do you recall

4    about what time of day this first incident occurred?  Morning?

5    Afternoon?

6    A.  It was early afternoon.

7    Q.  After you saw Ms. Craft leave, what did you do?

8    A.  We went back in the house.

9    Q.  So moving forward a few hours later in the day, did

10   something else happen involving Ms. Craft and her vehicle that

11   day?

12   A.  Yes.

13   Q.  When this happened, was your daughter S.P.2█ in the

14   cul-de-sac?

15   A.  Yes.

16   Q.  And she was on a bike?

17   A.  Yes.

18   Q.  Connie, did you personally observe Ms. Craft in the

19   cul-de-sac that day?

20   A.  Yes.

21   Q.  Could you hear Ms. Craft or could you only see her?

22   A.  Only see her.

23   Q.  And where were you that you were able to see what happened?

24   A.  On the side of my house, like by the kitchen/dining room

25   area.

1   Q.  Were you outside the house or inside?

2   A.  Outside.

3   Q.  But you were too far away to hear anything?

4   A.  Yeah, I was too far.

5   Q.  What did you see happen?

6   A.  I just saw Ms. Craft come home, and she pulled up right --

7   like right on top of S.P.2█'s bike.

8   Q.  Did you see anything else?

9   A.  I just saw her roll her window down and her mouth moving,

10  but I don't know what she said at that time.

11  Q.  Did you see S.P.2█ do anything after that happened?

12  A.  She took off back home.

13  Q.  Did you subsequently learn from members of your family the

14  defendant, Craft, had threatened S.P.2█?

15  A.  Yes.

16  Q.  What did you do after you learned this?

17  A.  I asked Chell what happened.  She told me what happened.  We

18  went around to the front yard, and that's when I saw Craft like

19  riding a bike in front of our house.  And I was trying to not

20  react to what Ms. Craft had done.  And I didn't want to

21  embarrass Chell, because she gets embarrassed really easy so --

22  but Chell said, "You have 30 seconds to say something."  And

23  like within 10 seconds, she just went off.

24  Q.  So she didn't give you your full 30 seconds?

25  A.  No.

1   Q.  You mentioned you saw Ms. Craft riding a bike in a

2   figure eight in front of your house.

3   A.  Yes.

4   Q.  Before that time, had you ever seen Ms. Craft on a bike

5   before?

6   A.  No.

7   Q.  And so you go around in front of your house.  What are you

8   thinking in that moment, just --

9   A.  I was angry and just, like, why would an adult say something

10  to a child?

11  Q.  Was anyone else outside at that time?

12  A.  K.P. and my youngest, D.P.█.

13  Q.  Was Ms. Craft's daughter outside anywhere?

14  A.  Yes.

15  Q.  Where was she?

16  A.  She was riding her bike.

17  Q.  And you mentioned that Michella didn't give you your full

18  30 seconds.

19  A.  No.

20  Q.  And you said she went off.

21  A.  Yeah.

22  Q.  Did she yell at Defendant Craft?

23  A.  Yes.

24  Q.  So there was a fair bit of yelling?

25  A.  Yes.

1    Q.  And at some point does Michella go back inside the house?

2    A.  Yes.

3    Q.  Did you remain outside?

4    A.  Yes.

5    Q.  At that point did you say anything to the defendant?

6    A.  Yes, because Craft still was saying "what I say" or "what

7    did you say."  And I just said, "Don't say shit to my kids ever

8    again, and if you have something to say, you come tell me."

9    Q.  And what, if anything, did the defendant, Craft, say at that

10   point?

11   A.  "What?  What?"  She just kept acting like she couldn't hear

12   me.

13   Q.  And what did you do then?

14   A.  I just went in the house.

15   Q.  And at that point was your entire family back inside, or was

16   anyone still outside?

17   A.  No, everybody was in the house.

18   Q.  Where was Ms. Craft after your whole family was back in your

19   house?

20   A.  She stayed in front of our house.  I don't know how long.  I

21   stood there for at least ten minutes.  She was still standing

22   there, and I just went and sat down.

23   Q.  As she was standing there, what was she doing?

24   A.  Just staring at the house.

25   Q.  Did she still have her bike?

Connie Pineda - Direct

1    A.   Yes.

2    Q.   Connie, how did that make you feel?

3    A.   Intimidated.

4    Q.   Did your wife, Michella, have your-all's baby shortly after

5    this?

6    A.   Yes.

7    Q.   And your child S.P.3█ was born early?

8    A.   Yes.

9    Q.   I'd like to take you now to June 7th of 2020.  On that

10   morning, did you and Michella find a racial slur painted on your

11   driveway?

12   A.   Yes.

13   Q.   Did you personally observe that?

14   A.   Yes.

15   Q.   I'd like to show you now Government's Exhibit 18 and just

16   briefly scroll through those.  Are these photographs of the

17   painting that you found on your driveway on June 7th of 2020?

18   A.   Yes.

19   Q.   And what's written here?

20   A.   Do I say the word?

21   Q.   You can.

22   A.   "Go away niggers."

23   Q.   What was your reaction when you found this on the morning of

24   June 7th?

25   A.   Embarrassed, confused.

1   Q.  Did you and Michella attempt to keep your children from

2   seeing this?

3   A.  Yes.

4   Q.  Did you call the police?

5   A.  Yes.

6   Q.  And is that the Louisville Metro Police Department?

7   A.  Yes.

8   Q.  Did they come out?

9   A.  Yes.

10   Q.  When the officers from the police department came out on

11   June 7th, where were they when you first saw them?

12   A.  At Craft's house.

13   Q.  Did you see Defendant Craft outside that day when you found

14   this driveway painting?

15   A.  Yes.

16   Q.  Did you say anything to her?

17   A.  Yes.

18   Q.  What did you say?

19   A.  "Did you do this?"

20   Q.  Did she say anything to you?

21   A.  No.

22   Q.  Did you then work to clean up this painting?

23   A.  Yes.

24   Q.  Was it difficult?

25   A.  Yes.

1    Q.  How'd you get it off?

2    A.  With the power washer.  I mean, it's like it took -- like

3    the color off, but you could still like see what it said

4    because, like, that area was clean and the rest of the driveway

5    was dirty.  So you could still see the letters.

6    Q.  You can kind of see it in this picture.  But, Connie, is

7    your driveway that kind of aggregate driveway where the top of

8    the concrete is off, and it's that bumpy surface?

9    A.  Yes.

10   Q.  Does that make it hard to get paint off the driveway?

11   A.  Yes.

12   Q.  Now, at the time that this painting occurred, did you and

13   your family have surveillance cameras on your house?

14   A.  Yes.

15   Q.  Are those Nest cameras?

16   A.  Yes.

17   Q.  Were they working?

18   A.  No.

19   Q.  Why not?

20   A.  Because we didn't know you had to pay for a subscription for

21   it to record.

22   Q.  When did you realize you had to pay for that subscription?

23   A.  When the police asked us to see the footage, we went in the

24   house to show them and there's nothing there.

25   Q.  So that was on June 7th, 2020?

Connie Pineda - Direct

1    A.   Yes.

2    Q.   After this driveway painting -- and we can take that down,

3    please -- what did you do with those cameras?

4    A.   I moved the one that -- originally it was on the garage, and

5    then I moved it to the tree.  And then when -- and ordered a

6    subscription for it to be able to record.

7    Q.   So then you said you moved it to a tree.  Is that a tree

8    that's between your property and your neighbor, Brian

9    Recktenwald's?

10   A.   Yes.

11   Q.   And that has a better view of your driveway?

12   A.   Yes.

13   Q.   So I want to take you less than two weeks later to June 16th

14   of 2020.  On that date did you and your wife, Michella, find

15   another racial slur painted in your driveway?

16   A.   Yes.

17   Q.   Did you personally observe that one?

18   A.   Yes.

19   Q.   I'm showing you Government Exhibit 19 briefly.  This is

20   another photograph of those paintings.  And are these from June

21   16th of 2020, scrolling briefly?

22   A.   Yes.

23   Q.   And does this one say "no N-words" with a swastika

24   underneath?

25   A.   Yes.

1   Q.  And your reaction to this?

2   A.  Now I'm mad, very, very angry.

3   Q.  Who did you --

4   A.  Still confused but angry.

5   Q.  I'm sorry.  I --

6   A.  Still confused but angry.

7   Q.  Who did you think this was directed at, Connie?

8   A.  My two older kids.

9   Q.  And why did you think that?

10  A.  Because they're mixed with Black.

11  Q.  Did you and Michella once again attempt to keep all your

12  children from seeing this?

13  A.  Yes.

14  Q.  Including your older children?

15  A.  Yes.

16  Q.  Did you call the police after you found the second driveway

17  painting?

18  A.  Yes.

19  Q.  Now, after you discovered this one, did you review to see if

20  your Nest camera system had captured any video related to this

21  one?

22  A.  Yes.

23  Q.  Did you find that it did?

24  A.  Yes.

25  Q.  Do you remember the video that you captured?

1    A.   Yes.

2            MS. ZIMDAHL:   And we can take this down, please.

3    Q.   What did that video show?

4    A.   It showed Craft coming out of her garage and walking down to

5    our driveway and painting it and then walking back to her house.

6    Q.   Now, after you realized its significance, that you had

7    captured video, did you save it?

8    A.   Yes.

9    Q.   And did you ultimately turn over that video, along with

10   other relevant videos, to the FBI?

11   A.   Yes.

12   Q.   And just as you did with the last one, were you able to

13   ultimately clean at least some of this off your driveway?

14   A.   Yes.

15   Q.   Did you power wash it once again?

16   A.   Yes.

17   Q.   Move forward again, this time 11 days later to June 27th of

18   2020, and that morning did you and Michella awake yet again to

19   find another racial slur painted on your driveway?

20   A.   Yes.

21   Q.   I'm showing you Government Exhibit 21.   Is this a photograph

22   or series of photographs of the painting that you observed on

23   your driveway on that date?

24   A.   Yes.

25   Q.   Was June 27th the day of the neighborhood yard sale in Lake

1    Forest?

2    A.  Yes.

3    Q.  Is that a day when a lot of people come into your

4    neighborhood?

5    A.  Yes.

6    Q.  And does this one say "go N-words" once again with a

7    swastika painted underneath, Connie?

8    A.  Yes.

9    Q.  What is your reaction to this one when it happened at the

10   time?

11   A.  Very angry, very, very angry.

12   Q.  Now, given the day that this occurred, did your wife ask you

13   to do something specific when this occurred?

14   A.  Yes.

15   Q.  And what did she ask you to do?

16   A.  To move the truck over the words.

17   Q.  Why did you do that?

18   A.  So everybody that was -- kept coming through there would

19   stop taking pictures and so the kids wouldn't see it.

20   Q.  And you said people taking pictures.  Were people gathering

21   to look at this?

22   A.  Yes.

23   Q.  How did that make you feel?

24   A.  Hurt really that the amount of people that kept either

25   videoing or taking pictures wouldn't come let us know that

```
 1    something horrible was on our driveway and then angry.
 2    Q.   And did you call the police about this one?
 3    A.   Yes.
 4    Q.   And, in fact, you called Louisville Metro Police Department
 5    after every single one of these driveway paintings; is that
 6    correct?
 7    A.   Yes.
 8    Q.   And they responded?
 9    A.   Yes.
10    Q.   And for this one, did you again review your Nest camera
11    system to see if it captured any footage?
12    A.   Yes.
13    Q.   And did it?
14    A.   Yes.
15    Q.   And did you review that?
16    A.   Yes.
17    Q.   And could you tell us what it found.
18    A.   Same thing, Craft coming from her garage down the sidewalk
19    and slowly walks up there, does -- paints on the driveway again
20    and walks back to her garage.
21    Q.   Did you save that?
22    A.   Yes.
23    Q.   Saved it to your computer?
24    A.   Yes.
25    Q.   And at the time that you had that and you called the police
```

1    to your home, did you provide that to the Louisville Metro

2    Police Department?

3    A.  Yes.

4    Q.  And you provided the previous video to Louisville Metro

5    Police Department?

6    A.  Yes.

7    Q.  And did you also provide this video to the FBI?

8    A.  Yes.

9    Q.  Along with all of the other Nest camera videos?

10   A.  Yes.

11   Q.  Now, how did you clean up this gold paint on your driveway?

12   A.  At first I tried some paint thinner.  I thought -- it says

13   it removes paint.  So I thought I would use paint thinner, but

14   that didn't work.  So a neighbor across the street had given me

15   some stuff called Goo Gone, and I used that to take it off.  And

16   that worked pretty good.

17   Q.  So that helped quite a bit?

18   A.  Yeah.

19   Q.  After all three of these, did you still have quite a bit of

20   residue and issues with your driveway left behind from these

21   paintings?

22   A.  Yes.

23   Q.  During the course of these events and with all of these

24   racial slurs painted on your driveway, were you and Michella

25   reaching out and trying to find ways to get help?

1   A.   Yes.

2   Q.   You mentioned that you called Louisville Metro Police, LMPD,

3   after each of these events.

4   A.   Yes.

5   Q.   Did those calls result in a stop to the driveway paintings

6   and the harassment of your family?

7   A.   No.

8   Q.   Did you also contact your homeowners association, the Lake

9   Forest homeowners association for help?

10  A.   Yes.

11  Q.   Did that in any way result in a stop to the painting on your

12  driveway and the harassment?

13  A.   No.

14  Q.   Did you post about what was happening to Facebook?

15  A.   Yes, after the third time.

16  Q.   Why did you do that?

17  A.   We didn't know what else to do.  We couldn't get help from

18  anybody.  So we thought, if we posted it, the police department

19  would get some heat and they would help us.

20  Q.   Were you frustrated?

21  A.   Very frustrated.

22  Q.   Were you upset?

23  A.   Yes.

24  Q.   Were you angry that nobody was helping your family?

25  A.   Yes.

1  Q.  At some point after the three times your driveway was

2  painted, did you connect with a civil attorney?

3  A.  Yes.

4  Q.  How did that happen?

5  A.  She responded to one of our posts saying something like, "I

6  can help you.  If we can't hold her accountable legally, then

7  maybe we can hold her accountable civilly."

8  Q.  And so in July 2020, through that civil attorney, did your

9  family file a civil lawsuit against Defendant Craft and the Lake

10 Forest homeowners association?

11 A.  Yes.

12 Q.  What was your reason for filing that civil lawsuit?

13 A.  Just to get her to stop.  We thought that would get her to

14 stop.  She thought maybe an attorney would get her to, you know,

15 leave us alone, that she would stop.

16 Q.  And did that lawsuit seek an injunction?

17 A.  Yes.

18 Q.  And did it also seek monetary damages?

19 A.  Yes.  It didn't really talk about it.

20 Q.  But that was part of the lawsuit; correct?

21 A.  Yeah.

22 Q.  Yeah.  Did you think you would be able to get significant

23 money from that lawsuit?

