```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
      UNITED STATES OF AMERICA,     )    Case No. 3:22-CR-00094-DJH
 4                                  )
               Plaintiff,           )    REDACTED
 5                                  )
      v.                            )
 6                                  )
      SUZANNE CRAFT,                )
 7                                  )    March 9, 2023
               Defendant.          )    Louisville, Kentucky
 8

 9                            * * * * *

10                            VOLUME 4
                      TRANSCRIPT OF JURY TRIAL
11              BEFORE HONORABLE DAVID J. HALE
                 UNITED STATES DISTRICT JUDGE
12
                              * * * * *
13
      APPEARANCES:
14
      For United States:       Christopher C. Tieke
15                             Stephanie M. Zimdahl
                               U.S. Attorney's Office
16                             717 West Broadway
                               Louisville, KY 40202
17
      For Defendant:           Angela M. Rea
18                             Western Kentucky Federal
                                  Community Defender, Inc.
19                             629 S. 4th Avenue, Suite 200
                               Louisville, KY 40202
20
      [Defendant present.]
21
                      Dena Legg, RDR, CRR, CCR-KY
22                     Official Court Reporter
                       208 U.S. Courthouse
23                     Louisville, KY 40202
                         (502) 625-3778
24
      Proceedings recorded by certified stenographer, transcript
25    produced by computer.
```

```
1            (Begin proceedings in open court at 8:41 a.m.  Jury out.)

2            THE COURT:  We are back on the record in U.S. v.

3   Craft.  The jury is not present in the courtroom.  We are

4   starting a bit behind schedule this morning, owing as I

5   understand it to some traffic difficulties.

6       Our jury is not yet fully checked in.  So we'll let them get

7   situated and take as much time as we need now to work through

8   our draft jury instructions.  We intended to start that, of

9   course, a little earlier, but I think we'll be okay time-wise.

10      So let me first ask counsel if you-all had a chance to

11  review the set of draft jury instructions we provided yesterday.

12           MR. TIEKE:  Yes, Your Honor, we had a chance to review

13  those.

14           MS. REA:  Yes, Your Honor, we did.

15           THE COURT:  And have each side had a chance to confer?

16           MR. TIEKE:  We discussed it this morning, Your Honor.

17           MS. REA:  Yes, sir.

18           THE COURT:  So tell me where we have disagreements or

19  may need to talk about modifications or revisions.

20           MS. REA:  Yes, Your Honor.  I think we don't have

21  disagreements.  I do think we have things that we agree upon

22  with respect to modifications.  I guess I might feel a little

23  bit more strongly about one of them than the U.S.  I will begin

24  with, just in order, Instruction Number 20 at page 26 in the

25  draft.
```

1    THE COURT:  Okay.  So does that mean that neither side

2  has an issue with Instructions 1 through 19?

3    MS. ZIMDAHL:  The only thing I would note, Your Honor,

4  as we're going forward, I belive there might be a numbering

5  issue.  And I apologize.  Are you all right if we both speak,

6  both Mr. Tieke and I?

7    THE COURT:  Sure.

8    MS. ZIMDAHL:  I know that can get confusing.  So I

9  apologize.  I think there is just duplicative numbering.  One of

10  them is -- there's two Instruction Number 2s.

11    MS. REA:  And I believe those are just duplicates.

12    THE COURT:  Not in my set.

13    MS. REA:  It might be just the way they're printed.

14    MS. ZIMDAHL:  That might just be our set having two,

15  then.

16    THE COURT:  Okay.  So short of that -- aside from

17  that, are we okay with 1 through 19?

18    MR. TIEKE:  No objections from the United States on 1

19  through 19.

20    MS. REA:  Yes, Your Honor.

21    THE COURT:  I will tell you that depending upon what

22  the defense decides to do once the Government has rested,

23  Instruction 1 where it says "then I will explain the defendant's

24  position," that can be removed --

25    MS. REA:  Yes, sir.

1          THE COURT:  -- if need be, and the follow-on

2     instruction can be removed.

3       Also, Instruction Number 9 might need to be modified

4     briefly.  I don't know that the jury -- I mean, we'll wait until

5     all the proof is in, but I don't know that the jury has heard

6     the word "objection" to this point.  I think we've only had a

7     couple.  Those have been introduced to the Court by way of a

8     request to approach and then a discussion.  So the jury at this

9     stage may not be aware that there have been any objections made.

10      So I think it's -- it's a pattern instruction.  It's a

11    typical instruction.  We'll leave it there for now, but I just

12    flag that as -- at the very end, we may jointly decide that it's

13    unnecessary.

14          MS. REA:  Your Honor, I think I said it once.  Other

15    than that, it was all stuff we were discussing.

16          THE COURT:  Oh, did you?

17          MS. REA:  Yes.

18          THE COURT:  I thought you only asked to approach, but

19    you may be right.  And if so, it's fine to just leave it as is.

20      Let me make sure.  Okay.  So then 1 through 19 we will

21    consider largely final.  And then we get to -- I believe you

22    said Instruction 20.

23          MS. REA:  Yes, Your Honor.  I think that this

24    instruction just does not apply.  I think it is meant for

25    situations in which a person can commit a crime in different

1    ways.

2        In this instance, I think the "ands" that we really see in

3    the substantive offense instruction are between the elements.

4    And I think including the instruction, in light of the fact that

5    we don't have multiple degrees or multiple -- not degrees --

6    theories of ways to commit the offense would create confusion.

7    So I think it simply does not need to be there.

8            THE COURT:  What's the Government's position?

9            MS. ZIMDAHL:  Your Honor, we would not object to

10   removing that.  I think then a change would need to be made in

11   Instruction Number 15 and all of the charged counts to have

12   "knowingly deposit in a post office or an authorized depository

13   for mail matter," the idea being that you prove in the -- you

14   charge in the conjunctive, prove in the disjunctive.

15           THE COURT:  Right.

16           MS. ZIMDAHL:  Move that to an "or."  Then we don't

17   have an "and."  And then that instruction with the "and" would

18   end up just being confusing to a jury.  And with that change

19   made, I don't think we'd have any objection to that.

20       I also don't think that that -- where the letters were

21   mailed from is any issue in this particular case.

22           THE COURT:  Tell me again where in Instruction 15.

23           MS. ZIMDAHL:  At the top of 15 where it's talking

24   about the language "did knowingly deposit in a post office and

25   an authorized depository for mail matter" -- I'm just making an

1   assumption that that is where the imprimatur for coming up with

2   an "and" instruction comes from because, otherwise, I don't

3   believe there's an "and" at issue.  But we could change that to

4   "or" because that's -- "either/or" would work for this charge.

5              THE COURT:  Would that be necessary in all five?

6              MS. ZIMDAHL:  Yes, Your Honor, it would.

7              THE COURT:  Yeah.

8         Ms. Rea.

9              MS. REA:  I think that's a good solution, Your Honor.

10             THE COURT:  All right.  So we'll -- in all five of the

11  instructions on the offense elements, in the third line down,

12  we'll change the "and" to an "or."  So it will read, "Suzanne

13  Craft did knowingly deposit in a post office or an authorized

14  depository for mail matter to be sent."  Is that correct?

15             MR. TIEKE:  Yes, Your Honor.

16             MS. ZIMDAHL:  Yes, Your Honor.

17             MS. REA:  Yes, sir.

18             THE COURT:  And then we will remove altogether

19  Instruction 20; correct?

20             MS. REA:  Yes, Your Honor.

21             MS. ZIMDAHL:  Yes, Judge.

22             THE COURT:  All right.  We will, of course, renumber

23  from there on.

24        What next after 20?

25             MS. REA:  I think the next thing that we both flagged,

1   Your Honor, is at this point we do not have witnesses who have

2   tested -- or testified to both facts and opinions.  So

3   Instruction Number 23 at page 29, the 7.03A instruction, is not

4   one that's necessary, and I don't think we anticipate it

5   becoming necessary.

6           MR. TIEKE:  The United States would --

7           THE COURT:  You're gonna have some work to do to

8   convince me.  I think, if you read the Committee Commentary to

9   the pattern instructions, I think in a case like this we need

10  both 7.03 and 7.03A.  The mixed opinion and fact testimony is

11  typically associated with case agents, is it not?

12          MS. ZIMDAHL:  I need to take another look at that

13  commentary, Your Honor, but I certainly wouldn't disagree.

14          THE COURT:  It is because a case agent testifies so

15  broadly and often offers their -- I hesitate to use the word,

16  but the jury's not here.  It's almost a word that the case law

17  suggests strongly we shouldn't use at all in front of the jury,

18  but they have an expert point of view or an expertise.  Law

19  enforcement officers are often qualified in that manner.

20      So it's been my experience that what is in our packet here

21  as Instruction Number 22, which I think in the next draft would

22  end up being 21, that follows the 7.03A instruction for a

23  witness testifying to both facts and opinions, I think that

24  would be most appropriate.

25      Now, if you don't want it in there --

1          MS. REA:  I don't have a particularly strong objection

2    to it.  I think I'm kind of agnostic on it remaining in or out,

3    just --

4          THE COURT:  All right.  I'm not a huge fan of the

5    approach in our circuit and others like our circuit where we're

6    forbidden from using -- largely forbidden.  I'm speaking with a

7    bit of hyperbole now, in case anyone in Cincinnati is listening,

8    but I think it -- I don't think it is as difficult for a modern

9    jury to understand and take instruction on, if properly

10   instructed, as how to handle expert testimony.

11      And I think the challenge here is to use the proper -- is to

12   identify what is opinion testimony in the traditional expert

13   sense as well as opinion testimony in the lay field.  We're not

14   talking about that.  We're talking about opinion testimony in

15   the traditional expert area.

16      So, clearly, we have that with respect to the lab folks.

17   And I think you -- Mr. Tieke, Ms. Zimdahl, you would agree with

18   that.

19          MS. ZIMDAHL:  Yes, Your Honor.

20          MR. TIEKE:  Definitely expert.

21          THE COURT:  That's 703.  But the hybrid testimony, I

22   think, still falls into that category.  So that's why I have it

23   in here.  And in the area where we say "insert names," I would

24   say we're probably talking about the case agent testimony.

25          MS. ZIMDAHL:  Your Honor, could we have a few moments,

```
1    and we could come back to this one?

2              THE COURT:  Sure.

3              MS. ZIMDAHL:  I think we would want to assess -- you

4    know, we have multiple law enforcement agents, obviously, who

5    testified.  Whether --

6              THE COURT:  I don't think it would apply to every law

7    enforcement --

8              MS. ZIMDAHL:  I think that's what we would want to

9    think about and assess and maybe discuss with Ms. Rea.  I also

10   think, perhaps from her position, she wouldn't want us to

11   include all of them in this.  I don't know what her position

12   would be so --

13             THE COURT:  Ms. Rea identifies herself agnostic on

14   703A.  I understand that.  What it comes down to is opinion and

15   expert are not always synonymous.

16             MS. ZIMDAHL:  Right.

17             THE COURT:  And so we're limited to opinion in the

18   instructions arena whereas the rules are really written around

19   it.  703 and 704 are written around expert.  I don't think it's

20   particularly consequential in terms of what the jury has heard

21   thus far, but what's your view?  Given that Ms. Rea is not

22   advocating for it, I am not as --

23             MS. ZIMDAHL:  Can we have just a moment?

24             THE COURT:  I'm willing to yield, given her position,

25   but I came here expecting to have one side wanting it and one
```

1   side not, so --

2          MS. ZIMDAHL:  Your Honor, at this point, I -- Your

3   Honor, I don't think it applies to the -- in reading this, I do

4   not think it applies to the law enforcement witness, Special

5   Agent Russell, who has testified thus far based on his

6   testimony.  I think it has been very fact based on evidence

7   that's come in.

8      Quite honestly, I'm just trying to think through what we're

9   going to present.  And I think it is possible that it does

10  apply, as we read through it, to the postal inspector who is

11  going to testify based on his knowledge and interpretation of

12  what goes through the mail.  In fairness, I think it might be

13  good to apply it to his testimony, now that we've discussed it

14  and read through that.

15         THE COURT:  Well, then, let's just mark it.  And after

16  the testimony is in, we'll make a final decision on how to apply

17  it.  Is that --

18         MS. REA:  Yes, Your Honor.

19         THE COURT:  -- approach okay with both sides?

20     All right.  You do agree with the -- again, the more

21  traditional opinion/expert --

22         MS. ZIMDAHL:  Yes, absolutely.

23         THE COURT:  -- instruction which is now 23, Ms. Rea?

24         MS. REA:  Yes, Your Honor.

25         THE COURT:  All right.  Instruction 24, of course,

1    offers two alternatives there.  That also is dependent, Ms. Rea,

2    on the steps that the defense takes or doesn't take.  We will

3    modify that accordingly.

4        All right.  What next do we need to discuss?

5            MR. TIEKE:  Your Honor, I believe we're in agreement

6    on Instruction Number 26, which would be the other acts

7    instruction we've been, you know, discussing throughout the

8    trial.

9        At this stage, we haven't put that evidence in.  I don't

10   think we intend to put that evidence in that would touch on

11   that.  So if it shakes out at the end of the day that we do not,

12   then 26 could come out -- or what's currently 26.  And we are

13   fine with 27, which is the instruction that's previously been

14   read with respect to the 2019 and 2020 incidents.

15           THE COURT:  Of the various evidence categories that --

16   as you numbered them in your motion in limine and as -- I think

17   Ms. Rea used the same numbers in response, of course, and we did

18   in the two orders that I entered addressing them.  I believe

19   there were -- and I have a list here somewhere that I can look

20   at, but I believe there were a couple that I reserved ruling on.

21   You have not gotten to those; right?

22           MS. ZIMDAHL:  No, Your Honor, we have not.

23           THE COURT:  And do you anticipate that you will at

24   this stage?

25           MS. ZIMDAHL:  No, Your Honor, we do not.  It is always

1    possible; and so I want to hedge that with an I'm not sure what

2    might come up on cross-examination or in the defendant's case,

3    but we do not intend, as we sit here right now, to bring those

4    up on direct examinations.

5         THE COURT:   I believe those were category numbers 6

6    and 7, 6 being the proposed testimony of neighbors regarding

7    their interactions with the defendant and then category 7 being

8    the July 15 and July 16, 2021, incidents on the highway with --

9    between the victims and the defendant.   So thus far no evidence

10   in those categories has been introduced.

11      The other category that would implicate the -- what is

12   Instruction Number 26, the 404(b) evidence, is category 12.

13   That's the category covering the state court records and the no

14   contact order.

15        MR. TIEKE:   Again, Your Honor, we have -- do not

16   intend to put that into evidence in our case-in-chief.   But, of

17   course, should that be an issue down the road in terms of --

18        THE COURT:   Right.   I'm not asking you with the point

19   of foreclosing you from introducing it in a rebuttal phase or

20   anything along those lines.   I'm just -- at this stage you

21   haven't, and it doesn't appear that you will; is that correct?

22        MR. TIEKE:   That's correct, Judge.

23        THE COURT:   So, Ms. Rea, would you agree then that

24   absent evidence being introduced in those categories, 6, 7, and

25   12, we would probably then not need the 404(b) instruction?

1          MS. REA:  Your Honor, based on the Court's pretrial

2     ruling, I would.  It was our argument that more of the material

3     that has been presented was, in fact, 404(b) and not background,

4     but the Court has ruled on that.

5          So based on where we are now and the categories as the Court

6     has outlined them, the categories that the Court said were other

7     acts evidence have not been introduced at this point.  So I

8     think we're not there.

9          THE COURT:  All right.  So that gets us to Instruction

10    Number 28, which might need to be modified based on the

11    stipulations.  I think you-all have already taken or decided not

12    to introduce one of the stipulations.  You've withdrawn it as

13    unnecessary.  So that leaves one read to the jury thus far and

14    two remaining.

15         MR. TIEKE:  That's correct, Judge, and I think we will

16    be able to get rid of number 4 as well.  The Court mentioned --

17    so we would have to take out 5 because that was part of the one

18    that was withdrawn, I believe, subcategory 5 in this one.

19         THE COURT:  Paragraph 5 in Instruction 28?

20         MR. TIEKE:  Paragraph 5 in Instruction 28, yes, Your

21    Honor.

22         THE COURT:  All right.

23         MR. TIEKE:  And then paragraph 4 in Instruction 28

24    applies to the authenticity of the iPhone.  I believe that we

25    have tendered that stipulation, but at this point, we'll discuss

1    it with Ms. Rea.  I do not think it needs to be read into the

2    record.  I think that it'd just -- had been agreed to; and so

3    the cell phone will just come in without having it read --

4              THE COURT:  All right.

5              MR. TIEKE:  -- to the jury.  So we can withdraw that

6    stipulation.

7              THE COURT:  So that would be number 4, paragraph

8    number 4 --

9              MR. TIEKE:  Yes, Your Honor.

10             THE COURT:  -- in draft Instruction Number 28.

11             MR. TIEKE:  Right.

12             THE COURT:  All right.

13             MR. TIEKE:  And then in 1, 2, and 3, the one that's

14   already been read, it just needs the exhibit numbers that

15   correspond to the one that's been signed and filed.

16             THE COURT:  Right.

17             MR. TIEKE:  And then 6, Your Honor, I'll request that

18   that be read in the middle of the testimony of a witness that

19   will testify today.  And so 6 will indeed be read; and so we

20   would keep 6.

21             THE COURT:  All right.  Renumbered as 4?

22             MR. TIEKE:  Renumbered as 4, yes, Your Honor.

23             THE COURT:  Right.

24             MS. REA:  And, Your Honor, I agree with that.

25             THE COURT:  Okay.  All right.  So in the -- what we

1    anticipate being the final set of instructions following our

2    discovery conference or instructions conference today, what is

3    now Instruction Number 28, which is the instruction that repeats

4    the parties' stipulations by agreement, paragraphs 4 and 5 will

5    be unnecessary because those stipulations will not be utilized

6    as tendered.

7        All right.  And we'll add the exhibit numbers, of course, to

8    the first couple of paragraphs.

9        Okay.  That's where -- I believe that's where the preclosing

10   argument instructions will end.  The postclosing argument

11   instructions will pick up in 29.  These are the instructions

12   that pretty much just tell them how to go about doing their

13   work.  I have actually in the past gone as far as Instruction

14   Number 31 preclosing.  You-all can take a look at that.  I don't

15   feel strongly about it one way or the other.

16       Instruction Number 32 is also sort of a natural postclosing

17   argument instruction.

18       All right.  Anything we need to talk about before we get to

19   the verdict form?

20              MS. REA:  No, sir.

21              MR. TIEKE:  No, Your Honor.

22              THE COURT:  All right.  And the verdict form, let me

23   get you-all to weigh in on that.

24              MR. TIEKE:  The United States is perfectly fine with

25   the verdict forms, Your Honor.

1          THE COURT:  Ms. Rea, your view?

2          MS. REA:  Your Honor, I do not have objections to the

3    verdict forms.  I think -- and I'm just thinking through it now.

4    Might it be helpful, with respect to the special verdict

5    question, to make sure they know what instruction they're

6    referring back to, which is Instruction 17?

7       So I don't know if it would be better to refer in the

8    verdict form to Instruction 17 or in Instruction 17 -- and I'm

9    looking to see if it's in there -- to tell them that this

10   instruction relates to the special verdict question.  I could

11   see that being confusing.  It's unusual to have that in addition

12   to the guilty/not guilties.

13          THE COURT:  You may be right.  It may be best to

14   include in what is Instruction Number 17 in this draft the

15   instruction that begins, "In connection with Counts 1 through 5

16   of the indictment, the Government has alleged that the defendant

17   selected the victims of the threatening communications because

18   of their actual or perceived race or color."

19      If there is a place in this instruction to add a reference

20   to the special verdict -- and that probably should be plural,

21   "questions" as opposed to "question."  We'll change that.  I'm

22   happy to include that.

23          MS. REA:  I think that would make sense, and we could

24   just put it at the end.

