```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF KENTUCKY
 2                          LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )     Case No. 3:22-CR-00094-DJH
 4                                  )
             Plaintiff,             )     REDACTED
 5                                  )
     v.                             )
 6                                  )
     SUZANNE CRAFT,                 )
 7                                  )     March 10, 2023
             Defendant.            )     Louisville, Kentucky
 8

 9                          *  *  *  *  *

10                             VOLUME 5
                        TRANSCRIPT OF JURY TRIAL
11                  BEFORE HONORABLE DAVID J. HALE
                      UNITED STATES DISTRICT JUDGE
12
                            *  *  *  *  *
13
     APPEARANCES:
14
     For United States:      Christopher C. Tieke
15                           Stephanie M. Zimdahl
                             U.S. Attorney's Office
16                           717 West Broadway
                             Louisville, KY 40202
17
     For Defendant:          Angela M. Rea
18                           Western Kentucky Federal
                                Community Defender, Inc.
19                           629 S. 4th Avenue, Suite 200
                             Louisville, KY 40202
20
     [Defendant present.]
21
                           Dena Legg, RDR, CRR, CCR-KY
22                          Official Court Reporter
                            232 U.S. Courthouse
23                          Louisville, KY 40202
                              (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1          (Begin proceedings in open court at 9:27 a.m.  Jury out.)

2              THE COURT:  Good morning.

3              MULTIPLE SPEAKERS:  Good morning, Your Honor.

4              THE COURT:  We're back on the record in U.S. v. Craft.

5      The jury is not present in the courtroom.  We're starting a

6      little bit later than I had hoped, but this last set of

7      revisions took a little longer than anticipated.  We've provided

8      you with the updated set of draft jury instructions.  There is

9      one yet to be completed, Ms. Rea, that I will need your input

10     on.  Let me walk you through now the revisions made from the

11     last set.

12         First of all, if you will look at Instruction Number 4 on

13     page 4, there were two lines removed from the fourth paragraph.

14     Those lines read:  "I also ruled that you could not see some of

15     the exhibits that the lawyers wanted you to see, and sometimes I

16     ordered you to disregard things that you saw or heard" -- excuse

17     me -- "or I struck things from the record."  I removed those two

18     lines because I don't think any of those reminders are

19     applicable here.

20             MR. TIEKE:  I don't believe so, Your Honor.

21             THE COURT:  Next let me ask you to look at page 9.

22     That's the new Instruction 8.  That is the evidence rule 610

23     instruction that the parties agreed to yesterday.

24             MS. REA:  And, Your Honor, that is what we agreed to.

25     I think it's appropriate for the purpose that we need it for.

1          MR. TIEKE:  That's fine with the United States, Your

2     Honor.

3          THE COURT:  Let's then talk about -- let's see here --

4     Instruction Number 21 on page 27.  This is the pattern

5     instruction and the place in the instructions where it is

6     normally positioned.  This is an instruction that in my

7     experience is slightly more important when the defendant does

8     not testify because this is the opportunity for the defense to

9     crystallize the position of the defense.

10         Obviously, Ms. Craft is testifying, and so it is a little

11    easier for the jury to hear directly from her.  What do you want

12    to say here, Ms. Rea?  The typical, I think, in a situation like

13    this is simply to say, "The defendant's position is that she

14    denies all allegations as charged in the indictment."

15         MS. REA:  Your Honor, I think that's an appropriate

16    way to go about it.  I also think, you know, based on the burden

17    of proof, it's -- the Government has to prove her guilty beyond

18    a reasonable doubt.  She starts out being innocent.

19         THE COURT:  All that's covered within these

20    instructions.

21         MS. REA:  All that's covered elsewhere, and I don't

22    know that we need it.

23         THE COURT:  That's fine too.

24         MS. REA:  I would be perfectly happy and actually

25    prefer that we simply not include it.  And that would also mean

1    in the --

2              THE COURT:  In the Instruction Number 1 --

3              MS. REA:  Yeah, to excise that, that would be my

4    request.

5              THE COURT:  All right.  So I presume no objection from

6    the Government there.

7              MR. TIEKE:  No, Your Honor.

8              THE COURT:  So we will then strike the line from

9    Instruction Number 1 that reads:  "Then I will explain the

10   defendant's position."  And we will remove Instruction Number 21

11   and renumber thereafter as appropriate.

12       So let's talk now about Instruction Number 23.  That's the

13   703 opinion testimony instruction that we discussed a bit

14   yesterday, I believe.  Let me start with the Government here.

15   What's your position?

16             MR. TIEKE:  Your Honor, that instruction's acceptable

17   to the Government.

18             MS. REA:  It's acceptable to me too.

19             THE COURT:  Instruction Number 24 is the 703(a)

20   pattern mixed opinion and fact testimony instruction.

21             MR. TIEKE:  That's also fine with the Government, Your

22   Honor.

23             MS. REA:  I agree, Your Honor.

24             THE COURT:  All right.  I believe the only other

25   change is with respect to the last instruction which introduces

1    the verdict form, which is 37 in the current draft, and since

2    we're removing the defendant's position instruction will be, in

3    the final, 36.

4        You will see that I have altered it from the last version.

5    The last version read:  "I have prepared a verdict form that you

6    should use to record your verdict."

7        The form reads as follows with a colon -- I have removed

8    that sentence and instead -- and replaced it with a sentence

9    that reads:  "It is attached to these instructions," which of

10   course, as I typically do it, the verdict form is the last item;

11   and then moved the line from the second paragraph, "Your

12   foreperson should then sign the form, put the date on it, and

13   return it to me" as its own stand-alone final line.  I think

14   that's slightly -- that's a slight improvement, given that we

15   have a verdict form with special verdict questions.

16       Ms. Rea, I'll start with you this time.

17           MS. REA:  Your Honor, I think it's clear.  That

18   revised instruction is acceptable to me.

19           MR. TIEKE:  Your Honor, I believe that's fine with the

20   United States as well.

21           THE COURT:  I appreciate your enthusiasm.

22       Let's talk now about the verdict form.  It is my practice --

23   I'm not wedded to it.  If the parties prefer me to do something

24   different, I'm open to hearing, but it is my practice, at the

25   conclusion of the -- what is now Instruction 37 and will be 36

1    to read the verdict form to the jury as part of the

2    instructions.  Is the way it's set up acceptable to both sides?

3            MS. REA:  It's acceptable to me, Your Honor.

4            MR. TIEKE:  That looks fine, Your Honor.

5            THE COURT:  All right.  So then the only change to be

6    made from this discussion is that we will remove the line

7    referring to the defendant's position from Instruction 1.

8        We will strike in full Instruction 21 from this -- yes, from

9    this version.  And we will do that now while the jury is being

10   lined up unless there's anything else with respect to

11   instructions that either side wishes to raise.  This is your

12   final opportunity.

13           MS. REA:  No, sir.

14           MR. TIEKE:  Nothing else to raise for the

15   instructions, Your Honor.

16           THE COURT:  All right.  So we will put the

17   instructions in final form, and they will be ready to go.

18       Is there anything else that we need to take up at this time?

19           MR. TIEKE:  No, Your Honor.  Could we just have a

20   quick break to use the bathroom and then --

21           THE COURT:  Yes.

22           MS. REA:  Nothing else, Your Honor.

23           THE COURT:  Why don't we take -- why don't you hold

24   up.  Since we're taking a break now, we'll -- well, I don't

25   know.  Are you done after --

1          MS. REA:  Yes, Your Honor, I am.

2          THE COURT:  Do you anticipate any rebuttal?

3          MR. TIEKE:  Unlikely, Your Honor.  I don't know what's

4    going to come up, but no at this point.

5          THE COURT:  This is really just a question about

6    another bathroom break.  So it's not that consequential.  If

7    there is no rebuttal, will you be prepared to go, then, straight

8    to instructions?

9          MR. TIEKE:  Yes.

10          THE COURT:  I mean, I think we'll have a Rule 29

11    conference.

12          MS. REA:  We will briefly.

13          THE COURT:  But if that proceeds quickly, we'll do

14    that at the bench outside the hearing of the jury.  Why don't we

15    play it by ear, given the hesitation all the way around.

16       All right.  Take your break.  I'll see you -- we'll plan on

17    starting in earnest here in about ten minutes.

18          MR. TIEKE:  Thank you, Judge.

19          THE COURT:  When we return from the break, if you will

20    ask Ms. Craft to take her position.

21          MS. REA:  Yes, sir.

22          THE COURT:  And remind her that she remains under oath

23    from yesterday.

24          MS. REA:  Yes.

25       (Recess at 9:39 a.m. until 9:50 a.m.  Jury out.)

1          THE COURT:  Mr. Tieke, Ms. Zimdahl, Ms. Rea, anything

2     we need to take up before the jury returns to the box?

3          MR. TIEKE:  No, Your Honor.

4          MS. REA:  No, Your Honor.

5      (Jury in 9:52 a.m.)

6          THE COURT:  Good morning, members of the jury.  We are

7     now ready to proceed.

8          MR. TIEKE:  Thank you, Your Honor.

9      (Transcript of testimony of SUZANNE CRAFT previously filed.)

10         THE COURT:  Ms. Rea, do you have another witness to

11    call?

12         MS. REA:  I do not, Your Honor.  The defense will

13    rest.

14         THE COURT:  Mr. Tieke, Ms. Zimdahl?

15         MR. TIEKE:  Your Honor, we're ready to rest as well.

16         THE COURT:  Members of the jury, this concludes all

17    testimony in this trial.  The next steps will be for me to give

18    you instructions.  Then you will hear from the lawyers in

19    closing arguments.  I will have final procedural instructions

20    for you.  We will then draw randomly two of you to serve as

21    alternate jurors, and then you will be excused to deliberate.

22      I am going to give you now another brief break to allow the

23    lawyers to prepare for the closing arguments, and I will bring

24    you back, at which time I will read to you the instructions.

25      The case is now essentially over, but you still cannot talk

1    about anything that you have heard in this case.  It's very

2    close to when you will be required to do that, but don't start

3    early.  You still need to hear instructions and arguments.

4        All right.  I will see you back in -- we'll say about ten

5    minutes should be all that we need.

6        (Jury out 10:30 a.m.)

7            THE COURT:  You may be seated.  The jury is now out of

8    the room.

9        I'll give you a few minutes to prepare.  I think we are done

10   with instructions; correct?

11           MS. REA:  Yes, Your Honor.

12           MR. TIEKE:  Yes, Your Honor.

13           THE COURT:  So I will be prepared then to go straight

14   through the instructions.

15       Madam Clerk, if you will hand me -- I think the only item

16   left to decide is where to break.  I believe I will read

17   Instructions 1 through 30 prior to closing arguments and then

18   pick up with Instruction Number 31 after the completion of the

19   closing arguments.

20           MS. REA:  That makes sense to me, Your Honor.

21           MR. TIEKE:  That's fine, Your Honor.

22           THE COURT:  Do you think you'll need more than about

23   ten minutes?

24           MS. REA:  No, sir.

25           MR. TIEKE:  No, Your Honor.

1          THE COURT:  Very well.  I'll be back in about ten

2    minutes.  Thank you.

3        (Recess at 10:32 a.m. until 10:42 a.m.  Jury out.)

4        (Bench conference on the record.)

5          THE COURT:  Okay.  Outside the hearing of the jury, do

6    you wish to renew your Rule 29 motion?

7          MS. REA:  Your Honor, I will renew those motions based

8    on the arguments that I previously made.  The additional basis

9    would be that the Court has now heard from Ms. Craft, who has

10   indicated that she did not commit any of the acts.  I don't have

11   any other information to add.

12         MR. TIEKE:  Your Honor, I think, viewing it in the

13   light most favorable to the Government, we will just adopt the

14   arguments that we made with respect to the earlier Rule 29

15   motion and would, in fact, just emphasize that we believe that

16   the defense case actually provided more evidence of the

17   allegations against the defense.  In particular, the cataloging

18   and true nature -- it explains the true nature and the purpose

19   behind the threats.

20      So we would argue that the defense case, despite Ms. Craft's

21   denial, actually provided more evidence.  And so when viewing

22   all of that in the light most favorable to the Government, we

23   believe we've met the standard of this case to take it to the

24   jury.

25         THE COURT:  I'm simply gonna find in the same fashion

1    as I found with respect to the first Rule 29 motion at the close

2    of the Government's proof, that it is sufficient evidence for

3    any rational trier of fact to find beyond a reasonable doubt on

4    all five counts.

5        Of course, Rule 29 and Rule 32 present further options for

6    the defendant, and beyond that, I think I need not -- anything

7    else along those lines we need to take up?

8              MS. REA:  No, sir.

9              MR. TIEKE:  Thank you, Your Honor.

10             THE COURT:  Are we ready to have the jury in and

11   proceed with the first set of instructions?

12             MS. REA:  Yes, Your Honor.

13             MR. TIEKE:  Yes, Your Honor.

14             THE COURT:  Very well.  Thank you.

15       (End of bench conference.)

16       (Jury in 10:47 a.m.)

17             THE COURT:  It is now time for me to read you the

18   first set of instructions.

19       Instruction Number 1.  Members of the jury, now it is time

20   for me to instruct you about the law that you must follow in

21   deciding this case.  I will start by explaining your duties and

22   the general rules that apply in every criminal case.  Then I

23   will explain the elements or parts of the crimes that the

24   defendant is accused of committing.  Then I will explain some

25   rules that you must use in evaluating particular testimony and

1    evidence.  And, last, I will explain the rules that you must

2    follow during your deliberations in the jury room and the

3    possible verdicts that you may return.

4        Please listen carefully to everything that I say.  A copy of

5    these instructions will be provided to you when you retire to

6    deliberate.

7        Instruction Number 2.  You have two main duties as jurors.

8    The first one is to decide what the facts are from the evidence

9    that you saw and heard here in court.  Deciding what the facts

10   are is your job, not mine, and nothing that I have said or done

11   during this trial was meant to influence your decision about the

12   facts in any way.

13       Your second duty is to take the law that I give you, apply

14   it to the facts, and decide if the Government has proved the

15   defendant guilty beyond a reasonable doubt.

