```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                        LOUISVILLE DIVISION

3
     UNITED STATES OF AMERICA,      )    Case No. 3:22-CR-00094-DJH
4                                   )
            Plaintiff,              )    REDACTED
5                                   )
     v.                             )
6                                   )
     SUZANNE CRAFT,                 )
7                                   )    July 26, 2023
            Defendant.              )    Louisville, Kentucky
8

9                              *  *  *  *  *

10                    TRANSCRIPT OF SENTENCING
                   BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                             *  *  *  *  *

13   APPEARANCES:

14   For United States:       Christopher C. Tieke
                              Stephanie M. Zimdahl
15                            U.S. Attorney's Office
                              717 West Broadway
16                            Louisville, KY 40202

17   For Defendant:          Angela M. Rea
                             Western Kentucky Federal
18                              Community Defender, Inc.
                             629 S. 4th Avenue, Suite 200
19                           Louisville, KY 40202

20   [Defendant present.]

21
                         Dena Legg, RDR, CRR, CCR-KY
22                        Official Court Reporter
                          208 U.S. Courthouse
23                        Louisville, KY 40202
                             (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

1          (Begin proceedings in open court at 1:52 p.m.)

2               DEPUTY CLERK:  3:22-CR-94, United States of America v.

3     Craft.

4               MR. TIEKE:  Good afternoon, Your Honor.  Chris Tieke

5     and Stephanie Zimdahl for the United States.  Present with us is

6     the Pineda family, some of whom would like to address the Court

7     today at the appropriate time.

8               MS. REA:  Good afternoon, Your Honor.  Angela Rea with

9     Ms. Craft.  I can ask her to join me now or later, whichever the

10    Court would prefer.

11              THE COURT:  I'll leave it up to you, however you want.

12              MS. REA:  Okay.  She can come up with me.  That's

13    fine.

14       Ms. Craft.

15              THE COURT:  We're here, obviously, for a sentencing

16    hearing.  Ms. Rea, would you confirm, please, that you and

17    Ms. Craft have received and reviewed the presentence

18    investigation report.

19              MS. REA:  Yes, Your Honor, we have received it, and we

20    have reviewed it.

21              THE COURT:  Ms. Craft, have you had enough time to go

22    through the PSR with Ms. Rea?

23              THE DEFENDANT:  Yes, I have.

24              THE COURT:  And, Ms. Rea, I understand that there are

25    two substantial objections to the guideline calculations

 1    contained in the PSR --

 2            MS. REA:  Correct.

 3            THE COURT:  -- left to be resolved; is that correct?

 4            MS. REA:  It is, Your Honor.

 5            THE COURT:  Let's take those up now.  The presentence

 6    investigation report proposes the following application of the

 7    advisory sentencing guidelines:

 8        The report begins the offense level computation in

 9    paragraph 34 on page 9.  Initially, in paragraph 35, the PSR

10    notes that Counts 1 through 5 are grouped for guideline

11    calculation purposes because they involve the same victims and

12    two or more acts or transactions connected by a common criminal

13    objective.  So we get a base offense level of 12.  That's for

14    the violations of Title 18 of the U.S. Code, Section 876(c).

15    Level 12 is found in Guideline 2A6.1.

16        There are a number of offense characteristics that cause

17    modifications to the base offense level.  The first one is that,

18    as suggested in paragraph 37, there is conduct evidencing an

19    intent to carry out the threats which were charged in Counts 1

20    through 5.

21        As noted in paragraph 37, the defendant exhibited behavior

22    that indicates an intent to carry out the threats and notes, on

23    one occasion, a threat to run over one of the minor victims, the

24    threat transmitted along with bullets, and another -- on another

25    occasion following the family on the interstate.  And so

1   pursuant to Guideline 2A6.1(b)(1), six levels are added.

2       Then paragraph 38 notes that because the offense involved

3   more than two threats, 2A6.1(b)(2)(A) adds two more levels.

4       And then paragraph 39 states that as the offense involved

5   the violation of a court protection order, that is, the state

6   court issued a no contact order dated July 15, 2020, to have no

7   contact with the victim family here, that same guideline,

8   subpart (b)(3), adds two additional levels.

9       Paragraph 40 notes that the jury found beyond a reasonable

10  doubt that the victims here were targeted as a result of their

11  perceived race and adds three additional levels under

12  Guideline 3A1.1(a).

13      Then paragraph 41 notes that because there were vulnerable

14  victims here, that is, children who were targeted by the

15  communications, two further levels are added under 3A1.1(b)(1).

16      Paragraph 43 adds two additional levels in an adjustment for

17  obstruction of justice.  We will talk more about this, as this

18  is one of the subjects of the defense objections, but I'll just

19  note here at this stage, under Guideline 3C1.1, the PSR notes

20  that the defendant willfully obstructed or impeded, or attempted

21  to do so, the administration of justice by instructing her

22  daughter to contact her father with respect to the location of

23  the bullets referenced earlier.  And there were other

24  communications along those lines justifying the application of

25  that enhancement.  So two levels are added.

1    That gets to an adjusted offense level of 29, and the

2    defendant's criminal history scored in Category I.  The

3    guideline recommendations for a total offense level of 29

4    applied to a criminal history category of I are as follows:

5    With respect to a term of incarceration, the guidelines

6    recommend a sentence of between 87 and 108 months.  With respect

7    to a term of supervised release to follow a term of

8    incarceration, the guidelines recommend between one and three

9    years.  As regards a potential fine, the guidelines recommend a

10   fine in the range of 30,000 to 300,000.

11   Ms. Rea, have I stated the guideline calculations correctly

12   as they are found in the PSR?

13              MS. REA:  You have, Your Honor.

14              THE COURT:  Mr. Tieke?

15              MR. TIEKE:  Yes, Your Honor.

16              THE COURT:  So let's now then take up the objections.

17   I wish to note at this point that I have, of course,

18   carefully reviewed the parties' respective sentencing memoranda.

19   I have reviewed your objections as submitted to the enhancements

20   here for six levels under Guideline 2A6.1(b)(1) and two levels

21   under 3C1.1, but if there is anything more you would like to

22   add, I'm happy to hear additional argument.

23              MS. REA:  And, Your Honor, I think we have laid it out

24   in our sentencing memo.  So I won't go over the things I've

25   already said.

1    I would note briefly that the two Sixth Circuit cases

2    cited -- *Nickerson* and *Newell* cited by the U.S. as well were

3    occasions where we have an overt act in addition to the threat.

4    That's what we're talking about is whether there's an overt act

5    evidencing an intent to carry out the threat.  In both of those

6    instances, we had someone who armed themselves with a weapon

7    close in time with the threat.  I think that is a big

8    distinguishing factor from Ms. Craft's situation.

9    As I noted in the memo, the other conduct that is cited, I

10   think, could arguably be seen as additional threats.  It doesn't

11   mean that it is an intent to carry out a threat to kill.  As

12   I've already said, there was no gun displayed, possessed, used.

13   So while the things that are pointed to could be called

14   threatening, I don't think they can be characterized as overt

15   acts with an intent to carry out the threat.

16   So I would just more specifically point to the facts of

17   those cases with people arming themselves with guns and knives,

18   which I think is a good example of overt acts that do carry that

19   intent.  But other than that, I think we've said it in our

20   objections in our memo.

21       MR. TIEKE:  Your Honor, we've addressed -- the United

22   States addressed many of those in the sentencing memo as well at

23   length.  And I'd like to hit the high points and then