24 A.  No.  It wasn't about the money.  I didn't care if we got a

25 penny from her.

1    Q.  During the time that you knew her, what did you think that

2    Ms. Craft's employment was?

3    A.  I didn't really know much about her except she was a -- I

4    don't know -- a bartender or waitress, something like that.

5    Q.  Did you think that she had financial means?

6    A.  Didn't know if she did or not.

7    Q.  What did you want as a resolution to that lawsuit?

8    A.  Just for her to leave us alone.

9    Q.  Did it work?

10   A.  No.

11   Q.  I want to turn your attention now to the fall of 2020, after

12   the time you filed that moving forward, November 2020.  Did you

13   find two letters in your yard?

14   A.  Yes.

15   Q.  I want to talk about how that came to be.  So could you

16   please tell the members of the jury how you found two letters in

17   your yard.

18   A.  I was blowing leaves from underneath the rocks and the water

19   fountain that we have there and noticed a bag of something.

20   That's when I picked it up.  Michella was on the lawn mower.  So

21   I took it to her, and that's when she opened it and read it.

22          MS. ZIMDAHL:  Could we put up Government Exhibit 16,

23   please.

24   Q.  And you can touch the screen and circle for us, if you

25   would.  About where did you find --

1      [Witness indicating.]

2   Q.  So right there, kind of in that fountain area, near the

3   rock?

4   A.  Yeah.

5   Q.  That general area?  And it was in a bag?

6   A.  Yes.

7   Q.  Was it like a ziplock bag or --

8   A.  Yes.

9   Q.  -- am I describing that right?

10  A.  Yes.

11  Q.  Did you find another letter in your yard around the same

12  time?

13  A.  Yes.

14  Q.  And was that in the same or different location?

15  A.  Same spot.

16  Q.  So kind of in this area here?  Am I -- I want to make sure

17  I'm describing this properly.

18  A.  Yes.

19         MS. ZIMDAHL:  Okay.  So if the record would just

20  reflect that the witness has identified the area near the

21  fountain and the rock in her front yard.

22         THE COURT:  I think the record properly reflects that,

23  yes.

24         MS. ZIMDAHL:  Thank you.

25  BY MS. ZIMDAHL:

1  Q.  So you found a total of two letters in your yard?

2  A.  Yes.

3  Q.  Did those letters that you found share similar

4  characteristics?

5  A.  Yes.

6  Q.  And what are those characteristics?

7  A.  They were threatening, and they had the cutout -- cutout

8  pieces of paper.

9        MS. ZIMDAHL:  If we could please put up Government

10 Exhibit 11A just for the witness and just scroll through that

11 quickly.

12     And then 12A just for the witness, please.

13 Q.  Connie, are these the two letters that you found in your

14 yard?

15 A.  Yes.

16        MS. ZIMDAHL:  All right.  I'd like to put these up,

17 please.  If we could start with Government Exhibit 11A for the

18 jury and go with page 4.

19 Q.  Connie, is this one of the letters that you found in your

20 yard by the fountain?

21 A.  Yes.

22 Q.  Did you open this with your wife, Michella?

23 A.  Yes.

24 Q.  And what does this letter say?

25 A.  "You had enough nigger bitch."

1    MS. ZIMDAHL:  And if we could please put up Government

2    Exhibit 12A, page 4.

3    Q.  Is this one of the other letters you found in your yard?

4    A.  Yes.

5    Q.  Does this one say "Die stupid bitch, move out"?

6    A.  Yes.

7    Q.  Connie, who did you think these were directed at when you

8    found them?

9    A.  My wife.

10   Q.  Why did you think that?

11   A.  I just figured because she's the bio mom of the kids.

12        MS. ZIMDAHL:  If we could please put up Government

13   Exhibit 12B.  And this is part of that threat I just read.  If

14   we could go to pages 5 and 6.

15   Q.  Included with that threat, the one that says "die stupid,"

16   did that also include -- back one page -- a piece of pasta box?

17   A.  Yes.

18   Q.  Barilla pasta box?

19   A.  Yes.

20   Q.  On the back of that, if we could go forward a page, did that

21   also include the words "die bitch" in cutout letters?

22   A.  Yes.

23   Q.  Who did you think that was directed at?

24   A.  My wife.

25        MS. ZIMDAHL:  You can take that down.

Connie Pineda - Direct

1   Q.  After you found these, did you and Michella go back and

2   review your Nest cameras to see if you had any footage that

3   might shed light on how they got there?

4   A.  Yes.

5   Q.  And do your cameras save videos for a certain period of

6   time?

7   A.  Yes.

8   Q.  So were you able to find some footage of someone putting

9   something in your yard near the fountain?

10  A.  Yes.

11  Q.  Were some of those videos from October 18th, 2020?

12  A.  Yes.

13  Q.  And did you also find another relevant video from November

14  1st, 2020?

15  A.  Yes.

16  Q.  And do your videos save, you know, screenshots like -- that

17  would save the front of those videos that have dates on them and

18  times?

19  A.  I'm sorry?

20  Q.  Do you have -- when those videos save, they capture the

21  dates?

22  A.  Yes.

23  Q.  And so I'd like to now start going through those videos, and

24  I'd like to start with the October 18th, 2020, video.  And I'd

25  ask you just to follow along.

```
 1              MS. ZIMDAHL:  And I'd ask if we just now play for

 2    everyone Government Exhibits 23B, C, and D, and just play those

 3    in succession.

 4         (Government playing videos.)

 5    Q.   The videos that we just watched, are those the videos that

 6    you and Michella found when you reviewed the Nest camera video

 7    after you found the letters in your yard?

 8    A.   Yes.

 9    Q.   And those are all from October 18th of 2020?

10    A.   Yes.

11    Q.   In that video, do we see a person approaching your yard from

12    Defendant Craft's house?

13    A.   Yes.

14              MS. ZIMDAHL:  And if we can just put up 23B.  Don't

15    play it.  Just put it up.

16    Q.   Does the person on the video appear to be coming from

17    Ms. Craft's house?

18    A.   Yes.

19    Q.   In the area where we saw in that video that the person did

20    something, dropped an item, that area, is that where you found

21    the letters?

22    A.   Yes.

23    Q.   And, Connie, you personally found the letters?

24    A.   Yes.

25    Q.   And so having observed this video, the video you found, and
```

1  knowing where you found the letters, those areas are the same?

2  A.  Yes.

3  Q.  Towards the end of the video, what did we see the individual

4  do who had just dropped something by your fountain?

5  A.  Yes.

6  Q.  What did we see that person do in the video?

7  A.  She dropped the letter by the rock, in between the rock and

8  the water fountain.

9  Q.  And then what did that person do next?

10 A.  Oh, then she went back to her house.  She's fiddling around

11 with I don't know what, gets in her car and leaves.

12 Q.  And did you recognize the vehicle in the video?

13 A.  Yes.

14 Q.  How so?

15 A.  It's the same white Lexus with the same brakes that make

16 that sound, that whistling sound.

17 Q.  Had you previously seen Defendant Craft drive that vehicle?

18 A.  Yes.

19 Q.  You previously heard it?

20 A.  Yes.

21 Q.  I'd like to now move to the second video you found, the

22 first set of videos being from October that we just addressed.

23 I'd like to move to the other one you found on November 1st,

24 2020.  And is that the early morning hours after Halloween?

25 A.  Yes.

1          MS. ZIMDAHL:  If we could now play Government

2    Exhibit 24B, and I'd just ask you to watch along while we play

3    it.

4          (Government playing video.)

5    Q.   Is this the -- one of the videos that you found when you and

6    Michella went to review your Nest camera video after finding the

7    letters in your yard?

8    A.   Yes.

9    Q.   And what do we see here on this video?

10   A.   Craft drop a letter behind the rock and then walk back to

11   her garage.

12   Q.   And, again, that area where the item is dropped, is that

13   where you found the other one of the letters?

14   A.   Yes.

15   Q.   Now, after you found these Nest videos and realized their

16   significance, did you save these videos?

17   A.   Yes.

18   Q.   Other than titling them so that you could save them, did you

19   alter these videos in any way?

20   A.   No.

21   Q.   Did you subsequently provide these videos to law

22   enforcement?

23   A.   Yes.

24   Q.   Did you provide them to the FBI?

25   A.   Yes.

1          MS. ZIMDAHL:  We can take this down.  Thank you.

2    Q.  So around the same time that you found these letters in the

3    yard, were you and your family also receiving threatening

4    mailings?

5    A.  Yes.

6    Q.  Letters that came to you through the mail instead of your

7    yard?

8    A.  Yes.

9    Q.  Did those mailed letters share similar characteristics to

10   the threatening letters that you found in your yard?

11   A.  Yes.

12   Q.  Can you describe what some of those similar characteristics

13   are?

14   A.  Threatening, racist, and the same cutout letters.

15   Q.  When those letters came into your home, did you and your

16   wife look at them together sometimes?

17   A.  Yes.

18   Q.  Did Michella show them to you?

19   A.  Yes.

20          MS. ZIMDAHL:  I'd like to look at a few of them with

21   you now, and we'll try to go through them briefly here.

22      If we could start with Government Exhibit 5A and start with

23   the first page, please.

24   Q.  Who is this mailing addressed to?

25   A.  My wife.

1    Q.   And is there anything off about your wife's name here?

2    A.   Her name's not spelled right.

3    Q.   Your wife's name is not Michelle?

4    A.   No.

5    Q.   Is that your address?

6    A.   Yes.

7    Q.   And this letter was mailed?

8    A.   I'm sorry?

9    Q.   And this was a mailed letter?

10   A.   Yes.

11   Q.   As we see there.

12           MS. ZIMDAHL:  Can we go to the seventh page, please.

13   Q.   Connie, have you seen this threat before?

14   A.   Yes.

15   Q.   At some point after it arrived at your home?

16   A.   Yes.

17   Q.   And did you discuss this with Michella?

18   A.   Yes.

19   Q.   And I'll just read it.  Does it say "N-words leave.  We hate

20   your kind.  Last chance"?

21   A.   Yes.

22   Q.   What did you think when you read this and you saw it at your

23   home?

24   A.   I'm sorry?

25   Q.   What did you think when you saw this come into your home?

1    A.   Somebody doesn't like our kids.

2             MS. ZIMDAHL:  Can we go to page 4, please.

3    Q.   When this particular letter -- when you-all saw this, did

4    you see this scribbled out text on this particular piece of

5    mailing?

6    A.   Yes.

7    Q.   And did you and Michella try to figure out what was

8    underneath this scribbled out text?

9    A.   Yes.

10   Q.   Were you curious?

11   A.   Yes.

12   Q.   Were you trying to make out what was underneath that?

13   A.   Yes.

14   Q.   Were you able to figure it out?

15   A.   No.

16   Q.   Did you try?

17   A.   Yes, we tried.  We put it up to the light.  The kids said

18   that you can look on TikTok how to do it, but --

19   Q.   And you at that time had the actual physical envelope;

20   correct?

21   A.   Yes.

22   Q.   Not just a picture of it?

23   A.   No, we had the envelope.

24   Q.   And you couldn't see through -- figure out what that

25   actually had underneath?

1    A.   No.

2              MS. ZIMDAHL:  Let's move on to Government Exhibit 7A,

3    please.

4    Q.   And who is this directed to, the address line?

5    A.   Who's it addressed to?

6    Q.   Addressed to?

7    A.   My wife.

8    Q.   That's a bad question.  And, again, misspelling of your

9    wife's name?

10   A.   Yes.

11   Q.   And is that your address?

12   A.   Yes.

13   Q.   And the return address, does that say "N-let Destroyer"

14   there?

15   A.   Yes.

16             MS. ZIMDAHL:  Can we go to the tenth page, please, of

17   this exhibit.

18   Q.   There was a piece of pasta box in this envelope; is that

19   correct?

20   A.   Yes.

21   Q.   And what kind of pasta does this look to be from?  I know

22   it's upside down, but if we can orient ourselves a little bit.

23   A.   Barilla.

24   Q.   And I know just a moment ago we were looking at one of the

25   threats that you had found in the yard.  Did that also have a

1  piece of pasta box in it?

2  A.  Yes.

3          MS. ZIMDAHL:  If we could back up one page to page 9.

4  Q.  Have you seen what was on the back of this pasta box before?

5  A.  I'm sorry?  What did you say?

6  Q.  Have you seen what was glued to the back of the pasta box

7  before, this threat?

8  A.  Yes.

9  Q.  At some point after it arrived at your home, did you discuss

10  this with Michella?

11  A.  Yes.

12  Q.  And I'll read it.  Did it say "two dead N-lets"?

13  A.  Yes.

14  Q.  Did you take this as a threat against your family?

15  A.  Absolutely.

16  Q.  And who did you think this was directed at?

17  A.  My two older kids.

18  Q.  Did you take it seriously?

19  A.  Absolutely.

20  Q.  Did you take steps to try to protect your family when you

21  saw this?

22  A.  Yes.

23  Q.  How did you feel when you saw this threat?

24  A.  Scared, very scared.

25          MS. ZIMDAHL:  If we could move on, please, to

1    Government's Exhibit 8A.

2    Q.   Who is this particular mailing addressed to?

3    A.   My wife.

4    Q.   Again with the misspelling of her name?

5    A.   Yes.

6    Q.   And even though there is that misspelling, did you generally

7    know, given the address and the close similarity, who it was

8    directed to?

9    A.   Yes.

10   Q.   But definitely not a correct spelling of your wife's name;

11   is that right?

12   A.   No, it's not right.

13   Q.   And is this the same return address we've seen before?

14   A.   Yes.

15          MS. ZIMDAHL:  And I'll say it, "N-let Destroyer."

16       Can we go to the fourth page, please, and one more forward.

17   Q.   Have you seen this threat before?

18   A.   Yes.

19   Q.   Discussed it with Michella?

20   A.   Yes.

21   Q.   And does this one say "You will die, bitch"?

22   A.   Yes.

23   Q.   What did you take those words to mean?

24   A.   That somebody's gonna kill my wife.

25   Q.   Did you take this threat seriously?

1    A.   Yes.

2    Q.   How did you feel when you saw this threat at your home?

3    A.   Very scared, very scared.

4         MS. ZIMDAHL:   If we could go now to Government

5    Exhibit 6A, please.

6    Q.   Is this, again, addressed to Michelle Pineda?

7    A.   Yes.

8    Q.   And with that same return address we've seen before?

9    A.   Yes.

10   Q.   If we can go to the fourth page, please.  Have you seen this

11   threat before?