25          THE COURT:  I'd rather put it in the instruction

1    rather than the verdict form, but --

2            MR. TIEKE:  I think that we're in agreement that --

3    that's fine.  I think the best place for that might be at the

4    end of the first paragraph, something that -- you know, if

5    you --

6            THE COURT:  All right.  Let's work on a sentence that

7    you both find acceptable.  The preceding sentence -- the second

8    sentence of the first paragraph reads:  "If you determine that

9    the defendant knowingly sent threatening communications by mail

10   by finding her guilty of" -- well, that needs to be modified,

11   "by finding her guilty of" -- we'll take out the word "on" --

12   "any or all of the charges on Counts 1 through 5, you must then

13   determine beyond a reasonable doubt whether the defendant sent

14   the particular threatening communications because of the actual

15   or perceived race or color of the victims."

16       So the following sentence would need to read something along

17   the lines of:  "You will do this by answering special verdict

18   questions on the verdict form."

19           MS. REA:  I think that's fine, Your Honor.

20           MR. TIEKE:  I think that's fine, Your Honor.

21           THE COURT:  All right.  I think that is an

22   improvement.

23       So that takes us all the way through, unless we've passed

24   over something else you-all want to talk about with respect to

25   the instructions.

```
 1            MS. REA:  No, sir.

 2            MS. ZIMDAHL:  No, Your Honor.

 3            MR. TIEKE:  I don't believe so, Your Honor.

 4            THE COURT:  All right.  You-all have your first

 5   witness ready?

 6            MS. ZIMDAHL:  We do.

 7            THE COURT:  How about if I give you a couple minutes

 8   to make sure?

 9            MS. ZIMDAHL:  That'd be great.

10            THE COURT:  And I am going to -- I'm going to let you

11   bring the jury in while I am off the bench for a couple of

12   minutes.  I'm going to take this draft back to chambers, and

13   I'll come right back.  But you can, in the meantime, go ahead

14   and get the jury in the box, and the United States can be

15   preparing their next witness.

16       (Jury in 9:12 a.m.)

17            THE COURT:  Good morning, members of the jury.  We are

18   starting only a few minutes behind this morning.  The lawyers

19   and I have been working a bit, and we are now ready to proceed

20   with testimony.  You may call your next witness.

21            MR. TIEKE:  Your Honor, the United States calls United

22   States Postal Inspector Charles Klein.

23       (CHARLES KLEIN, called by the Government, sworn.)

24                         DIRECT EXAMINATION

25   BY MR. TIEKE:
```

1    Q.   Good morning, Postal Inspector Klein.

2    A.   Good morning.

3    Q.   Could you please state your name for the jury.

4    A.   Charles Klein.

5    Q.   And where are you employed now?

6    A.   The United States Postal Inspection Service.

7    Q.   And what is your job title?

8    A.   Postal inspector.

9    Q.   How long have you worked for the United States Postal

10   Inspection Service?

11   A.   It'll be seven years this June.

12   Q.   What do you -- what do you do in your role as a postal

13   inspector?

14   A.   As postal inspectors, we're the law enforcement arm of the

15   United States Postal Service.  We are federal agents that

16   investigate any crimes that adversely affect the U.S. mail.

17   Q.   Did you receive any training with respect to your duties as

18   a postal inspector?

19   A.   I did.  I graduated from the United States Postal Inspection

20   Service Academy in 2016.  Prior to -- I'm sorry.  After

21   graduating, I've gone to many specialized trainings.  More

22   pertinent to this case would be training in dangerous mail

23   investigations as well as letter mail tracking training.

24   Q.   You mentioned this, but can you just tell the jury a little

25   bit about that specific training you received regarding those

1    dangerous mailings and the tracking.

2    A.   Dangerous mail investigations could be anything from bombs,

3    explosives, chemical or biological weapons, or threatening

4    communications utilizing the U.S. mail.

5        The letter mail tracking training was a training in which we

6    learned the ins and outs of the postal service and the mail

7    flow, how a letter enters the mail stream and ultimately gets

8    delivered to an address as well as analyzing different markings

9    that may be on parcels or letters to identify potentially where

10   that letter originated from.

11   Q.   So you mentioned you've been with the Postal Inspection

12   Service for seven years or so.  How long have you been in law

13   enforcement total?

14   A.   Seven.

15   Q.   Seven years?

16   A.   Uh-huh.

17   Q.   Okay.  As part of your duties with the Postal Inspection

18   Service, you investigate criminal cases relating to threats sent

19   through the mail?

20   A.   I do.

21   Q.   Did you participate in the investigation of the defendant,

22   Suzanne Craft, in this case?

23   A.   I did.

24   Q.   Let's talk about some of those markings that you mentioned

25   that you have that specific knowledge of.  Are you familiar with

1    the processing marks that the United States Postal Service uses

2    on mail?

3    A.   I am.

4    Q.   And so let's talk about -- what are some of the ways that

5    letters enter the mail system?

6    A.   There's several different ways that a letter would enter the

7    mail stream.  One, the individual may take it to the post office

8    and drop it off themselves.  They may place it in a blue

9    collection box located throughout the city.  They could hand-

10   deliver it to their -- to a letter carrier, or a more convenient

11   way is to place it in their individual mailbox for the letter

12   carrier to pick up.

13   Q.   And so once that mail kind of enters the mail stream in

14   whatever one of those ways that it does, how is a letter then

15   processed by the United States Postal Service at the processing

16   centers?

17   A.   So that -- a letter would enter the mail stream, and it

18   would go through a series of machines.  The first machine would

19   be the cooling machine.  This would kind of separate larger

20   envelopes from regular-sized envelopes and separates them.

21        Then after that separation, it would go into -- it's a

22   machine called the Advanced Facer Canceling System, and what

23   that does is exactly what the name says it does.  It puts the

24   letter in an upright position to where the stamp can be canceled

25   out.  It would leave like a postmark so it'd prevent the reuse

1    of that stamp.

2        It would also take an image of the address that is on the

3    letter, and it will analyze the address to know where that

4    individual letter is supposed to be delivered to.  And it also

5    sprays two unique barcodes on the front and back of the letter;

6    and it would also spray a readable ZIP 11, or human readable

7    ZIP code, on the front of the letter.

8    Q.  Okay.  You mentioned this.  So throughout that process, it

9    sounds like -- does the postal service processing center -- it

10   sounds like it's an automated process.

11   A.  It is, yes.

12   Q.  Through that automated process, are there certain markings

13   on the letter that are indicative of the fact that the mail was

14   indeed processed by the processing center?

15   A.  Yes.  That Advanced Facer Canceling System will indeed spray

16   several unique markings on a letter to indicate that it has been

17   processed by the United States Postal Service.

18   Q.  Postal Inspector Klein, I'm going to show you what's marked

19   as United States Exhibit 28, which is a demonstrative exhibit

20   relating to those United States Postal Service markings.  Is

21   this a fair and accurate depiction of the United States Postal

22   Service processing markings on the mailing that you just

23   described there?

24   A.  It is.

25   Q.  Will this demonstrative help you explain your testimony to

1    the jury today?

2    A.   Yes.

3             MR. TIEKE:   Okay.  Your Honor, at this time I'd move

4    to publish United States Exhibit 28 as a demonstrative exhibit.

5             MS. REA:   No objection.

6             THE COURT:   Granted.

7             MR. TIEKE:   Thank you.

8        If we could show the jury, please.  Carisa, if we can just

9    please blow up -- can you just blow up the top part here.

10   BY MR. TIEKE:

11   Q.   Postal Inspector Klein, I'd like you to just go ahead and

12   kind of walk the jury through this demonstrative that you made.

13   But before I do that, is this one of the mailings that's at

14   issue in this case?

15   A.   It is.

16   Q.   Okay.  And so you used that to make a demonstrative?

17   A.   Correct.

18   Q.   Okay.  So if you could just go ahead and please -- can you

19   take the jury through those markings on the front of this

20   envelope.

21   A.   Yes.  So as it enters the Advanced Facer Canceling System

22   and it's in its upright position, the first thing it would do is

23   called the cancelation mark where it would cancel out the stamp

24   located here.  This will prevent the reuse of that stamp.

25       And the majority of the time, that machine will also leave a

1    postmark indicating when that stamp was canceled and whereabouts

2    that stamp was canceled.  In this specific letter here, it was

3    canceled out on November 5th of 2020, and it was canceled at the

4    processing center in Louisville, Kentucky.

5        The next marking would be the human readable ZIP code, which

6    is located right here.  This human readable ZIP code is a series

7    of digits commonly referred to as the ZIP 11.  This ZIP 11 is

8    unique to the address that it is intended to be going to.  In

9    this case, this ZIP 11 is an indication that it is supposed to

10   be delivered to this address here.

11       And the last marking on the front of the --

12   Q.  Before we go to that last one, could I ask you a question

13   too about the ZIP 11?

14   A.  Sure.

15   Q.  Does it have the -- does it indicate there a ZIP code

16   where --

17   A.  Correct.

18   Q.  -- the item is going to?

19   A.  Yes, yes.

20   Q.  And we'll talk more about the human readable ZIP code in a

21   second --

22   A.  Okay.

23   Q.  -- but I just wanted to clear that up.  So let's talk about

24   that next marking.  Thank you.

25   A.  The next marking is called the intelligent mail barcode.

1   This is the machine's way of reading that ZIP 11.  It's located

2   right here.  So every time that letter hits a machine, it will

3   read that, and it will let the machine know where exactly that

4   letter is intended to go to.

5           MR. TIEKE:  Okay.  If we could -- Carisa, please, can

6   we zoom out, and let's go to the --

7   BY MR. TIEKE:

8   Q.  And now there's also a mark on the back of the envelope;

9   right?

10  A.  Correct.

11  Q.  Okay.  Can you go ahead and just explain to the jury what

12  the mark on the back is.

13  A.  Yes.  This is what's called the -- the identification tag.

14  This helps us track that letter, and it will indicate what

15  machine has ever ran that letter throughout the country.  So

16  it's a fluorescent colored barcode that -- it's a series of

17  decoding that.  And from that decoding, it will tell us exactly

18  what machine, when, and where that machine -- or that -- I'm

19  sorry -- where that letter ran on that machine.

20          MR. TIEKE:  Thank you.  If we could go back out,

21  please.  I want to -- Carisa, if we could blow this piece up.

22  Thank you.

23  Q.  That's the human readable ZIP code; right?

24  A.  Correct.

25  Q.  Okay.  I want to kind of go through and decode that code, so

1    to speak.  Okay?

2    A.  Okay.

3         MR. TIEKE:  So if we could pull out of that, please.

4    And we can take that down, please.  Thank you.

5    Q.  Inspector Klein, I'd like to show you what's marked as

6    United States Exhibit 42, which is a demonstrative exhibit kind

7    of discussing that human readable ZIP code.  Okay?  Is that a

8    demonstrative you made from one of the mailings at issue in

9    this -- or a few of the pieces of mail at issue in this case?

10   A.  It is.

11   Q.  And is that a fair and accurate depiction of that human

12   readable ZIP code on some of the mailings?

13   A.  It is.

14   Q.  And items in this case?

15   A.  Yes.

16   Q.  And will this demonstrative -- will this help you explain

17   your testimony to the jury today?

18   A.  It will.

19        MR. TIEKE:  Your Honor, at this time I'd move to

20   publish United States Exhibit 42 as a demonstrative exhibit.

21        MS. REA:  No objection.

22        THE COURT:  Granted.

23        MR. TIEKE:  Thank you.  If we could publish that to

24   the jury, please.

25   BY MR. TIEKE:

1    Q.  You said earlier that the human readable ZIP code pertains

2    to the destination address.

3    A.  Correct.

4    Q.  Okay.  So can you just -- you've got some red lines there.

5    Can you just explain to the jury the breakdown of the

6    information that's within that human readable ZIP code?

7    A.  Yes.  ZIP 11 is unique to any address or any residence.  So

8    everybody has a unique ZIP 11.  The ZIP 11 -- the first five

9    digits, which is right here, is going to be the ZIP code of the

10   address.

11       The next four digits, which is also called the ZIP+4, is an

12   indication of the first two digits being a geographical location

13   or a street or a block.  And then the next two digits would

14   indicate which side of the street that address or that residence

15   is on.

16       Next is called the ZIP 6, commonly referred to as ZIP 11,

17   which is all the digits, again, the first five being the ZIP

18   code, the next four being the geographical location and which

19   side the residence is on.  And then the last two digits would be

20   the numerical -- the last two numerical of an address.  In this

21   example, the address being 510 ███████████████, "10" being the

22   last two of that address, it would be indicative to the 10 that

23   is located on the final two digits of the ZIP 11.

24   Q.  I think you explained this earlier, but this is picked up --

25   the ZIP 11 -- the sequence is put on there when the mailing is

1    scanned by the machines at the processing center?

2    A.   Yes.  When it hits that first machine, it will analyze the

3    address that is listed on the letter; and from that, it will

4    spray the ZIP 11 on the front of that letter.

5    Q.   And so we have two examples here for the ZIP 11.  And so can

6    you explain the ZIP 11 for the Pineda house.

7    A.   Yes.  That would be the first letter.  You can see the first

8    five being the ZIP code.

9    Q.   This one?

10   A.   Correct.

11        MR. TIEKE:  Carisa, if we can blow that up so that

12   maybe we can make it a little bigger.  Thank you.  There we go.

13   A.   So the first five of the ZIP 11 is indicative to what ZIP

14   code that letter is going to.  The next four would be the

15   geographical location or the street and what side of the street

16   that residence is on.  And then, finally, the last two digits

17   would be indicative to the last two digits of that address.

18        MR. TIEKE:  Thank you.  We can go back down.

19   Q.   Can you explain the ZIP 11 for the defendant Craft's address

20   at 507 ▮▮▮▮▮▮▮▮▮▮▮▮?

21   A.   Yes.  So just like the Pinedas' address, Ms. Craft's address

22   is gonna be -- I'm sorry.  The first ZIP 6 is going to be the

23   same, meaning that the ZIP code is going to be identical.  And

24   then the next four would be the geographical location or the

25   street address.  And what side of the street it is on is the

1   same as the Pinedas.  The only difference is the final two --

2   the final two digits being 07, which is indicative to her

3   address ending in 507.

4   Q.  So, essentially, that final -- the final two --

5   A.  Correct.

6   Q.  -- kind of direct you to a particular address?

7   A.  Yes.

8   Q.  So to speak?

9   A.  Everybody on that cul-de-sac would -- the ZIP 4 would be the

10  same.  It would just be -- the final two digits would be

11  different.

12          MR. TIEKE:  So if we could just go back to Exhibit 28

13  and blow the top up again, please.

14  Q.  So on this letter, for example, this was a mailing that was

15  sent -- the top cancelation part tells you where it was

16  essentially processed?

17  A.  Yes.

18  Q.  And then this tells us that it goes to -- does this tell us

19  that it goes to a particular address in Louisville?

20  A.  Correct.  This letter first entered the mail stream in

21  Louisville, Kentucky.  And based on the human readable ZIP code,

22  it is destined for an address in Louisville, Kentucky.

23  Q.  And in this case, we can tell from the ZIP 11 that this was

24  going to 510, the Pinedas' house.

25  A.  Correct.

1    Q.   Okay.  So this is a Louisville-to-Louisville letter?

2    A.   Correct.

3    Q.   All right.  So with that all in mind, let's go ahead and

4    take a look at the mailings in this case.  Okay?  Did you

5    analyze the postal service markings on the mailings at issue in

6    this case?

7    A.   I did.

8    Q.   Let's look at the one that's the subject of Count 1, which

9    would be United States Exhibit 5A.  Is this a photograph of one

10   of the mailings that you looked at?

11   A.   It is.

12   Q.   Can you please tell the jury from the markings where this

13   mailing was sent from?

14   A.   From the cancelation mark, I can tell that this letter was

15   processed in Louisville, Kentucky, meaning that it entered the

16   mail stream in Louisville, Kentucky.  And the postmark, the

17   cancelation of this particular letter, was on November 2nd of

18   2020.

19   Q.   So from the markings, can you tell what destination this

20   letter was sent to?

21   A.   Yes.  It is destined for an address at -- from that ZIP code

22   indicating that it is going to an address in Louisville,

23   Kentucky.

24   Q.   So this mailing is -- was sent from Louisville to a

25   destination in Louisville?

1    A.  Correct.

2    Q.  Okay.  And now using the ZIP 11, can you tell which address

3    this was sent to?

4    A.  Yes.  The first five would indicate the ZIP code.  The next

5    four would be the geographical location or street, and the last

6    two digits being that -- the last two digits of that particular

7    address.  And putting all that together, it would be 510

8    ███████████████.

9    Q.  Is this a letter going from a Louisville location to the

10   Pinedas?

11   A.  Correct.

12   Q.  And if -- 5A, page 2.  And just so we can complete, you

13   know, the analysis, does it have the ID tag on the back?

14   A.  It does, yes.

15   Q.  Okay.  So from your analysis, was this letter processed

16   through the mail?

17   A.  It was.

18        MR. TIEKE:  Okay.  Let's go to 6A, page 1, a mailing

19   that's the subject of Count 2.  It's previously been admitted.

20   Q.  Is this a photograph of another one of the mailings you

21   looked at?

22   A.  It is.

23   Q.  And from the markings, can you tell where this mailing was

24   sent from?

25   A.  Yes.  It was mailed out of Louisville, Kentucky.

1   Q.  And from the markings, can you tell what destination this

2   was sent to?

3   A.  Yes.  The human readable ZIP code would indicate that it's

4   addressed to 510 █████████████.

5   Q.  Okay.  And so this is another Louisville-to-Louisville

6   mailing?

7   A.  Correct.

8   Q.  And, again, from that ZIP 11, you can decode that, and it

9   tells you that it went to the Pinedas' house?

10  A.  Correct.

11  Q.  Okay.  And then 6A-3, please, just to complete your

12  analysis.  And the back has the spray as well?

13  A.  Correct.

14  Q.  So from your analysis of this mail piece, was it processed

15  by the United States Postal Service?

16  A.  It was.

17  Q.  I'm showing you what's previously been admitted as United

18  States 7A, page 1.  This is the mailing that's the subject of

19  Count 3.  Is this a photograph of one of the mailings you looked

20  at?

21  A.  It is.

22  Q.  And from the markings, can you tell where this mailing was

23  sent from?

24  A.  Yes.  It was sent from an address in Louisville, Kentucky.

25  Q.  And from the markings, can you tell what destination this

1   was sent to?

2   A.   Yes.   The ZIP 11 indicates that it was addressed to 510

3   █████████████████.

4   Q.   Okay.   So another Louisville-to-Louisville?

5   A.   Correct.

6   Q.   And then 510?

7   A.   Yes.

8   Q.   Okay.   And 7A-4, please.   Does this one have the spray

9   indicating the ID tag as well?

10  A.   It does.

11  Q.   So from your analysis of this mailing, was it processed by

12  the United States Postal Service?

13  A.   It was.

14  Q.   Let's take a look at United States -- what's previously been

15  admitted as United States Exhibit 8A, page 1.   This is the

16  mailing that's the subject of Count 4.   Again, is this one of

17  the mailings you looked at?

18  A.   It is.

19  Q.   From the markings, can you tell where the mailing was sent

20  from?

21  A.   Yes, from Louisville, Kentucky.

22  Q.   From the markings, can you tell what destination it was sent

23  to?

24  A.   Yes.   It was sent to 510 █████████████.

25  Q.   And I should have done this on the other ones.   We can go

1   back before we go on.  That's my mistake.  What's the postmark

2   date for that one?

3   A.  November 6, 2020.

4   Q.  Okay.  And before we get too far ahead of ourselves -- I

5   apologize -- let's retract.  If we could pick up 7A, page 1.

6   This was the previous mailing we looked at.  What's the postmark

7   date on that one?

8   A.  November 6, 2020.

9   Q.  And if we could pull up 6A, page 1.  This was the mailing

10  that was the subject of Count 2.  Can you tell the postmark date

11  from that one?

12  A.  Yes, November 5th, 2020.

13  Q.  Okay.  And now page A5-1 -- or 5A, page 1.  This was the

14  mailing subject of Count 1.  What's the postmark date on that

15  one?