16       It is my job to instruct you about the law, and you are

17   bound by the oath that you took at the beginning of the trial to

18   follow the instructions that I give you even if you personally

19   disagree with them.  This includes the instructions that I gave

20   you before and during the trial and these instructions.  All the

21   instructions are important, and you should consider them

22   together as a whole.

23       The lawyers may talk about the law during their arguments,

24   but if what they say is different from what I say, you must

25   follow what I say.  What I say about the law controls.

1        Perform these duties fairly.  Do not let any bias, sympathy,

2    or prejudice that you may feel toward one side or the other

3    influence your decision in any way.

4        Instruction Number 3.  As you know, the defendant has

5    pleaded not guilty to the crimes charged in the indictment.  The

6    indictment is not any evidence at all of guilt.  It is just the

7    formal way that the Government tells the defendant what crimes

8    she is accused of committing.  It does not even raise any

9    suspicion of guilt.  Instead, the defendant starts the trial

10   with a clean slate, with no evidence at all against her, and the

11   law presumes that she is innocent.

12       This presumption of innocence stays with her unless the

13   Government presents evidence here in court that overcomes the

14   presumption and convinces you beyond a reasonable doubt that she

15   is guilty.

16       This means that the defendant has no obligation to present

17   any evidence at all or to prove to you in any way that she is

18   innocent.  It is up to the Government to prove that she is

19   guilty, and this burden stays on the Government from start to

20   finish.

21       You must find the defendant not guilty unless the Government

22   convinces you beyond a reasonable doubt that she is guilty.  The

23   Government must prove every element of the crimes charged beyond

24   a reasonable doubt.

25       Proof beyond a reasonable doubt does not mean proof beyond

1    all possible doubt.  Possible doubts or doubts based purely on

2    speculation are not reasonable doubts.  A reasonable doubt is a

3    doubt based upon reason and common sense.  It may arise from the

4    evidence, the lack of evidence, or the nature of the evidence.

5    Proof beyond a reasonable doubt means proof which is so

6    convincing that you would not hesitate to rely and act on it in

7    making the most important decisions in your own lives.

8        If you are convinced that the Government has proved the

9    defendant guilty beyond a reasonable doubt, say so by returning

10    a guilty verdict.  If you are not convinced, say so by returning

11    a not guilty verdict.

12        Instruction Number 4.  You must make your decision based

13    only on the evidence that you saw and heard here in court.  Do

14    not let rumors, suspicions, or anything else that you may have

15    seen or heard outside of court influence your decision in any

16    way.

17        The evidence in this case includes only what the witnesses

18    said while they were testifying under oath, the exhibits that I

19    allowed into evidence, and the stipulations that the lawyers

20    agreed to.  Nothing else is evidence.  The lawyers' statements

21    and arguments are not evidence.  Their questions and objections

22    are not evidence.  My legal rulings are not evidence, and my

23    comments and questions are not evidence.

24        During the trial, I did not let you hear the answers to some

25    of the questions that the lawyers asked.  You must completely

1    ignore all of these things.  Do not even think about them.  Do

2    not speculate about what a witness might have said or what an

3    exhibit might have shown.  These things are not evidence, and

4    you are bound by your oath not to let them influence your

5    decision in any way.  Make your decision based only on the

6    evidence as I have defined it here and nothing else.

7        Instruction Number 5.  You should use your common sense in

8    weighing the evidence.  Consider it in light of your everyday

9    experience with people and events and give it whatever weight

10   you believe it deserves.  If your experience tells you that

11   certain evidence reasonably leads to a conclusion, you are free

12   to reach that conclusion.

13       Instruction Number 6.  Now, some of you may have heard the

14   terms "direct evidence" and "circumstantial evidence."

15       Direct evidence is simply evidence like the testimony of an

16   eyewitness which, if you believe it, directly proves a fact.  If

17   a witness testified that he saw it raining outside and you

18   believed him, that would be direct evidence that it was raining.

19       Circumstantial evidence is simply a chain of circumstances

20   that indirectly proves a fact.  If someone walked into the

21   courtroom wearing a raincoat covered with drops of water and

22   carrying a wet umbrella, that would be circumstantial evidence

23   from which you could conclude that it was raining.

24       It is your job to decide how much weight to give the direct

25   and circumstantial evidence.  The law makes no distinction

1    between the weight that you should give to either one or say

2    that one is any better evidence than the other.  You should

3    consider all the evidence, both direct and circumstantial, and

4    give it whatever weight you believe it deserves.

5         Instruction Number 7.  Another part of your job as jurors is

6    to decide how credible or believable each witness was.  This is

7    your job, not mine.  It is up to you to decide if a witness's

8    testimony was believable and how much weight you think it

9    deserves.  You are free to believe everything that a witness

10   said, or only part of it, or none of it at all, but you should

11   act reasonably and carefully in making these decisions.

12        Let me suggest some things for you to consider in evaluating

13   each witness's testimony.  Ask yourself if the witness was able

14   to clearly see or hear the events.  Sometimes even an honest

15   witness may not have been able to see or hear what was happening

16   and may make a mistake.  Ask yourself how good the witness's

17   memory seemed to be.  Did the witness seem able to accurately

18   remember what happened?

19        Ask yourself if there was anything else that may have

20   interfered with the witness's ability to perceive or remember

21   the events.  Ask yourself how the witness acted while

22   testifying.  Did the witness appear honest, or did the witness

23   appear to be lying?

24        Ask yourself if the witness had any relationship to the

25   Government or the defendant or anything to gain or lose from the

 1    case that might influence the witness's testimony.  Ask yourself

 2    if the witness had any bias or prejudice or reason for

 3    testifying that might cause the witness to lie or to slant the

 4    testimony in favor of one side or the other.

 5        Ask yourself if the witness testified inconsistently while

 6    on the witness stand or if the witness said or did something, or

 7    failed to say or do something, at any other time that is

 8    inconsistent with what the witness said while testifying.

 9        If you believe that the witness was inconsistent, ask

10    yourself if this makes the witness's testimony less believable.

11    Sometimes it may; other times it may not.  Consider whether the

12    inconsistency was about something important or about some

13    unimportant detail.  Ask yourself if it seemed like an innocent

14    mistake or if it seemed deliberate.

15        And ask yourself how believable the witness's testimony was

16    in light of all the other evidence.  Was the witness's testimony

17    supported or contradicted by other evidence that you found

18    believable?  If you believe that a witness's testimony was

19    contradicted by other evidence, remember that people sometimes

20    forget things and that even two honest people who witness the

21    same event may not describe it exactly the same way.

22        These are only some of the things that you may consider in

23    deciding how believable each witness was.  You may also consider

24    other things that you think shed some light on the witness's

25    believability.  Use your common sense and your everyday

1    experience in dealing with other people and then decide what

2    testimony you believe and how much weight you think it deserves.

3        Instruction Number 8.  You have heard questions about the

4    religious affiliation of one witness and the defendant's

5    daughter.  You may not consider this evidence in assessing the

6    credibility of any witness.

7        Instruction Number 9.  One more point about the witnesses.

8    Sometimes jurors wonder if the number of witnesses who testified

9    makes any difference.  Do not make any decisions based only on

10   the number of witnesses who testified.  What is more important

11   is how believable the witnesses were and how much weight you

12   think their testimony deserves.  Concentrate on that, not the

13   numbers.

14       Instruction Number 10.  There is one more general subject

15   that I want to talk to you about before I begin explaining the

16   elements of the crimes charged.  The lawyers for both sides

17   objected to some of the things that were said or done during the

18   trial.  Do not hold that against either side.  The lawyers have

19   a duty to object whenever they think that something is not

20   permitted by the rules of evidence.  Those rules are designed to

21   make sure that both sides receive a fair trial.

22       And do not interpret my rulings on their objections as any

23   indication of how I think the case should be decided.  My

24   rulings were based on the rules of evidence, not on how I feel

25   about the case.  Remember that your decision must be based only

1    on the evidence that you saw and heard here in court.

2         Instruction Number 11.  That concludes the part of my

3    instructions explaining your duties and the general rules that

4    apply in every criminal case.  In a moment, I will explain the

5    elements of the crimes that the defendant is accused of

6    committing.  But before I do that, I want to emphasize that the

7    defendant is only on trial for the particular crimes charged in

8    the indictment.  Your job is limited to deciding whether the

9    Government has proved the crimes charged.

10        Number 12.  The defendant has been charged with several

11   crimes.  The number of charges is no evidence of guilt, and this

12   should not influence your decision in any way.  It is your duty

13   to separately consider the evidence that relates to each charge

14   and to return a separate verdict for each one.  For each charge,

15   you must decide whether the Government has presented proof

16   beyond a reasonable doubt that the defendant is guilty of that

17   particular charge.

18        Your decision on one charge, whether it is guilty or not

19   guilty, should not influence your decision on any of the other

20   charges.

21        Number 13.  Count 1 of the indictment charges that on or

22   about November 20, 2020, in the Western District of Kentucky,

23   Jefferson County, Kentucky, the defendant, Suzanne Craft, did

24   knowingly deposit in a post office or an authorized depository

25   for mail matter to be sent and delivered by the postal service

1    and caused to be delivered by the postal service according to

2    the directions thereon, a communication, addressed to another

3    person, whose identity is known to the grand jury, containing a

4    threat to injure the person of the addressee and others, in

5    violation of Title 18, United States Code, Section 876(c).

6       For you to find the defendant guilty of this crime, you must

7    be convinced that the Government has proved each and every one

8    of the following elements beyond a reasonable doubt:

9       (A) First, that the defendant knowingly mailed or caused to

10   be mailed by the United States Postal Service a communication.

11      (B) Second, that the communication contained a threat to

12   injure a particular person or particular group of individuals.

13      And (C), third, that the defendant mailed the communication

14   for the purpose of making a threat or knowing that the

15   communication would be viewed as a threat.

16      An act is done "knowingly" if done voluntarily and

17   intentionally and not because of mistake or accident or other

18   innocent reason.

19      The word "threat" means a serious statement expressing an

20   intention to injure any person which under the circumstances

21   would cause apprehension in a reasonable person as distinguished

22   from idle or careless talk, exaggeration, or something said in a

23   joking manner.

24      If you are convinced that the Government has proved all of

25   these elements, say so by returning a guilty verdict on this

1   charge.  If you have a reasonable doubt about any one of these

2   elements, then you must find the defendant not guilty of this

3   charge.

4       The Government need not prove that the defendant intended to

5   carry out the threat or was capable of carrying out the threats

6   at the time it was made or that specific targeted individuals

7   knew about the threats against them.  To qualify as a threat,

8   the statement need not -- I'm sorry -- the statement need not be

9   communicated to the targeted individual.

10      Instruction Number 14.  Count 2 of the indictment charges

11  that on or about November 5, 2020, in the Western District of

12  Kentucky, Jefferson County, Kentucky, the defendant, Suzanne

13  Craft, did knowingly deposit in a post office or an authorized

14  depository for mail matter to be sent and delivered by the

15  postal service and caused to be delivered by the postal service,

16  according to the directions thereon, a communication, addressed

17  to another person, whose identity is known to the grand jury,

18  containing a threat to injure the person of the addressee and

19  others, in violation of Title 18, United States Code,

20  Section 876(c).

21      For you to find the defendant guilty of this crime, you must

22  be convinced that the Government has proved each and every one

23  of the following elements beyond a reasonable doubt:

24      First, that the defendant knowingly mailed or caused to be

25  mailed by the United States Postal Service a communication.

1      Second, that the communication contained a threat to injure
2  a particular person or particular group of individuals.
3      And, third, that the defendant mailed the communication for
4  the purpose of making a threat or knowing that the communication
5  would be viewed as a threat.
6      An act is done "knowingly" if done voluntarily and
7  intentionally and not because of mistake or accident or other
8  innocent reason.
9      The word "threat" means a serious statement expressing an
10  intention to injure any person which under the circumstances
11  would cause apprehension in a reasonable person as distinguished
12  from idle or careless talk, exaggeration, or something said in a
13  joking manner.
14      If you are convinced that the Government has proved all of
15  these elements, say so by returning a guilty verdict on this
16  charge.  If you have a reasonable doubt about any of these
17  elements, then you must find the defendant not guilty of this
18  charge.
19      The Government need not prove that the defendant intended to
20  carry out the threat or was capable of carrying out the threat
21  at the time it was made or that specific targeted individuals
22  knew about the threats against them.  To qualify as a threat,
23  the statement need not be communicated to the targeted
24  individual.
25      Number 15.  Count 3 of the indictment charges that on or

1    about November 6, 2020, in the Western District of Kentucky,

2    Jefferson County, Kentucky, the defendant, Suzanne Craft, did

3    knowingly deposit in a post office or an authorized depository

4    for mail matter to be sent and delivered by the postal service

5    and caused to be delivered by the postal service according to

6    the directions thereon, a communication, addressed to another

7    person, whose identity is known to the grand jury, containing a

8    threat to injure the person of the addressee and others, in

9    violation of Title 18, United States Code, Section 876(c).

10         For you to find the defendant guilty of this crime, you must

11   be convinced that the Government has proved each and every one

12   of the following elements beyond a reasonable doubt:

13         First, that the defendant knowingly mailed or caused to be

14   mailed by the United States Postal Service a communication.

15         Second, that the communication contained a threat to injure

16   a particular person or a particular group of individuals.

17         And, third, that the defendant mailed the communication for

18   the purpose of making a threat or knowing that the communication

19   would be viewed as a threat.

20         An act is done "knowingly" if done voluntarily and

21   intentionally and not because of mistake or accident or other

22   innocent reason.

23         The word "threat" means a serious statement expressing an

24   intention to injure any person which under the circumstances

25   would cause apprehension in a reasonable person as distinguished

1    from idle or careless talk, exaggeration, or something said in a

2    joking manner.

3        If you are convinced that the Government has proved all of

4    these elements, say so by returning a guilty verdict on this

5    charge.  If you have a reasonable doubt about any of these

6    elements, then you must find the defendant not guilty of this

7    charge.

8        The Government need not prove that the defendant intended to

9    carry out the threat or was capable of carrying out the threat

10   at the time it was made or that specific targeted individuals

11   knew about the threats against them.  To qualify as a threat,

12   the statement need not be communicated to the targeted

13   individual.