24   specifically address the defense's characterization of this

25   enhancement.

1    While it's correct, you know, that the Sixth Circuit cases

2    require at least that the Court consider, in addition to the

3    threats themselves as well, overt acts that indicate an intent

4    to carry those out, the six-level enhancement is appropriate in

5    instances where those threatening communications had been

6    accompanied by physical objects evincing an intent to carry it

7    out.  And the United States cited the *Ellis* case where the

8    threats were accompanied by, in those instances, a dead rat that

9    was sent.

10   Here the evidence at trial was that the Pinedas received a

11   threat that stated "Move out or bullets" and then received a

12   letter with two rounds of ammunition wrapped in a threat stating

13   "Get out."  And all of that was done in the context of receiving

14   those threatening letters of direct violence against the family,

15   including direct threats of death such as "Die stupid bitch,

16   move out" and various other threats that the Court's well aware

17   of in this case.

18   I also point out that the six-level enhancement that we're

19   discussing is equally appropriate when there are active and

20   overt steps evincing a threat to carry it out.  And here I would

21   argue that those things that are characterized as additional

22   threats are, in fact, overt acts intended to carry out the

23   threats of harm in this case.

24   Ms. Craft, as the Court's well aware, directly threatened to

25   run over one of the Pineda children, S.P., who was just nine

1    years old riding her bike in the cul-de-sac, telling her, "Ride

2    on my side of the road and I'll run your ass over."

3        There were active and overt steps to research the family

4    almost immediately after they moved in.  Ms. Craft discussed

5    with her neighbor running the Pineda children over.  She sent

6    cropped photos of the Pineda children intimating that they were

7    not actually black.  She researched lynching photos and whether

8    throwing bananas would be a hate crime.

9        And, finally and perhaps most dangerously, I mean, she

10   engaged in erratic driving on the highway to maneuver behind the

11   Pinedas in an effort to tail and chase them on the highway; and

12   the United States has provided that footage as an attachment to

13   the sentencing memo.

14       Addressing the defense argument, it -- that it only applies

15   when a threat to kill is accompanied by an overt act of

16   purchasing a firearm is too narrow a reading of that

17   enhancement.  The threats in this case intended broad threats to

18   harm the family, including direct threats to kill them.

19       The only person that introduced the idea of a firearm in

20   this case was the defendant when she sent them a letter saying

21   "Move out or bullets" and then sent them bullets, an act, which

22   as I argued earlier, in and of itself supports the application

23   of the enhancement anyway.

24       But her threats were broader than that of just to shoot the

25   family.  Her threats included threats to harm the family,

1    whether that means psychological torture, stalking, et cetera.

2    And these threats were accompanied by many overt acts, some of

3    which we already discussed, the highway chase, incessant

4    research.  And so nothing in the guidelines, nothing in the

5    statute, nothing in the case law says that you have to purchase

6    a gun or it's necessary to apply the enhancement of an intent to

7    directly -- to carry out a threat of harm.

8        And I think the bottom line here is what started out as

9    verbal threats of death against the family turned to painted

10   racial slurs and then crescendoed with a barrage of these

11   threatening letters, including a threat containing a bullet.

12       And the escalating conduct, the threats themselves, in

13   conjunction with all these other overt acts, are exactly what

14   2A6.1(b)(1) contemplates; and I think it was appropriately

15   applied in this case and should be applied.

16            MS. REA:  Your Honor, may I respond just to two

17   things?

18            THE COURT:  Yes.

19            MS. REA:  Thank you.

20       With respect to the search items in the phone, this is a

21   cell phone download that I think everybody in the courtroom

22   probably got tired of us talking about -- or me talking about

23   how large it was.

24       If you look at the Cellebrite report or the timeline, which

25   is sort of a summary of everything, it's 500,000 items.  It

1    looks like a lot of that stuff starts around about after 2011.

2    So we have something someone has searched over probably an

3    11-year period, and there's half a million items in her

4    timeline.

5        Both of the things that the United States has pointed to

6    with respect to hate crimes, with respect to the lynching

7    photograph, those are two things in an 11-year history of half a

8    million items.  They're also, I will note, things you might look

9    at if you're looking at the news, if you're looking at history.

10        That particular photo, if you look into it, is associated

11    with a famous song about lynching by Nina Simone.  It's history.

12    I don't think looking at history, looking at news twice is

13    something that demonstrates some other sort of interest.

14        And in this case -- because what the U.S. is pointing toward

15    it for in this case is an intent to carry out a threat.  I'll

16    also note those two entries are not, as far as I can tell,

17    attached to any date.  Like I said, most of the items in the

18    cell phone download appear to show up after 2011, before the

19    phone was seized in 2022.  So I don't think they should weigh in

20    the scale when the Court is considering these things.

21        The only thing I'll say about -- two things, I guess, about

22    the video.  That was an interaction that took place July of

23    2021.  Ms. Craft remained out of custody until she was arrested

24    on this case in July of 2022.  I also believe, if the Court

25    looks at the end of that interaction, the Pineda vehicle exits

1    the highway.  Ms. Craft continues along her route.

2        So I think there's a lot of facts that we can talk about.  I

3    don't think particularly those two searched items are things

4    that weigh on the scale of an intent to carry out the threats

5    that were the indicted conduct -- or convicted conduct in this

6    case.

7            THE COURT:  Well, let's talk about some of those

8    facts.  I want to start with Exhibit 10 and the bullets that

9    were delivered.  Does that not represent an escalation of the

10   type contemplated by this guideline?

11           MS. REA:  Your Honor, I think it represents an

12   escalation of threat.  I don't think it represents an intent to

13   carry out the threat.  Quite simply, rounds don't fire

14   themselves.  And I think, when we're talking about an intent to

15   carry it out, it is just that, an intent to carry it out.  It's

16   not further or even escalating sorts of intimidation.

17       Carrying it out is of a different character.  I think that's

18   like we saw in the cases.  And it's not just the gun.  It's

19   arming one's self.  We have a Sixth Circuit case where someone

20   armed themselves with a bat, but it is preparing one's self to

21   commit the act that has been threatened.

22       While the bullets may seem -- may be fairly seen to be a

23   more serious threat, I don't think they rise to the level of an

24   overt act to carry out a threat to kill or a threat to harm.

25           MR. TIEKE:  Your Honor, may I respond briefly?  Just

1    to color in the lines on that, the threat with the bullets is at

2    the end of this line of threatening communications.  It is, in

3    fact, escalating conduct.  It's letters of threats to kill and

4    then bullets.  I mean, just because she didn't go out and get a

5    gun at this point doesn't mean that she wasn't going to.  We

6    don't know.

7         I would just point out that it was escalating, and it was

8    one of the later threats that was received and contained a

9    physical object.  I mean, the bullets in and of themselves would

10   be enough in this case, but we have the other overt acts that I

11   mentioned as well.

12              THE COURT:  Anything further?

13              MS. REA:  No, Your Honor.

14              THE COURT:  I have reviewed, of course, *Newell*, the

15   Sixth Circuit case.  The Sixth Circuit there explained that

16   consideration of the tone of the threats -- that's the word they

17   used -- viewed in conjunction with the defendant's other overt