12   A.   Yes.

13   Q.   And what does this one say?

14   A.   I'm sorry?  What did you say?

15   Q.   What does this one say?

16   A.   "Move out or bullets."

17   Q.   Connie, what did you think when you read this?

18   A.   The threats are getting more serious.

19   Q.   Did you take it seriously?

20   A.   Yes.

21   Q.   Now, in addition to receiving threatening letters in the

22   mail and your yard, did your family then also receive a package

23   containing bullets?

24   A.   Yes.

25   Q.   Were you physically there the day that Michella found those

1   bullets?

2   A.  Yes.

3   Q.  Where were you when they were found?

4   A.  On the side of the house between my house and Mr. Brian's

5   house.

6   Q.  And when you say "Mr. Brian," is that Brian Recktenwald?

7   A.  Yes.

8   Q.  Does he live in the yellow house next door to you?

9   A.  Yes.

10  Q.  What were you doing when Michella found those?

11  A.  We were moving red bricks to his backyard.

12  Q.  I'd like you to take a look at Government Exhibit 10A, and

13  let's scroll through those.  Are these pictures of the envelope

14  that you saw your wife, Michella, find?

15  A.  Yes.

16  Q.  You've seen this before?

17  A.  Yes.

18        MS. ZIMDAHL:  Can we go back to the first page,

19  please.

20  Q.  Who is this addressed to?

21  A.  My wife.

22  Q.  And did you and Brian Recktenwald observe Michella open this

23  envelope?

24  A.  Yes.

25  Q.  And turning to page 7, please, do you remember these two

1   bullets being in this envelope?

2   A.  Yes.

3   Q.  And just so I'm perfectly clear, there were two physical

4   bullets in the envelope, not a picture?

5   A.  Two physical bullets.

6   Q.  And what did you-all discuss when you found two physical

7   bullets, the three of you that were outside?

8   A.  Mr. Brian said, "Put them away.  They might be live.  Just

9   put them away.  Don't touch them."  So we put them in the bag

10  where the other letters were.

11        MS. ZIMDAHL:  And if we could just back up to page 8,

12  please.  I'm sorry.  I should have said 10B, page 8.  I

13  apologize.  I'm giving poor directions.

14  Q.  This note "get out," was that there with those bullets?

15  A.  Yes.

16  Q.  So you said you took this because you were worried about

17  them and put it in the bag with the bullets.  You put this

18  mailing with the bullets in a bag, and you added it to the

19  letters.  Where were you storing everything?

20  A.  I'm sorry?  What's the last thing you said?

21  Q.  Where were you storing everything?  You said you added this

22  to the other letters.  Where did you store them?

23  A.  In a ziplock bag in the freezer.

24  Q.  And why were you storing them in a freezer?

25  A.  We didn't want the kids to see them.  So we put them in the

1    freezer that there was only raw meat because they wouldn't go

2    there to look for food.

3    Q.  And how did you feel after you received this envelope?

4    A.  Scared, intimidated, confused on why somebody would want to

5    kill my wife and kids just because of their skin color.

6    Q.  So now you've said you were storing everything in the

7    freezer to keep it away -- make sure your children couldn't find

8    them.  Did you and Michella ultimately take all of those items

9    that you were storing, all the ones that you've received,

10   whether by the mail or in the yard, and turn those over to an

11   LMPD detective?

12   A.  Yes.

13   Q.  You met with him to turn them over?

14   A.  Yes.

15   Q.  And did you later find one more letter and turn that over to

16   FBI Task Force Officer Kristen Downs?

17   A.  Yes.

18   Q.  We've touched on this quite a bit, but I want to just

19   clarify.  Did you take all of these events, receiving these

20   threatening mailings, seriously?

21   A.  Absolutely.

22   Q.  Were you afraid?

23   A.  Yes.

24   Q.  Were you scared for your children?

25   A.  Yes.

Connie Pineda - Direct

1   Q.  And how has that impacted your family?

2   A.  My kids have become glued to their rooms.  They're like

3   frozen in time, like they're still that 14- and 11- and 8-year-

4   old kids.  My older kid should be going to the movies, going

5   bowling, getting their license.  My oldest daughter's given up

6   her dream of playing softball.

7       My wife and I used to have such a strong foundation, and

8   over time it has just ruined our marriage, which we're adults.

9   We will get past it.  It's my kids I'm worried about.  And I'm

10  hoping over time we can pick up the pieces and get our family

11  back where it was before we moved to █████████.

12              MS. ZIMDAHL:  Your Honor, I have no further questions.

13              THE COURT:  Members of the jury, we're going to take

14  our morning break now.  Remember the admonition not to discuss

15  the case amongst yourselves or with anyone else.  We'll be back

16  in about 12-15 minutes.

17      (Jury out 10:24 a.m.)

18              THE COURT:  You may be seated.  The jury has left the

19  courtroom.

20      Although you would not want to talk with your witness before

21  she is subjected to cross-examination, if you need to let

22  Ms. Pineda also step down and take a break --

23              MS. ZIMDAHL:  Thank you, Your Honor.

24              THE COURT:  -- that would be appropriate.

25      Do we need to take up anything during the break?

 1              MS. REA:  No, Your Honor.

 2              MR. TIEKE:  No, Your Honor.

 3              THE COURT:  I do expect, upon return from the break, I

 4   will have the draft instructions that I mentioned to you.

 5              MS. ZIMDAHL:  Thank you, Your Honor.

 6              MS. REA:  Thank you, Your Honor.

 7          (Recess at 10:25 a.m. until 11:35 a.m.  Jury out.)

 8              THE COURT:  Well, that was a slightly longer break

 9   than anticipated.  I should not have bragged to the jury this

10   morning that we were doing so well.  You now have received the

11   draft instructions; is that correct?

12              MR. TIEKE:  Yes, Your Honor.

13              MS. REA:  Yes, Your Honor.

14              THE COURT:  We had a couple of technical difficulties

15   in producing that batch, had to call the IT folks up to chambers

16   to help us with that.  So that's why we had a delay.

17       We will -- as a result of that, we will have our lunch break

18   a little later than anticipated.  I think, unless your cross

19   goes particularly long, we'll probably want to take the next

20   witness because you-all had indicated it would be briefer than

21   predicted in the filing; correct?

22              MR. TIEKE:  Yes, Your Honor.

23              THE COURT:  So we'll try and move along, make up a

24   little bit of the lost time, if possible, and have our lunch

25   break a little later.

Connie Pineda - Cross

1    After you-all have had an opportunity to review the draft,

2  then we can talk about when we want to schedule a discovery

3  conference.

4    All right.  Anything else we need to talk about before we

5  bring the jury in?

6          MR. TIEKE:  No, Your Honor.

7          THE COURT:  You want to have the witness retake the

8  stand first.

9          MR. TIEKE:  Yes, Your Honor.

10         MS. ZIMDAHL:  Yes.

11    (Jury in 11:40 a.m.)

12         THE COURT:  Members of the jury, I apologize for the

13  unexpected delay.  It was a result of some equipment

14  difficulties.  You know how it is.  You have to call in IT from

15  time to time when things don't work right, and that's what we

16  had to do during the break.  A task that we thought would only

17  take a few minutes took much longer as a result.  You can

18  attribute the delay to me and not to the parties, but we are now

19  ready to proceed.  We will probably take our lunch break a

20  little later today than we did yesterday as a result of the

21  delay.

22    Ms. Rea.

23         MS. REA:  Thank you, Your Honor.

24                         CROSS-EXAMINATION

25  BY MS. REA:

1    Q.  Good morning, Ms. Pineda.  My name is Angela.  I have a few

2    questions for you.  If I ask something poorly or in a way that's

3    confusing, please just tell me.

4        After you and your family moved into the Lake Forest

5    subdivision in April 2019, shortly thereafter you met Ms. Craft;

6    correct?

7    A.  Correct.

8    Q.  Okay.

9    A.  Yes.

10   Q.  I'll also -- I was gonna ask you to keep your voice up.  And

11   you also met her daughter, S.W.█?

12   A.  Not, like, "Hey, this is S.W.█," but, yeah, I seen her.

13   Q.  Okay.  Was she with Ms. Craft when Ms. Craft came over?

14   A.  Yes.

15   Q.  Okay.  And thereafter, for a period of time, the

16   relationship was something you described as cordial?

17   A.  Yes.

18   Q.  That included exchanging messages?

19   A.  Yes.

20   Q.  And some of those messages were from your wife, Michella;

21   right?

22   A.  Yes.

23   Q.  And some of those messages were from you?

24   A.  Yes.

25   Q.  And were there times when you would send messages to

Connie Pineda - Cross

1   Ms. Craft that were from Michella or from her point of view?

2   A.  Yes.

3   Q.  Okay.  We've also heard you testify about her name and been

4   shown the letters and the way that those were addressed.  Did

5   anyone call your wife Michelle?

6   A.  Anyone -- like anyone in the world or --

7   Q.  Anyone you knew.

8   A.  Anyone that I knew?  Probably.

9   Q.  Okay.  Was it something that from time to time happened,

10  that people would call her Michelle?

11  A.  They would because she wouldn't correct them.  She's too

12  shy.

13  Q.  Okay.  Did you ever refer to her in that fashion to other

14  people, not to her?

15  A.  No.

16  Q.  Okay.  When you were testifying earlier today, you were

17  asked questions about moving items out of the basement.  Do you

18  recall that?

19  A.  Yes.

20  Q.  And among those items that you moved out of the basement,

21  you said, and put on the curb, did you say there was paint?

22  A.  Yes.

23  Q.  Okay.  Was your first conversation with the FBI about paint

24  and moving paint out of the basement -- did that take place,

25  that conversation, in the last few weeks?

1    A.  I really don't know the date it started.

2    Q.  No, I'm not -- I'm not giving you a what date.  Was it more

3    recent that they asked you about that?

4    A.  Yes.

5    Q.  Okay.  Since you have moved into the house at 510, you have

6    built or have had built a fence around your property; right?

7    A.  Yes.

8    Q.  And that wasn't built all at one go, was it?

9    A.  You mean like in one day?

10   Q.  No, at one time.  Was it built in stages?

11   A.  I don't understand your question.

12   Q.  Did you build part of the fence and then did you later

13   decide to extend the fence?

14   A.  I don't -- I don't really know.

15   Q.  Okay.

16   A.  I just remember building the fence.  I don't remember a

17   conversation about how big or how -- I mean, I don't know.

18   Q.  Okay.  So you don't recall if you built part of it and then

19   decided you were gonna build more of that fence?

20   A.  No.  I remember building a lot of it.  I mean, I just

21   remember building the fence from one end to the other.

22   Q.  Okay.  But that fence, whenever it was built, was not there

23   at the time that you moved in?

24   A.  No.

25   Q.  It was built later in time?

1    A.   Yeah.

2    Q.   Okay.  You have talked through with us a time in March of

3    2020 when there was a confrontation involving Ms. Craft; right?

4    A.   Right.

5    Q.   And you recall that that occurred on March 22 of 2020.

6    A.   Yes.

7    Q.   Okay.  Was there a time shortly thereafter where S.W.█ again

8    tried to play with your children?

9    A.   I don't think so, but I don't remember.

10   Q.   Okay.  Not that you were -- not that you know of right now?

11   A.   No.

12   Q.   Okay.  Did you communicate with the HOA about this event

13   involving Ms. Craft?

14   A.   About the fight?

15   Q.   Yes, ma'am.

16   A.   Not about the fight, I don't think so.

17   Q.   Okay.  If I were to show you an email exchange -- well,

18   first of all, do you know who Maggie Warner Smith is?

19   A.   Yes.

20   Q.   Who is she?

21   A.   She works for -- in the HOA building.

22          MS. REA:  Okay.  And I'd like to just share my screen

23   with the witness, please.

24   Q.   I'm gonna show you an email.  Tell me when you can see it.

25   Can you see it?

1    A.  Oh, yeah, I remember that.

2    Q.  Okay.  And I want you to be able to read it all.  So I

3    wanted to wait.  So, first of all, is this an email exchange

4    that took place -- I'm looking at 3311.  Is this an email

5    exchange that took place between you and between Maggie?  Just

6    to orient you, I scrolled to the bottom to get to the earliest

7    message.

8    A.  Okay.  Yeah.

9    Q.  Okay.  And was this the same message that was sent on March

10   25th, 2020?

11   A.  What was the question?

12   Q.  Is this a message that you -- a message or a series of

13   messages that took place on March 25th of 2020?

14   A.  Yeah, that's what it says.

15   Q.  Okay.  Reading these messages, is this an exchange that is

16   about an altercation with Ms. Craft?

17   A.  Yes.

18   Q.  Okay.  Is there any other altercation with Ms. Craft that

19   took place close in time that this email exchange could be

20   discussing?

21   A.  I don't think so.

22   Q.  And in this exchange, what you describe to Maggie was that

23   you got into -- or excuse me -- that Michelle and you got into

24   it with her; correct?

25   A.  Correct.

Connie Pineda - Cross

1    Q.  And you used the name "Michelle"?

2    A.  That's autocorrect on your phone.

3    Q.  But that's what the email says?

4    A.  Yeah.

5    Q.  It says "Michelle"?

6    A.  Uh-huh.

7    Q.  And you also told Maggie, "You would have loved to have been

8    there."

9    A.  I told Maggie that?  Yeah, I said that.

10   Q.  Yes, ma'am.  Okay.  Maggie did respond to you, and she used

11   the name "Michelle" as well, didn't she, in her response?

12   A.  Yes, she did.

13   Q.  Okay.  You then responded to Maggie's message; right?

14   A.  Yes.

15   Q.  Okay.  Same day but it looks like later that day.  Do you

16   see that?

17       Okay.  Your description of the event is "Her daughter asked

18   my oldest daughter if she could play with her."  Did you write

19   that?

20   A.  I must have.  That's what it says.

21   Q.  Okay.  Your oldest daughter is K.P.; right?

22   A.  Yeah, but she wouldn't have asked my older daughter.

23   Q.  Okay.  But that's what --

24   A.  Yeah, I know that's what it says but --

25   Q.  Okay.  And you write that your oldest daughter said no

1    "because you are disrespectful to my parents and mean to my

2    younger sister."  Correct?

3    A.  Correct.

4    Q.  Then you write -- and I just want to -- I don't want to

5    leave anything out.  "So she went and told her mom."  The next

6    thing that you write is "So crazy decides to come over banging

7    on our door."  Right?

8    A.  Uh-huh.

9    Q.  "And throwing the 'F' bomb around."  And you say that "We

10   went off in her."  That's probably a typo.  On her; right?  Then

11   you write, "Man, did that feel good."  Right?

12   A.  Yes.

13   Q.  Okay.  And you wrote "been wanting to do that for a year

14   now."

15   A.  Yes.

16   Q.  Then you respond that the kids are good; right?

17   A.  Uh-huh.

18   Q.  And then the rest of it is about a doctor's appointment and

19   that the baby is going to be born early, and you're going to the

20   doctor; correct?