16  A.  November 2nd of 2020.

17  Q.  All right.  I apologize for backtracking a little bit.

18      So if we could go back to the mailing that's the subject of

19  Count 4, which would be United States Exhibit 8, page 1.  You

20  mentioned that this was mailed from Louisville?

21  A.  Correct.

22  Q.  Postmarked November 6, 2020?

23  A.  Yes.

24  Q.  And from the markings, can you tell what destination this

25  was sent to?

1    A.   Yes.   Just like the other letters previously shown, it is

2    addressed -- this ZIP 11 would indicate that it's addressed to

3    510 ███████████.

4    Q.   So another Louisville-to-Louisville mailing?

5    A.   Correct.

6    Q.   And from the ZIP 11, can you tell that it goes to the

7    Pinedas' address?

8    A.   Yes.

9    Q.   And page 8A-3.  And, again, is that the ID tag?

10   A.   Yes.

11   Q.   So did this letter -- was this processed by the postal

12   service?

13   A.   It was.

14   Q.   All right.  Let's look at 9A.  It's the mailing that's the

15   subject of Count 5.  Is this one of the mailings you looked at?

16   A.   It is.

17   Q.   From the markings there, can you tell where that mailing was

18   sent from?

19   A.   It was sent from Louisville, Kentucky.

20   Q.   And there's no postmark date.  Can you explain about the

21   time frame that this mailing was sent based on any of those

22   markings you see there?

23   A.   Yeah.  This particular stamp was canceled.  And you can kind

24   of see it here, but it says "Happy Holidays."  The postal

25   service would utilize that during Christmastime.  So more than

1    likely this letter was processed in the early parts of December.

2    Q.   And it's got that "Happy Holidays" up there, huh?

3    A.   Yeah.

4    Q.   Okay.  And so you mentioned it was from a Louisville -- sent

5    from Louisville?

6    A.   Correct.

7    Q.   And can you tell what the destination was?

8    A.   Yeah.  It still has the same ZIP 11 indicating that it's

9    addressed to 510 ██████████████.

10           MR. TIEKE:  Okay.  Page 9B-2 and if we could zoom.

11   Sorry, Carisa, not that part, but this part right here.

12   Q.   And it has the spray ID tag on that?

13   A.   Correct.

14   Q.   And so was this mailing processed by the postal service?

15   A.   It was.

16   Q.   Let's look at 9A-3, please.  When you looked at all the mail

17   and other items in this case, is this one of the interior

18   envelopes from the inside of the mailing that's admitted as

19   United States Exhibit 9?

20   A.   It is.

21   Q.   And is that the front -- we were looking at the front of the

22   envelope just a second ago; right?

23   A.   Correct.

24   Q.   And this was -- this is another envelope inside of that one?

25   A.   Correct.

1   Q.   Okay.  Did you take a look at the postal service markings on

2   this item?

3   A.   I did.

4   Q.   Okay.  And specifically let's take a look at the ZIP 11 on

5   this mailing.  But before I ask you to do that, is this -- from

6   your analysis of the mailings, is the threat in this case -- is

7   that on the back of this envelope?

8   A.   Yes.

9           MR. TIEKE:   Okay.  So let's take a look at the ZIP 11

10  for this interior envelope, if we could blow that up, please,

11  Carisa.

12  Q.   So kind of walk us through the analysis of this ZIP 11 on

13  this interior envelope.

14  A.   With the address not being on the front of this particular

15  piece of letter, you're -- but you're still able to tell where

16  exactly it was -- it was originated from.

17      Based on the ZIP 11, the first five digits would indicate

18  what ZIP code that it was destined to.  The next four digits

19  would indicate what geographical location or street that this

20  particular letter originated from and what side of the street

21  that was on.  And then the last two digits would indicate the

22  final digit -- the last two digits of that particular address.

23  This is the same ZIP+4 as the Pinedas.  The only thing different

24  being is the "07" indicating that it was somebody at 507

25  ██████████████.

1   Q.  And so you know who lives -- do you know who lives at 507

2   ███████████?

3   A.  Yes.

4   Q.  Who's that?

5   A.  Suzanne Craft.

6         MR. TIEKE:  So if we can zoom out of that, please.

7   Q.  So was this piece of mail originally sent to Craft's

8   residence?

9   A.  It was.

10  Q.  And can you tell that from the ZIP 11?

11  A.  Yes.

12        MR. TIEKE:  Let's look at one more mailing that went

13  to the Pineda residence.  If we could pull up Exhibit 4A.

14  Q.  This is an additional mailing that is different from the one

15  that we looked at earlier with respect to Count 1.  Is this a

16  photograph of one of the mailings you looked at?

17  A.  Yes.

18  Q.  From the markings, again, can you tell where this mailing

19  was sent from?

20  A.  Yes, from Louisville, Kentucky.

21  Q.  Postmark date?

22  A.  November 2nd, 2020.

23  Q.  And to a Louisville address?

24  A.  Correct.

25  Q.  And does the ZIP 11 tell you that that goes to the Pinedas?

1    A.  Yes.

2    Q.  Okay.  Let's take a look at 10A-1.  Is this a photograph of

3    a letter that you've looked at in this case?

4    A.  Yes.

5    Q.  Can you tell, was this processed by the postal service?

6    A.  It appears not.

7    Q.  Okay.  So how do you know that?

8    A.  It's missing every unique spray ID tag.  The stamps aren't

9    canceled out.  There is no readable ZIP code, and here you would

10   see that intelligent barcode.  It has none of those.  So this

11   piece of mail was not processed by the postal service.

12   Q.  And from your investigation in this case, does this

13   mailing -- is this the one that contained the bullets?

14   A.  Yes.

15   Q.  Okay.  And so there's no markings on it; correct?

16   A.  Correct.

17   Q.  Are there other ways that mail can be delivered to an

18   address without going through the formal processing center?

19   A.  Yes.

20   Q.  Okay.  And what are some of the ways that that can actually

21   happen?

22   A.  An individual could physically place that letter at the

23   final destination address where the mail piece was supposed to

24   go to.  Potentially the -- if the individual put this letter in

25   their mailbox for the letter carrier to pick up, he might have

1    picked it up and noticed that it was just going next door.  He

2    could have just saved the time of that letter being processed

3    and delivered it himself that day.

4    Q.  So one way that it could happen would be if, you know, your

5    post office employee comes to your house, gets one of your

6    mailings, notices it's sent to someone else on your street?

7    A.  Uh-huh.

8    Q.  Could they just take it out of your mailbox and then put in

9    the other mailbox on the street?

10   A.  They could.

11   Q.  Okay.  Save them from walking back to their mail truck and

12   stamping it or something like that?

13   A.  Yes.

14   Q.  Okay.

15   A.  I carried mail for five years prior to being an inspector.

16   We were always taught that if we did do that, that we would

17   cross out those stamps or cancel it so it would -- those stamps

18   couldn't be reused.

19   Q.  But maybe that didn't happen here?

20   A.  Correct.

21   Q.  Okay.  One last topic, Postal Inspector Klein.  Let's talk

22   about informed delivery.  Can you just tell the jury what

23   informed delivery is?

24   A.  Informed delivery is a service that the United States Postal

25   Service provides.  It is a service where you can get

1    notification on what mail you're expected to receive that

2    particular day, whether it be from an email or directly to your

3    smart device.

4    Q.  And so how long has that informed delivery -- how long has

5    that been available?

6    A.  I think it came out as a pilot program in 2014.  And then it

7    expanded to be available for the United States, I would say, in

8    the early part of 2018.

9    Q.  Okay.  So at least sometime 2017-2018, folks could use it?

10   A.  Correct.

11   Q.  How do you go about registering for informed -- that

12   informed delivery service?

13   A.  First, you have to set up an account through the postal

14   service.  From there, after you sign up and verify that you are

15   actually the person that lives there, you, I guess, would

16   receive a link to register for informed delivery as long as your

17   address qualifies.

18   Q.  And so the -- I guess step one, is that to set up a postal

19   account?

20   A.  Correct.

21   Q.  And then through that account, do you have the capability to

22   then opt in to informed delivery?

23   A.  Yes.

24   Q.  And is that an active step that a person has to take in

25   order to become -- to get informed delivery?

1   A.   Yes.

2   Q.   In the course of your investigation, did you investigate

3   whether the Defendant Craft had a postal account?

4   A.   Yes.

5   Q.   Step one?

6   A.   Yes.

7   Q.   And so when was that postal account set up?

8   A.   It was set up, I believe, in the early part of 2021.

9   Q.   And is that date after the postmark dates of the letters

10   we've reviewed?

11   A.   Yes.

12   Q.   And so that was step one.  Did she sign up for a postal

13   account in 2021?

14   A.   She did.

15   Q.   Did you review postal service records to confirm whether or

16   not Craft used her postal account to sign up for the informed

17   delivery service?

18   A.   I did and it showed that she was eligible but never opted in

19   for informed delivery.

20   Q.   So did Craft ever opt in to informed delivery?

21   A.   No.

22   Q.   Okay.  But she had a postal account but had just not signed

23   up for the informed delivery?

24   A.   Correct.  I believe the only thing she signed up for was a

25   click-and-ship account where she could potentially print postage

1    from her residence, but all indications show me that she never

2    did anything after that.  She never logged back in to her

3    account from when she created it.

4    Q.  And that was created in 2021?

5    A.  Correct.

6           MR. TIEKE:  Okay.  Thank you, Your Honor.  I have no

7    further questions.

8           THE COURT:  Ms. Rea.

9           MS. REA:  Thank you.

10                       CROSS-EXAMINATION

11   BY MS. REA:

12   Q.  Hi, Postal Inspector Klein.  Just a few questions for you.

13   One, with respect to the "Happy Holidays" postmark or

14   cancelation, is there a hard and fast period of time that the

15   USPS uses that designation?

16   A.  I know it's around the holiday, but I couldn't give you the

17   exact dates.

18   Q.  Okay.  So it's an "ish," around the holidays?

19   A.  Yes.

20   Q.  And I want to ask you some questions about the ID tag on the

21   back, the thing that was sprayed in orange.  What information

22   did you tell us that we get from that?

23   A.  That ID tag would let somebody know what machine and when

24   that letter was processed, what machine ever ran that letter

25   throughout the country.

1   Q.   Okay.  And "what machine" means what machine in a specific

2   post office?

3   A.   Correct.  And it could be here in Louisville.  It could be

4   in Sacramento.  If you're mailing a letter to California, more

5   than likely it would run on a machine there.  So that ID tag

6   would indicate both machines.

7   Q.   Okay.  And, also, what time it went through that machine?

8   A.   Correct.

9   Q.   Okay.  And these markings -- these markings, whether it be

10  the origination, the thing that says Louisville, KY, 3:00 p.m.,

11  et al., that tells us where it comes from?

12  A.   Correct.

13  Q.   The tags on the bottom, the ZIP 11, gives us with

14  specificity where it's going?

15  A.   Correct.

16  Q.   And then that spray ID tag that we see on the back tells us

17  where it went in between?

18  A.   Correct.

19  Q.   And that enables us to, with some specificity, track where

20  the -- how the item gets to where it's going; right?

21  A.   Yes.

22  Q.   Okay.  Does -- is there a timeline on how long that

23  information is available?

24  A.   It is.  I couldn't give you the exact time frame, but those

25  ID tags do get reused.

1    Q.   Okay.  So after a certain period of time, we can no longer

2    run that ID tag and figure out, number one, what machine; right?

3    A.   Right.

4    Q.   Anywhere in the country what machine?

5    A.   Right.

6    Q.   And after a certain period of time, we can no longer run

7    that ID tag and figure out the time that it went through that

8    machine; correct?

9    A.   Yes.

10   Q.   Okay.  With respect to items that end up in mailboxes

11   without those markings, I'm gonna ask you a couple of questions

12   about that.  You've said that occasionally a postal carrier

13   might pick up an item, see it's nearby and just drop it in

14   another box; right?

15   A.   Yes.

16   Q.   Which takes it out of that stream of tracking?

17   A.   Uh-huh.

18   Q.   Okay.  But in order for that to happen, somebody has to put

19   it in -- if we're going from mailbox number one to mailbox

20   number two, somebody has to place that item in mailbox number

21   one; correct?

22   A.   Correct.

23   Q.   They're not picking it up somewhere off the street, who

24   knows where, and saying, "Oh, this looks like mail.  I'll

25   deliver it."

1    A.   Right.

2    Q.   You're saying they would be likely to do that if it were

3    close by?

4    A.   Sure.

5    Q.   Like somewhere on the route just down the street?

6    A.   Yes.

7         MS. REA:   Okay.   I don't have any other questions for

8    you.

9         THE COURT:   Mr. Tieke, any redirect?

10        MR. TIEKE:   Briefly, Your Honor.   May I have a moment?

11        THE COURT:   Yes.

12                    REDIRECT EXAMINATION

13   BY MR. TIEKE:

14   Q.   Just a few follow-ups.   Again, for all of the markings and

15   the mailings that you looked at, the existence of the ID tags on

16   the back, those canceled -- the cancelation marks on the front

17   and the human readable ZIP code on the front as well, do those

18   all show you that those items had been processed through the

19   mail?

20   A.   Yes.

21   Q.   Okay.   So they were processed, no doubt about it?

22   A.   Correct.

23        MR. TIEKE:   If we could pull up Exhibit 28, please.

24        THE REPORTER:   Is this admitted?

25        MR. TIEKE:   No, as a demonstrative, ma'am.

1      Carisa, if we could please blow up this part.

2    BY MR. TIEKE:

3    Q.   Now, Ms. Rea asked you about the -- this ID tag on the back.

4    A.   Yes.

5    Q.   And you said they were recycled?

6    A.   Yes.

7    Q.   So what does that mean?

8    A.   The postal service processes probably over 400 billion -- or

9    million pieces of mail a day.  So more than likely, they're

10   gonna be -- they're gonna run out of certain sequence or ID tags

11   that they're gonna have to recycle that.

12   Q.   And you mentioned that that recycling process takes place

13   after a certain period that you don't know really?

14   A.   I'm sure it's years.

15   Q.   Okay.  So did you -- when you analyzed these mailings, did

16   you triangle back and figure out whether that -- the ID tags on

17   the mailings you looked at had been recycled or not?

18   A.   Yes.  I think I was successful in four letters identifying

19   what machine ran it and what time it ran it.

20   Q.   And when you looked at those, what did you determine?

21   A.   That those four letters were actually ran on a machine in

22   Louisville, Kentucky, and processed in Louisville, Kentucky.

23   Q.   And so some of those were processed, and then were others

24   recycled?

25   A.   It appears to be so.

1   Q.   Okay.  You were asked a little bit about items being put in

2   the mail.  Could a regular person take a letter they want to

3   send and put it in the recipient's mailbox too?

4   A.   They could, but then they would be out, you know, the

5   postage so --

6   Q.   Just out the postage, huh?

7   A.   Correct.

8           MR. TIEKE:  Okay.  Nothing further, Your Honor.

9           MS. REA:  Nothing else, Your Honor.

10          THE COURT:  May the witness be excused?

11          MR. TIEKE:  Yes, Your Honor.  And we would simply ask

12   to have -- if it's okay with Ms. Rea, if he be released from his

13   subpoena.

14          MS. REA:  Yes.

15          MR. TIEKE:  Thank you.

16          THE COURT:  Thank you.

17      You may call your next witness.

18          MR. TIEKE:  Your Honor, the United States calls

19   Richard Watts.

20          MS. REA:  Your Honor, may we take a brief break, or

21   may we approach?

22          THE COURT:  Yes, why don't you approach.

23      (Bench conference on the record.)

24          MS. REA:  She's asked for a restroom break.

25          THE COURT:  Okay.

1          MR. TIEKE:  That's fine, Your Honor.

2      (End of bench conference.)

3          THE COURT:  Members the jury, we're going to take a

4   brief break at this time.  We'll expect you back in about ten

5   minutes.  Remember the admonition.

6      (Jury out 10:04 a.m.)

7          THE COURT:  You may be seated.  The jury is out of the

8   courtroom.

9      Do you expect one more witness after the witness you've just

10  called?  Is that correct?

11         MR. TIEKE:  Yes, Your Honor.

12         THE COURT:  That's your longest witness?

13         MR. TIEKE:  I think the agent will be a while.  I

14  believe that we might be able to finish -- we'll be able to

15  finish this witness before lunch.  He's somewhat lengthy as

16  well, but we have just those two.

17         THE COURT:  All right.  I'll see you back here in

18  about ten minutes.

19     (Recess at 10:05 a.m. until 10:23 a.m.  Jury out.)

20         THE COURT:  We're back on the record.  The jury has

21  not yet returned.

22     Anything we need to take up before we have the jury back?

23         MS. REA:  No, Your Honor.

24         MR. TIEKE:  No, Your Honor.

25     (Jury in 10:24 a.m.)

1           THE COURT:  The Government may proceed.

2           MR. TIEKE:  Your Honor, we would call Richard Watts.

3        (Transcript of testimony of RICHARD WATTS previously filed.)

4           THE COURT:  Let me see counsel at the bench briefly,

5    please.

6        You may step down.  Thank you.

7        (Bench conference on the record.)

8           THE COURT:  It does seem a little early to break for

9    lunch.  Do you want to start with the preliminaries with your

10   witness?

11          MR. TIEKE:  That's fine, Your Honor, yes.

12          THE COURT:  I think we can keep moving that way.  I'll

13   let you go 15 or 20 minutes.  We'll still break a little early,

14   but at least you can get that far.

15          MR. TIEKE:  Sure.

16          THE COURT:  I think that's probably a better place to

17   break, since we've already had one or two -- did we have one

18   break this morning or two?

19          MR. TIEKE:  One bathroom break, I think.

20          THE COURT:  We started a little late, and we had a

21   quick break, yeah.  So let's at least begin with her.

22          MR. TIEKE:  Yes, Your Honor.

23       (End of bench conference.)

24          THE COURT:  You may call your next witness.

25          MS. ZIMDAHL:  Your Honor, the Government would call

1    FBI Task Force Officer Kristen Downs to the stand.

2         (OFFICER KRISTEN DOWNS, called by the Government, sworn.)

3                        DIRECT EXAMINATION

4    BY MS. ZIMDAHL:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Could you please state your name for the jury.

8    A.  Yes.  It's Kristen Downs.

9    Q.  Where are you employed?

10   A.  I'm employed with the Louisville Metro Police Department,

11   and I'm assigned to the FBI.

12   Q.  And what is your job title in that current position?

13   A.  I'm a task force officer.

14   Q.  How long have you worked as a task force officer for the

15   FBI?

16   A.  Since -- it was in 2017.

17   Q.  And you mentioned you are employed by the Louisville Metro

18   Police Department.  Did you work for them before you became a

19   task force officer for the FBI?

20   A.  Yes, I did.

21   Q.  How long have you worked for LMPD?

22   A.  Twenty years now.

23   Q.  And what was your job at LMPD prior to becoming a task force

24   officer with the FBI?

25   A.  So prior to going out to the FBI, I was a sergeant in the

1    Public Integrity Unit.  And before that -- I spent the bulk of

2    the time before that in homicide for seven years.

3    Q.  And when you were at the Public Integrity Unit, what was

4    your rank?

5    A.  A sergeant.

6    Q.  And during your time as a homicide detective, what did you

7    do in that role?

8    A.  We investigated any, basically, unnatural deaths to include

9    homicides, suicides, overdoses, accidental deaths.

10   Q.  And let's come present and talk about your current role as a

11   task force officer with the FBI.  Could you just tell the

12   members of the jury generally, what do you do as a task force

13   officer?

14   A.  So I'm assigned to the Public Corruption and Civil Rights

15   Task Force.  We investigate allegations of public corruption and

16   violations of civil rights.

17   Q.  Tell us briefly, what do civil rights investigations entail?

18   A.  They can include the color of law violations, Face Act

19   violations, and also hate crimes.

20   Q.  We've heard the phrase "color of law violations," and that's

21   a little bit of a legal term.  Could you explain what a color of

22   law violation is?