14       Number 16.  Count 4 of the indictment charges that on or

15   about November 6, 2020, in the Western District of Kentucky,

16   Jefferson County, Kentucky, the defendant, Suzanne Craft, did

17   knowingly deposit in a post office or an authorized depository

18   for mail matter to be sent and delivered by the postal service

19   and caused to be delivered by the postal service according to

20   the directions thereon, a communication, different from the

21   communication charged in Count 3 of this indictment, addressed

22   to another person, whose identity is known to the grand jury,

23   containing a threat to injure the person of the addressee and

24   others, in violation of Title 18, United States Code,

25   Section 876(c).

1    For you to find the defendant guilty of this crime, you must

2  be convinced that the Government has proved each and every one

3  of the following elements beyond a reasonable doubt:

4    First, that the defendant knowingly mailed or caused to be

5  mailed by the United States Postal Service a communication.

6    Second, that the communication contained a threat to injure

7  a particular person or particular group of individuals.

8    And, third, that the defendant mailed the communication for

9  the purpose of making a threat or knowing that the communication

10  would be viewed as a threat.

11    An act is done "knowingly" if done voluntarily and

12  intentionally and not because of mistake or accident or other

13  innocent reason.

14    The word "threat" means a serious statement expressing an

15  intention to injure any person which under the circumstances

16  would cause apprehension in a reasonable person as distinguished

17  from idle or careless talk, exaggeration, or something said in a

18  joking manner.

19    If you are convinced that the Government has proved all of

20  these elements, say so by returning a guilty verdict on this

21  charge.  If you have a reasonable doubt about any of these

22  elements, then you must find the defendant not guilty of this

23  charge.

24    The Government need not prove that the defendant intended to

25  carry out the threat or was capable of carrying out the threat

1    at the time it was made or that specific targeted individuals

2    knew about the threats against them.  To qualify as a threat,

3    the statement need not be communicated to the targeted

4    individual.

5         Number 17.  Count 5 of the indictment charges that in or

6    around December 2020, in the Western District of Kentucky,

7    Jefferson County, Kentucky, the defendant, Suzanne Craft, did

8    knowingly deposit in a post office or an authorized depository

9    for mail matter to be sent and delivered by the postal service

10   and caused to be delivered by the postal service according to

11   the directions thereon, a communication, addressed to another

12   person, whose identity is known to the grand jury, containing a

13   threat to injure the person of the addressee and others, in

14   violation of Title 18, United States Code, Section 876(c).

15        For you to find the defendant guilty of this crime, you must

16   be convinced that the Government has proved each and every one

17   of the following elements beyond a reasonable doubt:

18        First, that the defendant knowingly mailed or caused to be

19   mailed by the United States Postal Service a communication.

20        Second, that the communication contained a threat to injure

21   a particular person or particular group of individuals.

22        And, third, that the defendant mailed the communication for

23   the purpose of making a threat or knowing that the communication

24   would be viewed as a threat.

25        An act is done "knowingly" if done voluntarily and

1    intentionally and not because of mistake or accident or other

2    innocent reason.

3        The word "threat" means a serious statement expressing an

4    intention to injure any person which under the circumstances

5    would cause apprehension in a reasonable person as distinguished

6    from idle or careless talk, exaggeration, or something said in a

7    joking manner.

8        If you are convinced that the Government has proved all of

9    these elements, say so by returning a guilty verdict on this

10   charge.  If you have a reasonable doubt about any of these

11   elements, then you must find the defendant not guilty of this

12   charge.

13       The Government need not prove that the defendant intended to

14   carry out the threat or was capable of carrying out the threat

15   at the time it was made or that specific targeted individuals

16   knew about the threats against them.  To qualify as a threat,

17   the statement need not be communicated to the targeted

18   individual.

19       Instruction Number 18.  In connection with Counts 1

20   through 5 of the indictment, the Government has alleged that the

21   defendant selected the victims of the threatening communications

22   because of their actual or perceived race or color.  If you

23   determine that the defendant knowingly sent threatening

24   communications by mail by finding her guilty of any or all of

25   the charges in Counts 1 through 5, you must then determine

1    beyond a reasonable doubt whether the defendant sent the

2    particular threatening communication because of the actual or

3    perceived race or color of the victims.  You will do this by

4    answering special verdict questions on the verdict form.

5        To prove that the defendant acted "because of" the victim's

6    or group of victims' actual or perceived race or color, the

7    Government must prove beyond a reasonable doubt that the threats

8    would not have been made but for the fact of the victim's actual

9    or perceived race or color.

10       This does not mean that the Government must prove that the

11   victim's actual or perceived race or color was the defendant's

12   sole or only motive for the threats.  You may find that the

13   defendant sent the threatening communications because of race or

14   color even if there was more than one reason why she threatened

15   the persons identified in Counts 1 through 5.  You must find,

16   however, that the person's actual or perceived race or color

17   played a determinative role in the defendant's decision to

18   threaten him or her.

19       The Government may prove this motive through direct evidence

20   or may prove motive by circumstantial evidence.

21       Number 19.  Next I want to say a word about the dates

22   mentioned in the indictment.  The indictment charges that the

23   crimes happened on or about November 2, 2020; November 5, 2020;

24   November 6, 2020; and December 2020.  The Government does not

25   have to prove that the crimes happened on these exact dates, but

1    the Government must prove that the crimes happened reasonably

2    close to these dates.

3         Number 20.  Next I want to explain something about proving a

4    defendant's state of mind.  Ordinarily there is no way that a

5    defendant's state of mind can be proved directly because no one

6    can read a person's mind and tell what that person is thinking,

7    but a defendant's state of mind could be proved indirectly by

8    the surrounding circumstances.  This includes things like what

9    the defendant said, what the defendant did, how the defendant

10   acted, and any other facts or circumstances in evidence that

11   show what was in the defendant's mind.

12        You may also consider the natural and probable results of

13   any acts that the defendant knowingly did and whether it is

14   reasonable to conclude that the defendant intended those

15   results.  This, of course, is all for you to decide.

16        Number 21.  That concludes the part of my instructions

17   explaining the elements of the crimes.  Next I will explain some

18   rules that you must use in considering some of the testimony and

19   evidence.

20        Instruction Number 22.  You have heard the testimony of Icel

21   Kuznetsova, Jeremy Fletcher, and Hector Maldonado, who testified

22   as opinion witnesses.  You do not have to accept Icel

23   Kuznetsova, Jeremy Fletcher, or Hector Maldonado's opinions.  In

24   deciding how much weight to give them, you should consider the

25   witness's qualifications and how they reached their conclusions.

1    Also consider the other factors discussed in these instructions

2    for weighing the credibility of witnesses.

3        Remember that you alone decide how much of a witness's

4    testimony to believe and how much weight it deserves.

5        Number 23.  You have heard the testimony of Charles Klein

6    and Kristen Downs, who testified to both -- I'm sorry -- who

7    testified to both facts and opinions.  Each of these types of

8    testimony should be given the proper weight.

9        As to the testimony on facts, consider the facts -- the

10   factors discussed earlier in these instructions for weighing the

11   credibility of witnesses.

12       As to the testimony on opinions, you do not have to accept

13   Charles Klein or Kristen Downs' opinions.  In deciding how much

14   weight to give them, you should consider the witness's

15   qualifications and how they reached these conclusions along with

16   the other factors discussed in these instructions for weighing

17   the credibility of witnesses.

18       Remember that you alone decide how much of a witness's

19   testimony to believe and how much weight it deserves.

20       Number 24.  You have heard the defendant testify.  Earlier I

21   talked to you about the credibility or the believability of the

22   witnesses, and I suggested some things for you to consider in

23   evaluating each witness's testimony.  You should consider those

24   same things in evaluating the defendant's testimony.

25       Number 25.  You have heard the testimony of K.P.███ (K.P.)

1    and S.P.1▮▮▮▮, two young witnesses.  No witness is disqualified

2    just because of age.  There is no precise age that determines

3    whether a witness may testify.

4        With any witness, young or old, you should consider not only

5    age but also the witness's intelligence and experience and

6    whether the witness understands the duty to tell the truth and

7    the difference between truth and falsehood.

8        Number 26.  The United States has presented evidence that in

9    2019 and 2020, the defendant's daughter used racial slurs

10   against one of the victim children.  You may not, one, attribute

11   the racial slurs to the defendant; two, infer that the defendant

12   taught her daughter to use the racial slurs; or, three, infer

13   that the defendant instructed her daughter to use the racial

14   slurs against one of the victim children.

15       Number 27.  The Government and the defendant have agreed or

16   stipulated to certain facts.  Therefore, you must accept the

17   following stipulated facts as proved:

18       One, on or about November 13, 2020, the items identified as

19   United States Exhibits 4, 5, 6, 7, 8, 10, 11, and 12 were taken

20   into custody as evidence by the Louisville Metro Police

21   Department.

22       On or about December 16, 2020, the items identified as

23   United States Exhibits 4, 5, 6, 7, 8, 10, 11, and 12 were

24   transferred from the custody of the LMPD to the custody of the

25   United States Postal Inspection Service, where they were

1    maintained in evidence.

2        On or about December 22, 2020, the items identified as

3    United States Exhibits 4, 5, 6, 7, 8, 10, 11, and 12 were

4    transferred from the custody of the United States Postal

5    Inspection Service to the custody of the Federal Bureau of

6    Investigation, where they were maintained in evidence.

7        And, four, on July 28, 2022, at approximately 12:48 p.m.,

8    counsel for the United States sent counsel for Suzanne Craft a

9    letter indicating that Suzanne Craft was the target of a federal

10   investigation into potential federal criminal violations

11   involving the mailing of threatening communications and the

12   interference of the right to fair housing.  That same day and no

13   later than 8:00 p.m., the contents of the letter were

14   communicated to Ms. Craft.

15       Instruction Number 28.  That concludes the part of my

16   instructions explaining the rules for considering some of the

17   testimony and evidence.  Now let me finish up by explaining some

18   things about your deliberations in the jury room and your

19   possible verdicts.

20       The first thing that you should do in the jury room is

21   choose someone to be your foreperson.  This person will help to

22   guide your discussions and will speak for you here in court.

23       Once you start deliberating, do not talk to the jury officer

24   or to me or to anyone else except each other about the case.  If

25   you have any questions or messages, you must write them down on

1    a piece of paper, sign them, and then give them to the jury

2    officer.  The officer will give them to me, and I will respond

3    as soon as I can.  I may have to talk to the lawyers about what

4    you have added -- asked.  So it may take me some time to get

5    back to you.  Any question or message normally should be sent to

6    me through your foreperson.

7        The exhibits that were admitted in evidence will be provided

8    to you.

9        One more thing about messages.  Do not ever write down or

10   tell anyone, including me, how you stand on your votes.  For

11   example, do not write down or tell anyone that you are split 6-6

12   or 8-4 or whatever your vote happens to be.  That should stay

13   secret until you are finished.

14       Number 29.  Remember that you must make your decision based

15   only on the evidence that you saw and heard here in court.

16   During your deliberations, you must not communicate with or

17   provide any information to anyone by any means about this case.

18       You may not use any electronic device or media, such as a

19   cell phone, smartphone, iPhone, computer or tablet, the

20   internet, any internet service or any text or instant messaging

21   service, any internet chat room, blog, or website, such as

22   Facebook, Instagram, TikTok, MySpace, LinkedIn, YouTube, or

23   Twitter, to communicate to anyone any information about this

24   case or to conduct any research about this case until I accept

25   your verdict.

1      In other words, you cannot talk to anyone on the phone,

2   correspond with anyone, or electronically communicate with

3   anyone about this case.  You can only discuss the case in the

4   jury room with your fellow jurors during deliberations.  I

5   expect you will inform me immediately if you become aware of

6   another juror's violations of these instructions.

7      You may not use these electronic means to investigate or

8   communicate about the case because it is important that you

9   decide this case based solely on the evidence presented in this

10  courtroom.  Information on the internet or available through

11  social media might be wrong, incomplete, or inaccurate.  You are

12  only permitted to discuss the case with your fellow jurors

13  during deliberations because they have seen and heard the same

14  evidence you have.

15     In our judicial system, it is important that you are not

16  influenced by anything or anyone outside of the courtroom.

17  Otherwise, your decision may be based on information known only

18  by you and not your fellow jurors or the parties in the case.

19  This would unfairly and adversely impact the judicial process.

20     A juror who violates these restrictions jeopardizes the

21  fairness of these proceedings and a mistrial could result, which

22  would require the entire process -- trial process to start over.

23     Number 30.  Your verdict, whether it is guilty or not

24  guilty, must be unanimous as to each count.

25     To find the defendant guilty of a particular count, every

1  one of you must agree that the Government has overcome the

2  presumption of innocence with evidence that proves her guilt

3  beyond a reasonable doubt.

4      To find her not guilty of a particular count, every one of

5  you must agree that the Government has failed to convince you

6  beyond a reasonable doubt.  Either way, guilty or not guilty,

7  your verdict must be unanimous as to each count.

8      That concludes this portion of the instructions.  Is the

9  Government now ready to proceed with its closing argument?

10          MR. TIEKE:  Yes, Your Honor.

11          THE COURT:  You will reserve approximately how much

12  time for your rebuttal argument?

13          MR. TIEKE:  Fifteen minutes, Your Honor.

14          THE COURT:  Thank you.

15          MR. TIEKE:  "Two dead N-lets."  Ladies and gentlemen,

16  those are not my words.  Those are the words of the defendant,

17  Suzanne Craft.  Vulgar, repulsive, racially charged threats that

18  she used to terrorize the Pineda family with in 2020, threats

19  sent because of the race of the Pinedas' oldest children.

20      Now, we'll circle back to the facts of this case in a

21  moment, but first I'd like to discuss the law that you're to

22  follow in considering those facts.

23      Now, all the jury instructions that the judge went over,

24  those are all important, and what he says is the law and must be

25  followed.  What I'm gonna do is go over just a couple of those

1    instructions to highlight a few things.

2        Now, the defendant is charged with mailing five distinct

3    mailings as detailed in the jury instructions.