18   conduct is proper, although I'm not relying on the threats alone

19   charged in Counts 1 through 5.  I do, as instructed here,

20   consider the tone of these threats.

21        What was the tone of these threats?  Well, like in the

22   *Newell* case, Ms. Craft's threats were persistent.  They

23   contained exceedingly vulgar, angry, threatening, explicit, and

24   racist language indicating an intent to kill one or more

25   victim -- members of the victim family.  As in *Newell*, they

1    conveyed a message of a person on a mission.

2        Without rehashing all of the evidence received at trial and

3    reported on the PSR, I'll highlight a few.  With respect to

4    Count 2, the envelope there had a return address name of a

5    racial epithet and then the word "destroyer."  And it read in

6    cutout letters, the message inside, "Move out or bullets."

7        The envelope which constituted the charge in Count 3 also

8    used that racial epithet and the name "destroyer" and included

9    the message "two dead" and then the racial epithet referring to

10   juvenile African-Americans.

11       The "destroyer" name was used along with the word "die" as a

12   threat in Count 4.  "Destroyer" also used in Count 5, along with

13   the words "Die, die, stupid N-word, die."  It isn't too

14   difficult to figure out the tone of the threats as charged in

15   Counts 1 through 5.

16       Now, with respect to the other overt conduct which is

17   contemplated by the application notes to the guideline here, we

18   do have -- we do have run-ins with the victim family in which

19   the N-word was used, the threat to run over someone, and we have

20   these disconcerting background checks, the proof was heard at

21   trial, on the Pineda family members and photos of the victim

22   family saved in the defendant's phone.

23       And this is the type of conduct that other courts, including

24   the Fourth Circuit in *U.S. v. Gary*, found to support this

25   enhancement because it's based on a form of stalking the

1    victims, but it doesn't end there.  The conduct here includes

2    other communications, one including a cutting for an

3    advertisement for a funeral home.  Of course, we've got the

4    communication that includes what we've already discussed, the

5    two live ammunition rounds.  That's Exhibit 10 at trial.  In the

6    fall of 2020, another undated envelope found in the yard in the

7    same pattern.  "Die" is used again.

8        And I think the sum total here is that the conduct of the

9    defendant meets the standard required by the Sixth Circuit in

10   the *Newell* case.  Not only do we have the explicit language, but

11   we have other overt conduct which suggests, again, that she took

12   steps indicating an intent to do just what she was threatening

13   to do.

14       The facts and evidence taken as a whole show that direct

15   connection between prethreat conduct, conduct in or around the

16   time of the threats, and the threats themselves for the purposes

17   required of Guideline 2A6.1.  And so I conclude that the

18   six-level enhancement is properly applied, as it follows from

19   conduct evidencing an intent to carry out the communicated

20   threats.

21       Let's discuss the defense objection to the two-level

22   enhancement under 3C1.1.

23            MS. REA:  Yes, Your Honor.  We object to the

24   enhancement for the obstruction for 3C1.1.  Most of what I had

25   to say I have already laid out in the sentencing memo.

1    When Ms. Craft asked her daughter -- urged her daughter to

2   make that phone call, I don't think we heard any evidence that

3   she asked her to say any particular thing that wasn't true to

4   bring about any particular outcome or to influence anything.

5   What she's indicated is she recognized it as important, and she

6   said, "Tell him."

7    I think asking someone to share information with somebody

8   else, another witness, doesn't rise to the level of obstruction.

9   It's not an attempt to influence something if you're saying tell

10   the truth about it.  "Tell the truth.  Repeat this.  I think

11   it's important."  I don't think the Court could find by a

12   preponderance of evidence that she was trying to change

13   Mr. Watts' testimony through that.

14    With respect to her conversation with him, what Ms. Craft

15   had indicated in her testimony was he had said to her

16   previously, "Those look like my bullets."  When she's saying to

17   him, "You changed your story," it's in reaction to his assertion

18   of "They are my bullets."  It's a shade of difference.  It is a

19   difference.

20    And, again, she's not telling him to say something

21   different, to communicate anything different to law enforcement,

22   to communicate anything different when he testified.  She is

23   asserting her opinion that what you're saying now is not what

24   you were saying -- what you said previously when you talked to

25   me about this issue.

1     So I think as well that doesn't meet the standard of a
2     preponderance of the evidence for obstruction as far as
3     influencing or attempting to influence relation of anything to
4     law enforcement or anybody's testimony.

5          Another basis that was cited by probation in the PSR was her
6     testimony.  She testified about her opinion of the videos.  The
7     jury found her guilty.  We don't know what went on back in that
8     deliberation room, and it's their prerogative to take the
9     evidence, to analyze it, to make the decisions that they found
10    to be appropriate.  I don't think that leads to a direct
11    conclusion that her testimony is the equivalent of perjury,
12    which I think is what we would need for -- for the obstruction
13    to be based on that.

14         It's -- not noted in the probation report but noted in the
15    United States' sentencing memo, so I want to address it, is her
16    providing information for the PSR with respect to her finances.
17    Ms. Craft did participate in an interview.  She sat down and
18    talked to probation for about an hour.  While she has been in
19    custody, she has quite, I guess, expectedly not been able to
20    manage her own finances.  Her mother has been taking care of
21    that for her.

22         Probation noted that her accounts had around $7,000 when she
23    went in.  Ms. Craft reported that what they currently contain is
24    not known.  That's because her mother's been paying her bills.
25    The family puts money in the account.  Mom pays bills.  Mom did

1    report later to us those accounts now have maybe 5,000, maybe a

2    little less.

3        I don't think her not knowing the current state of her bank

4    accounts is an indication of her not being cooperative, given

5    her inability to get that information easily and relying on her

6    79-year-old mother in order to pay her bills.

7        So recognizing Ms. Craft testified -- a jury heard from her.

8    A jury found her guilty -- I still don't think certainly that

9    her testimony rises to the level that the Court can find

10   obstruction, finding that the testimony's equivalent to perjury

11   but also those other two events, the phone message from the

12   daughter and the conversation with Mr. Watts.

13       MR. TIEKE:  Your Honor, just briefly, the two-level

14   enhancement, 3C1.1, was appropriately applied here.  It can

15   apply if the defendant willfully obstructed or impeded, or

16   attempted to obstruct, the administration of justice in the

17   conduct related to the offense.  And, of course, as the Court

18   knows, the application notes provide a nonexhaustive list of

19   those examples, which include threatening, intimidating, or

20   otherwise unlawfully influencing a witness.

21       I'll start with the statements in her conversation with

22   Mr. Watts.  Mr. Watts certainly didn't perceive it as a semantic

23   in terms of a switch from "thought" to "knew."  In fact, he

24   testified at trial that she was trying to set him up.  So that

25   is certainly not how Mr. Watts perceived the conversation that

1    took place, I'll remind the Court, after Mr. Watts had met with

2    the FBI and provided information about the two bullets that the

3    Pinedas received.

4        Ms. Craft learned of that, became upset, and in Mr. Watts'

5    words at trial, "accused me of changing my story" and was trying

6    to, quote, "set her up -- set me up."  And so I don't think it's

7    just a semantics issue.  I think it's an issue more akin to what

8    Mr. Watts perceived that conversation as, as he testified to in

9    front of this Court, and that was an attempt to change his

10   story, an attempt to get him to change his story.