21   A.  Yes.

22   Q.  Okay.  In that email exchange between you and Maggie of the

23   HOA, there is no mention of use of racial slurs; right?  I

24   didn't mean to take it down.  I'm perfectly glad to still have

25   you look at it.  There is no mention of racial slurs; correct?

Connie Pineda - Cross

1    A.   Correct.

2    Q.   There is no mention of threats to run over S.P.2█; correct?

3    A.   Correct.

4         MS. REA:   Okay.   Now we can take that down, please.

5    Thank you.

6    Q.   After the mailings -- and when I say "mailings," I mean the

7    items received, whether in the mailbox or whether found in the

8    yard -- after those things were in your possession, there were

9    posts about them that were placed on the Facebook page; correct?

10   A.   Correct.

11   Q.   And do you remember the date -- me and technology -- the

12   date that you posted -- first posted information about those

13   mailings?

14   A.   No.

15        MS. REA:   Okay.   If I can share my screen just with

16   the witness again.

17   Q.   Did you post about those -- can you see that?   I can scroll

18   up or down.   I want to give you a chance to look at it.   You

19   posted about receiving those on November the 6th, 2020; correct?

20   A.   That's what it says.

21   Q.   So at that point, on November 6th, 2020, you had in your

22   possession threatening letters, and you said that they had been

23   found outside; right?

24   A.   Yes.

25   Q.   Okay.   I'm gonna scroll down.   You posted again later that

1    day about mailings.  Do you see that?

2    A.   Okay.

3    Q.   And that was also on November the 6th but in the evening at

4    5:09 p.m.  Do you see when that post was made?

5    A.   Yes.

6    Q.   In that post, did you also state that you received two

7    bullets in the mail?

8    A.   Yes.

9    Q.   With a threatening letter?

10   A.   Yes.

11   Q.   Okay.  And you went on to say "three or four threatening

12   letters that we now have."  Right?

13   A.   Right.

14   Q.   And that -- that information was shared on Facebook, again,

15   all of that on November 6th?

16   A.   Yeah, that's what it says.

17   Q.   Okay.  The last questions I'm gonna ask you are about what

18   was posted subsequent to that.  So subsequent to that, did you

19   produce another Facebook post that featured photos of the

20   mailings?

21   A.   If it's there, then, yeah, that's what I did.

22   Q.   Do you remember when you made that post?

23   A.   No.

24   Q.   Okay.  Does taking a look at the Facebook page refresh your

25   recollection of when that post was made?  Was that post made on

1    November the 11th, 2020?

2    A.  Yeah, that's what it says.

3    Q.  Okay.  And that post on the Facebook page included video

4    from Nest cameras; right?

5    A.  Yes.

6    Q.  Okay.  It also included photographs of, it looks like,

7    four -- no, excuse me -- four items that you had received;

8    right?

9    A.  I don't know, ma'am.

10   Q.  Okay.  You're looking at the photos, and those are the

11   photos that were posted on your Facebook page on 11-11; right?

12   A.  All I know is what I'm looking at.  I don't remember what

13   happened that day.

14   Q.  But you agree that you created the post?

15   A.  Yes.

16   Q.  Okay.  That's -- I'm asking you about what is in it, not

17   the -- what you did outside of what is on this page that we see.

18   A.  Okay.

19   Q.  So one of the items that you posted a photo of is the item

20   that says "N-word leave.  We hate your kind.  Last chance."

21   Right?  I can make it bigger.

22   A.  Are you telling me it's on the screen, or are you telling me

23   what it says?  Oh, there it is.

24   Q.  Yeah.

25   A.  Okay.  Yeah.

1    Q.  So that was one of the photos posted?

2    A.  Yes.

3    Q.  Okay.  And then, also, a photo posted was of the envelope

4    with the scribbled out stuff on it; right?

5    A.  Right.

6    Q.  Okay.  I'm just gonna talk through the three other things,

7    and it really is just what's on the page.  Another item that was

8    posted on that day was material that said, "You had enough NB";

9    right?

10   A.  Yes.

11   Q.  Okay.  And then another item posted on that day says, "Die

12   stupid B.  Move out."  See that?

13   A.  Yes, I see.

14   Q.  The last photo that was posted -- I'm gonna scroll.  It's

15   not to make you dizzy.  It's to make sure I haven't missed

16   anything.  The last photo that was posted on 11-11 is a photo

17   which depicts the item with the bullets; right?

18   A.  Yes.

19   Q.  And in that photo, you can also see the gloves, and you can

20   see a -- what I will call a business envelope.  Do you see that?

21   A.  A what?

22   Q.  I didn't hear you.

23   A.  What was the last thing you said?

24   Q.  It also contained -- that photo also contains the gloves;

25   right?

1    A.   Yes.

2    Q.   And it also contains what I called a business envelope.

3    It's what they're laying on.

4    A.   I'm not understanding that last one.

5    Q.   That's okay.  The gloves and the bullets are laying on an

6    envelope in that photo.

7    A.   Right.

8    Q.   With printing on it.

9    A.   Okay.

10   Q.   Do you agree with that?

11   A.   That it's laying on an envelope with print?

12   Q.   Yes, ma'am.

13   A.   Okay.  Yeah.

14   Q.   Okay.  And those are photos that were posted at that time?

15   A.   Yes.

16        MS. REA:  Okay.  That may be all I have for you.  Let

17   me -- Ms. Pineda, I don't have any other questions for you.

18   Thank you.

19        THE WITNESS:  Thank you.

20        THE COURT:  Ms. Zimdahl, any redirect?

21        MS. ZIMDAHL:  Yes, Your Honor.  May I approach?

22        THE COURT:  Yes.

23      (Bench conference on the record.)

24        MS. ZIMDAHL:  Your Honor, I think the cross-

25   examination raises a potential issue because that HOA email

1    talks about, you know, "We've been wanting to do this for a

2    year."  And the reason that is was because there were many

3    instances of harassment by Ms. Craft toward this family, and

4    those are a lot of those instances we were trying to avoid

5    raising.

6        There's a lot of other things that were done by Ms. Craft to

7    this family, and we tried very hard not to bring those up.

8    Unfortunately, I think this now makes it look potentially like

9    we're leaving something out.

10        I would propose asking a simple question, which is were

11    there many other instances of things Ms. Craft had done to your

12    family that you were upset about and leaving it at that.

13    Without asking that question, though, I think it's potentially

14    confusing why she says that in this email.

15            MS. REA:  And, Your Honor, I think the jury has heard

16    about what the Pinedas have described as a pretty eventful thing

17    that kicked off the bad feelings with the prior racial slur that

18    they have said that S.W. █ W██ uttered.  I don't think we need

19    further explanation on that.  So I would object to that

20    question.

21        If the Court finds otherwise, I do think a quick ask it and

22    be done with it is the best way, but I don't think we have

23    opened the door to a whole slew of things -- any slew of things.

24            THE COURT:  Is the email in evidence?

25            MS. REA:  I just crossed her about it.  I didn't

```
 1    introduce it.
 2              MS. ZIMDAHL:  She did, but she essentially read
 3    through it.  And it makes it sound as if she's itching for this
 4    fight because of one thing when, in fact, there are many things
 5    that have happened to her family other than just the thing that
 6    was said.  I mean, there are all kinds of things that were done.
 7              THE COURT:  But she didn't -- you didn't ask a
 8    question about over the -- that developed that portion of the
 9    email, did you?
10              MS. REA:  I didn't.
11              MS. ZIMDAHL:  She read it.
12              MS. REA:  I read it because I wanted it to be fair and
13    not cherry-pick the email so -- but I didn't ask a question
14    about it.
15              MS. ZIMDAHL:  But she read it.  And so it makes it
16    sound as if --
17              THE COURT:  Right, yeah, but I think you're gonna --
18    you're gonna add much more attention to it with a follow-up
19    question and an explanatory -- or an instruction.
20       Since it's not in evidence, I don't know that it -- it
21    didn't get emphasized.  From where I sit, it wasn't disembodied
22    from the rest of the email in such a way as to emphasize it, I
23    guess.  So I'm hesitant to do anything about it.  What exactly
24    would you ask on redirect?
25              MS. ZIMDAHL:  So I would just like to ask, "Were you
```

1    upset about what had happened?  And were you upset about other

2    instances that had happened over the last year between Craft

3    which were directed toward your family?"

4              THE COURT:  Yeah, I would be concerned about confusing

5    the jury at that point because we're not going to get into

6    those; right?

7              MS. ZIMDAHL:  No, I think we had intended not to.

8              THE COURT:  I understand that.  And so there is a

9    small amount of potential confusion about that phrase in the

10   email, but I think that that confusion is compounded if you

11   simply say, "Were there other incidents?"  Then the jury is left

12   wondering why.  "Why aren't we hearing about those?  Are those

13   being hidden from us?"  So I think that the better course is to

14   move on.

15      Now, if the email is to be admitted, that's a different

16   thing.

17             MS. ZIMDAHL:  Sure.

18             THE COURT:  The jury's not gonna have that back in

19   chambers so -- or back in the deliberation room.  So I don't

20   think it's going to be an ongoing source of confusion.

21             MS. ZIMDAHL:  Again, Your Honor, my concern is that,

22   you know, Ms. Rea picks up on that she's not bringing up this

23   racial piece.  And I think part of that is the HOA's aware of it

24   because of those prior incidents.  It's already been brought to

25   their attention.  They're aware of a prior incident with the

1    daughter.  They're aware of what's -- this litany of events; and

2    so it doesn't need to be necessarily said.  And leaving that out

3    makes it look like this witness is leaving out facts from prior

4    statements when that's not the course of conduct that's

5    happened.

6            MS. REA:  I would just say I don't think anything I

7    have been given with the HOA -- as of March 2020, there is

8    indication that they have been -- the 2019 --

9            THE COURT:  I didn't hear that last part.

10           MS. REA:  I will say, from the information that I have

11   about the HOA, I don't think there is indication that they have

12   been given information about allegations of racial slurs in

13   2019.  We can look at it, if you think it's there, but I

14   don't -- I don't think they were alerted to that particular

15   issue.

16           MS. ZIMDAHL:  And I don't want to misspeak, if I'm

17   mistaken, that they are certainly aware of this sort of litany

18   of other events and issues.

19           MS. REA:  They're aware of --

20           THE COURT:  Yeah.

21           MS. ZIMDAHL:  And if that's your ruling, that's fine,

22   Your Honor.  I'll stay away from that particular line of

23   questioning.

24           THE COURT:  I didn't hear that.

25           MS. ZIMDAHL:  I said, if that's your ruling, I'll stay

1    away from that line of questioning, Your Honor.

2              THE COURT:  I don't think that it's necessary.  I

3    understand that it's there, but it's -- the email is not

4    admitted into evidence.  There wasn't much development of that

5    line of questioning.

6        I think, if Ms. Rea had asked a series of questions or just

7    a follow-up question that developed that time period, I would

8    allow you to get into it.  But I think here the jury has heard

9    to this point a substantial amount of evidence about the

10   uncharged conduct, the res gestae here, and I don't think this

11   has a potential for confusion.  But I do think a follow-up

12   question that highlights conduct that will not be developed is

13   potentially more confusing.  So let's just move on.

14             MS. ZIMDAHL:  Thank you, Your Honor.

15        (End of bench conference.)

16                        REDIRECT EXAMINATION

17   BY MS. ZIMDAHL:

18   Q.  I just have a few questions, just a few follow-up questions

19   for you.  I promise I'll be brief.  You talked to Ms. Rea about

20   an email that you sent Maggie at the Lake Forest homeowners

21   association.

22   A.  Yes.

23   Q.  And were you in frequent communication with her or from time

24   to time as things arose in the neighborhood?

25   A.  Yes.

1   Q.  And related to moving into your new home?

2   A.  I don't understand the question.

3   Q.  Were you in communication with her or others at the

4   homeowners association as things arose with your new home,

5   moving into the neighborhood?

6   A.  Like did I contact her, like, when we first moved in?

7   Q.  Yeah.  If you needed something as it related to moving into

8   your house or putting up a fence, anything that might happen

9   with your house?

10  A.  Yeah, yeah.

11  Q.  And when you were emailing with her about this particular

12  incident that occurred in March and you were relating some of

13  the things that occurred -- for example, you didn't hear what

14  Ms. Craft said when she was banging on your door; is that

15  correct?

16  A.  That's correct.

17  Q.  So some of the things you were relating you hadn't heard

18  firsthand; correct?

19  A.  No, I haven't heard it yet.

20  Q.  And was your report to Maggie that day meant to be a full

21  report of everything that had happened?

22  A.  No.

23  Q.  Just a summary of some events at your house?

24  A.  Just a short version.

25  Q.  And you also talked to Ms. Rea about posting some things on

1   your Facebook page.

2   A.   Yes.

3   Q.   During the events that occurred in this case, did you and

4   Michella post things to Facebook from time to time?

5   A.   Yes.

6   Q.   And would you sometimes post copies of and pictures of the

7   letters that you received?

8   A.   Yes.

9   Q.   Did you post those at various times after you received them?

10  A.   Yes.

11  Q.   Would you post them in groups, maybe a couple of them or

12  several of them at a time?

13  A.   Yes.

14  Q.   After you found them?

15  A.   Yes.

16  Q.   And did you also sometimes post videos that you found of the

17  person who was doing this to you?

18  A.   Yes.

19  Q.   And why did you post those items on Facebook?

20  A.   We didn't know what else to do.  We couldn't get any help.

21  We called the cops three times.  Nobody was helping us.  So we

22  thought, if we posted it on social media, that they would put

23  fire under the police station to help us get this to stop.

24          MS. ZIMDAHL:  I have no further questions.

25          MS. REA:  Nothing else, Your Honor.

1           THE COURT:  May the witness be excused?

2           MS. ZIMDAHL:  Yes, Your Honor, please.  Thank you.

3           THE COURT:  Thank you.  You may step down.

4           MS. REA:  Your Honor, may we approach?

5           THE COURT:  Yes.

6        (Bench conference on the record.)

7           MS. REA:  I know it's soon, but Ms. Craft said she

8    needs a restroom break.  I think she was out here a lot during

9    the last break.  So she has said she needs a break.

10          THE COURT:  Okay.

11          MS. REA:  Thank you.

12          THE COURT:  Are you -- what's your preference here?

13   Is it to go forward and try and get the witness in and then take

14   a lunch break at --

15          MR. TIEKE:  I would just take the lunch, and we'll see

16   if we can expedite things this afternoon, Your Honor.

17          THE COURT:  You want to just go ahead and take lunch

18   now?

19          MR. TIEKE:  Take lunch now, and then we'll just come

20   back and try to do as many as we can this afternoon.