23   A.  So color of law violations would be when someone who's given

24   authority, by the state or the government, in some capacity uses

25   that authority or abuses that authority.  So oftentimes people

Downs - Direct

```
 1    will know that as, like, excessive force cases by police, things
 2    of that -- are probably the most common that people would know
 3    about.
 4    Q.  Do civil rights investigations also include investigations
 5    of hate crimes?
 6    A.  Yes.
 7    Q.  And have you personally investigated hate crime matters
 8    through your work as a task force officer?
 9    A.  Yes.
10    Q.  What makes a civil rights case a hate crime case?
11    A.  When it involves a bias, whether that be sexual orientation,
12    race, religious, those kind of protected areas.
13    Q.  As part your training and experience in investigating hate
14    crimes over the years, have you been trained and do you examine
15    racial and otherwise hateful rhetoric that is used in criminal
16    conduct?
17    A.  Yes.
18    Q.  And as part of your job, do you also work criminal
19    investigations that involve threatening communications?
20    A.  Yes.
21    Q.  And do those involve threatening communications that have
22    been used as a part of a hate crime?
23    A.  Yes.
24    Q.  Now, Task Force Officer, did you personally participate in
25    the FBI investigation of the defendant in this case, Suzanne
```

1   Craft?

2   A.  Yes.

3   Q.  As part of that investigation, did you come to learn who the

4   Pineda family were and how their family was made up?

5   A.  Yes, I did.

6   Q.  And generally what did you learn?

7   A.  So the Pineda family, Michella and Connie Pineda, they have

8   five children ranging from 2 to 18.  And when this investigation

9   started, I believe they only had four at the time.

10  Q.  As part of that investigation, did you learn that there had

11  been threats made against members of their family?

12  A.  Yes.

13  Q.  Were some of those threats made verbally?

14  A.  Yes.

15  Q.  Were some of them written in the form of paintings on their

16  driveway?

17  A.  Yes.

18  Q.  And were some of them made in the form of written letters

19  that were mailed or otherwise left for them?

20  A.  Yes.

21  Q.  And in the course of this investigation, did you investigate

22  and learn more about the defendant, Suzanne Craft?

23  A.  Yes, I did.

24  Q.  Did you learn where she lived?

25  A.  Yes.  She lives at 507 ███████████████.

Downs - Direct

1   Q.  And did you learn where that was in relation to the Pineda

2   family?

3   A.  Yes.  It's -- they are separated by one house.

4   Q.  Did you learn who the defendant, Ms. Craft, lived with?

5   A.  Yes, with her daughter, S.W.█████ █.

6   Q.  And did you also learn about the defendant -- her

7   ex-boyfriend and S.W.█████ ██' father?

8   A.  Yes.

9   Q.  And I know we've just heard from him as a witness.  And

10  you've been here in the courtroom, but did you investigate and

11  learn more about when Richard Watts moved out of 507 ██████████

12  ███████?

13  A.  Yes, roughly 2017.

14  Q.  In investigating the individuals in this case, their

15  backgrounds and the nature of the interaction between the

16  parties, was that a part of your investigation and the FBI

17  investigation in this case?

18  A.  Yes.

19  Q.  So now I'd like to move forward and talk to you about some

20  of the things that you did and learned in the FBI investigation

21  in this case.  So in the course of investigating the threatening

22  mailings, did you necessarily look into the racial slurs that

23  were painted on the Pinedas' driveway?

24  A.  Yes.

25  Q.  Did you learn that that happened to the Pineda family on

1    multiple occasions?

2    A.   Yes.

3    Q.   When did those take place?

4    A.   It was June 7th, 16th, and 27th of 2020, all in the early

5    morning hours.

6    Q.   And did you also learn that on the same date of June 7th,

7    2020, when the Pinedas had a racial slur painted on their

8    driveway, there was also something painted on the defendant,

9    Ms. Craft's driveway?

10   A.   Yes.

11   Q.   And have you seen videos and photographs of that painting?

12   A.   Yes.

13   Q.   Were there images of that painting that were captured by

14   LMPD officers on June 7th of that painting?

15   A.   Yes.

16   Q.   So those were captured along with images from the driveway

17   painting of the Pinedas' driveway by LMPD officers?

18   A.   Yes.

19           MS. ZIMDAHL:  And if we could show to the witness

20   only, please, what has been marked as Government Exhibit 41.

21           THE WITNESS:  Okay.

22   BY MS. ZIMDAHL:

23   Q.   TFO Downs, what is this?

24   A.   That is the painting on Craft's driveway.

25   Q.   And is this a true and accurate depiction of the painting on

Downs - Direct

1    Craft's driveway matching those that you have also reviewed from

2    the LMPD images?

3    A.  Yes.

4         MS. ZIMDAHL:  Your Honor, at this time I would move to

5    admit Government Exhibit 41.

6         MS. REA:  No objection.

7         THE COURT:  It will be admitted.

8      (Government Exhibit 41 admitted in evidence.)

9         MS. ZIMDAHL:  And, Your Honor, if I could publish

10   that, please.

11        THE COURT:  Yes.

12   BY MS. ZIMDAHL:

13   Q.  And I know it's a little bit hard to see.  And maybe it's

14   just the lighting, but hopefully we can all make that out.  And,

15   TFO Downs, I would ask if you could read what's written there.

16   A.  Yes.  It says, "No Ns, only whites."

17   Q.  So this is on June 7th on Defendant Craft's driveway; is

18   that correct?

19   A.  Yes.

20   Q.  And is that the same day that the Pinedas have a painting on

21   their driveway?

22   A.  Yes.

23   Q.  Where is this located on Ms. Craft's driveway?

24   A.  So it's a little closer to the house.  The sidewalk that you

25   see coming off to the right with a little corner of grass right

1    there, that sidewalk would lead to the front door.  So it's not

2    the sidewalk at the street.  It's actually closer to the house

3    leading up to the front door.

4    Q.  In the course of the FBI investigation, did you review video

5    that neighbor Matt Lanham downloaded and sent to law enforcement

6    from the overnight hours of June 7th?

7    A.  Yes, I did.

8    Q.  And is that the same video that we saw here in court

9    yesterday?

10   A.  Yes.

11   Q.  What did you observe about that video as compared to the

12   location that we see here where this painting on Ms. Craft's

13   driveway is located?

14   A.  The person that's in the video -- in Mr. Lanham's video that

15   is on and around Ms. Craft's driveway, they don't appear to

16   spend a significant amount of time in this area.  They appear to

17   be more on the sidewalk and above the sidewalk or even closer.

18   Q.  And if you want to mark on the screen where that person

19   pauses on the video.

20   A.  It seems they spent a more significant amount of time kind

21   of up in the sidewalk area.

22   Q.  So is it fair to conclude that the video that Mr. Lanham

23   provided to law enforcement and from your investigation did not

24   capture a recording of this painting?

25   A.  That's correct.

1    Q.  Now, in investigating this June 7th painting on Ms. Craft's

2    driveway, did you observe a physical connection between the

3    painting in the Pinedas' driveway and the painting on Defendant

4    Craft's driveway?

5    A.  Yes.

6    Q.  What was that?

7    A.  They're both in orange paint, similar color orange paint.

8    Q.  Did you observe anything between the two driveways?

9    A.  Yes.  There's a trail of paint in between the two driveways

10   along that sidewalk.

11   Q.  Did you also compare the language between the two paintings,

12   the painting that was on the Pineda driveway that day and the

13   one on Ms. Craft's driveway?

14   A.  Yes.

15        MS. ZIMDAHL:  And I'd ask now if we could please put

16   up Government Exhibit 18, page 2, and Government Exhibit 41 on

17   the split screen.

18   Q.  And, Task Force Officer Downs, what did you determine from

19   comparing the language painted on the Pinedas' driveway to that

20   painted on Defendant Craft's driveway?

21   A.  It appears the painting on the Pinedas' driveway is more of

22   an order versus a declarative statement on Ms. Craft's driveway.

23   Q.  And what does the statement on June 7th on the Pinedas'

24   driveway say?

25   A.  "Go away Ns."

1   Q.  And what does the statement that was painted on Ms. Craft's

2   driveway that day say?

3   A.  "No Ns, only whites."

4           MS. ZIMDAHL:  Your Honor, may I briefly approach?

5           THE COURT:  Yes.

6       (Bench conference on the record.)

7           MS. ZIMDAHL:  I just wanted to raise a matter of

8   timing.  I'm getting ready to hit kind of a lengthy section.  I

9   don't know if you want to pause now.

10          THE COURT:  Okay.  We can pause now.  We'll go from

11  now until 12:30 for lunch.

12          MS. ZIMDAHL:  Thank you, Your Honor.

13      (End of bench conference.)

14          THE COURT:  Members of the jury, I am informed that

15  this is a good place to pause; so we are going to pause here and

16  take our lunch break a bit early.  We will plan for you to come

17  back at 12:30, and the testimony will resume at that time.

18      Remember the admonition.  Please do not talk about the case

19  amongst yourselves, or with anyone else, and don't do any

20  research or communicate with anyone about any part of the case.

21  Thank you-all.

22      (Jury out 11:37 a.m.)

23          THE COURT:  You may be seated.  The jury has left the

24  courtroom.

25      Before I let you-all take your lunch break, is there

Downs - Direct

 1    anything we need to talk about at this point?

 2            MS. ZIMDAHL:  Your Honor, I think we just probably

 3    need to at least consider timing for the rest of the day.

 4    Without putting Ms. Rea on the spot, we may want to think about

 5    where we are.  I think we'll have, you know, the rest of this

 6    witness for the day and likely be in a position to wrap up our

 7    case.

 8            THE COURT:  So you have how much more -- ballpark for

 9    me -- on direct at this point?

10            MS. ZIMDAHL:  I go by pages.  Let me just check that.

11    Less than an hour.

12            THE COURT:  Famous last words.

13            MS. ZIMDAHL:  I've been told I'm wordy.

14            THE COURT:  All right.  So roughly an hour, and then

15    the Government will likely rest its case at that point,

16    case-in-chief in any event?

17            MS. ZIMDAHL:  I believe so, barring any, you know,

18    lunchtime conversations that lead us to have a revelation, but I

19    think that's very likely.

20            THE COURT:  You'll need to limit your conversations

21    with her during lunch.

22            MS. ZIMDAHL:  Yes.

23            THE COURT:  Right?

24            MS. ZIMDAHL:  Yes.

25            THE COURT:  So if you and Mr. Tieke come up with

 1   another witness, you'll have some explaining to do to me, but

 2   we'll take that up in due course.

 3       All right.  Again, I realize you don't have to answer, but

 4   what do you think?

 5           MS. REA:  Your Honor, we do anticipate putting some

 6   proof on.  We would be ready to do that by the time the United

 7   States has finished.  I don't think it would be lengthy.  We

 8   would, unless again something very much unforeseen happens, be

 9   able to complete that this afternoon easily.

10           THE COURT:  All right.  So I'm not even gonna get into

11   any rebuttal case.  We'll talk about that on the afternoon

12   break.

13       All right.  So I think that puts us, then, on track to be

14   able to put together a final set of instructions based upon how

15   the proof plays out this afternoon and the final decisions made

16   by each side.  And then we'll -- as I said, on the afternoon

17   break, we'll probably at that point have a better viewpoint, a

18   little better perspective on how things are going to wrap up,

19   the timing of instructions and closings, et cetera, et cetera.

20       All right.  I asked the jury to be prepared to come back at

21   12:30.  So I'll ask you-all to be back at 12:25, and I will see

22   you about that time.  Thank you.

23       (Recess at 11:40 a.m. until 12:47 p.m.  Jury out.)

24           THE COURT:  We're back on the record.  The jury is not

25   yet in the courtroom.  Are we ready to proceed?

Downs - Direct

```
 1                  MS. ZIMDAHL:  Yes, Your Honor, I believe we are.
 2                  THE COURT:  Do we have anything else that we need to
 3       discuss?
 4                  MS. REA:  No, Your Honor.
 5                  THE COURT:  You look like you might have hesitated
 6       there for a second.
 7                  MS. ZIMDAHL:  No.  The only thing I wanted to ask,
 8       Your Honor, is if it would be okay with you if I asked the
 9       witness at some point to come down and use the Elmo.  There's a
10       couple of exhibits I'd like to ask her to describe and
11       manipulate for the jury and -- rather than my testifying, if
12       that would be permissible.
13                  THE COURT:  Any objection to that, Ms. Rea?
14                  MS. REA:  No, no, Your Honor.
15                  THE COURT:  That'll be fine.
16                  MS. ZIMDAHL:  Thank you.
17          (Jury in 12:48 p.m.)
18                  THE COURT:  All right.  Members of the jury, we're
19       going to pick up where we left off.  Ms. Zimdahl.
20                  MS. ZIMDAHL:  Thank you, Your Honor.
21       BY MS. ZIMDAHL:
22       Q.  And, TFO Downs, when we left for our lunch break, we had
23       just wrapped up talking a little bit about driveway paintings,
24       but I'd like to move on to a different topic.
25       A.  Okay.
```

1   Q.  And I'd like to turn your attention now to a search of the

2   defendant's cellular telephone.

3   A.  Okay.

4   Q.  In February of 2022, did you obtain a search warrant to

5   allow the FBI to seize and search Defendant Craft's cellular

6   telephone?

7   A.  Yes.

8   Q.  On February 25th of 2022, did you and other agents with the

9   FBI execute that search warrant?

10  A.  Yes.

11  Q.  Can you just briefly describe the execution of that search

12  warrant?

13  A.  Yes.  Myself and other agents made contact with Ms. Craft

14  outside of her residence.  We advised that we had a search

15  warrant and provided her with that search warrant and took

16  possession of her cell phone.

17          MS. ZIMDAHL:  Your Honor, may I approach the witness?

18          THE COURT:  Yes.

19  BY MS. ZIMDAHL:

20  Q.  So I've handed you what's been marked for identification as

21  Government Exhibit 35.  TFO Downs, have you seen that item

22  before?

23  A.  Yes.

24  Q.  What is that?

25  A.  It's the iPhone that we seized from Ms. Craft.

Downs - Direct

1   Q.   How do you recognize it?

2   A.   Based upon the markings and the labels that identify it in

3   the way -- the label also indicates that it was taken to the

4   Kentucky Regional Computer Forensic Lab, which we call the

5   KRCFL.  It's short for that, so --

6   Q.   And does that just generally appear to be in the same or

7   substantially the same condition as when you seized that

8   cellular telephone from the defendant?

9   A.   Yes.  It's outside of the case is the only difference, and

10   the case is in the bag.

11        MS. ZIMDAHL:  Your Honor, at this time I would move to

12   admit Government Exhibit 35 into evidence.

13        MS. REA:  Your Honor, may we approach?

14        THE COURT:  Yes.

15     (Bench conference on the record.)

16        MS. REA:  What is it -- do you intend -- I'm trying to

17   figure out what we intend to do with it because there's so much

18   data on that phone and most of it is totally irrelevant.  So

19   it's just the physical object?

20        MS. ZIMDAHL:  Yeah, just so they know there's a phone

21   and that's where things come from.

22        MS. REA:  Okay.  There's no objection.

23        MS. ZIMDAHL:  Thank you.

24     (End of bench conference.)

25        MS. REA:  No objection, Your Honor.

 1            MS. ZIMDAHL:  Thank you.  I'll proceed.

 2   BY MS. ZIMDAHL:

 3   Q.  Could you just briefly hold that up again.

 4   A.  Yes.  So you're seeing, I think, a lot of the case.  It's

 5   kind of -- it's all there, and the iPhone is inside here.

 6            MS. ZIMDAHL:  Thank you.

 7       Your Honor, just to make sure I take care of housekeeping, I

 8   just want to make sure that we had admitted Government's

 9   Exhibit 35 into evidence.

10            THE COURT:  You're asking me?

11            MS. ZIMDAHL:  Yes.  I believe there was --

12            THE COURT:  I'm gonna have to ask the court reporter

13   if she's marked it down as admitted.

14            THE REPORTER:  Not yet, Your Honor.

15            THE COURT:  Yeah, I didn't see it in my note.

16            MS. ZIMDAHL:  I apologize.  I would like to formally

17   move to admit the phone, Government Exhibit 35, into evidence.

18            THE COURT:  It will be admitted.

19       (Government Exhibit 35 admitted in evidence.)

20            MS. ZIMDAHL:  Thank you, Your Honor.

21   BY MS. ZIMDAHL:

22   Q.  Now, I think you've mentioned this, but once you seized that

23   telephone, Government Exhibit 35, what did you do with it?

24   A.  It was immediately taken to the Kentucky Regional Computer

25   Forensic Laboratory, which like, again, it's KRCFL for short.

Downs - Direct

1    So oftentimes we'll refer to as "the RCFL."

2    Q.  And just generally speaking, what is the RCFL?

3    A.  So it's a laboratory -- FBI laboratory where electronic

4    devices, cell phones, computers, tablets -- there are forensic

5    examiners there that do the examination and make images of those

6    devices for us to then process and look through.

7    Q.  And once they do that, the forensic examiner, do they just

8    create a forensic image and a report of a cellular telephone

9    that allows you to look through that on a computer?

10   A.  Yes.

11   Q.  I'm now going to show you what's been marked for

12   identification as Government's Exhibit 36.

13           MS. ZIMDAHL:  If I may I approach, Your Honor.

14           THE COURT:  Yes.

15   BY MS. ZIMDAHL:

16   Q.  And what is this?

17   A.  So this is a drive that contains the image and extraction

18   that the examiner at the RCFL made of Ms. Craft's cell phone.

19   And it's labeled with the case number and the item number, and

20   then it was put into evidence at the FBI.

21   Q.  Have you previously reviewed that hard drive?

22   A.  Yes.

23   Q.  And does that hard drive contain a true and accurate

24   forensic image and report that was created from Ms. Craft's

25   phone?

1   A.   Yes.

2   Q.   Now, after you received that forensic report from Defendant

3   Craft's cellular telephone, did you undertake a review of that

4   report?

5   A.   Yes.

6   Q.   And did that allow you to review the contents of her

7   cellular telephone?

8   A.   Yes.

9   Q.   Approximately how large was Ms. Craft's telephone?

10  A.   It was very, very large as far as the amount of data on

11  there.

12  Q.   Practically impossible to review everything that's on it due

13  to that size?

14  A.   Yes.

15  Q.   Based on your review of that telephone, could you see who

16  the user of that phone was?

17  A.   Yes.

18  Q.   Who was the user of the phone?

19  A.   Suzanne Craft.

20  Q.   And, again, who did you seize that telephone from?

21  A.   Suzanne Craft.

22  Q.   Was the phone number associated with that phone

23  ███-███-8197?

24  A.   Yes.

25  Q.   So that's Ms. Craft's phone number?

1   A.  Yes, it is.

2   Q.  The number ending in 8197?

3   A.  Yes.

4   Q.  In your review of this phone, Suzanne Craft's phone, did you

5   find a contact card that was labeled "Michelle Pineda"?

6   A.  Yes.

7           MS. ZIMDAHL:  I'd like to show for the witness only,

8   please, Government's Exhibit 36A.

9   Q.  And just briefly, what do we have on the screen in front of

10  you here?

11  A.  A contact card showing information related to -- it's listed

12  as "Michelle Pineda."

13  Q.  And is this an item that you found in Defendant Craft's

14  phone?

15  A.  Yes.

16          MS. ZIMDAHL:  Your Honor, I'd move to admit this.

17          MS. REA:  No objection.

18          MS. ZIMDAHL:  And may I publish?

19          THE COURT:  It will be admitted.

20          MS. ZIMDAHL:  I'm sorry.  May I publish?

21          THE COURT:  Yes.

22      (Government Exhibit 36A admitted in evidence.)

23  BY MS. ZIMDAHL:

24  Q.  Now that we have it up on the screen, could you please walk

25  us through what you found in this contact card.

1   A.  So it lists the first and last name, like we're probably

2   used to seeing in all of our cell phones, but it lists the first

3   name as Michelle, last name Pineda, and it lists a phone number,

4   ███-███-2111.

5   Q.  Where did you find this in Defendant Craft's phone?

6   A.  In the contacts.

7   Q.  And what name is listed here as the name entered for this

8   contact?