4        And if I could go to the Elmo, please.

5        For example, this is the instruction regarding Count 1, the

6    November 2nd, 2020, mailing.  For each of those five mailings,

7    the United States must prove, first, that the defendant

8    knowingly mailed or caused to be mailed by the United States

9    Postal Service a communication; second, that the communication

10   contained a threat to injure a particular person or particular

11   group of individuals; and, third, that the defendant mailed the

12   communication for the purpose of making a threat or knowing that

13   the communication would be viewed as a threat.  Those are with

14   respect to each of the five mailings, and you'll have those

15   instructions with you.

16       Thank you.  If we could go back to --

17       Now, after you determine that the defendant mailed the

18   threatening messages, you'll be asked to consider whether or not

19   she did it because of race.

20       What does it mean to commit a crime because of something?  A

21   crime is because of something if that something is necessary for

22   the crime to happen, meaning that if you took that thing out of

23   the equation, the crime wouldn't have happened the way that it

24   did.  That's what the law calls a "but for cause."

25       The terms "but for cause" and "because of" mean the same

1  thing under the law, and I'll use them interchangeably.  But the

2  concept of but for causation, it may seem complicated at first,

3  but it's a lot easier to understand if you apply it to a set of

4  facts.  And the Supreme Court has explained that concept using a

5  baseball analogy.  So let's do that.

6      So let's think about a baseball game between the Cincinnati

7  Reds and the Pittsburgh Pirates.  Let's say the Reds win one to

8  nothing.  To find out the but for causes of the Reds' win in

9  that case, you must think about what things were necessary for

10  the Reds to win.  When you think about it, there might be many

11  different causes for that win.  If a Reds batter hits a home

12  run, then that's a but for cause, because if you take that one

13  thing away, the one-to-nothing win doesn't happen.

14      Another obvious cause is good pitching by the Reds.  You

15  can't win one to nothing unless you have good pitching.  Other

16  causes might be bad hitting by the Pirates, great fielding by

17  the Reds, a favorable call by the umpire.  Even the league's

18  decision to schedule the game is a but for cause, because if the

19  game had never been scheduled in the first place, the Reds could

20  have never won it.

21      The point of that analogy is to drive home an important

22  concept of but for causation, and that is that most events have

23  a lot of different but for causes.  And something doesn't have

24  to be a major factor to be a but for cause.  As long as it's one

25  of the reasons for the outcome, that's all that's required by

1    the law.

2         In this context, it means that the United States does not

3    have to prove that the defendant was a racist.  Indeed, that's

4    not what the United States has argued at all.  Instead, all you

5    have to find is that the race of the Pineda children was one of

6    the reasons that this happened the way that it did.

7         Now, at the beginning of this case, my colleague,

8    Ms. Zimdahl, told you that the United States would prove beyond

9    a reasonable doubt that the defendant used the mail to send

10   threatening communications to her neighbors, the Pinedas, and

11   that she did so because of their perceived case -- race or

12   color.  And that's exactly what the Government showed you this

13   week.  That's exactly what they did -- we did over this week.

14   The United States proved beyond a reasonable doubt that Craft

15   committed the crimes she's accused of committing.

16        Now, those three elements of the charge that I talked about

17   earlier in the jury instructions, I'd like to discuss them

18   somewhat out of order because some are more in dispute than

19   others in this case.  So we'll start with element two.

20        The second element of the charged crimes requires the United

21   States to prove that the mailings and letters contained a threat

22   to injure a particular person or particular group of

23   individuals.  Folks, I would submit to you that any reasonable

24   person receiving the same threatening mailings the Pinedas

25   received would perceive those threats to be authentic.  Just

1    take a look at the threats that were charged -- the five threats

2    that were charged in this case addressed to Michella Pineda at

3    her address, many bearing the return address "N-let Destroyer"

4    in the same cutout letters.

5        And, ladies and gentlemen, those are only the charged

6    threats.  Recall, as you heard from the Pinedas, they also

7    received a number of other similar threats containing similar

8    racially charged language, including threats such as "Die stupid

9    bitch, move out, get out and bullets," and "You had enough

10   N-word bitch."  The United States would submit that for each of

11   the charges it has proven element two beyond a reasonable doubt.

12       Now let's talk about element three.  The third element

13   requires the United States to prove that Craft sent the mailings

14   for the purpose of making a threat or knowing that the

15   communication would be viewed as a threat.

16       Again, folks, simply looking at the threats themselves that

17   you've seen time and time again in this case demonstrates their

18   purpose to threaten and intimidate the recipient or knowledge

19   that the communication would be viewed as a threat.

20       And, again, you heard from the victim family about incidents

21   between their children and Craft's daughter that led to Craft

22   banging on their door, directly using racist language against

23   them, painting graffiti on their driveway containing racial

24   slurs, and ultimately dropping racially charged threats in their

25   yard and sending it to -- sending them in the mail to them.

1      There is simply no other reason Craft would have sent these

2   threats other than for the purpose of making a threat or knowing

3   that they would be viewed as a threat.  And the United States

4   would submit that for each of the charges it has proven element

5   three beyond a reasonable doubt.

6      Element one requires that the United States prove beyond a

7   reasonable doubt that Suzanne Craft knowingly mailed or caused

8   to be mailed the five mailings.  Here I'd like to again start

9   with an issue that I don't believe is much in dispute, and that

10  is that the letters were actually mailed to the Pinedas.

11     You heard testimony from Michella Pineda about how after

12  getting one of these threatening letters in the mail, she went

13  to check the family mail pile and found similar threatening

14  letters.

15     You heard from Postal Inspector Charles Klein.  He told you

16  about the processing markings that the United States Postal

17  Service puts on each piece of mail that's processed.  He showed

18  you these two demonstrative exhibits detailing those processing

19  markings, including the cancellation marks indicating that the

20  stamps were cancelled, those ZIP 11's which corresponds to the

21  specific address that the mailing was destined for.

22     He also told you that he took a look at each of the five

23  charged mailings, the November 2nd, 2020, one; the November 5th,

24  2020, one; the November 6th, 2020, one; the other November 6th,

25  2020, one; and the December 2020 one; and he told you that all

1    of those were processed through the United States Postal Service

2    and all were mailed from a location in Louisville to the

3    Pinedas.  This was confirmed by those ZIP 11's, which indicate

4    the Pineda address as their destination.

5        What this trial really focused on is who sent the mailings.

6    And now, in her opening statement, Ms. Rea asked you to use your

7    common sense, and I'll ask you to do the same thing.  And when

8    you do that, folks, there is no reasonable doubt that Suzanne

9    Craft mailed these racially charged threats to the Pinedas in

10   November and December 2020.

11       And how do we know that?  Video caught her painting racial

12   slurs on the Pinedas' driveway.  She directed a racially charged

13   jingle at the Pineda children using the same language used in

14   the mailings.  Video caught her dropping two of the threats in

15   the Pinedas' yard.  The mailings were addressed to her mistaken

16   version of Michella's name.  The threats are on her mail.  She

17   told you they were on her mail.  Her ex-boyfriend's bullets were

18   found in one of the letters.  She interfered with a witness.

19   Some of the mailings contained the same pasta box.  The threats

20   share the same characteristics.  Her fingerprints are on one of

21   the threats, and she cataloged the Pineda family.

22       Now let's talk about how all of this was proven to you, and

23   that story of how we know that Craft sent these threats begins

24   when the Pinedas moved into what they thought would be their

25   forever home in April 2019.

1    As you heard from the victim family, in particular their
2    children, K.P. and S.P.1██████, the defendant's harassment started
3    shortly after the Pinedas moved into 510 ████████████ and Craft
4    discovered the children's racial makeup.

5    You heard from the victim family's children, K.P. and
6    S.P.1████, about an incident in the cul-de-sac in the summer of
7    2019 where Craft's daughter, S.W.█, referred to one of the
8    Pineda children using the N-word, leading Michella and Connie to
9    instruct their children to stay away from S.W.█ and avoid her.

10   You heard from K.P. regarding another incident March 22nd,
11   2020, where Craft's daughter, S.W.█, used the words "N-let,
12   N-let, N-let" and then the N-word.  You also heard from K.P.
13   about how she confronted S.W.█.

14   And you also heard from K.P. and Michella about how Craft, a
15   grown woman upset with how K.P. interacted with her daughter,
16   S.W.█, came to the Pinedas' property, banged on their front door
17   yelling down to her daughter, "S.W.█, what the F did that N-word
18   say to you?"

19   You also heard the victim family, how later that day Craft,
20   upon returning to the cul-de-sac, threatened to run over S██████,
21   an innocent girl riding her bike in the cul-de-sac.

22   You heard testimony about how, on June 7th, 2020, the
23   Pinedas and Craft had a painting on their driveways, the same
24   orange paint with drips on the sidewalk in between the houses,
25   one on the Pinedas' driveway saying, "Go away N-word," a racist

1   order telling the Pineda kids to leave; the other on Craft's

2   driveway, "N-word -- No N-word, only whites," harkening back to

3   a different era telling the Pineda children a place they could

4   not go.

5        You also heard from Connie and Michella about how after this

6   incident they activated their security cameras and they moved

7   them to a tree closer to the driveway.

8        And, again, you heard from Michella and Connie Pineda about

9   how once again, on the morning of June 16th, 2020, they awoke to

10  find another disgusting painting on their driveway.  Written

11  again in orange paint was the racist threat "No N-words" and a

12  swastika underneath.  You heard the Pinedas tell you they were

13  scared, humiliated, angry; and they were worried about their

14  kids, especially K.P. and S.P.1███, their multiracial Black

15  children at whom the threats were directed.

16       This time there was video.  You'll be able to watch this

17  video in the jury room.  We've seen it.  But if you'll recall in

18  that video, at 3:27 a.m., we see Craft coming down, walking

19  across the sidewalk, approaching the Pinedas' house, spraying

20  her racial graffiti on the Pinedas' driveway and then returning

21  back.  You also have video from Matt Lanham, who had no beef

22  with the Pinedas or Craft, confirming this event, showing Craft

23  walking back up her own driveway after her act of vandalism.

24       For a third time, on the morning of June 27th, the Pinedas

25  once again found another racial slur painted on their driveway.

1   This time it was written in gold paint, and it said "Go N-words"

2   with a swastika underneath.  Again, there was video.  And yet

3   again, that video shows Craft walking over to the Pinedas'

4   driveway in the early morning hours, painting the racial slurs

5   on the driveway, walking back to her home, up her driveway.

6   Lanham's video confirms this.

7       Shortly after the third driveway painting, the Pinedas'

8   filed a civil lawsuit against Craft and the Lake Forest

9   homeowners association in a desperate effort to get things to

10  stop.  Not only did it not work, it had the opposite effect.

11  Craft only escalated her behaviors.

12      In fact, you heard from Michella how, in August 2020, she

13  heard Craft while on Betty Probst's back deck sing a racially

14  charged jingle which included the word "N-let" and a reference

15  to "two dead N-lets hanging in a tree."

16      And in November 2020, while working outside, you heard from

17  the Pinedas about how they found two racially charged,

18  threatening letters in their yard in plastic bags near their

19  fountain.  One of the them contained the threat:  "You had

20  enough N-word bitch."  The other contained the threat:  "Die

21  stupid bitch, move out."  That mailing also contained a portion

22  of a Barilla pasta box, not the only time we'll see this pasta

23  box come up.

24      And you don't even have to take the Pinedas' word for the

25  fact that the threatening mailings were left in their yard.  You

1    saw it on video.  You saw Craft putting them in the yard on two

2    separate occasions.

3        Let's start with October 18th, 2020, when she throws

4    something in their yard, walks back to her garage, and then gets

5    in her car and leaves.

6        (Government playing video.)

7        (Government playing video.)

8        (Government playing video.)

9            MR. TIEKE:  And now the second time, the November 1st,

10   2020.

11           (Government playing video.)

12           MR. TIEKE:  You also saw how each of the mailings was

13   addressed incorrectly to Michelle Pineda with an "E."  You heard

14   Michella tell you that she never goes by that name but has heard

15   Craft refer to her as that.  Indeed, you also saw in Craft's

16   phone her contact card for Michella, which she set up in

17   July 2019, incorrectly referring to Michella as Michelle with an

18   "E," exactly the same way the threatening mailings were

19   addressed.

20       You also heard that the threats were on Craft's mail.  You

21   don't even have to take the United States' word for that.  Craft

22   told you herself that it was on her mail.

23       You heard testimony from Ms. Ballenger with the Metro Police

24   Department.  She told you, on November 30th, 2020, she received

25   a call from Craft claiming that on November 21st, 2020, her mail

1    was stolen from her mailbox.  Ironically, despite it being

2    stolen, she knew exactly what was in her mail when it was

3    allegedly stolen, claiming there was a Fifth Third Bank

4    statement, a Visa credit card statement, and a Girl Scouts

5    letter.  She told you that today.  Two of the three items were

6    found in the threatening mailings.

7        There was some suggestion that Craft knew what was in the

8    mailings because of the Facebook posts by the Pinedas detailing

9    the mailings.  However, you know that's not true.  One of the

10   items she claimed was stolen was a Girl Scouts letter.  However,

11   you know that at the time that the Pinedas possessed the

12   mailings, the writings on the Girl Scout letter were

13   obliterated.  You couldn't see that it was a Girl Scouts letter.

14   The Pinedas couldn't read it.  The FBI lab examiner, when he

15   received it, he couldn't read it.  Somehow, magically, Craft

16   told you she could.

17       Only later, as you heard from FBI Lab Specialist Hector

18   Maldonado, when the FBI lab applied special photographic

19   techniques in August of 2021 to this mailing did it become

20   apparent that the threat was on a Girl Scouts envelope.

21       Caught up in her own stories, Craft on two separate jail

22   calls tells her mother -- claiming now that the mail was stolen

23   from her trash.  Use your common sense, folks.

24       You also heard from Postal Inspector Klein.  He talked to

25   you about those ZIP 11's, that postal service marking regarding

 1    the destination address.  Inspector Klein told you that the

 2    inner envelope containing the threat "Die, die, stupid N-word"

 3    in the December mailing to the Pinedas, the subject of Count 5

 4    in this case, was again on the back of a piece of mail that was

 5    originally, as confirmed by that ZIP 11, sent to Craft's

 6    specific address.  And you can see that on the screen there.