11       Regarding the attempt -- Ms. Craft's attempt to influence

12   the investigation through her daughter, asking her to tell the

13   truth was asking her to tell Ms. Craft's truth at that time.

14   The Court heard testimony about how, on that same day that

15   Ms. Craft received the target letter, her daughter called

16   Mr. Watts and left a voicemail in which she described seeing the

17   bullets in a location that Mr. Watts had never even put them.

18   He told the Court that when he testified.

19       And so Mr. Watts talked about how the call was weird.  It

20   came from Ms. Craft's phone when his daughter has her own cell

21   phone.  And he became upset because he believed his daughter was

22   forced to make this call.  And so that would support yet another

23   attempt to influence testimony at trial.

24       And, finally, the issue of Ms. Craft's testimony at trial,

25   of course she has the right to testify.  One of the examples as

detailed under the application notes includes committing,

suborning, or attempting to suborn perjury, including during the

course of a civil proceeding, if such perjury pertains to the

conduct that forms the basis of the offense of conviction.

     The Court heard the testimony in this case, including that

of Ms. Craft.  In particular, I mean, the Court heard Craft's

testimony during which she denied being involved in all the

events of this case, including events which are captured on the

video.

     And the United States would submit that in reviewing that

testimony in the transcript, that it was not the result of

confusion, mistake, or faulty memory.  And the testimony that

this Court heard from Ms. Craft at trial, I think, would permit

it to make the necessary findings in order to apply the

enhancement.

     But, again, that's just one of the ways that this

enhancement in this particular case applies.  And so under any

one of those three scenarios, her blatant acts of attempting to

influence the testimony of R.W. or her daughter, as well as her

testimony regarding her actions, would warrant the two-level

enhancement under 3C1.1.

          MS. REA:  One response, Your Honor.  I will say, with

respect to what Ms. Craft's daughter observed herself prior to

her call to her dad -- neither party chose to call her.  So I

think where we are right now, what we know is what's been

1    reported about conversations by Ms. Craft and by Mr. Watts.

2    Neither of us called her.  So we don't have before the Court

3    information about what she actually observed, you know, whether

4    she was relating what she has indeed seen.  That's not something

5    we've heard about.

6          THE COURT:  Well, 3C1.1 provides that if the defendant

7    wilfully obstructed or impeded, or attempted to obstruct or

8    impede, the administration of justice with respect to the

9    investigation, prosecution, or sentencing of the instant

10   offense, then two levels are added.  And the application note

11   there provides, as Mr. Tieke pointed out, a nonexhaustive list

12   of examples, which include unlawfully influencing a witness or

13   attempting to do so.

14       I find by a preponderance of the evidence, relying on the

15   trial testimony of Mr. Watts as well as, in part, the

16   concessions made by Ms. Craft during her testimony, all of which

17   showed that at minimum Ms. Craft attempted to unlawfully

18   influence the testimony of Mr. Watts -- she contacted him via

19   text in November of 2020, after he had left their household and

20   was living elsewhere, and told him at that time that "They say I

21   put bullets in their mailbox" and sent him a photo of bullets.

22   He testified that he knew that the bullets were his at that

23   point because of the watermarks on them.

24       He testified in May of 2022 before the grand jury.  In June,

25   he advised the defendant that he had testified that the bullets

1   belonged to him.  And then at trial he testified regarding these

2   transactions in rather difficult fashion.  I observed that it

3   was not something he seemed to relish doing.  He -- but he

4   answered the questions, and he testified under oath during trial

5   that Ms. Craft accused him of changing his story about the

6   bullets having been identified as his.

7       In other words, he had said, as he testified, that "those

8   were my bullets" from the beginning of when they were first

9   identified.  And he took her interference with him or

10   suggestions to him, or attempted interference, as suggesting

11   that she was, in his words, "trying to set me up."

12       Also, with respect to the voicemail he received from his

13   daughter, which came from Ms. Craft's phone, that came on the

14   same day that the parties agree that Ms. Craft received what's

15   known as a target letter from the Department of Justice putting

16   her on official notice that she was under investigation for

17   these crimes.

18       Mr. Watts testified that it was odd that his daughter would

19   call him from her mother's phone, since she had her own phone,

20   and he testified that the daughter suggesting that she had seen

21   the bullets in a drawer at his prior residence -- I think he

22   testified the second residence he lived in after leaving the

23   house on ███████ -- was in his words -- forced, I think, is

24   the word he used.  He said, "It just seems like she was forced

25   to make the phone call," and that was upsetting to him.

1      In sum, there is sufficient evidence here, as I said, to

2  establish that Ms. Craft directly and indirectly engaged, or

3  attempted to engage, in obstructive conduct with knowledge that

4  she was the subject of an investigation.  And so I find that the

5  two-level enhancement is properly applied.

6      Are there any other objections not previously raised that we

7  need to take up?

8           MS. REA:  No, Your Honor.

9           MR. TIEKE:  Not from the United States, Your Honor.

10  Thank you.

11           THE COURT:  Are there any motions to be heard?

12           MR. TIEKE:  No, Your Honor.

13           THE COURT:  The Government, in its memorandum, seemed

14  to indicate an interest in a motion for upward departure.  Is

15  the Government proceeding with that?

16           MR. TIEKE:  Yes, Your Honor.  I apologize.  We are

17  seeking a motion for an upward departure in this case.

18           THE COURT:  I'll hear you on that now.

19           MR. TIEKE:  Your Honor, I want to couch this in terms

20  of disparities.  So I'll link it back to my arguments under the

21  factors, since, you know, an upward departure does implicate

22  that.  But as the PSR notes, there are factors warranting such a

23  departure in this case, and it's exactly what is contemplated by

24  certain guideline provisions that are directly applicable in

25  this case.

1    For reference, 2A6.1 contemplates an upward departure in

2    instances when the offense involved substantially more than two

3    threatening communications to the same victim or multiple

4    victims.  5K2.3 contemplates an upward departure in instances

5    where the victims suffer extreme and severe psychological

6    injury.  And 5K2.8 discusses an upward departure if the

7    defendant's conduct was unusually heinous, cruel, brutal, or

8    degrading to the victim.  In this case, Ms. Craft's egregious

9    and disgusting conduct falls in each and every one of those

10   provisions supporting an upward departure.

11   Regarding the number of threats, over a two-month period,

12   she sent substantially more than two threats to the Pinedas with

13   such threats to multiple victims at times, targeting the family

14   generally at other times, and directing her hate at M.P. or the

15   Pineda children specifically.  So under 2A6.1, an upward

16   departure is warranted.

17   But perhaps more than the number of threats and the multiple

18   victims is the extreme psychological injury the Pinedas suffered

19   as a result of the extremely -- and I'll use the guideline

20   words -- "heinous, cruel, egregious, and degrading conduct."

21   This Court heard testimony and, in fact, will hear later from

22   the Pinedas themselves about the effects of this conduct.  The

23   Court heard how the family slept together in one room in the

24   interior of their house because they feared for their safety.

25   The Court will hear -- heard how the Pinedas' oldest child

1    recounted how she gave up her dream of playing softball.  She

2    didn't want to drive or go to college or stayed at home because

3    she feared leaving her family.

4        The Pinedas' oldest son at trial talked about how he became

5    reclusive, stopped going outside, and about how his younger

6    sister, who was directly threatened by Craft, stayed up all