21          THE COURT:  Okay.  All right.

22          MR. TIEKE:  I'll defer to you, but I think --

23          THE COURT:  No.

24          MR. TIEKE:  -- that's the best course.

25          THE COURT:  My hesitation is based upon my frustration

1    with our IT equipment that led to the delay in getting you-all

2    the draft instructions.

3            MR. TIEKE:  We'll do our best to move as quickly as

4    possible this afternoon.

5            THE COURT:  Yeah.  Well, that problem is not yours.

6    I'm just trying to manage it now going forward.  That's fine.

7    We'll just do that.

8            MR. TIEKE:  Yes, sir.

9            MS. REA:  Thank you, Your Honor.

10       (End of bench conference.)

11           THE COURT:  Well, members of the jury, when I said

12   earlier we would likely start our lunch break late, I think now,

13   after conferring briefly with counsel, it's probably best that

14   we go ahead and take our lunch break now.  We'll have a very

15   full afternoon.  So make sure to take advantage of the lunch

16   hour.  Then we will be back at 1:10, and we will go through to

17   roughly 5:00.

18       Remember the admonition.  Remember also my prior

19   observations to you that real life trials are not like on TV.

20   They come with delays.  They come with behind-the-scenes work,

21   and we are doing our best to maintain the schedule and are doing

22   pretty well by contemporary standards.  So we're going to do our

23   best to get a full afternoon in for you, and we'll see you back

24   here at 1:10.  Thank you.

25           (Jury out 12:11 p.m.)

1          THE COURT:  All right.  You may be seated.  The jury
2     has left the courtroom.
3          Let's talk briefly, before I let you go, regarding the draft
4     instructions that we provided during the extended morning break.
5     What I would like to do is -- I know you've got a lot of things
6     to worry about in the middle of a trial.  Even at this point in
7     my service on the bench, I've still spent nearly as much time
8     behind those tables as behind this one in my career.  So I
9     appreciate that you have a lot of moving parts and things to
10    worry about, but I would ask you to give some of the time
11    available during the lunch hour to reviewing the draft
12    instructions.  I'll give you a bit of context to help in that.
13         First of all, the instructions incorporate the typical
14    pattern procedural instructions.  You will see in Instruction 1
15    -- the last line in Instruction 1 is one that I add to the
16    pattern instruction.  I do that because, in my experience, it
17    helps to relieve the anxiety of the jury to know that when they
18    go back to the deliberation room, they will have a copy of these
19    instructions.  Otherwise, you see folks either tuning out or
20    writing furiously, and we want them to primarily listen to the
21    instructions.
22         You will then see -- there are a number of them that we'll
23    talk about that we might need to slightly modify based upon the
24    options in the pattern instructions depending upon -- Ms. Rea,
25    depending in part upon your preferences on -- once the

1    Government has rested, in other words.  I think you know what
2    those are, and we'll talk about those.
3         As far as the substantive instructions on the elements,
4    there are five instructions.  Each crime charged has a separate
5    instruction.  Obviously, because these are similar, they follow
6    the same pattern with perhaps a difference in date.  And then
7    there are thereafter instructions regarding the special verdict.
8    The form in draft is also attached at the end.
9         When we had our final pretrial conference, I mentioned to
10   you that it is my practice to give the substantive instructions
11   first, before closing arguments, and then save the final
12   procedural instructions that relate to their actual work --
13   deliberating.  Those I give after the closing arguments and
14   before they are dismissed to begin deliberating.
15        I don't give an instruction on the selection of the
16   alternates.  I'll simply tell them, "I am now done with the
17   instructions.  Before we send you back, we have to randomly
18   select two of you to serve as alternates."  That's the most
19   efficient way I have found to handle that process.
20        So, obviously, the instructions on the elements are where
21   you should spend the most time.  These track the Sixth Circuit
22   pattern instruction for Section 875; is that right?
23             DEPUTY CLERK:  Yes, sir.
24             THE COURT:  And so I think they're -- I think the
25   crimes charged here are well served by that similar pattern

1     instruction, but we can talk about that.  I just wanted to

2     highlight for you that that's where you should spend most of

3     your time.

4          When we come back at the end of the break -- I'll ask

5     you-all to come in a few minutes before 1:10.  So if you can be

6     back by 1:00, 1:05, we can talk then about when to schedule the

7     discovery conference.

8          And with respect to the process for the discovery

9     conference, I will ask you-all to confer in advance.  So you'll

10    need to take that into consideration when we try and figure out

11    when to fit this in, at the end of the day today or early in the

12    morning tomorrow before testimony, whatever the case may be.

13         I'll want you-all to confer because what I want to spend our

14    time on are the instructions for which you-all disagree.  I'm

15    not gonna painfully go through every single instruction if

16    there's no disagreement about them, particularly given that

17    they're well-worn pattern instructions.

18         So what I'll ask you-all to do is confer and then let us

19    know which ones you have either agreement that need to be

20    changed or disagreement about what is there, and that's -- that

21    will be our agenda in the discovery conference.

22         All right.  Any questions about any of that?

23              MR. TIEKE:  No, Your Honor.

24              MS. REA:  No, Your Honor.

25              THE COURT:  Anything else you think we need to take up

1    now before the lunch break?

2             MR. TIEKE:  No, Your Honor.

3             MS. REA:  No, sir.

4             THE COURT:  And you'll have your next witness ready to

5    go?

6             MR. TIEKE:  Yes, Your Honor.

7             THE COURT:  All right.  I'll see you then.

8        (Recess at 12:18 p.m. until 1:10 p.m.  Jury out.)

9             THE COURT:  Good afternoon.  We are back on the record

10   in U.S. v. Craft.  Let's talk now about a schedule for

11   instructions.  Have you-all had a chance to at least begin your

12   review of the drafts provided earlier?

13            MR. TIEKE:  We have, Your Honor.  And in consultation

14   with the defense, I don't anticipate the instruction conference

15   taking all that long.  So we would just have it at the

16   convenience of the Court.  Tonight or tomorrow morning, either

17   is fine with us.

18            MS. REA:  And I agree, Your Honor.  I've been able to

19   review the draft instructions, talk to the U.S.  I don't think

20   it will be a lengthy conference so whenever it works for the

21   Court.

22            THE COURT:  Why don't we do this:  Let's schedule it

23   for in the morning.  So let's set it for 8:15.  And then we

24   can -- that'll give us plenty of time, even if -- even if we --

25   and perhaps this is being too ambitious.  Even if we get through

1    all testimony tomorrow, I think we would still have time to make

2    any necessary revisions and get a final list of -- or a final

3    compilation of instructions together.  So we'll plan on doing

4    that at 8:15.  That will give you-all a little more time to

5    finalize your review and confer as necessary.

6         Anything else we need to talk about before you call your

7    next witness?

8              MS. REA:  No, Your Honor.

9              THE COURT:  Let's have the jury.

10        (Jury in 1:12 p.m.)

11             THE COURT:  Welcome back, members of the jury.

12        Mr. Tieke, is the United States ready to call its next

13   witness?

14             MR. TIEKE:  Yes, Your Honor.  The United States calls

15   Matthew Lanham.

16        (MATTHEW LANHAM, called by the Government, sworn.)

17                         DIRECT EXAMINATION

18   BY MR. TIEKE:

19   Q.  Good afternoon, sir.

20   A.  Hello.

21   Q.  Can you please state your name for the jury.

22   A.  It's Matthew Lanham.

23   Q.  Mr. Lanham, what do you do for a living?

24   A.  I'm a chief information officer for a manufacturing company

25   here in town.

Lanham - Direct

1   Q.   How long have you been doing that?

2   A.   About four years.

3   Q.   Sir, are you pretty well versed in security cameras?

4   A.   I am.

5   Q.   Pretty well versed in computers and information technology,

6   things like that?

7   A.   Yes.

8   Q.   And, sir, where do you live?

9   A.   505 █████████████.

10  Q.   And that's in the ████████ cul-de-sac?

11  A.   Yes.

12  Q.   I'm gonna show you what's been admitted as United States

13  Exhibit 1.  And then just so the jury can orient themselves, is

14  this your house here at 505 --

15  A.   Yes, that's correct.

16  Q.   -- ███████? And your garage kind of faces toward the

17  cul-de-sac there?

18  A.   Yes.

19  Q.   And when did you move into 505 ██████████?

20  A.   2018.

21  Q.   And so you've been there --

22  A.   Almost five years.

23  Q.   Five years.  And do you know where the defendant, Suzanne

24  Craft, lives?

25  A.   Yes.  She lives right next door.

1    Q.   507?

2    A.   Yes.

3    Q.   And was she living there before you moved in?

4    A.   Yes.

5    Q.   And who lives here at 510 ███████?

6    A.   The Pinedas.

7    Q.   And that's here on the map?

8    A.   Yes.

9    Q.   And did they move in after you did?

10   A.   They did.

11   Q.   And so was your driveway essentially straight across from

12   the Pinedas' house?

13   A.   Yes.

14        MR. TIEKE:  We can take that down, please.

15   Q.   Do you have surveillance cameras on the outside of your

16   house there at 505 ██████?

17   A.   I do.

18   Q.   When did you install those?

19   A.   Shortly after I moved in, probably the same year.

20   Q.   2018?

21   A.   Yeah.

22   Q.   And where are your cameras located?

23   A.   Generally around the outside perimeter of my house, so

24   driveway, front yard, backyard.

25   Q.   You have some on the garage area?

1    A.   I do, yeah.

2    Q.   And what areas of your yard do all your cameras capture?

3    A.   Generally all of my front yard, all of my driveway, my

4    backyard, and kind of like my deck area in the back.

5    Q.   And because of the way your house kind of sits, does it --

6    are your cameras on your garage, are they able to capture like

7    other homes and driveways in the cul-de-sac?

8    A.   They are.

9    Q.   I'm gonna show you what's been marked as United States

10   Exhibit 40.  Do you recognize that photograph?

11   A.   Yes, that is my driveway.

12   Q.   And is that a photograph from one of your cameras that you

13   have there on your garage?

14   A.   Yes.

15   Q.   And does this -- I know this image -- was it taken in March

16   of 2023?

17   A.   It was.

18   Q.   Has that camera there, has that been in the same spot since

19   you put it in in 2018?

20   A.   It has been.

21   Q.   So does that view -- this picture, does that truly and

22   accurately reflect the view of that particular surveillance

23   camera on your garage?

24   A.   It does.

25        MR. TIEKE:  At this time, Your Honor, I'd move to

| | |
|---|---|
| 1 | admit United States Exhibit 40 and publish that for the jury. |
| 2 | MS. REA:  No objection. |
| 3 | THE COURT:  It will be admitted. |
| 4 | (Government Exhibit 40 admitted in evidence.) |
| 5 | BY MR. TIEKE: |
| 6 | Q.  So this is your driveway right here? |
| 7 | A.  Yes. |
| 8 | Q.  And across the street, is that the Pinedas' driveway over |
| 9 | there? |
| 10 | A.  It is. |
| 11 | Q.  And is this driveway -- is that Ms. Craft's driveway? |
| 12 | A.  Yes. |
| 13 | Q.  And is this over there, is that kind of a walkway? |
| 14 | A.  Yeah, that is a walkway to her front door. |
| 15 | Q.  So that's her driveway, and there's a walkway that goes up |
| 16 | to the front door? |
| 17 | A.  Correct. |
| 18 | Q.  And let's talk about your cameras there.  Those cameras that |
| 19 | you have, do they continuously record? |
| 20 | A.  They do. |
| 21 | Q.  And so at times, though, are there kind of gaps in those |
| 22 | recordings? |
| 23 | A.  There are occasionally if the cameras will glitch out or |
| 24 | something.  It's set to record continuously, but software |
| 25 | doesn't always work.  So sometimes there are glitches. |

Lanham - Direct

```
 1   Q.  And is that because they might get disconnected from the
 2   Wi-Fi?
 3   A.  The internet, any of the hardware in between.
 4   Q.  So these cameras continuously record.  Are they necessarily
 5   motion activated?
 6   A.  They're not, no.
 7   Q.  So you don't get like -- do you get movement alerts when
 8   something happens or anything like that?
 9   A.  I don't, no.
10   Q.  And how long does your system retain those videos that it
11   records?
12   A.  Roughly two weeks.
13   Q.  And then do you have to pull them down to keep them?
14   A.  Yes.
15   Q.  And so if you don't pull them down from your system and save
16   them somewhere separately, what happens to them after the two
17   weeks?
18   A.  The oldest get overwritten with new footage.  It just
19   continuously cycles.
20   Q.  Okay.  So let me take you to June 7th, 2020.
21          MR. TIEKE:  We can take that down, please.  Thank you.
22   Q.  Did you become aware of, you know, vandalism occurring in
23   the neighborhood on June 7th, 2020?
24   A.  Yes.
25   Q.  How did you first become aware of vandalism occurring in the
```

1    cul-de-sac at that time?

2    A.   That morning -- I believe it was -- I opened the garage door

3    or something, and I saw the police in the neighborhood, in the

4    cul-de-sac.  And that's, you know --

5    Q.   Okay.

6    A.   -- unusual.

7    Q.   And what did you do after that?

8    A.   I approached the officers, because they were in Ms. Craft's

9    driveway, and let them know that I had a camera and pointed in

10   that general direction.

11   Q.   So the police were in Craft's driveway, and you walked over

12   there?

13   A.   Yes.

14   Q.   Okay.  And when you walked over to Craft's driveway on June

15   7th, 2020, did you observe paint on her driveway?

16   A.   I did.

17   Q.   And what color was it?

18   A.   Orange.

19   Q.   Orange?

20   A.   Yeah.

21   Q.   And so if I pull up here -- let me pull up Exhibit 40.  This

22   is the view of your camera, present day view -- relatively

23   present day.  On the screen there -- and you can touch it, if

24   you want.

25   A.   Okay.

Lanham - Direct

1    Q.  From your observations when you walked over to that

2    driveway, where was the painting that you saw?

3    A.  It was in kind of this general area.

4    Q.  And so from your observations, was it below or above the

5    walkway running to her front door?

6    A.  Below.

7    Q.  And as you were at Craft's driveway, did you also notice if

8    -- the Pinedas at 510, if they had anything on their driveway?

9    A.  I believe, yes.  I didn't go over there to their house but

10   could kind of see it as I was going there.

11   Q.  What color was that paint?

12   A.  I believe it was orange as well.  Like I said, I didn't go

13   over to their driveway so --

14   Q.  So did you see what was on their driveway?

15   A.  I did not.

16   Q.  Okay.  And so the police were there, and what did you tell

17   the police?

18   A.  That I had cameras that pointed in that general direction,

19   that I might have footage.

20   Q.  And did you -- did you just offer to go and search that

21   footage for something that might have happened?

22   A.  Yeah.  Obviously, I told them I had it, if they needed it or

23   wanted it.