9   A.  Michelle.

10  Q.  And the last name?

11  A.  Pineda.

12  Q.  What is the phone number listed for the contact Michelle

13  Pineda?

14  A.  ███-███-2111.

15  Q.  In the course of your investigation in this case, did you

16  determine that the phone number ending in 2111 was, in fact, a

17  phone number for Michella Pineda?

18  A.  Yes.

19  Q.  What is the address listed for this contact?

20  A.  510 ███████████████.

21  Q.  Is that the address for Michella Pineda and her family?

22  A.  Yes.

23  Q.  When was this contact card created?

24  A.  Based upon the entry in the phone, it was July 31st, 2019.

25          MS. ZIMDAHL:  You can take that down, please.

1      And I'd like to now show the witness only, please,

2    Government's Exhibit 36B.

3    Q.   And, TFO Downs, is this another item that you found in

4    Defendant Craft's phone?

5    A.   Yes, it is.

6    Q.   Have you reviewed this prior to today?

7    A.   Yes.

8         MS. ZIMDAHL:  Your Honor, I'd move to admit Government

9    Exhibit 36B.

10        MS. REA:  No objection.

11        THE COURT:  It will be admitted.

12     (Government Exhibit 36B admitted in evidence.)

13        MS. ZIMDAHL:  And may I now publish, please?

14        THE COURT:  Yes.

15   BY MS. ZIMDAHL:

16   Q.   TFO Downs, what is this on the screen, generally speaking?

17   A.   It's from a text thread or conversation between the contact

18   listed as Michelle Pineda and then the -- Craft's cell phone.

19   Q.   Where did you find this in Defendant Craft's phone?

20   A.   Within the chats.

21   Q.   And I'd like to identify first who's texting here.  Who is

22   this contact that's marked here as "Local User"?

23   A.   So the software that -- that's used to review the forensic

24   image of the phone, the actual phone and device itself is listed

25   as "Local User" within that chat thread.  And then so -- and

Downs - Direct

1    it's formatted in a way similar to what we see on our iPhones or

2    different cell phones where, you know, one side of the

3    conversation is in one color to the right and the other -- the

4    response would be to the left from the other contact.

5    Q.  So the contact in blue, any texts in blue, that's coming

6    from Defendant Craft's phone?

7    A.  Yes.

8    Q.  And who is the number that we see on the bottom of this

9    first page in gray?

10   A.   It's listed for the contact for Michelle Pineda, and it's

11   ███-███-2111.

12   Q.  So the name is Michelle Pineda.  Who do you know that phone

13   number to belong to?

14   A.  For Michella Pineda.

15   Q.  And before we move forward with this, I wanted to talk a

16   little bit about time.  What do you know about the times on here

17   and what these times are reported in?

18   A.  So the times are reported in UTC.  So depending upon the

19   time or the date, you know, what part of the year we're in, it's

20   either gonna be minus four or minus five based upon Eastern

21   Standard Time and Daylight Savings.  So we have to do a little

22   math in order to get to what time it actually was in Eastern

23   Time.

24   Q.  So these times -- the times in between texts are an accurate

25   accounting of time in between them?

1   A.   Yes.

2   Q.   It's just that these are UTC times, not Eastern Standard or

3   Eastern Daylight Time?

4   A.   Yes.

5   Q.   So I'd like to start at the top.  Does this begin with a

6   text string between Defendant Craft and Michella, here labeled

7   as "Michelle Pineda," discussing Michella's pregnancy?

8   A.   Yes.

9   Q.   What date and time do we start with there?

10  A.   August 9th, 2019, and in UTC time, it would be 7:35 p.m.  So

11  I believe that's minus four during that time of year.  So it

12  would be 3:35 p.m.

13  Q.   And could you just start reading a few of the texts there

14  for us.

15  A.   "Hi how are you feeling?"  And then there's an image or what

16  -- probably a GIF.  When it's X'ed out in this way, it's just --

17  you see that kind of little image box there with an object or

18  "OBG" listed there -- "OBJ."  Sorry.

19      And then there's -- the next one is "Hope all is well with

20  you and your Family," smiley face.  "God bless," smiley face.

21      And then September 16th, 2019, "Hi Michelle, I have a lot of

22  Crosby Uniform Clothes.  If you would like to look through them

23  before I donate them to Crosby, please let me know.  Thanks!"

24  Smiley face.

25  Q.   And just to pause there, how does the user from Ms. Craft's

1    phone refer to Michella here in that text?

2    A.  "Michelle."

3    Q.  And does the number for Michella Pineda ever respond to

4    Defendant Craft?

5    A.  Yes.

6    Q.  And what does that say?

7    A.  It's, "Yeah that would be great.  Let me know when ur

8    available or u can always bring it n a bag here and I can go

9    through it and donate the rest, whichever us easier.  Thanks."

10   Q.  Is there then a significant break in time in texting until

11   Craft next texts to the number belonging to Michelle/Michella,

12   the number we know as Michella Pineda, again?

13   A.  Yes, there is.

14   Q.  And what is the date on that text?

15   A.  The next text is March 22nd, 2020.

16   Q.  And do we know that to be a significant date in this case?

17   A.  Yes.

18   Q.  And what happened on that date?

19   A.  That's the date that we've heard that Ms. Craft banged on

20   the door and referred to one of the Pineda children as the

21   N-word and then also -- then later that day threatened to run

22   over another Pineda -- another Pineda child, S.P.2█.

23   Q.  And I'd like to ask you to start reading these texts

24   starting with that text that sort of -- I apologize -- cuts

25   across pages, but if we could start reading -- ask you to start

1    reading there.  And if you would, please, as you read these,

2    describe the time between the texts as you go.

3    A.   Okay.  So it starts with "Hi Michelle, please tell me what

4    happened.  I don't understand what happened."  And that's March

5    22nd.  And so I believe at that point in the year, then we're

6    gonna be minus four.  So that would be, basically, like

7    7:45 p.m.

8         And then the next one is about three minutes later, three

9    and a half.  It says, "If my daughter was rude or out of line I

10   apologize for her, please accept the apology.  I'm trying to

11   understand what's going on."

12        Three minutes later, "Your anger towards my daughter is

13   frightening, what did she do?"

14        Four minutes later, "Please tell me what happened.  That way

15   I can address it."

16        About 12 minutes later, "Please let us apologize, please."

17        A minute later, "Can you please tell me what happened?"

18        And then there's about 14 minutes later, "Michelle please

19   tell me exactly what happened.  I don't understand what

20   happened.  Thank you."

21        Seven minutes later, "Hope you guys are ok.  I hope we can

22   fix this misunderstanding.  Please contact me.  Thanks."

23        Less than four minutes later, "What happened exactly?"

24        Thirteen seconds later, "Please tell me," smiley face.

25        About two minutes later, "Please respond I would like to

1  understand what happened.  Thank you."

2      Two minutes later, "If you could tell me what happened I

3  could try to apologize and fix it."

4      Thirty -- roughly 30 seconds later, "But I don't know or

5  understand what happened."

6      Three minutes later, "If you want to file a police report

7  against me please do and I will go to court and tell my side but

8  I can't until I know what I did exactly to harm you so what did

9  I do?"

10     It looks like less than a minute later -- actually about

11 17 seconds, "What did I do?"

12     Three minutes later or so, "Please let me know."

13     About 14 seconds later, "What did I do?"

14     Five minutes later, "Please tell me."

15     Nine minutes later, "Sara thought your daughter was her

16 friend.  What happened?"

17     Two minutes later, "So I don't understand what happened.

18 Can you please tell me?"

19     About three minutes later, "Please tell me what happened.  I

20 don't even know what happened.  Please."

21     Eleven minutes later, "What did I do?"

22     About -- less than 30 seconds later, "Please tell me.  Thank

23 you."

24     Nine minutes later, "Could you please tell what I did?"

25     Can you scroll back up a little bit.  I'm sorry.  I missed

1    the time on that.  Two minutes later, "It must have been

2    something really bad for you to ostracize my child."

3         A minute later, "What happened?"

4         Two minutes later, "Please tell me."

5         Fifteen minutes later, "Could you -- can you please tell me

6    what happened?"

7         Ten minutes later, "I don't understand what happened.  Can

8    you please tell me?"

9         Two minutes later, "Please let me know what happened."

10        Four minutes later, "Can you please tell me what happened?"

11        Ten minutes later, "You hate my daughter so much it is

12   really scaring us."

13        Fifteen minutes later, "What did she do to make you hate her

14   so much?"

15        Four minutes later, "Just tell me so I can talk to her about

16   it and fix it," smiley face.

17        Eleven minutes later, "God bless.  If you need anything let

18   us know.  God knows all."

19        About half an hour later, "My daughter is not a little bitch

20   like you said."  Pardon my language.  "She has a kind and true

21   heart.  She would save any animal in distress.  She is not a

22   little bitch as you screamed at her."

23        An hour and 19 minutes later, "Sara is not a 'little bitch'

24   as you called her.  Never."

25        A minute later, "Please tell me what happened."

1     Three minutes later, "I don't even know what I did."

2     Less than a minute later, "To make you hate us so much."

3     Less than a minute later, again, "Please tell me."

4     Two minutes later, "You hate us so much."

5     Four seconds later, "Why."

6     Six seconds later, "Why."

7     Four seconds later, "Why."

8     Fourteen seconds later, "What happened?"

9     And then less than a minute later, "Please tell me -- please

10    tell me."

11    And then about -- it looks like 22 minutes later, "Why do

12    you hate us so much?"

13    And then that was on -- the last one I just read was on

14    March 23rd.  The next one is on April 6th, and it's a screenshot

15    from the last response we saw from Michella, which in the

16    contacts is listed as Michelle, and that was on -- it's part of

17    that screen grab from that text thread, which was back September

18    17th.

19    Q.   So this last text here that Ms. Craft is sending to Michella

20    labeled as Michelle is sending Michella a text from quite a

21    while prior, a screen grab of a previous text exchange that they

22    had had?

23    A.   Yes.

24    Q.   And in the course of all of these texts, does Michella, the

25    number labeled as Michelle, ever respond to Defendant Craft?

1   A.   No.

2   Q.   TFO Downs, in the course of this investigation, did you

3   learn that Michella had blocked Defendant Craft's number in her

4   phone prior to receiving all of these texts?

5   A.   Yes.

6        MS. ZIMDAHL:  You can take that down.  Thank you.

7   Q.   In the course of reviewing Defendant Craft's phone, did you

8   also find a variety of pictures saved in her phone?

9   A.   Yes.

10  Q.   Where did you find those pictures and photographs?

11  A.   Some were in the images and some were also sent within

12  texts, like within chats or text threads with other individuals.

13  Q.   From any of those images, were you able to see where they

14  were saved?

15  A.   Yes.  They were in the images section, or also, they were

16  contained within the text thread.

17  Q.   And I'd like to ask you now about some of the specific

18  photos that you found saved in the defendant's phone.

19  A.   Okay.

20       MS. ZIMDAHL:  And if we could show just to the witness

21  only, please, Government's Exhibit 36C.

22  Q.   And could you -- is that a photograph that you found in

23  Defendant Craft's phone?

24  A.   Yes.

25       MS. ZIMDAHL:  Your Honor, I'd move to admit Government

1    Exhibit 36C.

2              MS. REA:  No objection.

3              THE COURT:  It will be admitted.

4       (Government Exhibit 36C admitted in evidence.)

5              MS. ZIMDAHL:  May I publish that?

6              THE COURT:  Yes.

7    BY MS. ZIMDAHL:

8    Q.  TFO Downs, could you tell us what this is?

9    A.  Yes.  It is an image that shows K.P.███ ██.  It's a black

10   and white photo, and you can see her brother, S.P.1███, just

11   over her shoulder to the right as we're looking at it.

12   Q.  Is this an item that you found in Defendant Craft's phone?

13   A.  Yes.

14   Q.  When was this saved?

15   A.  It lists a date of July 19th, 2020.

16   Q.  And who is the girl in the front of the photograph?

17   A.  That's K.P.███ ██.

18   Q.  And who is the boy standing behind her?

19   A.  S.P.1███  P████.

20             MS. ZIMDAHL:  Could we please show the witness only

21   now Government Exhibit 36D.

22   Q.  TFO Downs, is this an item that you found in Defendant

23   Craft's phone?

24   A.  Yes.

25             MS. ZIMDAHL:  Your Honor, I'd move to admit Government

Downs - Direct

```
 1   Exhibit 36D.
 2             MS. REA:  No objection.
 3             THE COURT:  It will be admitted.
 4        (Government Exhibit 36D admitted in evidence.)
 5             MS. ZIMDAHL:  And if I could publish that, please.
 6             THE COURT:  Yes.
 7   BY MS. ZIMDAHL:
 8   Q.  What is this on the screen?
 9   A.  So this is -- it looks a similar picture to what we just
10   saw.  This is a color photo of that, and it's actually a
11   little -- it's not cropped in as closely.  So you can see more
12   of K.P. and S.P.1███ P███.
13   Q.  Where did you find this within Defendant Craft's phone?
14   A.  In the photos with the images.
15   Q.  When was this image saved and created?
16   A.  The date listed is July 19th, 2020.
17   Q.  And just so we're all kind of following along, can you show
18   us -- and you can circle it or point to it on the screen --
19   where do you see that here in the image information that you
20   found in the phone?
21        (Witness indicating.)
22   Q.  And the time there says 5:35 a.m.?
23   A.  Yes.  That's the UTC time.  So we'll -- minus four would be
24   at 1:35 a.m.
25             MS. ZIMDAHL:  If we could take that down, please, and
```

1   show the witness only Government Exhibit 36E, please.

2   Q.  And is this another image that you found in Defendant

3   Craft's phone?

4   A.  Yes, it is.

5          MS. ZIMDAHL:  And if we could, Ms. Moss, please rotate

6   that, if possible.

7       Your Honor, may I admit this exhibit, 36E?

8          MS. REA:  No objection.

9          THE COURT:  It will be admitted.

10      (Government Exhibit 36E admitted in evidence.)

11         MS. ZIMDAHL:  And may I publish?

12         THE COURT:  Yes.

13  BY MS. ZIMDAHL:

14  Q.  Task Force Officer Downs, what are we looking at here on the

15  screen?

16  A.  It appears to be a picture of a school yearbook.  It looks

17  like most of the kids have a Crosby shirt -- polo or T-shirt on.

18  Q.  Is this a photograph that you found in Defendant Craft's

19  phone?

20  A.  Yes.

21  Q.  Where did you find this?

22  A.  In the images.

23  Q.  And when was it created?

24  A.  July 5th, 2020.

25  Q.  Based on your investigation, do you know where this image is

1    from?

2    A.   It appears to be from a yearbook from Crosby Middle School.

3    Q.   And is one of the Pineda children pictured in this yearbook

4    photo?

5    A.   Yes.  The third row down, the far picture on the left is

6    S.P.1█████ P█████.

7    Q.   Would you mind circling that or indicating that on your

8    screen.

9         (Witness indicating.)

10             MS. ZIMDAHL:  Can we put up for the witness only,

11   please, Government Exhibit F.

12   Q.   Is this another image that you found in Defendant Craft's

13   phone?

14   A.   Yes.

15             MS. ZIMDAHL:  Your Honor, I would move to admit

16   Government Exhibit 36F.

17             MS. REA:  No objection.

18             THE COURT:  It will be admitted.

19        (Government Exhibit 36F admitted in evidence.)

20             MS. ZIMDAHL:  May I publish?

21             THE COURT:  Yes.

22   BY MS. ZIMDAHL:

23   Q.   TFO Downs, is this another photograph that you found in

24   Defendant Craft's phone?

25   A.   Yes.

Downs - Direct

1    Q.  And is this an image that was saved separately from the

2    collective image that we just looked at before?

3    A.  Yes.

4    Q.  Did this image appear to be digitally cropped out and saved

5    separately from that prior image?

6    A.  Yes.

7    Q.  Where did you find this image in the defendant's phone?

8    A.  In the images.

9    Q.  When was this one saved?

10   A.  July 5th, 2020.

11   Q.  Based on your investigation, do you know where this

12   photograph is from?

13   A.  It appears to be from that same page we just saw, just

14   cropped in closer for S.P.1███.

15          MS. ZIMDAHL:  I'd like to now show the witness,

16   please, Government Exhibit 36G.

17   Q.  Is this another image that you found in Defendant Craft's

18   phone?

19   A.  Yes.

20          MS. ZIMDAHL:  Your Honor, may I please admit

21   Government's Exhibit 36G?

22          MS. REA:  No objection.

23          THE COURT:  It will be admitted.

24          MS. ZIMDAHL:  And published?

25          THE COURT:  Yes.

1        (Government Exhibit 36G admitted in evidence.)

2    BY MS. ZIMDAHL:

3    Q.   What is this on the screen?

4    A.   It's a photo of Michella Pineda.

5    Q.   Where did you find this photograph?

6    A.   In the images section.

7    Q.   When was it created?

8    A.   July 8th, 2020.

9    Q.   Based on your investigation, do you know where this

10   photograph of Michella Pineda is from?

11   A.   Yes.

12   Q.   And where is that?

13   A.   It's from her -- the Michella and Connie shared Facebook

14   page.

15   Q.   And is this how this image originally appeared?

16   A.   No, it is not.

17   Q.   Can you tell us a little bit about that?

18   A.   So it's cropped in just for Michella's photo.  It was a

19   picture with Michella, Connie, and D.P. ▓▓▓▓ ▓▓ together.

20   Q.   So I want to make sure I understand and that we understand.

21   Is this a photograph that's been sort of -- or an image that has

22   been extracted or cut out of another image?

23   A.   Yes.

24             MS. ZIMDAHL:  Okay.  Show to the witness only, please,

25   Government Exhibit 36H.

Downs - Direct

1    Q.  Is this another image that you found in Defendant Craft's

2    phone?

3    A.  Yes, it is.

4         MS. ZIMDAHL:  Move to admit Government Exhibit 36H.

5         MS. REA:  No objection.

6         THE COURT:  It will be admitted.

7       (Government Exhibit 36H admitted in evidence.)

8         MS. ZIMDAHL:  If we could put this up for the jury,

9    please.

10   BY MS. ZIMDAHL:

11   Q.  What is this image?

12   A.  This is an image of Connie Pineda.  Again, it appears to be

13   cropped down from that larger photo.

14   Q.  Was this saved on Defendant Craft's phone?

15   A.  Yes.

16   Q.  Where?

17   A.  In the images.

18   Q.  When?

19   A.  July 8th, 2020.

20   Q.  Was this image of Connie Pineda saved in the defendant's

21   phone separately from the image of Michella Pineda?

22   A.  Yes.

23   Q.  And based on your investigation in this case, do you know

24   that those two pictures originally came from one same picture?

25   A.  Yes.

1  Q.  That was probably a very inartfully asked question.  I

2  apologize.  The original image shows the two of them together?

3  A.  Yes, with their son D.P.██.

4  Q.  But the images, as they are saved in Ms. Craft's phone, have

5  been cropped into separately saved digital files?

6  A.  Yes, that's correct.

7  Q.  I apologize for my poor questioning.

8      And, again, that original image that contained the one you

9  previously testified about with Michella and now this photograph

10 of Connie Pineda, from your investigation where did that image

11 come from?

12 A.  From their shared Facebook page.

13         MS. ZIMDAHL:  I'd like to show the witness now

14 Government's Exhibit 36I.

15 Q.  TFO Downs, is this a photograph that you found saved in

16 Defendant Craft's phone?

17 A.  Yes, it is.

18         MS. ZIMDAHL:  Your Honor, I'd move to admit Government

19 Exhibit 36I.

20         MS. REA:  No objection.

21         THE COURT:  It will be admitted.

22     (Government Exhibit 36I admitted in evidence.)

23         MS. ZIMDAHL:  If we could please show that to the

24 jury.

25 BY MS. ZIMDAHL:

1    Q.   TFO Downs, what is this?

2    A.   So that is a picture -- a younger picture of S.P.2█ P█████.

3    Q.   Is this an item that you found in Defendant Craft's phone?

4    A.   Yes, it is.

5    Q.   Where did you find it?

6    A.   In the images section.

7    Q.   And when was it created within her phone?

8    A.   July 8th, 2020.

9    Q.   Based on this -- your investigation in this case, do you

10   know where this photograph came from?