 7        You heard from Connie and Michella how in November 2020 they

 8    were outside with their neighbor Brian Recktenwald when Michella

 9    walked down and retrieved an envelope.  You heard how inside was

10    another threat, this one containing physical bullets.

11        If we could go to the Elmo, please.

12        These two bullets.

13        You also heard from Craft's ex-boyfriend and S.W. ██ W████'

14    father.  He told you that Craft was the one that initially

15    texted him asking him how the Pinedas got the bullets.  You

16    heard about how, when he lived with Craft, he had three bullets.

17    He told you that he thought nothing of those bullets for years.

18    They were in with his military stuff.  He hadn't seen them in

19    years, since he moved out of 507 ████████.

20        He told you how he immediately recognized the bullets the

21    Pinedas received as his bullets based on the watermark on them

22    from the time the basement had flooded at 507 when he had lived

23    there.

24        Richard Watts also told you that after receiving Craft's

25    text and checking the box of his military items, he was missing

1   two bullets, those bullets.  He provided the one remaining

2   matching bullet that he had to the FBI.

3       If we could go back to the slides, please.

4       You also heard how, prior to a meeting with the FBI, Richard

5   Watts met with Craft and told her that he thought the bullets

6   the Pinedas received were his.  He told you that he testified in

7   the grand jury on May of 2022 and again told you the same -- and

8   told that same thing to the grand jury.

9       In a phone call, he told Craft about testifying.  He told

10  her that he told the grand jury the bullets were his.  Then she

11  accused him of changing his story, despite the fact that he had

12  always been consistent that the bullets were his, and that's

13  exactly what he told you from the witness stand.

14      You also heard that on July 28th, 2022, the United States

15  sent a letter to Craft telling her that she was a target of a

16  federal investigation.

17      You heard from Richard Watts that on that very same day his

18  daughter, S.W.█ W█████, despite having her own cell phone, called

19  him from Craft's phone and left an odd message relaying a story

20  about bullets being in a drawer, a story he did not recognize.

21  He told you that he'd found this call odd and that it sounded to

22  him like Craft was trying to influence S.W.█ to make the call.

23      You also saw the pasta box.  The mailings all shared the

24  same characteristics -- threatening, racially charged messages

25  in cutout letters placed or mailed in envelopes.

1    Further connecting them is the use of pieces of the same

2    pasta box in three separate mailings, a piece used in the threat

3    that Craft is caught on video dropping in the Pinedas' yard by

4    their fountain, a piece used in the threat containing Richard

5    Watts' bullets, and a piece used in the Count 3 mailing

6    containing the threat "Two dead N-lets."  And, folks, you know

7    these are pieces of the same pasta box because you watched Task

8    Force Officer Kristen Downs come up here and put those pieces

9    together for you.

10    FBI Forensic Examiner Icel Kuznetsova, she told you how she

11    found two fingerprints belonging to Craft on the inner envelope

12    on the threat "You will die bitch."  You heard how this

13    identification was confirmed by the FBI lab's internal

14    verification process.  You also heard how Examiner Kuznetsova

15    confirmed that the fingerprints she used for analysis belonged

16    to Craft by comparing them to fingerprint cards from ones taken

17    from Craft when she was arrested in this case.

18    And quite disturbingly, you heard how Craft stockpiled

19    pictures of the Pineda family whom she was terrorizing.  Her

20    phone contained images of the Pinedas and their five children.

21    Craft saved them.  She cropped them, manipulated them, and she

22    sent them to others.

23    Not only does her past behavior identify her as the person

24    mailing these threats, but the letters themselves, as we just

25    discussed, have evidence directly connecting them to Craft.  I'd

1    submit to you that the United States has proved beyond a

2    reasonable doubt that Suzanne Craft knowingly mailed or caused

3    to be mailed the five mailings.

4         If I can go to the Elmo, please.

5         And we walked through each of those elements for each of

6    those mailings, and you'll be able to do that for all five,

7    ladies and gentlemen.

8         Back to the presentation.

9         After you find Craft guilty of mailing the five threatening

10   letters, the Government is asking you to also find that she

11   engaged in these offenses against the Pinedas because of their

12   actual or perceived race or color, as we talked about this when

13   we reviewed the jury instructions earlier and as you heard Judge

14   discuss that.

15        And, folks, you know she did this to the Pinedas because of

16   race.  She painted racial slurs on their driveway.  She used

17   racial slurs, "N-word" and "N-let," when referring to them.  She

18   threw racially charged threats in their yard, and she sent them

19   the racially charged mailings to kill them.  You have all of

20   those things, but do you need anything more than the language of

21   the mailings themselves?

22        Ladies and gentlemen, go back in that jury room, follow the

23   evidence, follow the law, and take it to the only place that it

24   leads and find the defendant guilty.  Thank you.

25             THE COURT:  Members of the jury, before you hear the

1    next closing argument, we're going to take a brief break, about

2    ten minutes.

3        Remember the admonition.  It's as important as ever.  Do not

4    discuss anything throughout the course of the trial.  Do not

5    discuss the instructions I already gave you.  Do not discuss the

6    argument that you have heard.  Keep all of that to yourself

7    until we send you to the deliberation room a little later today.

8        We'll see you in about ten minutes.

9        (Jury out 12:03 p.m.)

10            THE COURT:  Thank you.  You may be seated.  The jury

11   has left the courtroom.

12       We will resume in about ten minutes, Ms. Rea.

13            MS. REA:  Yes, Your Honor.  Thank you.

14       (Recess at 12:03 p.m. until 12:16 p.m.  Jury out.)

15            THE COURT:  We are back on the record.  The jury is

16   not yet back in the courtroom.

17       Let me just speak a word to the folks in the gallery.  Court

18   rules prohibit recording anything -- any part of a court

19   proceeding, including a trial.  So I just want to remind you

20   that if you have a cell phone on you, it must be turned off; and

21   there should be no recording, either of sound or of video,

22   pictures included, in the courtroom.  We occasionally find it

23   necessary to remind folks of that, but that is -- that is a

24   court rule.

25       So are you ready to proceed, Ms. Rea?

1          MS. REA:  I am, Your Honor.

2      (Jury in 12:17 p.m.)

3          THE COURT:  Thank you, members of the jury.

4      Ms. Rea.

5          MS. REA:  Thank you, Your Honor.

6      Your job this afternoon will be to determine whether the

7  United States has proven Suzanne Craft guilty of the five counts

8  that are in the instructions that the Court has read to you for

9  five items that were received by the Pinedas November/December

10  of 2020.

11      Your job is not to determine whether she's a good or bad

12  neighbor, not to determine whether her daughter had an

13  altercation/confrontation with the neighbors.  Your job is to

14  make a determination about whether she has been proven guilty of

15  those counts, as the instructions told you.

16      The background that we have spent a fair amount of time

17  talking through, both in evidence and then in the U.S. closing,

18  gives you the context.  I'm gonna talk about it as -- a lot as

19  well, but to go back to the sports analogy, which I am generally

20  terrible with, keep your eye on the ball.  That is what your

21  role is here today is whether she's been proven guilty of those

22  counts.

23      I do want to talk through the history, how we get to the

24  fall of 2020.  The Pineda family moved into the neighborhood

25  April of 2019, pretty quickly met Ms. Craft and her daughter.

1    And as we have heard, interactions were cordial at first.  Kids,

2    if not playing together, played in the cul-de-sac at the same

3    time.  We have heard about a cordial-to-friendly text exchange

4    that was maintained.  Ms. Craft thought she was speaking

5    consistently with Michella.  She was speaking with Michella

6    and/or Connie at different points, as it turns out.

7         We did not hear any indication that Ms. Craft was given

8    reason to think something had gone wrong, that her daughter had

9    done something -- that anything had happened in connection with

10   the use of a racial slur in the summer -- late summer/fall of

11   2019.  And we have no evidence that Ms. Craft was harassing the

12   Pineda family during that period of time.

13        The first kind of flash point that we heard about was in

14   March of 2020, and I'm gonna ask you to think about what you

15   heard about that account.  You heard that the slur was uttered

16   by S.W.█ every time the child, S██████, or -- excuse me -- that

17   K.P. rode by in the cul-de-sac, in a cul-de-sac -- in what

18   you've heard is a pretty small cul-de-sac.  We're early COVID.

19   Everybody's home.  We haven't heard about anybody else hearing

20   that.

21        You've also heard that there was an ensuing or following

22   altercation wherein the Pineda family said that Ms. Craft banged

23   on the door and said, "What the F did that 'N' say to you?" and

24   that following that there was a threat to run over S█████.

25        I am gonna ask you to think critically and carefully about

1     that account and to ask you to put it in the context of how it

2     was communicated relatively contemporaneously to -- in an email

3     to the HOA.  No mention of racial slurs, no mention of threats

4     to run over.  It was a "We got into it with her."  Also with

5     note to that email and two sides of that exchange, Michella is

6     referred to as "Michelle."  So I submit to you that it's not the

7     tremendous red flag or connection point that perhaps it's been

8     put to you as.

9          Another thing with respect to that event that I think should

10    cause you to think carefully about it, a threat to run over a

11    child and someone standing staring at your house for a long

12    period of time thereafter might give you reason to call

13    authorities for help.  It is a serious threat, and you could

14    call for help for that.  And if she's still standing in the

15    driveway or in the cul-de-sac staring at you, she's still there.

16    So I'd ask you to think about how that event transpired and

17    whether instead it makes more sense that they got into it, as

18    Connie's email said.

19         The next event that you heard about is the 6-7 double

20    driveway paintings.  And this was an occasion where there was a

21    painting both on the 507 driveway and on the 510 driveway.

22    There are -- the videos that you have seen for that are one from

23    Matt Lanham's camera from that night and one from Ms. Craft's

24    camera from that night.  You will have these items to review.

25    I'm gonna play some of it for you.  I'm not gonna barrage you

1    with watching all of them again, but I'm gonna talk through

2    things I'd ask you to look for in them.

3        Mr. Lanham's video, when he narrated for you what he thought

4    happened, he thought the person came down Ms. Craft's driveway.

5    I submit to you that they didn't.  There's the -- not always a

6    barrier but an area of grass between the two driveways.  In some

7    videos it's grown up.  In some videos it's not.

8        That particular one, if you watch it carefully, you can see

9    the person come down Betty Probst's driveway, go around that

10   patch of what is then tall grass, go up Suzanne's driveway.

11   And, golly, it's fuzzy, but you can also see them linger up

12   there around where the sidewalk meets the driveway for a period

13   of time.  Watch it for yourself.  But this is the earliest point

14   at which we have something to do with anybody's driveway on

15   camera.  They're coming down Betty's driveway.

16       We also admitted video from Suzanne's Ring camera from 1:49

17   that night or -- yeah, 1:49 that night.  Mr. Lanham's video

18   is one, I think, 59.  So ten minutes -- ten minutes later -- of

19   a person right in front of her house, in the area where her

20   sprinklers are, turning on the sprinklers because she heard the

21   noise.  I think you can look at that pretty readily and see it's

22   a -- it is not a person who is Suzanne Craft.  It's a pretty

23   small person, certainly smaller than her.

24       Another important thing to know about that is Suzanne asked

25   for Mr. Lanham's video.  He gave it to her.  She knew at that

1    point anything that goes on would be captured on video.  With

2    that knowledge, I would ask you to ask yourself, why would a

3    person go down their own driveway, proceed to spray-paint racial

4    slurs on someone else's driveway and return?  You know it's on

5    film.  She knew it was on film from 6-7.  It does not make sense

6    that you would continue to -- essentially, it's a display to do

7    that, if this is something you want to do and something you want

8    to not have people know you do.

9        The next -- and the other thing I'll say is Ms. Craft

10   thought that the Pineda family had video at that point.  She had

11   asked them to check their cameras for something for her for

12   something that happened at her house.  They said they would.  So

13   right or wrong, she also thought that they had video that could

14   capture things that happened in the cul-de-sac.  Do you put on

15   this display thereafter when you know what is being -- whatever

16   would be happening is being observed as being recorded?

17       The next event that we have are the 6-16 paintings.  And for

18   that one, what -- the video that we have is both from the Pineda

19   camera as well as from the Lanham driveway.  Take a close look

20   at that one as well.  I think you'll see the person coming down

21   Ms. Probst's driveway.

22       In the video from the Pineda family cameras, it actually

23   stops while they're still spray-painting.  So you don't see a

24   return.  The Lanham video, it appears they come down Betty's

25   driveway.  It does look like they go back up Suzanne's driveway

1    and disappear.

2         With respect to that, do take a look at the physical

3    characteristics of that person.  And, remember, you've got an

4    Exhibit 3, a photo of what Ms. Craft looked like in August of

5    2020.  You can look at her arms.  You can look at her legs.  You

6    can look at her feet.  You can look at her stature, and you can

7    compare it to the person in that video.  And I submit to you

8    those are 9-1/2, size 10 feet.  Those aren't Suzanne's arms.

9    When they -- slim arms extend out for the spray-painting.

10   Compare those things for yourself to see what it is that -- how

11   they match up.  And I argue to you that you -- that you will not

12   find that they do.

13        While I'm talking about that video, I think it's also -- it

14   stops.  We don't see where the person goes back to.  Apparently

15   those cameras record nonstop.  Does the WiFi go out?  Why does

16   that stop?  Why don't we have the complete transaction?

17        Regardless, after this, as of 6-19, according to what you

18   heard from the U.S. and I agree with, these videos are posted on

19   Facebook.  If Ms. Craft did not know before that there is video

20   capturing everything in that cul-de-sac, she does now.  She knew

21   Lanham had video before.  I submit to you she thought the

22   Pinedas had video before.  She absolutely knows it now because

23   it has been publicly posted.

24        It defies logic that you keep going over there.  At that

25   point, this is a person who wants to appear on camera.

1    Ms. Craft, attempting to spray-paint racial slurs, later dropped

2    notes in the fountain, that wouldn't be someone who wanted to

3    appear on camera.  The fact that this person is Suzanne Craft

4    does not make sense for that reason.