7    night peering out her bedroom windows on the lookout for acts of

8    terror from Ms. Craft.

9        The mothers testified that they feared for the safety of

10   their family, began homeschooling their children, and about how

11   their family continues to suffer from the senseless acts of

12   hatred.

13       And this is not the sort of violent psychological torment

14   from which a family, especially children, recover from quickly.

15   The damage brought cannot be undone by a guilty verdict or even

16   a sentencing done by this Court.  Though that would be a measure

17   in recognition of the wrongs done to them, their recovery will

18   be a long process of regaining the trust and a sense of safety

19   in a world for them that's been shattered.

20       And so, Your Honor, for all of those reasons, the facts of

21   this case fit squarely within each of those provisions I cited

22   supporting an upward departure.  And for those reasons, we

23   request a moderate upward departure in this case to a 120-month

24   sentence.

25            MS. REA:  And, Your Honor, what we requested, in light

1    of the objections that we had made to the enhancement, would be

2    a downward variance to get to that same sentencing range based

3    on the 3553(a) factors.

4        The Court has heard throughout the trial and today a lot

5    about the characteristics of the offense and the seriousness of

6    the offense.  And now the Court's about to sentence Ms. Craft,

7    the person, in part based on those things but also on her own

8    history and characteristics.

9        I will not spend time going through in detail, but I'll

10   refer to the letters that were submitted to the Court that put

11   Ms. Craft more in context.  Ms. Craft is more than the person

12   that was depicted to the Court over the trial that we had back

13   in March.

14       As you saw from the letters, she's a caring daughter.  She's

15   a good friend, relative to close family members, very close to

16   her siblings.  Above everything else, she is a committed mother

17   to her daughter.  She will always be that no matter what the

18   sentence is, no matter if she's being a committed mother to her

19   daughter while she is serving a shorter period of time or a

20   longer period of time.

21       She also has a strong employment history of 30 years in the

22   hospitality industry, history with respect to her education.

23   We've heard a lot about her, and you saw it in the letters of

24   caring for animals, be it her own or being stray animals.  She

25   is more than this, and those are things that those factors

1    require the Court to take into consideration.

2        In addition to those strengths, there's also challenges that

3    she faced that are featured in the PSR, a period of abuse as a

4    child for which it seems like she's not received much help.

5    That is treatment that certainly can be provided in a

6    correctional environment, but, arguably, any mental health

7    treatment would be something that is better done in the

8    community.

9        She also had the challenge of living alone with her daughter

10   after she separated from her daughter's father and remained a

11   stalwart supporter of her daughter, both financially and

12   emotionally, and just seeing she got what she needed and moving

13   on to school.  So I'd ask the Court to take into consideration

14   that larger picture of Ms. Craft.

15       With respect to -- I kind of put punishment and

16   deterrence -- at least specific deterrence together.  I think we

17   think of the idea, if you're gonna have this experience in

18   custody, it's going to have an impact on how you live your life.

19   Ms. Craft is about to embark on something that is utterly

20   different from anything she has experienced in her life.  She

21   has not served any significant period of time.  As she stands

22   here now, she's been in custody for one year.  Her life prior to

23   this didn't include anything like that.

24       She also stands convicted of federal felonies.  That is a

25   punishment.  And there is a strong stigma that will go along

1    with these charges that will -- these convictions that will

2    continue to follow her.  So I think those are things to be taken

3    into consideration as well.

4        For someone who's not served any time in life, to be looking

5    out upon a prison sentence -- or not a significant time.  There

6    were, on the district court cases, a few days here and there,

7    but nothing like what she's looking at now.  I think that puts

8    that punishment into very -- into context as the very real

9    period of time that it is.

10       Her ability to move forward, I think, is best reflected in

11   her plans for the future.  However long this sentence is, what

12   she would like to do is to maintain and reconnect with, stay

13   close to and supportive of her mother, who depending on when

14   she's released -- her mother right now is almost 80.  She would

15   live with her mother until she can get a place of her own.

16   She's -- she knows she's not going back to that cul-de-sac.  She

17   is moving forward.

18       She also intends to maintain her relationship with her

19   daughter, to continue to be that mother and to resume working.

20   She has goals to improve her chances of doing well by working on

21   her master's in social work.  She's also, since she's been in

22   custody, been working to learn Spanish through self-study and

23   through conversation with other people.

24       So she is taking advantage of opportunities already for the

25   future.  She will continue to do that.  Many of those

1    opportunities and many of the things that she needs are things

2    that she can get outside of the correctional setting.  So I

3    submit that a lengthy sentence is not necessary for that.

4        We're dealing with serious convictions.  They're felonies.

5    They are Class D felonies.  They involve threats.  Each of them

6    is -- carries no more than five years with no mandatory minimum.

7    I think that's also important.

8        We are not -- the Court is not faced with a case in which

9    there was physical violence enacted on another person.  I'm not

10   saying it's not serious, but I am putting it in context for what

11   it is.

12       So what we are asking the Court to do, knowing her specific

13   background, where she -- her experiences prior to this case and

14   her plans for the future would be to grant a downward variance

15   and to sentence in that same category that we argued for with

16   the objections.  If it had been a 21 and she's a Category I,

17   that would have put us at 37 to 46 months, and that's what we're

18   requesting with the variance.

19            MR. TIEKE:  Your Honor, I think Ms. Rea went into the

20   factors.  If I could, could I supplement --

21            THE COURT:  That's fine.

22            MR. TIEKE:  -- just briefly on the factors, if the

23   Court would entertain.

24       I think that there's -- in terms of the nature and

25   circumstances of the offense, I don't think there's anyone more

appropriate to describe what happened here better than those who
lived it.  The Court will hear from the family.  You heard from
the family at trial.  They submitted victim impact statements to
the Court, and this Court will hear from some of them further
today in just a moment.

In terms of the history and characteristics of the
defendant, while Craft does not have a remarkably significant
criminal history, it's reflective of her character.  Her prior
employment history includes allegations of using the same racist
language.

Consider also her testimony at trial regarding events which
were captured on video.  I think that's also reflective of her
character.  Consider her testimony at trial regarding her
research of the Pineda family to show that they were not black,
her background checks of the family's father where she theorized
to her friends that the Pinedas were stealing Social Security
checks, and her conspiracy that the videos were altered, people
were in disguises, and the Pinedas were evil bitches working in
cahoots with her other neighbors to frame her.

In terms of the need for the sentence imposed to reflect the
seriousness of the offense, this offense was extensive,
pervasive.  And so though nothing can give back the Pinedas
what's been taken from them, the significant upward variance --
upward departure the United States is requesting is just
punishment here.

1    In terms of deterrence -- specific deterrence, I think it's

2  worth noting that only law enforcement intervention in this case

3  stopped the threats.  It's also worth noting that state charges

4  relating to the driveway paintings, home incarceration as part