24   Q.  And were -- what was the initial time that you were told to

25   search?

Lanham - Direct

1    A.   Around like 3:00, 3:30, somewhere in the morning there the

2    previous night.

3    Q.   And who told you to search that time?

4    A.   I believe it was Ms. Craft.   The police officer asked

5    Ms. Craft about what time.   She was the one that said about that

6    time.

7    Q.   And that was -- was it -- you said 3:30.   Was that

8    3:30 a.m.?

9    A.   Yes, a.m.

10   Q.   So did the police officer tell you that Ms. Craft said

11   search around 3:30 a.m.?

12   A.   Yes.

13   Q.   And so what'd you do at that point?

14   A.   At that point, I went back to my house and just kind of

15   started looking at the footage.   The server is in my basement.

16   So I went down there and started kind of looking through it

17   around that time.

18   Q.   Did you look around that 3:30 a.m. time frame?

19   A.   Yeah, that is where I would have started.

20   Q.   So did you kind of -- did you look a little bit before that?

21   A.   Yes.   Since it was 3:30, I probably started about 3:00 and

22   just kind of went from there.   My cameras record in one-hour

23   increments.   So I would have started at the 3:00 a.m. clip as

24   the starting point.

25   Q.   So what did you find there at the 3:30 -- around the 3:00,

Lanham - Direct

1    3:30 a.m. time frame?

2    A.   I didn't find anything when I was searching through that

3    footage.

4    Q.   Okay.  At some point did the police come over and tell you

5    to look at a different time?

6    A.   They did.

7    Q.   And what time was that?

8    A.   Around the 1:30-2:00 mark a.m.

9    Q.   And when you went back and looked at the 1:30 -- between

10   1:30 and 2:00 a.m. footage from your -- from June 7th, 2020,

11   what did you find?

12   A.   I did find a video of an individual around 1:40, '50 a.m.,

13   somewhere around there.

14   Q.   Okay.  I'm gonna show you what's been marked as United

15   States Exhibit 25.

16          THE REPORTER:  Is this admitted?

17          MR. TIEKE:  No, ma'am, for the witness only.

18      And if we'll play just a little bit.

19      (Government playing video.)

20          MR. TIEKE:  That's good.

21   BY MR. TIEKE:

22   Q.   You recognize that video?

23   A.   I do.

24   Q.   Is that a copy of your surveillance video of June 7th, 2020,

25   1:49 a.m.?

1    A.   It is.

2    Q.   Does that truly and accurately reflect your surveillance

3    video of June 7th, 2020, at approximately 1:49 a.m.?

4    A.   It does.

5             MR. TIEKE:  Your Honor, I move to admit United States

6    Exhibit 25 and publish.

7             MS. REA:  No objection, Your Honor.

8             THE COURT:  It will be admitted.

9        (Government Exhibit 25 admitted in evidence.)

10            MR. TIEKE:  All right.  If we could pull that.

11   BY MR. TIEKE:

12   Q.   So this is June 7th, 2020, 1:49 a.m.; is that correct?

13   A.   That is correct.

14   Q.   And so this is your driveway?

15   A.   Yes.

16   Q.   And the Pinedas' driveway is over in this area?

17   A.   Yes.

18   Q.   And is this their fountain right here?

19   A.   Yes.

20   Q.   And then here's -- is this Ms. Craft's driveway?

21   A.   It is.

22   Q.   And as we saw from that other daylight shot, is there a --

23   is this the walkway approximately in that area?

24   A.   Yes.

25            MR. TIEKE:  We can go ahead and play this video,

1    please.

2        (Government playing video.)

3    Q.  Sir, what did you appear to see in that video?

4    A.  An individual walked up Ms. Craft's driveway, was at the

5    very top of the visible driveway there for a bit, and then

6    walked back down and cross into the neighbor's driveway, it

7    looks like.

8    Q.  Does it appear that this individual went above the walkway

9    leading to Craft's door?

10   A.  Yes.

11   Q.  Does it appear that that's where the individual spent the

12   majority of the time on that video?

13   A.  Yes.

14   Q.  And when you personally observed the painting on Craft's

15   driveway later this morning, was it below the walkway?

16   A.  It was.

17   Q.  And so from your observations of your own video and your

18   observations of the driveway painting on Ms. Craft's driveway,

19   do you believe that this surveillance video from June 7th, 2020,

20   at 1:49 a.m., captured Craft's driveway being painted?

21   A.  It doesn't appear so, no.

22   Q.  And as we talked about earlier, when you went back and

23   reviewed the footage, you were asked to look around two times in

24   the early morning hours of June 7th, 2020?

25   A.  Uh-huh.

1    Q.   Is that a yes?

2    A.   Yes.   Sorry.

3    Q.   I'm sorry.   It makes it difficult.   She's got the hardest

4    job.   So we need to say yes or no.

5    A.   Yeah, sorry.

6    Q.   Thank you.   And did you review the entire late-night hours

7    of June 6th, 2020, the night -- the night before this?

8    A.   It wouldn't have been the entire night.   It would have been

9    probably several hours on either side of what I was asked to

10   so --

11   Q.   And so similarly, did you review all of the hours in the

12   morning of June 7th, 2020, leading up to the -- during the two

13   times you were asked to do it?

14   A.   No.

15   Q.   So, essentially, did you sit down and watch from when it got

16   dark on June 6th all the way up to the next morning when it got

17   light on June 7th, 2020?

18   A.   No.

19   Q.   And because you didn't sit there and watch the entire night,

20   I mean, could there have been other things that happened this

21   night?

22   A.   It's possible, yes.

23   Q.   And so would any footage of that, would that be gone now?

24   A.   At this point, yes.

25   Q.   And why's that?

1    A.  Because my cameras overwrite every two weeks or so.

2    Q.  And so after this June 7th, 2020, incident, did you add more

3    cameras to your house?

4    A.  I did add one additional.

5    Q.  And why'd you do that?

6    A.  Just because of things going on in the neighborhood, I

7    wanted more coverage of my yard.  This camera doesn't see to the

8    left into my yard as much; so I just wanted more coverage on my

9    yard and the cul-de-sac.

10   Q.  Okay.  Let's talk about June 16th, 2020.  Did you become

11   aware of vandalism occurring in the cul-de-sac on June 16th,

12   2020?

13   A.  I did become aware of it but not on the next day or

14   anything.  It was just through talking with neighbors later on.

15   Q.  And which of your neighbors had their driveway vandalized

16   that day?

17   A.  The Pinedas.

18   Q.  At 510?

19   A.  Yes, 510.

20   Q.  Did you go and review your -- did you find out in enough

21   time to go back and review your footage?

22   A.  I don't believe I did.  I think it would have been after.

23   Q.  And did you go and review your camera footage for around

24   June 16th, 2020?

25   A.  You know, I did.  I'm sorry.  I did, yes.  I did review it.

Lanham - Direct

```
 1   It would have been within that two-week span.
 2   Q.  So at some point in that two-week span --
 3   A.  Yes.
 4   Q.  -- you might have found out about their --
 5   A.  Yeah.
 6   Q.  -- driveway.  And so did you go back and review your
 7   footage?
 8   A.  I did, yes.
 9   Q.  And did you find something from June 16th, 2020?
10   A.  I did, yeah.
11   Q.  I'd like to show you Exhibit 26, please.  You recognize this
12   video?
13   A.  Yes.
14   Q.  And is it a copy of your surveillance video from June 16th,
15   2020, at 3:26 a.m.?
16   A.  Yes.
17   Q.  Have you reviewed this prior to your testimony today?
18   A.  Yes.
19   Q.  Does this video -- does this truly and accurately reflect
20   your surveillance video of June 16th, 2020, at 3:26 a.m.?
21   A.  It does.
22          MR. TIEKE:  Your Honor, I'd move at this time to admit
23   United States Exhibit 26 and publish.
24          MS. REA:  No objection, Your Honor.
25          THE COURT:  It will be admitted.
```

1          (Government Exhibit 26 admitted in evidence.)

2              MR. TIEKE:  Just a second.  Thank you.

3     BY MR. TIEKE:

4     Q.  And so is this the video you pulled down from the early

5     morning hours of June 16th, 2020?

6     A.  Yes.

7     Q.  And, again, this is your driveway here, the Pinedas' is

8     across the street, and is this Craft's driveway right here?

9     A.  Yes.

10             MR. TIEKE:  Okay.  We can play that, please.  Thank

11    you.

12         (Government playing video.)

13    Q.  Mr. Lanham, what does that video appear to capture?

14    A.  It shows an individual walking down Ms. Craft's driveway

15    along the sidewalk to the Pinedas, spending some time over in

16    their driveway, and walking back and back up Ms. Craft's

17    driveway.

18    Q.  When the person walked down, could you tell which driveway

19    they came down?

20    A.  Yes, Ms. Craft's.

21    Q.  And then -- because there's kind of some hedges there?

22    A.  Uh-huh.

23    Q.  Could it have been either driveway on the drive walking

24    down?

25    A.  It looked to me like it was in Ms. Craft's driveway.  The

1    hedges are between -- on the other side of her driveway from my

2    camera's perspective.

3    Q.   Okay.   From your camera's perspective?

4    A.   Yes.

5    Q.   And then where did that individual go?

6    A.   Walked over to -- along the sidewalk to the Pinedas'

7    driveway, looked like there was some movement in their yard and

8    then into their driveway and spent some time in their driveway,

9    it looked like, bent over and doing something and then walking

10   back.

11   Q.   Walking back and then, from your camera's perspective,

12   walking back up which driveway?

13   A.   Ms. Craft's.

14   Q.   Okay.   Let's talk about --

15            MR. TIEKE:   We can take that down, please.   Thank you.

16   Q.   -- June 27th, 2020.   Did you become aware of vandalism

17   occurring in the cul-de-sac on June 27th, 2020?

18   A.   Yes.

19   Q.   What did you learn about that painting on June 27th, 2020?

20   A.   That would have been that morning.   We had a yard sale.   So

21   my car -- during the yard sale, it was -- I could see it across

22   the street and --

23   Q.   And which of your driveways -- which of your neighbors --

24   excuse me -- had their driveways vandalized?

25   A.   The Pinedas.

1    Q.  And did you personally observe what was painted?

2    A.  I did.

3    Q.  Was it a racial slur?

4    A.  It was.

5    Q.  And what color was the paint?

6    A.  It was gold.

7    Q.  Did you again go ahead and go back and review your camera

8    footage?

9    A.  I did.

10   Q.  Did you find something?

11   A.  I did.

12   Q.  I'd like to show you United States Exhibit 27, please.  And

13   this has got the date stamp on it here.  You recognize this

14   video?

15   A.  Yes.

16   Q.  Is it a copy of your surveillance video of June 27th, 2020,

17   at approximately 2:41 a.m.?

18   A.  It is.

19   Q.  Does it truly and accurately reflect your surveillance video

20   of June 27th, 2020, at approximately 2:41 p.m.?

21   A.  Yes.

22          MR. TIEKE:  At this time I'd move to admit United

23   States Exhibit 27 and publish.

24          MS. REA:  No objection, Your Honor.

25          THE COURT:  It will also be admitted.

Lanham - Direct

1          (Government Exhibit 27 admitted in evidence.)

2     BY MR. TIEKE:

3     Q.   And so, Mr. Lanham, you pulled this video down from the

4     early morning hours of June 27th, 2020?

5     A.   Yes.

6     Q.   Same camera we've all been looking at here?

7     A.   Correct.

8          MR. TIEKE:   And so we can go ahead and play that.

9          (Government playing video.)

10    Q.   Sir, what appears to happen in that video from, you know,

11    the perspective of your camera here?

12    A.   An individual walks down Ms. Craft's driveway along the

13    sidewalk over to the Pinedas' driveway, spent some time in that

14    driveway, appears to be bent over and then walks back on the

15    sidewalk and back up Ms. Craft's driveway.

16         MR. TIEKE:   Thank you.   That's good.   You can take

17    that down.

18    Q.   Sir, you said you lived at 505 --

19    A.   Yes.

20    Q.   -- ███████████████.

21    A.   Yes.

22    Q.   I'm gonna show you what's been admitted as United States

23    Exhibit 9A, page 1, please.   This is one of the mailings the

24    Pinedas received.   Do you see that word up there, "N-let

25    Destroyer"?

1    A.   I do.

2    Q.   And is that your address there under that "N-let Destroyer"?

3    A.   It is.

4    Q.   And is this used on a mailing addressed to your neighbor,

5    "Michelle" Pineda?

6    A.   It is.

7    Q.   And 9B-6.  Sir, inside that envelope was there what appears

8    to be a threat that says, "Die, die, stupid N-word, die," or

9    something like that?

10   A.   Yes.

11   Q.   You ever use the word "N-let" in your return address?

12   A.   I have not.

13   Q.   You ever send your neighbor, the Pinedas, a threat saying

14   this?

15   A.   I have not.

16   Q.   Have you ever allowed anyone to use your return address to

17   send threats?

18   A.   No.

19   Q.   You ever specifically allow Ms. Craft to use your address

20   for any purpose?

21   A.   No.

22        MR. TIEKE:  Thank you, Your Honor.  I'll tender the

23   witness now.

24        THE COURT:  Ms. Rea.

25        MS. REA:  Thank you, Your Honor.

1                          CROSS-EXAMINATION

2    BY MS. REA:

3    Q.  Hi, Mr. Lanham.

4    A.  Hello.

5    Q.  I just have a few questions for you.  The first thing I'm

6    gonna ask you about using the Elmo and show you what has been

7    introduced as United States Exhibit 40, which you'll recognize

8    is the present day photo once we get it up there.

9        Okay.  It looks better the other way, I admit that.

10   Directing your attention to Ms. Craft's driveway and the

11   adjoining driveway, that adjoining -- the adjacent driveway.

12   The driveway that is right next to Ms. Craft is Ms. Probst's

13   driveway; correct?

14   A.  Yes.

15   Q.  And we can kind of see in that photo where there's a strip

16   of grass between the two driveways; is that right?

17   A.  Yeah.  It's flowers.  It's not just grass.

18   Q.  It looks like what?

19   A.  It's flowers.

20   Q.  Flowers?

21   A.  Yeah.

22   Q.  Okay.  Is sometimes -- poor question.  There have been times

23   when there's more foliage in that area, correct, separating the

24   two driveways?

25   A.  That is correct, yeah.

1    Q.  So sometimes it's taller than it is now?

2    A.  That is correct.

3    Q.  In the video that -- videos you've been looking at, indeed,

4    is it taller at that point?

5    A.  Yes, it appears to be.

6    Q.  Okay.  And that -- those driveways, that area of your video,

7    that was at the top, the far screen of that; right?

8    A.  Correct.

9    Q.  And when you see the figure walking, are there times when

10   the figure is walking where they sort of -- you can't see them

11   for a little bit because --

12   A.  Yes, that is correct.

13   Q.  -- it's hard to make out exactly where somebody is, okay,

14   against that foliage.