11   A.   Yes.  Based upon the photo itself and the other records, it

12   appears to be from Michella and Connie's Facebook page.

13          MS. ZIMDAHL:  Could I please show the witness now

14   Government Exhibit 36J.

15   Q.   Is this another image that you found in Defendant Craft's

16   phone?

17   A.   Yes, it is.

18          MS. ZIMDAHL:  Your Honor, I would move to admit

19   Government Exhibit 36J.

20          MS. REA:  No objection.

21          THE COURT:  It will be admitted.

22      (Government Exhibit 36J admitted in evidence.)

23          MS. ZIMDAHL:  And if we could please publish to the

24   jury.

25          THE COURT:  Yes.

1    BY MS. ZIMDAHL:

2    Q.   Task Force Officer Downs, what is this on the screen?

3    A.   So that's the -- a cropped image of D.P.████ ███, the image

4    we've talked about with Michella and Connie that were both

5    cropped.   This picture of D.P.██ was also in that larger image

6    from their Facebook page.

7    Q.   But in this image that's saved here, has he been cropped out

8    separately?

9    A.   Yes, yes.

10   Q.   And saved as a separate image within Ms. Craft's phone?

11   A.   Yes.

12   Q.   When was this image saved in Defendant Craft's cellular

13   telephone?

14   A.   July 8th, 2020.

15        MS. ZIMDAHL:  I'd like to show the witness now only,

16   please, Government Exhibit 36K.

17   Q.   TFO Downs, is this another image that you found within

18   Defendant Craft's cellular telephone?

19   A.   Yes, it is.

20        MS. ZIMDAHL:  Your Honor, I would move to admit

21   Government Exhibit 36K.

22        MS. REA:  No objection.

23        THE COURT:  It will be admitted.

24     (Government Exhibit 36K admitted in evidence.)

25        MS. ZIMDAHL:  And ask that we publish to the jury,

```
 1    please.
 2              THE COURT:  Yes.
 3    BY MS. ZIMDAHL:
 4    Q.  What is this on the screen?
 5    A.  So this is a photo of S.P.3████ ██.
 6    Q.  And is S.P.3████ ██ the daughter of Connie and Michella
 7    Pineda that was born in 2020?
 8    A.  Yes.
 9    Q.  When was this image saved?
10    A.  July 8th, 2020.
11    Q.  Based on your investigation in this case, do you know where
12    this image of S.P.3████ ██ came from?
13    A.  Yes, from Michella and Connie's shared Facebook page.
14    Q.  And you found this saved as a separate image within
15    Ms. Craft's phone; is that correct?
16    A.  Yes.
17    Q.  Now, based on your review of the defendant's cellular
18    telephone, could you tell whether these photographs of the
19    Pineda family could have been accidentally saved to the
20    defendant's phone?
21    A.  Yes, I could tell; and, no, they were not accidentally
22    saved.
23    Q.  How could you tell that this was not an accident?
24    A.  Well, they were saved in the images.  They were cropped
25    photos, and then they were also sent to several people.
```

1   Q.  In addition to those photographs that we've just gone

2   through, did you also find other photographs of the Pineda

3   family on Defendant Craft's phone?

4   A.  Yes.

5           MS. ZIMDAHL:  Your Honor, may I approach briefly?

6           THE COURT:  Yes.

7       (Bench conference on the record.)

8           MS. ZIMDAHL:  I just wanted to briefly signal I was

9   going to enter into the world of jail calls now.

10          THE COURT:  Say it again.

11          MS. ZIMDAHL:  I'm just going to play a couple of jail

12  calls now.  I wanted to let everyone know.  I mean, those do

13  make very clear --

14          MS. REA:  Are they the clips that you sent to me?

15          MS. ZIMDAHL:  They're the clips we sent.  They do make

16  clear that she's in custody at the time.  So I just wanted to --

17          THE COURT:  You will ask the foundational questions?

18          MS. ZIMDAHL:  Yes.  I mean, they do say that she's at

19  the detention center, all of those things.  We've addressed it,

20  but I wanted to make that clear to the Court before we

21  approached that territory.

22          THE COURT:  So there won't be any objections?

23          MS. REA:  There won't be.

24          THE COURT:  All right.

25          MS. ZIMDAHL:  Thank you, Your Honor.

1          (End of bench conference.)

2               BY MS. ZIMDAHL:  Thank you, Your Honor.

3     BY MS. ZIMDAHL:

4     Q.   I'd like to now turn your attention to a different topic in

5     the course of your investigation.  And in the course of your

6     investigation, did you also obtain certified copies of calls

7     that Defendant Craft made from the Oldham County Detention

8     Center?

9     A.   Yes.

10    Q.   Are calls that inmates make from the Oldham County Detention

11    Center recorded?

12    A.   Yes, they are.

13    Q.   What is the recording policy at the detention center?

14    A.   The calls will be monitored and recorded.

15    Q.   Do inmates at the Oldham County Detention Center, do they

16    receive a notice of that recording policy?

17    A.   Yes.  So it's on the -- at the beginning of every call --

18    that is a recording that is played at the beginning of each

19    call, that it's being recorded.  There is also a written policy

20    that they receive as well to that.

21    Q.   So they receive notice in multiple forms?

22    A.   Yes.

23    Q.   And any call that someone there makes to their attorney, is

24    that not recorded?

25    A.   That is not recorded, correct.

Downs - Direct

1    Q.   And that's the policy?

2    A.   Yes.

3    Q.   In fact, is there a separate way for attorneys to register

4    to ensure that that does not happen?

5    A.   Yes, correct.   They can register their phone number with the

6    detention center.   That way those calls, when they come in or

7    when they go out, or are made out, they're not recorded.

8    Q.   Once the call is recorded, are facility personnel able to

9    retrieve and listen to those phone calls?

10   A.   Yes.

11   Q.   And are law enforcement personnel, FBI, folks like

12   yourselves, are you also able to listen to those calls in

13   certain circumstances?

14   A.   Yes.

15   Q.   Can law enforcement personnel then download a copy of the

16   call?

17   A.   Yes.

18   Q.   And turning to this case, did you and other employees at the

19   FBI access calls made by the defendant from the Oldham County

20   Detention Center?

21   A.   Yes.

22   Q.   And were copies of certain recordings made?

23   A.   Yes.

24   Q.   And have those been certified?

25   A.   Yes.

1    Q.  So I'd like to ask you now about Government Exhibits 37 and

2    38.  Prior to testifying here today, did you listen to those

3    exhibits?

4    A.  Yes, I did.

5    Q.  Are they true and accurate excerpts from certified

6    recordings of calls that Defendant Craft made from the Oldham

7    County Detention Center?

8    A.  Yes.

9    Q.  Okay.  So I'd like to start with Government Exhibit 37.  And

10   before we play it, is this a call from October 13th of 2022?

11   A.  Yes.

12   Q.  And is this a portion from a longer call?

13   A.  Yes, it is.

14   Q.  That might have discussed other things but just a small clip

15   here today?

16   A.  Yes.  The calls can be up to 15 minutes long, so --

17           MS. ZIMDAHL:  Your Honor, I would move to admit

18   Government Exhibit 37.

19           MS. REA:  No objection.

20           THE COURT:  It will be admitted.

21      (Government Exhibit 37 admitted in evidence.)

22           MS. ZIMDAHL:  May I publish it by playing?

23           THE COURT:  Yes.

24      (Government playing audio.)

25   BY MS. ZIMDAHL:

1    Q.   So let's talk about that call.  Who do we hear talking on

2    that phone call?

3    A.   That's Suzanne Craft and her mother, Jo Ann Mangus.

4    Q.   And do you recognize Defendant Craft's voice?

5    A.   Yes.

6    Q.   How so?

7    A.   From listening to the calls and interacting with her, yes.

8    Q.   So you've had occasion to speak to Ms. Craft before?

9    A.   Yes.

10   Q.   You've heard her voice?

11   A.   Yes, when we collected her cell phone.

12   Q.   And have you also had occasion to speak to Defendant Craft's

13   mother?

14   A.   Yes, I have.

15   Q.   So you can recognize her voice as well?

16   A.   Yes.

17   Q.   What is Defendant Craft talking about here in the first part

18   of that call?

19   A.   She's talking about all of the items, the mail that was

20   received to the Pinedas containing the threats, that that was

21   all taken from her trash.

22   Q.   So Defendant Craft tells her mother that all of these items

23   came from her trash?

24   A.   Yes.

25   Q.   Through your investigation in this case, do you know and did

Downs - Direct

1    you learn that she previously reported, however, that some of

2    those items were stolen from her mail?

3    A.  Yes, she did.

4    Q.  In this call does Defendant Craft also tell her mother about

5    Richard Watts' testimony to the grand jury?

6    A.  She does.

7    Q.  And what specifically does she refer to?

8    A.  The bullets.

9    Q.  I'd like to move on to Government Exhibit 38.  TFO Downs, is

10   this call from October 14th of 2022?

11   A.  Yes.

12   Q.  And I know I've already asked you if these are true and

13   accurate excerpts; is that correct?

14   A.  Yes.

15   Q.  And is this just a portion of a call?

16   A.  Yes.

17           MS. ZIMDAHL:  All right.  Your Honor, may I move to

18   admit Government Exhibit 38?

19           MS. REA:  No objection.

20           THE COURT:  It will be admitted.

21       (Government Exhibit 38 admitted in evidence.)

22           MS. ZIMDAHL:  May I publish by playing?

23           THE COURT:  Yes.

24       (Government playing audio.)

25   BY MS. ZIMDAHL:

1    Q.   Who do we hear talking on that phone call?

2    A.   That is Ms. Craft and her mother, Jo Ann Mangus.

3    Q.   And, again, are you able to recognize the voices?

4    A.   Yes, I am.

5    Q.   What are they talking about here?

6    A.   So they talked about -- Suzanne Craft again told her mother

7    that all the items in the mail were stolen from her own trash,

8    and then she named specific pieces as well.

9    Q.   What specific pieces does she name here as having been --

10   coming from her trash?

11   A.   She specifically named the Girl Scout letter coming from her

12   trash and then also a spaghetti box.

13   Q.   So does she identify in this call a spaghetti box used in

14   the threatening letters as hers?

15   A.   Yes.

16   Q.   And does she specifically mention a Girl Scouts envelope in

17   this call?

18   A.   Yes, she does.

19   Q.   What did she say about the Girl Scouts envelope in this

20   call?

21   A.   That it also came from her trash.

22   Q.   Now, did Ms. Craft previously report, however, that a Girl

23   Scouts letter was stolen from her mailbox?

24   A.   Yes, she did.

25   Q.   Did Ms. Craft specifically make a report to the Louisville

1    Metro Police Department on November 30th that a Girl Scouts

2    letter was stolen from her mailbox on November 21st of 2020?

3    A.  Yes.  She reported that there were specific items stolen

4    from her mailbox, that she had video of the mailman putting them

5    in the mailbox -- I believe it was on November 21st, or about

6    that date.  And then when she went out the next morning, they

7    were not in her mailbox.

8    Q.  And, now, the reference to the Girl Scouts letter, just to

9    be clear with all the letter evidence in this case, is that the

10   envelope that Forensic Examiner Hector Maldonado testified about

11   yesterday that he removed that obscured writing from for the

12   first time in 2021?

13   A.  Yes.

14   Q.  So to go back to this call that we've heard just now, at the

15   time Craft reported to police the item was stolen from her mail,

16   but on this call what does she say about it?

17   A.  That it was stolen from her trash.

18   Q.  And just to briefly turn back to a review of Defendant

19   Craft's cell phone, when you were reviewing that cellular phone,

20   did you find whether -- did you find any Ring videos from a Ring

21   doorbell camera that the defendant had saved?

22   A.  Yes, quite a few.

23   Q.  Okay.  Tell us a little bit about how she had saved videos

24   or links to videos from a Ring doorbell camera.

25   A.  Yes, there were numerous links to videos that she had saved,

1    she had shared with different people on her phone.

2    Q.  Approximately how many links to Ring doorbell videos did you

3    find that Defendant Craft had saved in her phone?

4    A.  It was over a hundred, approximately 130, going back -- I

5    think the -- into 2019 forward.

6    Q.  Did you review any of those?

7    A.  Yes.

8    Q.  And were you able to look through them by date?

9    A.  Yes.

10   Q.  In reviewing that, did you find a Ring doorbell video saved

11   from November 21st, 2020?

12   A.  No.

13   Q.  Additionally, in reviewing that Ring doorbell video footage,

14   did you find that much of that footage was focused on a

15   particular individual or group of individuals?

16   A.  A good portion of it was focused toward the Pinedas.

17   Q.  I'd like to turn your attention now to those threatening

18   mailings and letters that the Pineda family received.  In the

19   course of your investigation in this case, did you obtain those

20   letters?

21   A.  Yes.

22   Q.  Was that part of your investigation, to collect and review

23   them?

24   A.  Yes, it was.

25   Q.  Is that what the FBI does when you're investigating a case

1  like this?

2  A.  Yes.

3  Q.  Sort of square one of the investigation?

4  A.  Yes.

5        MS. ZIMDAHL:  So I'd specifically like to ask you

6  about Government's Exhibit 9A, if we could just put that mailing

7  up, please.  That's already been admitted.  Could we scroll

8  through the pictures, please.

9  Q.  Is this the letter -- and we've seen it here multiple times.

10  So I want ask you to read it, but it's the letter that the

11  threat says, "Die, die, stupid N-word."  I mean, there's a third

12  "die," if I've made that out correctly.

13  A.  Yes.

14  Q.  Did the Pinedas provide this mailed letter directly to you

15  and other agents at the FBI?

16  A.  Yes.

17  Q.  When did that occur?

18  A.  I believe it was March 23rd, 2020.

19  Q.  What did you do with this letter when you received it?

20  A.  We photographed it, placed it in the evidence control room,

21  and then had it sent to the FBI lab.

22  Q.  Was this mailing similar in characteristics to all of the

23  other threatening mailings and communications that the Pineda

24  family was receiving in November of 2020?

25  A.  Yes, it was.

1    Q.   How so?

2    A.   It used the same cutout letters to spell out the threat

3    and/or the use of the racist language.

4    Q.   I'd like to now turn your attention to the pieces of pasta

5    box that we have seen.  They've been referenced.  I'd like to

6    talk about them a little bit.  How many letters and threatening

7    communications contained pieces of a pasta box?

8    A.   Three.

9    Q.   And for those three letters, did each of them contain only

10   one piece of a pasta box?

11   A.   Yes.

12   Q.   So does that give us a total -- I feel like I've asked to do

13   math several times that ought to be easy for me -- but three

14   letters, one piece each.  We have three pieces of pasta box?

15   A.   Yes.

16          MS. ZIMDAHL:  I'd like to get those items of evidence

17   out and -- if it's all right if I approach, Your Honor.

18          THE COURT:  Yes.

19          MS. ZIMDAHL:  I'm going to bring you Government

20   Exhibits 7, 10, and 12.  So I'd like to ask you to start with

21   Government Exhibit 7.

22       And, Ms. Moss, if you could put up Government Exhibit 7,

23   page 9 at the same time.

24   BY MS. ZIMDAHL:

25   Q.   And TFO Downs, if you could locate the piece of pasta box

 1    within Government Exhibit 7.

 2    A.  Okay.

 3    Q.  Is that the piece of pasta box there?

 4    A.  Yes, it is.

 5    Q.  And is that the same piece of pasta box I've got up on the

 6    screen here?  Hopefully I'm --

 7    A.  Yes, it is.  So the -- you can see the back side of this.

 8    What we're seeing on the screen is where the letters were glued

 9    to it.

10    Q.  Okay.  And does that come from the threat that says, "Two

11    dead N-lets"?

12    A.  Yes, it does.

13    Q.  Was that threat mailed to the Pineda family?

14    A.  Yes, it was.

15         MS. ZIMDAHL:  Could you set that aside.  And if we

16    could move now to Government Exhibit 12.

17       And, Ms. Moss, if you could put up Government Exhibit 12B,

18    page 6.

19    Q.  And same thing.  I'm just gonna ask if we can find the piece

20    of pasta box out of that mailing, and I should clarify as you

21    pull this out.  Government Exhibit 12, is this a threatening

22    letter that was dropped in the Pinedas' front yard?  I believe I

23    misspoke and said "mailing."  Is this one that was dropped in

24    their front yard?

25    A.  Yes.

Downs - Direct

1    Q.  And is this the threat that says, "Die stupid bitch, move

2    out"?

3    A.  On the piece of --

4    Q.  In the larger -- the part of the threat that had a larger

5    threat?

6    A.  Yes.

7    Q.  What does the piece of pasta box say?

8    A.  Just "Die bitch."

9    Q.  Could you just hold that up.

10       (Witness complying.)

11           MS. ZIMDAHL:  Could you set that aside when you're

12   finished.

13       And then, finally, if we could move to Government

14   Exhibit 10.

15       And, Ms. Moss, if you could put up Government Exhibit 10B,

16   page 8.

17   Q.  TFO Downs, is this the letter that contained two bullets?

18   A.  Yes.

19   Q.  Did it also have a piece of pasta box contained inside it?

20   A.  Yes.

21   Q.  And did that have words on it?

22   A.  Yes, "Get out."

23   Q.  In this letter, is this the one with the bullets that

24   Michella Pineda retrieved directly?

25   A.  Yes.

1    Q.  You can set that aside.  Have you, in the course of your

2    investigation, examined these three pieces of pasta box that

3    came from the three different threatening communications?

4    A.  Yes.

5    Q.  What, if anything, did you notice in examining these pieces

6    of pasta box?

7    A.  They appear to have all come from the same pasta box, all

8    parts of that box.

9            MS. ZIMDAHL:  And, Your Honor, could the witness be

10   allowed to leave the witness stand to use the Elmo to

11   demonstrate what she discovered in examining this evidence?

12           THE COURT:  Yes.

13           MS. ZIMDAHL:  If you could bring just those three

14   pieces with you.

15           THE COURT:  While she's doing that, would you remind

16   me again the three exhibit numbers.

17           MS. ZIMDAHL:  Absolutely.  It is Government Exhibit 7,

18   10, and 12.

19           THE COURT:  Thank you.

20           MS. ZIMDAHL:  And I'm just gonna step out of the way

21   and ask that Task Force Officer Downs demonstrate for the Court

22   and the jury what she discovered when examining those pasta

23   boxes.

24           THE WITNESS:  So you may have to move this back a

25   little bit.  I don't know how to work that.  Maybe it'll be all

1    right.  Thank you.

2    A.  So this is the longer piece that was from the mailing, that

3    went through the mail with the "two dead N-lets" on it.  And

4    this is the piece that was dropped in the yard that had the --

5    just the "die bitch" on it.

6        And then if you put those two together, it's cut right at

7    the "C."  So you can see that it's the back of the pasta box.

8    I'll slide it over a little bit.  And it just lines up like it

9    fits that piece there perfectly.

10       And then this appeared -- this piece is what appears to be

11   the end.  So it's where the pasta box would have the fold or

12   flap to it, and it's the same width as these other pieces.  So

13   it would be the back side of this box -- the same pasta box

14   of -- so almost like -- it's kind of hard to see on the Elmo,

15   really, but like the -- it would fit like a square pasta box for

16   the spaghetti.  So these two would be the back side, with this

17   being the opposite -- the other side.  Usually on the pasta box

18   there's a clear portion on the front so you can see part of the

19   noodles so --

20            MS. ZIMDAHL:  Thank you.

21       If the witness may return to her seat.

22            THE COURT:  Yes.

23            THE WITNESS:  Take these?

24            MS. ZIMDAHL:  Yes.

25       Thank you, Your Honor.

Downs - Direct

1   BY MS. ZIMDAHL:

2   Q.   And so, Task Force Officer Downs, as you've shown us here on

3   the Elmo for the members of the jury, do all three pieces of

4   those -- that box appear to have come from the same box of

5   Barilla pasta?

6   A.   Yes, they do.

7   Q.   And as an investigator, what does that tell you?

8   A.   That the individual involved with the mail -- that the one

9   that was placed through the mail, the one that was dropped at

10  the water fountain, and the one that was wrapped around the

11  bullets are the same individual.