5        I think there's other arguments, other reasons it doesn't

6    make sense either, but the simple fact of you know it's being

7    recorded, you know you're suspected, you keep coming down your

8    driveway when you know that that would be captured, I don't

9    think it's something that is reasonable to conclude that

10   Ms. Craft would have done.

11       The last video with respect to any driveway painting is from

12   6-27.  Take a look at that one.  And it appears, from looking at

13   it, that the person does come down Suzanne's driveway.  You

14   don't see them cross over from the garage.  You see them come

15   down the side of the driveway closest to Betty's area, and then

16   same thing when they return.  You see them come up that side of

17   the driveway.  You do not see them cross over to go to her

18   garage.

19       The clothing looks the same as last time.  The physical

20   appearance looks the same as last time.  Again, small feet, the

21   slim arms, not the features of Suzanne Craft.

22       You've also been shown and it's been admitted video from

23   Matt Lanham's camera on that day.  That one's fuzzy.  The person

24   blends in with the grass.  Take a look at it to see what you can

25   make of it, but you're gonna get more information out of that

1    other video.

2        And while I'm talking about those videos and what they

3    capture, you heard Suzanne speaking with Mr. Tieke about the

4    garage.  And it doesn't show anyone going in the garage.  You

5    can see someone in that 10-18 video going in the direction of

6    the garage from the video on the Pinedas' tree.  The door is

7    obscured by a bush.  You do see someone going in that direction.

8    It is not the same as seeing someone go into the garage.  And

9    I'll talk to you about the time on those 10-18 videos as well

10   because I think that is important.

11       So you have been given three videos from the evening of

12   10-18.  The first one is time-stamped, and you've got the time

13   stamps in the exhibits that you will have.  So the first one

14   time-stamped 1:41 a.m., that video is 1 minute and 14 seconds

15   long.  So that one's gonna end around about 1:42, 1:42 and a

16   half, if I can still do math.  That is the beginning.  That is

17   when you see the person go down the driveway, around the

18   sidewalk, over by the fountain, and then start to head back.

19   Then it stops.

20       We do have another video from that same view.  It's a

21   different clip.  This is not a continuous piece of video that

22   you've simply been shown this part and then this part.  It is a

23   different clip.  Look at the time stamp.  That one starts at

24   1:47 a.m.  It does not roll straight through.  It does not start

25   and stop.  There's, what, about four minutes between those.

1          You do have a view from another camera of part of later on

2     in these events.  That time stamp is 1:46 a.m.  1:46 a.m. you

3     are looking at a view through some trees of Suzanne's garage.

4     That's the one where you see the car back out.  So we've still

5     got a break between these.  These are not continuous, you're

6     seeing the whole thing at once.

7          Suzanne talked to you about what she was doing at that time,

8     and I mean that night.  I also mean more broadly.  She was

9     leaving to go stay with her friend Tammy.  She told you she

10    was -- she had begun doing this so that she wouldn't be home so

11    that people couldn't say that she was doing things that she

12    wouldn't do.  She did it -- while not every night, she did it

13    with some frequency.

14         And I submit to you that everybody in the neighborhood knew

15    when she was leaving and that she had begun leaving late at

16    night to go stay with her friend Tammy.  She was worried that

17    there would be more videos made where someone pretended to be

18    her.

19         The last video that you saw -- so 11-1, that's the loud one

20    because of the inflatables.  In that particular one, you will

21    see it's dark around the garage.  You see a person come down

22    from this dark area, go by the fountain, and then go back up

23    into the dark area.

24         And, remember, these are not, according to the testimony we

25    heard, motion-activated cameras.  These are cameras that record

1    all the time.  You just have to go back and pull the footage and

2    capture that within 30 days.  And in these instances, we know

3    that that was done because we have some of it.  We have pieces

4    of it.

5         I want to talk through some of the items, and I'm going to

6    talk through them with respect to the counts that you have.  You

7    have -- and this is just -- I will just use my computer.  This

8    is the item in Count 1, which is Exhibit 5, a postmark of 2

9    November 2020.

10        This particular item -- and what I've tried to do is kind of

11   put together all of the information that we have so I can talk

12   through it with you.  This is the item -- that's the Girl Scout

13   envelope.  And you can see in the photos that have been

14   introduced into evidence that the end of that ZIP code, the

15   uniquely identifying ████████████, is visible.  If you see

16   this posted online, you see the end of your ZIP code.

17        And I want to look more -- I'm gonna switch just to another

18   exhibit of the same thing.  These are the FBI photos of the same

19   item.  So Girl Scout -- I argue to you that you see that posted

20   on Facebook, you know it's a Girl Scout envelope.  You can read

21   "Girl Scouts."  You can see the emblem.  It did not require

22   special knowledge, because Ms. Craft had put the thing together,

23   for her to look at that as posted and know that it's a Girl

24   Scout envelope.

25        And while I'm talking about that, it also -- back to what

1    does and does not make sense.  If this is an attempt to obscure

2    your address, to obscure a return address, it cannot be

3    something that one hopes to succeed.

4        We heard from Mr. Maldonado, who testified about removing

5    the obliteration, and we could see all of it clearly.  But you

6    can look at it right now and know it's a Girl Scout envelope,

7    and you know by the ZIP code where it's going to.  So I don't

8    think that required any special knowledge of Suzanne.

9        We can take that down.  Thank you.

10       Also with respect to that item, the inner envelope, there

11   was DNA found on that inner envelope.  It was found to be a

12   profile that was suitable for comparison, female DNA.  Ms. Craft

13   was excluded from that.

14       The second item is -- it's on the craft paper envelope, and

15   I'll get it up before I ask to share it with you so you don't

16   have to bear with me too much.

17       So the second count -- and I will share that.  This is

18   Exhibit 5B -- is an item that was postmarked 5 November 2020

19   with a -- what I would call a craft envelope because of the

20   paper with those cutout letters on it.  On this particular item,

21   we have no DNA.  We have no fingerprints.  We just have the

22   item.  That's Count 2, just to kind of walk through and

23   distinguish them.

24       We can take that down before I go to the next.

25       Count 3 is a pasta box so -- and may I share my screen

1   again.

2       So Count 3 has an outer envelope with an address.  6

3   November 2020 is when that one was postmarked.  An inner

4   envelope -- this inner envelope is one that had Michella

5   Pineda's prints on it.  So it's not the outside with the

6   address.  It's the inner envelope but outside of the pasta box

7   with the cutout letters on it.

8       We can take that down while I move to the next one.

9       So the next item we have is Count 4.  I'll just go ahead and

10  do it.  This one we have another outer envelope in which there

11  was forensic evidence found.  This time the outer envelope

12  contains or has Ms. Connie Pineda's prints.

13      There's forensic evidence on another thing, though, and I

14  want to talk through what that is, this item.  So this item has

15  Suzanne's fingerprints on it.  They are not on this side of the

16  item.  You had some -- we heard from the fingerprint examiner

17  that you would expect someone's fingerprints to be found on the

18  outside of mail because that's what we touch, which is the

19  outside of mail.  That totally makes sense.

20      But what I want you to note is where the fingerprints were,

21  being on the other side of this item, is the outside of the

22  piece of mail, which is the thing you would touch when you

23  received it and when you opened it before you disposed of it.

24  So don't be confused by the inside/outside thing.  Her

25  fingerprints are found on the outside of this piece of mail,

1    which is consistent with her account of "I got the mail.  I

2    opened it.  I threw it away."

3        The last item and as far as the count -- so we can take that

4    down -- did not contain any forensic evidence as far as DNA or

5    any fingerprints on it.

6        There was one other item that did have DNA on it.  That is

7    the -- it's not charged.  It's the item that was taken from the

8    mailbox with the stamps and the gloves and the pasta box and the

9    rounds that were inside of that.

10       On that item there was a mixture of female DNA found from

11   three people.  Ms. Craft was excluded from that, being a

12   contributor to that, to any of those profiles.  Also know that

13   there were no other reference samples that were provided to the

14   examiner.  So whether or not those would match up to anybody

15   else in the case, we don't know because those other reference

16   samples were not provided.

17       And while I'm talking about this, I'll talk about the pasta

18   box, touching back on what makes sense and what does not make

19   sense.  Three items, three -- one in the mailing with the

20   bullets; one in a "mailing" mailing; one, if I recall correctly,

21   that was found in the yard contained pieces of a pasta box.

22   It's the same pasta box.

23       What is that consistent with?  Consistent with throwing away

24   one pasta box which is in the same bag of trash as your other --

25   as your mail and somebody getting that one bag of trash.

1    Because if you're gonna put together these little craft projects

2    with cutout letters and you are savvy enough to engage in that,

3    you do it with pieces of the same pasta box so that TFO Downs

4    can match them up and go, "Look, here's the pasta box," I argue

5    to you that you do not.

6        Also, with respect to the projects, you know, gluing on the

7    letters, you are savvy enough to manage that, which takes a lot

8    of contact to put all of that together -- you're savvy enough to

9    do all of that, not leave your DNA, not leave a fingerprint on

10   the "interior" interior of anything, but you use the same pasta

11   box, you use your mail with your ZIP code on it, with your

12   daughter's name on it with an easily discernible address

13   connected to your daughter -- it does not make sense.

14       While I'm still talking about the mail, the theft of mail

15   report that was done by Ms. Craft was done on November 30th for

16   mail that she did not get after mail delivery on November the

17   21st.  That is after this.

18       So the mailings that the Pinedas had that they turned over

19   to police, they turned those items over on 11-13.  They posted

20   several of them on Facebook on 11-11.  Ms. Craft was not saying

21   that those items were stolen from her on 11-21 because they were

22   already in the possession of the Pineda family and had been

23   publicized.  That does not make sense.

24       She knew what mail she was supposed to get.  She knew it had

25   been delivered from observing her Ring camera, and she didn't

1    have it.  She's not saying those were the same items, and she

2    explained that to you.  She suspected it was her trash.  She

3    suspected it was her trash by the appearance of the items on --

4    as posted on Facebook.  All the used envelopes with the business

5    printing on them, the postmarks from October of 2020, she

6    suspected those things.

7        She did confirm those things when she saw the photos of the

8    three pieces of the same pasta box.  There's nothing

9    particularly sophisticated or that requires any special

10   knowledge because you did the thing in making that conclusion.

11       So one more thing about the mailing before I talk in more

12   detail about what makes sense and what does not.  The item with

13   the bullets being taken from the mailbox after the mailman

14   delivered the mail, it's not postmarked.  I think that's why we

15   had a discussion about how did it get into the mailbox,

16   seemingly put there by the mailman, if it is -- if it didn't go

17   through the mail system?

18       There was discussion about, well, sometimes a postal carrier

19   will, if it's close by, take one from one mailbox, take it to

20   the other mailbox, skip that whole process.  But what does that

21   mean?  That means somebody had to put it in the other mailbox

22   the same day, the night before, within very close time for it to

23   be there to be picked up.  And postal carriers have routes.  You

24   could talk to that postal carrier.  You could see if he took --

25   he or she took that particular item out of another mailbox and

1    simply transported it.

2        We also know at this point in November of 2020, not

3    everybody -- several people on that cul-de-sac -- particularly

4    Matt Lanham and we know the Pineda family have cameras, and they

5    record all the time.  If we wanted -- if we thought somebody put

6    that in an adjacent mailbox, we could look at that.  We could

7    find that.

8        The other option that I think you could entertain is that

9    you're being asked to believe that Ms. Craft put it in the

10   mailbox and it was there; and the timing with when the mailman

11   went to the mailbox is just consistent with it was already

12   there.  I submit to you with, again, cameras throughout the

13   cul-de-sac, that's something that we could find out too.  We do

14   not have that.  That is not something that anybody chose to

15   offer you.

16       We also know from the testimony of the postal inspector that

17   that bar code that's sprayed on the back of envelopes tells us

18   what machine anywhere in the world -- not in the world --

19   anywhere in the U.S. that piece of mail went through when it was

20   processed and what time, but that information is recoverable if

21   you get to it before the particular code is recycled.  It didn't

22   happen here.  It didn't happen here.

23       We know that many of the pieces of mail were gathered/held

24   on to by the Pineda family until 11-13 -- it's in the

25   instructions you have -- when they gave them to LMPD.  We know

1    that many of them were received by 11-6 because they were posted

2    on Facebook.  We can't get that information to know where they

3    were processed through to see, do we have video of someone

4    taking those items to a particular postal facility?  Those codes

5    have had -- have long been recycled, and that's not something

6    that we could get.

7        I want to talk a little bit more about what does not make

8    sense.  Ms. Craft, based on all of the testimony that we have

9    heard, had never been to the farm where Richard Watts lived.

10   That's where he says the rounds were, to the best of his

11   knowledge.  He had moved several times, hadn't -- hadn't

12   eyeballed them since 2007.  She had not been there.  She did not

13   know what the address was.  He had not shown them to her.

14       We don't actually have reason to think that she knew that he

15   possessed the things.  She -- both because he says he didn't

16   show them to her and because she sent him a photograph of them.

17   She didn't send him a photograph of them and say, "Holy moly,

18   these are your bullets.  What's going on here?"  She sent him a

19   photograph of them and said, "They say I put bullets in their

20   mailbox."

21       Again, would you send a photograph of the items if you knew

22   the person could identify the items and say, "Oh, golly, you

23   must have taken those from me"?  That does not make sense.

24       So we are left with did she have her then 11-year-old

25   daughter take them when there's no indication that S.W.█ knew

1    they existed either until later?  At the time in November 2020,

2    no indication that S.W.█ knew they existed at that time.

3    Richard said he never told her about them.

4        So the other thing I'd ask you to think about in that

5    regard, when he saw the photo in November of 2020, it was just

6    that.  It was a photo.  He hadn't seen the things since 2007.

7    He hadn't laid eyes on them for 13 years.  They are, according

8    to him, 5.56 rounds that you shoot out of an M16.  They're not

9    exceedingly rare.

10       And I also ask you not to get -- to think carefully about

11   what we mean when we say "watermark."  It's a rust spot.  It's

12   not a serial number.  It's not something somebody chisels on a

13   particular item so that you can identify it.  These are rust

14   spots, rust spots that develop on metal when it gets wet.  I

15   don't think as well that's a hallmark that creates a great tie

16   between the items.  He hadn't seen them in person for 13 years.