5  of her pretrial conditions in state court, findings of contempt

6  in state court for violating those pretrial conditions did not

7  deter her.  A strong message from this Court hopefully will.

8    And just in terms of general deterrence, I mean, there can

9  be no doubt that the use of that language that was involved in

10  this case is highly offensive and demeaning.  It evokes a

11  history of racial violence, brutality, and insubordination.

12    Its use can only be expressive of racial hatred and bigotry

13  that belongs in a shameful past of waterfront signs and racial

14  separation.  Her motivated acts of hatred in this case belong to

15  a long forgotten era, and they should stay there.  And this

16  Court is in a position to send a loud and clear message that

17  this community will not retreat in that past.

18    And just to end, in terms of disparities, the reasons in

19  support of the United States' motion justify an upward departure

20  such that it would not represent disparities amongst other

21  defendants that share the specific characteristics and vile

22  nature that this case is.

23    And so for all the reasons that we've discussed -- that the

24  United States has argued today, as well as in its sentencing

25  memo, we will request a sentence of 120 months' imprisonment, a

1    fine at the low end of the guideline range followed by three

2    years of supervised release.  And the United States would

3    proffer that that sentence is not greater than necessary to

4    comply with 3553(a) and is certainly warranted in this case.

5              THE COURT:  I'm gonna defer a ruling on that motion

6    for the moment.

7        Is there anything further with respect to the factors set

8    out by Congress in Section 3553(a) that you would like to bring

9    up?

10             MS. REA:  Not that I have not addressed, Your Honor.

11   Thank you.

12             THE COURT:  Anything further in that category,

13   Mr. Tieke?

14             MR. TIEKE:  No, not with respect to the 3553(a)

15   factors, Your Honor.

16             THE COURT:  And, Ms. Rea, does Ms. Craft wish to

17   address the Court?

18             MS. REA:  No, Your Honor.

19             THE COURT:  Very well.  And let me just state for the

20   record and for those here who may be interested, I have

21   carefully reviewed all of the submissions that you made in

22   Ms. Craft's behalf.

23       I have also, of course, considered carefully the victim

24   impact statements submitted by the United States.  Does the

25   Government wish to provide, by way of testimony or statement,

1    anything further?

2          MR. TIEKE:  Yes, Your Honor.  Two of the family

3    members would like to address the Court in person here.  And

4    then one member of the family will be seated, and Ms. Zimdahl

5    has a statement that she would read on her behalf.

6       So by way of testimony, the United States would have M.P.

7    approach the podium, please.

8          M.P.:  Good afternoon.  November 2020, Ms. Craft, her

9    hate and lack of self control came to a point of no return when

10   she sent my family several death threats.  Those threats were

11   taken very seriously.  I am still in fear today, looking over my

12   shoulder everywhere I go.

13      I heard her message loud and clear.  I repeat, her message

14   was heard loud and clear.  Her intention was to instill fear in

15   me and to unalive my children and myself.  She was in the minds

16   of my entire family every night as I kissed the kids good night.

17   I would reassure them that I would be sleeping in the living

18   room, keeping an eye on the door, protecting them.

19      I gave her my power every evening at the dinner table when

20   our conversations always seemed to circle back around to her and

21   the ways that she harassed us earlier in the day.  Up until the

22   day before her arrest, we were being harassed by her.  So I

23   heard her message loud and clear.  I did.

24      I'm begging you, Judge Hale, please now send a message that

25   Ms. Craft hears loud and clear, that Ms. Craft and anyone else

1   who wants to follow in her footsteps traumatizing and harming

2   children the way that she has mine can hear loud and clear by

3   holding her accountable and sending her to prison for a very,

4   very long time.

5      In closing, I do want to say that I hold no hate in my heart

6   for her anymore.  I refuse to be held captive by her.  There's

7   just a big room of emptiness, nothingness in the space that was

8   once filled by her.  I take my power back, and I release this

9   cord that bound us together, and I leave it all here.  I do not

10   care one way or another when I walk out this room how her life

11   goes, but I can tell you that mine will be beautiful.

12      I will walk into my home and put my arms around my beautiful

13   children, and I will tell them that it is -- it's over, and I

14   will give them the tightest hug.  The children that she tried to

15   destroy with her hate will find comfort in my arms and will

16   eventually heal.  She does not get to continue into the next

17   chapter of my book.  Her story ends here when I walk out.  Thank

18   you.

19          MR. TIEKE:  Your Honor, K.P. from the Pineda family.

20          K.P.:  Good morning, Judge Hale.  Thank you for giving

21   me the opportunity to speak today.

22      I'm very grateful this day has finally come.  It's been a

23   long time coming for my siblings and I.  Many times we thought

24   we would actually never be here, but we are and I'm eternally

25   grateful.

1        Ms. Craft has created so much turmoil in our lives, and I

2   don't believe she will ever acknowledge or take accountability

3   for what she has caused.  Any apology she could ever offer would

4   be insincere at this point and unwelcome.

5        I do hope that she receives the maximum amount of time that

6   this Court could legally give.  Unfortunately, I feel as though

7   she still would not take accountability or acknowledge any

8   wrongdoing.

9        I hope she never gets the chance to chase down another

10  family with a 3,000 pound weapon on the highway.  I hope she

11  never gets the chance to threaten to run over another little

12  girl, and I hope she never has the opportunity to threaten to

13  unalive another family and send bullets to their children.

14       Ms. Craft tried to destroy my family.  In some ways she has

15  succeeded.  I will not sit here and give her the concession of

16  telling her how she has affected my family.  I will just say

17  that we're strong and determined to get back on track, but she

18  was very -- she was very determined to destroy my family.  She

19  actually destroyed her own, and I hope that -- I hope this was

20  all -- I hope all this was worth it.

21       In the end, my moms are still here.  She was unsuccessful

22  with her plans to unalive us because, you see, I have two very

23  caring parents that are determined to raise us to be kind,

24  respectful, and happy human beings.  We get the privilege of

25  having our parents very present in our daily lives.  She lost

1    that privilege, and I hope she understands what she has done.

2    Thank you.

3            MR. TIEKE:  Finally, Your Honor, Ms. Zimdahl will read

4    a statement on behalf of S.P.

5            MS. ZIMDAHL:  Thank you, Your Honor.

6        I'm gonna read this on behalf of one of the victim children:

7                It's Sunday, July 23rd, and I'm writing this.  And up

8                until today, I had no intention of speaking.  In fact,

9                I was under a lot of pressure to talk during the trial

10               and give my statement, but I just couldn't.

11               I couldn't get myself to speak up out of fear.  The

12               very sound of Ms. Craft's name made me feel as if I

13               was shaking inside and put so much fear inside my

14               heart.  So when asked to talk about her and all that

15               she has done, all I could do is cry.

16               Today I want to speak up.  Today I want to be heard.

17               I want to help my mom, and I want to help my family.

18               I want to help Chris, Stephanie, Kristin, and Matt,

19               who have worked so hard trying to bring justice to my

20               family.

21               Yesterday I overheard my mom talking to one of my

22               neighbors, and they were mentioning a little girl that

23               used to ride a yellow bike around the cul-de-sac a few

24               years ago.  In fact, it's been very quiet outside

25               because we don't go outside to play due to fear.

1        Ms. Craft has made my mom almost paranoid for our