15            MS. REA:  That's all for that.  Thank you.

16   Q.  After the 6-7 event happened, you've said you offered and

17   also, I believe, provided your video to law enforcement; right?

18   A.  Yes.

19   Q.  Okay.

20   A.  After that event, yes.

21   Q.  And you also provided it to Ms. Craft?

22   A.  Yes.

23   Q.  So when you provided it to her after 6-7, she knew what the

24   view from your cameras looked like; right?

25   A.  Yes.  I assume she watched it, yes.

Lanham - Cross

1    Q.  She'd seen the video, sure.  And she posted that video on a
2    social media site; correct?
3    A.  Yes.
4    Q.  Okay.  And you -- I'm gonna use a real lay person's term,
5    and correct me if I'm wrong -- broke the link?
6    A.  Yes.
7    Q.  And was that so that the public couldn't see the view that
8    your camera would capture?
9    A.  Correct, yes.
10   Q.  So to protect your security and your privacy, you didn't
11   want that view up there?
12   A.  That is correct.
13           MS. REA:  Okay.  I don't have any other questions for
14   you.  Thank you for being here.
15           THE WITNESS:  Okay.
16           THE COURT:  Any redirect?
17           MR. TIEKE:  No, Your Honor.
18           THE COURT:  May the witness be excused?
19           MR. TIEKE:  Yes, Your Honor.
20           THE COURT:  Thank you.  You may step down.
21      Is the Government ready with the next witness?
22           MR. TIEKE:  Yes, Your Honor.  The United States calls
23   Brian Recktenwald.
24      (BRIAN RECKTENWALD, called by the Government, sworn.)
25                        DIRECT EXAMINATION

```
 1    BY MR. TIEKE:

 2    Q.  Good afternoon, Mr. Recktenwald.

 3    A.  Hello.

 4    Q.  Could you please state your name for the jury.

 5    A.  My name is Brian Recktenwald.

 6    Q.  And, Mr. Recktenwald, what do you currently do for a living?

 7    A.  I'm a school teacher.  I teach the fourth grade.

 8    Q.  How long have you taught fourth grade?

 9    A.  This is my 22nd year of being an elementary school teacher,

10    and I have been teaching fourth grade for the last six in

11    Jefferson County.

12    Q.  And, Mr. Recktenwald, what is your address?

13    A.  508 ████████████████, Louisville, Kentucky, 40245.

14    Q.  Thank you.  How long have you lived at that address?

15    A.  We moved in officially about January 2020.

16    Q.  Okay.  And do you know who lived there before you?

17    A.  It was the Conleys.

18    Q.  Okay.  Do you -- are you neighbors with Connie and Michella

19    Pineda?

20    A.  Yes.

21    Q.  And is your house directly next door to theirs?

22    A.  Yes.

23    Q.  I'm gonna show you what's been admitted as United States

24    Exhibit 2, and we can just kind of focus on the houses.  If we

25    could go a little bit -- there we go.  Is that your yellow house
```

1    there at 508?

2    A.  Yes.

3    Q.  Okay.  If we could move forward to 510.  And is that the

4    Pinedas directly next door to you?

5    A.  Yes.

6    Q.  So here's your driveway.  Here's the Pinedas' driveway?

7    A.  Correct.

8    Q.  If we could go around to -- and who lives here in this red

9    brick house?

10   A.  That's Suzi Craft.

11   Q.  And is -- what's the address there?

12   A.  Is that 50 -- is it 510?

13   Q.  No, that's the Pinedas.

14   A.  Oh, 508.  I'm sorry.  509.

15   Q.  Does she live at 507 ████████?

16   A.  Or 507, yes.  I know they're out of order.

17   Q.  507?

18   A.  Yes.

19   Q.  Okay.  And so do you know the Pinedas?

20   A.  Yes.

21   Q.  How many children do they have?

22   A.  They have five.

23   Q.  Are you friendly with the Pineda family?

24   A.  Yes.

25   Q.  When you first moved in, did your children interact with the

1    Pineda children?

2    A.   Yes.

3    Q.   Did they play together?

4    A.   Yes.

5    Q.   Sir, do you know your other neighbor, Suzanne Craft?

6    A.   Yes.

7    Q.   Okay.  I'd like to show you United States Exhibit 3.  Is

8    that a photograph of your neighbor, Suzanne Craft?

9    A.   Yes.

10   Q.   Have you observed her in the neighborhood before?

11   A.   From time to time.  I know as she's going in and out of her

12   house, maybe Halloween I remember seeing her walking through the

13   neighborhood, cutting her grass.

14   Q.   Does she typically wear that kind of clothing in that photo

15   there?

16   A.   Yes.  When I see her -- most times when I've seen her,

17   whether it was in the neighborhood or if I was out -- I'm very

18   familiar with the -- she would have a black visor or a hat on

19   and a black shirt and black pants, it seemed, often.

20   Q.   And, I mean, do you have any real issues with Ms. Craft?

21   A.   No.

22   Q.   Do you know who lives at her house at 507 with her?

23   A.   I believe it's her daughter.

24   Q.   Okay.  Is she younger or older?

25   A.   Younger.  I want to say, I think, she was, you know, between

1    12, 13, 14.

2    Q.  So not an adult daughter?

3    A.  No.

4    Q.  Okay.  Let me take you to June 7th, 2020.

5    A.  Okay.

6    Q.  Did you personally observe the Pineda driveway after it had

7    been vandalized by paint?

8    A.  Yes.

9    Q.  And what color was that paint?

10   A.  I remember the orange paint.

11   Q.  I'm just gonna briefly show you Exhibit 18.  You recognize

12   that as the driveway painting from June 7th, 2020?

13   A.  Yes.

14   Q.  And were you with Connie and Michella when they saw that

15   painting?

16   A.  Afterwards, yes, in the morning.

17   Q.  What was their reaction?

18   A.  Angry, upset.  You know, I would say embarrassed as well.

19   Q.  Were you aware that Ms. Craft also had a painting on her

20   driveway too?

21   A.  Yes.

22   Q.  And did you see that one?

23   A.  No.  I did not walk over to see that.

24        MR. TIEKE:  Okay.  We can take that down, please.

25   Q.  And were there police in the neighborhood?

1    A.   Yes.

2    Q.   And were neighbors gathered there to look at the Pinedas'

3    painting?

4    A.   Yes.

5    Q.   What was -- what was Ms. Craft doing?

6    A.   From what I remember, a number of neighbors gathered, and we

7    were talking out in front of our house and the Pinedas.  And I

8    remember Ms. Craft sitting on her porch.  And I just felt that

9    was -- at the time, just my thinking was that was just kind of

10   odd that there wasn't the interaction that if she just got

11   spray-painted and that they got spray-painted that they would

12   talk about it.  It seemed kind of odd to me.

13   Q.   Okay.  Let's just move to the fall of 2020.  Did you witness

14   the Pinedas receiving a threatening mailing?

15   A.   Yes.

16   Q.   And were you-all outside together at that time?

17   A.   Yes.

18   Q.   And who was out there?

19   A.   So there's a middle section between our driveways, and I

20   remember walking over and talking with Connie.  And she was

21   there talking and with that -- I don't know if the mailman had

22   come up, but Michella went down to check her mail.

23   Q.   So outside that day was you, Michella, and Connie?

24   A.   Correct.

25   Q.   Okay.  And who went to go down there and get the mail?

1   A.  Michella.

2   Q.  Okay.  And what happened next, sir?

3   A.  With that, Michella returned back from the mailbox, and she

4   had mentioned something like, "This may be one of the letters we

5   have been receiving."  And she proceeded to open the envelope as

6   she was walking up towards Connie and I.

7   Q.  And so did she open it in front of you?

8   A.  Yes.

9   Q.  Did you see the contents?

10  A.  Yes.

11  Q.  I'm gonna show you what's been admitted as United States

12  Exhibit 10A, and if we can scroll through those, please.

13     Sir, now I'm gonna show you United States Exhibit 10B, which

14  are different photographs of the same mailing here.

15     Sir, you recognize those as photographs of the letter you

16  saw the Pinedas receive and that they opened with you there?

17  A.  Yes.

18          MR. TIEKE:  If we could go to 10A-4, please, and then

19  10A-5, please.

20  Q.  When they opened it, you recall seeing something that looked

21  like a bullet in this mailing here?

22  A.  Yes.

23  Q.  What do you recall -- do you recall it being placed in --

24  inside of something?

25  A.  Yes.  I remember them -- or her getting something out of the

1    envelope and unfolding it.  What really stood out -- you know,

2    when seeing these pictures again, it -- the pasta container,

3    that it was kind of cut out or folded up because I've purchased

4    that before.  You know, it was just kind of odd.  That just --

5    that stuck out.

6        But I remember her holding it out, kind of in her hand after

7    she undid it, and her hands kind of shaking and just -- was just

8    shocked, you know.  And at that point, I mentioned to her, I

9    said, "You know, we need to put it back in.  That way you can

10   give it to the police and use it as evidence and just not do as

11   much with it."

12   Q.  Do you recall seeing cutout letters?

13   A.  Yes.

14   Q.  Okay.  I'll show you 10B-8, please.  Do you recall seeing

15   something similar or that?

16   A.  Yes.  I know when I was interviewed by the FBI, I said I

17   remember something saying like "move out" and then seeing this,

18   the "get out."  I do remember seeing that where, when she folded

19   it out, that the letters were cut out.

20   Q.  You remember the cutout letters?

21   A.  Yes.

22   Q.  And you mentioned this, but you observed the Pinedas'

23   reaction to this?

24   A.  Yes.

25   Q.  And how would you describe that?

Recktenwald - Direct

1    A.  I mean, frightened, definitely angry, and -- you know, and

2    then as I mentioned, you know, Michella was just, you know,

3    nervous as she was holding it and just -- you know, just seemed

4    like an escalation of what events had transpired from weeks and

5    the month before.  It just seemed, you know, just very --

6    Q.  Scared?

7    A.  -- scared.

8    Q.  You stated earlier that, you know, the Pineda children had

9    often played together when you first moved in in 2020.  Did that

10   change?

11   A.  Yes.

12   Q.  When did that change?

13   A.  It slowly began changing with the number of incidents that

14   had occurred over that summer, definitely after receiving the

15   bullets in the mail.

16       You know, my -- I have three sons, and my middle son Noah

17   would play with S.P.1█████ from time to time.  Their kids would

18   play out in the front yard often.  In our cul-de-sac, they would

19   ride their bikes.  And I just feel like that moving forward

20   after that -- they had a fence put up in their backyard, and

21   they kept more to themselves and remained inside more often.

22   Q.  And specifically after this letter, did you and the Pinedas

23   come to an agreement regarding what to do if something were to

24   happen?

25   A.  Yes.

1              MS. REA:  Objection, Your Honor.  May we approach?

2              THE COURT:  Yes.

3         (Bench conference on the record.)

4              MS. REA:  Your Honor, my objection is as to the

5    relevance versus the prejudicial impact of this testimony.  I

6    think the point is that it is -- the experience was so scary,

7    they had a plan in place about what to do.

8         The Pinedas themselves have already expressed their reaction

9    in quite a lot of detail.  I think at this point it's just kind

10   of piling on and making it more inflammatory than any probative

11   value that it has.

12             MR. TIEKE:  Your Honor, I think it's relevant.  He's

13   gonna say that there was an agreement that if something were to

14   happen, that the kids would come over to his house, if something

15   were to happen at their house.

16        So it demonstrates the Pinedas' genuine reaction to the

17   threats and their desire to protect their children from those

18   threats, and it goes to the analysis of the true threat nature

19   that we have to prove.

20             THE COURT:  Anything further?

21             MS. REA:  No, sir.

22             THE COURT:  I'm gonna let you -- I think it goes

23   potentially to one of the elements with respect to the mailing

24   threatening communications, so I'll let you get into it.

25   Because we didn't hear anything about this from either of the

1    Pinedas, I think it necessarily needs to be brief.

2              MR. TIEKE:  I have one question.  I'll let him answer,

3    and I'll sit down.

4              THE COURT:  Thank you.

5         (End of bench conference.)

6    BY MR. TIEKE:

7    Q.  Sir, go ahead.  Specifically after the mailing, did you and

8    the Pinedas come to an agreement regarding what to do if

9    something were to happen?

10   A.  Yes.

11   Q.  Okay.  What was that?

12   A.  I had pulled in from work not too long after the bullets

13   were received in the mail, and as I was getting out of my Jeep,

14   Connie just motioned to me and asked me to just talk.  She

15   wanted to ask me something real quick.

16        And she had asked -- she said, you know, since receiving

17   pretty much the bullets in the mail, that with things being

18   escalated, she had asked that if, you know, there was ever any

19   threat or if they ever felt like that something bad would happen

20   at their house, that her kids and -- their kids would be able to

21   come over to our house.  And I told her absolutely, at any time

22   they could come front/back door if there was ever fear of any

23   retaliation or any -- any escalation of what was occurring.

24             MR. TIEKE:  Thank you, sir.  No further questions,

25   Your Honor.

1            THE COURT:  Ms. Rea.

2            MS. REA:  Thank you, Your Honor.

3                      CROSS-EXAMINATION

4    BY MS. REA:

5    Q.  Hi, Mr. Recktenwald.  I have only a couple questions for

6    you.  My name is Angela Rea.  When you were present for the

7    receiving of the item that you have been shown with the bullets

8    in it, that was an item that you said Michella Pineda removed

9    from the mailbox while you were present.

10   A.  Yes.

11   Q.  Okay.  She walked away -- it sounds like you guys were

12   standing right next to the mailbox.  She walked over, took it

13   out of the mailbox, and brought it back; is that right?

14   A.  We were standing at the end of the driveway -- the mailbox

15   was at the end.  We were standing in between towards the very

16   end of the driveway, yes.

17   Q.  Okay.  And you don't recall -- did she take the item apart

18   in front of you?  I'm trying to get at what you saw once she had

19   the item in her hands, because as you've seen, there's an outer

20   envelope, an inner envelope.  What did you see at that point?

21   A.  I remember her opening up the envelope, and I remember her

22   getting something out, whether it was an envelope or the cutout.

23   And then I -- I remember some kind of baggie or something along

24   that line that -- the purple gloves and seeing the copper part

25   of the bullets.

1  Q.  Okay.  And you had advice for them after you saw that the

2  item had been received; correct?

3  A.  Yes.

4  Q.  Which was to put it up or put it away, something like that,

5  and to get it to the police?