12  Q.   And, finally, as part of investigating this case and

13  investigating these threats, did you investigate the impact that

14  these threats had on the Pineda family and whether or not they

15  took these threats seriously?

16  A.   Yes.

17  Q.   What did you learn?

18          MS. REA:  Objection, Your Honor.  May we approach?

19          THE COURT:  Yes.

20      (Bench conference on the record.)

21          MS. REA:  Your Honor, my objection is as to the

22  relevance and, I guess, for the prejudicial impact of this.  We

23  have heard from Michella, Connie, K.P.█, and S.P.1█ about

24  the impact on their family.  They have testified to that.

25      We have further heard from the neighbor, Mr. Brian

Downs - Direct

 1    Recktenwald, who testified about the safety plan and that that

 2    was put in place.  So I think the U.S. has already put this

 3    evidence before the jury.

 4        I think at this point it's cumulative and just inflammatory

 5    to -- and increases the emotional impact of it.  It doesn't help

 6    the jury to make the decision that they need to make here.

 7            MS. ZIMDAHL:  And, Your Honor, I don't plan to spend

 8    much more than one question on this.  I do think there has been

 9    some implication that this is not -- that this is potentially

10    fabricated.  I mean, there has been that suggestion raised, that

11    this was something that the family didn't go through.

12        And I think that part of the investigation was investigating

13    did they take it seriously?  Did this occur?  And I think it is

14    fair for the agent to say, "I did look into that.  I looked --

15    as part of any investigation, is this a real threat?  How did

16    the family respond to it?"  I don't plan to spend a lot of time

17    on it, but I think it is fair for her to answer that.  It's an

18    element we have to meet, whether or not this is a true threat.

19            MS. REA:  And I also will just say briefly, I think it

20    would be her opinion on the matter.

21            THE COURT:  It would be -- I'm sorry?

22            MS. REA:  Her opinion on whether or not they took it

23    seriously.  They've already testified that they took it

24    seriously.  So that would be another --

25            MS. ZIMDAHL:  I can rephrase and ask whether or not

1    they took steps --

2            THE COURT:  The question is "Did you, as a responding

3    law enforcement officer, assess a risk here?"  I think that's a

4    fair and reasonable and regular type question to ask a law

5    enforcement officer that would be appropriate.

6        I do agree we've heard a lot about how the victims have been

7    impacted.  There's been substantial testimony about that.  To

8    the extent that we need to elicit testimony to show that the

9    responding law enforcement personnel assessed a risk or -- well,

10   just that.  I think it's appropriate, but I don't think we need

11   to spend much time on it.

12           MS. ZIMDAHL:  I'll just ask then, "When you were

13   investigating this case, did you assess a risk to the Pineda

14   family?"  I'll ask it simply as that, and I think it will be a

15   short answer.

16           MS. REA:  My objection still stands, but I understand.

17           THE COURT:  That's fine.

18       (End of bench conference.)

19   BY MS. ZIMDAHL:

20   Q.  Task Force Officer Downs, when you were investigating this

21   case, did you assess these threats to be a risk to the Pineda

22   family?

23   A.  Yes.

24           MS. ZIMDAHL:  I have no further questions.

25           THE COURT:  Ms. Rea, would you rather proceed now or

1    take an afternoon -- our first afternoon break?

2            MS. REA:  One moment, please, Your Honor.

3        (Ms. Rea conferring with defendant off the record.)

4            MS. REA:  Your Honor, I will proceed.  Thank you.

5                    CROSS-EXAMINATION

6    BY MS. REA:

7    Q.  Hi, Officer Downs.  I have very few questions.  As part of

8    your work in the case, as we've heard, you reviewed jail calls

9    that were made by Ms. Craft.

10   A.  Yes.

11   Q.  And all of those calls that she makes except to her attorney

12   are accessible to you; correct?

13   A.  Correct.

14   Q.  So they're there for the reviewing?

15   A.  Yes, ma'am.

16   Q.  Okay.  With respect to looking through her cell phone, there

17   have been several photos or screen grabs that were presented

18   that showed family members -- or members of the Pineda family.

19   Am I correct that those photos were -- those photos were saved,

20   at the earliest, July 5th of 2020?

21   A.  2020, yes, ma'am.

22   Q.  Yes, July 5th, 2020.  And the days thereafter, between

23   July 5 and July 19?

24   A.  The ones that we reviewed, yes.

25   Q.  Okay.  When you were working with her cell phone download,

Downs - Cross

1    you remarked that it was very, very large.

2    A.   Yes, ma'am.

3    Q.   Right?  Lots of data?

4    A.   Yes.

5    Q.   You spent probably a significant amount of time with that

6    cell phone.

7    A.   Yes.

8    Q.   Okay.  And in it -- in the download, you get all the data on

9    the phone; right?

10   A.   Yes.

11   Q.   Okay.  You get information about phone calls?

12   A.   Yes.

13   Q.   Not the recordings of the calls, of course, because that's

14   not how calls work.

15   A.   Right.

16   Q.   But you get the logs; right?

17   A.   Yes, there were logs in there.

18   Q.   Text messages?

19   A.   Yes.

20   Q.   Which I think in this download were called "chats"; right?

21   A.   Chats, yes, ma'am.

22   Q.   Social media posts?

23   A.   Some of them, yes.

24   Q.   Some web searches?

25   A.   Some web searches, yes.

1    Q.   Some websites visited?

2    A.   Some, yes.

3    Q.   And also some location data?

4    A.   Some.

5    Q.   Okay.  As well as images saved to the phone.  You have

6    access to those; right?

7    A.   Yes.

8    Q.   And videos that are saved on the phone?

9    A.   Yes, they're -- the videos as well.

10   Q.   All of that is something that was available to you to

11   review?

12   A.   Yes.

13        MS. REA:  I don't have any other questions.  Thank you

14   very much.

15        THE COURT:  Any redirect?

16        MS. ZIMDAHL:  No, Your Honor.

17        THE COURT:  May the witness be excused?

18        MS. ZIMDAHL:  Yes.

19        THE COURT:  You may step down.  We'll get them during

20   the break.

21       Members of the jury, we're now going to take an afternoon

22   break.  We'll see you back here in about ten minutes.  Remember

23   the admonition.  Thank you.

24       (Jury out 1:53 p.m.)

25            THE COURT:  You may be seated.  The jury has left the

1    courtroom.

2        Ms. Zimdahl, Mr. Tieke, does the Government have any more

3    witnesses?

4            MR. TIEKE:  No, Your Honor, we do not have any

5    additional witnesses.  We would just request a moment to make

6    sure everything's in order and then --

7            THE COURT:  There is one, I believe, as yet unused

8    stipulation.  You submitted four.  You withdrew one.  I've read

9    two.

10           MR. TIEKE:  Your Honor, I don't believe that we need

11   the cell phone -- as we kind of discussed this morning, I don't

12   believe we need the cell phone one read.  I think that it was

13   essentially just the agreement regarding the authenticity of the

14   forensic image, which I don't believe is challenged.  So we

15   would withdraw that.

16           THE COURT:  So it'll just be the two stipulations?

17           MR. TIEKE:  Yes, Your Honor.

18           THE COURT:  Very well.  Those two will be filed in the

19   record together in a single document, and then -- or a single

20   entry, I should say, and we will adjust the corresponding

21   instruction accordingly.

22       When we return from the break and the jury is again seated,

23   I will ask you formally if the Government has another witness.

24   And you can then inform me, in the hearing of the jury, that the

25   Government rests its case-in-chief.

1      I will then turn to you, Ms. Rea.  And do you intend to call

2   a witness at this time?

3            MS. REA:  I do, Your Honor.

4            THE COURT:  Very well.  We'll be on a very brief

5   break, then.

6      (Recess at 1:55 p.m. until 2:34 p.m.  Jury out.)

7            THE COURT:  Let me see counsel at the bench, please.

8      I'm gonna hand these stipulations back to you.  These were

9   the two that were withdrawn.

10      Let me also ask, do you wish to make a Rule 29 motion

11   outside the hearing of the jury?

12            MS. REA:  I do.  Let me grab my binder.

13            THE COURT:  Do you want to do it here, or do you want

14   to do it in open court?

15            MS. REA:  I don't really care, Judge, whatever --

16   whatever you would prefer.

17            THE COURT:  I don't have a preference.  It just --

18   before we bring the jury in --

19            MS. REA:  Sure.

20            THE COURT:  -- I want to give you that opportunity.

21            MS. REA:  Let me -- we can do it here.  It will be

22   brief.

23      And, Your Honor, I would make Rule 29 motions on the counts

24   of the indictment arguing that at this point the evidence --

25   taken in the light favorable to the U.S., there's not evidence

```
 1    for the jury to have to decide whether Ms. Craft is guilty of

 2    these offenses.

 3        There's a general argument with respect to -- I think there

 4    are issues with -- about just the logic of Ms. Craft,

 5    essentially, doing this to herself, using her mail when it is

 6    very obvious it is her own mail, appearing on camera when it is

 7    very obvious that she is being recorded.  I think it is not a

 8    credible accusation that she is the person who deposited the

 9    items.

10        The more specific motion I would make with respect to

11    Count 1, the mailing in Count 1, the item in Count 1, is with

12    respect to the language that is on the item -- let me get to it

13    -- which is "Leave, we hate your kind, last chance."  While

14    being a -- thank you -- a statement that sort of offers some

15    direction, it is not a direct threat of any injury to another

16    person.  It is an expression of animosity but not a threat to

17    commit any specific harm.  So that's my argument with respect to

18    that count.

19        More specifically -- and let me look at the last one.  That

20    may be all I got, all I have.  That is all for the specificity,

21    Your Honor, with respect to Count 1.

22            THE COURT:  Any response?

23            MR. TIEKE:  Yes, Your Honor.  In the light most

24    favorable to the Government, we are more than capable of moving

25    this past that standard.  I think there's -- I don't think
```

1    there's any dispute that those were mailed.  I mean, we heard

2    the testimony from the postal inspector.

3        I don't believe there's any dispute with respect -- and I'll

4    address Count 1 in a second, but that the communications

5    contained a threat to injure a particular person or particular

6    group of individuals.

7        I mean, I think particularly in the context of all the other

8    acts by the defendant, the res gestae, the driveway paintings,

9    and the fact that she is on video dropping these in the yard,

10   and specifically in terms of the true threat or injury, there

11   was ample testimony from the Pinedas regarding their perception

12   of these as true threats.  They took it seriously.  They were

13   scared.  They were scared for themselves.  They were scared for

14   their kids.  So I think that we easily meet that.

15       And with respect to Count 1, I think that taking -- I

16   believe the jury can make an inference regarding all of the

17   other threats taken together as a whole.  The threat contains

18   "N-words, leave, we hate your kind, last chance."  So I think

19   just taken on the face of it, you know, in the light most

20   favorable to the Government, it is a threat.  Nonetheless,

21   there's no doubt the context of the other letters and all these

22   other acts.

23       So I think, when we look at identity, the defendant mailed

24   the communication for the purpose of making a threat.  In the

25   light most favorable to the Government, all of the evidence

1    points back to Ms. Craft, including the fact that she is seen on

2    video on two separate occasions dropping threats in their yard,

3    in one particular occasion going back to her driveway, getting

4    in her car and driving away.

5        In terms of the charged ones that went through the mail, one

6    of those threats alone contains her fingerprints.  They all

7    share similar characteristics, cutout letters, threatening

8    nature.  They were produced on her mail.  She had access to her

9    mail.  And what we've put into evidence so far is that she has

10   multiple stories about where that mail was or where it was taken

11   from, indicating consciousness of guilt.

12       And so for all those reasons, Your Honor, I think, in the

13   light most favorable to the Government, we have met our burden

14   on all five of those counts.

15               THE COURT:  Anything further?

16               MS. REA:  No, Your Honor.

17               THE COURT:  I'm going to deny the motion pursuant to

18   Rule 29(a).  And using the language of the rule, I'm going to

19   find that the evidence is not insufficient to sustain a

20   conviction, considering it in the light most favorable to the

21   Government at this stage.

22       All right.  Anything else that we need to take up before we

23   bring the jury back in?

24               MR. TIEKE:  We'll just confirm that we admitted

25   everything and formally rest.  If there's anything to raise,

 1    we'll let you know beforehand.

 2              THE COURT:  Can you confirm you've got everything in

 3    now, because I'd like them to come in, ask you to say you rest.

 4    And then I'm simply gonna say -- Ms. Rea, I'm not gonna suggest

 5    you need do anything.  You can then tell me what you're gonna

 6    do.

 7              MS. REA:  Yes, Your Honor.

 8              MR. TIEKE:  We're good to go, Judge.  Thank you.

 9              THE COURT:  You've got everything you need?

10              MR. TIEKE:  Yes, Your Honor.

11              THE COURT:  We'll bring the jury in.  I will simply

12    say, "Mr. Tieke, Ms. Zimdahl," or some version of that

13    combination of partnership, and you can -- one of you can say

14    "The Government rests."

15              MR. TIEKE:  I'll take care of it.

16              THE COURT:  I'll turn to Ms. Rea, and she can tell me

17    what they intend to do.

18              MS. REA:  Thank you.

19              MR. TIEKE:  Thank you, Your Honor.

20              THE COURT:  Actually, I probably will -- this is all

21    coming back to me, but we had that long winter's break; right?

22    I probably will, after Mr. Tieke says, "The Government rests,"

23    turn to the jury and say, "That completes the Government's

24    case-in-chief."  And then I'll say "Ms. Rea," and you can tell

25    me what you're gonna do.

Probst - Direct

1          MS. REA:  Okay.  Thank you, Judge.

2          MR. TIEKE:  Thank you.

3      (End of bench conference.)

4      (Jury in 2:42 p.m.)

5          THE COURT:  Mr. Tieke, does the Government have any

6  more witnesses?

7          MR. TIEKE:  No, Your Honor.  The United States rests.

8          THE COURT:  Members of the jury, the Government has

9  now completed its case-in-chief.

10     Ms. Rea.

11         MS. REA:  Thank you, Your Honor.  The defense would

12 call Betty Probst.  She is outside.

13     (BETTY ANN PROBST, called by the defense, sworn.)

14                      DIRECT EXAMINATION

15 BY MS. REA:

16 Q.  Hi, Ms. Probst.

17 A.  Hi.

18 Q.  I'm gonna have a few questions for you, and then the

19 Government may have questions for you after that.  Okay?

20 A.  Okay.

21 Q.  Please introduce yourself to the jury.

22 A.  My name is Betty Ann Probst.

23 Q.  How old are you?

24 A.  Oh, you would ask that question.  Seventy-six.

25 Q.  And did you previously live on ██████████████?

Probst - Direct

1    A.   Yes.

2    Q.   What was your address there?

3    A.   509 ███████████.

4    Q.   And where are you staying right now?

5    A.   I'm staying at Vitality House in Prospect.

6    Q.   Okay.  How long did you live at 509 ███████████?

7    A.   Oh, dear, 22 or three years.

8    Q.   Do you know Ms. Suzanne Craft?

9    A.   Yes.

10   Q.   And is that Ms. Craft over there?

11   A.   Yes.

12   Q.   How long have you known Ms. Craft?

13   A.   For -- since she moved in 15 years ago.

14   Q.   Okay.  Have you been friendly with Ms. Craft?

15   A.   Yes.

16   Q.   Have you spent time at her house?

17   A.   Yes.

18   Q.   And with her family?

19   A.   Yes.

20   Q.   Do you know her daughter?

21   A.   Yes.

22   Q.   Do you know her mother?

23   A.   Yes.

24   Q.   Do you also know Mr. Richard Watts, her daughter's father?

25   A.   Yes.

Probst - Direct

1    Q.   And did you know him before he moved out?

2    A.   Yes.

3    Q.   Okay.  Do you also know your neighbors on the other side,

4    the Pineda family?

5    A.   Yes.

6    Q.   Did you meet them when they moved in?

7    A.   Yes, or shortly after.

8    Q.   Around about.  Okay.  Do you have a friendly relationship

9    with the Pinedas?

10   A.   Yes.

11   Q.   Have Connie or Michella ever been to your house to visit

12   you?

13   A.   They've been to my house to bring me dinner one night, but I

14   don't think they came in the house.

15   Q.   Okay.  When you stopped staying at your house, did you ask

16   them to see to the house and your cats while you were gone -- or

17   cat while you were gone?

18   A.   Not -- no.

19   Q.   Okay.  Did you write them a note when you left?

20   A.   I can't remember, but I probably did to tell them that I was

21   leaving and going to be gone, hopefully temporarily.

22   Q.   Okay.  In this case did you become aware of driveways being

23   painted in that ███████ cul-de-sac?

24   A.   Yes.

25   Q.   Did you ever yourself see any of the paint on the driveways?

1   A.  I saw -- I saw -- I didn't see anybody paint them, but I saw

2   it after it was painted.

3   Q.  Okay.  I want to back up a little bit.  Your house there in

4   ████████████, your backyard --

5   A.  Yes.

6   Q.  -- is it entirely enclosed by fence?

7   A.  Well, it was.  Half the fence has probably fallen down, but

8   it was -- it did have a fence.  It wasn't a very sturdy fence

9   after 20 years, but it -- it did have a fence.

10  Q.  Okay.  Could someone go behind your house and across your

11  backyard over toward Ms. Craft's house?

12  A.  Yes.

13  Q.  Okay.  Were you ever in this case shown any of the videos

14  that were associated with allegations of going over to the

15  Pinedas' driveway?

16  A.  I was shown a video or a picture -- I'm not sure which -- of

17  somebody painting the driveway, spray-painting the driveway.

18  Q.  Okay.  And what was your --

19  A.  Not her driveway, the Pineda driveway.

20  Q.  Yes, ma'am.  Thank you.  What was your observation of that

21  video?

22  A.  It was a person all dressed in white with black shoes.  And

23  my remark was, "Those are tiny little feet."

24  Q.  Okay.  Does Suzi have tiny little feet?

25  A.  No.

1    Q.  Okay.  So you looked at it, and what did you think about the

2    feet compared to Suzi's feet?

3    A.  Well, I said, "Those aren't Suzi's feet.  Those are just

4    little feet, not Suzi's feet."

5    Q.  Okay.

6         THE WITNESS:  Nothing personal, Suzi.

7    Q.  The next thing I would like to do is ask you about whether

8    you ever heard something said by Suzi.  In order to do that, I'm

9    going to display something only on your screen.

10        MS. REA:  I'm showing the note just to the witness.

11   Q.  Ms. Probst -- wait until it comes up.  Okay.  What you see

12   before you, which says -- I'm gonna paraphrase.  Okay?  And I'm

13   not gonna ask you to read it out loud.  "N-let, N-let, two

14   N-lets hanging in the trees, one for you, Betty, and an N for

15   me."  Did you ever hear Ms. Craft singsong or say that --

16   A.  No.

17   Q.  -- in your presence?

18   A.  No.

19   Q.  On your balcony or on your back deck?

20   A.  No.

21   Q.  Okay.  Were you present and laughing when she said anything

22   like that?

23   A.  No.

24        MS. REA:  Okay.  That may be all I have, Ms. Probst.

25   Just give me one moment.

1           And we can take that down.  Thank you.

2    Q.  When you were -- when you were still living there at 509

3    ██████████, was there a time that you usually went to bed?

4    A.  It was often late, like 11:00, 12:00 at night.

5    Q.  So when you say "late," you mean still before midnight?

6    A.  Yeah, usually.

7           MS. REA:  Thank you, Ms. Probst.  I don't have any

8    other questions.  The U.S. may have questions for you.

9                         CROSS-EXAMINATION

10   BY MS. ZIMDAHL:

11   Q.  Good afternoon, Ms. Probst.  You've been friends with the

12   defendant, Suzi Craft, for a long time; is that fair to say?

13   A.  About 15 years.

14   Q.  That's a long time in my world.  I think that's fair.

15   A.  Well, in my life, it's not quite that long.

16   Q.  Fair enough.  And fair to say you like Ms. Craft?

17   A.  Yes.

18   Q.  Spent a lot of time with her over the years?

19   A.  Not really.  I mean, we were friendly neighbors, but we

20   didn't hang out together, so to speak.