17       So in this case, I think in order to be convinced beyond a

18   reasonable doubt that Ms. Craft is guilty of these charges, you

19   have to think that she is so savvy and sophisticated that she at

20   some point got hands on and held onto those bullets between 2007

21   and 2017 to save them for some nefarious purpose, or she asked

22   her 11-year-old daughter to go get them because she was aware of

23   their existence, or that she broke into the farm and took them

24   when she did not know even where he lived.  And he's got

25   cameras, and there's no indication that that actually happened.

1    You have to think that Suzanne is that sophisticated.

2        You also have to think that she is, like I said,

3    sophisticated enough that she does the projects of putting the

4    letters on the mailings without leaving evidence on the --

5    actually on the inside of the inside but that also she is

6    reckless and unthinking enough that she goes straight from her

7    own garage, deposits something near the Pinedas' fountain, comes

8    back, gets in her car and drives away.  That is not a cohesive

9    picture of an individual.  You're not simultaneously that

10   sophisticated, that much of an engineer of things that you --

11   that the one goes with the other.

12       And, also, that she would be that sophisticated and then she

13   uses her own mail, which is very quickly and readily

14   identifiable as her own mail, and that she walked directly

15   toward a camera that she knew was capturing what happened on

16   that sidewalk.  She knew from June what was happening on that

17   sidewalk was captured on that camera.

18       If somebody wants to leave something, if somebody wants to

19   deface property and they do not want to be seen on that camera,

20   they go around.  They go around Ms. Betty's house in the back

21   yard, and they don't get captured on camera.

22       We have talked earlier in this case about the lawsuit that

23   the Pinedas filed against Ms. Craft.  And you heard evidence

24   that she's on assistance, that she may not have had a lot.

25   She's not the only one being sued.  So I would remind you that

1    it's also the Lake Forest Community Association, which is the

2    HOA, that is also being sued, even if they did -- the Pineda

3    family did not think that she had particularly vast resources.

4        Suzanne's cell phone was seized in this case and was

5    reviewed by TFO Downs.  And I think anymore cell phones are like

6    a window into our brains, good, bad, or ugly.  It was a very,

7    very large amount of data.  It contained photos, her videos, her

8    chats, which are text messages, social media, some web searches,

9    websites visited, even some location data, and you heard about

10   some of those things.  You have heard some text messages that

11   were exchanged between her and Tammy or between her and Betty.

12       You've gotten a window into her brain.  And the photos that

13   she was saving of the Pineda family, I think that also gives you

14   a window into what she was thinking about, which is pretty well

15   articulated in the messages that she sent to Michella when she

16   didn't know that Michella had blocked her.  "Why?  Why?  Why?"

17   She's trying to make sense of it, and she's -- she's struggling

18   to make sense of it.

19       She sent a lot of messages.  "Why is this happening?  Why

20   are you doing -- what -- where does this hatred of my daughter

21   come from?  Why?"  Same thing with the photos of the Pineda

22   children.  She knows that there's an accusation of using racial

23   slurs.  She's trying to make sense of how that connects.

24       There were questions asked of her about "You were

25   researching the Pineda family before this."  She was researching

1    the father, the person who had bought the house.  She was not

2    taking and saving close-up pictures of the children until later,

3    after the allegation of using the racial slurs.

4        You were not presented with evidence from her cell phone

5    download that showed her using those slurs against these

6    children or investigating, you know, how to put together craft

7    projects and threats to communicate to people and not get

8    caught.  You were not shown the kind of -- any behind-the-scenes

9    action in that phone, which is a window to her brain, that shows

10   her using that language, that shows her plotting to commit these

11   acts.

12       And I leave myself notes because I forget things if I don't.

13   Back just briefly to the rounds, another that just does not make

14   sense.  If Suzanne knew where they were, if Suzanne took them

15   from Richard, don't you think she would have taken all three?

16   Why leave one?  Why leave one for somebody to go, "Oh, that

17   matches up."  It does not make sense.

18       I think it is more likely that somewhere in the last

19   15 years, 13 years, when he went looking for it, he misplaced

20   two of them.  He has one.  He saw a photo and he thought they

21   were his.  That makes more sense than a -- what is candidly an

22   impossible way of Suzanne getting her hands on them and then

23   leaving one, then deciding to leave some evidence behind.

24       So I now, after kind of walking through these things, have

25   to sit down.  The U.S. will have the chance to talk to you last,

1    which is entirely appropriate because it is their burden to

2    prove guilt beyond a reasonable doubt, but it means I don't get

3    to respond.  Not getting to talk is hard for lawyers.  So what I

4    would ask -- or not getting to talk more is hard for lawyers.

5        What I would ask is that you keep in mind the things that I

6    have pointed out and talked through with you.  You will have

7    these exhibits.  You will have the videos.  I invite you -- I

8    encourage you to look at them closely and critically for what

9    they actually show you and to think through those things.

10       I believe that once you have done that and read carefully

11   through the instructions that the Court has read to you and

12   looked at those elements and examined all of it, that you will

13   not find that Suzanne is guilty of any of these five counts, and

14   I'll ask you to return that verdict.  Thank you.

15           MS. ZIMDAHL:  Thank you, Your Honor.

16       Ladies and gentlemen, Ms. Rea asked you to keep your eye on

17   the ball, but the last 30 minutes have been full of distractions

18   and conspiracy theories.

19       She asked you to go back and look at Matt Lanham's video of

20   that 6-7 -- June 7th driveway painting.  She said, "Focus on

21   where the person came from and where they go."  That's a

22   distraction.  Matt Lanham told you he looked at that video.

23   You've seen that video.  It doesn't even capture anyone painting

24   Ms. Craft's driveway.  It's irrelevant.  It's a distraction.

25   It's taking your eye off the ball.

1     She told you to go watch Ms. Craft's Ring doorbell video.

2    It's a distraction.  They say the person in Ms. Craft's Ring

3    doorbell video doesn't even look like Ms. Craft.  Okay.  That

4    person isn't painting driveways.  That person is not the one

5    who's leaving threatening letters for the Pinedas.  It's a

6    distraction.

7     Ms. Rea told you some of Suzanne Craft's theories about what

8    happened on October 18th, 2020, that day that Ms. Craft walked

9    from her home, dropped a threatening letter in the Pinedas'

10   fountain, then went home, went back in her garage and drove away

11   in her car.  You saw that video.  You've seen those for

12   yourselves.  And, in fact, Ms. Craft told you today it was her

13   leaving in the car.

14    Ms. Rea asked you to look at those time stamps.  She asked

15   you to believe that there's another person running around the

16   neighborhood framing Ms. Craft; and she just happens to do this

17   at the exact same moment that Ms. Craft is leaving, right before

18   2:00 a.m., to go to her friend Tammy's house.  Ms. Craft doesn't

19   see that person.  She doesn't talk to that person, even though

20   she's in the garage with this mysterious other person.

21    It's a distraction.  These wild conspiracy theories -- look

22   over here, ladies and gentlemen -- distractions.  Keep your eye

23   on the ball.  The defense attorney was correct -- Ms. Rea is

24   correct, keep your eye on the ball of this case.

25    She talked quite a bit about why would the defendant do this

1    when she knew that there were cameras in the neighborhood;

2    right?  You've heard a lot about security cameras that were

3    located in this neighborhood.

4        Well, ladies and gentlemen, you saw a lot of evidence of

5    Ms. Craft's obsession with the Pineda family, her anger toward

6    them, how her conduct toward them was escalating each step along

7    the way; and nothing seemed to stop her pattern, her harassment

8    of this family.  Why would a detail like a security camera stop

9    her?

10       She escalated.  Ms. Craft escalated from hurling racial

11   slurs to painting the driveway to dropping the threatening

12   letters and then sending them by mail, all of them full of the

13   same racial slurs.

14       And she told you today that she thinks those video cameras

15   are too blurry.  She said -- you heard her sit right there and

16   say, "You can't even tell if that's a man or a woman."  She

17   thought those cameras wouldn't be enough to prove who did it.

18   She said today, "They don't show a face."  She wasn't afraid of

19   those cameras because she didn't think they could prove who did

20   it.

21       I'm not here today to tell you that this course of conduct

22   makes sense, as Ms. Rea asked you to think about.  And, in fact,

23   we would submit to you that terrorizing your neighbors on the

24   basis of race, that doesn't make sense.  What we're here telling

25   you today and what you've seen over the course of this week is

1    that the evidence shows you that this is what happened.

2        And Ms. Rea also talked about the idea that the defendant

3    was searching out and saving those photographs of the Craft --

4    I'm sorry -- the Pineda family.  She's saving them on her phone.

5    She talks about the timing of when that occurs.  And somehow

6    that's done to respond to these allegations that she knows about

7    that she's painted the driveway.  It's just silly.  Use your

8    common sense, ladies and gentlemen.  That's ridiculous.

9        Even if a picture of the Pineda family is somehow helpful in

10   a response to that allegation, stockpiling images of that

11   family, cropping them out, taking individual images of those

12   family members, their children, that's not how you respond.

13       Ms. Craft, she searched out these images.  She saved them.

14   She cropped them.  She cut apart a family photo.  She cut it

15   apart just like she cut apart those letters that she glued onto

16   those threatening mailings and just like she tried to cut apart

17   this family with those racially motivated threatening letters.

18       Now, Ms. Craft, she found those images of the Pineda

19   children from when they were younger.  She took images from

20   their school yearbook, and she sent those images out to other

21   people, to her friends, to her neighbor, Betty Probst.

22       This is evidence of a woman who is obsessed with the Pineda

23   family and who's now enraged that they're trying to stand up for

24   themselves and seek help in protecting their family, a woman

25   whose targeting of the family is ramping up.  It's escalating to

1    sending them that pile of threatening letters.

2        And this idea that there was some proper purpose to these

3    pictures is even more offensive in light of the evidence that

4    you heard today that Ms. Craft was researching them well before

5    even the driveway paintings.  You heard today about research

6    that she was doing on Michella Pineda's father.

7        Ms. Rea told you that a person's cell phone is a window into

8    their brain.  These photos and her research on the Pineda

9    family, that's a window into Defendant Craft's brain, a window

10   into her obsession with this Pineda family.

11       Ladies and gentlemen, what the defendant's conspiracy

12   theories and the distractions in this case all fail to do is

13   deal with all of the evidence that's been presented to you this

14   week, and that is, all of the evidence that shows you that it is

15   the defendant, Suzanne Craft, who sent these threatening

16   mailings, these threatening, racially offensive letters to the

17   Pineda family.

18       Those theories, those distractions, they fail to deal with

19   the fact that it's Suzanne Craft who paints the slurs on the

20   driveway three times.  You see two videos of that.  They fail to

21   deal with the fact that it's Suzanne Craft, not some other

22   theoretical person, who is hurling racial slurs at them, banging

23   on their door and yelling the N-word, directing a jingle full of

24   racial slurs at their children.

25       It doesn't deal with the video showing her putting those

1    threatening letters in their yard.  It doesn't deal with the

2    fact that -- and defense counsel said this is a small thing, but

3    it's important nonetheless, that the mailings are addressed to

4    Michelle, which you heard Ms. Craft sit on the stand and call

5    her just this week.

6         It doesn't deal with the fact that those bullets came from

7    Suzanne Craft's ex-boyfriend.  How did someone else running

8    around get his bullets?  And, ladies and gentlemen, he sat here

9    and told you that he has consistently and adamantly maintained

10   that those are his bullets, despite Ms. Craft suggesting perhaps

11   that's not his story.

12        And, of course, it doesn't deal with the cataloging of the

13   Pineda family, all those pictures, that research, and the

14   obsession that you saw in that window into her brain on

15   Ms. Craft's phone.

16        And you can look at all of that evidence.  Look at all of

17   that evidence when you go back.  Look at all of that to conclude

18   that Suzanne Craft, the defendant, is the person that sent these

19   threatening letters to the Pineda family, all of those mailings

20   charged in Counts 1 through 5.

21        And I think, when you look at that, you're gonna see

22   something very convincing and, that is, when you look at all of

23   the evidence, you're going to see that the person, Ms. Craft,

24   who drops the mailing by the fountain -- and you know that's her

25   because you saw that she's the one who did that on that video --

1    and that the person who does that -- she drops those two letters

2    in the yard.  And those are, "You had enough N-word bitch" and

3    "Die, die, stupid bitch, move out," those horribly offensive and

4    threatening letters, the ones that share the same

5    characteristics with these threatening mailings -- well, the one

6    in the yard had the piece of pasta box.  So did one of the

7    mailings and so did the bullets that were wrapped up in that

8    pasta box.

9         So, ladies and gentlemen, when you go back and you look at

10   that evidence, you're gonna see that the woman, Suzanne Craft,

11   who dropped it in the yard, is the woman who sent the mailings,

12   is the woman who sent the bullets, the same woman who's

13   threatening the Pineda family through all the events in this

14   case.  The person is Suzanne Craft.  Find the defendant guilty.

15           THE COURT:  Thank you, Counsel.

16        Members of the jury, I have a few remaining instructions for

17   you.

18        Instruction Number 31.  Now that all the evidence is in and

19   the arguments are completed, you are free to talk about the case

20   in the jury room.  In fact, it is your duty to talk with each

21   other about the evidence and to make every reasonable effort you

22   can to reach unanimous agreement.  Talk with each other, listen

23   carefully and respectfully to each other's views, and keep an

24   open mind as you listen to what your fellow jurors have to say.

25        Try your best to work out your differences.  Do not hesitate

1    to change your mind if you are convinced that other jurors are

2    right and that your original position was wrong, but do not ever

3    change your mind just because other jurors see things

4    differently or just to get the case over with.  In the end, your

5    vote must be exactly that, your own vote.  It is important for

6    you to reach unanimous agreement but only if you can do so

7    honestly and in good conscience.

8        No one will be allowed to hear your discussions in the jury

9    room, and no record will be made of what you say.  So you should

10   all feel free to speak your minds.