2        safety, and we're not even allowed in the backyard

3        alone.

4        My parents have tried to shield us from the death

5        threats and the bullets that have come to our house,

6        but this has had an effect on me.  So much has

7        happened, and it has -- it was happening daily, but

8        one thing that I will never forget is Ms. Craft

9        pulling up next to my bike, rolling her window down,

10       and as she pointed in my face, she said, "Stay off my

11       side of the road, or I'll run your ass over."  I was

12       nine years old.  I believed her.  I still believe her.

13       I know that this started with me from the beginning,

14       and I feel responsible for causing so much pain to my

15       moms and my family.  Had I not spoken up when

16       Ms. Craft's daughter called my sister the N-word, I

17       believe this all could have been avoided.  I do feel

18       responsible for bringing so much pain to my family.

19       That little girl on the yellow bike was me.  I still

20       have that yellow bike, but I have not been able to

21       ride it since the day she threatened me.  I stay in

22       the house.  I stay in homeschool.  I don't go to the

23       store with my moms out of fear, and I don't sleep well

24       at night.

25       I have many dreams about Ms. Craft running me over in

1          the cul-de-sac, and she will circle around and run me

2          over again and again and again until I wake up.

3          It's so hard to remember a happy time or a peaceful

4          time in my life before Ms. Craft.  I am 13 years old.

5          It's upsetting that they have the nerve to come here

6          and ask for 36 months.  It just doesn't seem fair

7          because she's been doing this to us for longer than

8          36 months.

9          I am so scared for the day that she will get out of

10         jail.  I am so afraid that she will find me.  My mom

11         told me that Ms. Craft might only get ten years, and

12         that really scares me.  Judge Hale, please make an

13         example out of Ms. Craft.  People like her do not

14         belong in our society.  Thank you.

15         MR. TIEKE:  Nothing further, Your Honor.  Thank you.

16         THE COURT:  Anything further?

17         MS. REA:  No, Your Honor.

18         THE COURT:  Let me first indicate that I am going to

19    deny the Government's motion for an upward departure.  I find it

20    unnecessary here because the guidelines adequately address the

21    conduct at issue, and I see no evidence of any disparity in

22    sentencing that would be caused by a guideline sentence.

23       Before I state the sentence, is there anything else that

24    either side wishes to bring to my attention?

25         MR. TIEKE:  Nothing from the United States, Your

1    Honor.

2            MS. REA:  No, Your Honor.

3            THE COURT:  As previously discussed, I presided over

4    the trial of this matter.  I am well advised regarding the

5    difficult facts of this case as proven at trial.

6        I have carefully reviewed the presentence investigation

7    report.  I have considered the sentencing memoranda submitted by

8    counsel, the victim impact statements, and the letters submitted

9    in support of Ms. Craft.

10       I have considered the applicable advisory sentencing

11   guidelines, and I have ruled upon the objections advanced by the

12   defense counsel to the calculations of the guidelines.  Also, I

13   have carefully considered the sentencing factors that have been

14   established by Congress in Title 18 of the U.S. Code at

15   Section 3553(a) as they apply to Ms. Craft.

16       I will now impose the following sentence:

17       It is the judgment of the court that the defendant, Suzanne

18   Craft, is committed to the custody of the Bureau of Prisons for

19   a term of 21 months as to each of Counts 1 through 3 and

20   23 months as to Counts 4 and 5 in the indictment, to be served

21   consecutive to one another, for a total term of 108 months'

22   imprisonment.

23       Upon release, Ms. Craft shall be placed on supervised

24   release for a term of three years as to each of Counts 1

25   through 5 in the indictment, which shall be served concurrently,

1    for a total of three years.

2         While on supervised release, the defendant shall abide by

3    the standard conditions of supervision adopted by the court as

4    well as the special conditions that have been detailed in Part G

5    of the presentence report.  These special conditions include

6    mental health counseling and absolutely no contact with the

7    victims.  The U.S. probation Office will answer any questions

8    Ms. Craft may have regarding the requirements of these

9    conditions.

10        The defendant is required to pay a special penalty

11   assessment fee of $100 as to each count of conviction for a

12   total of $500.  It is further ordered that the defendant shall

13   pay a fine in the amount of $10,000 with interest waived.  These

14   financial sanctions shall be paid in accordance with the

15   schedule of payments page contained in the judgment.

16        I note here that no request for restitution has been

17   received.  Certainly it would have been appropriate under the

18   facts and circumstances of this case.

19        I have carefully considered the history and characteristics

20   of the defendant.  As has been noted, Ms. Craft has a minimal

21   criminal history, though I will also note that as we have

22   discussed, the proof shows that when she committed the offense

23   conduct charged in Counts 1 through 5, she ignored a state court

24   issued no contact order dated July 20, 2020.

25        The court also acknowledges, as is detailed in paragraphs 68

1    and 74 of the PSR, that the defendant suffered abuse as a child

2    and likely suffers from PTSD as a result of that childhood

3    abuse.

4        I have also considered the nature and circumstances of the

5    offenses here.  The offenses and related conduct proven at trial

6    were shocking, vile, cruel, degrading, and disturbing, and they

7    were not committed in some passing moment of anger or annoyance.

8    No, these were well-considered threats of violence against

9    children communicated in increasingly disturbing fashion over

10   many months and, as has been documented, with serious

11   consequences to the victim family.  We cannot tolerate or excuse

12   horrific threats of violence against people, especially

13   children, who are targeted because of their race.  The scope and

14   severity of these acts justify a sentence at the upper end of

15   the guidelines.

16       As I outlined at the outset, the guidelines here produce a

17   total offense level of 29 against a criminal history category of

18   I, resulting in a recommended guideline range of between 87 and

19   100 months in custody, a fine range of between 30,000 and

20   300,000, and a range of one to three years of supervised

21   release.

22       As to the other relevant factors set out in Section 3553(a),

23   I conclude that this sentence properly reflects the seriousness

24   of these sentence -- of these offenses.  The combined sentence

25   will promote respect for the law and afford adequate deterrence

1    to similar criminal conduct.  It will also protect the public

2    from further crimes of the defendant.

3        Accordingly, I conclude that a sentence of 108 months is

4    sufficient but not greater than necessary to comply with the

5    purposes set forth in Section 3553(a)(2) and satisfies the

6    applicable statutory provisions.  Under the facts of this case,

7    this sentence represents just punishment.

8        Are there any objections to the sentence that I've just

9    announced or the special conditions I listed which have not

10   previously been raised?

11           MR. TIEKE:  No, Your Honor.

12           MS. REA:  No, Your Honor.

13           THE COURT:  We now need to discuss Ms. Craft's appeal

14   rights.

15       Ms. Craft, you have the right to appeal your convictions and

16   the right to appeal the sentence I just imposed if you believe

17   it was illegally or incorrectly imposed.  Any notice of appeal

18   must be filed within 14 days of the entry of judgment or within

19   14 days of any notice filed by the United States.

20       If you need the assistance of the clerk's office, they will

21   upon request assist you in filing that notice of appeal.  If you

22   cannot afford the filing fee associated with that notice of

23   appeal, you may ask that it be waived.  And if you cannot afford

24   counsel on appeal, you may ask that counsel be appointed to

25   represent you free of charge.  Do you understand these appeal