6  A.  Yes.

7  Q.  And that's what you suggested they do?

8  A.  Yes.

9          MS. REA:  Okay.  That's all.  Thank you.

10          THE COURT:  Any redirect?

11          MR. TIEKE:  No, Your Honor.

12          THE COURT:  May the witness be excused?

13          MR. TIEKE:  Yes, Your Honor.

14          THE COURT:  Thank you.  You may step down.

15          THE WITNESS:  Thank you.

16          THE COURT:  The Government's next witness.

17          MR. TIEKE:  Yes, Your Honor.  The United States would

18  call Ms. Dena Ballenger.

19      (DENA BALLENGER, called by the Government, sworn.)

20                    DIRECT EXAMINATION

21  BY MR. TIEKE:

22  Q.  Good afternoon, ma'am.

23  A.  Hello.

24  Q.  I'll just ask you to keep your voice up.  That microphone is

25  right -- it's kind of right -- that bar right in front of you.

1    So we just want to make sure that everyone can hear what you

2    have to say.  Okay?

3    A.   Okay.

4    Q.   Could you please state your name for the jury.

5    A.   Dena Ballenger.

6    Q.   Ms. Ballenger, what is your current job?

7    A.   Police report technician.

8    Q.   And are you a civilian that works for Louisville Metro

9    Police Department?

10   A.   Yes, I am.

11   Q.   Okay.  How long have you been doing that job?

12   A.   In May it will be a total of 16 years.

13   Q.   And did you -- what was your previous role for Metro Police

14   Department?

15   A.   Prior to my current position, I was working for the

16   Telephone Reporting Unit.

17   Q.   And were you a civilian in that role as well?

18   A.   Yes, I was.

19   Q.   And so in total, how many years have you worked for LMPD as

20   a civilian?

21   A.   In May it will be a total of 16 years.

22   Q.   Sixteen total?

23   A.   Total, yeah, completely total for LMPD.

24   Q.   And you had those two jobs in that 16 years?

25   A.   Yes.

Ballenger - Direct

1    Q.  Okay.  In your current job, when someone calls in, what

2    happens?

3    A.  Well, in my current position, the police report technician,

4    if someone comes in, then I'm dispatched out on a run.

5    Q.  During the events of -- in 2020, when someone calls -- when

6    called in, what would happen?

7    A.  I would answer the phone.  And they would either start

8    straight off on what they were calling for, if they needed a

9    report, or I would ask, you know, "What do you need a report

10   for?"

11   Q.  So in your role in 2020, you essentially fielded incoming

12   calls to the Metro line?

13   A.  Yes.

14   Q.  Okay.  And when someone called in, how do you confirm the

15   caller's identification information when they do call in?

16   A.  I ask their name, date of birth, their current address,

17   their telephone number, and their sex and their race.

18   Q.  Okay.  And is that because you then confirm their ID and put

19   it into a report?

20   A.  Correct.

21   Q.  Okay.  Do you remember receiving a call from Suzanne Craft

22   on November 30th, 2020?

23   A.  As I can recall against the report that I reviewed.

24   Q.  Was that call by phone?

25   A.  Yes.

1    Q.  On that call did you go through the process and confirm that

2    Ms. Craft was the caller?

3    A.  Yes.

4    Q.  Okay.  And what did you do?

5    A.  I asked her name, date of birth, address, current phone

6    number, and sex and race.

7    Q.  And did she provide those from what you can recall?

8    A.  Yes.

9    Q.  And do you recall, what was the call about?

10   A.  It was a theft of mail from her mailbox.

11   Q.  And what date did she claim that her mail was stolen from

12   her mailbox?

13   A.  She claimed it was stolen on the 21st at 6:00 p.m.

14   Q.  November 21st?

15   A.  November 21st.

16   Q.  Okay.  And was she able to specifically identify exactly

17   what mail she claims was stolen?

18   A.  Yes.

19   Q.  And what were those items?

20   A.  She described those items as a Fifth Third Bank statement, a

21   Visa credit card statement, and then a letter from the Girl

22   Scouts.

23   Q.  Okay.  And so she reported the specific items on November

24   30th, 2020, that she claimed were stolen nine days before --

25   A.  Yes.

1    Q.  -- she called in?

2    A.  Yes.

3    Q.  Okay.  And where did she specifically claim the items were

4    stolen from?

5    A.  Her mailbox.

6    Q.  And did she claim to have video of the incident?

7    A.  She stated that she observed that the mailman had delivered

8    the mail to her mailbox through her Ring doorbell.

9    Q.  As far as your interaction with this report, did -- was that

10   ever provided?

11   A.  As far as my interaction, no.

12           MR. TIEKE:  Okay.  Thank you, ma'am.  No further

13   questions, Your Honor.

14           THE COURT:  Ms. Rea.

15           MS. REA:  Thank you, Your Honor.

16                        CROSS-EXAMINATION

17   BY MS. REA:

18   Q.  Hi, Ms. Ballenger.  I just have a couple questions for you.

19   When this report was made to you, there was -- as you've said,

20   there's a specific date that we're talking about, correct,

21   11-21?

22   A.  Yes.

23   Q.  And there wasn't an indication that there was video of the

24   theft; right?

25   A.  No.  She just stated the observation of the theft -- or the

1   delivery from the observation of her Ring doorbell.

2   Q.  She said she saw the mail being delivered through the Ring

3   doorbell; correct?

4   A.  Correct.

5   Q.  And the next day it was gone?

6   A.  Yes.

7   Q.  And the report was made on November 30th; correct?

8   A.  Yes.

9           MS. REA:  I don't have any other questions.  Thank

10  you.

11          THE COURT:  Any redirect?

12          MR. TIEKE:  No, Your Honor.  Thank you.

13          THE COURT:  May the witness be excused?

14          MR. TIEKE:  Yes, Your Honor.

15          THE COURT:  Thank you.  You may step down.

16      Members of the jury, we're going to take our afternoon break

17  at this point for about ten minutes, and then we'll quickly

18  reassemble and continue with testimony.  Remember the admonition

19  not to discuss the case.  Thank you.

20      (Jury out 2:12 p.m.)

21          THE COURT:  You may be seated.  The jury has left the

22  courtroom.

23      You'll be ready with your next witness?

24          MR. TIEKE:  Yes, Your Honor.

25          MS. ZIMDAHL:  Yes.

1          THE COURT:  I would like to remind you that I reserved

2     ruling on three of your evidence categories.  Those would be 6,

3     7, and 8.  Do you anticipate presenting testimony that would

4     implicate those three categories today?

5          MS. ZIMDAHL:  Let me flip to those briefly.  Your

6     Honor, I believe the answer is that will not be presented today.

7          THE COURT:  All right.  Anything else that we need to

8     take up before the brief break?

9          MS. REA:  No, sir.

10          MS. ZIMDAHL:  No, Your Honor.

11          THE COURT:  Thank you.

12     (Recess at 2:14 p.m. until 2:27 p.m.  Jury out.)

13          THE COURT:  We're back on the record.  They are lining

14     the jury up.  Is there anything we need to address before you

15     call your next witness?

16          MR. TIEKE:  No, Your Honor.

17          MS. REA:  No, sir.

18          THE COURT:  It's not quite 2:30.  There might be an

19     occasion for another brief break this afternoon, but if it is

20     not necessary and we can keep going, I'm happy to do that.

21          MR. TIEKE:  Thank you, Judge.

22     (Jury in 2:28 p.m.)

23          THE COURT:  You may call your next witness.

24          MR. TIEKE:  Your Honor, the United States calls FBI

25     Forensic Examiner Icel Kuznetsova.

1       (Transcript of testimony of ICEL KUZNETSOVA previously

2   filed.)

3            THE COURT:  Ms. Rea, before we move on --

4            MS. REA:  Yes, Your Honor.  I'm sorry.  May we

5   approach?

6            THE COURT:  Yes.

7       (Bench conference on the record.)

8            MS. REA:  I spoke before I actually heard you, and she

9   would like a break.  Thank you.

10           THE COURT:  That's what I anticipated.

11      (End of bench conference.)

12           THE COURT:  Members of the jury, we're now going to

13  take another brief break of about ten minutes.  Remember the

14  admonition.  I'll see you back here shortly.

15      (Jury out 3:31 p.m.)

16           THE COURT:  You may be seated.  The jury has left the

17  courtroom.

18      Thank you for doing that.  I was just -- I was trying to

19  match --

20           MS. REA:  Thank you for doing it.

21           THE COURT:  I was just trying to keep track of the

22  exhibits and -- well, I wasn't doing it adequately.  So thank

23  you.

24      Anything we need to talk about before everyone else gets a

25  brief break?

```
 1              MR. TIEKE:  No, Your Honor.

 2              THE COURT:  We'll see you back here at 20 before the

 3   hour.  Thank you.

 4         (Recess at 3:32 p.m. until 3:50 p.m.  Jury out.)

 5              THE COURT:  We're back on the record.  The jury is not

 6   yet back in the courtroom.  Are we ready to go with the next

 7   witness?

 8              MR. TIEKE:  Yes, Your Honor.

 9         (Jury in 3:51 p.m.)

10              THE COURT:  You may call your next witness.

11              MR. TIEKE:  Your Honor, the United States calls FBI

12   Forensic Examiner Jeremy Fletcher.

13         (Transcript of testimony of JEREMY FLETCHER previously

14    filed.)

15              THE COURT:  You may call your next witness.

16              MS. ZIMDAHL:  The United States would call Forensic

17   Examiner Hector Maldonado to the stand.

18         (Transcript of testimony of HECTOR MALDONADO previously

19    filed.)

20              THE COURT:  Let me ask counsel to approach, please.

21         (Bench conference on the record.)

22              THE COURT:  It is 4:35.  Do you have a quick witness?

23   What --

24              MR. TIEKE:  I think that the next three would --

25              THE COURT:  Are all longer?
```

1          MR. TIEKE:  Are all longer than the ones for today,

2    yes, Your Honor.

3          THE COURT:  I have your list pinned here on my iPad so

4    that I can keep track, and that's what I was afraid you were

5    going to tell me.

6       All right.  Let's then break for the day.

7          MR. TIEKE:  Thank you, Your Honor.

8          MS. REA:  Thank you.

9       (End of bench conference.)

10          THE COURT:  Members of the jury, we are now going to

11   break for the day.  The next witness and the witness following

12   that are both expected to take longer than the 25-30 minutes we

13   have roughly left today.  So we're going to let you go for the

14   evening.

15      Remember again the admonition.  I enjoy saying it so much

16   that I'm going to repeat it in detail.  Please do not talk with

17   each other as you're leaving the courthouse today.  Do not

18   contact each other during the evening to talk about this case.

19   Don't talk with your family members, friends, or anyone else

20   about the case.  You can talk with each other about anything you

21   like but the case.

22      We will see you back here tomorrow at 8:40, if you could

23   check in, and we will be prepared to start.  We believe it is

24   possible the testimony will end tomorrow, but don't get your

25   hopes up.  It might take through -- as we predicted during the

1  big jury pool discussion, it might take until Friday, but it is

2  possible that testimony will be completed tomorrow.

3      All right.  We'll see you in the morning.  Thank you very

4  much.

5      (Jury out 4:38 p.m.)

6          THE COURT:  You may be seated.  The jury has left the

7  courtroom.

8      I believe you have approximately three witnesses left; is

9  that correct?

10         MR. TIEKE:  That's correct, Your Honor.

11         THE COURT:  Ms. Rea, you of course do not need to tell

12  me nor the Government whether you intend to call anyone to the

13  stand, but I'll invite you, if you are inclined, to let us know

14  whether you expect to do so at this point.

15         MS. REA:  Your Honor, I expect that we will have some

16  testimony to put on.

17         THE COURT:  All right.  So I went out on a bit of a

18  limb there with the jury, but it seemed to me that it is

19  possible, even if you did present some testimony, that we might

20  be able to get through tomorrow.

21     I know you'll have a longish time with the case agent; is

22  that correct?

23         MR. TIEKE:  Yes, Your Honor.

24         THE COURT:  But I am hopeful that we could get through

25  testimony tomorrow even if we cannot get all the way to closing

1    arguments or instructions.  If we're able to get through

2    testimony and then have a -- the final day on Friday with

3    closing arguments, instructions, and getting the case to the

4    jury midday, I think that would be a -- that would be a schedule

5    that we could all strive for.

6        We already decided we would meet in the morning at 8:15 to

7    discuss the draft instructions that have been provided.  Is

8    there anything there we need to preview before we break for the

9    day?

10               MS. REA:  Not from me, Your Honor, no.

11               MR. TIEKE:  Not from the United States, Your Honor.

12               THE COURT:  Anything else?  Any anticipated witness

13   issues?  Evidentiary issues?  We have not used our agreed upon

14   404(b) instruction yet.  Do we anticipate we will do that

15   tomorrow?

16               MR. TIEKE:  No, Your Honor.

17               THE COURT:  All right.  I think that's all I have on

18   my list.  So unless there's anything else you-all can think of,

19   we will break for the evening, and I'll see you at 8:15.

20               MS. REA:  Thank you, Your Honor.

21               MR. TIEKE:  Thank you, Your Honor.

22               MS. ZIMDAHL:  Thank you, Judge.

23        (Proceedings concluded at 4:40 p.m.)

24

25

1           C E R T I F I C A T E

2       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5
        _____s/Dena Legg_____           _September 21, 2023_
6   Certified Court Reporter No. 20042A157     Date
    Official Court Reporter
7

8                   REDACTION CERTIFICATE
        I certify that the foregoing is a true and correct copy of
9   the transcript originally filed with the clerk of court on
    09/21/23 and incorporating redactions of personal identifiers
10  requested by the following attorney of record: Angela M. Rea in
    accordance with Judicial Conference policy.  Redacted characters
11  appear as a black box in the transcript.

12      _____s/Dena Legg_____           _October 30, 2023_
    Certified Court Reporter No. 20042A157  Date
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2     GOVERNMENT WITNESSES:

 3     CONNIE PINEDA
            Direct Examination By Ms. Zimdahl          8
 4          Cross-Examination By Ms. Rea               56
            Redirect Examination By Ms. Zimdahl        73
 5
       MATTHEW LANHAM
 6          Direct Examination By Mr. Tieke            82
            Cross-Examination By Ms. Rea               102
 7
       BRIAN RECKTENWALD
 8          Direct Examination By Mr. Tieke            104
            Cross-Examination By Ms. Rea               115
 9
       DENA BALLENGER
10          Direct Examination By Mr. Tieke            116
            Cross-Examination By Ms. Rea               120
11
       ICEL KUZNETSOVA (transcript previously filed)
12
       JEREMY FLETCHER (transcript previously filed)
13
       HECTOR MALDONADO (transcript previously filed)
14

15                            EXHIBITS
16
       GOVERNMENT:
17     25 - video                                     92
       26 - video                                     97
18     27 - video                                     100
       40 - photo                                     86
19

20     DEFENDANT:
       No exhibits
21

22

23

24

25
```