21   Q.  Don't want anything bad to happen to her?

22   A.  Oh, no.

23   Q.  And just about everything you know about this case you know

24   from Ms. Craft; is that right?

25   A.  And the newspapers.

1    Q.  Probably read a lot of those these days.

2    A.  Well, not -- not really, but I did read some articles.

3    Q.  Okay.  Back in 2020?  2021?

4    A.  I'm not sure it was that far back.  Actually, I'm more aware

5    of the more recent incident.

6    Q.  Okay.  So you've been following things more recently in this

7    case?

8    A.  Right.

9    Q.  Did you and Ms. Craft often spend holidays together?

10   A.  We would -- she would usually have me over for like

11   Christmas brunch and Thanksgiving something and Easter brunch,

12   that sort of thing, you know, a couple times a year.

13   Q.  Special times together?

14   A.  Special times.

15   Q.  And when you were living in your home on ██████████, you and

16   Ms. Craft texted one another?

17   A.  We might have.

18   Q.  You might have texted back and forth?

19   A.  Yeah, but not much.

20   Q.  Not too often?

21   A.  No, I don't think so.

22   Q.  You don't think that you texted with the defendant back and

23   forth on your cell phone regularly?

24   A.  No.

25   Q.  How about back in 2020, after the Pineda family moved in?

Probst - Cross

1    A.   Did I text the Pineda family?

2    Q.   No.  Did you text Ms. Craft back in that time frame?

3    A.   I don't think so.

4    Q.   If I were to show you some of your texts with Ms. Craft,

5    might that refresh your recollection about texting with her?

6    A.   It might.

7              MS. ZIMDAHL:  I'm gonna see if we can hook that up,

8    if I might have just a moment to get that -- if I may, Your

9    Honor.

10             THE COURT:  Yes.

11             MS. ZIMDAHL:  If we could put those up just for the

12   witness, please.

13       And I'm just gonna ask Ms. Moss to kind of scroll for you

14   kind of slowly through.

15   BY MS. ZIMDAHL:

16   Q.   These are texts between Ms. Craft and your phone.

17   A.   These are pictures.

18   Q.   Yes, ma'am.  We'll give it a moment to go through so you can

19   see these.  I'm sorry.  It takes a little while to scroll across

20   the screen.

21   A.   Okay.

22   Q.   And, Ms. Probst, to just point out there, I think we see a

23   phone number.  No one's seeing it.  This is just on your screen

24   right now.  Is that your phone number?  Just to orient you to

25   what you're looking at there.

1    A.  Yes, yes.

2    Q.  Okay.  And does this help to refresh your recollection that

3    back in 2020 you were texting with Ms. Craft?

4    A.  I don't really remember talking about disability with Suzi,

5    but if it was on my phone, I guess I did.

6    Q.  Did you text with Ms. Craft?

7    A.  I don't remember doing it.  I may have.

8    Q.  And do you remember that she sent you photographs of the

9    Pineda family?

10   A.  No, I don't remember that either.

11   Q.  Do you remember that she sent you photographs of Michella

12   Pineda's father?

13   A.  I think -- I think she did, yes.

14   Q.  Photographs taken from the internet?

15   A.  Probably.

16   Q.  Do you remember that she sent you photographs of Michella,

17   Connie Pineda, and D.P.█████ ████?

18   A.  No.

19          MS. ZIMDAHL:  Will you scroll us back up, please, a

20   little bit.

21   Q.  And if you were to look at this image that's in front of

22   you, might that refresh your recollection?

23   A.  I don't remember seeing that.

24   Q.  I'm gonna ask you to look at something else that might

25   refresh your recollection.  And I apologize.  Sometimes it takes

1    just a little bit to get things up on the screen.

2        And back in 2020, were you frequently texting information

3    about what the Pinedas were doing to Ms. Craft?

4    A.  No.

5    Q.  You don't recall that?

6    A.  No.

7    Q.  Might it refresh your recollection to look at what's on the

8    screen in front of you?

9    A.  "Good morning."

10   Q.  And you don't have to read it out loud.  I'd just like you

11   to read through this and see if that refreshes your

12   recollection.

13   A.  Okay.  I do remember something about the fence.

14   Q.  Were you keeping Ms. Craft up to date on what you saw your

15   neighbors doing?

16   A.  Well, probably.  It's usually the neighborhood thing to do

17   is to talk about what's going on in the neighborhood.

18   Q.  Why were you interested in whether or not they were putting

19   up a fence?

20   A.  No particular reason except it was a fence.

21   Q.  Did you want them to stay inside of it?

22   A.  I -- I didn't care.

23   Q.  Did you tell Ms. Craft that?

24   A.  I don't know.

25   Q.  Ms. Probst, did you write to Ms. Craft "maybe they'll stay

1  inside the fence"?

2  A.  I may have 'cause she was expressing some concern that the

3  children were out in the street and causing some traffic

4  confusion.

5  Q.  In your cul-de-sac?

6  A.  Yeah.

7  Q.  Traffic confusion in your cul-de-sac?

8  A.  Yeah.  The kids were riding around in the cul-de-sac.

9  Q.  Ms. Probst, you live on a really small cul-de-sac, is that

10  right, at the time?

11  A.  Well, you -- if there are kids riding bikes all over the

12  cul-de-sac, some people found it hard to get through to their

13  houses or around to their houses.

14        MS. ZIMDAHL:  Okay.  So could we also please put up

15  just for the witness a text stream from 7-13-2020, please.

16  Q.  I want to ask you if you remember this.  And I know you're

17  having some trouble, but see if this refreshes your

18  recollection.  Do you remember this conversation with Ms. Craft?

19  A.  Starting where?  "Good plan" -- about rabbits?  No, I don't

20  remember anything about rabbits.

21  Q.  Start at the top.

22  A.  I really don't remember the conversation at all.

23  Q.  You don't remember Ms. Craft saying to you that they will

24  try to say you tried to run them over?

25  A.  No.

Volume 4, Page 129

1    Q.  You don't remember responding to Ms. Craft, "I've thought

2    about it.  I haven't actually tried it yet."

3    A.  No.

4    Q.  You don't remember that?

5    A.  Uh-uh.

6    Q.  You don't remember this text?

7    A.  Nope.

8    Q.  You don't remember the winky face in response?

9    A.  No.

10   Q.  I just want to ask you about one more, July 30th, 2020.  Did

11   you text with Ms. Craft about what her Ring video showed that

12   she was following?

13   A.  About what her --

14   Q.  Well, when Ms. Craft texts you about what her Ring doorbell

15   was showing on a regular basis?

16   A.  Sometimes she did.

17   Q.  So she did text you from time to time about what the Pinedas

18   were doing?

19   A.  Yes, yes.

20   Q.  Yeah.  Okay.  So, you know, before you said she didn't.  Now

21   you say she did; right?

22   A.  Well --

23   Q.  She was texting you what was going on.

24   A.  Sometimes she did talk about what was happening in the

25   neighborhood.  That would have been part of it.

```
 1    Q.  So would this refresh your recollection about a conversation
 2    you had with Ms. Craft?
 3    A.  No.
 4    Q.  Does Ms. Craft text you about having a Ring doorbell video
 5    that showed Connie Pineda returning home?
 6    A.  No.
 7    Q.  That's not what this says?
 8    A.  I don't know.
 9    Q.  Do you say, "One night we have to follow her"?
10    A.  I don't remember saying that, but it -- I might have in
11    jest, telling Suzi, "We should see what's going on."
12    Q.  Ms. Probst, are you here because you want to support your
13    friend?
14    A.  Pardon me?
15    Q.  Are you here today because you want to support your friend?
16    A.  Well, sure, I would like to support her.
17    Q.  And you don't remember all these texts that you might have
18    had with her back at the time?
19    A.  No.  We're talking several years ago, and a lot of it was
20    probably just in jest.
21    Q.  So you just can't remember a lot of things that you thought
22    were in jest at the time?  A lot of things Ms. Craft said to
23    you, you just can't remember?  Is that -- is that what you're
24    saying?
25    A.  Yes.
```

```
 1              MS. ZIMDAHL:  No further questions.

 2              THE COURT:  Any redirect?

 3              MS. REA:  No, sir.

 4              THE COURT:  May the witness be excused?

 5              MS. REA:  Yes, Your Honor.

 6              THE COURT:  Thank you.  You may step down now.

 7              MS. REA:  Your Honor, at this time we would call

 8      Ms. Craft.  May we approach first?

 9              THE COURT:  Yes.

10         (Bench conference on the record.)

11              MS. REA:  She needs a bathroom break before.

12              THE COURT:  Okay.  You can step back.  Actually, you

13      two stay here.

14         (End of bench conference.)

15              THE COURT:  Members of the jury, we're going to take a

16      very brief break now for about ten minutes.  Remember the

17      admonition.

18         (Jury out 3:05 p.m.)

19              THE COURT:  You may be seated.

20         If you'll give us the white noise briefly.

21         (Bench conference on the record.)

22              THE COURT:  I'm concerned about Ms. Craft testifying.

23      This is a knowing and voluntary decision on her part; is that

24      correct?

25              MS. REA:  I believe it is, Your Honor.  I'd be happy
```

1   for the Court to speak to her about it.  I think that's an

2   appropriate way to proceed.

3             MR. TIEKE:  I agree.  I mean, I think the Court needs

4   to address her.

5             MS. REA:  And I'll confer with her briefly just to

6   confirm the decision and then ask --

7             THE COURT:  Yes, I would like for you to confer with

8   her.  And if you need, I will clear the courtroom to allow you

9   to do that.

10            MS. REA:  Okay.  That would be helpful, yes.

11            THE COURT:  Because I think that the record needs to

12   reflect that this is a well-considered decision before we move

13   forward.

14       All right.  Let's do that on open court -- in open court, I

15   should say.

16            MR. TIEKE:  Thank you.

17       (End of bench conference.)

18            THE COURT:  At this time I'm going to ask that the

19   courtroom be cleared during the balance of the break.  We are

20   not moving ahead with any part of the trial at this time, but I

21   need the courtroom cleared in order to facilitate attorney-

22   client communication.  So if you are not affiliated with the

23   defense, please vacate the courtroom for the duration of our

24   remaining break.

25       At the conclusion of the break, before the trial continues,

1    everyone will be welcome to return to the courtroom.  Thank you.

2         (Recess at 3:07 p.m. until 3:28 p.m.  Jury out.)

3         THE COURT:  We're back on the record.  The jury is not

4    present in the courtroom.

5         Let me see counsel at the bench, please.

6         (Bench conference on the record.)

7              THE COURT:  Ms. Rea, where do we stand?

8              MS. REA:  Your Honor, Ms. Craft does want to testify.

9              THE COURT:  That's fine.  That's her decision.

10             MS. REA:  Yes.

11             THE COURT:  Do you wish for the record to reflect any

12   questions from me regarding her understanding that she is

13   neither required to testify and that she -- nor is the jury

14   permitted to draw any negative inference from her decision not

15   to testify?

16             MS. REA:  Yes, Your Honor.

17             THE COURT:  I would prefer to do that here at the

18   bench outside the hearing, of course, of the jury, which is not

19   present, or the gallery.

20        What's the Government's position?

21             MS. ZIMDAHL:  I think that's just fine, Your Honor.

22             THE COURT:  Is that your preference?

23             MS. REA:  Yes, Your Honor.

24             THE COURT:  Would you ask the deputies to bring the

25   defendant to the bench.

1          That's all I intend to ask her, just to make sure the record

2     is clear.

3               MS. REA:  Okay.  Thank you, Your Honor.

4          (Defendant approaching the bench.)

5               THE COURT:  Ms. Craft, I understand you intend to

6     testify; is that correct?

7               THE DEFENDANT:  That's correct.

8               THE COURT:  That is your decision.  I do want to make

9     sure that the record is clear that you have made that decision

10    in full consultation with your counsel.  Is that correct?

11              THE DEFENDANT:  That's correct.

12              THE COURT:  And are you aware that you are not

13    required to testify?

14              THE DEFENDANT:  Yes, I am.

15              THE COURT:  And are you aware that if you choose not

16    to testify, the jury is not permitted to draw any negative

17    inference from that decision?

18              THE DEFENDANT:  Yes, yes, I am.

19              THE COURT:  And despite knowing that, you still wish

20    to testify; is that correct?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  All right.  Thank you.

23         Unless anyone suggests anything further, that's all I have.

24              MS. REA:  No, Your Honor, nothing else.

25              MR. TIEKE:  Nothing else.

1          THE COURT:  Thank you.  You may step back.

2      (End of bench conference.)

3          THE COURT:  Let's have the jury, please.  Thank you.

4      (Jury in 3:31 p.m.)

5          THE COURT:  Thank you, members of the jury.  We are

6  now ready to proceed.

7      Ms. Rea.

8          MS. REA:  Thank you, Your Honor.  The defense will

9  call Ms. Suzanne Craft.

10      (Transcript of testimony of SUZANNE CRAFT previously filed.)

11          THE COURT:  Ms. Craft, you may step down and return to

12  counsel table.

13      Members of the jury, we are going to end our day now.  When

14  you come back tomorrow, we will have the remainder of

15  Ms. Craft's testimony.  And we may have another witness, or that

16  may be the end of the testimonial portion of the trial.  I'm not

17  certain about that.  I'll be talking with the lawyers here after

18  you are gone for the evening.

19      I'm gonna ask you to return at 8:40 in the morning.  We'll

20  keep the same pattern.  And you may recall from the beginning I

21  explained how the trial would work.  So you know that the trial

22  is now coming near to the end, but there is still more work to

23  be done before I give you instructions and you go back to

24  deliberate.

25      At that point, most likely at some point tomorrow, I will

 1    instruct you that it is your job to deliberate and talk about

 2    the case but not until then.  So even though the case is

 3    still -- is almost over, we still have some work to do.

 4        So I need to remind you not to talk about the case with each

 5    other or family members, friends, anyone else, not to do any

 6    searches about any of the matters you have heard here in the

 7    courtroom.  That you need to stay completely away from.  And

 8    remember that you will decide the case only upon the evidence

 9    and testimony received in the courtroom, and I will instruct you

10    more about that at the close of the case.

11        Thank you for your patience with us today, and we will see

12    you at 8:40 in the morning.

13        (Jury out 5:08 p.m.)

14            THE COURT:  You may be seated.  The jury has left the

15    courtroom.

16        We will plan to have an updated instructions -- set of

17    instructions for you-all in the morning.  Why don't -- if you

18    can, why don't you plan to be in the courtroom by 8:45.  We'll

19    talk about those final revisions and the logistics of moving

20    from the close of the defense case as anticipated.

21        You don't anticipate another witness; correct?

22            MS. REA:  I do not, Your Honor.

23            THE COURT:  And so what next steps will be taken, I'm

24    not gonna ask you to tell me now.  We'll talk about that in the

25    morning.

1          I would like for things to go as quickly as circumstances

2     permit.  Since we have our instructions nearly finalized, we

3     ought to be able to complete Ms. Craft's testimony, cross,

4     redirect, explain to the jury that testimony has ended.  I will

5     give you-all a bit of time at that point.  I'll let them leave.

6          We will comb through the final set of instructions looking

7     for -- I'll expect everyone to do this -- looking for any

8     corrections, last-minute corrections that need to be made, and

9     then that will -- should also give you some time to prepare for

10    closing arguments.  I think -- given the amount of testimony,

11    I'm thinking somewhere in the 30-minute to 45-minute range.

12    What are you-all thinking?

13          MR. TIEKE:  Probably 45 to an hour, but I'll try to do

14    the best I can, Judge.

15          THE COURT:  Well, you don't need me to tell you,

16    either of you, that you go too long, it isn't me who's gonna be

17    upset with you.  It's gonna be the jury losing attention.

18    Right?  So let's be as efficient as we can.  You've got five

19    counts you've got to walk through, both sides, and you've got

20    four days' worth of testimony.  I get that, but you need to

21    address it in as efficient a manner as circumstances permit.

22          So you're gonna reserve how much of that?

23          MR. TIEKE:  Your Honor, I think the hour would -- we

24    can make the hour work for both of them.  So 45 and 15.

25          THE COURT:  All right.

1          MS. REA:  And, Your Honor, I wouldn't need more than

2     45.

3          THE COURT:  All right.

4          MS. REA:  Probably less.

5          THE COURT:  All right.  So at some point we'll go

6     substantive instructions, closing, closing, closing, and then

7     final procedural instructions.  That'll be the sequence.

8          And I think, given the length of time you're talking about

9     here, we will need to give the jury a break at some point in

10    there.  So we'll talk about that in the morning as well.

11         At the end of the procedural -- the second set of

12    instructions, the procedural questions, we will also randomly

13    select the two alternates.

14         My practice -- I think I mentioned this to you, but in case

15    I didn't, my practice is to ask the alternates to provide cell

16    phone information to the deputy clerk.  I will ask them not to

17    talk about the case, give them the same admonition so that if

18    there is at some point a problem with one of the members of

19    the -- one or two of the members of the jury, we could recall

20    them.  And generally, once a verdict is reached, we reach out to

21    the alternates and let them know that they are released from the

22    admonition not to discuss the case.

23         So I don't think there are any issues with instructions.

24    The 404(b) instruction, I think, is out now; is that correct?

25         So we'll also make the necessary revisions to the

```
 1    instruction addressing the parties' two stipulations.  We will

 2    add in the Rule 610 instruction, as discussed and agreed to

 3    during the bench conference, and we will make the appropriate

 4    revision to the instruction addressing the defendant's decision

 5    to testify.

 6        There may be a question that I will need you to be prepared

 7    to discuss in the morning regarding the reference in

 8    Instruction 1 to explaining the defendant's position.

 9            MS. REA:  Yes, sir.

10            THE COURT:  So we will want to tidy that up as well.

11        I think that's all I have.  You-all have anything we need to

12    take up at this point?

13            MR. TIEKE:  Your Honor, just it's our understanding

14    that the victims would like to attend the closing.  I think

15    they're entitled to do so.  And so I just wanted to advise the

16    Court of that so that we don't have them here all day, but we'll

17    attempt to line it up with when the closing would be, just for

18    your awareness.

19            THE COURT:  That's perfectly fine.

20            MS. REA:  Nothing else from me, Your Honor.

21            THE COURT:  Thank you.  I'll see you in the morning.

22        (Proceedings concluded at 5:15 p.m.)

23

24

25
```

1                    C E R T I F I C A T E

2      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5

6           _____s/Dena Legg_____     September 21, 2023_
           Certified Court Reporter No. 20042A157    Date
           Official Court Reporter

7

8                  REDACTION CERTIFICATE
           I certify that the foregoing is a true and correct copy of

9    the transcript originally filed with the clerk of court on
           09/21/23 and incorporating redactions of personal identifiers

10   requested by the following attorney of record: Angela M. Rea in
          accordance with Judicial Conference policy.  Redacted characters

11   appear as a black box in the transcript.

12         _____s/Dena Legg_____     October 30, 2023_
         Certified Court Reporter No. 20042A157  Date

13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

GOVERNMENT WITNESSES:

CHARLES KLEIN
     Direct Examination By Mr. Tieke                18
     Cross-Examination By Ms. Rea                   43
     Redirect Examination By Mr. Tieke              46

RICHARD WATTS (transcript previously filed)


OFFICER KRISTEN DOWNS
     Direct Examination By Ms. Zimdahl              51
     Cross-Examination By Ms. Rea                   109

DEFENSE WITNESSES:

BETTY ANN PROBST
     Direct Examination By Ms. Rea                  118
     Cross-Examination By Ms. Zimdahl               123

SUZANNE CRAFT (transcript previously filed)

                          EXHIBITS

GOVERNMENT:
35 - iPhone                                         66
36A - contact card                                 69
36B - messages                                     71
36C - photos                                       80
36D - photos                                       81
36E - photos                                       82
36F - photos                                       83
36G - photos                                       85
36H - photos                                       86
36I - photos                                       87
36J - photos                                       88
36K - photos                                       89
37 - audio                                         94
38 - audio                                         96
41 - photo                                         57


DEFENDANT:
No exhibits