11       Listen carefully to what the other jurors have to say and

12   then decide for yourself if the Government has proved the

13   defendant guilty beyond a reasonable doubt.

14       Number 32.  If you decide that the Government has proved the

15   defendant guilty, then it will be my job to decide what the

16   appropriate punishment should be.

17       Deciding what the punishment should be is my job, not yours.

18   It would violate your oaths as jurors to even consider the

19   possible punishment in deciding your verdict.  Your job is to

20   look at the evidence and decide if the Government has proved the

21   defendant guilty beyond a reasonable doubt.

22       Number 33.  Remember that the defendant is only on trial for

23   the particular crimes charged in the indictment.  Your job is

24   limited to deciding whether the Government has proved the crimes

25   charged.

1        Number 34.  Let me finish up by repeating something that I

2    said to you earlier.  Nothing that I have said or done during

3    this trial was meant to influence your decision in any way.  You

4    decide for yourselves if the Government has proved the defendant

5    guilty beyond a reasonable doubt.

6        Instruction Number 35.  Remember that if you elected to take

7    notes during the trial, your notes should be used only as memory

8    aids.  You should not give your notes greater weight than your

9    independent recollection of the evidence.  You should rely upon

10   your own independent recollection of the evidence or lack of

11   evidence, and you should not be unduly influenced by notes of

12   other jurors.  Notes are not entitled to any more weight than

13   the memory or impression of each juror.  Whether you took notes

14   or not, each of you must form and express your own opinion as to

15   the facts of the case.

16       Number 36.  I have prepared a verdict form that you should

17   use to record your verdict.  It is attached to these

18   instructions.  If you decide that the Government has proved a

19   charge against the defendant beyond a reasonable doubt, say so

20   by having your foreperson mark the appropriate place on the

21   form.  If you decide that the Government has not proved the

22   charge against her beyond a reasonable doubt, say so by having

23   your foreperson mark the appropriate place on the form.

24       If you find the defendant, Suzanne Craft, guilty of one or

25   more of the charges, then you must address the special verdict

1  questions.  If you find the defendant, Suzanne Craft, not guilty

2  of all of the charges, then you must ignore the special verdict

3  questions.  Your foreperson should then sign the form, put the

4  date on it, and return it to me.

5      This is the verdict form at the end of the instructions.  It

6  simply states:  "We, the jury, find the defendant, Suzanne

7  Craft, as to Count 1:  Guilty or not guilty; as to Count 2:

8  Guilty or not guilty," as to Count 3, 4, and 5, the same,

9  "guilty or not guilty."  There is a date line and a signature

10  line for your foreperson.

11      The verdict form then reads:  "If you find the defendant,

12  Suzanne Craft, guilty as charged of one or more of the charges,

13  then you must address the special verdict questions below.  If

14  you find the defendant, Suzanne Craft, not guilty as charged of

15  all of the charges, then you will ignore the special verdict

16  questions."

17      The second page contains the special verdict questions.  It

18  states, "We, the jury, having found the defendant, Suzanne

19  Craft, guilty of one or more of the offenses charged in the

20  indictment, further unanimously find that she selected the

21  victims of the threatening communication because of their actual

22  or perceived race or color."

23      There are five "yes" or "no" sections:  As to Count 1, if

24  applicable:  Yes or no; as to Count 2, if applicable:  Yes or

25  no; as to Count 3, if applicable:  Yes or no; as to Count 4, if

1    applicable, Yes or no; and as to Count 5, if applicable, Yes or

2    no; and a similar date line and signature line for the

3    foreperson.

4        Members of the jury, that concludes the instructions.  The

5    last remaining piece of business that we must undertake before I

6    allow you to go to the jury deliberation room is we will now

7    select two of you to remain here as alternate jurors.

8        The deputy clerk has all of your juror numbers in the wheel.

9    She will randomly select two.  If your number is called, please

10   remain in place when I dismiss the rest of the jury.

11           DEPUTY CLERK:  Number 5 and Number 340.

12           THE COURT:  So Juror Number 5 and Juror Number 340, if

13   you would remain in place.

14       The other 12 of you, I am going to ask you now to retire to

15   deliberate.

16       (Jury out 1:22 p.m.)

17           THE COURT:  Thank you.  You may be seated.  The jury

18   has left the courtroom.

19       Juror Number 5 and Juror Number --

20           DEPUTY CLERK:  340.

21           THE COURT:  -- 340, let me first thank you for your

22   service.  As I stated at the outset of this process, the jury

23   trial is the bedrock of the American system.  We could not

24   conduct fair and impartial jury trials without the participation

25   of all eligible citizens.  So we thank you for not just showing

1    up on the first day and responding to the notice but

2    participating through the course of this trial.  You've put in

3    the work.  You've been patient.  We appreciate that.

4        Now, here's how this works for you-all going forward:  I am

5    going to ask you to provide the deputy clerk with your cell

6    phone numbers.  And I'm going to let you leave, although I will

7    ask you to maintain for the time being the same admonition.

8    Please do not talk about the case with each other or anyone

9    else, and the reason is simple.

10       If a juror should become ill, if a juror should have some

11   other family emergency, whatever the case may be, and have to

12   leave the deliberation process, it is conceivable that we would

13   need you to come back.  And the process -- the deliberation

14   process then would start anew with you in place of the departed

15   juror.

16       If the 12 who were selected go back and complete their work,

17   we will give you notice when they have a verdict.  If they reach

18   a verdict, we will give you notice, and then you'll be released

19   from the instruction that you cannot talk about the case.  And

20   like them, you will then be allowed to discuss the case, if you

21   wish to do so.  Any questions about that?

22           A JUROR:  No.

23           THE COURT:  Thank you both very much.  I will have the

24   clerk then ask you for your number.  It will not be provided

25   publicly.  It will not be provided to counsel or anyone else.

1    She'll keep it so that she can contact you, and you can

2    otherwise leave.  Thank you.

3        Let me see counsel at the bench.

4        (Bench conference on the record.)

5            THE COURT:  First, let me say I thought -- well, all

6    three of you spent time in front of the jury.  You were

7    effective, and I thought you did nice jobs all the way around.

8            MS. REA:  Thank you.

9            MR. TIEKE:  Thank you, Your Honor.

10           THE COURT:  The exhibits and the instructions will go

11   back with the jury.  I believe that on the last break the jury

12   administrator ordered lunch.  So my guess is, since they're

13   getting back there at now 1:20, that that's probably their first

14   order of business before they start picking through the

15   instructions and reminding themselves of the process to select a

16   foreperson, et cetera, et cetera.  I think then the thing to do

17   is we'll just wait.

18           MR. TIEKE:  Yes, Your Honor.

19           THE COURT:  Oh, I did want to tell you too, we will

20   not be sending back a copy of the indictment.  I just found

21   it -- we do sometimes and other times we don't when it's --

22   sometimes you get dismissed counts, and it becomes confusing and

23   we don't do that.  And sometimes the instructions themselves

24   sort of obviate the need to do that.  I think that was true

25   here.

1           MR. TIEKE:  Yes, Your Honor.

2           THE COURT:  Because the way we wrote the instructions

3      for all five counts, the indictment language was utilized.  So

4      there's nothing to be gained from that.  It's just one more

5      thing -- one unnecessary thing, I should say, that they would

6      not need to consult.  That's all I have.

7        I'll ask each side to give a number or numbers where Natalie

8      can reach you while we wait.

9        If we happen to get a question or something like that, I

10     will -- I'll need at least one of you-all and you back in the

11     courtroom before I respond, of course.  Anything else?

12          MR. TIEKE:  No, Your Honor.  Thank you.

13          MS. REA:  No, sir.  Thank you.

14          THE COURT:  Thank you-all.

15       (End of bench conference.)

16          THE COURT:  Court will be in recess while the jury

17     deliberates.  Thank you.

18       (Recess at 1:27 p.m. until 1:46 p.m.  Jury out.)

19          THE COURT:  We're back on the record in U.S. v. Craft.

20     The jury is not present.

21       Let me see counsel at the bench, please.

22       (Bench conference on the record.)

23          THE COURT:  This is a first for me.  This is just a

24     note from the jury that indicates who their foreperson is.  I

25     think they have dutifully reported that despite not being asked.

1    So I wanted to put on the record that the note we received

2    rather quickly does indicate they followed the instruction.  The

3    foreperson is Number 145.

4        So it's not a question.  It doesn't call for a response, but

5    I did want to call you here, put this on the record for you so

6    that the record is clear that we received the note, and it has

7    been dutifully reported.  That's all I have for you.

8            MS. ZIMDAHL:  Thank you, Your Honor.

9            MS. REA:  Thank you, Your Honor.

10           MR. TIEKE:  Thank you, Judge.

11           THE COURT:  All right.

12       (End of bench conference.)

13           THE COURT:  Thank you.  We will return to recess

14   status.

15       (Recess at 1:47 p.m. until 2:54 p.m.  Jury out.)

16           DEPUTY CLERK:  We are back on the record in

17   3:22-CR-94, United States of America v. Suzanne Craft.

18           THE COURT:  Let me see the lawyers at the bench,

19   please.

20       (Bench conference on the record.)

21           THE COURT:  I propose to have the jury brought into

22   the courtroom.  I will announce to the gallery that we've

23   received a message that they have a verdict.

24       It's been quick.  So it'll take me a minute just -- it will

25   take me a minute to review the verdict form for completeness.

1        MR. TIEKE:  Yes, Your Honor.

2        THE COURT:  So there might be a little bit of a

3   pregnant pause up here.  I just wanted -- I'm going to carefully

4   make sure.

5     I will also tell you, if it is incomplete, all I'm gonna do

6   is give it back and say, "Your verdict form is incomplete.

7   Please retire and continue," no further -- not an *Allen* charge

8   or anything, just the basic benchbook instruction to them to go

9   back and finish their work.  I'm not anticipating that, but if

10  that's the case, that's what I'll do.  Otherwise, we'll just

11  take it in normal course.

12       MR. TIEKE:  Yes, Your Honor.

13       MS. REA:  Thank you, Your Honor.

14       MS. ZIMDAHL:  Thank you.

15     (End of bench conference.)

16       THE COURT:  The jury reports they have a verdict.  We

17  will invite them to return, please.

18     (Jury in 2:56 p.m.)

19       THE COURT:  Members of the jury, who is your

20  foreperson?

21       THE FOREPERSON:  Me, Your Honor.

22       THE COURT:  And has the jury reached a verdict?

23       THE FOREPERSON:  We have, Your Honor.

24       THE COURT:  Is the verdict unanimous?

25       THE FOREPERSON:  Yes, Your Honor.

1          THE COURT:  Please pass the verdict form to the CSO.

2      Members of the jury, your verdict will now be published.

3  Following publication of your verdict, either of the parties may

4  request that the jury be polled, that is, each of you will be

5  asked to confirm individually that these are your verdicts.  I

6  will now publish the verdict.

7      We, the jury, find the defendant, Suzanne Craft, as to

8  Count 1, guilty; as to Count 2, guilty; as to Count 3, guilty;

9  as to Count 4, guilty; as to Count 5, guilty; dated today,

10  signed by the foreperson.

11      As to the special verdict questions, we, the jury, having

12  found the defendant, Suzanne Craft, guilty of one or more of the

13  offenses charged in the indictment, further unanimously find

14  that she selected the victims of the threatening communication

15  because of their actual or perceived race or color.  As to

16  Count 1, yes; as to Count 2, yes; as to Count 3, yes; as to

17  Count 4, yes; and as to Count 5, yes; also dated and signed by

18  the foreperson.

19      Would either side like to inspect the verdict forms?

20          MS. REA:  No, Your Honor.

21          MR. TIEKE:  No, Your Honor.

22          THE COURT:  Does either side wish to poll the jury?

23          MS. REA:  No.  Thank you, Your Honor.

24          MR. TIEKE:  No, Your Honor.

25          THE COURT:  Members of the jury, that concludes your

1    service in this matter.  I'm now going to excuse you with the

2    thanks of the Court as well as the parties for your diligence

3    throughout the week and your patience with us.  Thank you.

4         (Jury out 2:59 p.m.)

5              THE COURT:  The jury having been excused -- they have

6    now exited the courtroom -- Ms. Rea, do you wish to renew any

7    motions at this time?

8              MS. REA:  Not at this time, Your Honor, no.

9              THE COURT:  Let's now proceed to set a date for a

10   sentencing hearing.

11             DEPUTY CLERK:  June 21st.

12             MS. REA:  I didn't hear you.

13             DEPUTY CLERK:  I'm sorry.  June 21st.

14             MS. REA:  That's fine.

15             DEPUTY CLERK:  9:30.

16             THE COURT:  The clerk will file and record the jury's

17   unanimous verdict.  The order following the verdict will

18   indicate that the sentencing hearing has been set for June 21 at

19   9:30.  Is there anything else to come before the Court at this

20   time?

21             MR. TIEKE:  No, Your Honor.

22             MS. REA:  No, Your Honor.

23             THE COURT:  The defendant will be remanded to the

24   custody of the Marshals Service.  Court will be adjourned.

25   Thank you.

1        (Proceedings concluded at 3:01 p.m.)

2                    C E R T I F I C A T E

3      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

4    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6
         _____s/Dena Legg_____            September 21, 2023
7    Certified Court Reporter No. 20042A157    Date
     Official Court Reporter
8

9                    REDACTION CERTIFICATE
          I certify that the foregoing is a true and correct copy of
10   the transcript originally filed with the clerk of court on
     09/21/23 and incorporating redactions of personal identifiers
11   requested by the following attorney of record: Angela M. Rea in
     accordance with Judicial Conference policy.  Redacted characters
12   appear as a black box in the transcript.

13       _____s/Dena Legg_____           October 30, 2023
     Certified Court Reporter No. 20042A157  Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX
 2    GOVERNMENT WITNESS:
 3
      SUZANNE CRAFT (transcript previously filed)        8
 4
      JURY INSTRUCTIONS                                 11
 5
      GOVERNMENT CLOSING                                35
 6
      DEFENSE CLOSING                                   52
 7
      GOVERNMENT REBUTTAL                               73
 8
      JURY INSTRUCTIONS                                 79
 9
      JURY NOTE                                         86
10
      VERDICT                                           87
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```