```
 1    rights that I've outlined for you?

 2             THE DEFENDANT:  Yes, Your Honor.

 3             THE COURT:  Do we have any other issues to address at

 4    this time?

 5             MR. TIEKE:  Not from the United States, Your Honor.

 6             MS. REA:  The only thing I would ask for the judgment,

 7    Your Honor, is that the Court ask that BOP attempt to place her

 8    as close as possible to Louisville.

 9             THE COURT:  I assume --

10             MR. TIEKE:  No objection, Your Honor.

11             THE COURT:  I will include that.

12        Let me correct, I think, my own mathematical error.  At the

13    outset, I stated that the defendant is committed to the custody

14    of the Bureau of Prisons for a term of 21 months as to each of

15    Counts 1 through 3.  I should have said 22 months for Count 4

16    and 23 months for Count 5.  I believe that math adds up to 108.

17    Is that correct, Mr. Tieke?

18             MS. REA:  That is what I get, Your Honor.

19             MR. TIEKE:  What were the numbers, Your Honor?  21,

20    21, 21, 23, and 24?  No?

21             THE COURT:  21, 21, 21 -- your cocounsel says I have

22    it right.

23             MR. TIEKE:  That's correct, Your Honor.

24             THE COURT:  22 and 23 for Counts 4 and 5 to add up to

25    a total of 108.  I misread my own note there.  The sum total is
```

1    unchanged by that correction of the subparts.

2        Again, anything else either side wishes to bring to my

3    attention?  I will include that recommendation in the judgment,

4    Ms. Rea.  Anything else?

5            MS. REA:  No, Your Honor.  Thank you.

6            MR. TIEKE:  No.  Thank you, Your Honor.

7            THE COURT:  It goes without saying, I believe, for

8    anyone who has followed this case that this has been a very

9    difficult case.  Thankfully, it is a rare case in this district.

10       I will just make in closing a couple of observations.

11   Ms. Craft, for you it is my hope that you will take stock and

12   that you will live up to the standards that your family

13   communicated to me they believe you already live up to.  It is

14   my hope that you will repudiate this threatening and racist

15   behavior.

16       For the victims and the victim family, I will simply say

17   that I wish for you healing in family and community, and I will

18   say that I know it will be better.  And I hope for you, you will

19   reach that same conclusion in the not too distant future.

20       The defendant will be remanded to the custody of the U.S.

21   Marshal, and we will now be adjourned.

22       (Proceedings concluded at 3:10 p.m.)

23

24

25

```
1                    C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5
           s/Dena Legg                    September 21, 2023
6   Certified Court Reporter No. 20042A157    Date
    Official Court Reporter
7

8                    REDACTION CERTIFICATE
         I certify that the foregoing is a true and correct copy of
9   the transcript originally filed with the clerk of court on
    09/21/23 and incorporating redactions of personal identifiers
10  requested by the following attorney of record: Angela M. Rea in
    accordance with Judicial Conference policy.  Redacted characters
11  appear as a black box in the transcript.

12         s/Dena Legg                    October 30, 2023
    Certified Court Reporter No. 20042A157  Date
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```